Nossaman LLP
Allan H. Ickowitz (SBN 110797)
Robert S. McWhorter (SBN 226186)
John W. Kim (SBN 216251)
445 S. Figueroa Street, 31st Floor
Los Angeles, California 90071
Telephone: 213.612.7800
Facsimile: 213.612.7801
aickowitz@nossaman.com
rmcwhorter@nossaman.com
jkim@nossaman.com

Attorneys for The Federal Deposit Insurance Corporation

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No: 2:09-bk-35127-VZ |
| GTS 900 F, LLC, a California limited liability company, aka Concerto, | Chapter 11 |
| Debtor, | **THE FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ASSUME SALES CONTRACTS AND COMPLETE SALE OF CONDOMINIUMS FREE AND CLEAR OF LIENS (WITH LIENS TO ATTACH TO SALE PROCEEDS)** |
| Tax Id #20-2396211 | |
| | [EVIDENTIARY OBJECTIONS TO DECLARATIONS OF SONNY ASTANI AND DAVID A. ZORASTER IN SUPPORT OT MOTION TO ASSUME FILED CONCURRENTLY HEREWITH] |
| | DATE: October 27, 2009<br>TIME: 11:00 a.m.<br>PLACE: U.S. Bankruptcy Court<br>Courtroom 1360<br>233 East Temple Street<br>Los Angeles, CA 90012 |

378205_1.DOC

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT. ...................................................1

II.   ANALYSIS OF FACTS...............................................................................................3

III.  ARGUMENT..............................................................................................................8

    A.    There Is No Statutory Basis For Approval Of Assumption Of The Residential
        Loft Unit Sale Contracts Or For Their Sale Free And Clear Of The Lender's
        Lien Under 11 U.S.C. § 363. ...........................................................................8

IV.   CONCLUSION ........................................................................................................13

FDICS MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO
ASSUME SALES CONTRACTS AND COMPLETE SALE OF CONDOMINIUMS FREE AND CLEAR OF LIENS

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Affiliated Nat'l Bank-Englewood v. TMA Assocs., Ltd.*
*(In re TMA Assocs., Ltd.)*, (D. Co. 1993) 160 B.R. 172 ...................................... 10

*Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*,
(B.A.P. 9th Cir. 2008) 391 B.R. 25 .................................................... 9, 10, 12

*In re Wester*,
(Bankr. N.D. Fla. 1988) 4 B.R. 770 ............................................................. 10

**Statutes**

11 U.S.C. § 363(b) ....................................................................................... 8, 10

11 U.S.C. § 363(c) ............................................................................................. 8

11 U.S.C. § 363(e) ........................................................................................... 12

11 U.S.C. § 363(f) ......................................................................................... 2, 8

11 U.S.C. § 363(f)(3) ................................................................................. 11, 12

11 U.S.C. § 363(f)(5) ................................................................................... 9, 11

11 U.S.C. § 506(a) ........................................................................................... 12

11 U.S.C. § 1129(b)(2) ...................................................................................... 9

11 U.S.C. § 1129(b)(2)(A) .............................................................................. 10

12 U.S.C. § 1821 ................................................................................................ 4

12 U.S.C. § 1821(d)(2)(A)(i) ............................................................................ 1

12 U.S.C. § 1823(e) ........................................................................................... 2

**Other Authorities**

3 Collier on Bankruptcy
(Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008)................... 10, 12

FDICS MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO
ASSUME SALES CONTRACTS AND COMPLETE SALE OF CONDOMINIUMS FREE AND CLEAR OF LIENS

**TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES BANKRUPTCY JUDGE, DEBTOR AND ITS COUNSEL OF RECORD, THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:**

The Federal Deposit Insurance Corporation, in its capacity as Receiver of Corus Bank, N.A. (*"FDIC"*)[1], submits the following Memorandum of Points and Authorities in opposition to the Motion by the Debtor, GTS 900 F, LLC (*"Debtor"*) for Order Authorizing Debtor to Assume Sales Contracts and Complete Sale of Condominiums Free and Clear of Liens (With Liens to Attach to Sale Proceeds) (the, *"Motion"*). In support of this opposition, the FDIC respectfully submits as follows:

## I. INTRODUCTION AND SUMMARY OF ARGUMENT.

The Debtor's Motion seeks to play fast and loose with the FDIC's security for repayment of a loan, the present outstanding amount of which the Debtor asserts is in excess of $162 million. (Schedule A of Debtor's Schedules and Statement of Affairs filed on October 2, 2009 and entered as Docket No. 29.)[2] The Debtor's Motion seeks the Court's approval for its assumption of sale contracts entered into pre-petition for all 77 of the condominium units referred to as the "Residential Loft Units"[3] in the Project which the Debtor represents will generate net revenue of $28,765,592. (Motion, page 10, lines 8-9.) The Debtor seeks to carve these units out of the FDIC's lien despite the fact that such a dissection of real estate collateral is not permitted by applicable law or by the Debtor's Construction Loan Agreement with Corus Bank. In other words, the Debtor does not propose merely to sell the FDIC's collateral free and clear of liens but to first excise a portion of that collateral, sell that portion of the

---

[1]  The Debtor correctly notes in its Motion that the FDIC was appointed as receiver of Corus Bank, N.A. ("Corus Bank") on September 11, 2009 by Order of the Office of the Comptroller of the Currency ("OCC"). As a result, the FDIC succeeded to all of the rights in the lien against the Project and the loan in connection therewith pursuant to 12 U.S.C. § 1821(d)(2)(A)(i) which provides that the FDIC as receiver of Corus Bank succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." The FDIC is in the process of marketing equity interests in a limited liability company to which certain assets of Corus Bank including the loan and claims against the Debtor will be transferred; the FDIC will remain the owner of a majority of the equity interests in such limited liability company. The sale has not yet closed.

