| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | Nossaman LLP<br>Allan H. Ickowitz (SBN 110797)<br>Robert S. McWhorter (SBN 226186)<br>John W. Kim (SBN 216251)<br>445 S. Figueroa Street, 31st Floor<br>Los Angeles, California 90071<br>Telephone: 213.612.7800<br>Facsimile: 213.612.7801<br>aickowitz@nossaman.com<br>rmcwhorter@nossaman.com<br>jkim@nossaman.com |
| 7 | Attorneys for The Federal Deposit Insurance Corporation |

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GTS 900 F, LLC, a California limited liability company, aka Concerto,<br><br>Debtor,<br><br>Tax Id #20-2396211 | Case No: 2:09-bk-35127-VZ<br><br>Chapter 11<br><br>**THE FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (PROCEEDS OF SALES OF RESIDENTIAL LOFT UNITS)**<br><br>[EVIDENTIARY OBJECTIONS TO DECLARATIONS OF SONNY ASTANI AND JAMES R. MADDOX IN SUPPORT OF MOTION RE CASH COLLATERAL FILED CONCURRENTLY HEREWITH]<br><br>DATE: October 27, 2009<br>TIME: 11:00 a.m.<br>PLACE: U.S. Bankruptcy Court<br>Courtroom 1360<br>233 East Temple Street<br>Los Angeles, CA 90012 |

378351_1.DOC

**FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (PROCEEDS OF SALES OF RESIDENTIAL LOFT UNITS)**

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT. .................................................................. 1

II. ANALYSIS OF FACTS ............................................................................................................. 3

III. ARGUMENT. .......................................................................................................................... 8

    A. The Debtor's Proposed Use of Cash Collateral Consisting of Proceeds of The Sales of Residential Loft Units Is Improper Under The Facts Of This Case. .................... 8

    B. The Debtor's Proposed Use of Cash Collateral Consisting of Proceeds of The Sales of Residential Loft Units Is Improper Based Upon Applicable Law ........................ 9

IV. CONCLUSION. ...................................................................................................................... 10

-i-

FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (PROCEEDS OF SALES OF RESIDENTIAL LOFT UNITS)

# TABLE OF AUTHORITIES

Page

**Cases**

*Alvucan Interstate Corp.*,
 12 B.R. 803 (Bankr. D. Utah 1981) ................................................................................. 9

*In re Pine Lake Village Apartment Co.*,
 16 B.R. 750 (Bankr. S.D.N.Y. 1981) ............................................................................. 10

*In re Stein*,
 19 B.R. 458 (Bankr. E.D. Pa. 1982) .............................................................................. 10

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
 (1988) 484 U.S. 365 ........................................................................................................ 9

**Statutes**

11 U.S.C. § 361 .......................................................................................................................... 8

11 U.S.C. § 549 .......................................................................................................................... 9

12 U.S.C. § 1821 ........................................................................................................................ 5

12 U.S.C. § 1821(d)(2)(A)(i) ..................................................................................................... 1

12 U.S.C. § 1823(e) ................................................................................................................... 2

TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES BANKRUPTCY JUDGE, DEBTOR AND ITS COUNSEL OF RECORD, THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:

The Federal Deposit Insurance Corporation, in its capacity as Receiver of Corus Bank, N.A. ("**FDIC**")[1], submits the following Memorandum of Points and Authorities in opposition to the Motion by the Debtor, GTS 900 F, LLC ("**Debtor**") for Order Authorizing Use of Cash Collateral (Proceeds of Sales of Residential Loft Units) (the, "**Motion**"). In support of this opposition, the FDIC respectfully submits as follows:

## I. INTRODUCTION AND SUMMARY OF ARGUMENT.

The Debtor's Motion seeks to play fast and loose with the FDIC's security for repayment of a loan, the present outstanding amount of which the Debtor asserts is in excess of $162 million. (Schedule A of Debtor's Schedules and Statement of Affairs filed on October 2, 2009 and entered as Docket No. 29.)[2] The Debtor has filed a companion motion for an Order Authorizing Debtor to Assume Sales Contracts and Complete Sale of Condominiums Free and Clear of Liens (With Liens to Attach to Sale Proceeds), hereinafter referred to as the "**Sale Motion**").

