1  Alan G. Tippie (CA Bar No. 89587)
       atippie@sulmeyerlaw.com
2  David S. Kupetz (CA Bar No. 125062)
       dkupetz@sulmeyerlaw.com
3  Marcus A. Tompkins (CA Bar No. 190922)
       mtompkins@sulmeyerlaw.com
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Hope Street, Thirty-Fifth Floor
   Los Angeles, California  90071-1406
6  Telephone: 213.626.2311
   Facsimile: 213.629.4520
7
   Bankruptcy Counsel for GTS 900 F, LLC
8  Debtor and Debtor in Possession

9          **UNITED STATES BANKRUPTCY COURT**

10    **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

11  In re                                    Case No.  2:09-bk-35127-VZ

12  GTS 900 F, LLC, a California limited      Chapter 11
    liability company, aka Concerto,
13                                            **DISCLOSURE STATEMENT AND**
              Debtor.                         **PLAN OF REORGANIZATION FOR**
14                                            **GTS 900 F, LLC**

15
                                             DATE:     February 18, 2010
16  Tax Id # 20-2396211                      TIME:     1:30 p.m.
                                             PLACE:    Courtroom 1368
17                                                      255 East Temple Street
                                                        Los Angeles, CA 90012
18

19

20

21

22

23

24

25

26

27

28

DKUPETZ\ 611528.1 1/13/2010 (12:22 PM)

*(Left margin, vertical text)* **Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# TABLE OF CONTENTS

Page

I. INTRODUCTION ......................................................................................................... 1

II. GENERAL DISCLAIMER AND VOTING PROCEDURE .......................................... 1

III. WHO MAY OBJECT TO CONFIRMATION OF THE PLAN ..................................... 2

IV. WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN ....................................... 3

V. VOTES NECESSARY TO CONFIRM THE PLAN ..................................................... 4

VI. INFORMATION REGARDING VOTING IN THIS CASE ........................................... 5

VII. DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND
EVENTS PRECIPITATING BANKRUPTCY FILING .............................................. 5

    A.    STRUCTURE OF DEBTOR ............................................................ 5

    B.    EVENTS PRECIPITATING THE CHAPTER 11 FILING ............... 7

    C.    DEBTOR'S BUSINESS AND BUSINESS PLAN ......................... 15

        1.    Development of Project .................................................... 15

        2.    Business Plan and Financial Model ................................ 16

        3.    Key Assumptions Underlying Business Plan ................... 17

        4.    Summary of Business Plan ............................................. 20

VIII. CRITICAL PLAN PROVISIONS ............................................................................. 21

IX. DESCRIPTION AND TREATMENT OF CLAIMS ................................................... 23

    A.    OVERVIEW OF PLAN PAYMENTS ............................................ 23

    B.    ADMINISTRATIVE EXPENSES .................................................. 28

    C.    UNSECURED TAX CLAIMS ....................................................... 29

    D.    DEFINITION OF NET DISTRIBUTABLE CASH ......................... 30

    E.    CLASS ONE ................................................................................ 30

    F.    CLASS TWO ................................................................................ 32

    G.    CLASS THREE ............................................................................ 33

    H.    CLASS FOUR .............................................................................. 34

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

X. SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS ...................... 35

XI. FINANCIAL INFORMATION TO ASSIST IN DETERMINING WHETHER
    PROPOSED PAYMENT IS FEASIBLE ................................................................. 37

XII. ASSETS AND LIABILITIES OF THE ESTATE.............................................................. 38

    A.    ASSETS............................................................................................. 38

    B.    LIABILITIES ....................................................................................... 38

    C.    SUMMARY ........................................................................................ 39

XIII. TREATMENT OF NONCONSENTING CLASSES................................................... 39

XIV. TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING
    CLASS (CHAPTER 7 LIQUIDATION ANALYSIS) ................................................ 40

XV. FUTURE DEBTOR ................................................................................................ 42

    A.    MANAGEMENT OF DEBTOR ............................................................. 42

    B.    DISBURSING AGENT ........................................................................ 43

    C.    FUTURE FINANCIAL OUTLOOK ........................................................ 43

XVI. SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS
    AND LEASES; OTHER PROVISIONS ................................................................. 44

XVII. BANKRUPTCY PROCEEDINGS.......................................................................... 45

    A.    COMMENCEMENT OF CASE ............................................................. 45

    B.    LOFT UNITS SALE AND CASH COLLATERAL MOTIONS ...................... 45

    C.    CLAIM OF CORUS CONSTRUCTION .................................................. 47

    D.    COMPLAINT AND OBJECTION TO CLAIM OF CORUS
          CONSTRUCTION FILED BY DEBTOR ................................................. 48

    E.    COMPLAINT REGARDING CLAIM AND LIEN OF CORUS
          CONSTRUCTION FILED BY CRDITORS' COMMITTEE ......................... 49

    F.    COMPLAINT REGARDING CLAIM AND LIEN OF CORUS LLC
          FILED BY ASTANI CONSTRUCTION, INC. ........................................... 49

    G.    PLAN AND DISCLOSURE STATEMENT .............................................. 50

XVIII. TAX CONSEQUENCES OF PLAN....................................................................... 50

    A.    INTRODUCTION ............................................................................... 50

    B.    FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR .................. 52

    C.    TAX CONSEQUENCES TO CREDITORS .............................................. 54

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

D.    TAX CONSEQUENCES TO EQUITY HOLDERS ...................................... 57

XIX. EFFECT OF CONFIRMATION OF PLAN ............................................................. 58

A.    GENERAL COMMENTS ............................................................................... 58

B.    DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS; STATUS
      OF LIENS; EQUITY SECURITY HOLDERS ............................................... 58

C.    MODIFICATION OF THE PLAN ................................................................... 58

D.    POST-CONFIRMATION CAUSES OF ACTION .......................................... 59

E.    DISSOLUTION OF COMMITTEE ................................................................ 59

F.    POST-EFFECTIVE DATE EMPLOYMENT AND COMPENSATION
      OF PROFESSIONALS ................................................................................. 59

G.    POST-CONFIRMATION OPERATIONS ...................................................... 60

H.    EXECUTION AND DELIVERY OF DOCUMENTS ....................................... 60

I.    FINAL DECREE ........................................................................................... 60

XX. DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN ......... 60

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

I.

## INTRODUCTION

On September 17, 2009, GTS 900 F, LLC ("Debtor" or "GTS"), a California limited liability company, also known as Concerto, filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code ("Code").  The document you are reading is both the Plan of Reorganization ("Plan") and the Disclosure Statement.  Debtor ("Proponent") has proposed the Plan to treat the claims of the Debtor's creditors and the interests of equity holders and to reorganize the Debtor's business affairs.  A disclosure statement describes the assumptions that underlie the Plan and how the Plan will be executed.  The Bankruptcy Court ("Court") has approved the form of this document as an adequate disclosure statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone.

The Proponent has reserved _____, 2010, in Courtroom 1368, 255 East Temple Street, Los Angeles, California, for a hearing to determine whether the Court will confirm the Plan.

