9.    Class Four – equity interest          none                    n/a              n/a
       holders

## Claimants and Interest Holders who are Affiliates of the Debtor

| Name & Address of Claimant or Interest Holder | Relationship to Debtor | Amount of Claim or Interest |
|---|---|---|
| Concerto Partners, LLC<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA  90212 | equity interest holder | Holds 50% membership interest |
| Astani/Cho Living Trust<br>Attn:  Sonny Astani and Jo Cho, as Trustees<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA  90212 | equity interest holder | Holds 30% membership interest in the Debtor |
| Concerto Manager, Inc.<br>Attn:  Sonny Astani, President<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA  90212 | claimant | No claim |
| Astani Enterprises, Inc.<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA  90212 | claimant | No claim |
| Astani Construction, Inc.<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA  90212 | claimant | Pre-petition claims:<br>$2,550,000 (for services)<br>$200,000 (for loan) |
| HPG Management, Inc.<br>P.O. Box 2399<br>Beverly Hills, CA  90213 | claimant | Administrative Expense Claim:<br>$5,000 per month for postpetition services involving maintaining Debtor's books and records and related services. |

   Below is a detailed description and treatment of administrative expenses, claims
and interests.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**B.    ADMINISTRATIVE EXPENSES**

1.    These include the "actual, necessary costs and expenses of preserving the estate" as determined by the Court after notice to creditors of a request for payment and after a hearing thereon.  The amounts set forth below are estimates and actual amounts required to be paid may be substantially greater or less depending on the extent of opposition and/or other litigation with respect to the Plan and/or the extent of litigation regarding claims and/or other matters in this case and the extent of services required in connection with the case.  Further, the amounts estimated may differ substantially from the amounts required to be paid on the Effective Date depending upon the amount of cash collateral used to pay such claims prior to confirmation of the Plan.  Also included within this category of administrative expenses are any allowable claims asserted pursuant to 11 U.S.C. § 503(b)(9) for the value of goods delivered within 20 days before the commencement of this chapter 11 case.  The Debtor is not aware of any such claims.

2.    The Code requires that allowed administrative expenses be paid on the effective date unless the party holding the administrative expense agrees otherwise.  The claimants have not agreed otherwise.

(a)    Administrative Expense #1.

Claimant:  SulmeyerKupetz, a professional

corporation (Debtor's bankruptcy counsel).

$250,000, subject to court approval

(b)    Administrative Expense # 2.

Claimant:  Parker, Milliken, Clark, O'Hara

Samuelian, a professional corporation (Debtor's

special litigation counsel)

$200,000, subject to Court approval

(c)    Administrative Expense # 3.

Claimant:  Pachulski, Stang, Ziehl & Jones

(Creditors' Committee Counsel).

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1      $100,000, subject to Court approval

2   (d)  Administrative Expense # 4.

3      Claimant:  Grant Thornton LLP

4      (Creditors' Committee Financial Advisor)

5      $25,000, subject to Court approval of

6      employment and compensation

7   (e)  Administrative Expense # 5.

8      Claimant:  HPG Management, Inc.

9      (postpetition services relating to maintaining

10     Debtor's books and records)

11     $35,000

12

13     ESTIMATED TOTAL:   $610,000

14 **C.**  **UNSECURED TAX CLAIMS**

15  1.  These include certain types of property, sales, and income taxes.  The

16 Debtor is not aware of any such prepetition claims against the Debtor and does not

17 believe that any such claims exist.

18  2.  The Code requires that the holders of such claims receive regular

19 installment payments in cash over a period ending not later than five years after the date

20 of the order for relief, unless agreed otherwise.  Any such claimant has not agreed

21 otherwise.    The total cash payments must have a present value equal to the amount of

22 the allowed claim.  The treatment of any such claims must be in a manner not less

23 favorable than the most favored nonpriority unsecured claim provided in this Plan (other

24 than any cash payments to an administratively convenient class).   To the extent that any

25 allowed prepetition tax claim exists, such claim(s) shall receive the same treatment that is

26 provided under the Plan for the holders of allowed claims in classes 2 and 3.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

D.    **DEFINITION OF NET DISTRIBUTABLE CASH**

The term "Net Distributable Cash" as used in connection with the Plan is defined as net proceeds from sales of Tower I units plus net cash flow from commercial components of the Project, less:

a.  completion costs of the Project and operating costs of the Debtor and/or connected with the Project;

b.  bankruptcy and litigation costs; and

c.  interest due under the Plan on allowed Corus LLC claim and allowed claims of members of Classes 2 (mechanics' lien claimants) and 3 (general unsecured creditors). "Net proceeds from sale of Tower I units" equals gross sales price less brokerage commissions, title charges, legal fees, taxes, and any other closing costs and/escrow prorations.  "Net cash flow from commercial components" equals gross collected rents minus tenant improvement costs, brokerage commissions, property taxes and insurance. "Operating costs" for the Debtor and the Project include repairs and maintenance, sales and marketing costs (other than direct costs such as broker commissions, escrow and closing costs), property taxes, HOA dues, insurance, utilities, security, trash removal, and other ordinary expenses connected with the Debtor's operations and responsibilities with respect to the Project and phase II.

E.    **CLASS ONE**

This Class is impaired and includes the secured claim arising under the Corus Bank Loan Agreement now held by Corus LLC.

The total amount of Corus LLC's allowed claim is subject to dispute.  Corus LLC filed a proof of claim against the Debtor on October 29, 2009, in the face amount of $162,662,216.26.  The Debtor has filed a complaint and objection to the claim asserting that the claim should be reduced by a sum to be determined, but believed by the Debtor to be at least $40,000,000.  The Committee and Astani Construction, Inc., have also filed complaints with respect to Corus LLC's claim.  The objection to claim and complaints are discussed in Section XVII.

1    The allowed secured claim in this class is to be paid in full with interest.    Interest

2  shall accrue on the allowed amount of this claim as of the Effective Date of the Plan at

3  the rate of 4% per annum and shall be paid monthly commencing 30 days following the

4  Effective Date.

5    Total amount of payments (over time) to satisfy the secured claim:  Full amount of

6  allowed claim plus interest payments on said allowed claim at the rate of 4% per annum.

7    Interest rate (to compensate creditor because claim is paid over time): 4% per

8  annum.

9    First interest payment date:  30 days following the Effective Date of the Plan.

10    Frequency of interest payments:  interest payments will be made monthly.

11    Principal reduction payments:  by the later of 60 days following the Effective Date

12  or 10 days after the issuance of a Temporary Certificate of Occupancy for Tower 1  a

13  principal reduction payment in the sum of $2,500,000 shall be made (this payment is

14  conditioned upon the issuance of a Temporary Certificate of Occupancy for Tower I), and

15  beginning 90 days following the Effective Date  monthly principal reduction payments will

16  be made in the sum of  50% of Net Distributable Cash (as defined in Section IX.D) until

17  allowed claims in Classes 2 and 3 are paid in full, and 100% of Net Distributable Cash

18  thereafter, until allowed claim of Corus LLC is paid in full.

