Van C. Durrer II (Cal. Bar No. 226693)
Kurt Ramlo (Cal. Bar No. 166856)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600
van.durrer@skadden.com
kurt.ramlo@skadden.com

Attorneys for Corus Construction Venture, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.: 2:09-bk-35127-VZ |
| GTS 900 F, LLC, a California limited liability company, aka Concerto, | Chapter 11 |
| Debtor. | **Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement and Plan of Reorganization for GTS 900 F, LLC** |
| Tax ID # 20-2396211 | Date: April 22, 2010<br>Time: 1:30 p.m.<br>Judge: Hon. Vincent P. Zurzolo<br>Location: Courtroom 1368<br>255 E. Temple Street<br>Los Angeles, CA  90012 |

1

**Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT........................................................................................... 1

BACKGROUND...................................................................................................................2

OBJECTIONS.......................................................................................................................3

    I.    The Proposed Plan is Not Confirmable, and the Disclosure Statement Therefore Should Not Be Approved. ...................................................................3

        A.    The Plan Does Not Meet Cram-Down Requirements. ..................................4

        B.    The Plan is Not Feasible. ...............................................................................5

        C.    The Plan Prematurely Assumes that the Mechanic's Lien Claims Have Priority, Thus Rendering the Plan Unfeasible......................................6

        D.    The Plan Improperly Classifies Astani's Claims............................................7

    II.    The Disclosure Statement Does Not Contain Adequate Information. ........................8

        A.    Disparate Treatment of Secured Claims ...................................................... 10

        B.    Cash Flow Projections ................................................................................ 10

        C.    DeStefano Copyright Infringement Claims ................................................ 10

        D.    Adversary Proceedings Against CCV.......................................................... 11

    III.    The Disclosure Statement Provides Inaccurate Accounts of the Events Precipitating and Following the Chapter 11 Filing. ................................................. 11

    IV.    The Parties Have Taken Inconsistent Positions With Respect to the Validity of the Mechanic's Lien Claims. ................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

In re Adana Mortgage Bankers, Inc.,
   14 B.R. 29 (Bankr. N.D. Ga. 1981)...........................................................................................9

In re Beyond.com Corp.,
   289 B.R. 138 (Bankr. N.D. Cal. 2003) ......................................................................................3

In re Cardinal Congregate I,
   121 B.R. 760 (Bankr. S.D. Ohio 1990) .....................................................................................9

In re First Magnus Financial Corp.,
   2008 WL 450447 (Bankr. D. Ariz. Feb. 15, 2008) ...................................................................4

In re Main Street AC, Inc.,
   234 B.R. 771 (Bankr. N.D. Cal. 1999) ......................................................................................9

In re Market Square Inn, Inc.,
   163 B.R. 64 (Bankr. W.D. Pa. 1994).........................................................................................4

In re McGrew,
   60 B.R. 276 (Bankr. W.D. Ark. 1986) ......................................................................................9

In re Metrocraft Publishing Services, Inc.,
   39 B.R. 567 (Bankr. N.D. Ga. 1984).........................................................................................9

In re New Haven Radio, Inc.,
   18 B.R. 977 (Bankr. D. Conn. 1982).........................................................................................9

In re U.S. Brass Corp.,
   194 B.R. 420 (Bankr. E.D. Tex. 1996)......................................................................................4

Liberty National Enterprises v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd.
   Partnership),
   115 F.3d 650 (9th Cir. 1997) .....................................................................................................4

Oneida Motor Freight, Inc. v. United Jersey Bank,
   848 F.2d 414 (3d Cir. 1988).......................................................................................................8

Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),
   844 F.2d 1142 (5th Cir. 1988)....................................................................................................8

**Statutes**

11 U.S.C. § 1125(a)(1) ....................................................................................................................8

11 U.S.C. § 1125(b) ........................................................................................................................8

11 U.S.C. § 1129(a)(11) ..................................................................................................................5

11 U.S.C. § 1129(b) ........................................................................................................................4

**Other Authorities**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977).................................................................................8

Corus Construction Venture, LLC ("CCV"), the successor in interest to the secured lender of GTS 900 F, LLC (the "Debtor") for the Debtor's Concerto development project (the "Project"), Corus Bank, N.A. ("Corus Bank"), hereby submits this objection (the "Objection") to the First Amended Disclosure Statement and Plan of Reorganization for GTS 900 F, LLC (Docket No. 211) (the "Disclosure Statement")[1]. In support of this Objection, CCV respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Disclosure Statement describes and incorporates a plan of reorganization (the "Plan") that is not confirmable. Moreover, even assuming the Plan were confirmable, the Disclosure Statement does not contain information sufficient to permit creditors to make an informed decision regarding the Plan. For these reasons, the Court should deny approval of the Disclosure Statement.

