Van C. Durrer II (SBN 226693)
Ramon M. Naguiat (SBN 209271)
Bertrand Pan (SBN 233472)
Emily C. Ma (SBN 246014)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600
van.durrer@skadden.com
ramon.naguiat@skadden.com
bertrand.pan@skadden.com
emily.ma@skadden.com

Attorneys for Corus Construction Venture, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GTS 900 F, LLC, a California limited liability company, aka Concerto,<br><br>       Debtor.<br><br><br><br><br>Tax ID # 20-2396211<br>──────────────── | Case No.:  2:09-bk-35127-VZ<br><br>Chapter 11<br><br>**Corus Construction Venture, LLC's First Amended Disclosure Statement and Plan of Reorganization**<br><br>Date:<br>Time:<br>Judge:  Hon. Vincent P. Zurzolo<br>Location: Courtroom 1368<br>     255 E. Temple Street<br>     Los Angeles, CA  90012 |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................1

II.     GENERAL DISCLAIMER AND VOTING PROCEDURE....................................1

III.    WHO MAY OBJECT TO CONFIRMATION OF THE CCV PLAN ...................2

IV.     WHO MAY VOTE TO ACCEPT OR REJECT THE CCV PLAN .......................2

V.      VOTES NECESSARY TO CONFIRM THE CCV PLAN .................................4

VI.     INFORMATION REGARDING VOTING IN THIS CASE ................................5

VII.    DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND
        EVENTS  PRECIPITATING BANKRUPTCY FILING ......................................5

        A.      STRUCTURE OF DEBTOR .......................................................5

        B.      EVENTS PRECIPITATING THE CHAPTER 11 FILING ......................7

        C.      DEBTOR'S BUSINESS AND FUTURE OF THE PROJECT ..................9

                1.      Development of Project .................................................9

                2.      Future of the Project.....................................................10

                3.      No Current Alternative to the CCV Plan .......................14

VIII.   CRITICAL PLAN PROVISIONS .................................................................14

IX.     DESCRIPTION AND TREATMENT OF CLAIMS ...........................................15

        A.      OVERVIEW OF PLAN PAYMENTS ............................................15

        B.      ADMINISTRATIVE CLAIMS ....................................................19

        C.      UNSECURED TAX CLAIMS .....................................................21

        D.      CLASS 1 (CCV'S SECURED CLAIM)........................................22

        E.      CLASS 2 (MECHANIC'S LIEN CLAIMS) ...................................24

        F.      CLASS 3 (GENERAL UNSECURED CLAIMS)...............................25

        G.      CLASS 4 (ASTANI CLAIMS)....................................................26

        H.      CLASS 5 (EQUITY INTERESTS) ...............................................28

X.      SOURCE OF MONEY TO PAY CLAIMS AND INTEREST HOLDERS..........28

i

XI.     FINANCIAL INFORMATION TO ASSIST IN DETERMINING
        WHETHER PROPOSED PAYMENT IS FEASIBLE ........................................28

XII.    ASSETS AND LIABILITIES OF THE ESTATE .................................................29

        A.      ASSETS ...................................................................................................29

        B.      LIABILITIES ...........................................................................................30

        C.      SUMMARY ..............................................................................................31

XIII.   TREATMENT OF NON-CONSENTING CLASSES ........................................31

XIV.    TREATMENT OF NON-CONSENTING MEMBERS OF CONSENTING
        CLASS (CHAPTER 7 LIQUIDATION ANALYSIS .........................................32

XV.     FUTURE DEBTOR ............................................................................................35

        A.      MANAGEMENT OF DEBTOR................................................................36

        B.      PLAN ADMINISTRATOR .......................................................................36

        C.      FUTURE FINANCIAL OUTLOOK .........................................................37

XVI.    SALE OF PROPERTY; ASSUMPTION/REJECTION OF CONTRACTS
        AND LEASES; OTHER PROVISIONS ..............................................................38

XVII.   BANKRUPTCY PROCEEDINGS .....................................................................39

        A.      COMMENCEMENT OF CASE ................................................................39

        B.      LOFT UNITS SALE AND CASH COLLATERAL MOTIONS ..............39

        C.      CLAIM OF CCV ......................................................................................40

        D.      DEBTOR'S COMPLAINT AND OBJECTION TO CLAIM OF
                CORUS ....................................................................................................40

        E.      COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED
                BY ASTANI CONSTRUCTION ..............................................................41

        F.      COMPLAINT AGAINST CORUS BANK.................................................42

        G.      COMPLAINT REGARDING CLAIM AND LIEN OF FIRE
                PROTECTION GROUP FILED BY ASTANI CONSTRUCTION,
                INC..........................................................................................................43

        H.      THE CCV PLAN AND THE CCV DISCLOSURE STATEMENT .........44

        I.      TREATMENT OF MECHANIC'S LIEN CLAIMS UNDER THE
                CCV PLAN ..............................................................................................44

        J.      AVOIDANCE ACTIONS .........................................................................45

        K.      CLAIM AND RELATED CONTENTIONS OF COASTAL
                INTERNATIONAL, INC. .........................................................................45

ii

L.    CLAIM AND CONTENTIONS OF DESTEFANO AND PARTNERS, LTD. .................................................46

XVIII. TAX CONSEQUENCES OF PLAN ........................................................46

A.    INTRODUCTION .....................................................46

B.    FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR ...........48

    1.    Pass-Through Tax Entity ............................................48

    2.    Reduction of Debtor's Indebtedness ...............................48

C.    TAX CONSEQUENCES TO CREDITORS ....................................49

    1.    Claims Satisfied With Payment. ....................................49

    2.    Receipt of Interest ....................................................50

    3.    Other Tax Considerations ...........................................51

D.    TAX CONSEQUENCES TO EQUITY HOLDERS ...............................51

XIX.    EFFECT OF CONFIRMATION OF THE CCV PLAN ...........................52

A.    GENERAL COMMENTS ...............................................52

B.    DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS; STATUS OF LIENS; EQUITY SECURITY HOLDERS .......................53

C.    MODIFICATION OF THE CCV PLAN ...................................53

D.    POST-CONFIRMATION CAUSES OF ACTION ...........................53

E.    DISSOLUTION OF COMMITTEE .......................................53

F.    POST-EFFECTIVE DATE EMPLOYMENT AND COMPENSATION OF PROFESSIONALS ...............................53

G.    POST-CONFIRMATION OPERATIONS ..................................54

H.    EXECUTION AND DELIVERY OF DOCUMENTS ...........................54

I.    FINAL DECREE .......................................................54

XX.    DECLARATION IN SUPPORT OF THE CCV DISCLOSURE STATEMENT AND THE CCV PLAN ...........................................55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    **INTRODUCTION**

On September 17, 2009, GTS 900 F, LLC (the "<u>Debtor</u>" or "<u>GTS</u>"), a California limited liability company, also known as Concerto, filed a bankruptcy petition under Chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  On June 7, 2010, Corus Construction Venture, LLC ("<u>CCV</u>" or the "<u>Proponent</u>") filed its Disclosure Statement and Plan of Reorganization [Docket No. 415] (the "<u>Original Plan and Disclosure Statement</u>").  The document you are reading amends the Original Plan and Disclosure Statement, and is <u>both</u> the Plan of Reorganization (as amended, the "<u>CCV Plan</u>") and the Disclosure Statement (as amended, the "<u>CCV Disclosure Statement</u>").  CCV has proposed the CCV Plan to treat the claims of the Debtor's creditors and the interests of equity holders and to liquidate the Debtor's assets.  A disclosure statement describes the assumptions that underlie the CCV Plan and how the CCV Plan will be executed.  The Bankruptcy Court (the "<u>Court</u>") has approved the form of this document as an adequate disclosure statement, containing enough information to enable parties affected by the CCV Plan to make an informed judgment about the CCV Plan.  The Court has not yet confirmed the CCV Plan, which means the terms of the CCV Plan are not now binding on anyone.

CCV has reserved _____, 2010 in Courtroom 1368 for a hearing to determine whether the Court will confirm the CCV Plan.

Any interested party desiring further information should contact bankruptcy counsel for CCV, Skadden, Arps, Slate, Meagher & Flom LLP, Attention: Van C. Durrer II, Esq., 300 S. Grand Ave #3400, Los Angeles, CA 90071; Telephone: (213) 687-5000; Facsimile: (213) 687-5600, E-mail: <u>van.durrer@skadden.com</u>.

## II.    **GENERAL DISCLAIMER AND VOTING PROCEDURE**

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY.  IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE CCV PLAN.  IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE CCV PLAN.  IT ALSO TELLS ALL CREDITORS AND EQUITY HOLDERS (MEMBERS OF THE DEBTOR) WHAT TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE CCV PLAN, SHOULD THE CCV PLAN BE CONFIRMED BY THE COURT.

1  THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS

2  DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XX BELOW.  ALL

3  REPRESENTATIONS ARE TRUE TO THE PROPONENT'S BEST KNOWLEDGE.

4  NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE INCONSISTENT

5  WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT TO THE EXTENT,

6  IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

7  After carefully reviewing this document and the attached exhibits, please vote on the

8  enclosed ballot and return it in the enclosed envelope.

9  The Proponent has reserved a hearing date for a hearing to determine whether the Court

10  will confirm the CCV Plan (the "Confirmation Hearing").  Please refer to Section I above for the

11  specific hearing date.  If, after receiving ballots, it appears that the Proponent has the requisite

12  number of votes required by the Bankruptcy Code, the Proponent will file a motion for an order

13  confirming the CCV Plan (the "Confirmation Motion").

14  The Confirmation Motion shall at least be served on all impaired creditors and equity

15  holders who reject the CCV Plan and on the Office of the United States Trustee.  Any opposition to

16  the Confirmation Motion shall be filed and served on the Proponent, the Debtor, and the Official

17  Committee of Unsecured Creditors no later than fourteen (14) days prior to the hearing date.

18  Failure to oppose the confirmation of the CCV Plan may be deemed consent to the CCV Plan's

19  confirmation.

20  **III.    WHO MAY OBJECT TO CONFIRMATION OF THE CCV PLAN**

21  Any party in interest may object to confirmation of the CCV Plan, but as explained below

22  not everyone is entitled to vote to accept or reject the CCV Plan.

23  **IV.    WHO MAY VOTE TO ACCEPT OR REJECT THE CCV PLAN**

24  It requires both an allowed and impaired claim or interest in order to vote either to accept or

25  reject the CCV Plan.  A claim is defined by the Bankruptcy Code to include a right to payment

26  from the Debtor.  An interest represents an ownership stake in the Debtor.

27  In order to vote a creditor or interest-holder must first have an allowed claim or interest.

28  With the exceptions explained below, a claim is allowed if proof of the claim or interest is properly

2

1  filed before any bar date and no party in interest has objected, or if the court has entered an order

2  allowing the claim or interest.  Please refer to Section VI below for specific information regarding

3  bar dates in this case.

4        Under certain circumstances a creditor may have an allowed claim even if a proof of claim

5  was not filed and the bar date for filing a proof of claim has passed.  A claim is deemed allowed if

6  the claim is listed on the Debtor's schedules (including any amended schedules) and is not

7  scheduled as disputed, contingent, or unliquidated.  Numerous claims were scheduled in this case

8  as contingent because those claims are held by subcontractors whose direct contract is with the

9  general contractor for the Debtor's project.  Further, many such creditors may have mechanic's lien

10 rights that they may or may not timely assert and perfect.  The deadline set by the Court for filing

11 proofs of claim against the Debtor was January 29, 2010.

12       Similarly, an interest is deemed allowed if it is shown on the list of equity security holders

13 filed by the Debtor with the Court and is not scheduled as disputed.

14       In order to vote, an allowed claim or interest must also be impaired by the CCV Plan.

15       Impaired creditors include those whose legal, equitable, or contractual rights are altered by

16 the CCV Plan, even if the alteration is beneficial to the creditor.  A contract provision that entitles a

17 creditor to accelerated payment upon default does not, however, necessarily render the claimant

18 impaired, even if the Debtor defaulted and the CCV Plan does not provide the creditor with

19 accelerated payment.  The creditor is deemed unimpaired so long as the CCV Plan cures the default,

20 reinstates the maturity of such claim as it existed before default, compensates for any damages

21 incurred as a result of reasonable reliance upon the acceleration clause, and (except for a default

22 arising from failure to operate a nonresidential lease subject to section 365 (b)(1)(A) of the

23 Bankruptcy Code) compensates for any actual pecuniary loss incurred as a result of any failure to

24 perform a non-monetary obligation.

25       Impaired interest holders include those whose legal, equitable, and contractual rights are

26 altered by the CCV Plan, even if the alteration is beneficial to the interest holder.

27

28

1    There are also some types of claims that the Bankruptcy Code requires be treated a certain

2    way.  For that reason they are considered unimpaired and therefore holders of these claims cannot

3    vote.

4    To summarize, there are two prerequisites to voting: a claim or interest must be both

5    allowed and impaired under the CCV Plan.

6    If a creditor or interest holder has an allowed and impaired claim or interest, then he or she

7    may vote either to accept or reject the CCV Plan (unimpaired claimants or interest-holders are

8    deemed to have accepted the CCV Plan).  Impaired claims or interests are placed in classes and it is

9    the class that must accept the CCV Plan.  Members of unimpaired classes do not vote, although as

10    stated above, they may object to confirmation of the CCV Plan.  Even if all classes do not vote in

11    favor of the CCV Plan, the CCV Plan may nonetheless be confirmed if the dissenting classes are

12    treated in a manner prescribed by the Bankruptcy Code.  Please refer to Section VI below for

13    information regarding impaired and unimpaired classes in this case.

14    Section IX sets forth which claims are in which classes.  Secured claims are placed in

15    separate classes from unsecured claims.  Rule 3018(d) of the Federal Rules of Bankruptcy

16    Procedure (the "Bankruptcy Rules") provides: "A creditor whose claim has been allowed in part as

17    a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both

18    capacities."  Fed. R. Bankr. P. 3018(d).

19    **V.**    **VOTES NECESSARY TO CONFIRM THE CCV PLAN**

20    The Court may confirm the CCV Plan if at least one non-insider impaired class of claims

21    has accepted and certain statutory requirements are met as to both non-consenting members within

22    a consenting class and as to dissenting classes.  A class of claims has accepted the CCV Plan when

23    more than one-half in number and at least two-thirds in amount of the allowed claims actually

24    voting, vote in favor of the CCV Plan.  A class of interests has accepted the CCV Plan when at

25    least two-thirds in amount of the allowed interests of such class actually voting have accepted it.  It

26    is important to remember that even if the requisite number of votes to confirm the CCV Plan are

27    obtained, the CCV Plan will not bind the parties unless and until the Court makes an independent

28

4

1  determination that confirmation is appropriate.  That is the subject of any upcoming confirmation

2  hearing.