[2]  The Debtor indicates that the outstanding amount outstanding on the Corus Bank loan is approximately $160 million in the Motion itself. Motion, page 5, lines 14-15.

[3]  Capitalized terms not defined herein shall have the meanings set forth in the Motion.

378205_1.DOC                                       -1-

collateral for only a fraction of the total debt owed to the secured creditor and then use the proceeds to pay for what the Debtor speculates will complete construction of the remainder of the collateral. There in no basis in 11 U.S.C. 363(f) or any other authority for the Debtor's proposed gamble with the FDIC's secured debt. Many of the contentions identified in the declarations supporting the Debtor's Motion are based on speculation that is without adequate evidentiary support.

The Debtor acknowledges that the proposed sale prices are materially below the partial release prices required by the Loan Agreement and represent a substantial decline in the projected values of the collateral when the subject loan was made.[4] Nevertheless, and despite the fact that the current market is severely depressed, the Debtor asserts that completing an unsupported and discounted sale of units will adequately protect the FDIC's security interest. The Debtor's position is misplaced. Further, the Debtor should not be permitted to spend nearly $10 million of the approximately $28 million in net proceeds of those loft sales to attempt to complete construction of the Debtor's remaining real estate project .

The Debtor posits that the expenditure of those funds will be sufficient to complete the Project (without providing any proof that the funds will suffice) which will enhance the value of the FDIC's lien to such an extent that the FDIC will be adequately protected. The Debtor contends adequate protection will be established despite the fact that approximately 22% of the total number of residential units in the Project will have been sold for net proceeds significantly less than the loan exposure per sellable square foot (even after allocating a portion of the loan to Tower II and its parking). How can this be the case given the grave market and economic conditions besetting the glutted Downtown Los Angeles residential real estate market? The Debtor's Motion is not adequately supported because it relies upon (i) speculative projections of what its declarants believe the value of the completed project will be (ii) a business model that includes an expedited timetable for the completion of sales of remaining non-loft

---

[4] While the Debtor also intimates that there may have been some unspecified communications or other indications relating to the possibility of a different approach to sales than reflected in the Loan Agreement based on Corus Bank's awareness of the "present market condition" (See Astani Declaration, para. 38, page 15, lines 4 to 16.) Any such discussions not reduced to a written agreement signed by Corus Bank, approved by Corus Bank's Board or loan committee and maintained continuously as a record of Corus Bank, which the Debtor does not allege to have been the case, has no legal effect whatsoever in any event and certainly not vis a vis the FDIC pursuant to 12 U.S.C. § 1823(e).

1    units that is contrary to professional opinions that the dire residential market conditions will not recover

2    substantially during the next 12 to 18 months and (iii) unit prices that are not optimal for the Property.

3        Even if applicable law permitted the sale of a portion of a lender's secured property for less than

4    the outstanding amount of the secured debt, which it does not, such a sale cannot be based on adequate

5    protection claims that depend upon projections of _possible_ future values. This is particularly so in light

6    of the fact that the Debtor proposes to spend and/or retain the proceeds of its loft sales without turning

7    them over to the FDIC.

8    **II.     ANALYSIS OF FACTS.**

9        The subject of the Motion is the loft tower comprising of two residential buildings in Phase 1 of

10   the Concerto Project. Phase 1 of the Project also includes retail and parking facilities.

11       The Debtor's Motion, if granted, would allow the Debtor to sell the Residential Loft Units on

12   terms resulting from the "sales event" conducted on August 29, 2009. (Motion, page 9, lines 24 to 28.)

13   However, the sale cannot proceed unless the Debtor obtains an Order severing the FDIC's lien against

14   the entire Project. The Debtor's Motion does not demonstrate sufficient legal authority to decree a

15   partial release from the applicable trust deed under the circumstances in this case. Further, the Debtor's

16   supporting declarations provide insufficient factual support that the proposed sale prices reflect an

17   accurate value of the partial lien covering those pro-rated units of the Residential Loft Units. Further, it

18   is unclear if the proposed sale would leave sufficient collateral value in the Property to protect the

19   FDIC's secured interest in the remaining collateral.

20       The Debtor and its supporting declarants engage in an extensive discourse regarding the

21   purported upswing in economic and real estate market conditions that will ensure that the remainder of

22   the Project will result in satisfying the balance under the Loan Agreement. The Debtor also argues that

23   the proposed sale prices for the Residential Loft Units are "optimal" despite the fact that those units

24   would be sold for an average price of only $399,539 per unit (based upon the gross aggregate prices of

25   $30,764,513) or $368 per square foot[5], close to 40% less than the $600 per square foot minimum

26   "weighted average gross sales price" required by the Loan Agreement dated July 2, 2007. That Loan

27

28   [5]     See the second paragraph on page 2 of Exhibit 1 attached to the Declaration of David A. Zoraster in support of the Motion.