As detailed in this Motion and the Sale Motion, the Debtor seeks the Court's approval for its assumption of sale contracts entered into pre-petition for all 71 of the condominium units referred to as the "Residential Loft Units"[3] in the Debtor's 7-story residential loft building for what the Debtor represents is a net price of $28,765,592. (Motion, page 9, lines 26-27). The Debtor seeks to carve these

---

[1] The Debtor correctly notes in its Motion that the FDIC was appointed as receiver of Corus Bank, N.A. ("Corus Bank") on September 11, 2009 by Order of the Office of the Comptroller of the Currency ("OCC"). As a result, the FDIC succeeded to all of the rights in the lien against the Project and the loan in connection therewith pursuant to 12 U.S.C. § 1821(d)(2)(A)(i) which provides that the FDIC as receiver of Corus Bank succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." The FDIC is in the process of marketing equity interests in a limited liability company to which certain assets of Corus Bank including the loan and claims against the Debtor will be transferred; the FDIC will remain the owner of a majority of the equity interests in such limited liability company. The sale has not yet closed.

[2] The Debtor indicates that the outstanding amount outstanding on the Corus Bank loan is approximately $160 million in the Motion itself. Motion, page 5, lines 14-15.

[3] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

-1-

units out of the FDIC's lien despite the fact that such a dissection of real estate collateral is not permitted by applicable law or by the Debtor's Construction Loan Agreement with Corus Bank. In other words, the Debtor does not propose merely to sell the FDIC's collateral free and clear of liens but to first excise a portion of that collateral, sell that portion of the collateral for only a fraction of the total debt owed to the secured creditor and then use the proceeds to pay for what the Debtor speculates will complete construction of the remainder of the collateral. There in no basis in 11 U.S.C. 363(f) or any other authority for the Debtor's proposed gamble with the FDIC's secured debt. Many of the contentions identified in the declarations supporting the Debtor's Motion are based on speculation that is without adequate evidentiary support.

The Debtor acknowledges that the proposed sale prices are materially below the partial release prices required by the Loan Agreement and represent a substantial decline in the projected values of the collateral when the subject loan was made.[4] Nevertheless, and despite the fact that the current market is severely depressed, the Debtor asserts that completing an unsupported and discounted sale of units will adequately protect the FDIC's security interest. The Debtor's position is misplaced. Further, the Debtor should not be permitted to spend nearly $10 million of the approximately $28 million in net proceeds of those loft sales to attempt to complete construction of the Debtor's remaining real estate project.

The Debtor posits that the expenditure of those funds will be sufficient to complete the Project (without providing any proof that the funds will suffice) which will enhance the value of the FDIC's lien to such an extent that the FDIC will be adequately protected. The Debtor contends adequate protection will be established despite the fact that approximately 22% of the total number of residential units in the Project will have been sold for net proceeds significantly less than the loan exposure per sellable square foot (even after allocating a portion of the loan to Tower II and its parking). How can this be the case given the grave market and economic conditions besetting the glutted Downtown Los Angeles residential real estate market? The Debtor's Motion is not adequately supported because it relies upon

---

[4] While the Debtor also intimates that there may have been some unspecified communications or other indications relating to the possibility of a different approach to sales than reflected in the Loan Agreement based on Corus Bank's awareness of the "present market condition" (See Astani Declaration, para. 38, page 15, lines 4 to 16.) Any such discussions not reduced to a written agreement signed by Corus Bank, approved by Corus Bank's Board or loan committee and maintained continuously as a record of Corus Bank, which the Debtor does not allege to have been the case, has no legal effect whatsoever in any event and certainly not vis a vis the FDIC pursuant to 12 U.S.C. § 1823(e).

-2-

1 (i) speculative projections of what its declarants believe the value of the completed project will be (ii) a
2 business model that includes an expedited timetable for the completion of sales of remaining non-loft
3 units that is contrary to professional opinions that the dire residential market conditions will not recover
4 substantially during the next 12 to 18 months and (iii) unit prices that are not optimal for the Property.

Even if applicable law permitted the sale of a portion of a lender's secured property for less than the outstanding amount of the secured debt, which it does not, such a sale cannot be based on adequate protection claims that depend upon projections of <u>possible</u> future values. This is particularly so in light of the fact that the Debtor proposes to spend and/or retain the proceeds of its loft sales without turning them over to the FDIC.

## II. ANALYSIS OF FACTS.

The subject of the Motion is the loft tower comprising of two residential buildings in Phase 1 of the Concerto Project. Phase 1 of the Project also includes retail and parking facilities.