Any interested party desiring further information should contact bankruptcy counsel for the Debtor, SulmeyerKupetz, a professional corporation, attention:  Marcus Tompkins, 333 South Hope Street, 35th Floor, Los Angeles, CA  90071; telephone (213) 626-2311; facsimile (213) 629-4520, email mtompkins@sulmeyerlaw.com.

II.

## GENERAL DISCLAIMER AND VOTING PROCEDURE

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY.  IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN.  IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  IT ALSO TELLS ALL CREDITORS AND EQUITY HOLDERS (MEMBERS OF THE DEBTOR) WHAT TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE PLAN, SHOULD THE PLAN BE CONFIRMED BY THE COURT.

1    THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS

2    DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XX BELOW.  ALL

3    REPRESENTATIONS ARE TRUE TO THE PROPONENT'S BEST KNOWLEDGE.

4    NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE

5    INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT

6    TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

7    After carefully reviewing this document and the attached exhibits, please vote on

8    the enclosed ballot and return it to bankruptcy counsel for the Debtor by no later than 5:00

9    p.m. on _____, 2010.  The ballot may be returned by mail, fax, or email as follows:

10
11       **Sulmeyer**Kupetz
         A Professional Corporation
         Attn: Ann Sokolowski
12       333 South Hope Street, 35th Floor
         Los Angeles, CA 90071
13       Telephone: (213) 626-2311
         Facsimile: (213) 629-4520
14       Email: asokolowski@sulmeyerlaw.com

15    The Proponent has reserved a hearing date for a hearing to determine whether the

16    Court will confirm the Plan.  Please refer to Section I above for the specific hearing date.

17    The Proponent will file a motion for an order confirming the Plan.  Notice of the Motion

18    shall be served on all creditors and equity holders and on the Office of the United States

19    Trustee.  Any opposition to the Motion shall be filed and served on bankruptcy counsel

20    for the Proponent no later than _____ days prior to the hearing date.  Failure to oppose the

21    confirmation of the Plan may be deemed consent to the Plan's confirmation.

22                                          III.

23    <u>**WHO MAY OBJECT TO CONFIRMATION OF THE PLAN**</u>

24    Any party in interest may object to confirmation of the Plan, but as explained below

25    not everyone is entitled to vote to accept or reject the Plan.

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1

## IV.

2

## WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

3        It requires both an allowed and impaired claim or interest in order to vote either to

4   accept or reject the Plan.  A claim is defined by the Code to include a right to payment

5   from the Debtor.  An interest represents an ownership stake in the Debtor.

6        In order to vote a creditor or interest-holder must first have an allowed claim or

7   interest.  With the exceptions explained below, a claim is allowed if proof of the claim or

8   interest is properly filed before any bar date and no party in interest has objected, or if the

9   court has entered an order allowing the claim or interest.  Please refer to Section VI

10  below for specific information regarding bar dates in this case.

11       Under certain circumstances a creditor may have an allowed claim even if a proof

12  of claim was not filed and the bar date for filing a proof of claim has passed.  A claim is

13  deemed allowed if the claim is listed on the Debtor's schedules (including any amended

14  schedules) and is not scheduled as disputed, contingent, or unliquidated.  Numerous

15  claims were scheduled in this case as contingent because those claims are held by

16  subcontractors whose direct contract is with the general contractor for the Debtor's

17  project.  Further, many such creditors may have mechanics' lien rights which they may or

18  may not timely assert and perfect.  The deadline set by the Court for filing proofs of claim

19  against the Debtor is January 29, 2010.

20       Similarly, an interest is deemed allowed if it is shown on the list of equity security

21  holders filed by the Debtor with the Court and is not scheduled as disputed.

22       In order to vote, an allowed claim or interest must also be impaired by the Plan.

23       Impaired creditors include those whose legal, equitable, or contractual rights are

24  altered by the Plan, even if the alteration is beneficial to the creditor.  A contract provision

25  that entitles a creditor to accelerated payment upon default does not, however,

26  necessarily render the claimant impaired, even if the Debtor defaulted and the Plan does

27  not provide the creditor with accelerated payment.  The creditor is deemed unimpaired so

28  long as the Plan cures the default, reinstates the maturity of such claim as it existed

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  before default, compensates for any damages incurred as a result of reasonable reliance

2  upon the acceleration clause, and (except for a default arising from failure to operate a

3  nonresidential lease subject to 11 U.S.C. § 365 (b)(1)(A)) compensates for any actual

4  pecuniary loss incurred as a result of any failure to perform a non-monetary obligation.

5      Impaired interest-holders include those whose legal, equitable, and contractual

6  rights are altered by the Plan, even if the alteration is beneficial to the interest holder.

7      There are also some types of claims that the Code requires be treated a certain

8  way.  For that reason they are considered unimpaired and therefore holders of these

9  claims cannot vote.

10      To summarize, there are two prerequisites to voting: a claim or interest must be

11  both allowed and impaired under the Plan.

12      If a creditor or interest-holder has an allowed and impaired claim or interest, then

13  he or she may vote either to accept or reject the Plan (unimpaired claimants or interest-

14  holders are deemed to have accepted the Plan).  Impaired claims or interests are placed

15  in classes and it is the class that must accept the Plan.  Members of unimpaired classes

16  do not vote, although as stated above, they may object to confirmation of the Plan.  Even

17  if all classes do not vote in favor of the Plan, the Plan may nonetheless be confirmed if

18  the dissenting classes are treated in a manner prescribed by the Code.  Please refer to

19  Section VI below for information regarding impaired and unimpaired classes in this case.

20      Section IX sets forth which claims are in which class.  Secured claims are placed

21  in separate classes from unsecured claims.  Fed. R. Bankr. P. 3018(d) provides: "A

22  creditor whose claim has been allowed in part as a secured claim and in part as an

23  unsecured claim shall be entitled to accept or reject a plan in both capacities."

24                          V.

25          VOTES NECESSARY TO CONFIRM THE PLAN

26      The Court may confirm the Plan if at least one noninsider impaired class of claims

27  has accepted and certain statutory requirements are met as to both nonconsenting

28  members within a consenting class and as to dissenting classes.  A class of claims has

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  accepted the Plan when more than one-half in number and at least two-thirds in amount

2  of the allowed claims actually voting, vote in favor of the Plan.  A class of interests has

3  accepted the Plan when at least two-thirds in amount of the allowed interests of such

4  class actually voting have accepted it.  It is important to remember that even if the

5  requisite number of votes to confirm the Plan are obtained, the Plan will not bind the

6  parties unless and until the Court makes an independent determination that confirmation

7  is appropriate.  That is the subject of any upcoming confirmation hearing.

8                                                    **VI.**

9                **INFORMATION REGARDING VOTING IN THIS CASE**

10            The bar date (deadline) for filing a proof of claim in this case is January 29, 2010.

11            The bar date for hearings on objections to claims is June 30, 2010.

12            In this case, the Proponent believes that classes 1 (Corus Construction Venture,

13  LLC), 2 (mechanics' lien claimants), and 3 (general unsecured creditors) are impaired

14  and therefore entitled to vote on the Plan.  The Debtor believes that Class 4 (equity

15  interest-holders) is unimpaired and therefore does not vote.  A party that disputes the

16  Proponent's characterization of its claim or interest as unimpaired may request a finding

17  of impairment from the Court in order to obtain the right to vote.