19    The lien held by Corus LLC is not modified in any way by the Plan and is to be

20  retained until allowed claim is paid in full, except that the Debtor may sell residential units

21  at the Project free and clear of Corus LLC's lien (with the lien to attach to proceeds with

22  the same priority as existing lien and subject to compliance with the lien release prices for

23  each unit set forth in Exhibit 7 hereto) and may lease and use commercial retail, parking,

24  and other space at the Project and the Debtor may use the proceeds of sales, leases and

25  any other revenue generated at or from the Project in accordance with its business plan

26  and/or as is otherwise necessary in the ordinary course of business so long as no

27  payment default exists with respect the Debtor's obligations to Corus LLC under the Plan.

28  Notwithstanding the foregoing, the Debtor may sell units in Tower I at less than the lien

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  release price set forth for the particular unit in Exhibit 7 hereto if the cumulative total of

2  sales prices for Tower I units as of the time of sale is not more than 15% less than the

3  sales prices set forth in Exhibit 7 hereto for Tower I units that have sold as of that date.

4  The allowed claim of Corus LLC is secured by all assets of the Concerto project,

5  including phase I and phase II, with the exception of units that have been sold.  Until such

6  time as the claim of Corus LLC is allowed by an order of the Court, the claim shall be

7  treated under the Plan to the extent of the amount of the proof of claim of Corus LLC that

8  is not subject to a timely filed objection (i.e., pursuant to the Debtor's objection to the

9  Corus LLC proof of claim, until such objection is resolved by order of the Court, the

10  allowed claim of Corus LLC shall be treated in an amount not greater than $122,000,000

11  under the Plan).

12       The Debtor shall have 10 business days to cure any payment default to Corus

13  LLC.  Upon full payment of the allowed claims in Classes 2 and 3, the Debtor may pre-

14  pay the allowed claim of Corus LLC without penalty.

15  **F.    CLASS TWO**

16       This class is impaired and includes all allowed claims secured by validly perfected

17  mechanics' liens on assets of the Debtor.  The liens securing such allowed claims are of

18  equal priority.  The total amount of such claims is undetermined at this time.  The bar

19  date for filing claims is January 29, 2010.  The bar date for hearings on objections to

20  claims is June 30, 2010.  See Exhibit 8 hereto for a list of claimants who have filed

21  notices of perfection of mechanics' liens in this chapter 11 case as of January 11, 2010.

22  Allowed claims in this class are to be paid in full, with interest.

23       Total amount of payments (over time) to satisfy allowed claims:  Full payment of

24  allowed claims plus interest accruing at the rate of 4% per annum commencing on the

25  effective date of the Plan.

26       Interest rate:  4% per annum.

27       First interest payment date:  30 days following the Effective Date of the Plan.

28       Frequency of interest payments:  payments will be made monthly.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Principal reduction payments:  by the later of 60 days following the Effective Date

2    or 10 days after the issuance of a Temporary Certificate of Occupancy for Tower I, a

3    principal reduction payment shall be made consisting of each claimant's pro rata share of

4    the total allowed claims of members of Classes 2 and 3 under the Plan of $2,500,000

5    (this payment is conditioned upon the issuance of a Temporary Certificate of Occupancy

6    for Tower I), and commencing 90 days following the Effective Date monthly principal

7    reduction payments shall be made in the amount of each claimant's pro rata share of  the

8    total allowed claims of the members of Classes 2 and 3 under the Plan of 50% of Net

9    Distributable Cash (as defined in Section IX.D), until allowed claims are paid in full.

10    The mechanics' liens held by members of this class, to the extent otherwise valid

11    and perfected, are not modified in any way by the Plan and are to be retained until the

12    allowed claim is paid in full, except that the Debtor may sell residential units at the Project

13    free and clear of mechanics' liens (with the liens to attach to proceeds with same priority

14    as existing liens and subject to compliance with the lien release prices set forth in Exhibit

15    7 hereto) and may lease and use commercial retail, parking, and other space at the

16    Project and the Debtor may use the proceeds of sales, leases and any other revenue

17    generated at or from the Project in accordance with its business plan and or as is

18    otherwise necessary in the ordinary course of business so long as no payment default

19    exists with respect the Debtor's obligations to members of this class under the Plan.

20    Notwithstanding the foregoing, the Debtor may sell units in Tower I at less than the lien

21    release price set forth for the particular unit in Exhibit 7 hereto if the cumulative total of

22    sales prices for Tower I units as of the time of sale is not more than 15% less than the

23    sales prices set forth in Exhibit 7 hereto for Tower I units that have sold as of that date.

24    The Debtor shall have 10 business days to cure any payment default to members

25    of this class.

26    G.    **CLASS THREE**

27    This Class is impaired and includes all allowed general unsecured claims against

28    the Debtor.  The total amount of such claims is undetermined at this time.  The bar date

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  for filing claims is January 29, 2010.  The bar date for hearings on objections to claims is

2  June 30, 2010.  See Exhibit 5 hereto for list of prepetition payables (including general

3  unsecured claims and mechanics' lien claims – this list includes members of classes 2

4  and 3) and estimated amounts owed each.  Allowed claims in this class are to be paid in

5  full, with interest.

6       Total amount of payments (over time) to satisfy allowed claims:  Full payment of

7  allowed claims plus interest accruing at the rate of 4% per annum commencing on the

8  Effective Date of the Plan.

9       Interest rate:  4% per annum.

10      First interest payment date:  30 days following the Effective Date of the Plan.

11      Frequency of interest payments:  payments will be made monthly.

12      Principal reduction payments:  by the later of 60 days following the Effective Date

13  or 10 days after the issuance of a Temporary Certificate of Occupancy for Tower I, a

14  principal reduction payment shall be made consisting of each claimant's pro rata share of

15  the total allowed claims of the members of classes 2 and 3 under the Plan of $2,500,000

16  (this payment is conditioned upon the issuance of a Temporary Certificate of Occupancy

17  for Tower I), and commencing 90 days following the Effective Date monthly principal

18  reduction payments shall be made in the amount of each claimant's pro rata share of the

19  total allowed claims of the members of classes 2 and 3 under the Plan of 50% of Net

20  Distributable Cash (as defined in Section IX.D), until allowed claims are paid in full.

21      The Debtor shall have 10 business days to cure any payment default to members

22  of this class.

23      **H.    CLASS FOUR**

24      This Class includes the equity interests (membership interests) in the Debtor.

25  Under the Plan, equity interest-holders simply retain their interests.  The Plan leaves

26  unaltered the legal, equitable, and contractual rights to which the equity interests in the

27  Debtor entitle the holders thereof.  Accordingly, the Debtor believes that this class is

28  unimpaired.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    In accordance with applicable state law, the holders of equity interests shall not

2    receive any distribution or other payment from the Debtor on account of their equity

3    interests until after all allowed claims against the Debtor have been paid in full pursuant

4    to the Plan.

5    <center>X.</center>

6    <center>**SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS**</center>

7    The Plan cannot be confirmed unless the Court finds that it is "feasible," which

8    means that the Proponent has timely submitted evidence establishing that the Debtor will

9    have sufficient funds available to satisfy all expenses, including the scheduled creditor

10    payments discussed above.  What follows is a statement of projected cash flow reflecting

11    that the Debtor shall have the ability to make the payments contemplated under the Plan.