2. Specifically, the Plan cannot be confirmed because it fails to meet the cram-down requirements of title 11 of the United States Code (the "Bankruptcy Code") due to its unfair discrimination among secured creditors. The Plan is also not feasible because the interest rate payable on secured claims is inadequate, and the Debtor concedes in the Disclosure Statement that the Debtor cannot sustain a proper market rate of interest. Finally, the Plan improperly proposes to pay the subordinated claims of Astani Construction, Inc. ("Astani") on an equal ranking with other secured claims.

3. Even if the Plan were confirmable, however, the Disclosure Statement does not contain information sufficient to enable the Debtor's creditors to make an informed decision regarding the Plan. For example, the Plan treats certain mechanic's lien claimants more favorably than other mechanic's lien claimants, but the Disclosure Statement fails to provide any reason or justification for such disparate treatment. The Debtor also fails to acknowledge that the projections and description of construction timing are not the Debtor's current projections, which continue to change over time. In addition, there are other examples, enumerated below, of the Debtor's disclosure failures that prevent approval of the Disclosure Statement.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

## BACKGROUND

4. On July 2, 2007, the Debtor and Corus Bank entered into a Construction Loan Agreement (the "Loan Agreement"), under which Corus Bank agreed to extend up to $190,000,000 to the Debtor (the "Loan"). As a precondition to obtaining the Loan, the Debtor issued a promissory note (the "Note") to Corus Bank drawn to correspond to the total future loan disbursements from Corus Bank, not to exceed $190,000,000. The purpose of the Loan was to provide the Debtor with a significant portion of the capital required to construct the Project, a multi-unit residential and retail complex and parking garage in downtown Los Angeles. Pursuant to the terms of the Note and a Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 2, 2007, the Debtor granted Corus Bank a perfected first priority security interest in most of the Debtor's assets, including the Project. Also on July 2, 2007, Sonny Astani and Marco Astani, two principals of Astani, executed three guaranties related to the Debtor's obligations under the Construction Loan: (i) Repayment Guaranty (the "Repayment Guaranty"), (ii) Completion Guaranty (the "Completion Guaranty"), and (iii) Carve-Out Guaranty (the "Carve-Out Guaranty" and, collectively with the Repayment Guaranty and the Completion Guaranty, the "Guaranties")[2].

5. The Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 17, 2009. On October 16, 2009, CCV, an entity unaffiliated with Corus Bank, purchased certain assets of Corus Bank, including the Note, from the Federal Deposit Insurance Corporation (the "FDIC") in its capacity as receiver for Corus Bank. The purchase was effected by a Loan Contribution and Sale Agreement dated October 16, 2009 between the FDIC and CCV (the "Loan Sale Agreement"). CCV did not assume and, under section 2.2(a) of the Loan Sale Agreement, expressly disclaimed assumption of "any liabilities or obligations of the [FDIC] to the extent attributable to an act, omission or circumstances that

---

[2] The Repayment Guaranty, the Completion Guaranty, and the Carve-Out Guaranty are attached as Exhibit A, Exhibit B, and Exhibit C, respectively, to the Declaration of John Barkidjija in Support of Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement and Plan of Reorganization of GTS 900 F, LLC (the "Barkidjija Declaration"), filed contemporaneously herewith.

occurred or existed prior to [October 16, 2009] and that constitutes a breach or default under any contract (including any contract included in the Obligation [which includes the Loan Agreement]), a tort, willful misconduct, fraud or a violation of [law] by the [FDIC] or [Corus Bank]." (Loan Sale Agreement § 2.2.)[3]

6. On October 29, 2009, CCV filed a proof of claim in this Court seeking recovery of nearly $163,000,000 owed by the Debtor under the Note, which claim CCV subsequently amended on January 29, 2010 (as amended, the "CCV Claim"). (Claims Register, Claims 16-1 & 16-2.)