3  **VI.    INFORMATION REGARDING VOTING IN THIS CASE**

4          The bar date (deadline) for filing a proof of claim in this case was January 29, 2010.

5          The bar date for hearings on objections to claims was June 30, 2010.

6          In this case, the Proponent believes that Class 1 (CCV's secured claim) and Class 4 (Astani

7  Claims) are impaired and therefore entitled to vote on the CCV Plan.  The Proponent believes that

8  Class 2 (mechanic's lien claims) and Class 3 (general unsecured claims) are unimpaired and

9  therefore deemed to accept the CCV Plan.  Under the CCV Plan, if Class 4 (Astani Claims) votes

10 in favor of the CCV Plan, holders of interests in Class 5 will retain their interests in the Debtor and

11 Class 5 is unimpaired.  If Class 4 (Astani Claims) votes against the CCV Plan, then equity interests

12 will be cancelled and equity interest holders will receive nothing under the CCV Plan on account of

13 their interests.  In that scenario, Class 5 is impaired and will be deemed to reject the CCV Plan.

14         A party that disputes the Proponent's characterization of its claim or interest as unimpaired

15 may request a finding of impairment from the Court in order to obtain the right to vote.

16         Ballots must be received by 5:00 p.m. on _____, 2010 by the Voting Agent:

17 Venable LLP, Attn: Hamid R. Rafatjoo, Esq., 2049 Century Park East, Suite 2100

18 Los Angeles, CA 90067, facsimile: (310) 229-9901, e-mail: hrafatjoo@venable.com.

19 **VII.   DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS
         PRECIPITATING BANKRUPTCY FILING**
20

21         **A.    STRUCTURE OF DEBTOR**

22         The Debtor is a California limited liability company.  The members (interest holders) of the

23 Debtor consist of parties experienced in real estate development and management and outside

24 investors.  The holders of the equity (membership) interests in the Debtor are as follows: (1) Sonny

25 Astani and Jo Cho, as trustees of the Astani/Cho Living Trust (30%); (2) Marco Astani, as trustee

26 of the Marco Astani Living Trust (5%); (3) FG 98 Investment Co., LP. (15%); and (4) Concerto

27 Partners, LLC, a California limited liability company (50%).  Sonny Astani is the manager of

28 Concerto Partners, LLC, and is a controlling equity holder in or affiliate of entities holding the

1    majority of membership interests in the Debtor.  Marco Astani is the brother of Sonny Astani.

2    Concerto Manager, Inc. ("Concerto Manager") is the manager of GTS.  Sonny Astani is the

3    President of Concerto Manager.

4        According to the Debtor, Astani Enterprises, Inc. ("Astani Enterprises") is the driving force

5    behind GTS.  The Debtor believes that, through its subsidiaries and affiliates, Astani Enterprises is

6    downtown Los Angeles's largest residential real estate developer, as well as the owner and

7    operator of more than 5,000 apartment units throughout Southern California and the current

8    developer of 1,700 units of apartments, condominiums and mixed-use projects in downtown Los

9    Angeles, Hollywood, Encino, and elsewhere, collectively valued at more than $500,000,000.

10   Sonny Astani is the Chairman and President of Astani Enterprises, Inc.  According to the Debtor,

11   Sonny Astani has more than 30 years of real estate experience in the Southern California and Baja

12   Mexico areas, and has been involved in the acquisition, development, construction and

13   management of more than $1,000,000,000 of multi-family buildings and condominiums, including

14   5,000 new residential units in the City of Los Angeles.

15        Astani Construction, Inc. ("Astani Construction"), a California corporation and affiliate of

16   Astani Enterprises, Inc., is the general contractor of the Concerto project.  The Debtor contends

17   that Astani Construction, through its principals (Marco Astani and Sonny Astani), has a successful

18   track record of 30 years of building, developing, and renovating more than $1,000,000,000 worth

19   of apartment buildings, condominiums, custom homes, tenant improvements, and commercial

20   enterprises throughout the United States.  Marco Astani is the President of Astani Construction.

21        As used herein, (a) the "Astani Parties" means, collectively, in all capacities, Sonny Astani,

22   Marco Astani, their respective spouses and relatives, and any and all affiliates of any or all of the

23   foregoing, including, without limitation, Astani Enterprises, Astani Construction, Astani/Cho

24   Living Trust, the Marco Astani Living Trust, Concerto Partners, LLC, Concerto Manager, HPG

25   Management, Inc.; and (b) the "Astani Claims" means, collectively, (i) with respect to

26   Administrative Claims (defined below), any and all Administrative Claims of any of the Astani

27   Parties that relate in any way to payments made by or on behalf of the Astani Parties to any estate

28   professionals, and (ii) with respect to non-Administrative Claims, any and all claims of any of the

1  Astani Parties, including, without limitation, any claims transferred or sold to any of the Astani

2  Parties.

3          The Debtor conducted all of its business activity in the County of Los Angeles since its

4  formation effective on January 27, 2005.

5          **B.**     **EVENTS PRECIPITATING THE CHAPTER 11 FILING**

6          What follows is a brief summary of the dates and circumstances that led Debtor to file

7  bankruptcy.  CCV's allegations and contentions set forth in this Section constitute CCV's views

8  regarding events precipitating the filing of this chapter 11 case and may be contested by the Debtor.

9  More information regarding the Debtor's contentions regarding the circumstances that led to its

10 bankruptcy filing can be found in the Second Amended Disclosure Statement and Plan of

11 Reorganization for GTS 900 F, LLC [Docket No. 252] (the "Denied Debtor Plan").  The Court has

12 denied confirmation of the Denied Debtor Plan.

13         As of July 27, 2007, the Debtor and Corus Bank, N.A. ("Corus Bank") entered into a

14 Construction Loan Agreement (the "Loan Agreement"), in which Corus Bank agreed to lend to the

15 Debtor up to $190,000,000 (the "Loan")  to allow the Debtor to construct, at 900 S. Figueroa Street

16 and 901 S. Flower Street in Los Angeles: (1) a tower that would contain 271 residential units as

17 well as retail space and storage space ("Tower I"); (2) a loft building that would contain 77

18 residential units as well as retail space and storage space (the "Loft"); and (3) a seven-story partly

19 underground parking structure (the "Parking Garage").  In addition, there was originally

20 contemplated a second Tower (the "Tower II").  As used herein, "Project" refers, collectively, to

21 Tower I, the Loft, Tower II, the Parking Garage, and the land underlying each.  As a precondition

22 to obtaining the Loan, the Debtor issued a promissory note (the "Note") to correspond to the total

23 future loan disbursements from Corus Bank, not to exceed $190 million.  Pursuant to the terms of

24 the Note and a Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement

25 and Fixture Filing dated July 2, 2007 (the "Deed of Trust" and, collectively with the Loan

26 Agreement, the Note, and related agreements, the "Agreements"), the Debtor granted Corus Bank a

27 perfected first priority security interest in most of the Debtor's assets, including the Project.

28

1    Also on July 2, 2007, Sonny Astani, Marco Astani, individually and as trustee of the Marco

2    Astani Family Trust dated as of March 15, 2006, and Sonny H. Astani and Jo Cho, as Trustees of

3    the Astani/Cho Living Trust dated as of April 29, 1999 (collectively, the "Guarantors"), executed

4    three guaranties related to the Debtor's obligations under the Loan Agreement: (i) Repayment

5    Guaranty (the "Repayment Guaranty"), (ii) Completion Guaranty (the "Completion Guaranty") and

6    (iii) Carve-Out Guaranty ( the "Carve-Out Guaranty" and, with the Repayment Guaranty and the

7    Completion Guaranty, the "Guaranties").  Pursuant to the Guaranties, the Guarantors each agreed

8    to subordinate the claims and liens of any entity they control to the claims and liens of Corus Bank.

9    The Debtor has previously acknowledged in this Bankruptcy Case that Sonny Astani and Marco

10   Astani control Astani Construction, meaning any claims of Astani Construction against the Debtor

11   are subordinated to those of CCV.

12    The Debtor and Corus Bank, through the Agreements, anticipated that the Debtor would

13   subsequently construct a second tower, Tower II, which was not being financed through the Loan

14   Agreement, but which would be constructed on land on which Corus Bank would initially possess

15   a security interest pursuant to the Agreements.

16    The sub-prime mortgage collapse in early 2007 began to have adverse effects on main

17   stream real estate lending and markets in 2007 and 2008.  By 2009, the depressed commercial real

18   estate market made it nearly impossible for units in the Project to be sold at the release prices

19   required in the Agreements.  Despite the economic climate and depressed market, the Debtor

20   planned a sales event for the first completed units in the Project.  Notwithstanding Corus Bank's

21   repeated efforts to obtain information regarding the sales event, the Debtor proceeded with the

22   sales event on August 29, 2009 without Corus Bank's consent.

23    On September 4, 2009, prior to Corus Bank's seizure by the Federal government, the

24   Debtor filed a lawsuit against Corus Bank for (1) breach of contract, (2) breach of the covenant of

25   good faith and fair dealing, (3) declaratory relief, and (4) injunctive relief.  The action was

26   originally filed in the Superior Court of the State of California, County of Los Angeles, as *GTS 900*

27   *F, LLC v. Corus Bank, N.A.,* Case No. BC421309 (the "Prepetition Action").  On September 11,

28   2009, the Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver of Corus

Bank by Order of the Office of the Comptroller of the Currency.  As a result, the FDIC succeed to all of the rights, titles, powers, and privileges of Corus Bank under the Loan Agreement.  At all times leading up to the appointment of the FDIC as receiver and thereafter, Corus Bank continued to satisfy its obligations to fund loans in the ordinary course of business.  As described in more detail in the Denied Debtor Plan, the Debtor disputes this assertion.

On September 17, 2009, the Debtor filed a petition under chapter 11 of the Bankruptcy Code, initiating the above-captioned bankruptcy case.  It is CCV's belief that the Debtor initiated the case so that it could dictate the terms of the development of the Project.  On September 21, 2001, the Debtor filed a notice of removal of the Prepetition Action with the Bankruptcy Court.

On October 16, 2009, CCV, an entity unaffiliated with Corus Bank, purchased certain loan assets of Corus Bank, include Corus Bank's rights under the Loan Agreement, from the FDIC in its capacity as receiver for Corus Bank.  On October 29, 2009, CCV filed a proof of claim in this case in the sum of $162,662,216.26.  CCV filed an amended proof of claim (as amended, the "Proof of Claim") on January 10, 2010, which did not change the amount of the asserted claim.  The Proof of Claim is based on the claim of Corus Bank under the Loan Agreement and the acquisition of that claim by CCV from the FDIC.  The Debtor, the Committee, and Astani Construction, Inc., have each filed complaints with respect to the claim of CCV and the Debtor has filed an objection, in accordance with Bankruptcy Rule 3007(b), as part of its complaint.  Each of the complaints with respect to the CCV claim as well as the Prepetition Action is discussed in Section XVII below.

What follows is a brief description of the Debtor's business and the future of the Project Further details relating to the Debtor's financial condition and post-confirmation operation of the Project are found in sections X, XI, XII, XVI, and XV.

## C.    DEBTOR'S BUSINESS AND FUTURE OF THE PROJECT

### 1.    Development of Project

The Debtor is the owner and developer of an approximately 1,000,000 square foot residential real estate development know as "Concerto" located in downtown Los Angeles.  The Concerto Project is built on a full city block situated at the north end of an evolving entertainment district anchored by the Staples Center and L.A. Live, a sports and entertainment complex,

1  sometimes described as Times Square West.  Concerto is part of a wave of development that has

2  gained momentum since 2003, when Los Angeles expanded adaptive reuse policies similar to those

3  of New York.  Construction on the Concerto Project started in 2007 and was timed to come on line

4  with a full range of residential units and retail space at the same time as L.A. Live and the new

5  Ralph's Supermarket serving downtown residents.

6      The Project consists of Tower I (containing 271 residential units and retail and storage

7  space), the Loft (containing 77 residential units and retail and storage space), and the Parking

8  Garage (a seven-story partly underground parking structure).  A phase II of the Concerto

9  development consisting of Tower II (a second 30- story tower) was contemplated for the future,

10  and its infrastructure (including subterranean parking, elevator shafts, DWP vaults, excavation,

11  shoring and some foundation) has been completed, but further construction has not been

12  commenced.  The Debtor's phase II assets also serve as collateral for the Corus Bank loan.

13      In 2004, GTS purchased the 100,000 square foot parcel on which the Concerto Project is

14  located, consisting of a full city block.  The development team envisioned an environmentally

15  conscious all glass residential structure with a range of moderately priced to higher priced

16  condominium units, together with shared amenities, ample parking, and retail and restaurant space

17  as part of the "new downtown L.A." In all, the Debtor invested more than $63,000,000 as equity

18  funds into the Concerto Project (with more than $54,500,000 in cash and approximately

19  $8,500,000 consisting of deferred developer's and general contactor's fees), starting one of the first

20  high rise residential construction projects in downtown Los Angeles in more than 15 years.

21              2.    Future of the Project

22      Under the CCV Plan, the Project Assets will be sold to the highest or best bidder at an

23  auction (the "Project Auction") to be conducted seven (7) days before the Confirmation Hearing.

24      As used herein, "Project Assets" includes the Project and, more specifically, refers

25  collectively to (A) the Estate Held Cash (defined below) after payment of allowed Administrative

26  Claims (defined below); (B) that certain parcel of real property located at 900 South Figueroa

27  Street, 901 South Flower Street, and 700 West 9th Street in the City of Los Angeles, County of Los

28  Angeles, State of California, as more particularly described on Exhibit 1 attached hereto (the "Land

10

Parcel"), (C) all improvements (including, without limitation, all infrastructure improvements and public improvements) attached to or placed, erected, constructed, or developed on the Land Parcel or otherwise affixed thereto (collectively, the "Improvements"); (D) any and all fixtures, furnishings, equipment, machinery, furniture, and other items of tangible personal property located on the Land Parcel or in the Improvements or used in connection with the development, construction, use, occupancy, operation, and maintenance of all or any part of the Land Parcel or the Improvements, including construction equipment, machinery, signs, artwork, furnishings, specialized fixtures, furnishings, and equipment relating to the Debtor's development of the Land Parcel, and all renewals of or replacements or substitutions for any of the foregoing, whether or not the same are or shall be attached to the Land Parcel or Improvements (the "FF&E"); (E) any contracts relating to the Land Parcel, the Improvements, or the FF&E (including all construction related agreements, license agreements, service agreements, maintenance agreements, management agreements, and other agreements relating to the development of the Land Parcel) that are designated for assumption and assignment in accordance with and subject to the Auction Procedures (defined below); (F) all entitlements, permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land Parcel ("Permits"); and (F) all streets, roads, public places, easements and rights-of-way, existing or proposed, public or private, adjacent to or used in connection with, belonging, or pertaining to the Land Parcel.