| | |
|---|---|
| 1 | Agreement also requires that any such sale contracts be approved by the FDIC. (See Sections 7.16(b)(4) |
| 2 | and 7.22 on pages 40 to 43 and 44 to 46 Exhibit 5 attached to the Declaration of Sonny Astani filed in |
| 3 | support of the Motion, hereinafter the "*Astani Declaration*.") |
| 4 |       In order to realize the allegedly enhanced value for the remaining unsold portions of the Project, |
| 5 | however, the Debtor seeks the relief requested by its accompanying Motion for an Order Authorizing |
| 6 | Use of Cash Collateral (Proceeds of Sales of Residential Loft Units), hereafter the "*Cash Collateral* |
| 7 | *Motion*." In its Cash Collateral Motion, the Debtor seeks authorization to use nearly $10 million of the |
| 8 | sale proceeds, which the Debtor acknowledges constitute the FDIC's cash collateral, to complete |
| 9 | construction of the unfinished portion of the Project and for the payment of approximately $864,000 |
| 10 | plus another $258,000 in so-called "General Conditions" to the Debtor's insider general contractor, |
| 11 | Astani Construction, Inc. (Exhibit 1 attached to the Cash Collateral Motion; Astani Declaration, para. |
| 12 | 16, page 5, lines 22 to 27; Maddox Declaration, para. 17, page 5, lines 4 to 10.) While the remaining |
| 13 | proceeds would be retained subject to the FDIC's lien under the Motion and Cash Collateral Motion, |
| 14 | there is no provision in either motion for their remittance to the FDIC nor are any details provided by the |
| 15 | Debtor regarding measures that would be taken to insure the preservation of those funds. |
| 16 |       The Debtor's assertion that the FDIC's lien will be adequately protected following the approval |
| 17 | of both of the subject motions contradict each other and in the final analysis fly in the face of the unclear |
| 18 | economic and real estate conditions in the Downtown Los Angeles residential and retail markets in |
| 19 | general. The Debtor justifies its "auction" bulk sale of the Residential Loft Units and the low prices |
| 20 | resulting from that process by referring to various delays allegedly caused by Corus Bank as well as |
| 21 | depressed market conditions. See Motion, page 10, lines 10 to 18.[6] |
| 22 | |

---

[6]     The Debtor's lengthy discourse regarding the purported effects of delays and breaches allegedly committed by Corus Bank and the adverse consequences to the completion of the Project and the sale of loft units have no relevance to the outcome of this Motion. The Debtor does not seek any relief based upon such allegations in connection with the Motion and, therefore, there is no need to address those allegations in opposing the Motion. Those allegations are the subject of a lawsuit commenced by the Debtor against Corus Bank prior to its seizure and appointment of the FDIC as Receiver. The Debtor filed a Notice of Removal of that litigation to this Court. However, 12 U.S.C. § 1821 provides that any such alleged claims are claims against the Corus Bank receivership estate and will be adjudicated in the FDIC administrative claims process not in this Court during which time any litigation must be stayed. The jurisdictional issues affecting that litigation will be raised by the FDIC as appropriate The FDIC does not acknowledge the validity or accuracy of any of such allegations and disputes such allegations.

The Debtor also argues that the FDIC will be adequately protected by the completion of the remainder of the Project and its enhanced value that will result in the FDIC holding a substantial equity cushion even after excluding the proceeds from the Residential Loft Units. However, a careful analysis of the Debtor's supporting declarations evidence clearly indicates that the Debtor's claims regarding adequate protection are misplaced.

The Debtor's Financial Projection Model attached as Exhibit 1 to the Declaration of James R. Maddox filed in support of the Motion ("**Maddox Declaration**") and the Maddox Declaration assume that the Project construction will be completed by the end of 2009 and that sales of the 277 Tower units will be completed by the end of 2010. The Debtor speculates that 102 Tower units will be sold in March and April of 2010 and the remaining 169 units will be sold at the rate of 20 units per month thereafter. (Maddox Declaration, para. 20, page 5, lines 20 to 23.) These projections are materially more optimistic than those made in the January, 2009 appraisal purportedly obtained by Corus Bank and attached as Exhibit 1 to the Astani Declaration. That January, 2009 appraisal assumed a four year absorption period for the Project's residential units to be sold at a rate of 7.25 units per month, a fraction of that in the Debtor's current estimates.[7] (Exhibit 1 attached to the Astani Declaration at page 2, second paragraph.) There is no evidence furnished by the Debtor demonstrating that the excessive inventory of downtown housing has been removed from the market to a degree sufficient to cut the time to absorb the Project units from four years to about 15 months.[8]

[7]    The FDIC is not supporting or relying upon the January, 2009 appraisal in connection with this Motion except for the material cited herein. Given the volatility of the economy and real estate market, the appraisal is stale for purposes of the pending Motion. Given the time constraints particularly the press of activities and transactions which the FDIC has had to address in the time period since the recent establishment of the receivership and transactions relating to sale of Corus Bank's assets by the FDIC as Receiver, the FDIC is not in a position within the time prior to the deadline for filing papers in opposition to the Motion to procure a current appraisal of the Project. In addition, the FDIC disputes the accuracy of the Debtor's statements regarding the amounts outstanding under the subject loan or the accrual or payment of interest thereunder. The FDIC reserves the right to submit its own facts regarding those items as soon as they can be compiled and made available.

[8]    It is interesting to note that the Debtor's accusations regarding Corus Bank's alleged conduct as the cause of the Debtor's delay in completing and marketing the Project are revealed to have no merit whatsoever by the Debtor's own moving papers. According to the January, 2009 appraisal, the projected completion of the Project at that time prior to the alleged events described in the Astani Declaration, was the end of 2009. (Page 1, para. 1.) As a result, the litany of allegations concerning the delays in completion caused by Corus Bank and it collapse had no impact whatsoever on when the Debtor otherwise would have completed or sold the units in the Project.