The Debtor's Motion, if granted, would allow the Debtor to sell the Residential Loft Units on terms resulting from the "sales event" conducted on August 29, 2009. (Motion, page 9, lines 24 to 28.) However, the sale cannot proceed unless the Debtor obtains an Order severing the FDIC's lien against the entire Project. The Debtor's Motion does not demonstrate sufficient legal authority to decree a partial release from the applicable trust deed under the circumstances in this case. Further, the Debtor's supporting declarations provide insufficient factual support that the proposed sale prices reflect an accurate value of the partial lien covering those pro-rated units of the Residential Loft Units. Further, it is unclear if the proposed sale would leave sufficient collateral value in the Property to protect the FDIC's secured interest in the remaining collateral.

The Debtor and its supporting declarants engage in an extensive discourse regarding the purported upswing in economic and real estate market conditions that will ensure that the remainder of the Project will result in satisfying the balance under the Loan Agreement. The Debtor also argues that the proposed sale prices for the Residential Loft Units are "optimal" despite the fact that those units would be sold for an average price of only $399,539 per unit (based upon the gross aggregate prices of $30,764,513) or $368 per square foot[5], close to 40% less than the $600 per square foot minimum

---
[5] See the second paragraph on page 2 of Exhibit 1 attached to the Declaration of David A. Zoraster in

-3-

FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (PROCEEDS OF SALES OF RESIDENTIAL LOFT UNITS)

"weighted average gross sales price" required by the Loan Agreement dated July 2, 2007. That Loan Agreement also requires that any such sale contracts be approved by the FDIC. (See Sections 7.16(b)(4) and 7.22 on pages 40 to 43 and 44 to 46 Exhibit 5 attached to the Declaration of Sonny Astani filed in support of the Motion, hereinafter the "*Astani Declaration*.")

In order to realize the allegedly enhanced value for the remaining unsold portions of the Project, however, the Debtor seeks the relief requested in this Motion. Here, the Debtor seeks authorization to use nearly $10 million of the sale proceeds, which the Debtor acknowledges constitute the FDIC's cash collateral, to complete construction of the unfinished portion of the Project and for the payment of approximately $864,000 plus another $258,000 in so-called "General Conditions" to the Debtor's insider general contractor, Astani Construction, Inc. (Exhibit 1 attached to the Motion; Astani Declaration, para. 16, page 5, lines 22 to 27; Maddox Declaration, para. 17, page 4, line 27 to page 5, line 7.) Independent of the issue of whether any portion of the sale proceeds should be used by the Debtor, there is no reason that the Debtor's own principals and insiders should not be required to defer their payments until the FDIC is paid in full on its claim. While the remaining proceeds would be retained subject to the FDIC's lien under the Motion and Sale Motion, there is no provision in either motion for their remittance to the FDIC nor are any details provided by the Debtor regarding measures that would be taken to insure the preservation of those funds.

The Debtor's assertion that the FDIC's lien will be adequately protected following the approval of both of the subject motions contradict each other and in the final analysis fly in the face of the unclear economic and real estate conditions in the Downtown Los Angeles residential and retail markets in general. The Debtor justifies its "auction" bulk sale of the Residential Loft Units and the low prices resulting from that process by referring to various delays allegedly caused by Corus Bank as well as depressed market conditions. See Motion, page 10, lines 5 to 9.[6]

---

support of the Motion.

[6] The Debtor's lengthy discourse regarding the purported effects of delays and breaches allegedly committed by Corus Bank and the adverse consequences to the completion of the Project and the sale of loft units have no relevance to the outcome of this Motion. The Debtor does not seek any relief based upon such allegations in connection with the Motion and, therefore, there is no need to address those allegations in opposing the Motion. Those allegations are the subject of a lawsuit commenced by the Debtor against Corus Bank prior to its seizure and appointment of the FDIC as Receiver. The Debtor filed a Notice of Removal of that litigation to

-4-

The Debtor also argues that the FDIC will be adequately protected by the completion of the remainder of the Project and its enhanced value that will result in the FDIC holding a substantial equity cushion even after excluding the proceeds from the Residential Loft Units. However, a careful analysis of the Debtor's supporting declarations evidence clearly indicates that the Debtor's claims regarding adequate protection are misplaced.