18            Ballots must be received by the Proponent, addressed to SulmeyerKupetz, a

19  professional corporation, attention: Ann Sokolowski, 333 South Hope Street, 35th Floor,

20  Los Angeles, California 90071, (telephone) (213) 626-2311, (fax) (213) 629-4520, (email)

21  asokolowski@sulmeyerlaw.com, by 5:00 p.m. on _____, 2010.

22                                                    **VII.**

23      **DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS**

24                    **PRECIPITATING BANKRUPTCY FILING**

25        **A.        STRUCTURE OF DEBTOR**

26            The Debtor is a California limited liability company.  The members (interest

27  holders) of the Debtor consist of parties experienced in real estate development and

28  management and outside investors.  The holders of the equity (membership) interests in

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    the Debtor are as follows: (1) Sonny Astani and Jo Cho, as trustees of the Astani/Cho

2    Living Trust (30%); (2) Marco Astani, as trustee of the Marco Astani Living Trust (5%); (3)

3    FG 98 Investment Co., LP. (15%); and (4) Concerto Partners, LLC, a California limited

4    liability company (50%).  Sonny Astani is the manager of Concerto Partners, LLC, and is

5    a controlling equity holder in or affiliate of entities holding the majority of membership

6    interests in the Debtor.  Marco Astani is the brother of Sonny Astani.  Concerto Manager,

7    Inc., is the manager of GTS.  Sonny Astani is the President of Concerto Manager, Inc.

8    Astani Enterprises, Inc. is the driving force behind GTS.  Through its subsidiaries

9    and affiliates, Astani Enterprises, Inc., is downtown Los Angeles' largest residential real

10    estate developer, as well as the owner and operator of more than 5,000 apartment units

11    throughout Southern California and the current developer of 1,700 units of apartments,

12    condominiums and mixed-use projects in downtown Los Angeles, Encino, and

13    elsewhere, collectively valued at more than $500,000,000.  Sonny Astani is the Chairman

14    and President of Astani Enterprises, Inc.  He has more than 30 years of real estate

15    experience in the Southern California and Baja Mexico areas, and has been involved in

16    the acquisition, development, construction and management of more than

17    $1,000,000,000 of multi-family buildings and condominiums, including 5,000 new

18    residential units in the City of Los Angeles.

19    Astani Construction, Inc., a California corporation and affiliate of Astani

20    Enterprises, Inc., is the general contractor of the Concerto project.  Astani Construction,

21    Inc., through its principals (Marco Astani and Sonny Astani), has a successful track

22    record of 30 years of building, developing and renovating more than $1,000,000,000

23    worth of apartment buildings, condominiums, custom homes, tenant improvements, and

24    commercial enterprises throughout the United States.  Marco Astani is the President of

25    Astani Construction, Inc.

26    Debtor conducted all of its business activity in the County of Los Angeles since its

27    formation effective on January 27, 2005.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

B.    **EVENTS PRECIPITATING THE CHAPTER 11 FILING**

What follows is a brief summary of the dates and circumstances that led Debtor to file bankruptcy.  The Debtor's allegations and contentions set forth in this Section constitute the Debtor's views regarding events precipitating the filing of this chapter 11 case, are the subject of pending litigation, and may be contested by Corus Bank, N.A. ("Corus Bank"), the Federal Deposit Insurance Corporation (the "FDIC"), and/or Corus Construction Venture, LLC.

The Debtor believes this case is the result of the conduct of a financially-troubled lender, Corus Bank, whose construction loan was oversecured by the Debtor's mixed use residential/retail project in the heart of downtown Los Angeles.  As discussed below, Corus Bank was ultimately seized and shut down by the Federal government.  Construction of phase I of the approximately 1,000,000 square foot development known as "Concerto" was approaching completion at the time of the commencement of the Debtor's chapter 11 case.  However, the final completion of phase I of the Debtor's Concerto development  was substantially delayed and undermined by Corus Bank's misconduct and delays and failure to fund the balance of its loan commitment in accordance with the terms of the construction loan.  Delays in the administration of the construction loan impeded the timeliness of the sale of units at the project and further loan advances needed to complete the project.  Further, delays caused by Corus Bank cost the Debtor time, money, sales opportunities and market momentum.  Nonetheless, prior to the commencement of this reorganization case, the Debtor was able to conduct a sales event on August 29, 2009, which resulted in buyers entering into contracts to purchase all 77 units in the seven-story loft structure that constitutes part of the Debtor's first phase of the Concerto development.

As of July 27, 2007, the Debtor and Corus Bank entered into a Construction Loan Agreement (which, together with all documents executed by the Debtor pursuant to such agreement, shall be referred to as the "Loan Agreement"), in which Corus Bank agreed to lend to GTS up to $190,000,000 to allow the Debtor to construct, at 900 S. Figueroa

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Street and 901 S. Flower Street in Los Angeles:  (1) a tower that would contain 271

2  residential units as well as retail space and storage space ("Tower I"); (2) a loft building

3  that would contain 77 residential units as well as retail space and storage space (the

4  "Loft"); and (3) a seven-story partly underground parking structure (the "Parking

5  Garage").  The construction of Tower I, the Loft and the Parking Garage shall be referred

6  to as the "Project."  The Loan Agreement contemplated that the Debtor would sell the

7  residential units in the Project as condominiums.

8       GTS and Corus Bank, through the Loan Agreement, anticipated that the Debtor

9  would subsequently construct a second tower ("Tower II"), which was not being financed

10  through the Loan Agreement, but which would be constructed on land on which Corus

11  Bank would initially possess a security interest pursuant to the Loan Agreement.  The

12  Loan Agreement was structured so that, in order for GTS to borrow the full amount

13  available under the Loan Agreement ($190,000,000), GTS would need to repay from the

14  sale of residential units in the Loft ("Residential Loft Units") up to $23,200,000 of the

15  outstanding loan amounts.  This would enable the Debtor to complete the Project,

16  including the remainder of Tower I.

17       Accordingly, the Debtor invested significant time and money structuring the

18  Concerto development in a manner that would facilitate sales of the Residential Loft Units

19  such that the Debtor could repay to Corus Bank a portion of the loan and receive the

20  additional funding necessary  to complete the Project.  Towards that end, GTS re-phased

21  the Project numerous times and created a single condominium association for both

22  Tower I and Tower II, per the Loan Agreement, which had the effect of reducing

23  maintenance expenses and monthly assessments that purchasers of the residential units

24  would need to pay, and making the units more affordable and economically feasible for

25  prospective purchasers.  However, as more fully described below, Corus Bank's delays,

26  improper demands and administration of the Loan Agreement, delayed the Debtor in

27  placing the Residential Loft Units on the market and otherwise injured the Debtor.

28

1    The Debtor experienced problems with Corus Bank's construction loan beginning

2  in or about the Fall of 2008 and thereafter, at or about the time that Corus Bank's

3  financial problems became readily apparent.  At that time, various governmental

4  agencies informed Corus Bank that it needed to raise capital or risk being seized by

5  regulators; which regulators began to be physically present in Corus Bank's offices at that

6  time.