12    The focus is on projected cash receipts and cash disbursements.  All non-cash items

13    such as depreciation, amortization, gains and losses are omitted.  A positive number

14    reflects a source of cash; a (negative number) reflects a use of cash.  A more detailed

15    statement of monthly cash flow projections for through February 2013 is included in

16    Exhibit 4 hereto.

17

18

19

20

21

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Unit Sales Assumptions

**Loft Sales**

| | | | | |
|---|---|---|---|---|
| Units | 77 | Gross Revenue | $ 30,803,528 | |
| | | Sales Costs | $ (1,986,828) | 6.45% |
| Average Price | $ 400,046 | $368 /sf | Net Revenue | $ 28,816,700 |

**Tower Sales Assumptions** — Year - 2010

| | | | | |
|---|---|---|---|---|
| Units / Month | 8 | Gross Revenue | $ 39,964,885 | |
| | | Sales Costs | $ (1,998,244) | 5.00% |
| Average Price | $ 713,659 | $663 /sf | Net Revenue | $ 37,966,640 |

Sales begin in Month    Jun-10

**Tower Sales Assumptions** — Year - 2011

| | | | | |
|---|---|---|---|---|
| Units / Month | 8 | Gross Revenue | $ 71,936,792 | |
| Sales Price Growth | 5% | Sales Costs | $ (3,596,840) | 5.00% |
| Average Price | $ 749,342 | $696 /sf | Net Revenue | $ 68,339,953 |

**Tower Sales Assumptions** — Year - 2012

| | | | | |
|---|---|---|---|---|
| Units / Month | 8 | Gross Revenue | $ 75,533,632 | |
| Sales Price Growth | 5% | Sales Costs | $ (3,776,682) | 5.00% |
| Average Price | $ 786,809 | $731 /sf | Net Revenue | $ 71,756,950 |

**Tower Sales Assumptions** — Year - 2013

| | | | | |
|---|---|---|---|---|
| Units / Month | 8 | Gross Revenue | $ 19,001,429 | |
| Sales Price Growth | 5% | Sales Costs | $ (950,071) | 5.00% |
| Average Price | $ 826,149 | $767 /sf | Net Revenue | $ 18,051,358 |

**Tower Totals**

| | | | | |
|---|---|---|---|---|
| Units | 271 | Gross Revenue | $ 206,436,738 | |
| Sales Price Growth | 5% | Sales Costs | $ (10,321,837) | 5.00% |
| Average Price | $ 768,990 | $714 /sf | Net Revenue | $ 196,114,901 |

### Summary of Estimated Project Cash Flows

| | | |
|---|---|---|
| Lofts - Net Sales Price | $ | 28,816,700 |
| Tower - Net Sales Price | $ | 196,114,901 |
| Net Condo Sales Proceeds | $ | 224,931,601 |
| | | |
| Hard Costs to Complete | $ | 10,588,355 |
| Soft Costs to Complete | $ | 6,509,834 |
| Astani Operating Costs | $ | 1,975,210 |
| Total Costs - Condos | $ | 19,173,399 |
| | | |
| Net Proceeds - Condos | $ | 205,758,202 |
| Net Cash Flow - Commercial | $ | 9,656,250 |
| | | |
| Net Cash Available for Distribution | $ | 215,414,452 |
| Less: | | |
| Bankruptcy Costs / Legal Fees | $ | (2,150,000) |
| Corus Bank - Interest | $ | (18,378,855) |
| Unsecured Debt - Interest | $ | (506,525) |
| Corus Bank Loan - Principal | $ | (162,098,832) |
| Unsecured Debt - Principal | $ | (23,182,154) |
| Total Distributions | $ | (206,316,386) |
| | | |
| Net Proceeds | $ | 9,098,086 |
| Beginning Cash (9/2) | $ | 220,955 |
| Ending Cash | $ | 9,319,041 |
| | | |
| Calculation Check | $ | - |

### Corus Loan Information

| | | |
|---|---|---|
| UPB as of 9/02/09 | $ | 162,098,832 |
| INTEREST RATE - Pre Petition | | 7.36% |
| INTEREST RATE - Post Confirmation | | 4.00% |
| LIBOR 3 Months | | 0.27% |

### Prepetition Unsecured Debt

| | | |
|---|---|---|
| UPB as of 1/10/09 | $ | 23,182,154 |

### Beginning Cash Balance

| | | |
|---|---|---|
| Beginning Cash | $ | 220,955 |
| (9/18/09) | | |

### Share of Net Available Cash Flow

| | |
|---|---|
| Corus Bank - % of Available Cash Flow | 50.00% |
| Pre-Petition Debt - % of Avail Cash Flow | 50.00% |
| Debt Reduction Upon Confirmation | 5,000,000 |

1      Section VII.C states the assumptions and details surrounding the statement of

2 projected cash flow.

3      On the Effective Date, interest on allowed claims begins to accrue in accordance

4 with the Plan and, as set forth above, and initial payments under the Plan commence 30

5 days following the Effective Date.

6 <div align="center">**XI.**</div>

7 <div align="center">**FINANCIAL INFORMATION TO ASSIST IN DETERMINING WHETHER PROPOSED**</div>

8 <div align="center">**PAYMENT IS FEASIBLE**</div>

9      In the case of the Debtor, historical financial information regarding the Debtor's

10 operating results is not pertinent and does not exist since the Debtor's business primarily

11 involves the development of the Concerto project and the sale of condominium units at

12 the Project. The closing of such sales began following the Debtor obtaining Court

13 authority to close sales in this chapter 11 case. As reflected by the Debtor's business

14 plan (see the components of the financial model underlying the Debtor's business plan

15 attached hereto as Exhibits 1- 7), all debts of the Debtor can be satisfied in full by the

16 sale of units in Tower I by March 2013. Pursuant to the Debtor's projections, this is the

17 case regardless of whether the claim of Corus LLC is disallowed in part and reduced by

18 the Court or not. A summary of estimated net proceeds based on the Debtor's business

19 plan projections is set forth in Section VII.C above. As reflected in that summary,

20 approximately $9.3 million of cash would be generated after full repayment of debt in

21 accordance with the business plan, with Corus LLC's claim not being reduced. This

22 estimate does not include any value attributable to the sale of commercial components of

23 the Project or to the land and entitlements for phase II of the development (valued at

24 $34,500,000 by the Debtor – see valuation letter attached hereto as Exhibit 9). The

25 Debtor believes that the assumptions underlying its business plan are reasonable and

26 appropriate. See Section VII.C above for a discussion of the assumptions.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## XII.

## ASSETS AND LIABILITIES OF THE ESTATE

A.    **ASSETS**

As discussed above, the Debtor's assets consist of the Concerto development and revenues generated from the Project. The development is a two-phase, mixed-use (residential condominium and retail) development. The site is located at the southeast corner of Figueroa Street and 9th Street. The Project (phase I) consists of Tower I (containing 271 residential units and retail and storage space), the Loft (containing 77 residential units and retail and storage space), and the Parking Garage (a seven-story partly underground parking structure). A phase II of the Concerto development consisting of Tower II (a second 30-story tower) is contemplated for the future, and its infrastructure (including subterranean parking, elevator shafts, DWP vaults, excavation, shoring and some foundation) has been completed, but further construction has not been commenced.