7. On December 29, 2009, the official committee of unsecured creditors (the "Committee"), the Debtor and Astani each filed separate adversary proceedings against CCV: (i) Adversary Proceeding Case No. 09-03555, filed by the Committee (the "Committee Adversary Proceeding"), (ii) Adversary Proceeding Case No. 09-03557, filed by the Debtor (the "Debtor Adversary Proceeding"), and (iii) Adversary Proceeding Case No. 09-03561, filed by Astani (the "Astani Adversary Proceeding" and, collectively with the Committee Adversary Proceeding and the Debtor Adversary Proceeding, the "Adversary Proceedings").

8. On February 17, 2010, CCV filed motions to dismiss each of the Adversary Proceedings. On March 25, 2010, the Court held hearings on such motions to dismiss. The Court granted the motion to dismiss the Committee Adversary Proceeding. The Court denied the motions to dismiss the Astani Adversary Proceeding and the Debtor Adversary Proceeding, but granted the motion to dismiss as to the sixth claim for declaratory relief in the Debtor Adversary Proceeding respecting CCV's fees and expenses.

**OBJECTIONS**

**I.   The Proposed Plan is Not Confirmable, and the Disclosure Statement Therefore Should Not Be Approved.**

9. As demonstrated below, the Plan is not confirmable. As such, the Court should not approve the Disclosure Statement. See, e.g., In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement

---

[3]   The Loan Sale Agreement is attached as Exhibit D to the Barkidjija Declaration.

3

**Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement**

may not be approved."); In re U.S. Brass Corp., 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible."); In re Market Square Inn, Inc., 163 B.R. 64 (Bankr. W.D. Pa. 1994) ("[W]here it is clear that a plan is not capable of confirmation it is appropriate to refuse the approval of the disclosure statement.").

### A.    The Plan Does Not Meet Cram-Down Requirements.

10. For a plan to be confirmed, all 13 requirements of section 1129(a) of the Bankruptcy Code must be satisfied. However, if section 1129(a)(8) is left unsatisfied – because a class of impaired claims has not accepted the plan – a plan may nonetheless be confirmed if the cram-down requirements of section 1129(b) are met with respect to such class. See 11 U.S.C. § 1129(b). The cram-down requirements dictate that the plan (a) treat each objecting impaired class fairly and equitably, and (b) not discriminate unfairly against any objecting impaired class. Id.; see also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1997).

11. The Debtor has unfairly discriminated in its treatment of holders of secured claims in Class 2 and Class 3. Unfair discrimination is a concept that applies to whether a plan properly treats claims or interests differentially. In re First Magnus Fin. Corp., 2008 WL 450447 at *6 (Bankr. D. Ariz. Feb. 15, 2008). Specifically, mechanic's lien claims arising from work performed, or services, equipment and/or materials provided for the Loft building in Class 2 ("Loft Mechanic's Lien Claims"), are paid prior to mechanic's lien claims arising from work performed, or services, equipment and/or materials provided at the Project other than for the Loft Building in Class 3 ("Tower Mechanic's Lien Claims").  While Class 2 and Class 3 claims will eventually be paid in full plus interest accruing at 4% per annum under the Plan, the timing of principal payments of such claims are varied, with Loft Mechanic's Lien Claims paid first. Treatment of Class 2 and Class 3 claims under the Plan is compared in the following table:

4
**Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement**

|  | **Class 2 – Loft Mechanic's Lien Claims** | **Class 3 – Tower Mechanic's Lien Claims** |
|---|---|---|
| **Payment** | Full amount of allowed claim plus interest payments | Full amount of allowed claim plus interest payments |
| **Interest rate** | 4% per annum | 4% per annum |
| **First interest payment date** | 30 days following the Effective Date of the Plan | 30 days following the Effective Date of the Plan |
| **Frequency of interest payments** | Monthly | Monthly |
| **Principal reduction payments** | Later of (i) 30 days following the Effective Date or (ii) 10 days after the issuance of a Temporary Certificate of Occupancy for Tower I, a principal reduction payment shall be made in an amount of up to $5,900,000 and, to the extent such sum is insufficient to pay all Class 2 claims in full, each claimant shall receive its pro rata share of that sum, and in the event that all allowed claims have not been paid in full, commencing 60 days following the Effective Date monthly principal reduction payments shall be made in the amount of each claimant's pro rata share of 100% of Net Distributable Cash, until allowed claims are paid in full | Beginning the later of (i) 60 days following the Effective Date or the date by which all allowed claims in Class 2 have been paid in full, monthly principal reduction payments will be made in the amount of each claimant's pro rata share of 75% of Net Distributable Cash, until allowed claims are paid in full |