The Project Auction shall be subject to the following procedures (collectively, the "Auction Procedures"):

a.      Bids on the Project Assets must be submitted to the Committee at least three (3) days before the Project Auction (the "Bid Deadline").

b.      For at least forty-five (45) days before the Project Auction, CCV shall provide potential bidders with access to a data room containing all information reasonably available to CCV from the Debtor, including any appraisals of the project available for release to potential bidders.

c.      For at least ten (10) days before the Bid Deadline, bidders who have satisfied all of the requirements to be considered a Qualified Bidder (as defined below), with the exception of the submission of a Qualified Bid, shall have an opportunity to physically tour the Project.

d.      CCV has bid value in the amount of at least $142,995,000 for the Project Assets (such bid, the "Stalking Horse Bid"), as follows:

i.      a credit bid in the amount of $122,000,000;

ii.     earmarked cash sufficient to pay allowed mechanic's lien claims in Class 2 in full (CCV estimates that there may be approximately $19,095,000 in allowed mechanics lien claims, which (A) is based on the claims actually allowed as of September 2, 2010, plus, with respect to pending claims objection, the amounts that the Debtor believes are allowable and (B) excludes the mechanic's lien claim of approximately $2.55 million asserted by Astani Construction), which CCV will pay to the Plan Administrator for distribution directly to holders of allowed Class 2 claims;

iii.    earmarked cash sufficient to pay general unsecured claims in Class 3 in full (according to the Debtor's estimates in the Denied Debtor Plan, allowed general unsecured claims could total approximately $900,000, not including the CCV Deficiency Claim[1]), which CCV will pay to the Plan Administrator for distribution directly to holders of allowed Class 3 claims; and

iv.     earmarked cash in the amount of $1,000,000 to the Plan Administrator to fund the post-confirmation administration of the estate (the "Post-Confirmation Fund").

e.      Only bidders that have submitted the following to the Committee and to the Proponent by the Bid Deadline (such bidders, "Qualified Bidders" and, their respective bids, "Qualified Bids") shall be allowed to participate at the Project Auction:

i.      execution and delivery to the Committee and the Proponent of a form of confidentiality agreement with respect to information regarding the Project, in a form provided by the Proponent;

ii.     submission of a bid for the Project Assists that (A) consists solely of cash consideration, (B) is in an amount at least equal to the amount of the Stalking Horse Bid, (C) earmarks cash in the same manner as the Stalking Horse Bid, (D) contains no contingencies whatsoever, and (E) is irrevocable until the later of thirty (30) days following the Project Auction or three (3) days following consummation of the CCV Plan (at which time any deposits will be returned to Qualified Bidders);

iii.    a cash deposit in the amount of $15,000,000; and

iv.     evidence of the bidder's financial ability to close on the proposed purchase, which evidence must be reasonably satisfactory to the Committee.

f.      CCV shall be deemed a "Qualified Bidder" eligible to participate at the Project Auction and the Stalking Horse Bid shall be deemed a "Qualified Bid, all without any further action required of CCV.

---

[1] For purposes of the CCV Plan only, CCV has agreed that the CCV Deficiency Claim shall be paid only from Estate Proceeds.

g.    By the conclusion of the Project Auction, the Winning Bidder must identify any executory contracts and leases that it wishes to be assumed by the Debtor and assigned to it.  If the Winning Bidder identifies any executory contracts and leases for assumption and assignment, the Proponent shall immediately file a motion for approval of such assumption and assignment. Notwithstanding this procedure, bids may not contain any contingencies whatsoever, as noted above.  Thus, the Winning Bidder will be obligated to consummate the transaction regardless of the outcome of any such motion.

h.    The Committee shall share all bids and information received from bidders. with the Proponent.

i.    Overbids at the Project Auction must be irrevocable and in increments of $500,000, unless the Committee agrees to some lesser amount.

j.    The Project Auction will be conducted in an open format with all participating Qualified Bidders made aware of any Qualified Bids submitted.

k.    Subject to Court approval, the Project Assets will be sold to the Qualified Bidder that the Committee designates at the Project Auction (the "<u>Winning Bidder</u>") as having the highest and best offer for the Project.

l.    If no Qualified Bids are submitted by the Bid Deadline, the Project Auction need not be conducted and CCV shall be deemed the Winning Bidder.

CCV is authorized under the CCV Plan to execute all documents necessary to transfer title to the Project Assets to the Winning Bidder at the Project Auction, including, but not limited to all affidavits, documents, instruments of conveyance, and/or other agreements as CCV deems necessary or appropriate to fully transfer and convey all of Debtor's right, title, and interest in and to the Project Assets.  The Project will be managed by the Winning Bidder.  Additional details as to the management of the Project are not available or pertinent as creditors under the CCV Plan will be paid solely from the proceeds of the Project Auction ("<u>Project Auction Proceeds</u>"), cash held in the Debtor's estate as of the Effective Date ("<u>Estate Held Cash</u>"), and the net proceeds (the "<u>Estate Proceeds</u>") of estate property other than the Project assets, including, without limitation, any Estate Actions (defined below).  Creditors will not be paid from or have any interest in future revenues from the Project under the CCV Plan.  At the closing of the Project Auction, the Winning Bidder shall receive all estate cash, other than the funds in the Administrative Claims Reserve (defined below).

3.      No Current Alternative to the CCV Plan

The Court denied confirmation of the Denied Debtor Plan, which was formerly a potential alternative to the Original Plan and Disclosure Statement.  Thus, to the best of the Proponent's knowledge, there is no pending alternative to the CCV Plan.  In the event that a competing plan is filed, CCV shall have the right to solicit creditors and equity interest holders, including creditors whose claims are classified in unimpaired classes under this CCV Plan, with respect to which of the competing plans they prefer be confirmed.

**VIII.    CRITICAL PLAN PROVISIONS**

The following sources of funds may be used to pay creditors in accordance with the terms of this CCV Plan: (A) Project Auction Proceeds; (B) Estate Held Cash; and (C) Estate Proceeds.

Most likely, CCV (Class 1) can expect payment of its secured claim on the Effective Date from the Project Auction proceeds or title to the Project Assets if CCV is the Winning Bidder at the Project Auction.  To the extent that such Project Auction proceeds are insufficient to pay CCV's secured claim in full, CCV shall have a deficiency claim (the "CCV Deficiency Claim") that will be treated as a general unsecured claim in Class 3.

Most likely, holders of allowed mechanic's lien claims for work performed, or services, equipment, and/or materials provided with respect to the Project (Class 2) can expect payment in full from the Project Auction Proceeds on the later of the Effective Date of the CCV Plan and the date on which such claims are allowed.

Most likely, holders of allowed general unsecured claims (Class 3) can expect payment in full from the Project Auction Proceeds on the later of the Effective Date of the CCV Plan and the date on which such claims are allowed, except that, for purposes of the CCV Plan only, CCV has agreed that the CCV Deficiency Claim shall be paid only from Estate Proceeds.  For the avoidance of doubt, this agreement by CCV is only for purposes of the CCV Plan and is without prejudice to CCV's rights to pursue payment of the CCV Deficiency Claim against non-Debtor parties, including, without limitation, against the Guarantors.

Most likely, Astani Parties (Class 4) can expect payment from any Estate Proceeds that remain after the CCV Deficiency Claim, if any, has been paid in full from Estate Proceeds.

1    The holders of the equity interests (membership interests) in the Debtor (Class 5) will retain

2  their interests in the Debtor if Class 4 (Astani Claims) votes to accept the CCV Plan.  If Class 4

3  (Astani Claims) votes against the CCV Plan, then equity interests will be cancelled and equity

4  interest holders will receive nothing under the CCV Plan on account of their interests.  In this

5  scenario, Class 5 is deemed to reject the CCV Plan.

6  **IX.    DESCRIPTION AND TREATMENT OF CLAIMS**

7         **A.    OVERVIEW OF PLAN PAYMENTS**

8         Below is a summary of who gets paid what and when and from what source.  The identity

9  of members within a particular class is explained beginning on the next page.  The second column

10  lists the estimated total amounts to be paid.  <u>The Proponent is usually not required by law to pay an</u>

11  <u>unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy</u>

12  <u>case not commenced.</u>  The "Payment Due Date" column states the dates by which payments to

13  class of claimants will be completed.  Look at the "Payment Due Date" to figure out who will be

14  paid before and after you and in what amount.  The "Source of Payment" column describes the

15  expected source of payment.  Further details regarding the source of payment are found in sections

16  X and Xl.

17         The timing of payments to many creditors is determined by the "Effective Date."  Allowed

18  administrative claims, unless otherwise stated, must be paid by the Effective Date.  The timing of

19  payments to impaired creditors is measured from the Effective Date.  In this case, the Effective

20  Date shall be the first business day after the date on which the Court's order confirming the CCV

21  Plan is no longer subject to any stay.

22

23

24

25

26

27

28

| | Payment Recipient | Amount of Payment (Total amount to be paid)[2] | Payment Due Date | Source of Payment |
|---|---|---|---|---|
| 1. | Holder of Allowed Administrative Claims | $1,627,000 | Effective Date | Estate Held Cash |
| 2. | Class 1 — Corus Construction Venture, LLC (Secured Claim Under Corus Loan) | $162,662,216.26[3] | Effective Date | Project Auction Proceeds |
| 3. | Class 2 — Mechanic's Lien Claims | The Debtor estimates that allowable mechanic's lien claims owing with respect to work performed, or services, equipment, and/or materials provided for the Loft building may collectively amount to approximately $19,095,000 | Later of the Effective Date and the date on which such claims are allowed | Project Auction Proceeds |

---

[2] These amounts are estimates based on the information contained in the Denied Debtor Plan. For example, with regard to professionals, the estimated amount of the paid to professionals may be substantially greater or less than projected depending on the extent of litigation and/or other opposition presented with respect to the CCV Plan and/or other matters in the case. Further, the amounts may be substantially greater or less depending on the amount of payments received by professionals prior to confirmation of the CCV Plan. The total amounts of mechanic's lien claims and general unsecured claims are uncertain at this time and remain to be determined in light of pending claims objections. Nonetheless, according to the Debtor, these estimates are based on the Debtor's best efforts to estimate such claims as of the filing of the Denied Debtor Plan. The Debtor has advised that its estimate of claims is based upon review and analysis of the Debtor's books and records and an initial review of proofs of claim and related documents filed in the case. At this time, there is some uncertainty with respect to the total allowable amount of certain claims for reasons such as (1) certain portions of some mechanic's lien claims may be based on change orders that were never agreed to; (2) various claims are asserted by sub-subcontractors and may duplicate or overlap with claims asserted by subcontractors; and (3) while the Debtor believes that its estimates are reasonable and appropriate, further analysis and documents may be needed to fully determine definitive allowable amounts of certain sub-subcontractor, subcontractor, and general unsecured claims.

[3] To the extent that its full claim amount is not paid from Project Auction Proceeds, CCV will have the CCV Deficiency Claim, which will be classified in Class 3. CCV has agreed, under the CCV Plan only, that the CCV Deficiency Claim shall be paid solely from Estate Proceeds.

| Payment Recipient | Amount of Payment (Total amount to be paid)[2] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 4. Class 3 — General Unsecured Creditors | The Debtor estimates that allowable general unsecured claims collectively amount to approximately $900,000, not including the CCV Deficiency Claim | Later of the Effective Date and the date on which such claims are allowed | Project Auction Proceeds, except that the CCV Deficiency Claim will be paid solely from Estate Proceeds |
| 5. Class 4 – Astani Parties | Allowed claims of Astani Parties will be from any Estate Proceeds that remaining after payment in full of the CCV Deficiency Claim | As soon as practicable after the Effective Date | Remaining Estate Proceeds after the CCV Deficiency Claim has been paid in full from the Estate Proceeds |
| 6. Class 5 — Equity Interest Holders | Existing equity interests in the Debtor or nothing if Class 4 rejects the CCV Plan | As soon as practicable after the Effective Date | N/A |

| Claimants and Interest Holders Who Are Affiliates of the Debtor[4] | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Concerto Partners, LLC 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | equity interest holder | Holds 50% membership interest  No claim |
| Astani/Cho Living Trust Attn: Sonny Astani and Jo Cho, as Trustees 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | equity interest holder | Holds 30% membership interest in the Debtor  No claim |
| Concerto Manager, Inc. Attn: Sonny Astani, President 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant | No claim |
| Astani Enterprises, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant | No claim |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant, and general contractor for the Project | Pre-petition claims: $2,550,000 (for services secured by mechanic's lien) and approximately $121,000 (for advances made on behalf of the Debtor and treated by the claimant as unsecured loans) (also approximately another $20,000,000 included in proof of claim of with respect to liabilities to subcontractors — this portion of the claim duplicates the claim of subcontractors) |
| HPG Management, Inc. P.O. Box 2399 Beverly Hills, CA 90213 | claimant | Administrative Expense Claim:  $5,000 per month for postpetition services involving maintaining Debtor's books and records and related services. |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant, and general contractor for the Project | $3,246.78 as purchaser of Claim No. 94-1 from Rolf Jensen & Associates, Inc. |

---

[4] This information was taken from the Denied Debtor Plan, and may not include other claimants and interest holders that are affiliates of the Debtor.

18

| Claimants and Interest Holders Who Are Affiliates of the Debtor[4] | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant, and general contractor for the Project | $13,602.33 as purchaser of Claim No. 96-1 from Sunstate Equipment, Inc. |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant, and general contractor for the Project | $11,120 as purchaser of claim from Sense, Inc. |

As reflected above, certain insiders of the Debtor hold claims against the Debtor.  Among the material insider claims is the claim of Astani Construction, the general contractor for the Project.  As discussed above, this claim is subordinated to that of CCV.  The Proponent understands that the Astani Construction's claim consists of (i) a claim of $2,550,000 for services pursuant to its contract; (ii) a claim of approximately $121,000 for funds advanced on behalf of the Debtor to subcontractors and professionals, and to meet other expenses of the Debtor, which were treated by Astani Construction as unsecured loans to the Debtor; and (iii) a claim of approximately $20,000,000, which includes and duplicates amounts owed by the Debtor to subcontractors, most of whom have perfected lien rights against the Debtor as well as contractual rights to payment from Astani Construction.  Further, Astani Construction has also purchased the claims of Rolf Jensen & Associates, Inc. (the "Rolf Claim"), Sunstate Equipment, Inc. (the "Sunstate Claim"), and Sense, Inc. (the "Sense Claim").  Notices of claim transfer were filed for the Rolf Claim (Docket No. 558) and the Sunstate Claim (Docket No. 559) on July 19, 2010.  No notice of claim transfer has been filed for the Sense Claim.  Per the Denied Debtor Plan, the Debtor has not commingled assets with other entities and is not aware of other insider claims (the bar date was January 29, 2010).