378205_1.DOC                                    -5-

The Debtor's own moving papers are incomplete and inconsistent and confirm that the "comfortable" equity margin the Debtor assures will be created for the FDIC, will not exist in reality. The Debtor does not offer a current full appraisal report in support of the Motion. Rather, the Debtor submits a "Valuation Letter" attached as Exhibit 1 to the Declaration of David A. Zoraster filed in support of the Motion ("*Zoraster Declaration*"). The only arguably relevant opinion on the question of whether the risk the Debtor seeks to impose upon the FDIC is warranted is the current "as is" market value conclusion. That portion of the valuation letter reaches the conclusion that the "as is" value for the Project including the 77 units the Debtor proposes to sell pursuant to this Motion, is only $142,200,000. (Zoraster Declaration, Exhibit 1, page 2, Bates Page No. 005.) Mr. Zoraster states that, "Our as is value includes the $30,764,513 total sales prices for the 77 units in the low-rise loft condominium building." (*Id.*, second paragraph on page 2, Bates Page No. 005.)

Given that the Debtor proposes to spend nearly $10 million of the loft sale proceeds initially and continues to retain the remaining funds thereby making it possible for the Debtor to seek permission to spend more later, the actual, present value of the FDIC's collateral in the opinion of the appraiser that the Debtor itself has retained is reduced to $132,200,000, leaving the FDIC undersecured by approximately $30 million using the Debtor's own calculations. If the even more speculative value of the undeveloped parcel planned as the site for Phase II which Mr. Zoraster opines has a value of $34,100,000 is added, the FDIC's lien would barely be covered with absolutely no equity cushion leaving the FDIC without adequate protection.

Recognizing that the "as is" value of the Project could not warrant granting the Debtor's Motion, the Debtor asserts that the completion of the Project as proposed will result in a greatly enhanced value of $179,900,000 according to the Zoraster valuation letter. (That number goes up to $214,400,000 per the Zoraster valuation letter when the vacant land for Phase II is added.) Even at a $179,900,000 value and assuming that all of the Debtor's rosy and unrealistic projections of the future turn out to be accurate, the FDIC's lien is barely covered when a year of interest at the 7.36% rate referred to the Motion is accrued and added. The end result--still no significant cushion for the FDIC's lien.[9] (Maddox

---

[9] Unimproved land, i.e. the future site of Phase II cannot, in this market, be relied upon as a basis for a literal taking of a substantial portion of the FDIC's lien.

1  Declaration, para. 19, page 5, lines 17 to 19.)  Even the outdated January, 2009 appraisal concluded that

2  what was referred to as the "estimated Prospective 'bulk discounted' market value…upon completion

3  and assuming all costs have been expended, of the condominium sell-out, as of January 1, 2010, will be

4  $187,000,000."  (Exhibit 1 attached to the Astani Declaration, page 3, Bates Page No. 21.)  This number

5  reflects the type of sales proposed in the Motion rather than an orderly absorption such as that assumed

6  by a retail analysis.  Again, once the proceeds from the sale of the Loft Residential Units are subtracted

7  and accruing interest is added, the FDIC would have no significant cushion for adequate protection

8  purposes, particularly if the Debtor is permitted to dispose of $10 million in cash.

9          The Debtor's projections regarding the purported value of the finished Project, however, are just

10  that and are not germane to the instant Motion.  Those projections should not be considered in

11  determining whether to grant the relief sought by the Debtor.  Even if that were not the case, the Debtor

12  fails to provide any backup for its construction cost projections to demonstrate that the Project actually

13  will be completed for that amount, or to detail the precise outlays that the Debtor proposes to make and

14  why they represent payments for work to be conducted post-petition rather than improper payments for

15  pre-petition obligations to contractors, subcontractors and suppliers.

16          Moreover, the Debtor's assertion that the value of the remaining Project will be enhanced by

17  completion and will be marketable at the values asserted by the Debtor is based upon what the Debtor

18  describes as the improvement in circumstances affecting the Downtown residential market such as the

19  effects of Government economic stimuli and stock market improvements.  (Astani Declaration, para. 42,

20  page 16, lines 10 to 25.)  There is no realistic basis for such optimism for the foreseeable future.  In fact,

21  the January, 2009 appraisal indicates that as of the end of 2008, vacancy levels in Downtown Los

22  Angeles were projected to increase from just under 10% to 12.8% by 2012 although these numbers are

23  for apartment housing rather than condominium sales per se.  This was due not only to increasing rents

24  but also growth in supply, i.e., an increase in housing stock in the market.  (Exhibit 1 attached to the

25  Astani Declaration, page 35 of Report, Bates Page No. 61.)  Although that report cited expectations that

26  the economy in the form of GDP would stabilize in the second half of 2009, the report also stated that

27  "significant risks remain."  (Exhibit 1 attached to the Astani Declaration, page 26 of Report, Bates Page

28  No. 52.)

In fact, actual developments during 2009 have been worse.  For example, the United States Bureau of Labor Statistics web site discloses that as of October 7, 2009, unemployment continued its upward trend nationwide through September, 2009.  (See Exhibit 1 attached hereto available at www.bls.gov and of which the Court is respectfully requested to take judicial notice.)  Specifically, conditions are worse here in California where unemployment continued to rise thought August to 12.2% per Bureau of Labor Statistics data as included in Exhibit 2 attached hereto from the Bureau's web site at www.bls.gov and of which the Court also is respectfully asked to take judicial notice.