The Debtor's Financial Projection Model attached as Exhibit 1 to the Declaration of James R. Maddox filed in support of the Motion ("***Maddox Declaration***") and the Maddox Declaration assume that the Project construction will be completed by the end of 2009 and that sales of the 277 Tower units will be completed by the end of 2010. The Debtor speculates that 102 Tower units will be sold in March and April of 2010 and the remaining 169 units will be sold at the rate of 20 units per month thereafter. (Maddox Declaration, para. 20, page 5, lines 20 to 23.) These projections are materially more optimistic than those made in the January, 2009 appraisal purportedly obtained by Corus Bank and attached as Exhibit 1 to the Astani Declaration. That January, 2009 appraisal assumed a four year absorption period for the Project's residential units to be sold at a rate of 7.25 units per month, a fraction of that in the Debtor's current estimates.[7] (Exhibit 1 attached to the Astani Declaration at page 2, second paragraph.) There is no evidence furnished by the Debtor demonstrating that the excessive inventory of downtown housing has been removed from the market to a degree sufficient to cut the time to absorb the Project units from four years to about 15 months.[8]

---

this Court. However, 12 U.S.C. § 1821 provides that any such alleged claims are claims against the Corus Bank receivership estate and will be adjudicated in the FDIC administrative claims process not in this Court during which time any litigation must be stayed. The jurisdictional issues affecting that litigation will be raised by the FDIC as appropriate  The FDIC does not acknowledge the validity or accuracy of any of such allegations and disputes such allegations.

[7]  The FDIC is not supporting or relying upon the January, 2009 appraisal in connection with this Motion except for the material cited herein. Given the volatility of the economy and real estate market, the appraisal is stale for purposes of the pending Motion. Given the time constraints particularly the press of activities and transactions which the FDIC has had to address in the time period since the recent establishment of the receivership and transactions relating to sale of Corus Bank's assets by the FDIC as Receiver, the FDIC is not in a position within the time prior to the deadline for filing papers in opposition to the Motion to procure a current appraisal of the Project. In addition, the FDIC disputes the accuracy of the Debtor's statements regarding the amounts outstanding under the subject loan or the accrual or payment of interest thereunder. The FDIC reserves the right to submit its own facts regarding those items as soon as they can be compiled and made available.

[8]  It is interesting to note that the Debtor's accusations regarding Corus Bank's alleged conduct as the cause of the Debtor's delay in completing and marketing the Project are revealed to have no merit whatsoever by the

-5-

The Debtor's own moving papers are incomplete and inconsistent and confirm that the "comfortable" equity margin the Debtor assures will be created for the FDIC, will not exist in reality. The Debtor does not offer a current full appraisal report in support of the Motion. Rather, the Debtor submits a "Valuation Letter" attached as Exhibit 1 to the Declaration of David A. Zoraster filed in support of the Motion ("***Zoraster Declaration***"). The only arguably relevant opinion on the question of whether the risk the Debtor seeks to impose upon the FDIC is warranted is the current "as is" market value conclusion. That portion of the valuation letter reaches the conclusion that the "as is" value for the Project <u>including</u> the 77 units the Debtor proposes to sell pursuant to this Motion, is only $142,200,000. (Zoraster Declaration, Exhibit 1, page 2, Bates Page No. 005.) Mr. Zoraster states that, "Our as is value includes the $30,764,513 total sales prices for the 77 units in the low-rise loft condominium building." (*Id.,* second paragraph on page 2, Bates Page No. 005.)

Given that the Debtor proposes to spend nearly $10 million of the loft sale proceeds initially and continues to retain the remaining funds thereby making it possible for the Debtor to seek permission to spend more later, the actual, present value of the FDIC's collateral in the opinion of the appraiser that the Debtor itself has retained is reduced to $132,200,000, leaving the FDIC undersecured by approximately $30 million using the Debtor's own calculations. If the even more speculative value of the undeveloped parcel planned as the site for Phase II which Mr. Zoraster opines has a value of $34,100,000 is added, the FDIC's lien would barely be covered with absolutely no equity cushion leaving the FDIC without adequate protection.

Recognizing that the "as is" value of the Project could not warrant granting the Debtor's Motion, the Debtor asserts that the completion of the Project as proposed will result in a greatly enhanced value of $179,900,000 according to the Zoraster valuation letter. (That number goes up to $214,400,000 per the Zoraster valuation letter when the vacant land for Phase II is added.) Even at a $179,900,000 value and assuming that all of the Debtor's rosy and unrealistic projections of the future turn out to be accurate, the FDIC's lien is barely covered when a year of interest at the 7.36% rate referred to the

---

Debtor's own moving papers. According to the January, 2009 appraisal, the projected completion of the Project at that time prior to the alleged events described in the Astani Declaration, was the end of 2009. (Page 1, para. 1.) As a result, the litany of allegations concerning the delays in completion caused by Corus Bank and it collapse had no impact whatsoever on when the Debtor otherwise would have completed or sold the units in the Project.