7    As of February 18, 2009, Corus Bank's financial condition had deteriorated to such

8  a point that it was forced to enter into a Stipulation and Consent Order with the

9  Comptroller of the Currency of the United States Department of Treasury.  The Consent

10  Order required Corus Bank to achieve and maintain minimal levels of capital pursuant to

11  a capital plan, and prohibited Corus Bank from declaring a dividend unless it was in

12  compliance with the capital plan.  Corus Bank's reputation in the financial and business

13  community diminished such that companies would not issue bonds to GTS because of

14  concern about Corus Bank's ability to finance the Project; subcontractors on the Project

15  were significantly concerned about GTS's ability to access its construction loan to pay

16  them for the work they performed.  The deterioration of Corus Bank's reputation and

17  financial rating severely impacted GTS's ability to complete the Concerto development.

18    Despite the Debtor's requests, and delays Corus Bank had already caused, Corus

19  Bank was unwilling or unable to provide assurances, even in light of its highly publicized

20  failure to fully fund a loan commitment made to the Terranea Resort development in

21  Rancho Palos Verdes, California, that it would be able to satisfy its loan commitment to

22  the Debtor in connection with the completion of the Project.  Corus Bank was seized and

23  closed on September 11, 2009, by the Comptroller of the Currency, which appointed the

24  FDIC as receiver.

25    Despite the obstacles and delays caused by Corus Bank, and coupled with its

26  diminished reputation, GTS moved forward with completion of the Concerto Project.  The

27  Debtor planned, publicized and executed a significant "sales event" for the first completed

28  units in the Project, the Residential Loft Units.  The sales event, which occurred on

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  August 29, 2009, was "successful" to the extent that all 77 available Residential Loft

2  Units were conditionally sold in a single day, with back-up offers for each unit.  Prior to

3  the commencement of the Debtor's chapter 11 case, the Debtor entered contracts for the

4  sale of each of the 77 Residential Loft Units.  The purchasers made deposits into escrow

5  in the amount of  3% of the purchase prices.  Approximately $1,000,000 was held in

6  escrow.  The total sale price for the 77 units was $30,753,726, and the projected net

7  proceeds from sales amounted to $28,765,592.

8  The prices for the Residential Loft Units were set in a modified auction procedure

9  through the Debtor's consultation with real estate marketing and sale experts.  Corus

10  Bank had participated in and encouraged the marketing of these sales by approving the

11  $1,000,000 marketing budget funded under the Loan Agreement.  Despite the national

12  economic downturn and depressed real estate market for new homes and despite the

13  numerous obstacles the Debtor resulting from Corus Bank's misconduct, the Debtor was

14  able to optimize under the circumstances the prices obtained for the Residential Loft

15  Units through its heavily publicized auction procedure and careful analysis of sales

16  demand, new loan terms, and buyer preferences.

17  To be permitted to offer for sale the Residential Loft Units, the Debtor needed to

18  obtain various governmental permits and approvals, including, but not limited to, approval

19  by the California Department of Real Estate ("DRE") in the form of a Conditional or Final

20  Public Report.  In September of 2008, GTS provided for review and approval to Corus

21  Bank the Condominium Documents, as defined by the Loan Agreement (the

22  "Condominium Documents"), including the declaration of covenants, conditions and

23  restrictions.  However, rather than review and approve the Condominium Documents,

24  Corus Bank delayed.

25  In addition, Corus Bank made unreasonable and improper demands that GTS

26  modify the Condominium Documents.  For example, Corus Bank unilaterally demanded

27  that GTS create separate condominium associations for Tower I and Tower II, contrary to

28  the terms of the Loan Agreement, thereby increasing the amount of monthly

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    assessments that purchasers would need to pay and making the Residential Loft Units

2    less attractive to prospective purchasers.  The Debtor believes that Corus Bank

3    demanded the creation of a separate condominium association for Tower II because,

4    rather than focusing on the success of the Project, Corus Bank already was anticipating

5    foreclosing on the land upon which the Project was being built, i.e., the land containing

6    Tower I and the Loft.

7         It was not until after February 10, 2009, that Corus Bank finally approved, in a form

8    substantially similar to that which had been submitted approximately four months earlier,

9    the Condominium Documents GTS had submitted in September of 2008.  As a result of

10   Corus Bank's delays and improper demands, the Debtor was unable in the time frame

11   originally anticipated to secure the government approvals, including the final approval

12   from the DRE that it needed to proceed with offering the Residential Loft Units for sale.

13   As a further consequence of Corus Bank's delays and improper demands, (i) GTS was

14   unable to open its sales center for these units in January 2009 as scheduled, or to meet

15   its anticipated escrow closings of May 2009, despite having written commitments from

16   several purchasers to purchase such units, (ii) GTS lost the ability to bring the Residential

17   Loft Units to market, as planned, before Evo, a neighboring 311-unit condominium project

18   located at 1155 S. Grand Avenue that also was being financed by Corus Bank and was

19   competing for the same or similar prospective purchasers, and (iii) GTS incurred

20   considerable expenses, including payments to Corus Bank's  attorneys to review the

21   documents, and including increased costs in attempting to procure the various bonds

22   needed to obtain final governmental approval.

23        Corus Bank's representatives repeatedly advised the Debtor that Corus Bank

24   would approve the Residential Loft Unit sales prices and consent to the release of its lien

25   on units to be sold if the Debtor obtained a "White Report" from the California Department

26   of Real Estate, which was needed to close escrow for the sale of the units.  This was

27   made very difficult and delayed by Corus Bank's unreasonable refusal to approve the

28   Condominium Documents and publicly known financial troubles which prevented the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Debtor from being able to obtain bonds required to obtain the White Report.  Ultimately,

2    after posting cash collateral, the Debtor was able to obtain the White Report; yet Corus

3    Bank failed to fulfill its commitment to approve the sales prices, was seized by the

4    Federal government, and placed under the control of the FDIC.

5        As it entered a period of financial freefall in or about the Fall of 2008, Corus Bank

6    began, to its benefit and to the detriment of the Debtor, to engage in a pattern and

7    practice of:  (a) delaying approvals on documentation submitted to it by the Debtor, (b)

8    delaying the payment of construction loan funds, (c) making unreasonable demands of

9    the Debtor unwarranted by and in violation of the Loan Agreement as preconditions to its

10   own compliance with the Loan Agreement, and (d) engaging in further delay tactics which

11   made it difficult for the Debtor to successfully and timely complete the Concerto

12   development.