Attached hereto as Exhibit 9 is a letter from a valuation expert working with the Debtor setting forth the value of the Project and phase II upon completion of phase I in the sum of $203,300,000 (in addition, the Debtor is projected to have cash on hand in the approximate amount of $14,000,000 at the time of completion of Phase I). The underlying valuation report providing more detail than Exhibit 9 is available upon request to the Debtor's bankruptcy counsel.

B.    **LIABILITIES**

The bar date for filing proofs of claim is January 29, 2010. The deadline for hearings on objections to claims is June 30, 2010. As set forth above, Corus LLC has filed a proof of claim in the sum of $162,662,216.26. The Debtor has objected to this claim and asserts that the claim should be reduced by a sum of at least $40,000,000. The Debtor estimates that other claims (mechanics' lien and general unsecured claims) against the Debtor (not including the Corus LLC claim) amount to approximately

1  $23,200,000. Attached hereto as Exhibit 5 is a list of the Debtor's accounts payable as of

2  the commencement of the Debtor's chapter 11 case.

3  **C.   SUMMARY**

4       As of the completion of Phase I of the Concerto development, the Debtor's assets

5  (phase I and phase II of the Concerto development and estimated cash on hand) have an

6  estimated value of $217,000,000. Total liabilities (assuming that CCV's claim is not

7  disallowed in part and reduced) are in the estimated amount of $186,000,000.

8                                    **XIII.**

9            **TREATMENT OF NONCONSENTING CLASSES**

10      As stated above, even if all classes do not consent to the proposed treatment of

11  their claims under the Plan, the Plan may nonetheless be confirmed if the dissenting

12  classes are treated in a manner prescribed by the Code. The process by which

13  dissenting classes are forced to abide by the terms of a plan is commonly referred to as

14  "cramdown." The Code allows dissenting classes to be crammed down if the Plan does

15  not "discriminate unfairly" and is "fair and equitable." The Code does not define

16  discrimination, but it does provide a minimum definition of "fair and equitable." The term

17  can mean that secured claimants retain their liens and receive cash payments whose

18  present value equals the value of their security interest. For example, if a creditor lends

19  the Debtor $100,000 and obtains a security interest in property that is worth only

20  $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash

21  payments whose present value equals $80,000 and not $100,000. The term means that

22  unsecured claimants whose claims are not fully satisfied at least know that no claim or

23  interest that is junior to theirs will receive anything under the Plan, except where the

24  Debtor is an individual, has elected to retain property included in the Estate under 11

25  U.S.C. § 1115 and has satisfied 11 U.S.C. § 1129(b)(2)(B)(ii). "Fair and equitable"

26  means that each holder of an interest must receive the value of such interest or else no

27  junior interest is entitled to receive anything.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Therefore, if a class of general unsecured claims votes against the Plan, the Plan

2    cannot be confirmed where a class of interest holders (e.g. shareholders or partners) will

3    receive or retain any property under the Plan on account of such interests, unless the

4    Plan provides that the class of general unsecured claims shall be paid in full with interest.

5    These are complex statutory provisions and the preceding paragraphs do not purport to

6    state or explain all of them.

7                                    XIV.

8    **TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS**

9    **(CHAPTER 7 LIQUIDATION ANALYSIS)**

10    The Plan must provide that a nonconsenting impaired claimant or interest holder of

11    a consenting class receive at least as much as would be available had the Debtor filed a

12    Chapter 7 petition instead.

13    In a Chapter 7 case the general rule is that the Debtor's assets are sold by a

14    trustee.  Unsecured creditors generally share in the proceeds of sale only after secured

15    creditors and administrative claimants are paid.  Certain unsecured creditors get paid

16    before other unsecured creditors do.  Unsecured creditors with the same priority share in

17    proportion to the amount of their allowed claim in relationship to the total amount of

18    allowed claims.

19    Generally, a creditor would recover from the assets of the bankruptcy estate less

20    under Chapter 7 than under Chapter 11 for various reasons.  First, the liquidation value of

21    an asset  is frequently less than its fair market value when a liquidation sale would take

22    place on an expedited or short-term basis and/or under what prospective purchasers are

23    likely to perceive as a distressed sale or "fire sale" situation.  In this case, the Debtor

24    believes that it's current business plan has been appropriately adjusted to current market

25    circumstances and is the best means under the circumstances for maximizing the value

26    of the Project and the recoveries available for creditors and equity interest holders of the

27    Debtor.  There is no certainty regarding whether a chapter 7 trustee appointed to

28    liquidate the Debtor's assets would have familiarity or expertise with regard to conducting

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   such a liquidation.  Further, the Debtor fears that the general impression of prospective

2   buyers in the context of the conversion of the Debtor's chapter 11 case to a chapter 7

3   liquidation would be that the liquidation is taking place in a distressed "fire sale"

4   environment and potential buyers would likely expect a substantial discount from

5   otherwise potentially obtainable values.  The Debtor believes that a bulk sale (a

6   "wholesale" disposition) or more expedited sale process under a chapter 7 liquidation

7   would generate a smaller recovery and potentially eliminate recovery by equity holders

8   and reduce creditor recovery compared to a "retail" sale of condominium units to natural

9   buyers as contemplated by the Plan.  While difficult to quantify this expected loss of

10  value, for purposes of the liquidation analysis chart set forth below, the Debtor has

11  reduced the value of phase I and phase II as of completion of phase I ($203,000,000) by

12  15% of that sum ($30,450,000).

13         Second, in a chapter 7 case a trustee is appointed and is entitled to compensation

14  from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all

15  moneys disbursed, 10% on any amounts over $5,000 and up to $50,000, 5% on all

16  amounts over $50,000 and up to $1,000,000, and such reasonable compensation no

17  more than 3% of moneys over $1,000,000.  In this case, the trustee's fee would amount

18  to millions of dollars.  For purposes of the liquidation analysis chart set forth below, the

19  Debtor has estimated the chapter 7 trustee's fee to be $5,000,000.  Moreover, the

20  chapter 7 trustee would employ professionals adding another layer of administrative

21  expense on the estate. This additional layer of expense could also amount to millions of

22  dollars.  For purposes of the liquidation analysis chart set forth below, the Debtor has

23  estimated the sum of this additional layer (chapter 7 professional fees) of administrative

24  expense to be $1,000,000.  Further for purposes of the liquidation analysis chart set forth

25  below, the Debtor has assumed that the secured claim of CCV is not materially reduced

26  and is allowed in the amount of $162,000,000.

27         In this case, the Debtor believes that creditors will be paid in full under the chapter

28  11 Plan and has serious concerns that payments would be jeopardized and diminished in

1  a chapter 7 scenario.  The Debtor believes that payment will be made more quickly and

2  with greater certainty pursuant to the Debtor's chapter 11 plan than in the situation where

3  an unknown chapter 7 trustee would come in to take over control of the Debtor's assets.