12. Under Article IX.F of the Plan, the Class 2 Loft Mechanic's Lien Claims are paid in advance of Class 3 Tower Mechanic's Lien Claims. Although both classes of claimants begin receiving interest payments within 30 days of the Effective Date of the Plan, holders of Class 2 claims receive principal reduction payments well before holders of Class 3 claims. The Disclosure Statement fails to provide any explanation of why Class 2 claims are treated more favorably than Class 3 claims when both are mechanic's lien claims. Such disparate treatment cannot be justified.

**B.   The Plan is Not Feasible.**

13. Under section 1129(a)(11) of the Bankruptcy Code, a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor." 11 U.S.C. § 1129(a)(11).

14. The feasibility of the Plan depends on a number of factors, including the proposed interest rate for payments to be made post-confirmation to creditors. Under the Plan, the Debtor proposes to pay an interest rate of 4% per annum, which is unjustifiably low. The Disclosure

Statement admits that the Debtor's cash flow projections cannot support an interest rate in excess of 6.7% per annum. Such an interest rate is still conservative and inadequate.

15. In fact, the Debtor's own appraisers apply discount rates far greater than 6.7%. In the Debtor's Market Value Appraisal Summary Report, attached to the Disclosure Statement as Exhibit 9, CB Richard Ellis, Inc. ("CBRE") noted that "[i]t is an extraordinary assumption of this report that the subject will include non-recourse debt financing of $162,098,032, with an annual rate of 4.00% . . . ." (Disc. St. Ex. 9 at 104.) In fact, CBRE substantially increased their discount rate for all periods after the $162,098,032 loan is repaid, using a 25% discount rate for the remaining periods of cash flow. (Id. Ex. 9 at 104-05.) CBRE further stated that its research and survey of the major homebuilders indicated that the typical discount rate "ranges from 10 to 15 percent for this type of investment." (Id. Ex. 9 at 104.) Similarly, in the Debtor's Prospective Liquidation Value Appraisal, attached to the Disclosure Statement as Exhibit 15, CBRE again indicated that the typical discount rate for this type of investment ranges from 10-15%. (Id. Ex. 15 at 17.) To analyze the liquidation value of the Project, CBRE used a discount rate of 13%. (Id.)

16. As stated by the Debtor's own appraisers, an interest rate of 4% is extraordinary. Even the maximum interest rate that the Debtor's cash flow projections can support, 6.7%, is below what the Debtor's appraisers believe to be the typical interest rate for this type of investment. The Court is therefore likely to apply an interest rate that is substantially higher than 6.7%; accordingly, the Plan is not feasible.

**C. The Plan Prematurely Assumes that the Mechanic's Lien Claims Have Priority, Thus Rendering the Plan Unfeasible.**

17. The Debtor has taken the position that mechanic's lien claims in Class 2 and Class 3 are senior in priority to the lien held by CCV in Class 1, and has proposed the Plan based on this position. (See Disc. St. at 73.) This assumption, however, is the subject of two highly contested adversary proceedings pending before this Court, the aforementioned Astani Adversary Proceeding and Debtor Adversary Proceeding. In the Astani Adversary Proceeding, Astani seeks, among other things, (i) the Court's declaration of the parties' respective rights with respect to the CCV Claim and the extent, validity and priority of CCV's lien, and (ii) equitable subordination of the CCV

6

**Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement**

Claim. In the Debtor Adversary Proceeding, the Debtor seeks, among other things, equitable subordination of the CCV Claim. CCV vehemently opposes the relief sought in both adversary proceedings.

18. The Debtor's proposed Plan assumes that either Astani or the Debtor, or both, will be successful on the merits of their respective adversary proceedings. However, if in fact CCV prevails, and it should prevail, the Debtor's Plan fails. The Court cannot ignore the distinct possibility that, to reverse the effects of the implementation of the current proposed Plan, the Debtor may very well need further reorganization. This renders the Plan unfeasible – the Plan simply cannot be confirmed when it is dependent on a particular outcome of not just one, but two adversary proceedings. If nothing else, the Plan must at least provide for an alternative resolution should CCV prevail. As it is currently proposed, the Plan is not feasible.