Below is a detailed description and treatment of administrative expenses, claims, and interests.

B.    **ADMINISTRATIVE CLAIMS**

The Bankruptcy Code requires that allowed Administrative Claims be paid on the Effective Date unless the party holding the administrative expense agrees otherwise.  As used herein, "Administrative Claims" means claims for administrative costs or expenses that are allowable

under section 503(b) of the Bankruptcy Code or 28 U.S.C. § 1930.  Administrative Claims include the "actual, necessary costs and expenses of preserving the estate" as determined by the Court after notice to creditors of a request for payment and after a hearing thereon.  This CCV Plan provides for payment in full of allowed Administrative Claims on the later of the Effective Date and the date on which such claims are allowed.

Any requests for payment of an Administrative Claims must be filed with the Court and served on the Plan Administrator (defined below) no later than forty five (45) days after the Effective Date (the "Administrative Claims Bar Date").  Holders of Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its estate, and such Administrative Claims shall be deemed discharged as of the Effective Date.  The Plan Administrator must file any objections to Administrative Claims no later than sixty (60) days after the Administrative Claims Bar Date (the "Administrative Claims Objection Deadline").  The Plan Administrator may resolve Administrative Claims without further order of the Court.  As described below, the Plan Administrator shall hold $3,000,000 of the Estate Held Cash in reserve for payment of allowed Administrative Claims (the "Administrative Claims Reserve").

The amounts set forth below are estimates based upon various filings in the Debtor's bankruptcy case.  The actual amounts of Administrative Claims may differ significantly from the estimates below because such amounts are subject to Court approval and may have been paid in the ordinary course.  In addition, depending on how this case proceeds, including the extent of litigation on this CCV Plan and other matters, the actual amounts may be significantly higher.  Notwithstanding anything to the contrary in the CCV Plan, CCV reserves the right to review and object to the allowance of any asserted Administrative Claims.

| **Estimated Administrative Claim** | Notes |
| --- | --- |
| (a)  Administrative Expense #1.<br><br>Claimant: SulmeyerKupetz, a professional corporation (Debtor's bankruptcy counsel).<br><br>Approximately $614,000, subject to Court approval | Based on total of post-petition retainers received as of August 16, 2010.  See Docket No. 691.  The amount of fees actually incurred is not disclosed in the document describing the retainers.  The Denied Debtor Plan estimated $250,000.00. |

| **Estimated Administrative Claim** | **Notes** |
|---|---|
| (b) Administrative Expense #2.<br><br>Claimant: Parker Milliken Clark O'Hara & Samuelian, a professional corporation (Debtor's special litigation counsel).<br><br>Approximately $582,000, subject to Court approval | Based on total of post-petition fees and expenses billed as of June 30, 2010. See Docket. No. 682. The Denied Debtor Plan estimated $200,000.00. |
| (c) Administrative Expense #3.<br><br>Claimant: Pachulski Stang Ziehl & Jones LLP (Creditors' Committee counsel).<br><br>Approximately $201,000, subject to Court approval | Based on information provided to CCV by the Committee's counsel regarding actual fees incurred but not yet approved by the Court. This amount includes an estimate of $125,000.00 for fees and expenses for January - March 2010 provided by Committee's counsel. The Denied Debtor Plan estimated $100,000.00. |
| (d) Administrative Expense #4.<br><br>Claimant: Venable LLP (Creditors' Committee's counsel).<br><br>Approximately $150,000.00, subject to Court approval | Based on estimate of $150,000.00 for fees and expenses for March - July 2010 provided by Committee's counsel. The Debtor did not provide an estimate of these fees in the Denied Debtor Plan. |
| (e) Administrative Expense #5.<br><br>Claimant: Grant Thornton LLP (Creditors' Committee's financial advisor).<br><br>$25,000, subject to Court approval | Amount is based on Debtor's original estimate of $25,000.00 from the Denied Debtor Plan. See Doc. No. 252. |
| (f) Administrative Expense #6.<br><br>Claimant: HP Management, Inc. (postpetition services relating to maintaining Debtor's books and records).<br><br>Approximately $55,000, subject to Court approval | Amount is based on Debtor's original estimate of $35,000.00 from the Denied Debtor Plan, plus an additional $5,000/month for July - November 2010 ($20,000.00). See Docket No. 252. |
| Total Estimated Administrative Claims: $1,627,000 | |

## C.    UNSECURED TAX CLAIMS

These include certain types of property, sales, and income taxes. Per the Denied Debtor Plan, the Debtor is not aware of any such prepetition claims against the Debtor and does not believe that any such claims exist.

The Bankruptcy Code requires that the holders of such claims receive regular installment payments in cash over a period ending not later than five years after the date of the order for relief, unless agreed otherwise. Any such claimant has not agreed otherwise. The total cash payments must have a present value equal to the amount of the allowed claim. The treatment of any such

1  claims must be in a manner not less favorable than the most favored non-priority unsecured claim

2  provided in this CCV Plan (other than any cash payments to an administratively convenient class).

3  To the extent that any allowed prepetition tax claim exists, such claim(s) shall receive the same

4  treatment that is provided under the CCV Plan for the holders of allowed claims in Class 3.

5         **D.**      **CLASS 1 (CCV'S SECURED CLAIM)**

6        Class 1 is impaired and includes the secured claim arising under the Corus Bank Loan

7  Agreement now held by CCV.  CCV filed a proof of claim against the Debtor on October 29, 2009,

8  in the face amount of $162,662,216.26.  CCV filed an amended proof of claim on January 26, 2010,

9  which did not change the amount of the claim asserted.  The Debtor has filed a complaint and

10  objection to the claim asserting that the claim should be reduced by a sum to be determined, but

11  believed by the Debtor as of March 2010, to be at least $46,000,000.  The Committee and Astani

12  Construction also filed complaints with respect to CCV's claim.  The objection to claim and

13  complaints are discussed in Section XVII.  Although the total amount of CCV's allowed claim is

14  subject to dispute, CCV's claim shall be allowed in full under this CCV Plan, without prejudice to

15  the matters discussed in Section XVII, which will survive confirmation of the CCV Plan.

16        As stated above, the Project Assets will be sold to the highest or best bidder at the Project

17  Auction to be held prior to the Confirmation Hearing.  CCV is authorized under the CCV Plan to

18  execute all documents necessary to transfer title to the Project Assets to the winning bidder at the

19  Project Auction, including, but not limited to all affidavits, documents, instruments of conveyance

20  or other agreements as CCV determines are necessary to fully transfer and convey all of Debtor's

21  right, title, and interest in and to the Project Assets.  Pursuant to section 363(f) of the Bankruptcy

22  Code, the sale of the Project Assets to the Winning Bidder shall be free and clear of all liens,

23  claims, interests, and encumbrances that are dealt with in the CCV Plan.

24        The Project Auction will be subject to the Auction Procedures.  CCV will be entitled, but

25  not required, to credit bid the entire $162,662,216.26 amount of its claim at the Project Auction.  If

26  CCV is the winning bidder, it will receive title to the Project Assets and will have the CCV

27  Deficiency Claim to the extent the sale price is less than $162,662,216.26.  If a bidder other than

28  CCV prevails at the Project Auction, CCV will receive up to $162,662,216.26 from the Project

Auction Proceeds, excluding any earmarked proceeds.  To the extent that CCV receives less than $162,662,216.26 from the Project Auction Proceeds, it will have the CCV Deficiency Claim in the amount of any difference.  The CCV Deficiency Claim will be classified as part of Class 3 and receive the treatment described below.

As discussed in more detail in Section XVII below, the Debtor filed on December 29, 2009 a Complaint and Objection to Claim against CCV, thereby commencing the action captioned *GTS 900 F, LLC v. Corus Construction Venture, LLC, Adv. No. 2:09-ap-03557V* (the "Debtor Adversary Proceeding").  The complaint, as amended on February 3, 2010, alleges that the claim filed by Corus LLC should be reduced because of the misconduct of Corus Bank in the administration of the construction loan.  The Debtor thus alleges that CCV's Proof of Claim should be disallowed to the extent of damages caused by and defenses resulting from Corus Bank's alleged breaches of its contractual obligations and alleged breaches of the implied covenant of good faith and fair dealing arising from the Loan Agreement and related documents.

The Debtor's complaint asserts claims for (1) declaratory relief as to the amount of the CCV claim, (2) offset and recoupment of damages against the loan amount, and (3) equitable subordination of the CCV claim and lien to the claims of creditors holding allowed secured and unsecured claims against the Debtor.  The Debtor's complaint alleges that as a result of Corus Bank's actions and inactions, the Debtor has been damaged in an amount to be determined, but believed to be in excess of $46,000,000.  The Debtor's objection to claim asserts that CCV's claim should be reduced to the extent of the damages caused by the conduct of its predecessor and assignor, Corus Bank.  CCV disputes the allegations in the Debtor's complaint.

On December 29, 2009, the Committee filed a complaint in this case commencing the action captioned *Official Committee of Unsecured Creditors v. Corus Construction Ventures LLC, Adv. No. 2:09-ap-03555-VZ* (the "Committee Adversary Proceeding").  The Committee's complaint was for (i) declaratory relief regarding validity, priority, and extent of liens; and (ii) for equitable subordination.  In the adversary proceeding, the Committee seeks a determination from the Court that the lien rights of mechanic's lien claimants, to the extent that such lien rights are valid and properly perfected, are prior and senior to the lien rights of CCV, and requests an order of

the Court ruling that CCV's rights under the Loan Agreement are equitably subordinated to claims of all other creditors of the Debtor for purposes of distribution and/or that any lien securing those rights be transferred to the Debtor's estate.

The Committee's complaint asserts that the mechanic's lien claimants are senior in priority to the claim of CCV, based on the fact that substantial work was performed on the construction site prior to the recordation of the Corus Bank lien on July 5, 2007, thus giving priority to all subsequent mechanic's lien claimants, whose lien rights relate back to the commencement of the work of improvement. The Committee's equitable subordination claim, among other things, arises from the unwarranted delays in funding the construction loan and mismanagement of the construction ban that has injured the rights of the mechanic's lien creditors.

By an order entered April 6, 2010 [Docket No. 32 in Committee Adversary Proceeding] (the "Dismissal Order"), the Court dismissed the Committee Adversary Proceeding. The Committee filed a notice of appeal of the Dismissal Order [Docket No. 33 in Committee Adversary Proceeding] on April 8, 2010. Pursuant to a stipulation with CCV filed on August 4, 2010 [Docket No. 669] (the "Committee Stipulation"), the Committee agreed to dismiss its appeal of the Dismissal Order when the order approving the Committee Stipulation became final and non-appealable. On August 13, 2010, the Court entered an order approving the Committee Stipulation [Docket No. 685].

### E.    CLASS 2 (MECHANIC'S LIEN CLAIMS)

Class 2 is unimpaired. It includes all allowed claims for work performed, or services, equipment, and/or materials provided with respect to the Project building secured by validly perfected mechanic's liens on assets of the Debtor, but excludes any Astani Claims. Per the Denied Debtor Plan, the Debtor estimated the total amount of allowed mechanic's lien claims at approximately $22,400,000.

The bar date for filing claims was January 29, 2010. The bar date for hearings on objections to claims was June 30, 2010. Lists of claimants who, according to the Debtor, have asserted mechanic's lien claims in this chapter 11 case that the Debtor believes relate to work performed, or services, equipment, and/or materials provided with respect to the Project are

attached hereto as <u>Exhibit 2</u>.  Per the Denied Debtor Plan, the Debtor's estimate of claims was based upon review and analysis of the Debtor's books and records and an initial review of proofs of claim and related documents filed in the case.  There remains some uncertainty with respect to the total allowable amount of mechanic's lien claims for reasons such as (1) certain portions of some mechanic's lien claims may be based on change orders that were never agreed to; (2) various claims are asserted by sub-subcontractors and may duplicate or overlap with claims asserted by subcontractors; and (3) although the Debtor believed that its estimates were reasonable and appropriate, further analysis and documents were needed to fully determine definitive allowable amounts of certain sub-subcontractor, subcontractor, and other claims asserted in this case.

Based on a review of various filings in the bankruptcy cases, CCV estimates that there may be approximately $19,095,000.  This estimate (1) is based on the mechanic's lien claims actually allowed as of September 2, 2010, plus, with respect to mechanic's lien claims subject to pending claims objections, the amounts that the Debtor believes are allowable with respect to such claims, and (2) excludes the asserted mechanic's lien claim of approximately $2.55 million asserted by Astani Construction, which is an Astani Claim in Class 4.  The final allowed amounts of all mechanic's lien claims are undetermined at this time.

Allowed claims in this class will be paid in full through the earmarked Project Auction Proceeds on the later of the Effective Date of the CCV Plan and the date such claims are allowed. The mechanic's liens held by members of this class, to the extent otherwise valid and perfected, will be extinguished when the applicable allowed claim is paid in full.  In addition, any and all claims and causes of action that members of Class 2 may have against CCV will be extinguished when the applicable allowed claim is paid in full.  In the event that the earmarked proceeds exceed the amount of allowed Class 2 claims, such excess proceeds shall be returned to the Winning Bidder by the Plan Administrator.

**F.    <u>CLASS 3 (GENERAL UNSECURED CLAIMS)</u>**

Class 3 is unimpaired.  It includes all allowed general unsecured claims against the Debtor, but excludes any Astani Claims.  The bar date for filing claims was January 29, 2010.  The bar date for hearings on objections to claims was June 30, 2010.  <u>Exhibit 3</u> hereto contains a list of general

1  unsecured claims filed in the Debtor's chapter 11 case as of March 15, 2010.  Of those claims,

2  approximately $88,000 involve claims for deposits by purchasers of Loft units and those claims

3  should be withdrawn or otherwise eliminated since the loft unit sales closings have moved forward.

4  The Debtor estimates that allowed general unsecured claims will likely amount to approximately

5  $900,000 (the amount ultimately may be less or more, depending on whether claims filed as

6  unsecured claim are determined to have mechanic's lien rights or are otherwise disallowed as

7  general unsecured claims).  Exhibit 4 hereto is a list, compiled based on the Debtor's books and

8  records, of prepetition payables (including general unsecured claims and mechanic's lien claims —

9  this list includes members of Classes 2 and 3).  Further analysis and documents may be needed for

10  the Debtor to fully determine definitive allowable amounts of general unsecured claims.