As if to somehow justify the Debtor's attempt to take more than one-third of the already deflated proceeds from the proposed Residential Loft Units sales, the Debtor states repeatedly that the Debtor has itself assumed risks with respect to the Project in the past to the extent that some $60 million in alleged equity invested in the property.  Nowhere are any details presented establishing this investment or how it was actually expended.  Moreover, even if this amount represents cash actually spent out of pocket, it is an equity investment and is completely irrelevant to the issue of adequate protection.

## III.   ARGUMENT.

### A.   There Is No Statutory Basis For Approval Of Assumption Of The Residential Loft Unit Sale Contracts Or For Their Sale Free And Clear Of The Lender's Lien Under 11 U.S.C. § 363.

Leaving aside the issues of whether or not the proposed sales are in the ordinary course of business under 11 U.S.C. § 363(c) or outside of the ordinary course of business under 11 U.S.C. § 363(b), the Debtor cannot assume or complete those sale transactions unless the Court approves of the sales free and clear of the lender's lien pursuant to Section 363(f).  The Debtor cannot satisfy the requirements of that statute and, therefore, the Motion must be denied.  Although the Debtor discusses all of the Section 363(f) subparagraphs in its Motion, the only provision for which an argument could conceivably be made in this case are subparagraphs (3) and (5).  The Debtor appropriately makes no attempt to assert that subparagraph (1) allowing such a sale if applicable nonbankruptcy law permits a sale free and clear of the subject interest applies.  Subparagraph (2) is rendered inapplicable by the submission of this Opposition and the fact that the FDIC does not consent to the proposed sales.  The Debtor makes no claim that subparagraph (4) applies (e.g., that the FDIC's interest is in bona fide dispute).

The Debtor contends that subparagraph (5) of Section 363(f) does apply in this case because the FDIC's claim could be crammed down under a plan of reorganization that implemented the terms of the proposed sale. Section 363(f)(5) applies only if the secured creditor could be compelled "in a legal or equitable proceeding" to accept money in an amount less than the full amount of its claim in satisfaction of its interest. The Debtor's position is based upon certain courts having interpreted the statute to provide that a "cramdown" as part of a Chapter 11 plan confirmation proceeding under 11 U.S.C. § 1129(b)(2) is a type of "proceeding" that could be brought to compel the lien holder to accept a money satisfaction of less than the total amount owing on the creditor's claim for the release of the creditor's interest for purposes of Section 363(f)(5). Thus, if the proposed sale could be crammed down against the secured creditor under Section 1129(b)(2), the sale should be permitted under Section 363(f)(5).

The Debtor notes that courts are divided over the question of whether or not a cramdown pursuant to a Chapter 11 plan is the type of legal or equitable proceeding by which a lien holder could be compelled to accept money in satisfaction of its lien such that a sale free and clear of that lien can be approved under Section 363(f)(5). The Debtor offers no case law in this Circuit to support the interpretation that the Debtor urges this Court to adopt. In fact, the Ninth Circuit Bankruptcy Appellate Panel expressly rejected the Debtor's construction of subparagraph (5) in its decision in *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 46 (B.A.P. 9th Cir. 2008). There, the BAP noted that,

> "The Trustee points out that courts have found that cramdown under § 1129(b)(2) is a qualifying legal or equitable proceeding. See, e.g., *In re Gulf States Steel*, 285 B.R. at 508; *In re Grand Slam USA, Inc.*, 178 B.R. 460, 462 (E.D. Mich. 1995); *In re Healthco*, 174 B.R. at 176; *In re Terrace Chalet Apts.*, 159 B.R. at 829.
>
> We disagree with the reasoning of these courts. As a leading treatise recognizes, use of the cramdown mechanism to allow a sale free and clear under § 363(f)(5) uses circular reasoning - it sanctions the effect of cramdown without requiring any of § 1129(b)'s substantive and procedural protections. 3 COLLIER ON BANKRUPTCY, supra, at P 363.06[6]. If the proceeding authorizing the satisfaction was found elsewhere in the Bankruptcy Code, then an estate would not need § 363(f)(5) at all; it could simply use the other Code provision.
>
> In addition, this reasoning undercuts the required showing of a separate proceeding. For example, it is correct that § 1129(b)(2) permits a cramdown of a lien to the value of the collateral, but it does so only in the

context of plan confirmation. To isolate and separate the cramdown from the checks and balances inherent in the plan process undermines the entire confirmation process, and courts have been leery of using § 363(b) to gut plan confirmation or render it superfluous

We thus hold that Congress did not intend under § 363(f)(5) that nonconsensual confirmation be a type of legal or equitable proceeding to which that paragraph refers. As a result, the availability of cramdown under § 1129(b)(2) is not a legal or equitable proceeding to which § 363(f)(5) is applicable." (Footnotes omitted.)