-6-

Motion is accrued and added. The end result--still no significant cushion for the FDIC's lien.[9] (Maddox Declaration, para. 19, page 5, lines 12 to 14.) Even the outdated January, 2009 appraisal concluded that what was referred to as the "estimated Prospective 'bulk discounted' market value...upon completion and assuming all costs have been expended, of the condominium sell-out, as of January 1, 2010, will be $187,000,000." (Exhibit 1 attached to the Astani Declaration, page 3, Bates Page No. 21.) This number reflects the type of sales proposed in the Motion rather than an orderly absorption such as that assumed by a retail analysis. Again, once the proceeds from the sale of the Loft Residential Units are subtracted and accruing interest is added, the FDIC would have no significant cushion for adequate protection purposes, particularly if the Debtor is permitted to dispose of $10 million in cash.

The Debtor's projections regarding the purported value of the finished Project, however, are just that and are not germane to the instant Motion. Those projections should not be considered in determining whether to grant the relief sought by the Debtor. Even if that were not the case, the Debtor fails to provide any backup for its construction cost projections to demonstrate that the Project actually will be completed for that amount, or to detail the precise outlays that the Debtor proposes to make and why they represent payments for work to be conducted post-petition rather than improper payments for pre-petition obligations to contractors, subcontractors and suppliers.

Moreover, the Debtor's assertion that the value of the remaining Project will be enhanced by completion and will be marketable at the values asserted by the Debtor is based upon what the Debtor describes as the improvement in circumstances affecting the Downtown residential market such as the effects of Government economic stimuli and stock market improvements. (Astani Declaration, para. 42, page 16, lines 10 to 25.) There is no realistic basis for such optimism for the foreseeable future. In fact, the January, 2009 appraisal indicates that as of the end of 2008, vacancy levels in Downtown Los Angeles were projected to <u>increase</u> from just under 10% to 12.8% by 2012 although these numbers are for apartment housing rather than condominium sales per se. This was due not only to increasing rents but also growth in supply, i.e., an increase in housing stock in the market. (Exhibit 1 attached to the Astani Declaration, page 35 of Report, Bates Page No. 61.) Although that report cited expectations that

---

[9] Unimproved land, i.e. the future site of Phase II cannot, in this market, be relied upon as a basis for a literal taking of a substantial portion of the FDIC's lien.

FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (PROCEEDS OF SALES OF RESIDENTIAL LOFT UNITS)

the economy in the form of GDP would stabilize in the second half of 2009, the report also stated that "significant risks remain." (Exhibit 1 attached to the Astani Declaration, page 26 of Report, Bates Page No. 52.)

In fact, actual developments during 2009 have been worse. For example, the United States Bureau of Labor Statistics web site discloses that as of October 7, 2009, unemployment continued its upward trend nationwide through September, 2009. (See Exhibit 1 attached hereto available at www.bls.gov and of which the Court is respectfully requested to take judicial notice.) Specifically, conditions are worse here in California where unemployment continued to rise thought August to 12.2% per Bureau of Labor Statistics data as included in Exhibit 2 attached hereto from the Bureau's web site at www.bls.gov and of which the Court also is respectfully asked to take judicial notice.

As if to somehow justify the Debtor's attempt to take more than one-third of the already deflated proceeds from the proposed Residential Loft Units sales, the Debtor states repeatedly that the Debtor has itself assumed risks with respect to the Project in the past to the extent that some $60 million in alleged equity invested in the property. Nowhere are any details presented establishing this investment or how it was actually expended. Moreover, even if this amount represents cash actually spent out of pocket, it is an equity investment and is completely irrelevant to the issue of adequate protection.

### III. ARGUMENT.

#### A. The Debtor's Proposed Use of Cash Collateral Consisting of Proceeds of The Sales of Residential Loft Units Is Improper Under The Facts Of This Case.

The Debtor asserts that, under the applicable case law, the FDIC's interest in its collateral is adequately protected for purposes of 11 U.S.C. § 361 notwithstanding the Debtor's proposed expenditure of some $10 million of the subject sale proceeds and continued retention of the remainder of those proceeds without applying them to reduce the FDIC's outstanding loan amounts.