13       In pending litigation, discussed more fully below, the Debtor asserts that Corus

14   Bank breached its contractual obligations and breached its implied duty of good faith and

15   fair dealing arising from the Loan Agreement in the following respects, among others:

16       a.    Corus Bank failed to timely provide funding to the Debtor;

17       b.    Corus Bank unreasonably failed and refused to timely approve the

18   Condominium Documents (as defined by the Loan Agreement) submitted to it for

19   approval;

20       c.    Corus Bank jeopardized the success of the entire Concerto development

21   by refusing to consent to the Condominium Documents unless the Debtor would first

22   agree to relinquish its contractual right, upon making a $25,000,000 payment to Corus

23   Bank, to obtain a release of the Tower II land from the deed of trust executed in favor of

24   Corus Bank;

25       d.    Despite the delays that it had caused and the fact that the market would no

26   longer allow for the sale of the Residential Loft Units at prices originally contemplated in

27   the Loan Agreement, and even though its security interest was not impaired, Corus Bank

28

1   unreasonably refused to approve the sale of the Residential Loft Units at market prices

2   calculated to optimize sales and sales proceeds;

3       e.      Despite the delays it had caused and despite the Debtor's inability to obtain

4   bonds because of the deterioration of Corus Bank's financial rating and reputation, Corus

5   Bank unreasonably refused to advance funds to the Debtor from budgeted-for but

6   unfunded items to allow the Debtor to procure the bonds necessary to obtain a White

7   Report from the California Department of Real Estate;

8       f.      Corus Bank offered the mezzanine lender of Evo, a neighboring 311-unit

9   condominium project located at 1155 S. Grand Avenue that also was being financed by

10  Corus Bank, a right of first refusal to purchase Evo's existing promissory note,

11  empowering it to offer the Evo units at a reduced price at a competitive advantage.

12      The Debtor contends that, as a result of Corus Bank's breaches of its contractual

13  obligations and its implied duty of good faith and fair dealing arising from the Loan

14  Agreement, (a) the completion of the Project, including the loft portion of the Project, was

15  delayed; (b) the Debtor was unable to timely offer the Residential Loft Units for sale and,

16  when they were offered for sale, was forced to sell them for lower prices than they would

17  have sold for absent Corus Bank's misconduct; (c) the Debtor was unable to timely close

18  escrows on the Residential Loft Units; (d) the Debtor was unable to complete Tower I or

19  to market or sell the Tower I units; (e) the Project was not completed; (f) the Debtor was

20  unable to pay down the Corus Bank loan as projected; and (g) the Debtor was forced into

21  bankruptcy in order to protect itself from further losses, and to protect and safeguard the

22  interests of its buyers.

23      The Debtor also contends that, as a result of Corus Bank's breaches of its

24  contractual obligations and breaches of its implied duty of good faith and fair dealing

25  arising from the Loan Agreement, the Debtor has incurred considerable additional fees

26  and expenses, including but not limited to (a) increased costs in attempting to procure the

27  various bonds needed to obtain final governmental approval with respect to the

28  Residential Loft Units; (b) increased construction and insurance costs; (c) increased

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  interest under the Loan Agreement; (d) additional payments to Corus Bank's attorneys to

2  review the documents; (e) increased assessors taxes and homeowners association fees;

3  and (f) increased fees and costs in connection with this bankruptcy case.

4      Also as a result of Corus Bank's breaches of its contractual obligations and

5  breaches of its implied duty of good faith and fair dealing arising from the Loan

6  Agreement, the Debtor asserts that it has been damaged in an amount to be determined,

7  but believed to be in the range of at least $40,000,000.

8      On September 4, 2009, prior to Corus Bank being seized by the Federal

9  government, the Debtor filed a lawsuit against Corus Bank for (1) breach of contract, (2)

10  breach of the covenant of good faith and fair dealing, (3) declaratory relief, and (4)

11  injunctive relief.  The action was originally filed in the Superior Court of the State of

12  California, County of Los Angeles, *as GTS 900 F, LLC v. Corus Bank, N.A.,* Case No.

13  BC421309.  Following the commencement of this chapter 11 case, the Debtor removed

14  the lawsuit to the Bankruptcy Court.  Thereafter, the Bankruptcy Court issued an order

15  approving a stipulation between the Debtor and the FDIC (as receiver for Corus Bank)

16  staying this action.

17      In October, 2009, Corus Construction Ventures, LLC ("Corus LLC"), acquired the

18  loan assets of Corus Bank from the FDIC.   The terms of the acquisition have not been

19  fully disclosed, including the extent to which Corus LLC also acquired the liabilities of

20  Corus Bank, or contends, in the transaction with Corus Bank, to have disclaimed any

21  such liability.  Despite repeated requests by the Debtor, Corus LLC has failed to disclose

22  the terms of the purchase and sale agreement with the FDIC.

23      On October 29, 2009, Corus LLC filed a proof of claim in this case in the sum of

24  $162,662,216.26.  The proof of claim is based on the claim of Corus Bank under the

25  Loan Agreement and the acquisition of that claim by Corus LLC from the FDIC.  The

26  Debtor, the official committee of creditors appointed in this case (the "Committee"), and

27  Astani Construction, Inc., have each filed complaints with respect to the claim of Corus

28  LLC and the Debtor has filed an objection, in accordance with Bankruptcy Rule 3007(b),

1    as part of its complaint.  Each of the complaints with respect to the Corus LLC claim is

2    discussed in Section XVII below.

3        What follows is a brief description of the Debtor's business and future business

4    plans.  Further details relating to the Debtor's financial condition and post-confirmation

5    operation of the Debtor are found in sections X, XI, XII, XVI, and XV.

6    **C.    DEBTOR'S BUSINESS AND BUSINESS PLAN**

7            1.  Development of Project

8        As stated above, the Debtor is the owner and developer of an approximately

9    1,000,000 square foot residential real estate development know as "Concerto" located in

10   downtown Los Angeles.  The Concerto project is built on a full city block ideally situated

11   at the north end of an evolving entertainment district anchored by the Staples Center and

12   L.A. Live, a sports and entertainment complex, sometimes described as Times Square

13   West.  Concerto is part of a wave of development that has gained momentum since

14   2003, when Los Angeles expanded adaptive reuse policies similar to those of New York.

15   Construction on the Concerto project started in 2007 and was timed to come on line with

16   a full range of residential units and retail space at the same time as L.A. Live and the new

17   Ralph's Supermarket serving downtown residents.

18       As discussed above, the Project consists of Tower I (containing 271 residential

19   units and retail and storage space), the Loft (containing 77 residential units and retail and

20   storage space), and the Parking Garage (a seven-story partly underground parking

21   structure).  A phase II of the Concerto development  consisting of Tower II (a second 30-

22   story tower) is contemplated for the future, and its infrastructure (including subterranean

23   parking, elevator shafts, DWP vaults, excavation, shoring and some foundation) has

24   been completed, but further construction has not been commenced.  The Debtor's phase

25   II assets also serve as collateral for the Corus Bank loan.

26       In 2004, GTS purchased the 100,000 square foot parcel on which the Concerto

27   project is located, consisting of a full city block.  The development team envisioned an

28   environmentally conscious all glass residential structure with a range of moderately

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 priced to higher priced condominium units, together with shared amenities, ample parking

2 and retail and restaurant space as part of the "new downtown L.A."  In all, the Debtor

3 invested more than $63,000,000 as equity funds into the Concerto project (with more

4 than $54,500,000 in cash and approximately $8,500,000 consisting of deferred

5 developer's and general contactor's fees), starting one of the first high rise residential

6 construction projects in downtown Los Angeles in more than 15 years.