4

| | | Chapter 7 | Chapter 11 |
|---|---|---|---|
| 1. | Value of assets | $186,550,000 | $217,000,000 |
| 2. | Administrative exp. | $1,610,000 | $610,000 |
| | Corus LLC secured debt | $162,000,000 | $162,000,000 |
| | priority unsecured claims | none | none |
| 3. | chapter 7 trustee fee | $5,000,000 | n/a |
| | TOTAL AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED CREDITORS AND MECHANICS' LIEN CLAIMS (IN CHAPTER 7, THE MECHANICS' LIEN CLAIMANTS MIGHT BE PAID IN FULL PRIOR TO CORUS LLC RECEIVING PAYMENT DEPENDING ON THE RESULTS OF LITIGATION OF THAT ISSUE OF PRIORITY) | $17,940,000 | $54,390,000 |

Unsecured creditors (and mechanics' lien claimants and Corus LLC) receive payment 100% of total allowed claims under the Plan

## XV.

## FUTURE DEBTOR

### A.    MANAGEMENT OF DEBTOR

The Debtor will continued to be managed by Concerto Manager, Inc. (the "Manager"), the current manager of the Debtor.  Sonny Astani is the President of Concerto Manager, Inc., and is a controlling equity holder in or an affiliate of persons or entities holding the majority of the equity interests in the Debtor.

As set forth above, Astani Enterprises, Inc. is the driving force behind GTS. Through its subsidiaries and affiliates, Astani Enterprises, Inc. is downtown Los Angeles' largest residential real estate developer, as well as the owner and operator of more than

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  5,000 apartment units throughout Southern California and the current developer of 1,700

2  units of apartments, condominiums and mixed-use projects in, among other areas,

3  downtown Los Angeles, Encino, and elsewhere, collectively valued at more than

4  $500,000,000.  Sonny Astani is the Chairman and President of Astani Enterprises, Inc.

5  He has more than 30 years of real estate experience in the Southern California and Baja

6  Mexico areas, and has been involved in the acquisition, development, construction and

7  management of more than $1,000,000,000 of multi-family buildings and condominiums,

8  including 5,000 new units in the City of Los Angeles.

9       Astani Construction, Inc., a California corporation and affiliate of Astani

10  Enterprises, Inc., is the general contractor of the Concerto project.  Astani Construction,

11  Inc., through its principals, has a successful track record of 30 years of building,

12  developing and renovating more than $1,000,000,000 worth of apartment buildings,

13  condominiums, custom homes, tenant improvements, and commercial enterprises

14  throughout the United States.

15  **B.    DISBURSING AGENT**

16       The Manager of the Debtor, Concerto Manager, Inc., shall serve as disbursing

17  agent under the Plan and is responsible for collecting money intended for distribution to

18  claimants and transmitting it to them.

19  **C.    FUTURE FINANCIAL OUTLOOK**

20       The Proponent believes that the Debtor's economic health will improve from its

21  prebankruptcy state for the following reasons.  As discussed in detail above, the

22  development of the Concerto project was halted as a result of the conduct and ultimate

23  demise of the Debtor's construction lender, Corus Bank.  Among other things, Corus

24  Bank failed to make timely advances required for construction of phase 1 of the Debtor's

25  development, and also failed to consent to the sale of the units in the Loft so that, in lieu

26  of advances under the construction loan, the Debtor could generate funds to complete

27  the construction.  Following commencement of this chapter 11 case, having failed to

28  obtain Corus Bank's or the FDIC's approval, the Debtor obtained Court approval to close

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   the sales of units in the Loft and use the sales proceeds to complete construction.

2   Further, the Debtor developed the business plan discussed above and reflected in the

3   financial model embodied in Exhibits 1 – 7 hereto.  In accordance with its business plan,

4   the Debtor projects that it will have adequate funds to complete construction of the

5   Project and pay all claims in full with interest by February 2013.

6         Section X provides a summary of the projected cash flow of the Debtor for the

7   duration of the Plan.  The  assumptions summarized in Section VII.C above underlie the

8   projections.  As previously stated, Plan payments will come from the continued operation

9   of the Debtor's business involving completion of the Project, the sale of residential units,

10   and the leasing of commercial retail, parking, and storage space.

11                             XVI.

12   **SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND**

13   **LEASES; OTHER PROVISIONS**

14         The Plan provides for the sale of property of the Debtor (residential condominium

15   units) free and clear of liens and the lease and use of property of the Debtor (retail,

16   parking, and storage spaces) free and clear of liens (with such liens to attach to proceeds

17   with the same validity, priority and extent as exists prior to confirmation of the Plan),

18   without the need for further notice or order of the Court other than the order confirming

19   the Plan.  Sales of Tower 1 units may be made by the Debtor free and clear of all liens so

20   long as the unit lien release price for the subject unit set forth in Exhibit 7 hereto is

21   satisfied.  Notwithstanding the foregoing, the Debtor may sell units in Tower I at less than

22   the lien release price set forth for the particular unit in Exhibit 7 hereto if the cumulative

23   total of sales prices for Tower I units as of the time of sale is not more than 15% less than

24   the sales prices set forth in Exhibit 7 for Tower I units that have sold as of that date.

25   Pursuant to the Plan, Debtor may use the proceeds of sales, leases and any other

26   revenue generated at or from the Project or from phase II in accordance with its business

27   plan and to make the payments required under the Plan and or as is otherwise necessary

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  in the ordinary course of business so long as no uncured payment default exists with

2  respect the Debtor's obligations to creditors pursuant to the Plan.

3      As of the Effective Date of the Plan, all prepetition executory contracts of the

4  Debtor not otherwise previously assumed by order of the Court or subject to a pending

5  motion to assume shall be deemed rejected, except that the Debtor's general contractor

6  agreement with the Project's general contractor, Astani Construction, Inc., shall be

7  assumed, with such assumption not to be subject to any cure requirement other than

8  payment of the allowed claims of Astani Construction, Inc. as a member of class 2 and/or

9  3 in accordance with the same treatment provided to all other members of such classes

10  under the Plan.

11      The Court must make certain findings of fact before approving the Plan.  The

12  Proponent will request that the Court make the appropriate findings at the confirmation

13  hearing, based upon evidence submitted in support of the confirmation motion.

14  <div align="center">**XVII.**</div>

15  <div align="center">**BANKRUPTCY PROCEEDINGS**</div>

16      **A.**    **COMMENCEMENT OF CASE**

17      The Debtor commenced its reorganization case by filing a voluntary chapter 11

18  petition on September 17, 2009.  Following the commencement of the Debtor's chapter

19  11 case, the Court approved the Debtor's employment of SulmeyerKupetz, a professional

20  corporation, as bankruptcy counsel and Parker, Milliken, Clark, O'Hara & Samuelian, A

21  Professional Corporation, as special corporate counsel.  On October 16, 2009, pursuant

22  to the "Notice of Appointment and Appointment of Committee of Creditors Holding

23  Unsecured Claims", the United States Trustee appointed a creditors committee in this

24  case.  The Committee's retention of Pachulski Stang Ziehl & Jones LLP as counsel has

25  been approved by the Court.