### D. The Plan Improperly Classifies Astani's Claims.

19. As mentioned above, Sonny Astani and Marco Astani, two principals of Astani, executed three Guaranties related to the Debtor's obligations under the Construction Loan. The trio of Guaranties all contain identical subordination provisions confirming that Astani's claims are subordinate to the claims and liens of CCV. Pursuant to the Repayment Guaranty, the Completion Guaranty and the Carve-Out Guaranty, Sonny Astani and Marco Astani each agreed to subordinate the claims and liens of any entity they control to the claims and liens of Corus Bank. (See Repayment Guaranty § 3.8; Completion Guaranty § 3.8; Carve-Out Guaranty § 3.8.) The Debtor has acknowledged that Sonny Astani and Marco Astani control Astani Construction (See Disc. St. at 6-7 ("Astani Construction, Inc., through its principals (Marco Astani and Sonny Astani), has a successful track record of 30 years of building . . . . Marco Astani is the president of Astani Construction, Inc.").) Thus, it appears that Sonny Astani and Marco Astani voluntarily forfeited any priority Astani may have had over CCV.

20. Additionally, pursuant to the Construction Loan Agreement, the Debtor represented to Corus Bank that Corus Bank had a first priority perfected security interest in the premises subject only to certain "Permitted Exceptions," of which Astani's lien does not appear to be one. (See Construction Loan Agreement § 3.24 & Ex. B.) This is clearly contradictory to Astani's

7

**Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement**

position that it has a first lien and calls the validity of that position into question. Likewise, the Construction Loan Agreement requires the subordination of a $2,500,000 "G.C. Fee to Astani Construction, Inc." to the payment of the Loan. (See Construction Loan Agreement § 2.7(iii).)

21. Under the current Plan, Astani's claim is paid pari passu with other mechanic's lien claimants. The provisions of the Guaranties and the Construction Loan Agreement, however, show that CCV has priority over Astani Construction's mechanic's lien. The Debtor should therefore reclassify Astani's claim such that it is subordinated to the CCV Claim.

## II. The Disclosure Statement Does Not Contain Adequate Information.

22. The Disclosure Statement does not contain information sufficient to enable the Debtors' creditors to evaluate and make an informed decision with respect to the Plan. A disclosure statement must be approved by the court before any party may use it to solicit votes to accept or reject a plan of reorganization. 11 U.S.C. § 1125(b). A court may not approve a disclosure statement unless it finds that the disclosure statement contains adequate information. Id. The Bankruptcy Code defines adequate information as follows:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1). Although Congress did not provide any more detailed description of what constitutes "adequate information" in section 1125(a)(1) of the Bankruptcy Code, Congress intended "precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis." H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977); Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."). Full and adequate disclosure is critical to the legitimacy of the reorganization process. See Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.

Given this reliance, [the Court] cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"). As a general rule, a disclosure statement should contain all pertinent information bearing upon the success or failure of the proposals contained in the plan of reorganization and should set forth all material information relating to the risks posed to creditors. See, e.g., In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

23.     Where, as here, a disclosure statement fails to provide information material to the proffered plan, courts will deny approval of the disclosure statement. See, e.g., In re Main Street AC, Inc., 234 B.R. 771 (Bankr. N.D. Cal. 1999) (disclosure statement denied inadequate for failure to provide sufficient information concerning financial information of debtor's acquisition); In re Metrocraft Publishing Servs., Inc., 39 B.R. 567, 569-81 (Bankr. N.D. Ga. 1984) (approval denied where disclosure statement omitted information relating to value of debtor's fixtures and equipment, amount of unsecured claims, ability to collect accounts receivable, and estimated return to creditors in chapter 7 liquidation); In re New Haven Radio, Inc., 18 B.R. 977 (Bankr. D. Conn. 1982) (disclosure statement inadequate for failure to provide sufficient information concerning debtor's assets and liabilities, specifically to identify creditors, to identify or indicate amount of or to classify claims, and to disclose status of debtor's FCC license); In re Adana Mortgage Bankers, Inc., 14 B.R. 29 (Bankr. N.D. Ga. 1981) (failure to disclose financial and other information relating to risks to creditors under plan is inadequate); In re McGrew, 60 B.R. 276 (Bankr. W.D. Ark. 1986) (disclosure statement inadequate for failure to account for value of certain assets).]