11      Allowed claims in this class will be paid in full through the earmarked Project Auction

12  Proceeds and Estate Proceeds, except that CCV has agreed that the CCV Deficiency Claim shall be

13  paid solely from the Estate Proceeds.  In the event that the earmarked proceeds exceed the amount

14  of allowed Class 3 claims, such excess proceeds shall be returned to the Winning Bidder by the

15  Plan Administrator.

16          **G.      CLASS 4 (ASTANI CLAIMS)**

17      Class 4 is impaired.  It consists of any and all Astani Claims.  For the avoidance of doubt,

18  any and all Astani Claims are classified in Class 4, regardless of whether such an Astani Claim

19  might fall within the parameters of some other class of claims under the CCV Plan.  As discussed

20  above, the Astani Claims are subordinated to that of CCV pursuant to the Guaranties.  If and only if

21  the CCV Deficiency Claim, if any, is paid in full, the Astani Claims will be paid in accordance

22  with their respective priorities from any Estate Proceeds that may be available after payment in full

23  of CCV's entire claim.

24      On December 29, 2010, Astani Construction, Inc. filed the action captioned *Astani*

25  *Construction, Inc. v. Corus Construction Venture, LLC, Adv. No. 2:09-ap-01361-VZ.* (the "Astani

26  Construction Adversary Proceeding").  An Amended Complaint was filed on January 27, 2010 (as

27  amended, the "Astani Construction Complaint").  The Astani Construction Complaint alleges

28  claims for relief based on (1) Determination of the Extent, Validity and Priority of the lien asserted

by Corus Construction Venture, LLC, (2) Equitable subordination, (3) Enforcement of Stop Notice Claim, (4) Declaratory Relief re Priority of Stop Notice Claim, and (5) Injunctive Relief.

Among other things, Astani Construction, Inc. asserts that its claims arise from its status as a mechanic's lien holder with a claim of approximately $22,550,000 (including the mechanic's lien claims of all of the subcontractors).  Similar to the complaint filed by the Committee, Astani Construction, Inc. alleges that the mechanic's lien claims are prior to and senior to the secured claim of CCV based on the fact that the work of improvement on the Project was commenced prior to the recordation of Corus Bank's deed of trust on July 5, 2007.

Further, Astani Construction, Inc. alleges that its rights under a recorded stop notice makes its entire $25 million claim senior to the undisbursed construction loan funds including pre-allocated interest payments to be paid and that have already been paid to CCV and to Corus Bank. Finally, Astani Construction, Inc. incorporates the Debtor's damage claim and alleges that it too has been damaged by Corus Bank's conduct and as a result, CCV's Proof of Claim should be equitably subordinated to the entire claim of Astani Construction, Inc. and its subcontractors.

CCV disputes the allegations in the Astani Construction Complaint and has asserted various defenses to the claims asserted in the Astani Construction Complaint, including that Astani Construction, Inc. voluntarily subordinated its claim to that of CCV pursuant to the Guaranties and that pursuant to Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(d)(2)(G)(i)(II), Astani Construction, Inc. is barred from seeking relief from CCV because CCV, as purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper defendant because it did not expressly assume receivership liabilities of Corus Bank.

Under the CCV Plan, the Astani Construction Adversary Proceeding is transferred to the Plan Administrator and shall be deemed an Estate Action (defined below), unless otherwise ordered by the Court.  In the event that the Court determines that the Astani Construction Adversary Proceeding is not an Estate Action, no estate property may be used to fund the pursuit of the Astani Construction Adversary Proceeding.

### H.    CLASS 5 (EQUITY INTERESTS)

Class 5 includes the equity interests (membership interests) in the Debtor.  Under the CCV Plan, if Class 4 votes to accept the CCV Plan, then equity interest holders simply retain their interests in the Debtor, receive no other consideration under the CCV Plan, and are deemed to accept the CCV Plan (because they are unimpaired in that scenarios).  If, however, Class 4 votes against the CCV Plan, then equity interests are cancelled and Class 5 is therefore impaired.  In that scenario, holders of equity interests will receive nothing under the CCV Plan on account of their interests and Class 5 is therefore deemed to reject the CCV Plan.

## X.    SOURCE OF MONEY TO PAY CLAIMS AND INTEREST HOLDERS

The CCV Plan cannot be confirmed unless the Court finds that it is "feasible," which means that the Proponent has timely submitted evidence establishing that there will be sufficient funds available to satisfy all expenses, including the scheduled creditor payments discussed above.  As detailed above, creditors under the CCV Plan will receive payment from the Project Auction Proceeds, Estate Held Cash, and Estate Proceeds.

According to the monthly operating report [Docket No. 678] filed by the Debtor, as of July 31, 2010, the Debtor had a cash balance of approximately $9,342,000.  Assuming that the Effective Date of the CCV Plan occurs within the next few months, the Estate Held Cash on the Effective Date will likely be sufficient to cover the payments due to holders of allowed Administrative Claims that remain outstanding at that time.  In addition, as reflected in the certification of the Chief Accounting Officer of ST Residential, LLC (which is the managing member of CCV), attached hereto as Exhibit 5 (the "CAO Certification"), CCV has the financial wherewithal to fulfill its payment obligations under the CCV Plan.  Further, the Project Auction Procedures ensure that if CCV is not the Winning Bidder, that the Winning Bidder will have sufficient financial wherewithal to fulfill its payment obligations in connection with the Project Auction.

## XI.    FINANCIAL INFORMATION TO ASSIST IN DETERMINING WHETHER PROPOSED PAYMENT IS FEASIBLE

In the case of the Debtor, historical financial information regarding the Debtor's operating results prior to the commencement of this chapter 11 case is not pertinent as payments under the

1   CCV Plan will be funded by Project Auction Proceeds, Estate Held Cash, additional cash to be

2   contributed by CCV or before the Effective Date, and Estate Proceeds.

3   　　　　According to the monthly operating report [Docket No. 678] filed by the Debtor, as of July

4   31, 2010, the Debtor had a cash balance of approximately $9,342,000.  Assuming that the Effective

5   Date of the CCV Plan occurs within the next few months, the Estate Held Cash on the Effective

6   Date will likely be sufficient to cover the payments therefrom contemplated by this CCV Plan.  In

7   addition, as reflected in the CAO Certification, CCV has the financial wherewithal to fulfill its

8   payment obligations under the CCV Plan.

9   **XII.   ASSETS AND LIABILITIES OF THE ESTATE**

10  　　　　**A.   ASSETS**

11  　　　　As discussed above, the Debtor's assets consist of the Concerto development and revenues

12  generated from the Project.  The development is a two-phase, mixed-use (residential condominium

13  and retail) development.  The site is located at the southeast corner of Figueroa Street and 9th Street.

14  The Project (Phase I) consists of Tower I (containing 271 residential units and retail and storage

15  space), the Loft (containing 77 residential units and retail and storage space), and the Parking

16  Garage (a seven-story partly underground parking structure).  A phase II of the Concerto

17  development consisting of Tower II (a second 30-story tower) was contemplated for the future, and

18  its infrastructure (including subterranean parking, elevator shafts, DWP vaults, excavation, shoring

19  and some foundation) has been completed, but further construction has not been commenced.

20  　　　　Attached hereto as Exhibit 6 is a "Summary Appraisal Report" prepared by valuation

21  experts working with CCV (the "CCV Appraisal Report") setting forth the "as is" value of the

22  Project as $122,000,000 as of April 6, 2010 and a value of $146,000,000 for the Project upon

23  completion.  The experts who prepared the CCV Appraisal Report are with the firm of Cushman &

24  Wakefield, Inc.  The experts are James H. Pike and Michele Kauffman.  The qualifications of Mr.

25  Pike and Ms. Kauffman are set forth in detail in Addendum A appearing at the end of the CCV

26  Appraisal Report.

27

28

1    **B.    LIABILITIES**

2        The bar date for filing proofs of claim was January 29, 2010.  The deadline for hearings on

3    objections to claims was June 30, 2010.  As set forth above, CCV has filed the Proof of Claim in

4    the sum of $162,662,216.26.  The Debtor has objected to this claim and asserts that the claim

5    should be reduced by a sum of at least $46,000,000.  The Debtor estimates that other allowable

6    claims (mechanic's lien and general unsecured claims) against the Debtor (not including the CCV

7    claim) amount to approximately $23,300,000.  Of that sum, the Debtor estimates that

8    approximately $22,400,000 are allowable mechanic's lien claims (with approximately $5,900,000

9    of that sum relating to work performed, or services, equipment, and/or materials provided with

10   respect to the Loft building and approximately $16,500,000 representing other mechanic's lien

11   claims) and approximately $900,000 are allowable general unsecured claims.  The Debtor has filed

12   a number of objections to claims in this case that are currently pending.  Attached hereto as <u>Exhibit</u>

13   <u>4</u> is a list of the Debtor's accounts payable, according to the Debtor's books and records, as of the

14   commencement of the Debtor's chapter 11 case. Attached hereto as <u>Exhibit 2</u> are lists of asserted

15   mechanic's lien claims as of March 15, 2010, for work performed, or services, equipment, and/or

16   materials provided with respect to the Project.  Attached hereto as <u>Exhibit 3</u> is a list of asserted

17   general unsecured claims as of March 15, 2010.  The Debtor has filed objections to a number of

18   asserted mechanic's lien and general unsecured claims.  Certain of these claim objections remain

19   pending.  If these objections are not resolved by the Effective Date, the Plan Administrator

20   (defined below) will succeed to the Debtor's rights with respect to the unresolved objections, and

21   CCV will have the right to join such objections on or before the Effective Date.

22        The foregoing information is drawn from the Denied Debtor Plan.  In certain sections of the

23   CCV Plan, CCV has attempted to provide updated estimates of potential allowed claims in certain

24   classes.

25

26

27

28

C.    **SUMMARY**

The Debtor's assets have an estimated "as is" value of $131,342,000 ($122,000,000 for the Project and approximately $9,342,000[5] of cash on hand).  Total liabilities are in the estimated amount of $187,822,241.

**XIII.    TREATMENT OF NON-CONSENTING CLASSES**

As stated above, even if all classes do not consent to the proposed treatment of their claims under the CCV Plan, the CCV Plan may nonetheless be confirmed if the dissenting classes are treated in a manner prescribed by the Bankruptcy Code.  The process by which dissenting classes are forced to abide by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows dissenting classes to be crammed down if the CCV Plan does not "discriminate unfairly" and is "fair and equitable."  The Bankruptcy Code does not define discrimination, but it does provide a minimum definition of "fair and equitable." The term can mean that <u>secured claimants</u> retain their liens and receive cash payments whose present value equals the value of their security interest.  For example, if a creditor lends the Debtor $100,000 and obtains a security interest in property that is worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash payments whose present value equals $80,000 and not $100,000.  The term means that unsecured claimants whose claims are not fully satisfied at least know that no claim or interest that is junior to theirs will receive anything under the CCV Plan, except where the Debtor is an individual, has elected to retain property included in the estate under 11 U.S.C. § 1115 and has satisfied 11 U.S.C. § 1129(b)(2)(B)(ii).  "Fair and equitable" means that <u>each holder of an interest</u> must receive the value of such interest or else no junior interest is entitled to receive anything.

Therefore, if a class of general unsecured claims votes against the CCV Plan, the CCV Plan cannot be confirmed where a class of interest holders (e.g. shareholders or partners) will receive or retain any property under the CCV Plan on account of such interests, <u>unless</u> the CCV Plan provides

---

[5] This estimate is based on the cash balance as of July 31, 2010, as set forth in the monthly operating report [Docket No. 678] filed by the Debtor.

1    that the class of general unsecured claims shall be paid in full with interest.  These are complex

2    statutory provisions and the preceding paragraphs do not purport to state or explain all of them.

3    **XIV.    TREATMENT OF NON-CONSENTING MEMBERS OF CONSENTING CLASS**

4    **(CHAPTER 7 LIQUIDATION ANALYSIS**

5         The CCV Plan must provide that a non-consenting impaired claimant or interest holder of a

6    consenting class receive at least as much as would be available had the Debtor filed a Chapter 7

7    petition instead.

8         In a Chapter 7 case the general rule is that the Debtor's assets are sold by a trustee.

9    Unsecured creditors generally share in the proceeds of sale only after secured creditors and

10    administrative claimants are paid.  Certain unsecured creditors get paid before other unsecured

11    creditors do.  Unsecured creditors with the same priority share in proportion to the amount of their

12    allowed claim in relationship to the total amount of allowed claims.

13         Generally, a creditor would recover from the assets of the bankruptcy estate less under

14    Chapter 7 than under Chapter 11 for various reasons.  First, the liquidation value of an asset is

15    frequently less than its fair market value when a liquidation sale would take place on an expedited

16    or short-term basis and/or under what prospective purchasers are likely to perceive as a distressed

17    sale or "fire sale" situation.  In this case, CCV believes that the sale of the Project Assets at the

18    Project Auction, combined with the Estate Held Cash and the Estate Proceeds, will provide

19    creditors with a far greater return that they would receive in a chapter 7 liquidation.  There is no

20    certainty regarding whether a chapter 7 trustee appointed to liquidate the Debtor's assets would

21    have familiarity or expertise with regard to conducting such a liquidation.  Further, CCV fears that

22    the general impression of prospective buyers in the context of the conversion of the Debtor's

23    chapter 11 case to a chapter 7 liquidation would be that the liquidation is taking place in a

24    distressed "fire sale" environment and potential buyers would likely expect a substantial discount

25    from otherwise potentially obtainable values.

26         Second, in a chapter 7 case a trustee is appointed and is entitled to compensation from the

27    bankruptcy estate in an amount no more than 25% of the first $5,000 of all moneys disbursed, 10%

28    on any amounts over $5,000 and up to $50,000, 5% on all amounts over $50,000 and up to

$1,000,000, and such reasonable compensation no more than 3% of moneys over $1,000,000.  In this case, the trustee's fee would amount to millions of dollars.  For purposes of the liquidation analysis chart set forth below, CCV has estimated the chapter 7 trustee's fee to be $5,000,000.  Moreover, the chapter 7 trustee would employ professionals adding another layer of administrative expense on the estate.  This additional layer of expense could also amount to millions of dollars.  For purposes of the liquidation analysis chart set forth below, CCV has estimated the sum of this additional layer (chapter 7 professional fees) of administrative expense to be $1,000,000.

CCV believes that total payment will be substantially greater and payments made more quickly and with greater certainty pursuant to the CCV's chapter 11 plan than in the situation where an unknown chapter 7 trustee would come in to take over control of the Debtor's assets.

The CCV Appraisal Report, is attached hereto as <u>Exhibit 6</u>, set forth the "as is" value of the Project as of April 6, 2010 as $122,000,000.  James H. Pike and Michele Kauffman of the firm of Cushman & Wakefield, Inc. are the experts who prepared the CCV Appraisal Report.  The qualifications of Mr. Pike and Ms. Kauffman are set forth in detail in Addendum A appearing at the end of the CCV Appraisal Report.