Even if this Court were to reject the BAP's decision in the *Clear Channel* case, the decisions that the Debtor relies on have required that the proposed sale be "fair and equitable" from the perspective of the secured creditor who is being compelled to forego its lien on the portion of the property being sold as would be required under a plan pursuant to 11 U.S.C. § 1129(b). See, e.g., *In re Wester*, 4 B.R. 770, 772 (Bankr. N.D. Fla. 1988); *Affiliated Nat'l Bank-Englewood v. TMA Assocs., Ltd. (In re TMA Assocs., Ltd.)*, 160 B.R. 172 (D. Co. 1993). In order to satisfy that requirement, the debtor must provide assurance that the terms of the proposed sale will not diminish the value of the secured creditor's lien and that the sale will not affect the value of the remaining property in a way that the creditor will lose the protection of whatever equity cushion is presently available. *In re Wester*, 84 B.R at 772. Moreover, the creditor must either (1) retain its lien and receive the deferred cash payments with present value at least equal to the claim, or (2) the property securing the claim is to be sold and the lien is to attach to the proceeds of the sale, with the lien on the proceeds to be treated as described in (1) or (3), or (3) the creditor is to realize the "indubitable equivalent" of its secured claim. See 11 U.S.C. § 1129(b)(2)(A); Motion, page 29, lines 15 to 21.

The proposed sales in this case do not satisfy the "fair and equitable" requirements that would be applicable in a cram down context, contrary to the Debtor's claims. As discussed above, the Debtor does not and cannot establish that the value of the remaining Project plus the proceeds of the Residential Loft Units will leave the FDIC with the same equity cushion and collateral value as it has today. This is because the Debtor's proposed sales are for prices that do not realize the fair value of those units being sold and will decrease the value of the FDIC's collateral by an amount in excess of the sale proceeds that would be realized. Even if that were not the case, the Debtor proposes not only to partially release the creditor's lien with respect to the units being sold but also to dispose of $10 million of those

proceeds--more than a third of the total proceeds--with the lien holder retaining its lien against only the

remaining proceeds and without any assurance that the value of the remaining Project will be increased

as a result given the uncertainty regarding completion of the Project and the declining Downtown Los

Angeles residential housing market. Moreover, the Debtor proposes to retain the balance of the sale

proceeds without remitting them to the FDIC to apply against the Debtor's outstanding indebtedness.

The Debtor's premise in asking for authorization to conduct the subject sales free and clear of

liens is that the proposed terms should be imposed because they will facilitate an otherwise feasible plan

of reorganization in this case. The suggestion that a plan that generates sufficient proceeds to pay the

FDIC in full cannot be supported by current market and economic conditions.

The Debtor's assertion that the Motion should be granted under 11 U.S.C. § 363(f)(3) also must

fail. As is the case with Section 363(f)(5), the Debtor notes that there is a split in authority between

those courts that allow a sale free and clear of liens under that subsection only if the sale proceeds are

sufficient to satisfy the <u>amounts</u> owed to lien holders in full, on the one hand, and those courts which

hold that the statute requires payment of only the value <u>of the collateral</u> securing the liens. Again, the

Debtor relies upon authority outside of the Ninth Circuit and differs with the clear ruling by the Ninth

Circuit BAP in the *Clear Channel* decision which disagreed with the Debtor's reading by the Trustee in

that case and by the Debtor in the within case:

> "We disagree. This reading expands <u>§ 363(f)(3)</u> too far. It would
> essentially mean that an estate representative could sell estate property
> free and clear of any lien, regardless of whether the lienholder held an
> allowed secured claim. We think the context of <u>paragraph (3)</u> is
> inconsistent with this reading. If Congress had intended such a broad
> construction, it would have worded the paragraph very differently. See
> *Ron Pair Enters*. 489 U.S. at 242 n.5 (Congress knows distinction
> between types of liens, and language of the Bankruptcy Code should be
> interpreted in a way that acknowledges that knowledge). For this reason,
> many courts and commentators have rejected this approach. See, e.g.,
> *Richardson v. Pitt County (In re Stroud Wholesale, Inc.)*, 47 B.R. 999,
> 1002 (E.D.N.C. 1985), aff'd mem., 983 F.2d 1057 (4th Cir. 1986); *Scherer
> v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159
> B.R. 821 (N.D. Ill. 1993); *In re Perroncello*, 170 B.R. 189 (Bankr. D.
> Mass. 1994); *In re Feinstein Family P'ship*, 247 B.R. 502 (Bankr. M.D.
> Fla 2000); *In re Canonigo*, 276 B.R. 257 (Bankr. N.D. Cal. 2002); *Criimi
> Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*,
> 298 B.R. 527 (D.N.J. 2003); see also *In re Healthco Int'l, Inc.*, 174 B.R.
> 174 (Bankr. D. Mass. 1994); 3 <u>COLLIER ON BANKRUPTCY</u> P

363.06[4][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008).

But another reason, rooted in the text of the paragraph, exists to reject such an expansive reading. Paragraph (3) permits the sale free and clear only when "the price at which such property is to be sold is greater than the aggregate value of all liens . . . ." 11 U.S.C. 363(f)(3) (emphasis added). If, as DB and the Trustee assert, "aggregate value of all liens" means the aggregate amount of all allowed secured claims as used in § 506(a), then the paragraph could never be used to authorize a sale free and clear in circumstances like those present here; that is, when the claims exceed the value of the collateral that secures them. In any case in which the value of the property being sold is less than the total amount of claims held by secured creditors, the total of all allowed secured claims will equal, not exceed, the sales price, and the statute requires the price to be "greater than" the "value of all liens." See, e.g., *In re Gen. Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992).

As a result, we join those courts cited above that hold that § 363(f)(3) does not authorize the sale free and clear of a lienholder's interest if the price of the estate property is equal to or less than the aggregate amount of all claims held by creditors who hold a lien or security interest in the property being sold." (Footnotes omitted.)