As discussed above, the Debtor does not and cannot establish that the value of the remaining Project plus the proceeds of the Residential Loft Units will leave the FDIC with the same equity cushion and collateral value as it has today. This is because the Debtor's proposed sales are for prices that do not realize the fair value of those units being sold and will decrease the value of the FDIC's collateral by an amount in excess of the sale proceeds that would be realized. Even if that were not the case, the

Debtor proposes not only to partially release the creditor's lien with respect to the units being sold but also to dispose of $10 million of those proceeds--more than a third of the total proceeds--with the lien holder retaining its lien against only the remaining proceeds and without any assurance that the value of the remaining Project will be increased as a result given the uncertainty regarding completion of the Project and the declining Downtown Los Angeles residential housing market. Moreover, the Debtor proposes to retain the balance of the sale proceeds without remitting them to the FDIC to apply against the Debtor's outstanding indebtedness.

By proposing to carve those units out of the FDIC's lien, the Debtor would strip the FDIC of a substantial portion of its security without any assurance that the remaining Project will maintain its current value or will increase in value in an amount sufficient to offset the proceeds that the Debtor seeks to use pursuant to the Motion.

### B. The Debtor's Proposed Use of Cash Collateral Consisting of Proceeds of The Sales of Residential Loft Units Is Improper Based Upon Applicable Law.

The Debtor's own case law compels denial of the cash collateral Motion. As noted in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S. Ct. 826, 98 L. Ed. 2d 740 (1988) and *Alvucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981), a secured creditor is entitled to protection against any diminution in the value of its collateral. The instant Motion unashamedly seeks to accomplish just that by, at a minimum, dissipating nearly $10 million in sales proceeds on a gamble that the expenditure of those sums will be replaced by an enhanced value for the remainder of the Project that can be realized within a reasonable time and before the accrual of interest exceeds any projected gain in value. The diminution is problematic for the further reason that the proposed budget does not specify what the payments in each category are for and whether payments are simply for past due, pre-petition amounts (which would be contrary to 11 U.S.C. § 549).

The Debtor makes the additional argument that courts favor approving the use of cash collateral where is it necessary to pursue reorganization and to prevent a premature liquidation of the debtor by enabling the debtor to continue to operate. However, that general policy cannot be furthered at the expense of the diminution of cash collateral and the absence of an equity cushion for a secured lender as is the circumstance in this case.

In *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982) cited by the Debtor (Motion, page 23, lines 22 to 26), the court premised its authorization of the use of cash collateral in a farming business case upon clear evidence that the value of the livestock and crops securing the creditor's liens was increasing as the debtor's herd continued to reproduce and crops are harvested and that such increase was at a faster rate than the depreciation of equipment. 19 B.R. at 460. There is no such production of value in this case, rather the Debtor relies upon speculation regarding the appreciation and future marketability of real estate. Similarly, in *In re Pine Lake Village Apartment Co.*, 16 B.R. 750 (Bankr. S.D.N.Y. 1981), the debtor has a finished, operating rental project and the court authorized the use of cash collateral solely for purposes of maintenance and repair of the property that would preserve the value of the collateral for the secured creditor as well as the debtor. The debtor in that case was not using the lien holder's cash collateral to finance a speculative venture in a severely depressed market. There is no reason that the Debtor's own principals cannot fund the balance of construction funds with their own capital nor does the Debtor demonstrate its inability to raise the necessary funds from its equity interest owners.

**IV. CONCLUSION.**

On the basis of the foregoing, the FDIC respectfully requests that the Court deny the Motion and grant such other and further relief as is just and proper under the circumstances herein.

Dated: October 13, 2009

NOSSAMAN LLP
Allan H. Ickowitz
Robert S. McWhorter
John W. Kim

By: _____
ALLAN H. ICKOWITZ
Attorneys for The Federal Deposit Insurance Corporation

# EXHIBIT 1



**UNITED STATES DEPARTMENT OF LABOR**

www.bls.gov                                          Search: All BLS.gov    for:                                                           Search

**125 YEARS**
**BUREAU OF LABOR STATISTICS**                                                              Newsroom | Tutorials | Release Calendar

Home    Subject Areas    Databases & Tables    Publications    Economic Releases                                    A - Z Index | About BLS

## Databases

FONT SIZE:

**Change Output Options:**    From: 1999    To: 2009    GO
                                   ☐ include graphs                           More Formatting Options →
Data extracted on: October 7, 2009 (4:41:43 PM)

**Labor Force Statistics from the Current Population Survey**

```
Series Id:             LNS14000000
Seasonal Adjusted
Series title:          (Seas) Unemployment Rate
Labor force status:    Unemployment rate
Type of data:          Percent
Age:                   16 years and over
```