7                     2.  Business Plan and Financial Model

8         The Debtor's business plan primarily involves the sale of residential units at the

9 Concerto project and use of the sale proceeds to complete construction of the Project

10 and (along with commercial income generated from retail, parking, and storage space at

11 the Project) to satisfy the Debtor's debts by payment of allowed claims in full over time.

12 The financial model that reflects the Debtor's business plan and sets forth the basis for

13 performing the Plan is attached hereto as Exhibits 1 - 7.   The financial model attached

14 hereto as Exhibits 1 – 7 includes the following components:

15 Exhibit 1 – Summary of Key Input Assumptions and Aggregate Net Cash Flow
Exhibit 2 – Summary of Monthly Cash Flow
16 Exhibit 3 – Summary of Costs to Complete
      Note – consists of Hard Costs and General Conditions through completion of construction
17 and commencement of Tower I unit sales closings in June 2010
Exhibit 4 – Detailed Monthly Cash Flow Forecast
18 Exhibit 5 – Accrued Payables – detail (includes sub-contractor retentions)
Exhibit 6 – Loft Sales Prices – actual per 8/29/2009 one day sales event
19 Exhibit 7 – Tower I Sales Prices and Release Prices

20 Summary of Key Assumptions

21     1.  Loft sales closings span a four month period beginning November 2009
22     2.  Loft sales proceeds are retained and used to complete Tower I construction and pay
        $1,000,000 monthly adequate protection/interest payments to Corus LLC through
23         Plan confirmation
24     3.  Tower I sales: orderly sales at estimated 8 units per month beginning in June 2010,
        with prices flat in 2010 and increasing 5% per year thereafter
25     4.  Construction budget excludes $4.6 million interest reserve and $6.2 million
        developer's fee that were included in the prepetition Corus Bank loan construction
26         budget
27     5.  Remaining costs to complete Project are paid beginning in November 2009, through
        June 2010
28     6.  Costs to complete include General Conditions fees payable to Project's general

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

contractor

7. Prepetition non-Corus Bank debt (mechanics' lien claims and general unsecured claims) receive monthly payments of 50% of Net Distributable Cash beginning in July 2010 (90 days following projected Plan effective date in April 2010), until allowed claims are paid in full

8. Corus LLC receives monthly payments of 50% of Net Distributable Cash beginning in July 2010 (90 days following projected Plan effective date in April 2010), until allowed mechanics' lien claims and allowed general unsecured claims are paid in full, and 100% of Net Distributable Cash thereafter until allowed claim of Corus LLC is paid in full

9. "Net Distributable Cash" is defined as net proceeds from sales of Tower I condominium units plus net cash flow from commercial components of the Project, less:

   a. Completion costs and operating costs, including marketing and insurance
   b. Bankruptcy and legal costs
   c. Interest due under Plan on Corus Bank loan and other prepetition debt (mechanics' lien claims and general unsecured claims)

10. Interest paid on Corus LLC debt at 4.00% annualized following the projected Plan effective date in April 2010

11. Interest is paid to Corus LLC for Sep-2009 to Nov-2009 of $3,000,000 and $1,000,000 per month thereafter through projected Plan effective date in April 2010

12. Interest is paid monthly on prepetition non-Corus Bank debt (mechanics' lien claims and general unsecured claims), with such interest beginning to accrue as of the projected Plan effective date in April 2010, and the first payment being made in May 2010

13. Debtor pays sum of $5,000,000 in June 2010 (60 days following projected Plan effective date in April 2010, assuming that a Temporary Certificate of Occupancy has been issued for Tower I): 50% to Corus LLC and 50% to other prepetition debt holders (mechanics' lien claimants and general unsecured creditors), in accordance with each such non-Corus LLC creditor's pro rata share of total prepetition non-Corus Bank debt.

14. Minimum lien release prices for Tower I units are established at 85% of the Sales Price as set forth in Exhibit 7 hereto or 85% cumulative release price as set forth in the Plan.

### 3. Key Assumptions Underlying Business Plan

The Debtor's business plan assumes that proceeds from the Loft sales are retained to complete Tower I. Completion of Tower I is anticipated in June 2010, at which time Tower I unit sales are projected to commence.

Key specific assumptions are listed below:

(a)    Condominium Unit Sales & Commercial Income:

- All 77 Loft unit sales closings occur in November through February 2010; net sales proceeds are retained to cover balance of Tower I completion costs and to make monthly payments to Corus, LLC.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

- Tower I unit sales: Close 271 units at 8 units/month starting in June 2010. Note that the projected average selling prices for the Tower I units ($714,000 per unit, $663 per square foot) are significantly higher than the sales prices obtained in the Loft building one-day sales event ($400,000 per Unit, $368 per square foot). Tower I is a high rise of steel construction with superior finishes and views (including 10.5' ceilings and floor to ceiling glass), and therefore the Debtor anticipates that it can obtain higher sales prices as compared to units in the Loft building, which is a low rise building that was designed utilizing a less expensive wood-frame construction, with inferior views and finishes as compared to Tower I and interior bedrooms and baths without windows and direct light. Also, the Loft units were sold in a one-day sales event, thereby accelerating sales in order to re-start the project in light of the problems and damage caused by Corus Bank during the period leading up to Corus Bank's demise. The business plan for the Tower I units calls for an orderly sale over approximately 36 months, in order to take advantage of the anticipated improvement in the market in coming years (which is consistent with press releases issued by the purchaser of the Corus Bank debt). Tower I has 35 different floor plans consisting of 186 units in floors 3 through 20, with sizes ranging from 646 sq. ft. to 1,186 sq. ft. that are more affordable than the larger, more expensive upper floor units. The proposed average price point ($539,000 per unit and $582 per square foot) for the 186 units on floors 3 through 20 would enable buyers to qualify for new Fannie Mae, Freddie Mac or FHA/VA conforming loans. The remaining 85 units on floors 21 through 30 are much larger units topping off with a few 2,300 sq. ft. penthouse units, each with outstanding views. These higher priced units (average $1,100,000 per unit and $780 per square foot) have the effect of increasing the overall average prices for the Tower I portion of the Project.

- Tower I units average sales prices are assumed to be flat in 2010, and increase 5% in each of 2011, 2012 and 2013, with assumed average commissions and closing costs of 5%.

- Projected net rental income from the commercial components commences in January 2010 and appears on the Detailed Monthly Cash Flow (Exhibit 4 hereto).

(b)    Expenses & Payables:

- Hard costs to complete construction are projected to be paid beginning in December 2009 through June 2010 per the Debtor's budget. As of January 13, 2010, this has been delayed by Corus LLC not approving an updated budget.

- Soft costs including real estate taxes and HOA dues are paid through the balance of Tower I sellout, as budgeted by the Debtor.

- Fixed costs appearing on the Detailed Monthly Cash Flow (Exhibit 4 hereto) consists of budgeted costs for security, utilities, salaries, office expenses and management fee. Subsequent to completion of construction, fixed costs consists of salaries budgeted to operate the on-site sales office staffed with three sales persons (budgeted in marketing costs).