26      **B.**    **LOFT UNITS SALE AND CASH COLLATERAL MOTIONS**

27      On October 1, 2009, the Debtor filed two related motions.  One motion (the "Sale

28  Motion") requested that the Court authorize the Debtor to complete the 77 pending sales

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  (and to complete sales substitute back-purchasers, if necessary, in the event that any

2  pending buyers fail to perform) of all units in the Debtor's low-rise loft structure by

3  authorizing the Debtor's assumption (subject to the Court approving these sales free and

4  clear of interests) of sales contracts and approving the sales free and clear of interests,

5  with all liens to attach to the sale proceeds with the same validity, priority, and perfection

6  as existed with respect to the residential units to be sold.  Pursuant to the second motion

7  (the "Cash Collateral Motion"), the Debtor requested that the Court authorize the use of

8  cash collateral (the net proceeds of the sale of the Residential Loft Units) in order to

9  complete construction of phase I of the Concerto project, with the secured lender and any

10  other lien holders to receive replacement liens on postpetition improvements to the

11  collateral and the proceeds therefrom.

12          The FDIC (as receiver for Corus Bank) filed objections to both the Sale Motion and

13  the Cash Collateral Motion.  However, the FDIC's participation with respect to these

14  motions were short lived.  On October 7, 2009, Starwood Capital Group ("Starwood")

15  issued a press release stating that Starwood, TPG Capital, Perry Capital and WLR

16  LeFrak had reached a definitive agreement with the FDIC to acquire an equity interest in

17  a limited liability company which will hold construction loans and real estate owned

18  assets formerly owned by Corus Bank.  The Debtor's construction loan was one of the

19  significant assets acquired by the Starwood-lead investment consortium.  A true and

20  correct copy of the Press Release is attached hereto as Exhibit 10.  Among other things,

21  the Press Release stated that the transaction equated to approximately 60% of unpaid

22  principal balance and a significantly greater discount to total construction costs, that the

23  FDIC will hold a 60% equity interest in Corus Construction Ventures, LLC, and will

24  provide financing with a 0% coupon for 50% of the purchase price to Corus LLC, and that

25  Starwood will also receive a management fee to oversee the day-to-day management of

26  Corus Construction Ventures, LLC.  The Debtor has repeatedly requested that Corus

27  LLC provide a copy of the purchase agreement for the Debtor's loan with Corus Bank.

28  As of January 13, 2010, Corus LLC has not provided the document(s).

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Prior to the hearing on the Sale Motion and the Cash Collateral Motion, the Debtor

2   commenced discussions with Corus LLC and ultimately agreed on orders to be entered

3   by the Court with respect to the Sale Motion and the Cash Collateral Motion.  At a

4   hearing on October 29, 2009, the Court announced that it was granting approval of the

5   Sale Motion and the Cash Collateral Motion and on October 30, 2009, orders were

6   entered granting the Motions.  Thereafter, substantial information and documents were

7   provided by the Debtor to Starwood/Corus LLC and their consultants with regard to the

8   Project, an updated construction budget, draw requests, and related matters.

9   Representatives of the Debtor and the general contractor for the Project spent significant

10   time meeting with consultants for Starwood/Corus LLC and the process of closing sales

11   of residential units in the Loft commenced.  As of January 15, 2010, the Debtor has paid

12   CCV $4,000,000 in postpetition payments.  Construction necessary to complete the Lofts

13   and Tower I was delayed as a result of CCV and its consultants not promptly approving

14   the Debtor's updated construction budget.

15    The order approving the Cash Collateral Motion set a deadline of 60 days from the

16   date of submission of documentation by Corus LLC to the Debtor and the Committee

17   (December 29, 2009) for objecting to the claim of Corus LLC and/or asserting claims

18   against Corus LLC.

19    **C.**    **CLAIM OF CORUS CONSTRUCTION**

20    On October 29, 2009, Corus LLC filed a Proof of Claim in this chapter 11 case in

21   the amount of $162,662,216.26, which has been assigned claim number 16 in the claims

22   register in this case.  The Proof of Claim is based upon a Promissory Note dated as of

23   July 2, 2007 given by the Debtor to Corus Bank, which is Corus LLC's predecessor in

24   interest, and the Deed of Trust given by the Debtor to Corus Bank.  Both the Promissory

25   Note and the Deed of Trust reference an underlying construction Loan Agreement

26   between the Debtor and Corus Bank.

27    Corus LLC asserts that it received an interest in the Promissory Note and loan

28   documents pursuant to an agreement with the FDIC, as receiver for Corus Bank.  The

1 | Debtor has repeatedly requested that Corus LLC provide a copy of the agreement by

2 | which it acquired the Debtor's loan from the FDIC, and, to date, Corus LLC has not done

3 | so.

4 | **D.    COMPLAINT AND OBJECTION TO CLAIM OF CORUS CONSTRUCTION**

5 | **FILED BY DEBTOR**

6 | In response to Corus LLC's Proof of Claim filed on October 29, 2009, the Debtor

7 | filed on December  29, 2009, in this chapter 11 case, a Complaint and Objection to Claim

8 | commencing an adversary proceeding against Corus LLC, entitled *GTS 900 F. LLC v.*

9 | *Corus Construction Ventures, LLC, Adv. No. 2:09-ap-02188-VZ*.  The Complaint and

10 | Objection alleges, among other things, that the claim held by Corus LLC should be offset

11 | and reduced because of the misconduct of Corus Bank in the administration of the

12 | construction loan, including, but not limited to, the acts outlined in section VII.B above.  In

13 | the Complaint and Objection to Claim, the Debtor also alleges, among other things, that

14 | as a result of Corus Bank's breaches of its contractual obligations and breaches of its

15 | implied duty of good faith and fair dealing arising from the Loan Agreement, the Debtor

16 | has been damaged in an amount to be determined, but believed to be at least

17 | $40,000,000.

18 | In objecting to Corus LLC's claim, the Debtor asserts that Corus LLC's claim fails

19 | and must be disallowed to the extent of damages caused by and defenses resulting from

20 | Corus Bank's breaches of its contractual obligations and breaches of  its implied duty of

21 | good faith and fair dealing arising from the Loan Agreement.  As part of the Complaint

22 | against Corus LLC, the Debtor also asserts claims for (i) declaratory relief as to the

23 | amount of the Corus LLC claim, (ii) offset against Proof of Claim of Corus LLC for

24 | damages sustained by the Debtor, and (iii) equitable subordination of the Corus LLC

25 | claim to the claims of creditors holding allowed secured and unsecured claims against

26 | the Debtor.

27 |

28 |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

E.     **COMPLAINT REGARDING CLAIM AND LIEN OF CORUS**

**CONSTRUCTION FILED BY CREDITORS" COMMITTEE**

On December 29, 2009, the creditors' committee appointed in this chapter 11 case filed a complaint in this case commencing an adversary proceeding against Corus LLC entitled *Official Committee of Unsecured Creditors v. Corus Construction Ventures LLC,* Adv. No. 2:09-ap-01_____-VZ. The Committee's Complaint is for (i) declaratory relief regarding validity, priority and extent of liens, and (ii) for equitable subordination. In the adversary proceeding, the Committee seeks a determination from the Court that the lien rights of mechanics' lien claimants, to the extent that such lien rights are valid and properly perfected, are prior and senior to the lien rights of Corus LLC, and requests an order of the Court ruling that Corus LLC's rights under the Loan Agreement are equitably subordinated to claims of all other creditors of the Debtor for purposes of distribution and/or that any lien securing those rights be transferred to the Debtor's estate.