24.     As more fully described below, the Disclosure Statement fails to adequately disclose a number of critical items, including, without limitation, (i) the reason for treating the Loft Mechanic's Lien Claims more favorably than the Tower Mechanic's Lien Claims and the CCV claims, (ii) the Debtor's cash flow projections, as compared with Astani's construction schedule, (iii) how the Debtor plans to handle the copyright infringement claims of DeStefano and Partners, Ltd. ("DeStefano") and, if DeStefano is successful on its claims, how the Debtor plans to proceed with the Project, and (iv) the current status of the three Adversary Proceedings filed by the Debtor, Astani and the Committee against CCV.

### A. Disparate Treatment of Secured Claims

25. As discussed above, the Plan provides that holders of Loft Mechanic's Lien Claims in Class 2 receive principal reduction payments prior to holders of both Tower Mechanic's Lien Claims in Class 3 and CCV claims in Class 1. While the Disclosure Statement explains the Debtor's and the Committee's erroneous theory that mechanic's lien claims are entitled to priority over CCV's liens and claims, it fails to explain why holders of Loft Mechanic's Lien Claims receive more favorable treatment than holders of Tower Mechanic's Lien Claims. In order for the Disclosure Statement to provide adequate information, the Debtor must explain the rationale behind such favorable treatment of Loft Mechanic's Lien Claims.

### B. Cash Flow Projections

26. The Debtor's cash flow projections, attached to the Disclosure Statement as <u>Exhibit 2</u> and in more detail as <u>Exhibit 4</u>, are not consistent with Astani's construction schedule. At CCV's request, Astani provided CCV with its projected construction schedule in November 2009, claiming that it intended to start work in December 2009. Astani did not commence such work in December 2009, and more recently revised its construction schedule by (i) changing the start date to February 15, 2010, and (ii) adding one month to the end of the schedule. This revised schedule contemplates 261 days to complete construction, while the original schedule, upon which the Debtor's monthly cash flow projections are based, contemplated only 241 days to complete construction. The Debtor therefore must revise both the cash flow projections and its construction schedule in order for its cash flow projections to be meaningful.

### C. DeStefano Copyright Infringement Claims

27. According to the Debtor's Disclosure Statement, the Debtor believes that DeStefano has billed the Debtor the prepetition sum of approximately $4,000,000. (Disc. St. at 77.) DeStefano asserts that failure to pay this claim may have subjected the Debtor's estate to claims for copyright infringement relating to the reproduction and/or use of plans for the Project because the claim includes the Debtor's license fee for such plans. (<u>Id.</u>) The Disclosure Statement does not provide adequate information as to how the Debtor intends to handle DeStefano's infringement claim. While the Debtor does not believe that such claim has merit, the Debtor's contemplated

solution is to hire a replacement architect.  (Id.)  Such a solution does not address some of the most significant issues arising out of the dispute.  First, the Debtor must explain how it will complete the Project without both DeStefano's assistance and plans.  Second, if the Debtor chooses to use DeStefano's plans anyway, the Debtor must disclose the potential damages associated with infringing upon DeStefano's copyright.  Finally, should the Debtor hire a replacement architect, the Debtor has not adequately described the estimated cost and time associated with such an undertaking.  Such deficiencies must be remedied in order for the Disclosure Statement to be approved.

### D. Adversary Proceedings Against CCV

28.　The Disclosure Statement describes the three Adversary Proceedings commenced against CCV on December 29, 2009 by the Committee, the Debtor and Astani.  Since the Disclosure Statement was filed with the Court, the status of these Adversary Proceedings has changed.

29.　As described above, the Committee Adversary Proceeding has been dismissed and is no longer pending before the Court.  Further, the sixth claim for declaratory relief in the Debtor Adversary Proceeding has also been dismissed.  The Debtor must revise the Disclosure Statement to reflect the current status of the Adversary Proceedings.

### III. The Disclosure Statement Provides Inaccurate Accounts of the Events Precipitating and Following the Chapter 11 Filing.