The value of the Debtor's assets set forth in the liquidation analysis chart below includes the value conclusion for the Project in the CCV Appraisal Report ($122,000,000) plus estimated cash on hand of approximately $9,342,000[6] for the chapter 7 liquidation asset value and the valuation conclusion in the CCV Appraisal Report ($122,000,000) plus projected cash on hand as of the Effective Date in the approximate sum of $9,342,000[7] plus the earmarked Project Auction Proceeds estimated to be $20,995,000 for the value of the Debtor's assets in a chapter 11 reorganization under the CCV Plan.  The claim amounts set forth in the liquidation analysis chart below are discussed above and are the same in chapter 7 and chapter 11 with respect to estimated total mechanic's lien claims ($19,095,000), potential allowed CCV secured claim ($162,662,216),

---

[6] This estimate is based on the cash balance as of July 31, 2010, as set forth in the monthly operating report [Docket No. 678] filed by the Debtor.

[7] This estimate is based on the cash balance as of July 31, 2010, as set forth in the monthly operating report [Docket No. 678] filed by the Debtor.

and estimated allowed general unsecured claims ($900,000).  As discussed above, an additional $6,000,000 in administrative expenses ($1,000,000 for professional fees and $5,000,000 for the chapter 7 trustee fee) are projected in the event of a chapter 7 liquidation.  Under the Debtor's chapter 11 plan all creditors other than CCV and the Astani Parties will be paid in full on the allowed amount of their claims.  In a chapter 7 liquidation, CCV projects that there will be a deficiency of approximately $59,942,216 of claims that will go unpaid and that creditors holding general unsecured claims will receive nothing.  This liquidation analysis is reflected as follows:[8]

| | Chapter 7 (CCV Appraisal Report Valuation of Project) | Chapter 7 (Debtor's Valuation of Project) | Chapter 11 |
|---|---|---|---|
| 1.  Value of assets | $131,342,000[9] | $151,942,000[10] | $152,337,000[11] |
| 2.  Administrative expenses[12] | $(2,627,000) | $(2,627,000) | $(1,627,000) |
| 3.  Mechanic's lien claims | $(19,095,000)[13] | $(19,095,000) | $(19,095,000) |
| 4.  CCV secured claim | $(162,662,216) | $(162,662,216) | $(162,662,216) |
| 5.  Priority unsecured claims | none | none | none |

---

[8] The information set forth in this chart is for comparison purposes only and is without prejudice to CCV's rights to contest the validity and/or amounts of any claims included therein.

[9] This amount was calculated by adding the value conclusion for the Project in the CCV Appraisal Report ($122,000,000) to estimated cash on hand of approximately $9,342,000.

[10] This amount was calculated by adding the Debtor's valuation of the Project from the Debtor Plan ($142,600,000) to estimated cash on hand of approximately $9,342,000.  (See Denied Debtor Plan at 62.)

[11] This total is comprised of the value conclusion for the Project in the CCV Appraisal Report ($122,000,000), estimated cash on hand of approximately $9,342,000, and earmarked Project Auction Proceeds in the estimated amount of $20,995,000.

[12] Generally, in chapter 7, administrative claimants are paid after claimants holding valid liens on collateral.  Administrative claimants are typically paid from unencumbered assets unless there is a surcharge of collateral under section 506(c) of the Bankruptcy Code, which CCV does not believe to be likely in this case.

[13] This amount excludes Astani Claims, which are classified in Class 4.

| | | | |
|---|---|---|---|
| 6. Chapter 7 trustee fee | $(5,000,000) | $(5,000,000) | n/a |
| 7. General Unsecured Claims | $(900,000)[14] | $(900,000) | $(900,000) |
| Amount of deficiency (claims left unpaid) for payment of creditors in chapter 7 liquidation (general unsecured creditors receive nothing in chapter 7 liquidation) | $(59,942,216) | $(38,342,216) | $(31,947,216) |
| Percentage of payment of non-subordinated allowed general unsecured claims under CCV Plan | | | 100% |
| Percentage of payment of non-subordinated allowed mechanic's lien claims under CCV Plan | | | 100% |

As reflected above, and as the Debtor itself concedes,[15] general unsecured creditors would receive nothing in a chapter 7 liquidation.  In contrast, allowed general unsecured creditors in Class 3 will be paid in full under the CCV Plan.

**XV.    FUTURE DEBTOR**

The following description of the management of the Debtor is taken from the Denied Debtor Plan.  CCV maintains that the future management of the Debtor is not pertinent to the CCV Plan pertinent as creditors under the CCV Plan will be paid solely from the Project Auction Proceeds, Estate Held Cash, additional cash to be provided by CCV on or before the Effective Date, and the Estate Proceeds.  Likewise, the future management of the Project is not pertinent for the

---

[14] This amount is an estimate of the allowed amount of general unsecured claims that comes from the Denied Debtor Plan.  (See Denied Debtor Plan at 63.)

[15] See Denied Debtor Plan 63.

1  same reason.  The Project will be managed by the Winning Bidder at the Project Auction.

2  Additional details are not ascertainable at this point in time.

3       **A.    MANAGEMENT OF DEBTOR**

4       The Debtor will continue to be managed by Concerto Manager, the current manager of the

5  Debtor.  Sonny Astani is the President of Concerto Manager, and is a controlling equity holder in

6  or an affiliate of persons or entities holding the majority of the equity interests in the Debtor.

7       As set forth above and according to the Debtor, Astani Enterprises is the driving force

8  behind GTS.  The Debtor believes that, through its subsidiaries and affiliates, Astani Enterprises is

9  downtown Los Angeles's largest residential real estate developer, as well as the owner and

10  operator of more than 5,000 apartment units throughout Southern California and the current

11  developer of 1,700 units of apartments, condominiums and mixed-use projects in downtown Los

12  Angeles, Hollywood, Encino, and elsewhere, collectively valued at more than $500,000,000.

13  Sonny Astani is the Chairman and President of Astani Enterprises, Inc.  According to the Debtor,

14  Sonny Astani has more than 30 years of real estate experience in the Southern California and Baja

15  Mexico areas, and has been involved in the acquisition, development, construction, and

16  management of more than $1,000,000,000 of multi-family buildings and condominiums, including

17  5,000 new residential units in the City of Los Angeles.

18       Astani Construction, a California corporation and affiliate of Astani Enterprises, is the

19  general contractor of the Concerto project.  The Debtor contends that Astani Construction, through

20  its principals (Marco Astani and Sonny Astani), has a successful track record of 30 years of

21  building, developing, and renovating more than $1,000,000,000 worth of apartment buildings,

22  condominiums, custom homes, tenant improvements, and commercial enterprises throughout the

23  United States.  Marco Astani is the President of Astani Construction.

24       **B.    PLAN ADMINISTRATOR**

25       Peter S. Kravitz shall serve as the plan administrator (the "Plan Administrator").  Mr.

26  Kravitz's qualifications are listed on Exhibit 7.  The Plan Administrator's compensation shall be

27  determined by the Committee and paid solely from the Post-Confirmation Fund.  The Plan

28

1  Administrator's address and telephone number are: 9952 S. Santa Monica, Beverly Hills, CA

2  90212; (909) 964-0643.

3      On the Effective Date, all property of the estate (the "Estate Property"), including, without

4  limitations, any and all claims and causes of action belonging to the estate (collectively, "Estate

5  Actions") and the Project Auction Proceeds, shall be transferred to the Plan Administrator.  The

6  Plan Administrator shall (1) investigate Estate Actions and may, in the exercise of his reasonable

7  business judgment, prosecute the Estate Actions, (2) liquidate Estate Property, and (3) distribute

8  the Estate Proceeds and the proceeds of other Estate Property in accordance with the terms of this

9  CCV Plan.  As noted above, the Astani Construction Adversary Proceeding is transferred to the

10  Plan Administrator and shall be deemed an Estate Action (defined below), unless otherwise

11  ordered by the Court.  In the event that the Court determines that the Astani Construction

12  Adversary Proceeding is not an Estate Action, no estate property may be used to fund the pursuit of

13  the Astani Construction Adversary Proceeding..

14      As noted above, the Plan Administrator has until the Administrative Claims Objection

15  Deadline to file objections to asserted Administrative Claims.  The Plan Administrator shall hold

16  $3,000,000 in the Administrative Claims Reserve for payment of allowed Administrative Claims,

17  and shall remit all other cash of the Debtor to the Winning Bidder as soon as practicable, but in no

18  case later than the twentieth (20th) day after the Administrative Claims Bar Date.  If an

19  Administrative Claim is allowed in an amount lower than the claimed amount, the Plan

20  Administrator shall remit the difference from the Administrative Claims Reserve to the Winning

21  Bidder within five (5) days following the Court's entry of an order, or the Plan Administrator's

22  entry into an agreement, allowing such Administrative Claim.

23      C.    **FUTURE FINANCIAL OUTLOOK**

24      The future financial outlook of the Debtor and the Project is not pertinent to the CCV Plan

25  as creditors will be paid solely from the Project Auction Proceeds, Estate Held Cash, additional

26  cash to be provided by CCV on or before the Effective Date, and Estate Proceeds.  Claims against

27  the Debtor will be discharged as of the Effective Date and creditors will hold no interests in the

28  Project or the Project Assets.

## XVI.    SALE OF PROPERTY; ASSUMPTION/REJECTION OF CONTRACTS AND LEASES; OTHER PROVISIONS

Pursuant to section 363(f) of the Bankruptcy Code, the Project Asset shall be sold to the Wining Bidder at the Project Auction free and clear of any and all liens, claims, interests, and encumbrances that are dealt with by the CCV Plan.  The notice of Confirmation Hearing will include the Auction Procedures and will be served on all creditors and other parties entitled to notice.  Thus, parties in interest will be aware of the sale of the Project and will have the opportunity to participate in the Project Auction, subject to the Auction Procedures.  Moreover, nothing in the CCV Plan precludes the Debtor from providing or sharing such notice with other parties that it believes might be interested in participating in the Project Auction.  The Project Auction will both maximize the value of the Project Assets for the benefit of the estate and expose the Project Assets to the market, which exposure will aid in determining the actual, and not just an appraised, value of the Project Assets.

CCV is authorized under the CCV Plan to execute all documents necessary to transfer title to the Project Assets to the winning bidder at the Project Auction, including, but not limited to all affidavits, documents, instruments of conveyance or other agreements as CCV determines are necessary to fully transfer and convey all of Debtor's right, title and interest in and to the Project Assets.  The sale of the Project Assets to the Winning Bidder is to be approved at the Confirmation Hearing.

As of the Effective Date of the CCV Plan, all remaining executory contracts and unexpired leases of the Debtor that are not identified by the Winning Bidder for assumption and assignment under the Auction Procedures shall be deemed rejected.

The Court must make certain findings of fact before approving the CCV Plan.  The Proponent will request that the Court make the appropriate findings at the Confirmation Hearing, based upon evidence submitted in support of the Confirmation Motion.

## XVII.  BANKRUPTCY PROCEEDINGS

### A.    COMMENCEMENT OF CASE

The Debtor commenced this bankruptcy case by filing a voluntary chapter 11 petition on September 17, 2009 (the "Petition Date").  Following the commencement of the Debtor's chapter 11 case, the Court approved the Debtor's employment of SulmeyerKupetz, a professional corporation, as bankruptcy counsel and Parker, Milliken, Clark, O'Hara & Samuelian, A Professional Corporation, as special corporate counsel.  On October 16, 2009, pursuant to the "Notice of Appointment and Appointment of Committee of Creditors Holding Unsecured Claims", the United States Trustee appointed a creditors committee in this case.  The Committee's retention of Venable LLP as counsel and the Committee's retention of Grant Thornton LLP as financial advisor have been approved by the Court.

### B.    LOFT UNITS SALE AND CASH COLLATERAL MOTIONS

On October 1, 2009, the Debtor filed two related motions.  One motion (the "Sale Motion") requested that the Court authorize the Debtor to complete the 77 pending sales (and to complete sales substitute back-purchasers, if necessary, in the event that any pending buyers fail to perform) of all units in the Debtor's low-rise loft structure by authorizing the Debtor's assumption (subject to the Court approving these sales free and clear of interests) of sales contracts and approving the sales free and clear of interests, with all liens to attach to the sale proceeds with the same validity, priority, and perfection as existed with respect to the residential units to be sold.  Pursuant to the second motion (the "Cash Collateral Motion"), the Debtor requested that the Court authorize the use of cash collateral (the net proceeds of the sale of the Residential Loft Units) in order to complete construction of phase I of the Concerto project, with the secured lender and any other lien holders to receive replacement liens on postpetition improvements to the collateral and the proceeds therefrom.

Prior to the hearing on the Sale Motion and the Cash Collateral Motion, the Debtor commenced discussions with CCV and ultimately agreed on orders to be entered by the Court with respect to the Sale Motion and the Cash Collateral Motion.  At a hearing on October 29, 2009, the Court announced that it was granting approval of the Sale Motion and the Cash Collateral Motion

1 and on October 30, 2009, orders were entered granting the motions.  As of March 15, 2010, the

2 Debtor has paid CCV $6,000,000 in postpetition payments.  On or about January 18, 2010, CCV,

3 the Debtor, and the Committee agreed on a modified budget.  On January 19, 2010, the Debtor

4 filed a notice with the Court, stating that agreement had been reached on a modified budget and

5 attaching a copy of the modified budget.

6       The order approving the Cash Collateral Motion set a deadline of 60 days from the date of

7 submission of documentation by CCV to the Debtor and the Committee (December 29, 2009) for

8 parties to object to the claim of CCV and/or assert claims against CCV.

9       **C.**     **CLAIM OF CCV**

10       As noted above, CCV filed the Proof of Claim in the amount of $162,662,216.26 in this

11 chapter 11 case.  The Proof of Claim is based upon a Promissory Note dated as of July 2, 2007

12 given by the Debtor to Corus Bank, which is CCV's predecessor in interest, and the Deed of Trust

13 given by the Debtor to Corus Bank.  Both the Promissory Note and the Deed of Trust reference the

14 underlying Construction Loan Agreement between the Debtor and Corus Bank.

15       **D.**     **DEBTOR'S COMPLAINT AND OBJECTION TO CLAIM OF CORUS**

16       In response to CCV's Proof of Claim, the Debtor filed on December 29, 2009 a Complaint

17 and Objection to Claim against CCV thereby commencing the Debtor Adversary Proceeding.  The

18 complaint, as amended on February 3, 2010 (the "Debtor Complaint"), alleges that the claim filed

19 by Corus LLC should be reduced because of the misconduct of Corus Bank in the administration of

20 the construction loan.  The Debtor thus alleges that CCV's Proof of Claim should be disallowed to

21 the extent of damages caused by and defenses resulting from Corus Bank's breaches of its

22 contractual obligations and breaches of the implied covenant of good faith and fair dealing arising

23 from the Loan Agreement and related documents.