In any event, even if the Court does not follow the rule enunciated by the court in *Clear Channel*, those courts which have allowed sales free and clear of liens under 11 U.S.C. § 363(f)(3) for less than the full amount of lien holders' claims have done so, as the Debtor notes, on the condition that no such sale is permitted unless the secured creditor is provided with adequate protection of its interest as required by Section 363(e). The Debtor's sale of the 77 Residential Loft Units in this case as the Debtor intends to complete fails to provide such adequate protection. By proposing to carve those units out of the FDIC's lien, the Debtor would strip the FDIC of a substantial portion of its security without any assurance that the remaining Project will maintain its current value or will increase in value in an amount sufficient to offset the proceeds that the Debtor seeks to use pursuant to the Cash Collateral Motion.

1    **IV.    CONCLUSION**

2        On the basis of the foregoing, the FDIC respectfully requests that the Court deny the Motion and

3    grant such other and further relief as is just and proper under the circumstances herein.

4

5    Dated: October 13, 2009                    NOSSAMAN LLP
                                                 Allan H. Ickowitz
6                                                Robert S. McWhorter
                                                 John W. Kim
7
8                                                By: _____
                                                     ALLAN H. ICKOWITZ
9                                                Attorneys for The Federal Deposit Insurance Corporation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FDICS MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ASSUME SALES CONTRACTS AND COMPLETE SALE OF CONDOMINIUMS FREE AND CLEAR OF LIENS**

EXHIBIT 1

UNITED STATES DEPARTMENT OF LABOR

Search: All BLS.gov | for: | Search

**125 YEARS**
**BUREAU OF LABOR STATISTICS**

Newsroom | Tutorials | Release Calendar

Home    Subject Areas    Databases & Tables    Publications    Economic Releases

A - Z Index | About BLS

## Databases

FONT SIZE:

**Change Output Options:** From: 1999 To: 2009 GO

☐ include graphs

More Formatting Options ➡

Data extracted on: October 7, 2009 (4:41:43 PM)

**Labor Force Statistics from the Current Population Survey**

```
Series Id:            LNS14000000
Seasonal Adjusted
Series title:        (Seas) Unemployment Rate
Labor force status:  Unemployment rate
Type of data:        Percent
Age:                 16 years and over
```

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|--------|
| 1999 | 4.3 | 4.4 | 4.2 | 4.3 | 4.2 | 4.3 | 4.3 | 4.2 | 4.2 | 4.1 | 4.1 | 4.0 | |
| 2000 | 4.0 | 4.1 | 4.0 | 3.8 | 4.0 | 4.0 | 4.0 | 4.1 | 3.9 | 3.9 | 3.9 | 3.9 | |
| 2001 | 4.2 | 4.2 | 4.3 | 4.4 | 4.3 | 4.5 | 4.6 | 4.9 | 5.0 | 5.3 | 5.5 | 5.7 | |
| 2002 | 5.7 | 5.7 | 5.7 | 5.9 | 5.8 | 5.8 | 5.8 | 5.7 | 5.7 | 5.7 | 5.9 | 6.0 | |
| 2003 | 5.8 | 5.9 | 5.9 | 6.0 | 6.1 | 6.3 | 6.2 | 6.1 | 6.1 | 6.0 | 5.8 | 5.7 | |
| 2004 | 5.7 | 5.6 | 5.8 | 5.6 | 5.6 | 5.6 | 5.5 | 5.4 | 5.4 | 5.5 | 5.4 | 5.4 | |
| 2005 | 5.2 | 5.4 | 5.2 | 5.2 | 5.1 | 5.1 | 5.0 | 4.9 | 5.0 | 5.0 | 5.0 | 4.8 | |
| 2006 | 4.7 | 4.8 | 4.7 | 4.7 | 4.7 | 4.6 | 4.7 | 4.7 | 4.5 | 4.4 | 4.5 | 4.4 | |
| 2007 | 4.6 | 4.5 | 4.4 | 4.5 | 4.5 | 4.6 | 4.7 | 4.7 | 4.7 | 4.8 | 4.7 | 4.9 | |
| 2008 | 4.9 | 4.8 | 5.1 | 5.0 | 5.5 | 5.6 | 5.8 | 6.2 | 6.2 | 6.6 | 6.8 | 7.2 | |
| 2009 | 7.6 | 8.1 | 8.5 | 8.9 | 9.4 | 9.5 | 9.4 | 9.7 | 9.8 | | | | |

Quick Links

**Tools**
⊠ At a Glance Tables
⊠ Economic News Releases
⊠ Databases & Tables
⊠ Maps

**Calculators**
⊠ Inflation
⊠ Location Quotient
⊠ Injury And Illness

**Help**
⊠ Help & Tutorials
⊠ A to Z Index
⊠ FAQs
⊠ Glossary
⊠ About BLS
⊠ Contact Us

**Info**
⊠ What's New
⊠ Careers @ BLS
⊠ Find It! DOL
⊠ Join our Mailing Lists
⊠ Privacy & Security
⊠ Linking & Copyright Information

Frequently Asked Questions | Freedom of Information Act | Customer Survey

U.S. Bureau of Labor Statistics 2 Massachusetts Avenue, NE Washington, DC 20212-0001

www.bls.gov | Telephone: (202) 691-5200 | Do you have a Data question?