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|--------|
| 1999 | 4.3 | 4.4 | 4.2 | 4.3 | 4.2 | 4.3 | 4.3 | 4.2 | 4.2 | 4.1 | 4.1 | 4.0 |        |
| 2000 | 4.0 | 4.1 | 4.0 | 3.8 | 4.0 | 4.0 | 4.0 | 4.1 | 3.9 | 3.9 | 3.9 | 3.9 |        |
| 2001 | 4.2 | 4.2 | 4.3 | 4.4 | 4.3 | 4.5 | 4.6 | 4.9 | 5.0 | 5.3 | 5.5 | 5.7 |        |
| 2002 | 5.7 | 5.7 | 5.7 | 5.9 | 5.8 | 5.8 | 5.8 | 5.7 | 5.7 | 5.7 | 5.9 | 6.0 |        |
| 2003 | 5.8 | 5.9 | 5.9 | 6.0 | 6.1 | 6.3 | 6.2 | 6.1 | 6.1 | 6.0 | 5.8 | 5.7 |        |
| 2004 | 5.7 | 5.6 | 5.8 | 5.6 | 5.6 | 5.6 | 5.5 | 5.4 | 5.4 | 5.5 | 5.4 | 5.4 |        |
| 2005 | 5.2 | 5.4 | 5.2 | 5.2 | 5.1 | 5.1 | 5.0 | 4.9 | 5.0 | 5.0 | 5.0 | 4.8 |        |
| 2006 | 4.7 | 4.8 | 4.7 | 4.7 | 4.7 | 4.6 | 4.7 | 4.7 | 4.5 | 4.4 | 4.5 | 4.4 |        |
| 2007 | 4.6 | 4.5 | 4.4 | 4.5 | 4.5 | 4.6 | 4.7 | 4.7 | 4.7 | 4.8 | 4.7 | 4.9 |        |
| 2008 | 4.9 | 4.8 | 5.1 | 5.0 | 5.5 | 5.6 | 5.8 | 6.2 | 6.2 | 6.6 | 6.8 | 7.2 |        |
| 2009 | 7.6 | 8.1 | 8.5 | 8.9 | 9.4 | 9.5 | 9.4 | 9.7 | 9.8 |     |     |     |        |

### Quick Links

**Tools**
- At a Glance Tables
- Economic News Releases
- Databases & Tables
- Maps

**Calculators**
- Inflation
- Location Quotient
- Injury And Illness

**Help**
- Help & Tutorials
- A to Z Index
- FAQs
- Glossary
- About BLS
- Contact Us

**Info**
- What's New
- Careers @ BLS
- Find It! DOL
- Join our Mailing Lists
- Privacy & Security
- Linking & Copyright Information

Frequently Asked Questions | Freedom of Information Act | Customer Survey                                        bls.gov
U.S. Bureau of Labor Statistics 2 Massachusetts Avenue, NE Washington, DC 20212-0001

www.bls.gov | Telephone: (202) 691-5200 | Do you have a **Data question**?