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

- The Summary of Costs to Complete (Exhibit 3 hereto) sets forth all of the projected hard costs required to complete construction and commence unit sales for Tower I.

- Prepetition Accrued Payables are listed by vendor or sub-contractor on Exhibit 5 and include $2.55 million general contractor fee

- The forecast includes approximately $2.15 million of bankruptcy costs and legal fees. Costs are $50,000 per month per the cash collateral order through projected Plan effective date in April 2010. A lump sum payment is made on the projected Plan effective date for outstanding bankruptcy costs payable. Legal fees are projected at $125,000 per month for six months following the Effective Date, decreasing to $20,000 for three months and $10,000 per month thereafter.

(c)    Taxes and Interest:

- The financial forecast includes amounts budgeted for pre-paid 2009-2010 property taxes to be reimbursed by homeowners, property taxes pro-rated through escrow upon closing of unit sales, and estimated property taxes due and payable in November and February of each year calculated at 1.5% of the Debtor's estimated value of the remaining units plus the estimated value of the commercial components and Phase II land.

- Interest on the Corus LLC claim is accrued at the current "floor" interest rate of 7.36% per annum under the Loan Agreement prior to Plan confirmation, with an assumed post confirmation rate of 4% per annum based upon confirmation of the Debtor's proposed Plan of Reorganization anticipated to go effective in April 2010. Interest on other prepetition debt (mechanics' lien and general unsecured claims) accrues at the rate of 4% per annum commencing on the projected effective date of the Plan in April 2010.

- The model further reflects that the interest (adequate protection) payment of $3 million for the period of September to November was made to Corus LLC in December 2009 and $1,000,000 is paid per month thereafter through the projected Plan effective date in April 2010.

(d)    Marketing Plan for the Tower I Units

- The Debtor plans to sell 8 units per month for the next 3 years and does not currently anticipate any accelerated marketing plans. This represents a shift in strategy from the marketing plan presented in support of the Debtor's earlier motion to approve the use of cash collateral filed on October 1, 2009 in the bankruptcy case, which contemplated an accelerated marketing/launch event of a portion of the Tower I units in order to jump start an accelerated sales program. Since the time that the Debtor filed that motion, several competitors have replicated the accelerated sale approach (i.e. Market Lofts) or plan to replicate it (i.e. Meruelo Maddox) and the Lofts units sales accelerated marketing strategy, and other competitors have added to the supply of condos in downtown Los Angeles for sale by shifting from apartment rental to condo sales plans (Roosevelt). Therefore, the Debtor has elected to pursue a different marketing strategy in order to preserve desired pricing levels and to take advantage of anticipated improving market conditions over the next several years following 2010, rather than go head to head with competitors who are willing to accept dramatic discounts.

4.  Summary of Business Plan

- Based on the Debtor's business plan, the construction loan (the Corus LLC claim) plus all interest would be paid by March 2013 and all prepetition accrued payables (mechanics' lien claims and general unsecured claims) plus interest would be repaid by March 2011.  Further, the net proceeds collected from sales of the Loft units of approximately $28.8 million would be sufficient to fund the remaining completion of construction costs of Tower I and the Loft (and payment of approximately $7,500,000 anticipated to be paid to Corus LLC) through anticipated commencement of Tower I unit sales in June 2010.

- The Debtor has projected a total of $12.15 million to complete construction through June 2010, consisting of approximately $10.69 million of hard costs and $1.46 million for General Conditions (See Exhibit 3 - Summary of Costs to Complete).  However, as of January 13, 2009, construction has been delayed by Corus LLC's failure to approve an updated construction budget.  Moreover, this total does not include ongoing property taxes, homeowner's association dues, and operating and marketing costs that would be incurred during the sellout period.

- A summary of the estimated net proceeds based upon the Debtor's business plan is set forth below.  Note that approximately $9.3 million of cash would be generated after payment of costs to complete construction and repayment of all of the Debtor's debt.  In addition to the estimated net proceeds, the Debtor would retain the residual value attributable to sale of the commercial components (parking, retail, and storage space) of phase I and phase II of the Concerto development, and the residual value attributable to sale of the land and entitlements for phase II.

### CONCERTO PHASE I
### Projected Cash Flows

| | | |
|---|---|---|
| Lofts - Net Sales Price | $ | 28,816,700 |
| Tower I - Net Sales Price | $ | 196,114,901 |
| **Net Condo Sales Proceeds** | **$** | **224,931,601** |
| | | |
| Hard Costs to Complete | $ | 10,688,355 |
| Soft Costs to Complete | $ | 6,509,834 |
| Operating Costs | $ | 1,975,210 |
| Total Costs - Condos | $ | 19,173,399 |
| | | |
| Net Proceeds - Condos | $ | 205,758,202 |
| Net Cash Flow - Commercial | $ | 9,656,250 |
| | | |
| **Net Cash Available for Distribution** | **$** | **215,414,452** |
| Less: | | |
| Bankruptcy Costs | $ | (2,150,000) |
| Corus Bank - Interest | $ | (18,378,855) |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| | | |
|---|---|---|
| Unsecured/Mechanics' Lien Debt - Interest | $ | (506,525) |
| Corus Loan - Principal | $ | (162,098,832) |
| Unsecured/Mechanics' Lien Debt - Principal | $ | (23,182,154) |
| Total Distributions | $ | (206,316,366) |
| | | |
| **Net Proceeds** | $ | **9,098,086** |
| Beginning Cash (9/2) | $ | 220,955 |
| **Ending Cash** | $ | **9,319,041*** |

*In addition, as set forth above, following payment of all claims in full the Debtor's business plan provides for the Debtor's retention of the commercial components of phase I and the entirety of phase II of the Concerto development.

## VIII.

## CRITICAL PLAN PROVISIONS

Listed below are the sources of money earmarked to pay creditors:

a.    Proceeds from the sale of the Loft and Tower I condominium units; and

b.    Rent and other income from commercial retail tenants and parking and storage space revenues.

Most likely, mechanics' lien claimants (Class 2) and general unsecured creditors (Class 3) holding allowed claims can expect payment:

a.    commencing 30 days following the Effective Date of the Plan;

b.    in the total amount of their allowed claims plus interest accruing at the rate of 4% per annum beginning on the Effective Date of the Plan;

c.    payments will be made monthly, beginning 30 days following the Effective Date of the Plan, with (i) the first payment to include one month's interest, (ii) monthly interest payments to be made thereafter, (iii) by the later of 60 days following the Effective Date or 10 days after the issuance of a Temporary Certificate of Occupancy for Tower I a principal reduction payment will be made in the sum of each claimant's pro rata share of total allowed claims of members of Classes 2 and 3 of $2,500,000, and (iv) commencing 90 days following the Effective Date monthly principal reduction payments will be made in the amount of each claimant's pro rata share of total allowed claims of members of

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Classes 2 and 3 of 50% of Net Distributable Cash (as defined in Section IX.D), until

2  allowed claims are paid in full;

3      d.      projections are that allowed claims of members of Classes 2 and 3 will be

4  paid in full by March, 2011.