The Committee's complaint asserts that the mechanics' lien claimants are senior in priority to the claim of Corus LLC, based on the fact that substantial work was performed on the construction site prior to the recordation of the Corus Bank lien on July 5, 2007, thus giving priority to all subsequent mechanic's lien claimants, whose lien rights relate back to the commencement of the work of improvement. The Committee's equitable subordination claim, among other things, arises from the unwarranted delays in funding the construction loan and mismanagement of the construction loan that has injured the rights of the mechanic's lien creditors.

F.     **COMPLAINT REGARDING CLAIM AND LIEN OF CORUS LLC FILED BY**

**ASTANI CONSTRUCTION, INC.**

On December 29, 2009, Astani Construction, Inc., the general contractor for the Project, filed a complaint against Corus LLC for (i) determination of extent, validity and priority of lien asserted by CCV, and (ii) equitable subordination, *Astani Construction, Inc. v. Corus construction Ventures, LLC, Adv. No. 2:09-ap-01356-VZ.* In the Complaint, Astani Construction, Inc., requests that the Court determine (A) that the lien asserted by

1  Corus LLC is junior and subordinate to the lien of Astani Construction, Inc., and to each

2  of the valid and properly perfected mechanic's liens against the Concerto project, (B) that

3  the amount of the allowable claim held by Corus LLC should be determined, fixed and

4  reduced to the amount that reflects the objections and offsets in the approximate amount

5  of $40 million asserted by the Debtor and otherwise applicable to such claim, and (C) that

6  the allowed claim of Corus LLC is to be subordinated to the allowed claims of Astani

7  Construction, Inc., and all other validly perfected mechanics' lien claims.

8          G.      **PLAN AND DISCLOSURE STATEMENT**

9          The Debtor filed a Disclosure Statement and Plan of Reorganization in this case

10  on January 13, 2010.  The hearing on the Disclosure Statement was set for February 18,

11  2010.  As set forth above, the Court has approved the Disclosure Statement as

12  containing adequate information and a hearing on confirmation of the Plan is set for

13  _____, 2010.

14                          XVIII.

15                  **TAX CONSEQUENCES OF PLAN**

16          A.      **INTRODUCTION**

17          The implementation of a chapter 11 plan may have federal, state and local tax

18  consequences to the Debtor and the Debtor's creditors and equity holders.  No tax

19  opinion has been sought or will be obtained with respect to any tax consequences of the

20  Plan.  This Disclosure Statement does not constitute and is not intended to constitute

21  either a tax opinion or tax advice to any person, and the summary contained herein is

22  provided for informational purposes only.

23          The discussion below summarizes only certain of the federal income tax

24  consequences associated with the Plan's implementation.  This discussion does not

25  attempt to comment on all aspects of the federal income tax consequences associated

26  with the Plan, nor does it attempt to consider various facts or limitations applicable to any

27  particular creditor or equity interest-holder which may modify or alter the consequences

28  described herein.  A creditor or equity interest-holder may find that the tax consequences

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   of the Plan to such creditor or equity holder differ materially from the tax consequences

2   discussed below because of such creditor's or equity holder's facts and circumstances.

3   This discussion does not address state, local or foreign tax consequences or the

4   consequences of any federal tax other than the federal income tax.

5        The following discussion is based upon the provisions of the Internal Revenue

6   Code of 1986, as amended from time to time (the "Internal Revenue Code" or ("IRC"), the

7   Treasury Income Tax regulations, as amended from time to time, promulgated

8   thereunder, existing judicial decisions and administrative rulings.  In light of the rapidly-

9   changing nature of tax law, no assurance can be given that legislative, judicial or

10  administrative changes will not be forthcoming that would affect the accuracy, validity or

11  applicability of the discussion below.  Any such changes could be material and could be

12  retroactive with respect to the transactions entered into or completed prior to the

13  enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan

14  are uncertain due to the lack of applicable legal authority and may be subject to judicial or

15  administrative interpretations that differ from the discussion below.

16       CREDITORS AND  EQUITY INTEREST-HOLDERS ARE ADVISED TO

17  CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX

18  CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE

19  PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX

20  CONSEQUENCES.  NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT

21  WAS INTENDED OR WRITTEN TO BE USED, CAN BE USED BY ANY TAXPAYER OR

22  MAY BE RELIED UPON OR USED BY ANY TAXPAYER, FOR THE PURPOSE OF

23  AVOIDING PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE

24  INTERNAL REVENUE CODE OF 1986, AS AMENDED.  ANY WRITTEN STATEMENT

25  CONTAINED IN THIS DISCLOSURE STATEMENT RELATING TO ANY FEDERAL TAX

26  TRANSACTION OR MATTER MAY NOT BE USED BY ANY PERSON IN ANY MANNER

27  TO SUPPORT THE PROMOTION OR MARKETING OF OR TO RECOMMEND ANY

28  FEDERAL TAX TRANSACTION(S) OR MATTER(S).

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## B.    FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR

1.    Utilization of a Debtor's Net Operating Losses

Internal Revenue Code section 382 places potentially severe limitations upon an entity's use of its net operating losses and loss carryovers ("NOLs") and certain other tax attributes if an "ownership change" occurs with respect to such entity's equity interests. Any pre-effective date shift (deemed or actual) in the ownership of stock of a debtor, directly or by attribution, outside the scope of a chapter 11 plan may trigger an "ownership change" that would adversely affect the availability of a debtor's NOLs. Because the federal income tax consequences of any such shift would depend on the particular facts and circumstances at such time and the application of complex legislation and regulations, the Debtor expresses no view as to the effect of any transactions outside the scope of the Plan or the survival of any NOLs or other tax attributes.  Parties in interest are cautioned against assuming that NOLs will be available to shelter any income or gain that may be recognized as a result of Plan transactions or the Debtor's operations prior to the Effective Date.

2.    Reduction of Debtor's Indebtedness

Any amount of potential discharged indebtedness for federal income tax purposes will be referred to herein as a "Debt Discharge Amount."  In general, the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any consideration given for such discharge.  No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

If a taxpayer is in a title 11 case (a case under the Bankruptcy Code) and the discharge of indebtedness occurs pursuant to a plan approved by the court (such as the Plan in this case, if confirmed), such discharge of indebtedness is specifically excluded from gross income.  If the taxpayer is insolvent before a cancellation or deemed cancellation of debt and does not become solvent by reason of the cancellation or

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   deemed cancellation, such cancellation or deemed cancellation of indebtedness is

2   specifically excluded from gross income.  The Plan in this case does not result in the

3   elimination of debt.