30.　The Debtor concedes that its views regarding the events leading up to this chapter 11 case are the subject of pending litigation and may be contested by CCV.  (Disc. St. at 7.)  Indeed, CCV disagrees with the Debtor's characterization of the facts.  CCV notes that the Debtor's contentions respecting the events precipitating the chapter 11 case are directed not at CCV, but rather at Corus Bank.  Still, and although CCV has disclaimed responsibility for Corus Bank's conduct, the Debtor improperly continues to seek to impose liability on CCV for Corus Bank's conduct.

31.　As an initial matter, the Disclosure Statement only makes conclusory allegations as to Corus Bank's conduct, stating vague and unspecified contentions of delay, unreasonableness,

11

**Corus Construction Venture, LLC's Objection to First Amended Disclosure Statement**

and breaches of duty.  These allegations, however, are unsubstantiated.  Furthermore, the Disclosure Statement acknowledges that the Debtor commenced a lawsuit against Corus Bank for the same allegations in state court, which lawsuit was removed to Bankruptcy Court and stayed (the "<u>Stayed Proceeding</u>").  The Disclosure Statement fails to disclose, however, that the Court-approved stipulation staying the Stayed Proceeding substituted the FDIC for Corus Bank as the proper defendant against whom the Debtor's allegations should be made.  This is a critical disclosure as the Debtor continues to use estate resources to pursue such allegations against CCV.  Minimally, the Disclosure Statement should be revised to reflect this.

### IV.   The Parties Have Taken Inconsistent Positions With Respect to the Validity of the Mechanic's Lien Claims.

32.    Astani's claim is largely based on the mechanic's lien claims of its subcontractors and sub-subcontractors.  In this chapter 11 case, the Debtor, Astani and the Committee have all taken the position that the mechanic's lien claims are not only valid and effective, but that they also have priority over the claims and liens of CCV.  (<u>See</u> Disc. St. at 73-76; Astani Adversary Proceeding First Amended Complaint at 7-8; Committee Adversary Proceeding Complaint at 5.)

33.    Astani, however, has taken the position that the claims of at least one of its subcontractors were released and waived.  On December 7, 2009, SASCO, a subcontractor of Astani filed four suits against Astani in the Superior Court of the State of California, Case Nos. BC 427511, BC 427512, BC 427513, and BC 427514 (the "<u>SASCO Suits</u>"), seeking, among other things, to foreclose on four separate mechanic's liens.  In the SASCO Suits, SASCO alleges it is owed money for subcontracting services, labor, and materials performed on the Project.  (<u>See</u> SASCO Complaint.)[4]  On February 1, 2010, Astani filed answers to SASCO's complaints and asserted, as affirmative defenses, that SASCO's claims (i) were released, in whole or in part, and (ii) are barred by the doctrine of waiver, in whole or in part.  (<u>See</u> SASCO Answer at 2.)

---

[4] SASCO's complaint and Astani's answer filed in Case No. BC 427511 are attached to the Barkidjija Declaration as <u>Exhibit E</u> and <u>Exhibit F</u>, respectively.  The complaint and answer in Case No. BC 427511 are substantially similar to the complaints and answers in the other SASCO Suits.

34.     In the Disclosure Statement, the Debtor relies solely on the Committee's assertions that the mechanic's lien claims are senior in priority to CCV's lien.  (See Disc. St. at 73.)  The Debtor should engage in its own inquiry for two reasons.  First, and most importantly, Astani, a mechanic's lien holder itself, has taken inconsistent positions with respect to the mechanic's lien claims of its subcontractors, whose claims are the basis of Astani's approximately $22,000,000 claim.  Second, the Committee's assertions with respect to the mechanic's lien claims cannot be taken seriously.  The Committee's responsibility is to protect the unsecured creditor body, not the mechanic's lien claimants, who the Debtor and the Committee believe hold secured claims.  One of the most significant disputes regarding the Plan and Disclosure Statement is the priority of the mechanic's lien claims.  Accordingly, the Debtor should not rely solely on the Committee's analysis and, minimally, should revise the Disclosure Statement to reflect Astani's position in the SASCO Suits to show the incongruity with its and the Committee's position in this chapter 11 case.

WHEREFORE, for the reasons set forth herein, CCV respectfully requests that the Court not approve the Disclosure Statement and grant such other relief as is just and proper.

Date: April 8, 2010

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____
Van C. Durrer II (Cal. Bar No. 226693)
Kurt Ramlo (Cal. Bar No. 166856)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

Attorneys for Corus Construction Venture, LLC