24       The Debtor Complaint asserts claims for (1) declaratory relief as to the amount of the CCV

25 claim, (2) offset and recoupment of damages against the loan amount, and (3) equitable

26 subordination of the CCV claim and lien to the claims of creditors holding allowed secured and

27 unsecured claims against the Debtor.  The Debtor Complaint alleges that as a result of Corus

28 Bank's actions and inactions, the Debtor has been damaged in an amount to be determined, but

1  believed to be in excess of $46,000,000.  The Objection to Claim asserts that CCV's claims should

2  be reduced to the extent of the damages caused by the conduct of its predecessor and assignor,

3  Corus Bank.  CCV disputes the allegations in the Debtor Complaint and has asserted various

4  defenses to the claims asserted in the Debtor Complaint, including that pursuant to FIRREA, 12

5  U.S.C. § 1821(d)(2)(G)(i)(II), the Debtor is barred from seeking relief from CCV because CCV, as

6  purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper defendant because it

7  did not expressly assume receivership liabilities of Corus Bank.

8       **E.    COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED BY
9              ASTANI CONSTRUCTION**

10      On December 29, 2010, as contemplated by the Cash Collateral Order, Astani Construction,

11  the Debtor's general contractor for the Concerto Project and a mechanic's lien holder, filed a

12  Complaint commencing the Astani Construction Adversary Proceeding.  The Astani Construction

13  Complaint was filed on January 27, 2010.  The Astani Construction Complaint alleges claims for

14  relief based on (1) Determination of the Extent, Validity and Priority of the lien asserted by Corus

15  Construction Venture, LLC, (2) Equitable subordination, (3) Enforcement of Stop Notice Claim, (4)

16  Declaratory Relief re Priority of Stop Notice Claim, and (5) Injunctive Relief.

17      Among other things, Astani Construction asserts that its claims arise from its status as a

18  mechanic's lien holder with a claim of approximately $22,550,000 (including the mechanic's lien

19  claims of all of the subcontractors).  Similar to the Complaint filed by the Creditors' Committee,

20  Astani Construction alleges that the mechanic's lien claims are prior to and senior to the secured

21  claim of CCV based on the fact that the work of improvement on the Concerto Project was

22  commenced prior to the recordation of Corus Bank's deed of trust on July 5, 2007.

23      Further, Astani Construction alleges that its rights under a recorded stop notice makes its

24  entire $25 million claim senior to the undisbursed construction loan funds including pre-allocated

25  interest payments to be paid and that have already been paid to CCV and to Corus Bank.  Finally,

26  Astani Construction incorporates the Debtor's damage claim and alleges that it too has been

27  damaged by Corus Bank's conduct and as a result, CCV's Proof of Claim should be equitably

28  subordinated to the entire claim of Astani Construction and its subcontractors.

1    In the Astani Construction Adversary Proceeding, Astani Construction filed a motion for

2   order granting provisional relief: (1) to segregate adequate protection payments pending

3   determination of lien status; (2) to disgorge post-petition interest payments; and (3) to disgorge

4   prepetition interest payments [Docket No. 25 in the Astani Construction Adversary Proceeding].

5    CCV disputes the allegations in the Astani Construction Complaint and has asserted various

6   defenses to the claims asserted in the Astani Construction Complaint, including that Astani

7   Construction voluntarily subordinated its claim to that of CCV pursuant to the Guaranties and that

8   pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"),

9   12 U.S.C. § 1821(d)(2)(G)(i)(II), Astani Construction is barred from seeking relief from CCV

10  because CCV, as purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper

11  defendant because it did not expressly assume receivership liabilities of Corus Bank.  [Docket No.

12  48 in the Astani Construction Adversary Proceeding.]

13    On July 22, 2010, CCV and Astani Construction filed a joint scheduling conference report

14  pursuant to Fed. R. Civ. P. 26(f) [Docket No. 55 in the Astani Construction Adversary Proceeding],

15  proposing to the Court each party's respective discovery proposal.  The Court subsequently entered

16  a discovery order on August 5, 2010, setting: (i) January 14, 2011, as the deadline by which the

17  parties must complete discovery; and (ii) February 4, 2011, as the deadline by which the parties

18  must exchange their respective expert damages reports and identify a neutral damages expert

19  [Docket No. 55 in the Astani Construction Adversary Proceeding].

20    **F.    COMPLAINT AGAINST CORUS BANK**

21    On September 4, 2009, prior to the commencement of this chapter 11 reorganization case

22  and prior to Corus Bank's seizure by the Federal government, the Debtor filed the Prepetition

23  Action for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3)

24  declaratory relief, and (4) injunctive relief.  The Prepetition Action was originally filed in the

25  Superior Court of the State of California, County of Los Angeles, as *GTS 900 F, LLC v. Corus

26  Bank, N.A. et al., Case No: BC421309*.  Following the commencement of this chapter 11 case, the

27  Debtor removed the Prepetition Action to the Bankruptcy Court.  The removed action is pending as

28  *GTS 900 F, LLC v. Corus Bank, N.A., Adv. No. 2:09-ap-02188-VZ* (the "Removed Action").  In the

1  Removed Action, the Court entered an order approving a stipulation between the Debtor and the

2  FDIC (as receiver for Corus Bank) entitled Order Granting Stipulation (1) Substituting the Federal

3  Deposit Insurance Corporation, as Receiver for Corus Bank, N.A.; (2) Extending Deadline to

4  Answer or Otherwise Respond to Complaint; and (3) Staying Adversary Proceeding [Docket No.

5  20 in the Removed Action].  The Court also entered an order approving a stipulation between the

6  FDIC and the Debtor permitting the FDIC to file a motion in the United States District Court for

7  the Central District of California (the "District Court") to withdraw the reference of this proceeding

8  to the Bankruptcy Court [Docket No. 28 in the Removed Action].

9          On May 17, 2010, in the District Court proceeding titled *GTS 900 F, LLC v. FDIC et al.,*

10  *Civ. No. 2:10-cv-02763-SJO* (the "District Court Proceeding"), the District Court entered an order

11  withdrawing reference from the Bankruptcy Court [Docket No. 12 in the District Court

12  Proceeding].  The FDIC subsequently filed an answer to the Debtor's complaint on July 8, 2010

13  [Docket No. 16 in the District Court Proceeding].  By its answer, the FDIC raised among its

14  numerous affirmative defenses that under FIRREA, "Congress withdrew jurisdiction from all

15  courts to take any action that would restrain or affect the [FDIC], as receiver, in the exercise of its

16  statutory powers and functions."  Id. at 12.  Specifically, 11 U.S.C. § 1821(j) prohibits courts from

17  taking action against the FDIC in its receivership capacity, except at the request of the agency's

18  board of directors.  On information and belief, the FDIC recently rejected the Debtor's claim

19  against Corus Bank submitted in Corus Bank's receivership proceeding.

20          Following an unsuccessful, informal settlement conference, on August 31, 2010, the FDIC

21  and the Debtor filed a joint status report in the District Court Proceeding advising the District Court

22  of the parties' intention to move towards discovery and trial [Docket No. 26 in the District Court

23  Proceeding].

24      **G.      COMPLAINT REGARDING CLAIM AND LIEN OF FIRE PROTECTION
             GROUP FILED BY ASTANI CONSTRUCTION, INC.**

25

26          On January 28, 2010, Fire Protection Group ("FPG") timely filed a proof of claim in the

27  amount of $550,553.79.  [Claim Register No. 103-1.]  On May 21, 2010, FPG filed an amended

28

proof of claim, asserting against the Debtor a claim for mechanic's liens in the amount of $550,552.79 (as amended, the "FPG Claim").

On May 21, 2010, the Debtor filed a motion to disallow the FPG Claim [Docket No. 286] (the "FPG Claim Motion"). In the FPG Claim Motion, the Debtor asserted that the claim was miscalculated by FPG and should be reduced from $550,552.79 to $489,731.00. [FPG Claim Motion at 2.] On June 11, 2010, Astani Construction filed a joinder to the FPG Claim Motion [Docket No. 435] (the "Joinder"). In the Joinder, Astani Construction alleged that FPG's work was deficient and incomplete. [Joinder at 2-3.] On June 14, 2010, the Debtor filed a supplement to the FPG Claim Motion [Docket No. 454] (the "FPG Claim Motion Supplement"). The sole purpose of the FPG Claim Motion Supplement was to add the relief requested by the Plaintiff in the Joinder.

On June 22, 2010, the Court held a hearing on, among other things, the FPG Claim Motion (the "Claims Hearing"). At the Claims Hearing, the Court granted the FPG Claim Motion and denied both the Joinder and the FPG Claim Motion Supplement.

On July 8, 2010, FPG transferred its claim to CCV Concerto Lien 4, LLC ("CCV Lien 4"), an affiliate of CCV. A notice of such claim transfer was filed with the Court on July 12, 2010 [Docket No. 516].

On August 4, 2010, Astani Construction commenced an adversary proceeding by filing a complaint (the "FPG Complaint") against FPG and CCV Lien 4 to object to FPG's claim. In the FPG Complaint, Astani Construction makes the same allegations, with more detail, that it had made in the Joinder. The defendants' response to the FPG Complaint is due to be filed on September 7, 2010.

**H.     THE CCV PLAN AND THE CCV DISCLOSURE STATEMENT**

As noted above, the Court denied confirmation of the Denied Debtor Plan. The Court has approved the CCV Disclosure Statement as containing adequate information and has set a hearing on confirmation of the CCV Plan for _____, 2010.

**I.     TREATMENT OF MECHANIC'S LIEN CLAIMS UNDER THE CCV PLAN**

CCV believes that mechanic's lien claims are treated appropriately under the CCV Plan. Pursuant to Stipulation Between Official Committee of Unsecured Creditors and Corus

1  Construction Venture, LLC Regarding Objection to Plan Confirmation [Docket No. 669] (the

2  "Priority Stipulation"), which the Court approved by an order [Docket No. 685] entered on August

3  13, 2010, CCV stipulated that the CCV Secured Claim is junior to certain valid and properly

4  perfected mechanic's liens encumbering the Loft and certain valid and properly perfected

5  mechanic's liens encumbering Tower I.  The Plan provides for payment in full of allowed

6  mechanic's liens claims.  In addition, to the extent required by section 506(b) of the Bankruptcy

7  Code, interest and applicable costs and expenses shall be paid with respect to qualifying allowed

8  mechanic's lien claims in Class 2.  Subject to the Priority Stipulation, CCV expressly reserves its

9  rights to contest the validity and/or priority of any asserted mechanic's lien claim.

10    **J.    AVOIDANCE ACTIONS**

11         As noted above, on the Effective Date, the Estate Property, including the Estate Actions,

12  shall be transferred to the Plan Administrator.  The Estate Actions include any and all avoidance

13  actions and claims of the estate (the "Avoidance Actions").  The Plan Administrator may therefore

14  prosecute Avoidance Actions on behalf of the estate.  Any Estate Proceeds, including proceeds of

15  the Avoidance Actions, will be paid to satisfy the CCV Deficiency Claim, if any, is paid in full.

16  Thereafter, any remaining Estate Proceeds shall be paid to holders of allowed Astani Claim in

17  Class 4.

18         The Proponent believes that all payments made by the Debtor within ninety (90) days

19  before the Petition Date were made in the ordinary course of business.  Accordingly, the Plan

20  Administrator shall not investigate or pursue any Avoidance Actions arising from payments made

21  during the ninety days before the Petition Date.

22    **K.    CLAIM AND RELATED CONTENTIONS OF COASTAL
          INTERNATIONAL, INC.**

23

24         Coastal International, Inc. ("Coastal"), a sub-subcontractor whose contract is with a

25  subcontractor (Alno Pasadena) of the Debtor's general contractor, Astani Construction, Inc., asserts

26  that it holds a validly perfected, secured claim in this case, in the amount of at least $947,862.52,

27  plus postpetition interest, costs and fees.  The general contractor's contract with Alno Pasadena

28  was for the approximate amount of $1,260,000.  Alno Pasadena has alleged that Coastal has

1 executed lien releases reflecting payments to Coastal with respect to work on the Project, through

2 June, 2009, totaling $466,622, and that Coastal's 20-day preliminary notice is dated July 9, 2009.

3 Alno Pasadena further alleges that there may have been certain change orders submitted by Coastal

4 to Alno Pasadena that were not approved by Alno Pasadena. Coastal disputes all of Alno

5 Pasadena's allegations with respect to Coastal's secured claim and supplied the Debtor, through its

6 proof of claim and other documentation, with the evidence that Coastal asserts supports its secured

7 claim in full. On August 13, 2010, the Court entered an order [Docket No. 683] approving a

8 stipulation between the Debtor and Coastal under which they agreed, among other things, that

9 Coastal will have an allowed mechanic's lien in the amount of $602,500.

10       **L.**      **CLAIM AND CONTENTIONS OF DESTEFANO AND PARTNERS, LTD.**

11       DeStefano and Partners, Ltd. ("DeStefano"), the architect for the Concerto Project, asserts

12 that it has an approximate $300,000 prepetition claim under its architect contract. DeStefano

13 asserts that failure to pay the prepetition claim may have subjected the Debtor's estate to claims for

14 copyright infringement relating to the reproduction and/or use of plans for the Project because the

15 Debtor has not paid the license fee. In addition, DeStefano contends that the Debtor continues to

16 use the reproductions and/or plans without DeStefano's consent. The Debtor disagrees and does

17 not believe that its completion of the Project will result in any claim for copyright infringement,

18 but continues to evaluate DeStefano's contentions. On July 2, 2010 the Court entered an order

19 [Docket No. 505] approving a stipulation between the Debtor and Destefano under which they

20 agreed that Destefano will have an allowed claim in the amount of $342,568.50.

21 **XVIII.**   **TAX CONSEQUENCES OF PLAN**

22       **A.**     **INTRODUCTION**

23       The following is a summary of certain Federal income tax consequences of the CCV Plan.

24 This summary is for informational purposes only and is based on the Internal Revenue Code of

25 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, and

26 administrative and judicial interpretations and practice, all as in effect on the date of this CCV

27 Disclosure Statement and all of which are subject to change or differing interpretations, with

28 possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a

1  number of areas, substantial uncertainty may exist with respect to some of the tax consequences

2  described herein. No opinion of counsel has been obtained as to any of the tax consequences of the

3  CCV Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect to

4  any statement or conclusion in this summary. No representations are being made regarding the

5  particular tax consequences of the confirmation or implementation of the CCV Plan as to any

6  creditor or equity interest holder and there can be no assurance that the IRS would not assert, or

7  that a court would not sustain, positions different from those discussed herein.

8      This summary assumes creditors and equity interest holders hold their claims or interests as

9  capital assets for Federal income tax purposes (generally property held for investment). The

10  following discussion does not address foreign, state, or local tax consequences of the CCV Plan,

11  nor does it purport to address the Federal income tax consequences of the CCV Plan to special

12  classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-

13  exempt organizations, governmental entities, partnerships or other pass-through entities, persons

14  whose functional currency is not the U.S. dollar, foreign persons, dealers in securities or foreign

15  currency, employees, and persons who received their claims pursuant to the exercise of an

16  employee stock option or otherwise as compensation). Furthermore, the following discussion does

17  not address Federal taxes other than income taxes.