bls.gov

EXHIBIT 2

 **U.S. Bureau of Labor Statistics**

## Economy at a Glance

# California

| California | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Series** | **Back Data** | **Mar 2009** | **Apr 2009** | **May 2009** | **June 2009** | **July 2009** | **Aug 2009** |
| **Labor Force Data** | | | | | | | |
| Civilian Labor Force (1) |  | 18,614.9 | 18,629.5 | 18,540.6 | 18,501.5 | 18,458.5 | (P) 18,390.5 |
| Employment (1) |  | 16,523.1 | 16,564.0 | 16,387.9 | 16,347.4 | 16,259.0 | (P) 16,142.5 |
| Unemployment (1) |  | 2,091.8 | 2,065.5 | 2,152.8 | 2,154.0 | 2,199.5 | (P) 2,248.0 |
| Unemployment Rate (2) |  | 11.2 | 11.1 | 11.6 | 11.6 | 11.9 | (P) 12.2 |
| **Nonfarm Wage and Salary Employment** | | | | | | | |
| Total Nonfarm (3) |  | 14,475.1 | 14,412.3 | 14,351.5 | 14,285.4 | 14,246.9 | (P) 14,234.6 |
| 12-month % change |  | -4.2 | -4.7 | -4.9 | -5.1 | -5.1 | (P) -4.9 |
| Mining and Logging (3) |  | 27.9 | 27.5 | 27.5 | 27.0 | 26.9 | (P) 26.7 |
| 12-month % change |  | -1.4 | -4.2 | -3.8 | -5.6 | -6.3 | (P) -7.0 |
| Construction (3) |  | 674.8 | 665.4 | 655.3 | 643.8 | 632.4 | (P) 625.4 |
| 12-month % change |  | -18.3 | -18.3 | -18.4 | -18.4 | -18.7 | (P) -18.5 |
| Manufacturing (3) |  | 1,338.2 | 1,324.0 | 1,314.1 | 1,306.8 | 1,302.3 | (P) 1,299.6 |
| 12-month % change |  | -7.1 | -8.0 | -8.5 | -8.7 | -8.8 | (P) -8.6 |
| Trade, Transportation, and Utilities (3) |  | 2,719.9 | 2,700.2 | 2,695.3 | 2,682.8 | 2,673.7 | (P) 2,666.6 |
| 12-month % change |  | -6.0 | -6.6 | -6.5 | -6.7 | -6.6 | (P) -6.7 |
| Information (4) |  | 461.9 | 455.1 | 448.1 | 445.3 | 442.9 | (P) 446.3 |
| 12-month % change |  | -3.3 | -4.4 | -6.8 | -7.9 | -6.4 | (P) -6.1 |
| Financial Activities (3) |  | 813.7 | 807.3 | 804.4 | 802.4 | 801.8 | (P) 800.8 |
| 12-month % change |  | -5.8 | -6.0 | -6.0 | -5.8 | -5.3 | (P) -5.0 |
| Professional & Business Services (3) |  | 2,151.7 | 2,141.8 | 2,131.4 | 2,117.0 | 2,112.4 | (P) 2,111.6 |
| 12-month % change |  | -4.8 | -5.4 | -5.6 | -5.8 | -6.1 | (P) -5.9 |
| Education & Health Services (3) |  | 1,750.0 | 1,744.8 | 1,744.3 | 1,743.5 | 1,738.4 | (P) 1,744.4 |
| 12-month % change |  | 2.3 | 1.1 | 1.2 | 1.1 | 0.9 | (P) 0.8 |

| In re: GTS 900 F., LLC, a California limited liability company, aka Concerto | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 09-35127-VZ |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**Nossaman LLP, 445 S. Figueroa Street, 31st floor, Los Angeles, CA 90071**

The foregoing document described **THE FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ASSUME SALES CONTRACTS AND COMPLETE SALE OF CONDOMINIUMS FREE AND CLEAR OF LIENS (WITH LIENS TO ATTACH TO SALE PROCEEDS)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 13, 2009**. I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On **October 13, 2009**. I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 13, 2009**. I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Hon. Vincent P. Zurzolo
U.S. Bankruptcy Court
Central District of California
Courtroom 1360
233 East Temple Street
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 13, 2009 | Marlene Bonilla | *Marlene Bonilla* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

| In re: GTS 900 F., LLC, a California limited liability company, aka Concerto | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 09-35127-VZ |

## CATEGORY I.  To Be Served By The Court Via Notice Of Electronic Filing ("NEF"):

Cathrine M Castaldi    ccastaldi@rusmiliband.com
Andy Kong    Kong.Andy@ArentFox.com
David S Kupetz    dkupetz@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
Mette H Kurth    kurth.mette@arentfox.com
Dare Law    dare.law@usdoj.gov
Joel S. Miliband    jmiliband@rusmiliband.com
Gregory M Salvato    gsalvato@pmcos.com, calendar@pmcos.com
Marcus Tompkins    mtompkins@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

## CATEGORY II.  Served By U.S. Mail:

Richard A. Clark, Esq.
Gary Ganchrow, Esq.
Parker, Milliken, Clark, et al.
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071-2440

Michael S. Kogan, Esq.
Ervin, Cohen & Jessup LLP
9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974

Debtor
GTS 900 F, LLC
C/O Sonny Astani
Concerto Manager, Inc.
9595 Wilshire Blvd., Ste 1010
Beverly Hills, CA  90212

CORUS Bank, N.A.
c/o Dean A. Isaacs, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606

Attorneys for Debtor
Alan G. Tippie, Esq.
SulmeyerKupetz
333 South Hope Street, 35th Floor
Los Angeles, CA  90071

PricewaterhouseCoopers
Acting on behalf of FDIC as Receiver of Corus Bank, N.A.
Attn: Mike Mulhern, Project Manager
3959 N. Lincoln Avenue
Chicago, Ill 60613

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 **F 9013-3.1**