EXHIBIT 2

 **U.S. Bureau of Labor Statistics**

## Economy at a Glance

# California

| Data Series | Back Data | Mar 2009 | Apr 2009 | May 2009 | June 2009 | July 2009 | Aug 2009 |
|---|---|---|---|---|---|---|---|
| **Labor Force Data** | | | | | | | |
| Civilian Labor Force (1) | 🦕 | 18,614.9 | 18,629.5 | 18,540.6 | 18,501.5 | 18,458.5 | (P) 18,390.5 |
| Employment (1) | 🦕 | 16,523.1 | 16,564.0 | 16,387.9 | 16,347.4 | 16,259.0 | (P) 16,142.5 |
| Unemployment (1) | 🦕 | 2,091.8 | 2,065.5 | 2,152.8 | 2,154.0 | 2,199.5 | (P) 2,248.0 |
| Unemployment Rate (2) | 🦕 | 11.2 | 11.1 | 11.6 | 11.6 | 11.9 | (P) 12.2 |
| **Nonfarm Wage and Salary Employment** | | | | | | | |
| Total Nonfarm (3) | 🦕 | 14,475.1 | 14,412.3 | 14,351.5 | 14,285.4 | 14,246.9 | (P) 14,234.6 |
| 12-month % change | 🦕 | -4.2 | -4.7 | -4.9 | -5.1 | -5.1 | (P) -4.9 |
| Mining and Logging (3) | 🦕 | 27.9 | 27.5 | 27.5 | 27.0 | 26.9 | (P) 26.7 |
| 12-month % change | 🦕 | -1.4 | -4.2 | -3.8 | -5.6 | -6.3 | (P) -7.0 |
| Construction (3) | 🦕 | 674.8 | 665.4 | 655.3 | 643.8 | 632.4 | (P) 625.4 |
| 12-month % change | 🦕 | -18.3 | -18.3 | -18.4 | -18.4 | -18.7 | (P) -18.5 |
| Manufacturing (3) | 🦕 | 1,338.2 | 1,324.0 | 1,314.1 | 1,306.8 | 1,302.3 | (P) 1,299.6 |
| 12-month % change | 🦕 | -7.1 | -8.0 | -8.5 | -8.7 | -8.8 | (P) -8.6 |
| Trade, Transportation, and Utilities (3) | 🦕 | 2,719.9 | 2,700.2 | 2,695.3 | 2,682.8 | 2,673.7 | (P) 2,666.6 |
| 12-month % change | 🦕 | -6.0 | -6.6 | -6.5 | -6.7 | -6.6 | (P) -6.7 |
| Information (4) | 🦕 | 461.9 | 455.1 | 448.1 | 445.3 | 442.9 | (P) 446.3 |
| 12-month % change | 🦕 | -3.3 | -4.4 | -6.8 | -7.9 | -6.4 | (P) -6.1 |
| Financial Activities (3) | 🦕 | 813.7 | 807.3 | 804.4 | 802.4 | 801.8 | (P) 800.8 |
| 12-month % change | 🦕 | -5.8 | -6.0 | -6.0 | -5.8 | -5.3 | (P) -5.0 |
| Professional & Business Services (3) | 🦕 | 2,151.7 | 2,141.8 | 2,131.4 | 2,117.0 | 2,112.4 | (P) 2,111.6 |
| 12-month % change | 🦕 | -4.8 | -5.4 | -5.6 | -5.8 | -6.1 | (P) -5.9 |
| Education & Health Services (3) | 🦕 | 1,750.0 | 1,744.8 | 1,744.3 | 1,743.5 | 1,738.4 | (P) 1,744.4 |
| 12-month % change | 🦕 | 2.3 | 1.1 | 1.2 | 1.1 | 0.9 | (P) 0.8 |

| In re: GTS 900 F., LLC, a California limited liability company, aka Concerto | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 09-35127-VZ |

NOTE: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**Nossaman LLP, 445 S. Figueroa Street, 31st floor, Los Angeles, CA 90071**

The foregoing document described **THE FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (PROCEEDS OF SALES OF RESIDENTIAL LOFT UNITS)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 13, 2009**. I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **October 13, 2009**. I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 13, 2009**. I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Hon. Vincent P. Zurzolo
U.S. Bankruptcy Court
Central District of California
Courtroom 1360
233 East Temple Street
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 13, 2009 | Marlene Bonilla | *Marlene Bonilla* |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                   **F 9013-3.1**

| In re: GTS 900 F., LLC, a California limited liability company, aka Concerto | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 09-35127-VZ |

**CATEGORY I. To Be Served By The Court Via Notice Of Electronic Filing ("NEF"):**

Cathrine M Castaldi    ccastaldi@rusmiliband.com
Andy Kong    Kong.Andy@ArentFox.com
David S Kupetz    dkupetz@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
Mette H Kurth    kurth.mette@arentfox.com
Dare Law    dare.law@usdoj.gov
Joel S. Miliband    jmiliband@rusmiliband.com
Gregory M Salvato    gsalvato@pmcos.com, calendar@pmcos.com
Marcus Tompkins    mtompkins@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

**CATEGORY II. Served By U.S. Mail:**

Richard A. Clark, Esq.
Gary Ganchrow, Esq.
Parker, Milliken, Clark, et al.
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071-2440

Michael S. Kogan, Esq.
Ervin, Cohen & Jessup LLP
9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974

Debtor
GTS 900 F, LLC
C/O Sonny Astani
Concerto Manager, Inc.
9595 Wilshire Blvd., Ste 1010
Beverly Hills, CA 90212

CORUS Bank, N.A.
c/o Dean A. Isaacs, Esq.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606

Attorneys for Debtor
Alan G. Tippie, Esq.
SulmeyerKupetz
333 South Hope Street, 35th Floor
Los Angeles, CA 90071

PricewaterhouseCoopers
Acting on behalf of FDIC as Receiver of Corus Bank, N.A.
Attn: Mike Mulhern, Project Manager
3959 N. Lincoln Avenue
Chicago, Ill 60613

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

**F 9013-3.1**