5      The definition of "pro rata" as used in connection with the Plan means

6  proportionately so that the ratio of the amount of payment made on account of a particular

7  allowed claim in Classes 2 and 3 is the same as the ratio of the amount of such particular

8  allowed claim to the total amount of allowed claims in Classes 2 and 3.

9      The Debtor projects that a Temporary Certificate of Occupancy for Tower I

10  (assuming that construction on Tower I moves forward without further delay) will be issued

11  in or about June 2010.

12      Most likely, Corus LLC (Class 1) can expect payment:

13      a.      commencing 30 days following the Effective Date of the Plan;

14      b.      in the total amount of Corus LLC's allowed claim plus interest accruing at

15  the rate of 4% per annum beginning on the Effective Date of the Plan;

16      c.      interest payments will be made monthly, beginning 30 days following the

17  Effective Date of the Plan;

18      d.      by the later of 60 days following the Effective Date or 10 days after the

19  issuance of a Temporary Certificate of Occupancy for Tower I, a $2,500,000 principal

20  reduction payment shall  be made;

21      e.      beginning 90 days following the Effective Date, monthly principal reduction

22  payments shall me made in the amount of 50% of Net Distributable Cash (as defined in

23  Section IX.D) until allowed claims in Classes 2 and 3 are paid in full, and 100% of Net

24  Distributable Cash thereafter, until allowed claim of Corus LLC is paid in full;

25      d.      assuming that Corus LLC's asserted claim is not disallowed in part and

26  reduced, it is projected that Corus LLC's claim will be paid in full by February, 2013.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# IX.

## DESCRIPTION AND TREATMENT OF CLAIMS

### A.    OVERVIEW OF PLAN PAYMENTS

Below is a summary of who gets paid what and when and from what source. The identity of members within a particular class is explained beginning on the next page. The second column lists the estimate total amounts to be paid (excluding interest payments). <u>The Proponent is usually not required by law to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy case not commenced.</u> The "Payment Due Date" column states the frequency with which payments will be made and the starting and ending dates. Look at the starting date to figure out who will be paid before and after you and in what amount. The "Source of Payment" column describes the expected source of payment. Further details regarding the source of payment are found in sections X and XI.

The timing of payments to many creditors is determined by the "Effective Date." Administrative claims, unless otherwise stated, must be paid by the Effective Date. The timing of payments to impaired creditors is measured from the Effective Date.  In this case, the Effective Date shall be the first business day ten (10) days after entry of the Court's order confirming the Plan.

| Payment Recipient | Amount of Payment (Total amount to be paid)[1] | Payment Due Date | Source of Payment |
| --- | --- | --- | --- |

---

[1] These amounts are estimates. For example, with regard to professionals, the estimated amount of the paid to professionals may be substantially greater or less than projected depending on the extent of litigation and/or other opposition presented with respect to the Plan and/or other matters in the case. Further, the amounts may be substantially greater or less depending on the amount of payments received by professionals prior to confirmation of the Plan. With respect to the claim of Corus LLC, for example, the amount allowed and paid may vary dramatically depending upon how the Debtor's complaint and objection to claim with regard to Corus LLC's claim are resolved. The total amounts of mechanics' lien claims and general unsecured claims are uncertain at this time and remain to be determined in light of the bar date for filing claims of January 29, (footnote continued)

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| Payment Recipient | Amount of Payment (Total amount to be paid)[1] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 1. Debtor's Bankruptcy Counsel (SulmeyerKupetz, a Professional Corporation) | $250,000 | Effective Date | Condominium Unit Sales and Other Commercial Income of Debtor |
| 2. Debtor's Special Corporate Counsel (Parker Milliken, Clark, O'Hara & Samuelian, A Professional Corporation) | $200,000 | Effective Date | Condominium Unit Sales and Other Commercial Income of Debtor |
| 3. Creditors' Committee Counsel (Pachulski, Stang, Ziehl & Jones) | $100,000 | Effective Date | Condominium Unit Sales and Other Commercial Income of Debtor |
| 4. Other Professionals that may be Employed by Debtor or Committee Pursuant to Court Order | $ 25,000 | Effective Date | Condominium Unit Sales and Other Commercial Income of Debtor |
| 5. HPG Management, Inc. | $35,000 | Effective Date | Condominium Unit Sales and Other Commercial Income of Debtor |
| 6. Class One – Corus Construction Ventures, LLC (Secured Claim Under Corus Loan) | $162,662,216.26 (this claim is subject to pending dispute) | Interest Payments each month commencing 30 days following Effective Date at the rate of 4% per annum, with a principal reduction payment to be made by the later of 60 days following the Effective Date or 10 days following the issuance of a Temporary Certificate of Occupancy for Tower I in the sum of $2,500,000, and monthly principal reduction payments commencing 90 days following the | Condominium Unit Sales and Other Commercial Income of Debtor |

2010 and the claims objection hearing deadline of June 30, 2010.  Nonetheless, the Debtor has made its best effort to estimate such claims as of this time.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| Payment Recipient | Amount of Payment (Total amount to be paid)[1] | Payment Due Date | Source of Payment |
|---|---|---|---|
| | | Effective Date to be in the amount of 50% of Net Distributable Cash (as defined in Section IX.D) until allowed claims in Classes 2 and 3 are paid in full, and 100% of Net Distributable Cash thereafter, until allowed claim of Corus LLC is paid in full. | |
| 7.  Class Two – Mechanics' Lien Claims | $ undetermined (the Debtor estimates that mechanics' lien claims and general unsecured claims collectively amount to approximately $23,200,000) | Interest Payments each month commencing 30 days following the Effective Date at the rate of 4% per annum, with a principal reduction payment to be made by the later of 60  days following the Effective Date or 10 days after the issuance of a Temporary Certificate of Occupancy for Tower I in the total sum of $2,500,000 to be distributed to members of classes 2 and 3 holding allowed claims on a pro rata basis, and with monthly principal reduction payments commencing 90 days following the Effective Date to be made to the members of classes 2 and 3 holding allowed claims on a pro rata basis in the | Condominium Unit Sales and Other Commercial Income of Debtor |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| Payment Recipient | Amount of Payment (Total amount to be paid)[1] | Payment Due Date | Source of Payment |
|---|---|---|---|
| | | amount of 50% of Net Distributable Cash (as defined in Section IX.D) until allowed claims are paid in full. | |
| 8. Class Three – General Unsecured Creditors | $ undetermined (the Debtor estimates that mechanics' lien claims and general unsecured claims collectively amount to approximately $23,200,000) | Interest Payments each month commencing 30 days following the Effective Date at the rate of 4% per annum, with a principal reduction payment to be made by the later of 60 days following the Effective Date or 10 days after the issuance of a Temporary Certificate of Occupancy for Tower I in the total sum of $2,500,000 to be distributed to members of classes 2 and 3 holding allowed claims on a pro rata basis, and with monthly principal reduction payments commencing 90 days following the Effective Date to be made to the members of classes 2 and 3 holding allowed claims on a pro rata basis in the total amount of 50% of Net Distributable Cash (as defined in Section IX.D) until allowed claims are paid in full. | Condominium Unit Sales and Other Commercial Income of Debtor |