4        Accordingly, the Debtor believes that it will not be required to include in gross

5   income any Debt Discharge Amount as a result of the Plan.  The Internal Revenue Code

6   requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount

7   excluded from gross income.  Tax attributes are reduced in the following order of priority:

8   current year net operating losses and net operating loss carryovers; general business

9   credits; minimum tax credits; capital loss carryovers; basis of property of the taxpayer;

10  passive activity loss or credit carryovers; and foreign tax credit carryovers.  Tax attributes

11  are generally reduced by one dollar for each dollar excluded from gross income, except

12  that general tax credits, minimum tax credits and foreign tax credits are reduced by 33.3

13  cents for each dollar excluded from gross income.  The tax attribute reduction rules may

14  eliminate a portion of a debtor's NOLs and other tax attributes.  However, such NOLs and

15  other tax attributes will not be reduced until after the determination of tax, if any, for the

16  taxable year in which a plan is confirmed and becomes effective.

17       3.    Alternative Minimum Tax

18       In general, an alternative minimum tax ("AMT") is imposed on an entity's

19  "alternative minimum taxable income" ("AMTI") at a 20 percent rate to the extent such tax

20  exceeds the corporation's regular federal income tax for the taxable year.  AMTI

21  generally is equal to regular taxable income with certain adjustments.  For purposes of

22  computing AMTI, certain tax deductions and other beneficial allowances are modified or

23  eliminated.  In particular, even though an entity otherwise may be able to shelter all of its

24  taxable income for regular income tax purposes by applying available NOLs, an entity  (or

25  consolidated group) is entitled to offset no more than 90 percent of its AMTI with NOLs

26  (as recomputed for AMT purposes).  The confluence of a 20 percent AMT tax rate and a

27  90 percent (of AMTI) cap on the deduction for AMT NOLs creates an effective AMT tax

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  rate of two percent (i.e., 20 percent of the 10 percent of AMTI that is not sheltered with

2  AMT NOLs).

3      Accordingly, even if a debtor's NOLs remain available to fully shelter net income or

4  gain, if any, recognized during the tax year in which the Plan is confirmed and becomes

5  effective, a debtor may be liable for AMT even though a debtor is not liable for regular

6  federal income tax.

7      4.    Pass-Through Tax Entity

8      The Debtor is a California limited liability company.  A limited liability company

9  ("LLC") is a hybrid business entity having certain characteristics of both a corporation and

10 a partnership.  The primary characteristic an LLC shares with a corporation is limited

11 liability, and the primary characteristic it shares with a partnership is the availability of

12 pass-through income taxation.  The Debtor has elected to be taxed like a partnership.

13 Section 5 of the Debtor's Second Amended and Restated Operating Agreement, effective

14 as of March 15, 2007, provides that net profits and net losses of the Debtor shall be

15 allocated to the members (equity interest-holders) of the Debtor in proportion to the

16 percentage of their respective equity interests in the Debtor.

17    **C.    TAX CONSEQUENCES TO CREDITORS**

18     The tax consequences of a chapter 11 plan's implementation to a creditor may

19 depend on many factors, including the type of consideration received by the creditor in

20 exchange for its claim, whether the creditor reports income on the cash or accrual

21 method, whether the creditor receives consideration in more than one tax year of the

22 creditor, and whether all the consideration received by the creditor is deemed to be

23 received by that creditor in an integrated transaction.  The tax consequences upon the

24 receipt of Cash, debt instruments or other property allocable to interest are discussed

25 below under "Receipt of Interest."  Creditors are advised to seek their own tax counsel to

26 properly assess the tax consequences in their particular situation.

27     1.    Claims Satisfied With Payment.

28        (a)    Gain/Loss on Exchange

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   As a general rule, a creditor whose existing claims are satisfied with payments

2   under a chapter 11 plan or with the receipt of equity interests in a reorganized debtor, will

3   recognize gain or loss on the actual or constructive exchange of such creditor's existing

4   creditor claims (other than claims for accrued interest) for the consideration received

5   equal to the difference between (i) the "amount realized" in respect of such claims, and

6   (ii) the creditor's tax basis in such claims.  The "amount realized" will generally be equal

7   to the sum of the cash received plush the fair market value of the other consideration

8   received.   Again, creditors are advised to seek their own tax counsel to properly assess

9   the tax consequences in their particular situation.

10          (b)      Tax Basis and Holding Period of Items Received

11   Pursuant to Internal Revenue Code Section 1223, the aggregate tax basis in the

12   items received or deemed received by a creditor will generally equal the amount realized

13   in respect of such items (other than amounts allocable to any accrued interest).  The

14   holding period for items received in the exchange will generally begin on the day

15   following the exchange.

16          (c)      Determination of Character of Gain

17   Under the general rule governing exchanges under the Internal Revenue Code, in

18   the case of a creditor whose existing claims constitute capital assets in such creditor's

19   hands, the gain required to be recognized will generally be classified as a capital gain,

20   except to the extent of interest (including accrued market discount, if any), with any gain

21   recognized thereon generally treated as ordinary income to the extent of accrued market

22   discount.  As a general rule, any capital gain recognized by a creditor will be long-term

23   capital gain with respect to those claims for which the creditor's holding period is more

24   than one year, and short-term capital gain with respect to such claims for which the

25   creditor's holding period is one year or less.  Again, the actual characterization of

26   gain/loss in this particular instance pursuant to the general rules governing exchanges is

27   qualified by, among other things, the qualifications noted above with respect to realization

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1    of gain/loss and exchanges.  Creditors should be advised to seek their own tax counsel

2    to properly assess the tax consequences in their particular situation.

3        2.        Receipt of Interest

4        As a general rule, income attributable to accrued but unpaid interest will be treated

5    as ordinary income, regardless of whether the creditor's existing claims are capital assets

6    in its hands.  A creditor who, under its accounting method, was not previously required to

7    include in income accrued but unpaid interest attributable to existing claims, and who

8    exchanges its interest claim for cash or other property pursuant to a chapter 11 plan, will

9    generally be treated as receiving ordinary interest income to the extent of any

10   consideration so received allocable to such interest, regardless of whether that creditor

11   realizes an overall gain or loss as a result of the exchange of its existing claims.  A

12   creditor who had previously included in income accrued but unpaid interest attributable to

13   its existing claims will generally recognize a loss to the extent such accrued but unpaid

14   interest is not satisfied in full.  For purposes of the above discussion, "accrued" interest

15   means interest which was accrued while the underlying claim was held by the creditor.

16   The extent to which consideration distributable under the Plan is allocable to such

17   interest is uncertain.

18       3.        Other Tax Considerations

19           (a)        Market Discount

20       If a creditor has a lower tax basis in one of a debtor's obligations than its face

21   amount, as a general rule, the difference may constitute market discount under Internal

22   Revenue Code section 1276.  (Certain obligations are excluded from the operation of this

23   rule, such as obligations with a fixed maturity date not exceeding one year from the date

24   of issue, installment obligations to which Internal Revenue Code section 453B applies

25   and, in all likelihood, demand instruments).

26       Holders in whose hands a debtor's obligations are market discount bonds may be

27   required to treat as ordinary income any gain recognized upon the exchange of such

28   obligations to the extent of the market discount accrued during the holder's period of

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520