18      Creditors and equity interest holders are urged to consult with their tax advisor regarding

19  the tax consequences to them of the transactions contemplated by the CCV Plan, including Federal,

20  state, local and foreign tax consequences.

21      **TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, CREDITORS AND**

22  **EQUITY INTEREST HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY**

23  **DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS**

24  **CCV DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED,**

25  **AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE**

26  **PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER**

27  **THE TAX CODE, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE**

28  **PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED**

1   HEREIN, AND (C) CREDITORS AND EQUITY INTEREST HOLDERS SHOULD SEEK

2   ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN

3   INDEPENDENT TAX ADVISOR.

4            B.      **FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR**

5                    1.      Pass-Through Tax Entity

6            The Debtor is a California limited liability company.  A limited liability company ("LLC")

7   is a hybrid business entity having certain characteristics of both a corporation and a partnership.

8   The primary characteristic an LLC shares with a corporation is limited liability, and the primary

9   characteristic it shares with a partnership is the availability of pass-through income taxation

10  provided that an election has not been made to be taxed as a corporation.  In general, for Federal

11  income tax purposes, the partners of a partnership, and not the partnership itself, are subject to

12  taxation under the Tax Code on items of income, gain, loss or deduction of the partnership.  For

13  purposes of the discussion herein it is assumed that the Debtor is treated as a partnership for

14  Federal income tax purposes.  Section 5 of the Debtor's Second Amended and Restated Operating

15  Agreement, effective as of March 15, 2007, provides that net profits and net losses of the Debtor

16  shall be allocated to the members (equity interest holders) of the Debtor in proportion to the

17  percentage of their respective equity interests in the Debtor.

18                   2.      Reduction of Debtor's Indebtedness

19           Any amount of potential discharged indebtedness for Federal income tax purposes will be

20  referred to herein as a "Debt Discharge Amount." In general, the Tax Code provides that a taxpayer

21  who realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross

22  income in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any

23  consideration given for such discharge.  No income from the discharge of indebtedness is realized

24  to the extent that payment of the liability being discharged would have given rise to a deduction.

25  In the event that any action taken pursuant to the CCV Plan results in the discharge of indebtedness

26  of the Debtor, any resulting cancellation of indebtedness ("COD") income to the Debtor from such

27  discharge will pass-through the Debtor and will be allocable solely to the members of the Debtor

28  (the equity interest holders).

Generally, a taxpayer recognizes COD income upon satisfaction of its outstanding indebtedness for less that its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent. Although while a debtor is either in bankruptcy or insolvent, section 108 of the Tax Code provides for the exclusion of COD income generally from gross income, such rules apply at the partner, rather than the partnership level. Consequently, the Debtor will not be entitled to exclude COD income from gross income, but instead is required to pass such COD income through to its members and the extent to which that income might be excluded by a member will be determined by the particular tax attributes of the member.

Accordingly, the members of Debtor will be required to prepare and file income tax returns reporting transactions occurring under the CCV Plan.

### C.    TAX CONSEQUENCES TO CREDITORS

The tax consequences of a chapter 11 plan's implementation to a creditor may depend on many factors, including the type of consideration received by the creditor in exchange for its claim, whether the creditor reports income on the cash or accrual method, whether the creditor receives consideration in more than one tax year of the creditor, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction. The tax consequences upon the receipt of cash, debt instruments or other property allocable to interest are discussed below under "Receipt of Interest." Creditors are urged to consult with their tax advisor to properly assess the tax consequences in their particular situation.

1.    Claims Satisfied With Payment.

(a)    Gain/Loss on Exchange

As a general rule, a creditor whose existing claims are satisfied with payments under a chapter 11 plan or with the receipt of equity interests in a reorganized debtor, will recognize gain or

1  loss on the actual or constructive exchange of such creditor's existing creditor claims (other than

2  claims for accrued interest) for the consideration received equal to the difference between (i) the

3  "amount realized" in respect of such claims, and (ii) the creditor's tax basis in such claims.  The

4  "amount realized" will generally be equal to the sum of the cash received plus the fair market value

5  of the other consideration received.

6  (b)    Tax Basis and Holding Period of Items Received

7  Pursuant to Tax Code section 1223, the aggregate tax basis in the items received or deemed

8  received by a creditor will generally equal the amount realized in respect of such items (other than

9  amounts allocable to any accrued interest).  The holding period for items received in the exchange

10  will generally begin on the day following the exchange.

11  (c)    Determination of Character of Gain

12  The character of any gain or loss as capital gain or loss or as ordinary income or loss will be

13  determined by a number of factors, including the tax status of the creditor, the nature of the claim

14  in the creditor's hands, the amount of accrued interest, whether the claim was purchased at a

15  discount, and whether and to what extent the creditor has previously claimed a bad debt deduction

16  with respect to the claim.  Any such capital gain or loss will be long-term capital gain or loss if the

17  creditor's holding period for the claim on the Effective Date is more than one year.  The

18  deductibility of capital losses is subject to certain limitations.  The Federal income tax

19  consequences of the receipt of cash allocable to accrued interest and market discount are

20  summarized below.

21  2.    Receipt of Interest

22  As a general rule, income attributable to accrued but unpaid interest will be treated as

23  ordinary income, regardless of whether the creditor's existing claims are capital assets in its hands.

24  A creditor who, under its accounting method, was not previously required to include in income

25  accrued but unpaid interest attributable to existing claims, and who exchanges its interest claim for

26  cash or other property pursuant to a chapter 11 plan, will generally be treated as receiving ordinary

27  interest income to the extent of any consideration so received allocable to such interest, regardless

28  of whether that creditor realizes an overall gain or loss as a result of the exchange of its existing

50

1    claims.  A creditor who had previously included in income accrued but unpaid interest attributable

2    to its existing claims will generally recognize a loss to the extent such accrued but unpaid interest

3    is not satisfied in full.  For purposes of the above discussion, "accrued" interest means interest

4    which was accrued while the underlying claim was held by the creditor.

5             3.      Other Tax Considerations

6                     (a)      Market Discount

7             In general, if a claim were acquired by a creditor on the secondary market at a discount to

8    its stated principal amount, then such claim may be subject to the "market discount" rules of the

9    Tax Code. (Certain obligations are excluded from the operation of this rule, such as obligations

10   with a fixed maturity date not exceeding one year from the date of issue, installment obligations to

11   which Tax Code section 453B applies and, possibly, demand instruments).

12           Holders in whose hands a debtor's obligations are market discount bonds may be required

13   to treat as ordinary income any gain recognized upon the exchange of such obligations to the extent

14   of the market discount accrued during the holder's period of ownership, unless the holder has

15   elected to include such market discount in income as it accrued.

16                    (b)      Withholding

17           The reorganized debtor will, as a general rule, withhold any amounts required by law from

18   payments made, or deemed to be made, to creditors.  In addition, creditors may be required to

19   provide general tax information in order to receive distributions pursuant to a chapter 11 plan.

20           THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

21   CONSEQUENCE TO EACH CREDITOR.  FURTHERMORE, THE TAX CONSEQUENCES OF

22   A PLAN MAY BE COMPLEX AND, IN SOME CASES, UNCERTAIN.  THEREFORE, IT IS

23   IMPORTANT THAT EACH CREDITOR CONSULT WITH HIS, HER OR ITS TAX ADVISOR

24   REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE

25   CCV PLAN.

26   **D.      TAX CONSEQUENCES TO EQUITY HOLDERS**

27           Equity interest holders will receive their distributive share of items of income (including

28   any COD income), gain, loss, deduction, and credit from the Debtor.  Such items will affect the

1  basis of the equity interest holders' membership interests in the Debtor.  Although equity interest

2  holders may receive no cash distributions under the CCV Plan, they may be deemed for Federal

3  partnership tax purposes to have received a constructive distribution from the Debtor pursuant to

4  section 752 of the Tax Code, relating to a net decrease in a share of liabilities of the Debtors.  Such

5  constructive distributions may reduce the amount of any loss or substantially increase the amount

6  of any gain recognized by the equity interest holders.

7          THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

8  CONSEQUENCE TO EACH HOLDER OF AN EQUITY INTEREST.  FURTHERMORE, THE

9  TAX CONSEQUENCES OF A PLAN MAY BE COMPLEX AND, IN SOME CASES,

10  UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN EQUITY

11  INTEREST OR EQUITY INTEREST RELATED CLAIM CONSULT WITH HIS, HER, OR ITS

12  TAX ADVISOR REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN

13  EQUITY INTEREST AS A RESULT OF THE CCV PLAN.

14  **XIX.    EFFECT OF CONFIRMATION OF THE CCV PLAN**

15          **A.    GENERAL COMMENTS**

16          The provisions of a confirmed CCV Plan will bind the Debtor, any entity acquiring

17  property under the CCV Plan, and any creditors and equity interest holders of the Debtor, even

18  those who do not vote to accept the CCV Plan.  Confirmation of CCV Plan will vest all property of

19  the estate in the Debtor and the Plan Administrator per the terms of this CCV Plan.

20          The automatic stay is lifted upon confirmation as to property of the estate.  The stay

21  continues, however, to prohibit collection or enforcement of pre-petition claims against the Debtor

22  or the Debtor's property until the date the Debtor receives a discharge, if any.  The Debtor will be

23  discharged pursuant to the CCV Plan and, upon occurrence of the Effective Date of the CCV Plan,

24  the Debtor's pre-confirmation obligations and claims in connection therewith shall be replaced by

25  the Debtor's obligations under the CCV Plan, except as otherwise specified in the Court's order

26  confirming the CCV Plan.

27

28

**B.    DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS; STATUS OF LIENS; EQUITY SECURITY HOLDERS**

Unless the Debtor is not entitled to receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code, the debtor may obtain a discharge only upon specific order of the Court. Notwithstanding the foregoing, the confirmation of the CCV Plan does not discharge the Debtor from any debt of a kind specified in sections 523(2)(A)–(B) of the Bankruptcy Code that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State Statutes, or tax or custom duties with respect to which the debtor made a fraudulent tax return or willfully attempted in any manner to evade or to defeat tax or custom duties.

**C.    MODIFICATION OF THE CCV PLAN**

The Proponent may modify the CCV Plan pursuant to section 1127 of the Bankruptcy Code.

**D.    POST-CONFIRMATION CAUSES OF ACTION**

To the best of the Proponent's knowledge, the estate has the following causes of action: the Debtor Adversary Proceeding and the Removed Action.  As noted above, the Estate Property, including the Estate Actions, shall be transferred to the Plan Administrator on the Effective Date. Thus, the Plan Administrator will serve as the estates representative under section 1123(b)(3) of the Bankruptcy Code and shall have the right to assert any or all of the Estate Actions post-confirmation in accordance with applicable law.

**E.    DISSOLUTION OF COMMITTEE**

On the Effective Date of the CCV Plan, the Committee shall be deemed dissolved and disbanded and the duties of the Committee shall terminate.

**F.    POST-EFFECTIVE DATE EMPLOYMENT AND COMPENSATION OF PROFESSIONALS**

After the Effective Date of the CCV Plan, the Plan Administrator may employ, without notice, hearing or order of the Court, such attorneys, accountants and other professionals as it may desire to render services on such terms as it deems reasonable.  With respect to services rendered by professional persons employed by the Plan Administrator after the Effective Date, the Plan

1  Administrator shall be authorized to pay for such services, related costs, and expenses without

2  notice, hearing, or order of the Court; provided however, that with respect to fees, costs, and

3  expenses of such professional persons for services rendered after the Effective Date in or in

4  connection with this chapter 11 case, or in connection with the CCV Plan and incident to the case,

5  in the event the Plan Administrator disputes the reasonableness of any such fees, costs, or expenses,

6  the Debtor shall pay such professional person only the undisputed amount, if any, and the Plan

7  Administrator or the professional may file an application with the Court to determine the

8  reasonableness of the fees, costs, or expenses which are in dispute.

9    **G.    POST-CONFIRMATION OPERATIONS**

10    Following the Effective Date, the Debtor will have no operations as the Project Assets will

11  have been sold pursuant to this CCV Plan.  The Plan Administrator will liquidate and distribute

12  Estate Assets in accordance with the terms of this CCV Plan.

13    **H.    EXECUTION AND DELIVERY OF DOCUMENTS**

14    Following the Effective Date, CCV and the Plan Administrator are authorized to execute

15  and deliver documents and instruments as are necessary or appropriate to promote and implement

16  consummation of the CCV Plan or to carry out the purposes of the CCV Plan.  To the extent

17  necessary or appropriate to such purposes, parties shall reasonably cooperate with CCV and the

18  Plan Administrator and take such actions as reasonably requested by CCV or the Plan

19  Administrator.

20    **I.    FINAL DECREE**

21    Once the CCV Plan has been consummated, a final decree may be entered upon motion of

22  the Proponent's.  The effect of the final decree will be to close this bankruptcy case.  After such

23  closure, a party seeking any type of relief relating to a provision of the CCV Plan can seek such

24  relief in a state court of general jurisdiction.

25

26

27

28

## XX.    DECLARATION IN SUPPORT OF THE CCV DISCLOSURE STATEMENT AND THE CCV PLAN

I, John Barkidjija, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

1.    Van C. Durrer II, Ramon M. Naguiat, and Bertrand Pan of Skadden, Arps, Slate, Meagher & Flom LLP, CCV's bankruptcy counsel, are the individuals who prepared this document.

2.    The source of Exhibit 5 is CCV.  Except as otherwise indicated, the source of all other financial data is the Debtor, Astani Construction, and Astani Enterprises, and such financial data was taken from exhibits originally filed with the Denied Debtor Plan.

3.    I have reviewed the foregoing CCV Plan and CCV Disclosure Statement.  All facts and representations in the CCV Plan and CCV Disclosure Statement are true to the best of my knowledge.

4.    To the best of my knowledge, no fact material to a claimant or equity interest holder in voting to accept or reject the proposed CCV Plan has been omitted.

5.    The names of the persons who prepared the financial documents supplied by the Debtor, Astani Construction, and Astani Enterprises are listed in the Denied Debtor Plan.

6.    From the Denied Debtor Plan, it appears that the accounting method used to prepare the financial documents supplied by the Debtor, Astani Construction, and Astani Enterprises is a cash-basis approach.

7.    James H. Pike and Michelle Kauffman of Cushman & Wakefield Western, Inc. prepared the valuation reports attached as exhibits to the CCV Plan and supplied valuation information and conclusions used in the CCV Plan.

55

602662-Los Angeles Server 1A - MSW

Dated: _____9/3/10_____

_____
John Barkidjija