David S. Kupetz (CA Bar No. 125062)
dkupetz@sulmeyerlaw.com
Steven F. Werth (CA Bar No. 205434)
swerth@sulmeyerlaw.com
SulmeyerKupetz
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Bankruptcy Counsel for GTS 900 F, LLC
Debtor and Debtor in Possession

Van C. Durrer II (SBN 226693)
Ramon M. Naguiat (SBN 209271)
Emily C. Ma (SBN 246014)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600
van.durrer@skadden.com
ramon.naguiat@skadden.com
emily.ma@skadden.com

Attorneys for Corus Construction Venture, LLC

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:09-bk-35127-VZ |
| GTS 900 F, LLC, a California limited liability company, aka Concerto, | Chapter 11 |
| Debtor | **FIRST AMENDED UNITARY DISCLOSURE STATEMENT AND COMPETING PLANS OF REORGANIZATION PROPOSED BY GTS 900 F, LLC AND CORUS CONSTRUCTION VENTURE, LLC**[1] |
| Tax Id # 20-2396211 | DATE:      February 17, 2011<br>TIME:      9:30 a.m.<br>PLACE:    Courtroom 1368<br>             255 East Temple Street<br>             Los Angeles, CA 90012 |

---

[1] Revisions to the originally filed version of this document [Docket No. 830] were made pursuant to the Court's _____ __, 2010 order [Docket No. __].  A redline showing all changes made between the originally filed version of this document and this amended version has been separately filed with the Court under declaration and is also available at http://www.kccllc.net/Concerto.

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     GENERAL DISCLAIMER AND VOTING PROCEDURE ..................................... 2

III.    WHO MAY OBJECT TO CONFIRMATION OF THE PLAN .............................. 3

IV.     WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN .................................. 3

V.      VOTES NECESSARY TO CONFIRM THE PLAN ................................................. 5

VI.     INFORMATION REGARDING VOTING IN THIS CASE .................................... 6

VII.    DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND
        EVENTS PRECIPITATING BANKRUPTCY FILING .......................................... 7

        A.      STRUCTURE OF DEBTOR ................................................................ 7

        B.      EVENTS PRECIPITATING THE CHAPTER 11 FILING ......................... 8

                1.      DEBTOR'S VIEW .................................................................. 8

                2.      CCV'S VIEW ...................................................................... 16

        C.      DEBTOR'S BUSINESS AND FUTURE OF THE PROJECT .................. 18

                1.      DEVELOPMENT OF PROJECT ............................................. 18

                2.      FUTURE OF THE PROJECT ................................................. 19

                        (a)      SALE OF THE PROJECT (GTS PLAN) ........................... 19

                                 (i)      DEBTOR'S RETENTION OF PREMIER
                                          MULTIFAMILY PROPERTY BROKERAGE
                                          FIRM ................................................................. 20

                                 (ii)     MARKETING PROCESS FOR SALE OF
                                          THE PROJECT ..................................................... 24

                                 (iii)    FEASIBILITY OF SALE OF PROJECT (GTS
                                          PLAN) ............................................................... 30

                                          (1)      SALES ENVIRONMENT FOR
                                                   APARTMENTS .......................................... 30

                                          (2)      MORAN VALUATION ANALYSIS .......... 31

                                          (3)      SALE COMPS .......................................... 32

                                          (4)      SOUTHERN CALIFORNIA DEALS
                                                   UNDER CONTRACT ................................ 33

i

(5)     RECENT SALES OF SOUTHERN CALIFORNIA DEVELOPMENT SITES...........................................33

(6)     CORE APARTMENT SALES SINCE 2000 ........................................34

(b)     TRANSFER OF THE PROJECT TO CCV (CCV PLAN)..................................................35

3.     CURRENT ALTERNATIVE TO THE PLANS .............................37

VIII.     CRITICAL PLAN PROVISIONS .........................................................38

A.     THE GTS PLAN ....................................................................38

B.     THE CCV PLAN ....................................................................39

IX.     DESCRIPTION AND TREATMENT OF CLAIMS................................42

A.     OVERVIEW OF PLAN PAYMENTS ........................................42

(a)     THE GTS PLAN ........................................................43

(b)     THE CCV PLAN .......................................................45

2.     AFFILIATE CLAIMS...............................................49

(a)     GTS PLAN .................................................................49

(b)     CCV PLAN ................................................................50

B.     ADMINISTRATIVE EXPENSES ..............................................53

1.     THE GTS PLAN .......................................................53

2.     THE CCV PLAN .......................................................54

C.     UNSECURED TAX CLAIMS.....................................................57

D.     CLASSIFICATION OF CLAIMS AND INTERESTS ...............58

E.     CCV'S SECURED CLAIM .......................................................58

F.     MECHANIC'S LIEN CLAIMS ..................................................63

G.     GENERAL UNSECURED CLAIMS ..........................................65

H.     EQUITY INTERESTS................................................................66

I.     CCV DEFICIENCY CLAIM ......................................................67

J.     SECURED CLAIMS OF DEBTOR'S AFFILIATES .................69

K.     UNSECURED CLAIMS OF DEBTOR'S AFFILIATES ...........70

X.      SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS ............ 71

XI.     FINANCIAL INFORMATION TO ASSIST IN DETERMINING
        WHETHER PROPOSED PAYMENT IS FEASIBLE ............................................ 72

XII.    ASSETS AND LIABILITIES OF THE ESTATE ..................................................... 73

        A.      ASSETS ..................................................................................................... 73

        B.      LIABILITIES ............................................................................................ 75

        C.      SUMMARY ............................................................................................... 76

XIII.   TREATMENT OF NONCONSENTING CLASSES ............................................ 76

XIV.    TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING
        CLASS (CHAPTER 7 LIQUIDATION ANALYSIS) ........................................... 77

        A.      DEBTOR'S LIQUIDATION ANALYSIS FOR GTS PLAN .................... 78

        B.      CCV'S LIQUIDATION ANALYSIS FOR CCV PLAN .......................... 80

XV.     FUTURE DEBTOR ............................................................................................... 83

        A.      MANAGEMENT OF DEBTOR ............................................................... 83

        B.      DISBURSING AGENT (GTS PLAN ONLY) ........................................... 84

        C.      PLAN ADMINISTRATOR (CCV PLAN ONLY) .................................... 84

        D.      FUTURE FINANCIAL OUTLOOK ......................................................... 86

XVI.    SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF
        CONTRACTS AND   LEASES; OTHER PROVISIONS .................................... 86

XVII.   BANKRUPTCY PROCEEDINGS ........................................................................ 88

        A.      COMMENCEMENT OF CASE ............................................................... 88

        B.      LOFT UNITS SALE AND CASH COLLATERAL MOTIONS ............... 88

        C.      CLAIM OF CCV ....................................................................................... 90

        D.      DEBTOR'S COMPLAINT AND OBJECTION TO CLAIM OF
                CCV ........................................................................................................... 90

        E.      COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED
                BY CREDITORS' COMMITTEE .............................................................. 91

        F.      COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED
                BY ASTANI CONSTRUCTION, INC......................................................... 92

        G.      COMPLAINT AGAINST CORUS BANK ................................................ 93

        H.      CLAIMS ACQUIRED BY AFFILIATES OF CCV .................................. 95

iii

I.      RELIEF FROM STAY MOTION ................................................... 95

J.      COMPLAINT AGAINST GUARANTORS ................................................ 95

K.      COMPLAINT REGARDING CLAIM AND LIEN OF FIRE
        PROTECTION GROUP FILED BY ASTANI CONSTRUCTION,
        INC. ................................................................................ 96

L.      TREATMENT OF MECHANIC'S LIEN CLAIMS UNDER THE
        CCV PLAN ........................................................................ 97

M.      PLANS AND DISCLOSURE STATEMENTS ................................ 97

N.      NO AVOIDANCE ACTIONS ..................................................... 98

XVIII.  TAX CONSEQUENCES OF PLANS ...................................................... 98

A.      GTS PLAN ......................................................................... 98

        1.      INTRODUCTION ........................................................... 98

        2.      FEDERAL INCOME TAX CONSEQUENCES TO A
                DEBTOR ................................................................. 100

                (a)     UTILIZATION OF A DEBTOR'S NET
                        OPERATING LOSSES .................................... 100

                (b)     REDUCTION OF DEBTOR'S INDEBTEDNESS............ 100

                (c)     ALTERNATIVE MINIMUM TAX ................................ 101

                (d)     PASS-THROUGH TAX ENTITY .................................. 102

        3.      TAX CONSEQUENCES TO CREDITORS ................................ 102

                (a)     CLAIMS SATISFIED WITH PAYMENT....................... 103

                        (i)     GAIN/LOSS ON EXCHANGE............................ 103

                        (ii)    TAX BASIS AND HOLDING PERIOD OF
                                ITEMS RECEIVED....................................... 103

                        (iii)   DETERMINATION OF CHARACTER OF
                                GAIN ................................................... 103

                (b)     RECEIPT OF INTEREST .............................................. 104

                (c)     OTHER TAX CONSIDERATIONS ................................ 104

                        (i)     MARKET DISCOUNT..................................... 104

                        (ii)    WITHHOLDING ........................................... 105

        4.      TAX CONSEQUENCES TO EQUITY HOLDERS .................... 105

B.      THE CCV PLAN................................................................... 105

iv

1.  INTRODUCTION ................................................................. 105

2.  FEDERAL INCOME TAX CONSEQUENCES TO A
    DEBTOR ........................................................................... 107

    (a)  PASS-THROUGH TAX ENTITY ................................... 107

    (b)  REDUCTION OF DEBTOR'S INDEBTEDNESS............ 107

3.  TAX CONSEQUENCES TO CREDITORS ................................ 108

    (a)  CLAIMS SATISFIED WITH PAYMENT....................... 109

         (i)   GAIN/LOSS ON EXCHANGE............................. 109

         (ii)  TAX BASIS AND HOLDING PERIOD OF
               ITEMS RECEIVED....................................... 109

         (iii) DETERMINATION OF CHARACTER OF
               GAIN ........................................................ 109

    (b)  RECEIPT OF INTEREST ................................................ 109

    (c)  OTHER TAX CONSIDERATIONS ................................ 110

         (i)   MARKET DISCOUNT....................................... 110

         (ii)  WITHHOLDING ............................................. 110

4.  TAX CONSEQUENCES TO EQUITY HOLDERS .................... 111

XIX.  EFFECT OF CONFIRMATION OF PLAN.......................................... 112

      A.  GENERAL COMMENTS .................................................... 112

      B.  DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS;
          STATUS OF  LIENS; EQUITY SECURITY HOLDERS ...................... 112

      C.  MODIFICATION OF THE PLANS .......................................... 113

      D.  POST-CONFIRMATION CAUSES OF ACTION............................ 113

      E.  DISSOLUTION OF COMMITTEE............................................ 114

      F.  POST-EFFECTIVE DATE EMPLOYMENT AND
          COMPENSATION OF PROFESSIONALS.................................... 114

      G.  POST-CONFIRMATION OPERATIONS ................................. 115

      H.  EXECUTION AND DELIVERY OF DOCUMENTS.......................... 115

      I.  FINAL DECREE............................................................... 115

XX.   DECLARATIONS IN SUPPORT OF DISCLOSURE STATEMENT AND
      PLAN............................................................................... 116

v

A.    GTS PLAN ...................................................................................... 116

B.    CCV PLAN ..................................................................................... 118

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

626760.11-Los Angeles Server 2A - MSW

## I.  **INTRODUCTION**

On September 17, 2009 (the "Petition Date"), GTS 900 F, LLC ("Debtor" or "GTS"), a California limited liability company, also known as Concerto, filed a bankruptcy petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The document you are reading contains two plans of reorganization: (i) the plan proposed by the Debtor (the "GTS Plan") and (ii) the plan (the "CCV Plan") proposed by creditor Corus Construction Venture, LLC ("CCV" and with the Debtor, the "Proponents").  The document you are reading also contains a unitary disclosure statement (the "Unitary Disclosure Statement"), submitted at the request of the Court, for both the CCV Plan and the GTS Plan, which disclosure statement was prepared jointly by the Debtor and CCV.

A disclosure statement describes the assumptions that underlie the GTS Plan and the CCV Plan and how each of the Plans will be executed.  The Court has approved the form of this document as an adequate disclosure statement, containing enough information to enable parties affected by the CCV Plan and the GTS Plan to make an informed judgment about the Plans.  The Court has not yet confirmed either the GTS Plan or the CCV Plan, which means the terms of the GTS Plan and the CCV Plan are not now binding on anyone.

READERS OF THE UNITARY DISCLOSURE STATEMENT SHOULD NOTE THAT THE GTS PLAN AND THE CCV PLAN ARE DIFFERENT.  AS SUCH, CERTAIN CONCEPTS AND DEFINED TERMS WHICH APPLY TO ONE OF THE PLANS MAY NOT APPLY TO THE OTHER.  THEREFORE, READERS OF THE UNITARY DISCLOSURE STATEMENT ARE ADVISED TO CAREFULLY REVIEW THE DOCUMENT TO HELP ENSURE AN ACCURATE READING OF THE DOCUMENT.

The Debtor has proposed the GTS Plan to treat the claims of the Debtor's creditors and the interests of equity holders and to sell the Debtor's assets in a manner designed to maximize value.  CCV has proposed the CCV Plan to treat the claims of the Debtor's creditors and the interests of equity holders and to liquidate the Debtor's assets.

1

The Proponents have reserved February 17, 2011, at 9:30 a.m., in Courtroom 1368, 255 East Temple Street, Los Angeles, California, for a hearing to determine whether the Court will confirm the GTS Plan or the CCV Plan.

Any interested party desiring further information regarding the GTS Plan should contact bankruptcy counsel for the Debtor, SulmeyerKupetz, a professional corporation, Attention: Steven S. Werth, 333 South Hope Street, 35th Floor, Los Angeles, CA 90071; Telephone (213) 626- 2311; Facsimile (213) 629-4520, Email swerth@sulmeyerlaw.com.  Any interested party desiring further information regarding the CCV Plan should contact bankruptcy counsel for CCV, Skadden, Arps, Slate, Meagher & Flom LLP, Attention: Van C. Durrer II, Esq., 300 South Grand Avenue, Suite 3400, Los Angeles, CA  90071; Telephone: (213) 687-5000; Facsimile: (213) 687-5600, E-mail: van.durrer@skadden.com.

## II.    GENERAL DISCLAIMER AND VOTING PROCEDURE

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY.  IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE CCV PLAN AND THE GTS PLAN.  IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLANS.  IT ALSO TELLS ALL CREDITORS AND EQUITY HOLDERS (MEMBERS OF THE DEBTOR) WHAT TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE EACH OF THE PLANS, SHOULD THE GTS PLAN OR THE CCV PLAN BE CONFIRMED BY THE COURT.

THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS DOCUMENT ARE SET FORTH IN THE DECLARATIONS IN SECTION XX BELOW.  ALL REPRESENTATIONS MADE BY THE DEBTOR ARE TRUE TO THE DEBTOR'S BEST KNOWLEDGE.  ALL REPRESENTATIONS MADE BY CCV ARE TRUE TO CCV'S BEST KNOWLEDGE.

NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

2

1    After carefully reviewing this document and the attached exhibits, the GTS Plan and the

2    CCV Plan, please vote on each of the Plans on the enclosed ballot and indicate a preference, if you

3    have one, for either the GTS Plan or the CCV Plan.  Return the completed ballot to voting agent for

4    the Plans (the "Voting Agent") no later than 5:00 p.m. on _____, 2011 (the "Voting

5    Deadline").  The ballot may be returned by mail, fax, or email as follows:

6        Concerto Plan Ballot Processing Center
         Kurtzman Carson Consultants LLC
7        2335 Alaska Avenue
         El Segundo, CA 90245
8        Email: ConcertoInfo@kccllc.com
         Facsimile to (310) 751-1577
9

10    The Proponents have reserved a hearing date for a hearing to determine whether the Court

11    will confirm either of the Plans.  Please refer to Section I above for the specific hearing date.  The

12    Debtor will file a motion for an order confirming the GTS Plan (the "Debtor Motion") and CCV

13    will file a motion for an order confirming the CCV Plan (the "CCV Motion" and with the Debtor

14    Motion, the "Motions").  Notice of the Motions shall be served on all creditors and equity holders

15    and on the Office of the United States Trustee.  Any opposition to the Debtor Motion shall be filed

16    and served on bankruptcy counsel for the Debtor no later than fourteen (14) days prior to the

17    hearing date.  Any opposition to the CCV Motion shall be filed and served on bankruptcy counsel

18    for CCV no later than fourteen (14) days prior to the hearing date, if they desire to request

19    confirmation of their respective Plans.  Failure to oppose the confirmation of the GTS Plan may be

20    deemed consent to the confirmation of the GTS Plan.  Likewise, failure to oppose the confirmation

21    of the CCV Plan may be deemed consent to the confirmation of the CCV Plan.

22    **III.    WHO MAY OBJECT TO CONFIRMATION OF THE PLAN**

23    Any party in interest may object to confirmation of the GTS Plan and/or the CCV Plan, but

24    as explained below not everyone is entitled to vote to accept or reject the Plans.

25    **IV.    WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN**

26    It requires both an allowed and impaired claim or interest in order to vote either to accept or

27    reject the GTS Plan or the CCV Plan.  A claim is defined by the Bankruptcy Code to include a

28    right to payment from the Debtor.  An interest represents an ownership stake in the Debtor.

3

1      In order to vote a creditor or interest-holder must first have an allowed claim or interest.

2  With the exceptions explained below, a claim is allowed, if proof of the claim or interest is

3  properly filed before any bar date and no party in interest has objected, or if the court has entered

4  an order allowing the claim or interest.  Please refer to Section VI below for specific information

5  regarding bar dates in this case.

6      Under certain circumstances a creditor may have an allowed claim even if a proof of claim

7  was not filed and the bar date for filing a proof of claim has passed.  A claim is deemed allowed if

8  the claim is listed on the Debtor's schedules (including any amended schedules) and is not

9  scheduled as disputed, contingent, or unliquidated.  Numerous claims were scheduled in this case

10  as contingent because those claims are held by subcontractors whose direct contract is with the

11  general contractor for the Debtor's project.  Further, many such creditors may have mechanics' lien

12  rights that they may or may not timely assert and perfect.  The deadline set by the Court for filing

13  proofs of claim against the Debtor was January 29, 2010.

14      Similarly, an interest is deemed allowed if it is shown on the list of equity security holders

15  filed by the Debtor with the Court and is not scheduled as disputed.

16      In order to vote on a particular Plan, an allowed claim or interest must also be impaired by

17  that particular Plan.

18      <u>Impaired creditors</u> with respect to a particular Plan include those whose legal, equitable, or

19  contractual rights are altered by the Plan, even if the alteration is beneficial to the creditor.  A

20  contract provision that entitles a creditor to accelerated payment upon default does not, however,

21  necessarily render the claimant impaired, even if the Debtor defaulted and the Plan does not

22  provide the creditor with accelerated payment.  The creditor is deemed unimpaired so long as the

23  Plan cures the default, reinstates the maturity of such claim as it existed before default,

24  compensates for any damages incurred as a result of reasonable reliance upon the acceleration

25  clause, and (except for a default arising from failure to operate a nonresidential lease subject to 11

26  U.S.C. § 365 (b)(1)(A)) compensates for any actual pecuniary loss incurred as a result of any

27  failure to perform a non-monetary obligation.

28

4

1    Impaired interest-holders with respect to a particular Plan include those whose legal,

2    equitable, and contractual rights are altered by the Plan, even if the alteration is beneficial to the

3    interest holder.

4        There are also some types of claims that the Bankruptcy Code requires be treated a certain

5    way.  For that reason they are considered unimpaired and therefore holders of these claims cannot

6    vote.

7        To summarize, there are two prerequisites to voting on a particular Plan: a claim or interest

8    must be both allowed and impaired under that Plan.

9        If a creditor or interest-holder has an allowed and impaired claim or interest under a

10   particular Plan, then he or she may vote either to accept or reject that Plan (unimpaired claimants or

11   interest-holders are deemed to have accepted the Plan).  Impaired claims or interests under a

12   particular Plan are placed in classes and it is the class that must accept that Plan.  Members of

13   unimpaired classes do not vote, although as stated above, they may object to confirmation of the

14   Plan.  Even if all classes do not vote in favor of a particular Plan, that Plan may nonetheless be

15   confirmed if the dissenting classes are treated in a manner prescribed by the Bankruptcy Code.

16   Please refer to Section VI below for information regarding impaired and unimpaired classes in this

17   case.

18       Section IX sets forth which claims are in which class.  Secured claims are placed in

19   separate classes from unsecured claims.  Fed. R. Bankr. P. 3018(d) provides: "A creditor whose

20   claim has been allowed in part as a secured claim and in part as an unsecured claim shall be

21   entitled to accept or reject a plan in both capacities."

22   **V.    VOTES NECESSARY TO CONFIRM THE PLAN**

23       The Court may confirm a particular Plan if at least one noninsider impaired class of claims

24   has accepted and certain statutory requirements are met as to both nonconsenting members within a

25   consenting class and as to dissenting classes.  A class of claims has accepted a particular Plan when

26   more than one-half in number and at least two-thirds in amount of the allowed claims actually

27   voting, vote in favor of the Plan.  A class of interests has accepted a particular Plan when at least

28   two-thirds in amount of the allowed interests of such class actually voting have accepted it.  It is

5

1  important to remember that even if the requisite number of votes to confirm a Plan are obtained,

2  the Plan will not bind the parties unless and until the Court makes an independent determination

3  that confirmation is appropriate.  That is the subject of any upcoming confirmation hearing.

4  **VI.**    **INFORMATION REGARDING VOTING IN THIS CASE**

5      The bar date (deadline) for filing a proof of claim in this case was January 29, 2010.

6      The bar date for hearings on objections to claims was June 30, 2010.  All objections

7  brought by the Debtor to claims have been resolved, except for the pending objection to the claim

8  of Corus Construction Venture, LLC.

9      With respect to the GTS Plan, the Debtor believes that classes 1 (Corus Construction

10  Venture, LLC), 2 (mechanics' lien claimants), and 3 (general unsecured creditors) are impaired and

11  therefore entitled to vote on the GTS Plan.  The Debtor believes that Class 4 (equity interest-

12  holders) is unimpaired and therefore does not vote.  A party that disputes the Debtor's

13  characterization of its claim or interest as unimpaired may request a finding of impairment from the

14  Court in order to obtain the right to vote.

15      With respect to the CCV Plan, CCV believes that Class 1 (CCV's secured claim), Class 4

16  (CCV's unsecured deficiency claim), Class 6 (Astani unsecured claims), and Class 7 (equity

17  interests) are the only impaired classes that may be entitled to vote on the CCV Plan.  CCV

18  believes that Class 2 (non-insider mechanic's lien claims), Class 3 (non-insider general unsecured

19  claims), and Class 5 (Astani secured claims) are unimpaired and therefore deemed to accept the

20  CCV Plan.  A party that disputes CCV's characterization of its claim or interest as unimpaired may

21  request a finding of impairment from the Court in order to obtain the right to vote.

22      Ballots must be received by 5:00 p.m. on the Voting Deadline by the Voting Agent, by mail,

23  hand delivery, or by overnight courier at the following address:

24          Concerto Plan Ballot Processing Center
            Kurtzman Carson Consultants LLC
25          2335 Alaska Avenue
            El Segundo, CA 90245
26

27      Alternatively, Ballots may be returned to the Voting Agent by the Voting Deadline by

28  email to ConcertoInfo@kccllc.com or by facsimile to (310) 751-1577.

6

## VII. DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS PRECIPITATING BANKRUPTCY FILING

### A. STRUCTURE OF DEBTOR

The Debtor is a California limited liability company. The Debtor believes that the members (interest holders) of the Debtor consist of parties experienced in real estate development and management and outside investors. The holders of the equity (membership) interests in the Debtor are as follows: (1) Sonny Astani and Jo Cho, as trustees of the Astani/Cho Living Trust (30%); (2) Marco Astani, as trustee of the Marco Astani Living Trust (5%); (3) FG 98 Investment Co., LP. (15%); and (4) Concerto Partners, LLC, a California limited liability company (50%). Sonny Astani is the manager of Concerto Partners, LLC, and is a controlling equity holder in or affiliate of entities holding the majority of membership interests in the Debtor. Marco Astani is the brother of Sonny Astani. Concerto Manager, Inc., is the manager of GTS. Sonny Astani is the President of Concerto Manager, Inc.

According to the Debtor, Astani Enterprises, Inc. is the driving force behind GTS. The Debtor believes that, through its subsidiaries and affiliates, Astani Enterprises, Inc., is downtown Los Angeles' largest residential real estate developer, as well as the owner and operator of more than 5,000 apartment units throughout Southern California and the current developer of 1,700 units of apartments, condominiums and mixed-use projects in downtown Los Angeles, Hollywood, Encino, and elsewhere, collectively valued at more than $500,000,000. Sonny Astani is the Chairman and President of Astani Enterprises, Inc. According to the Debtor, he has more than 30 years of real estate experience in the Southern California and Baja Mexico areas, and has been involved in the acquisition, development, construction and management of more than $1,000,000,000 of multi-family buildings and condominiums, including 5,000 new residential units in the City of Los Angeles.

Astani Construction, Inc., a California corporation and affiliate of Astani Enterprises, Inc., is the general contractor of the Concerto project. The Debtor contends that Astani Construction, Inc., through its principals (Marco Astani and Sonny Astani), has a successful track record of 30 years of building, developing and renovating more than $1,000,000,000 worth of apartment

7

1  buildings, condominiums, custom homes, tenant improvements, and commercial enterprises

2  throughout the United States.  Marco Astani is the President of Astani Construction, Inc.

3       As used herein, (a) the "Astani Parties" means, collectively, in all capacities, Sonny Astani,

4  Marco Astani, their respective spouses and relatives, and any and all affiliates of any or all of the

5  foregoing, including, without limitation, Astani Enterprises, Astani Construction, Astani/Cho

6  Living Trust, the Marco Astani Living Trust, Concerto Partners, LLC, Concerto Manager, HPG

7  Management, Inc.; and (b) the "Astani Claims" means, collectively, (i) with respect to

8  Administrative Claims (defined below), any and all Administrative Claims of any of the Astani

9  Parties that relate in any way to payments made by or on behalf of the Astani Parties to any estate

10  professionals, and (ii) with respect to non-Administrative Claims, any and all claims of any of the

11  Astani Parties, including, without limitation, any claims transferred or sold to any of the Astani

12  Parties.

13       According to the Debtor, it conducted all of its business activity in the County of Los

14  Angeles since its formation effective on January 27, 2005.

15  **B.    EVENTS PRECIPITATING THE CHAPTER 11 FILING**

16       The Debtor and CCV have differing views of the events precipitating the Debtor's chapter

17  11 filing.  The following subsections represent the Proponents' respective views of the events

18  leading to this bankruptcy cases.

19       1.    DEBTOR'S VIEW

20       What follows is a brief summary of the dates and circumstances that led Debtor to file

21  bankruptcy.  The Debtor's allegations and contentions set forth in this sub-section constitute the

22  Debtor's views regarding events precipitating the filing of this chapter 11 case, are the subject of

23  pending litigation, and may be contested by Corus Bank, N.A. ("Corus Bank"), the Federal Deposit

24  Insurance Corporation (the "FDIC"), and/or CCV.

25       The Debtor believes this case is the result of the conduct of a financially- troubled lender,

26  Corus Bank, whose construction loan was oversecured by the Debtor's mixed use residential/retail

27  project in the heart of downtown Los Angeles.  As discussed below, Corus Bank was ultimately

28  seized and shut down by the Federal government.  Construction of phase I of the approximately

8

1   1,000,000 square foot development known as "Concerto" was approaching completion at the time

2   of the commencement of the Debtor's chapter 11 case.  However, the final completion of phase I of

3   the Debtor's Concerto development was substantially delayed and undermined by Corus Bank's

4   misconduct and delays and failure to fund the balance of its loan commitment in accordance with

5   the terms of the construction loan.  Delays in the administration of the construction loan impeded

6   the timeliness of the sale of units at the project and further loan advances needed to complete the

7   project.  Further, delays caused by Corus Bank cost the Debtor time, money, sales opportunities

8   and market momentum.  Nonetheless, prior to the commencement of this reorganization case, the

9   Debtor was able to conduct a sales event on August 29, 2009, which resulted in buyers entering

10  into contracts to purchase all 77 units in the seven-story loft structure that constitutes part of the

11  Debtor's first phase of the Concerto development.

12      As of July 27, 2007, the Debtor and Corus Bank entered into a Construction Loan

13  Agreement (which, together with all documents executed by the Debtor pursuant to such agreement,

14  shall be referred to as the "Loan Agreement"), in which Corus Bank agreed to lend to GTS up to

15  $190,000,000 to allow the Debtor to construct, at 900 S. Figueroa Street and 901 S. Flower Street

16  in Los Angeles: (1.) a tower that would contain 271 residential units as well as retail space and

17  storage space ("Tower I"); (2) a loft building that would contain 77 residential units as well as

18  retail space and storage space (the "Loft"); and (3) a seven-story partly underground parking

19  structure (the "Parking Garage").  The construction of Tower I, the Loft and the Parking Garage are

20  collectively referred to as "Phase I" of the Concerto project.

21      GTS and Corus Bank, through the Loan Agreement, anticipated that the Debtor would

22  subsequently construct a second tower ("Tower II"), which was not being financed through the

23  Loan Agreement, but which would be constructed on land on which Corus Bank would initially

24  possess a security interest pursuant to the Loan Agreement.  The construction of Tower II is

25  referred to as "Phase II" of the Concerto project.  As used herein, "Project" refers, collectively, to

26  Tower I, the Loft, Tower II, the Parking Garage and the land underlying each.  The Loan

27  Agreement was structured so that, in order for GTS to borrow the full amount available under the

28  Loan Agreement ($190,000,000), GTS would need to repay from the sale, of residential units in the

9

1  Loft ("Residential Loft Units") up to $23,200,000 of the outstanding loan amounts.  This would

2  enable the Debtor to complete Phase I, including the remainder of Tower I.

3          Accordingly, the Debtor invested significant time and money structuring the Concerto

4  development in a manner that would facilitate sales of the Residential Loft Units such that the

5  Debtor could repay to Corus Bank a portion of the loan and receive the additional funding from

6  Corus Bank necessary to complete the Project.  Towards that end, GTS re-phased the Project

7  numerous times and created a single condominium association for both Tower I and Tower II, per

8  the Loan Agreement, which had the effect of reducing maintenance expenses and monthly

9  assessments that purchasers of the residential units would need to pay, and making the units more

10  affordable and economically feasible for prospective purchasers.  However, as more fully described

11  below, Corus Bank's delays, improper demands and administration of the Loan Agreement,

12  delayed the Debtor in placing the Residential Loft Units on the market and otherwise injured the

13  Debtor.

14          The Debtor experienced problems with Corus Bank's construction loan beginning in or

15  about the Fall of 2008 and thereafter, at or about the time that Corus Bank's financial problems

16  became readily apparent.  At that time, various governmental agencies informed Corus Bank that it

17  needed to raise capital or risk being seized by regulators; which regulators began to be physically

18  present in Corus Bank's offices at that time.

19          As of February 18, 2009, Corus Bank's financial condition had deteriorated to such a point

20  that it was forced to enter into a Stipulation and Consent Order with the Comptroller of the

21  Currency of the United States Department of Treasury.  The Consent Order required Corus Bank to

22  achieve and maintain minimal levels of capital pursuant to a capital plan, and prohibited Corus

23  Bank from declaring a dividend unless it was in compliance with the capital plan.  Corus Bank's

24  reputation in the financial and business community diminished such that companies would not

25  issue bonds to GTS because of concern about Corus Bank's ability to finance the Project;

26  subcontractors on the Project were significantly concerned about GTS's ability to access its

27  construction loan to pay them for the work they performed.

28

626760.11-Los Angeles Server 2A - MSW

1    Despite the Debtor's requests, and delays Corus Bank had already caused, Corus Bank was

2   unwilling or unable to provide assurances, even in light of its highly publicized failure to fully fund

3   a loan commitment made to the Terranea Resort development in Rancho Palos Verdes, California,

4   that it would be able to satisfy its loan commitment to the Debtor in connection with the

5   completion of the Project.  Corus Bank was seized and closed on September 11, 2009, by the

6   Comptroller of the Currency, which appointed the FDIC as receiver.

7    Despite the obstacles and delays caused by Corus Bank, and coupled with its diminished

8   reputation, GTS moved forward with completion of the Concerto Project.  The Debtor planned,

9   publicized and executed a significant "sales event" for the first completed units in the Project, the

10   Residential Loft Units.  The sales event, which occurred on August 29, 2009, was "successful" to

11   the extent that all 77 available Residential Loft Units were conditionally sold in a single day, with

12   back-up offers for each unit.  Prior to the commencement of the Debtor's chapter 11 case, the

13   Debtor entered contracts for the sale of each of the 77 Residential Loft Units.  The purchasers made

14   deposits into escrow in the amount of 3% of the purchase prices.  Approximately $1,000,000 was

15   held in escrow.  The total sale price for the 77 units was $30,753,726, and the projected net

16   proceeds from sales amounted to $28,765,592.

17    The prices for the Residential Loft Units were set in a modified auction procedure through

18   the Debtor's consultation with real estate marketing and sale experts.  Corus Bank had participated

19   in and encouraged the marketing of these sales by approving the $1,000,000 marketing budget

20   funded under the Loan Agreement.  Despite the national economic downturn and depressed real

21   estate market for new homes and despite the numerous obstacles facing the Debtor resulting from

22   Corus Bank's misconduct, the Debtor was able to optimize under the circumstances the prices

23   obtained for the Residential Loft Units through its heavily publicized auction procedure and careful

24   analysis of sales demand, new loan terms, and buyer preferences.

25    To be permitted to offer for sale the Residential Loft Units, the Debtor needed to obtain

26   various governmental permits and approvals, including, but not limited to, approval by the

27   California Department of Real Estate ("DRE") in the form of a Conditional or Final Public Report.

28   In September of 2008, GTS provided for review and approval to Corus Bank the Condominium

Documents, as defined by the Loan Agreement (the "Condominium Documents"), including the declaration of covenants, conditions and restrictions.  However, rather than review and approve the Condominium Documents, Corus Bank delayed.

In addition, Corus Bank made unreasonable and improper demands that GTS modify the Condominium Documents.  For example, Corus Bank unilaterally demanded that GTS create separate condominium associations for Tower I and Tower II, contrary to the terms of the Loan Agreement, thereby increasing the amount of monthly assessments that purchasers would need to pay and making the.  Residential Loft Units less attractive to prospective purchasers.  The Debtor believes that Corus Bank demanded the creation of a separate condominium association for Tower II because, rather than focusing on the success of the Project, Corus Bank already was anticipating foreclosing on the land upon which the Project was being built, i.e., the land containing Tower I and the Loft.

It was not until after February 10, 2009, that Corus Bank finally approved, in a form substantially similar to that which had been submitted approximately four months earlier, the Condominium Documents GTS had submitted in September of 2008.  As a result of Corus Bank's delays and improper demands, the Debtor was unable in the time frame originally anticipated to secure the government approvals, including the final approval from the DRE that it needed to proceed with offering the Residential Loft Units for sale.  As a further consequence of Corus Bank's delays and improper demands, (i) GTS was unable to open its sales center for these units in January 2009 as scheduled, or to meet its anticipated escrow closings of May 2009, despite having written commitments from several purchasers to purchase such units, (ii) GTS lost the ability to bring the Residential Loft Units to market, as planned, before Evo, a neighboring 311-unit condominium project located at 1155 S. Grand Avenue that also was being financed by Corus Bank and was competing for the same or similar prospective purchasers, and (iii) GTS incurred considerable expenses, including payments to Corus Bank's attorneys to review the documents, and including increased costs in attempting to procure the various bonds needed to obtain final governmental approval.

626760.11-Los Angeles Server 2A - MSW

1  Corus Bank's representatives repeatedly advised the Debtor that Corus Bank would

2  approve the Residential Loft Unit sales prices and consent to the release of its lien on units to be

3  sold if the Debtor obtained a "White Report" from the California Department of Real Estate, which

4  was needed to close escrow for the sale of the units.  This was made very difficult and delayed by

5  Corus Bank's unreasonable refusal to approve the Condominium Documents and publicly known

6  financial troubles which prevented the Debtor from being able to obtain bonds required to obtain

7  the White Report.  Ultimately, after posting cash collateral, the Debtor was able to obtain the White

8  Report; yet Corus Bank failed to fulfill its commitment to approve the sales prices, was seized by

9  the Federal government, and placed under the control of the FDIC.

10  As it entered a period of financial freefall in or about the Fall of 2008, Corus Bank began to

11  engage in a pattern and practice of: (a) delaying approvals on documentation submitted to it by the

12  Debtor, (b) delaying the payment of construction loan funds, (c) making unreasonable demands of

13  the Debtor unwarranted by and in violation of the Loan Agreement as preconditions to its own

14  compliance with the Loan Agreement, and (d) engaging in further delay tactics which made it

15  difficult for the Debtor to successfully and timely complete the Concerto development.

16  In pending litigation, discussed more fully below, the Debtor asserts that Corus Bank

17  breached its contractual obligations and breached its implied duty of good faith and fair dealing

18  arising from the Loan Agreement in the following respects, among others:

19  (a)  Corus Bank failed to timely provide funding to the Debtor;

20  (b)  Corus Bank unreasonably failed and refused to timely approve the Condominium

21  Documents (as defined by the Loan Agreement) submitted to it for approval;

22  (c)  Corus Bank jeopardized the success of the entire Concerto development by refusing

23  to consent to the Condominium Documents unless the Debtor would first agree to relinquish its

24  contractual right, upon making a $25,000,000 payment to Corus Bank, to obtain a release of the

25  Tower II land from the deed of trust executed in favor of Corus Bank;

26  (d)  Despite the delays that it had caused and the fact that the market would no longer

27  allow for the sale of the Residential Loft Units at prices originally contemplated in the Loan

28  Agreement, and even though its security interest was not impaired, Corus Bank unreasonably

13

1  refused to approve the sale of the Residential Loft Units at market prices calculated to optimize

2  sales and sales proceeds;

3       (e)    Despite the delays it had caused and despite the Debtor's inability to obtain bonds

4  because of the deterioration of Corus Bank's financial rating and reputation, Corus Bank

5  unreasonably refused to advance funds to the Debtor from budgeted-for items to allow the Debtor

6  to procure the bonds necessary to obtain a White Report from the California Department of Real

7  Estate;

8       (f)    Corus Bank offered the mezzanine lender of Evo, a neighboring 311-unit

9  condominium project located at 1155 S. Grand Avenue that also was being financed by Corus

10  Bank, a right of first refusal to purchase Evo's existing promissory note, empowering it to offer the

11  Evo units at a reduced price at a competitive advantage.

12       The Debtor contends that, as a result of Corus Bank's breaches of its contractual obligations

13  and its implied duty of good faith and fair dealing arising from the Loan Agreement, (a) the

14  completion of the Project, including the loft portion of the Project, was delayed; (b) the Debtor was

15  unable to timely offer the Residential Loft Units for sale and, when they were offered for sale, was

16  forced to sell them for lower prices than they would have sold for absent Corus Bank's misconduct;

17  (c) the Debtor was unable to timely close escrows on the Residential Loft Units; (d) the Debtor was

18  unable to complete Tower I or to market or sell the Tower I units; (e) the Project was not

19  completed; (f) the Debtor was unable to pay down the Corus Bank loan as projected; and (g) the

20  Debtor was forced into bankruptcy in order to protect itself from further losses, and to protect and

21  safeguard the interests of its buyers.

22       The Debtor also contends that, as a result of Corus Bank's breaches of its contractual

23  obligations and breaches of its implied duty of good faith and fair dealing arising from the Loan

24  Agreement, the Debtor has incurred considerable additional fees and expenses, including but not

25  limited to (a) increased costs in attempting to procure the various bonds needed to obtain final

26  governmental approval with respect to the Residential Loft Units; (b) increased construction and

27  insurance costs; (c) increased interest under the Loan Agreement; (d) additional payments to Corus

28

1  Bank's attorneys to review the documents; (e) increased assessors taxes and homeowners

2  association fees; and (f) increased fees and costs in connection with this bankruptcy case.

3       Also as a result of Corus Bank's breaches of its contractual obligations and breaches of its

4  implied duty of good faith and fair dealing arising from the Loan Agreement, the Debtor asserts

5  that it has been damaged in an amount to be determined, but believed to exceed $46,000,000.

6  Attached hereto as Exhibit A-1 is a declaration of a damage expert engaged in a continuing review

7  and analysis of damages Corus Bank caused the Debtor to suffer.  The expert, Thomas E. Kabat,

8  MAI, CRE, Managing Director, Real Estate, of LECG, LLC, a global expert services and

9  consulting firm, sets forth a preliminary conclusion regarding economic damages in the declaration

10  attached hereto as Exhibit A-1.  The qualifications of the expert are set forth in the declaration.

11  The expert states that "[a]s a result of my preliminary evaluation, and based on my present

12  assumptions [set forth in the declaration], I have concluded that the present value of damages

13  suffered by GTS as of the currently assumed damage date of November 1, 2008 (without regard to

14  pre-judgment interest) is in excess of forty-six million dollars . . . ."

15       On September 4, 2009, prior to Corus Bank's seizure by the Federal government, the

16  Debtor filed a lawsuit against Corus Bank for (1) breach of contract, (2) breach of the covenant of

17  good faith and fair dealing, (3) declaratory relief, and (4) injunctive relief.  The action was

18  originally filed in the Superior Court of the State of California, County of Los Angeles, *as GTS 900*

19  *F, LLC v. Corus Bank, N.A.*, Case No. BC421309.  On September 11, 2009, the FDIC was

20  appointed as receiver of Corus Bank by Order of the Office of the Comptroller of the Currency.

21  On September 17, 2009, the Debtor filed a petition under chapter 11 of the Bankruptcy Code,

22  initiating the above-captioned chapter 11 bankruptcy case.

23       In October, 2009, CCV acquired the loan assets of Corus Bank from the FDIC.  On October

24  29, 2009, CCV filed a proof of claim in this case in the sum of $162,662,216.26.  CCV filed an

25  amended proof of claim on January 10, 2010, which did not change the amount of the asserted

26  claim.  The proof of claim is based on the claim of Corus Bank under the Loan Agreement and the

27  acquisition of that claim by CCV from the FDIC.  The Debtor, the Committee, and Astani

28  Construction, Inc., each filed complaints with respect to the claim of CCV and the Debtor has filed

15

1  an objection, in accordance with Bankruptcy Rule 3007(b), as part of its complaint.  Each of the

2  complaints with respect to the CCV claim is discussed in Section XVII below.

3            2.      CCV'S VIEW

4       What follows is a brief summary of the dates and circumstances that led Debtor to file

5  bankruptcy.  CCV's allegations and contentions set forth in this sub-section constitute CCV's

6  views regarding events precipitating the filing of this chapter 11 case and may be contested by the

7  Debtor.

8       As of July 27, 2007, the Debtor and Corus Bank entered into a Construction Loan

9  Agreement, in which Corus Bank agreed to lend to the Debtor up to $190,000,000 (the "Loan") to

10  allow the Debtor to construct, at 900 S. Figueroa Street and 901 S. Flower Street in Los Angeles:

11  (1) Tower 1; (2) the Loft; and (3) the Parking Garage.  In addition, Tower II was originally

12  contemplated.  As a precondition to obtaining the Loan, the Debtor issued a promissory note (the

13  "Note") to correspond to the total future loan disbursements from Corus Bank, not to exceed $190

14  million.  Pursuant to the terms of the Note and a Construction Deed of Trust, Assignment of Leases

15  and Rents, Security Agreement and Fixture Filing dated July 2, 2007 (the "Deed of Trust" and,

16  collectively with the Loan Agreement, the Note, and related agreements, the "Agreements"), the

17  Debtor granted Corus Bank a perfected first priority security interest in most of the Debtor's assets,

18  including the Project.

19       Also on July 2, 2007, Sonny Astani, Marco Astani, individually and as trustee of the Marco

20  Astani Family Trust dated as of March 15, 2006, and Sonny H. Astani and Jo Cho, as Trustees of

21  the Astani/Cho Living Trust dated as of April 29, 1999 (collectively, the "Guarantors"), executed

22  three guaranties related to the Debtor's obligations under the Loan Agreement: (i) Repayment

23  Guaranty (the "Repayment Guaranty"), (ii) Completion Guaranty (the "Completion Guaranty") and

24  (iii) Carve-Out Guaranty ( the "Carve-Out Guaranty" and, with the Repayment Guaranty and the

25  Completion Guaranty, the "Guaranties").  Pursuant to the Guaranties, the Guarantors each agreed

26  to subordinate the claims and liens of any entity they control to the claims and liens of Corus Bank.

27  The Debtor has previously acknowledged in this Bankruptcy Case that Sonny Astani and Marco

28  Astani control Astani Construction, meaning any claims of Astani Construction against the Debtor

16

1  are subordinated to those of CCV.  As noted below, CCV is pursuing litigation against the

2  Guarantors in connection with the Guaranties.

3      The Debtor and Corus Bank, through the Agreements, anticipated that the Debtor would

4  subsequently construct a second tower, Tower II, which was not being financed through the Loan

5  Agreement, but which would be constructed on land on which Corus Bank would initially possess

6  a security interest pursuant to the Agreements.

7      The sub-prime mortgage collapse in early 2007 began to have adverse effects on main

8  stream real estate lending and markets in 2007 and 2008.  By 2009, the depressed commercial real

9  estate market made it nearly impossible for units in the Project to be sold at the release prices

10  required in the Agreements.  Despite the economic climate and depressed market, the Debtor

11  planned a sales event for the first completed units in the Project.  Notwithstanding Corus Bank's

12  repeated efforts to obtain information regarding the sales event, the Debtor proceeded with the

13  sales event on August 29, 2009 without Corus Bank's consent.

14      On September 4, 2009, prior to Corus Bank's seizure by the Federal government, the

15  Debtor filed a lawsuit against Corus Bank for (1) breach of contract, (2) breach of the covenant of

16  good faith and fair dealing, (3) declaratory relief, and (4) injunctive relief.  The action was

17  originally filed in the Superior Court of the State of California, County of Los Angeles, as *GTS 900*

18  *F, LLC v. Corus Bank, N.A.,* Case No. BC421309 (the "Prepetition Action").  On September 11,

19  2009, the FDIC was appointed as receiver of Corus Bank by Order of the Office of the Comptroller

20  of the Currency.  As a result, the FDIC succeed to all of the rights, titles, powers, and privileges of

21  Corus Bank under the Loan Agreement.  At all times leading up to the appointment of the FDIC as

22  receiver and thereafter, Corus Bank continued to satisfy its obligations to fund loans in the ordinary

23  course of business.  The Debtor disputes this assertion.

24      On September 17, 2009, the Debtor filed a petition under chapter 11 of the Bankruptcy

25  Code, initiating the above-captioned bankruptcy case.  It is CCV's belief that the Debtor initiated

26  the case so that it could dictate the terms of the development of the Project.  On September 21,

27  2009, the Debtor filed a notice of removal of the Prepetition Action with the Bankruptcy Court.

28

17

1      On October 16, 2009, CCV, an entity unaffiliated with Corus Bank, purchased certain loan

2 assets of Corus Bank, include Corus Bank's rights under the Loan Agreement, from the FDIC in its

3 capacity as receiver for Corus Bank.  On October 29, 2009, CCV filed a proof of claim in this case

4 in the sum of $162,662,216.26.  CCV filed an amended proof of claim (as amended, the "<u>Proof of</u>

5 <u>Claim</u>") on January 10, 2010, which did not change the amount of the asserted claim.  The Proof of

6 Claim is based on the claim of Corus Bank under the Loan Agreement and the acquisition of that

7 claim by CCV from the FDIC.  The Debtor, the Committee, and Astani Construction, Inc., have

8 each filed complaints with respect to the claim of CCV and the Debtor has filed an objection, in

9 accordance with Bankruptcy Rule 3007(b), as part of its complaint.  Each of the complaints with

10 respect to the CCV claim as well as the Prepetition Action is discussed in Section XVII below.

11      What follows is a brief description of the Debtor's business and the future of the Project.

12 Further details relating to the Debtor's financial condition and post- confirmation operation of the

13 Debtor are found in sections X, XI, XII, XVI, and XV.

14     **C.**     <u>**DEBTOR'S BUSINESS AND FUTURE OF THE PROJECT**</u>

15     1.     <u>DEVELOPMENT OF PROJECT</u>

16      The Debtor is the owner and developer of an approximately 1,000,000 square foot

17 residential real estate development known as "Concerto" located in downtown Los Angeles.  The

18 Concerto project is built on a full city block situated at the north end of an evolving entertainment

19 district anchored by the Staples Center and LA Live, a sports and entertainment complex,

20 sometimes described as Times Square West.  Concerto is part of a wave of development that has

21 gained momentum since 2003, when Los Angeles expanded adaptive reuse policies similar to those

22 of New York.  Construction on the Concerto project started in 2007 and was timed to come on line

23 with a full range of residential units and retail space at the same time as L.A. Live and the new

24 Ralph's Supermarket serving downtown residents.

25      The Project consists of Phase I, including Tower I (containing 271 residential units and

26 retail and storage space), the Loft (containing 77 residential units and retail and storage space), and

27 the Parking Garage (a seven-story partly underground parking structure), and a Phase II, consisting

28 of Tower II (a second 30-story tower) contemplated for the future.  The infrastructure of Tower II

1  (including subterranean parking, elevator shafts, DWP vaults, excavation, shoring and some

2  foundation) has been completed, but further construction has not been commenced. The Debtor's

3  phase II assets also serve as collateral for the Corus Bank loan.

4      In 2004, GTS purchased the 100,000 square foot parcel on which the Concerto project is

5  located, consisting of a full city block. The development team envisioned an environmentally

6  conscious all glass residential structure with a range of moderately priced to higher priced

7  condominium units, together with shared amenities, ample parking and retail and restaurant space

8  as part of the "new downtown L.A." In all, the Debtor invested more than $63,000,000 as equity

9  funds into the Concerto project (with more than $54,500,000 in cash and approximately $8,500,000

10  consisting of deferred developer's and general contactor's fees), starting one of the first high rise

11  residential construction projects in downtown Los Angeles in more than 15 years.

12                    2.    FUTURE OF THE PROJECT

13      The Plans contemplate different dispositions for the Project. The GTS Plan calls for a sale

14  of the Project following a 14-19 week marketing process. See Section VII.C.2.(a)(ii) below. The

15  CCV Plan calls for a transfer of the Project to CCV on the effective date of the CCV Plan (the

16  "CCV Plan Effective Date").[2] See Section VII.C.2.(b) below.

17                    (a)    SALE OF THE PROJECT (GTS PLAN)

18      The GTS Plan provides that the Debtor Project Assets will be sold pursuant to the GTS Plan

19  or pursuant to an order of the Court approving a motion by the Debtor to sell the Debtor Project

20  Assets under Section 363 of the Bankruptcy Code entered prior to confirmation of the GTS Plan.

21  As used herein, "Debtor Project Assets" include the Project and, more specifically, refers

22  collectively to the Debtor's interests in (A) that certain parcel of real property located at 900 South

23  Figueroa Street, 901 South Flower Street, and 700 West 9th Street in the City of Los Angeles,

24  County of Los Angeles, State of California, as more particularly described in Exhibit A-2 attached

25  hereto (the "Land Parcel"); (B) all improvements (including, without limitation, all infrastructure

26  and public improvements) attached to or placed, erected, constructed, or developed on the Land

27  _____

28      [2] As defined below, the CCV Plan Effective Date is the first business day after the date on
which the Court's order confirming the CCV Plan is no longer subject to any stay.

19

1  Parcel or otherwise affixed thereto (collectively, the "Improvements"); (C) any and all fixtures,

2  furnishings, equipment, machinery, furniture, and other items of tangible personal property located

3  on the Land Parcel or in the Improvements to the extent that such personal property is owned by

4  the Debtor, whether or not the same are or shall be attached to the Land Parcel or the

5  Improvements (the "FF&E"); (D) any executory contracts relating to the Land Parcel, the

6  Improvements, or the FF&E (including all construction related agreements, license agreements,

7  service agreements, maintenance agreements, management agreements, and other agreements

8  relating to the development of the Land Parcel constituting executory contracts) that are designated

9  for assumption and assignment prior to the Effective Date of the GTS Plan (with the sale not to be

10  conditioned on any such assumption and assignment); (E) all entitlements, permits, licenses,

11  franchises, certificates, and other rights and privileges obtained in connection with the Land Parcel

12  ("Permits"); and (F) all streets, roads, public places, easements and rights-of-way, existing or

13  proposed, public or private, adjacent to or used in connection with, belonging, or pertaining to the

14  Land Parcel.  Under the GTS Plan, the Debtor Project Assets are to be sold to one purchaser or

15  more than one purchaser for a total purchase price sufficient to pay all allowed claims against the

16  Debtor and all administrative expenses of the Debtor's estate in full.  As used herein, "Project Sale

17  Proceeds" means the net proceeds of the sale of the Debtor Project Assets.

18      The Sale of Tower I as an apartment tower will not affect the Loft Home Owner's

19  Association, which is already operational, nor will it trigger the Tower I Home Owner's

20  Association budget since the Debtor Project Assets will be sold in bulk and no single units will be

21  sold.

22          (i)    DEBTOR'S RETENTION OF PREMIER
                  MULTIFAMILY PROPERTY BROKERAGE FIRM
23

24      The Debtor has retained Moran & Company ("Moran"), one of the premier multifamily

25  property brokerage firms in the market, to assist and represent the Debtor as its broker in

26  connection with the sale of the Project.  Since its inception in 1971, Moran has focused all of its

27  energies around a single product type: apartments.  Moran has been and remains solely dedicated to

28  the multifamily asset class.  Since the creation of its brokerage business in 1995, Moran has closed

20

1   just under 300 transactions totaling nearly $11 billion, in value and almost 90,000 apartment units.

2   Moran's California team has closed 124 institutional-grade sales totaling $5.5 billion since 1995.

3   Thirty-six of these sales, $1.7 billion in total, were in the Los Angeles area.  Attached hereto as

4   Exhibit A-3 is a resume for Moran's California office.  Moran's commission for the sale of the

5   Project is $600,000.  The Debtor does not anticipate any other significant costs of sale.

6          Moran has advised the Debtor that the sale of the Concerto project is a special boutique deal

7   that will require a broker to sell once-in-a-lifetime opportunity to acquire an apartment

8   development second to none.  Moran advises that if the Project is sold to an apartment buyer

9   pursuant to the GTS Plan or a section 363 motion approved by Court order entered prior to

10  confirmation of the GTS Plan, the next time the Project comes up for sale, it will be a for sale

11  condominium project.  Thus, Moran advises that this is a very rare opportunity for prospective

12  purchasers to own a rental property of Concerto's caliber.  The buyer will have a significant

13  advantage of having the ability to immediately lease the units in Tower I as apartments since

14  Tower I will be sold as a vacant building.  Moran has advised the Debtor that Moran has

15  established itself as a brokerage firm that is hired to sell "story deals" which are deals that require

16  Moran to sell the "dream" connected with ownership of the subject property.  These types of deals

17  do not have any operating history, and include early or pre sales, vacant condominium buildings,

18  and joint venture development deals.  In addition, Moran has advised that this also includes deals

19  that are finishing lease-up or deals in transition neighborhoods.  Moran further advises that over the

20  last 2 years it has worked on several "story deals" that relate to Concerto.  The details of these

21  transactions are set forth immediately below.

22         Redwood Lofts — 140 Units - Located in Marina Del Rey; Built by Standard  Pacific

23  Homes

24         1.      This property has open loft floor plans with an average of 1,306 sq. feet.

25         2.      The property had a construction defect and at sale would require a 10-year condo

26  restriction.

27

28

21

1    3.    Moran created a sales package highlighting today's high-end rents on large lofts and

2   traditional units in Marina Del Rey.  In addition to the rental analysis, Moran also showcased

3   today's condo values and potential condo values in the future.

4    4.    Redwood Lofts was sold to Behringer Harvard in September of 2009 for

5   $46,000,000.  Not many properties were sold in 2009, and especially not higher risk vacant

6   apartment properties at $329,000 per unit achieved in this transaction.

7   Glo — 201 Units — Located on Wilshire Blvd in Downtown Los Angeles; Built by

8   Holland Residential

9    1.    Glo was a distress sale that closed in December 2008.  Glo is financed with tax

10  exempt bonds and had just reached stabilization.  The property was converting from a construction

11  loan to a permanent loan.  The property had $47.5 million in low floater bonds, but only qualified

12  for $35 million.  The owner was not able to fund the short fall at conversion.  Thus the property

13  went to market to sell or be recapitalized.

14   2.    Glo was marketed in the Fall of 2008.  Not only was this a tough economic time, but

15  Downtown Los Angeles was delivering the brunt of its apartment/condominium pipeline at that

16  time.

17   3.    Moran had to walk investors through the bond financing and tax credits at

18  conversion.  More importantly, Moran had to walk investors through the Downtown Los Angeles

19  story.  This included the apartment/condo pipeline, LA Live, the convention business, and the job-

20  to-housing imbalance.

21  The Gardens At Wilshire — 159 units — Located on Wilshire Boulevard (3 miles West of

22  Concerto); Built by Chandler Partners

23   The Gardens was completed in 2008 and leased-up during 2009.

24   1.    Because the property was in lease-up, the historical operations were not

25  representative of a stabilized property.  Moran needed to sell the dream of where rents and

26  expenses would be during the buyer's first year of ownership.  Moran walked investors through

27  rents and apartment deliveries in Korea town, Miracle Mile, and Downtown Los Angeles.  Moran

28  also pointed out to investors how limited the opportunity was to purchase a new core (well located)

22

1  deal in this west side submarket.  Over the last 11 years, there have been only 10 core apartment

2  sales with properties over 90 units (not including presales/recaps).  That is less than one per year.

3  Moran advises that this message to apartment investors cannot be understated.

4      2.      Interest level was very high for a "core" property located on Wilshire Boulevard.

5  Moran had 52 tours, 28 written offers, and selected 12 buyers to interview in a best and final

6  interview approach.

7      3.      The property was sold to Watermarke Properties at a 4.8% cap rate and pro forma

8  expenses.

9      705 W. 9th - 244 units - 35-story vacant condo high-rise located in  Downtown Los

10  Angeles, Built by Meruelo Maddux

11      1.      Meruelo Maddux was building a 35-story high-rise all cash until mid-2008, when it

12  got an $84 million mezzanine loan from Canyon Johnson at 12%.  During 2009, while Meruelo

13  Maddux was finishing the building, the company filed for bankruptcy reorganization.  Meruelo

14  Maddux was fighting Canyon Johnson to wrap-up construction and deliver the project as condos,

15  but Canyon Johnson wanted to foreclose and take back the property.  Meruelo Maddux had two

16  choices: 1) fight it out in court with Canyon, or 2) bulk-sell the property to an apartment purchaser.

17  Ultimately, Meruelo Maddux sold it to Watermarke as an apartment deal.

18      2.      Meruelo Maddux asked Moran to price the property as an apartment and quietly

19  solicit for offers while it was in bankruptcy.

20      3.      Moran walked investors through several key points: the potential high-rise rents and

21  costs; the Downtown Los Angeles story; and the fact that this was a rare opportunity to own one of

22  the few high-rise rental properties in Southern California.  Moran also stressed the point that the

23  next time this property comes to market, it would be converted into a condominium property.

24      4.      The property was built for approximately $734,000 per unit and sold for $514,000

25  per unit.

26      Acappella at the Crossing - 163 Units — Currently a vacant apartment property located in

27  San Bruno, CA; Built by MacFarlane / SNK

28      1..      Acappella was completed in November 2009.

626760.11-Los Angeles Server 2A - MSW

1   2.      Because the property was vacant, Moran needed to walk investors through: potential

2   future rents at this luxury property; the 20-acre transit-oriented master plan community of The

3   Crossings; and the fact that this was a rare opportunity to own a new urban, transit-oriented

4   apartment property on the San Francisco Peninsula.

5   3.      This property is under contract and is scheduled to close in September — October,

6   2010.  The property is being sold for just under $330,000 per unit.  The cap rate on a stabilized

7   basis is approximately 5.15%, but there is a deduction of approximately $2 million for loss of

8   income related to lease-up costs.

9                  (ii)    <u>MARKETING PROCESS FOR SALE OF THE
10                          PROJECT</u>

11   Since 1995 Moran has sold over $11 billion in apartment transactions and has refined and

12   perfected it's national marketing process to market apartment properties.  Moran advises that every

13   aspect of its marketing effort is designed and executed with one goal in mind: the timely sale of its

14   client's asset at the highest possible price.  Below is the process Moran developed for Concerto

15   commencing as of September 14, 2010:

16   Moran's marketing plan follows a seven-step process (this is the "<u>Sales Process</u>" to be used

17   in conjunction with the sale of the Project).  That process begins at the execution of a listing

18   agreement (for the Concerto project this occurred on September 14, 2010) and typically continues

19   for 3-5 months until closing.  The process for the Concerto project is summarized below:

20

21

22

23

24

25

26

27

28

| Task | | |
| --- | --- | --- |
| Execution of Listing Agreement | | |
| Step 1: Preparation of Marketing Materials | | 1-2 weeks |
| Step 2: Client Review & Printing of Sales Materials | | 1 week |



626760.11-Los Angeles Server 2A - MSW

Step 1: Preparation of Marketing Materials (1-2 Weeks)

Moran advises the Debtor that it is proud to have created some of the best sales materials in the apartment business.  Moran has explained that its packages "tell the story" that supports price better than any other materials in the business.  Rather, than a miscellaneous collection of facts and figures about its client's property, Moran connects those facts in such a way as to present the most compelling argument for its client's asset's offering price.

Initial Contact — Moran's first communication with prospective buyers will be via an email/and personal contact to announce this once in a lifetime opportunity to purchase the Concerto project.  This email announcement will include a brief summary of the offering, several photographs, and contact information for Moran.  If the investors are interested they will need to execute a confidentiality agreement to receive a full sales memorandum.

The Sales Memorandum — The second piece of collateral material is the sales memorandum itself, which is made available only to qualified investors who have signed a confidentiality agreement.  Each sales package is contained in a hard cover and presents all of the information required to underwrite the asset.  Moran explains that this information is presented in a manner that is designed to appeal to the intellect, as well as the "spirit," of the investor.  It builds credible support for the pro forma returns and focuses on the unique aspects of this offering that support a reduced cap rate and a higher price.

Moran's sales memoranda do not contain unsubstantiated pro formas.  Rather, all of the pro formas are footnoted in detail to explain the differences between the sales pro forma, historical operating statements and the current operating budget.  Moran's packages contain profiles of all relevant sales comparables and explain why the offering price for the subject property is justified in light of these recent sales.  Moran includes information on apartment supply and demand, evaluating prospects for job and household growth as well as the pipeline of product being developed.  Moran's packages aim to include all the information that an investor needs to present to his investment decision-makers in order to gain approval for the acquisition.

Preparation of the Targeted Prospect List — While the sales materials are being prepared, Moran prepares a customized list of target prospects.  This Targeted Prospect List ("TPL") will

1 usually contain 75 to 150 names of companies that either own property located in the same

2 metropolitan area as the subject offering or have indicated an interest in purchasing apartment

3 assets in this particular market. These prospects will be culled from the Moran customer

4 relationship database. The database is continually updated, supplemented, and honed to ensure that

5 the right investors receive Moran's sales materials. Due to the size and the complexity of Concerto

6 ($200 million+ development), the potential buyer list could be reduced to 50-75 potential buyers.

7      Step 2: Client Review & Printing of Sales Materials (1 Week)

8      Moran advises that it is important that Moran's clients review the offering materials to

9 confirm the accuracy of the representations being made. The entire process for review and printing

10 of the sales materials usually takes less than a week.

11      Step 3: Solicitation & Property Tours (4 Weeks)

12      Phone Solicitation —After the email solicitation has been sent, and the sales packages are

13 complete, the one-on-one marketing effort begins in earnest. Senior Moran personnel assigned to

14 the account will contact the key acquisitions officer at every prospective buyer on the TPL by

15 phone to describe the offering and solicit his or her interest.

16      Property Tours — During the marketing period, every prospect will be invited to tour the

17 Project and the immediate market area. A Moran principal will tour each prospect personally,

18 using that time not only to "sell" the offering but to better understand the investor's experience,

19 source of funds, approval process, etc. The property tour is the most important part of the

20 marketing effort because it enables Moran to see what the prospect sees, listen to his or her

21 questions, establish a personal rapport and "sell" the potential of enhanced property performance.

22      Driving Tours — All prospects visiting the Property will also be invited to tour the market

23 area with Moran personnel. Moran will drive interested prospects through relevant rental and sales

24 comps, by the offices of major employers, and by retail centers, recreational facilities and cultural

25 centers. This extended driving tour gives Moran the additional opportunity to make sure each

26 prospect sees the locational attributes of the subject offering.

27

28

626760.11-Los Angeles Server 2A - MSW

1    Many institutional buyers visiting the property from out of town appreciate the opportunity

2    to be educated on the area as well as the asset.  This education, in turn, allows him or her to better

3    sell this investment to his or her committee.

4    <u>Underwriting Assistance</u> — After the Project tour, most investors will begin their

5    underwriting process.  All relevant underwriting and due diligence information is posted to the

6    password-protected Moran website.  Investors who have received security clearance can easily

7    download the information they require to complete their underwriting.

8    <u>Client Reporting</u> — Throughout this phone solicitation and tour period, Moran reports to

9    the owner on the status of Moran's marketing efforts.  Moran submits a written report summarizing

10   the level of interest from each prospect on Moran's targeted prospect list.  The report will

11   summarize which buyers have signed confidentiality agreements, received sales packages, toured

12   the property or been contacted by phone.

13   <u>Step 4: Bid & Interview Process (1-2 Weeks)</u>

14   When all interested bidders have had sufficient time to tour and underwrite the project,

15   Moran will set a bid date and call for bids.  All bids will be submitted to Moran.  Within one

16   business day after the bid date, the results of the bidding will be summarized by Moran and

17   forwarded to the owner with a copy of each individual bid.

18   Moran will typically recommend that the owner or his representatives invite three to five of

19   the strongest purchasing groups to personally meet with Moran to discuss their candidacy.  Moran

20   believes that bringing the maximum number of qualified purchasers to the table in a bidding

21   process is the best way to secure the highest price.  Each bidder knows that he must put his top bid

22   on the table to insure that he makes it to the "best and final interview." At the interview, each

23   bidder is given a chance to differentiate himself further by either increasing his price or enhancing

24   the terms of his offer.  Moran believes that the interview process is critically important to let each

25   buyer explain his due diligence and approval process, to allow discussion of important contract

26   items and to help the owner assess the likelihood that each buyer can and will close at the price

27   offered.

28

27

1    The bidding process also lets each buyer know that there are other interested and

2  competitive buyers that will step in to buy if the winning bidder is unwilling to close the

3  transaction at the price and terms agreed.

4    For Concerto, Moran expects a 30 day due diligence period with a 30 day closing time.

5  Moran advises that because the buyers for Concerto will likely be all cash buyers, the closing time

6  frame of 30 days may be reduced.  Moran expects escrow deposits to be a minimum of $3,000,000

7  and become non-refundable at the end of due diligence.

8    Step 5: Contract Negotiations & Letter of Intent (1-2 Weeks)

9    Moran recommends that prior to best and final interviews, the owner's Purchase and Sale

10  contract be sent to the finalists.  This will enable each prospective purchaser to review the contract

11  and identify any amendments that would be required if they were selected as the buyer.  This puts

12  the contract negotiations in a competitive venue and makes prospective purchasers compete on

13  contract terms as well as price.

14    When contracts are not presented to the finalists, Moran recommends that due diligence

15  begin under a letter of intent that "starts the due diligence clock" and allows the contract to be

16  negotiated simultaneously.  This minimizes the seller's exposure in terms of time.  Moran

17  recommends that the parties aim to execute a contract within two weeks of selecting a purchaser.

18    Step 6: Due Diligence (4 Weeks)

19    At the option of the owner, Moran can play an active role in the due diligence process.  On

20  the owner's behalf Moran will accompany major outside inspectors and contractors on the site to

21  observe their investigations.  Buyers sometimes may try to exaggerate project deficiencies in an

22  attempt to lower the price, but if Moran accompanies these third parties at the property, it is harder

23  for them to make unsubstantiated claims.  It also lets Moran know immediately if the buyer finds

24  any legitimate structural or environmental challenges.

25    Due diligence usually takes approximately four weeks.  Closing is usually set one to four

26  weeks after the conclusion of due diligence.

27

28

1    Step 7: Closing (2-4 Weeks)

2        Although usually the attorneys for the buyers and the sellers control this process, Moran

3  advises that it has abundant experience that may sometimes be brought to bear to assist in closing

4  activities, and it is prepared to participate in any way the seller should desire.

5        Moran maintains a data base of over 6,500 potential apartment buyers across the county,

6  and that it customizes its outreach program for each deal.  Below are two recent examples of this

7  that Moran highlighted for the Debtor:

8        During the spring of 2010, Moran sold The Gardens at Wilshire, which is a 159 unit

9  apartment property 3 miles west of Concerto.  As for price, this was a $48 million deal size at a

10  4.8% cap rate, which is in the sweet spot for all institutional investors ($30 - $60 million).  Thus,

11  for marketing, Moran did an email blast to over 6,500 potential buyers..  Moran conducted 52

12  property tours, took 29 written offers, and selected 12 buyers to interview in a best and final offer

13  process.

14        Currently Moran is marketing Archstone Gateway, which is a brand new 884 unit property

15  finishing its lease-up in Anaheim, California.  This property is under contract at approximately

16  $250 million, and expected to close at or around the end of September, 2010.  Due to the size of

17  this property and price point, Moran contacted approximately 75 potential investors that would be

18  interested in a $250 million dollar property.  Moran conducted 18-20 tours and received 10 offers.

19  Note that all of these offers were cash offers, with no finance contingency.

20        For Concerto, Moran sees a very similar process as it did with Archstone Gateway ($250

21  million deal).  Moran has advised that it will be contacting approximately 75 potential investors

22  who look at bigger high profile deals and also are interested in development deals.  Moran expects

23  to conduct approximately 20 tours of the Project and receive 8-12 offers for this type of asset.

24        The marketing process designed by Moran is structured to maximize value in a relatively

25  short period of time by appropriately exposing the Project to institutional investors (such investors

26  are the most likely purchasers and generally do not need financing).  On the other hand, the

27  expedited CCV "auction" process set forth in the amended chapter 11 plan filed by CCV on

28  September 3, 2010, is perceived by the Debtor and Moran to be structured in a manner that does

1  not maximize value, but rather is designed to allow CCV to obtain the Project through a credit bid,

2  at a depressed value, without having to comply with state foreclosure law requirements.  Further,

3  the Debtor believes that the second amended plan filed by CCV on September 22, 2010, and the

4  current CCV Plan are designed to accomplish the same goals through the transfer of the Debtor's

5  assets to CCV without the use of an auction

6  (iii)    FEASIBILITY OF SALE OF PROJECT (GTS PLAN)

7  (1)  SALES ENVIRONMENT FOR
APARTMENTS

8

9      The Debtor believes that multifamily acquisition market has been building momentum

10  during 2010, with cap rates declining on a national level and the gap between buyers and sellers

11  narrowing.  Starting in the Spring of 2010, Moran advises that all of the apartment buyers were

12  back in the market looking to buy.  This group includes the national apartment REITs (real estate

13  investment trusts), Private REITs, Pension Funds, Insurance Companies, and Private Companies.

14      Typical sellers in the past two years seemed to be only those who had to sell.  Many owners

15  who bought at the height of the market have remained on the sidelines, not listing their properties

16  due to the perception that rents and values will escalate two years from now.  Thus, with heavy

17  buyer demand and historical low apartment sales volume, Moran is seeing very competitive

18  bidding on high-quality multifamily assets.  For example, Moran sold The Gardens At Wilshire, a

19  recently completed 159 unit apartment property on Wilshire Boulevard.  Moran conduced 52 tours,

20  received 28 written offers and took 12 potential buyers into a best and final round with the seller.

21  Not only has Moran witnessed this first hand, this is also being commented on nationally by

22  National Multifamily Housing Council (www.nmhc.org), and the public REITS during quarterly

23  investors calls.

24      Moran is constantly in contact with local and national apartment owners.  What the

25  investors have continually told Moran all year (2010) is that they are looking for "high quality core

26  assets in core locations." This is especially true for condo quality high- rise properties like

27  Concerto.  These types of properties rarely come to market for two reasons, 1) a typical core

28  apartment buyer has a 7-10 year holding period, and 2) naturally being a condominium quality

30

building, Tower I will be converted to condominiums next cycle. Thus, being removed from the

rental market. Moran advises that this makes a deal like Concerto a once in a lifetime opportunity

for an apartment investor.

As it relates to apartment pricing, the Debtor believes that today is a very good time for the

seller. There is very high demand for apartments, and the interest rates are very low. With interest

rates low, Moran advises that this helps create a low cap rate environment which in turn increases

prices. Now no one knows when interest rates will rise, but when they do, that will put downward

pressure on pricing. Moran advises that today the core stabilized cap rate (which Moran believes is

the approximate cap rate for the Concerto Project) is 4.5%.

(2)  <u>MORAN VALUATION ANALYSIS</u>

Moran has done an apartment/development valuation for Phase I and Phase II of the

Concerto project. Moran's valuation analysis is attached hereto as Exhibit A-4. Moran's valuation

analysis concludes with a range of value for the net sale price for the Project of approximately

$190,000,000 - $200,000,000, consisting of Phase I (approximately $156,355,000 - $166,605,000,

using 4.5% - 4.75% cap rates) and Phase II (approximately $31,300,000 - $34,900,000, using a

6.25% - 6.50% yield on cost). <u>See</u> Exhibit A-4.

(3) <u>SALE COMPS</u>

In 2010, stabilized core apartment assets have consistently traded at cap rates ranging from 4.50% to 5.00% (core meaning new properties in strong locations).  In the case of WaterMarke Tower (214-unit high-rise in Downtown Los Angeles) and Essex Skyline (349-unit high-rise in Santa Ana)-both of which are large high-rise condo reversions and were sold in the spring of 2010 as vacant buildings-cap rates were closer to 5.50% on stabilized numbers.  However, once you add the lease-up costs to the  purchase price this cap rate is closer to a 5% range.

| Property | Location | Units | Year Built | Closing Date | Price | Price/ Unit | Cap Rate | Buyer | Seller |
|---|---|---|---|---|---|---|---|---|---|
| 1 Essex Skyline | Santa Ana | 349 | 2009 | Mar-10 | $128,000,000 | $366,762 | 5.50% | Essex Property Trust | Fremont Investment & Loan |
| 2 The Gardens at Wilshire | Los Angeles | 159 | 2008 | Apr-10 | $48,000,000 | $301,887 | 4.80% | Watermarke | Chandler Partners |
| 3 WaterMarke Tower | Los Angeles | 214 | 2010 | Apr-10 | $110,000,000 | $514,019 | 5.40% | Waterrnarke | Meruelo Maddux |
| 4 City Pointe | Fullerton | 183 | 2004 | May-10 | $43,500,000 | $237,705 | 5.00% | Equity Residential | Morgan Group/ Cornerstone |
| 5 Marbella | Carlsbad | 143 | 2006 | Jun-10 | $35,500,000 | $248,252 | 4.75% | Irvine Company | Alliance Residential/ Prudential |
| 6 NoHo 14 | North Hollywood | 180 | 2008 | Jun-10 | $58,500,000 | $325,000 | 4.75% | Kennedy Wilson/ Guardian Life | Bank of America |
| 7 Versailles | Los Angeles | 225 | 2008 | Jul-10 | $55,000,000 | $244,444 | 4.80% | Equity Residential | Frost/ Chaddock |

* Note WaterMarke Tower and Essex Skyline were vacant high-rise condo properties.  Based on stabilized cap rates these were sold in approximately 5.5%.  However if you add the lease up costs to the purchase price, the cap rate is closer to 5% range.

(4)  SOUTHERN CALIFORNIA DEALS
UNDER CONTRACT

Currently Moran has marketed and placed Archstone Gateway and Marina Pointe under contract.  Archstone Gateway (brand new 884 unit apartment property in Anaheim California) is under contract for approximately $250 million at a 4.6% cap rate.  Marina Pointe (583 units built in 1993 in Marina del Rey) is under contract for $157,500,000, which reflects a cap rate of approximately 4.25%.  With respect to The Charter, based on Moran's underwriting and its conversations with several best and final bidders, Moran believes the contract price reflects a 4.65% cap rate.  Not only do these transactions show that pricing is holding up for older properties in "A" locations, but they also 'demonstrate that pricing may be getting more aggressive.

| Property | Location | Units | Year Built | Closing Date | Price | Est. Price/ Unit | Est. Cap Rate | Buyer | Seller |
|---|---|---|---|---|---|---|---|---|---|
| 1. The Charter | Irvine | 403 | 1988 | 3Q 2010 | $85,000,000 | $210,918 | 4.65% | Western National | OSTRS |
| 2. Marina Pointe | Marina del Rey | 583 | 1993 | 4Q 2010 | $157,500,00 | $270,154 | 4.25% | UDR | BlackRock/ CalPERS |
| 3. Archstone Gateway | Anaheim | 884 | 2008 | 4Q 2010 | $250,000,000 | $282,805 | 4.60% | Confidential | Archstone |
| Archstone Gateway is under contract and confidential, but the sales price is approximately $250,000,000 | | | | | | | | | |

(5)  RECENT SALES OF SOUTHERN
CALIFORNIA DEVELOPMENT SITES

There have only been three relevant multifamily land sales in Southern California during the last 12 months. The sites, which are all located in areas less desirable than Downtown Los Angeles, and sold at prices ranging from $57,000 to $121,000 per unit.

The chart below also includes expected pricing for Pacific Ridge, a 533-unit San Diego site that is currently being sold by The Irvine Company.  Moran advised that this site is rumored to be under contract for over $80,000 per unit.

| Property | Location | Units | Year Built | Closing Date | Price | Price/Unit | Est. Rents | Buyer | Seller |
|---|---|---|---|---|---|---|---|---|---|
| 1. 512 Rose Avenue | Venice Beach | 70 | TBD | Jun-10 | $8,438,000 | $120,543 | N/A | Gerding Edlen | Macquarie Bank |
| 2. 14121 Ventura Blvd. | Sherman Oaks | 99 | TBD | Dec-09 | $6,300,000 | $63,636 | N/A | BW Brody Company | Bank of America |
| 3. 8798 Spectrum Center Blvd | San Diego | 379 | TBD | Aug-10 | $21,500,000 | $56,728 | $1.90 | Wood Partners | Sunroad Enterprises |
| 4. Pacific Ridge | San Diego | 533 | TBD | TBD | $42,500,000 | $79,737 | $2.00 | TBD | Irvine Company |

33

1    (6)  <u>CORE APARTMENT SALES SINCE</u>
2    <u>2000</u>

3    Moran advises that West Los Angeles tops the list of just about every apartment investor's

4    wish list.  Despite this fact, investors who have actually been able to acquire a core West L.A.

5    apartment asset is an entirely different story.  Even if the boundaries of West L.A. are stretched to

6    include Hollywood, the Wilshire Corridor, and Downtown Los Angeles (north of the 10 fwy),

7    Moran advises that only ten properties built after 2000 have traded hands (excluding condo

8    conversions).  These ten sales are shown in the chart below.

9

| Property | Location | Units | Year Built | Closing Date | Price | Price/Unit | Buyer | Seller |
|---|---|---|---|---|---|---|---|---|
| 1 Legacy Westwood | Los Angeles | 187 | 2001 | Sep-02 | $85,100,000 | $455,080 | TIAA-CREF | Legacy Partners |
| 2 Park Catalina Apartments | Los Angeles | 90 | 2002 | Mar-03 | $17,750,000 | $197,222 | SSR Realty Advisors / Met Life | SARES-REGIS |
| 3 The Marlowe | Los Angeles | 121 | 2004 | Sep-04 | $52,000,000 | $429,752 | SSR Realty Advisors | The Kor Group |
| 4 Sunset+Vine | Hollywood | 300 | 2004 | Jan-05 | $160,000,000 | $533,333 | BlackRock/ CalPERS | Canyon-Johnson / Bond Cos, |
| 5 Park Catalina | Los Angeles | 90 | 2002 | Nov-05 | $23,000,000 | $255,556 | NM-Exchange LLC | Met Life |
| 6 Museum Gardens | Los Angeles | 94 | 2005 | Feb-06 | $39,500,000 | $420,213 | BlackRock | Chandler Partners / Ameriton |
| 7 Glo | Los Angeles | 201 | 2007 | Feb-09 | $47,500,000 | $236,318 | Berkshire Income Realty / Holland | Holland Partners |
| 8 The Gardens at Wilshire | Los Angeles | 159 | 2008 | Apr-10 | $48,000,000 | $301,887 | Watermarke | Chandler Partners |
| 9 WaterMarke Tower | Los Angeles | 214 | 2010 | Apr-10 | $110,000,000 | $514,019 | Watermarke | Meruelo Maddux |
| 10 Versailles | Los Angeles | 225 | 2008 | Jul-16 | $55,000,000 | $244,444 | Equity Residential | Frost/ Chaddock |

22    In essence, for all of the investors who would like to acquire a core West Los Angeles

23    apartment community, only one has been successful at doing so in each of the last ten years.

24    Needless to say, this substantial supply-demand imbalance favors owners of West L.A. core

25    apartment product.  In the case of Concerto, containing a vacant high-rise (Tower I), Moran advises

26    that this is a once in a lifetime opportunity would command a premium.   While the Concerto

27    project is not in West Los Angeles, Moran advises that it views it to have a desirable "core"

28    location (as is the case with the properties in the above chart that are outside of West Los Angeles).

1    Additionally, CB Richard Ellis, Valuation and Advisory Services ("CBRE"), has evaluated

2    the Project in a bulk sale scenario, with Tower I to be viewed by the prospective purchaser as an

3    apartment tower, and has concluded that the prospective market value of the Project, as of

4    December 1, 2010, is $191,200,000 ($155,000,000 for Phase I and $36,200,000 for Phase II).  The

5    CBRE Summary Appraisal Report (available for download at http://www.kccllc.net/Concerto) also

6    references CBRE's prior appraisal report for the Project which was attached as Exhibit 9 to the

7    Debtor's Second Amended Disclosure Statement and Plan [Docket No. 252 in the Debtor's chapter

8    11 case] (also available for download at http://www.kccllc.net/Concerto).

9         (b)      TRANSFER OF THE PROJECT TO CCV (CCV PLAN)

10    Under the CCV Plan, on the CCV Plan Effective Date, the CCV Project Assets shall be

11    transferred to CCV free and clear of any and all liens, claims, interests, and encumbrances that are

12    dealt with by the CCV Plan.  As used herein, "CCV Project Assets" includes the Project and, more

13    specifically, refers collectively to (A) the Estate Held Cash (defined below) subject to payment of

14    the Administrative Claims Reserve (defined below); (B) the Land Parcel, (C) the Improvements;

15    (D) any and all fixtures, furnishings, equipment, machinery, furniture, and other items of tangible

16    personal property located on the Land Parcel or in the Improvements or used in connection with the

17    development, construction, use, occupancy, operation, and maintenance of all or any part of

18    the Land Parcel or the Improvements, including construction equipment, machinery, signs, artwork,

19    furnishings, specialized fixtures, furnishings, and equipment relating to the Debtor's development

20    of the Land Parcel, and all renewals of or replacements or substitutions for any of the foregoing,

21    whether or not the same are or shall be attached to the Land Parcel or Improvements (the "CCV

22    Plan FF&E"); (E) any contracts relating to the Land Parcel, the Improvements, or the CCV Plan

23    FF&E (including all construction related agreements, license agreements, service agreements,

24    maintenance agreements, management agreements, and other agreements relating to the

25    development of the Land Parcel) that CCV designates for assumption and assignment (subject to

26    Court approval, which, if applicable, will be sought by separate motion); (E) Permits; and (F) all

27    streets, roads, public places, easements and rights-of-way, existing or proposed, public or private,

28    adjacent to or used in connection with, belonging, or pertaining to the Land Parcel.  In this case, the

35

"CCV Plan Effective Date" shall be the first business day after the date on which the Court's order confirming the CCV Plan is no longer subject to any stay.

Under the CCV Plan, CCV is authorized, and the Debtor is authorized and directed, to execute all documents necessary or appropriate to fully transfer all of the Debtor's right, title, and interest in and to the CCV Project Assets from the Debtor to CCV, including, but not limited to, all affidavits, documents, instruments of conveyance, and other agreements as CCV determines are necessary or appropriate.  The Project will be managed by CCV.  Additional details as to the management of the Project are not available or pertinent as creditors under the CCV Plan will be paid solely from the cash held in the Debtor's estate as of the CCV Plan Effective Date (the "Estate Held Cash"),[3] the cash to be contributed by CCV for payment of allowed claims in accordance with the CCV Plan (the "CCV Cash"), and/or the net proceeds (the "Estate Proceeds") of any and all claims and causes of action belonging to the estate (collectively, such claims and causes of action, the "Estate Actions"), including the Debtor Adversary Proceeding (defined below) (which is the subject of the CCV District Court Proceeding (defined below)) the FDIC District Court Proceeding (defined below) and the Astani Construction Adversary Proceeding (defined below). Creditors will not be paid from or have any interest in future revenues from the Project under the CCV Plan.

On or before January 7, 2011, CCV will file and serve a declaration stating its reasonable estimate of the total amount to be paid in CCV Cash in satisfaction of allowed claims as of the CCV Plan Effective Date (the "CCV Deposit Amount") and setting for the basis for this estimate, excluding amounts attributable to any claim held on such date by CCV or any entities it directly or indirectly controls.  CCV will deposit the CCV Deposit Amount into a segregated account held by the Voting Agent (the "CCV Deposit Account") on or before January 7, 2011.  If the Court confirms the CCV Plan, upon the CCV Plan Effective Date, the Voting Agent shall disburse the

---

[3] "Estate Held Cash" is also defined below as the cash held in the Debtor's estate as of the GTS Plan Effective Date.  Thus, when discussed in the context of the CCV Plan, Estate Held Cash is the cash held in the Debtor's estate as of the CCV Plan Effective Date and when discussed in the context of the GTS Plan, Estate Held Cash is cash held in the Debtor's estate as of the GTS Plan Effective Date.

36

1  funds held in the CCV Deposit Account in accordance with the terms of the CCV Plan, with any

2  excess amount immediately remitted to CCV.  Based upon preliminary estimates, CCV believes it

3  will be obligated to deposit approximately $1,200,000 into the CCV Deposit Account, comprised

4  of approximately $1,100,000 of Class 2 (non-insider mechanic's lien) claims, inclusive of

5  postpetition interest, and approximately $100,000 of Class 3 (non-insider general unsecured)

6  claims.

7           3.    CURRENT ALTERNATIVE TO THE PLANS

8           The Court denied confirmation of the Debtor's prior plan which provided for the sale of

9  individual units at the Project as condominiums.  The GTS Plan and the CCV Plan are currently the

10 only proposed and available alternatives in terms of chapter 11 plans in this bankruptcy case.

11          Following the Court's denial of confirmation of the Debtor's prior plan, the Debtor has

12 reevaluated the best current means for maximizing the value of the Project and has elected to move

13 forward with the GTS Plan that provides for the sale of the Project in its entirety and, most likely,

14 to a purchaser who will lease-up Tower I as a high-rise apartment tower.  Under the GTS Plan, the

15 Project is to be sold to one or more buyers pursuant to the Plan or pursuant to an order approving a

16 motion by the Debtor under Section 363 of the Bankruptcy Code approved by the Court prior to

17 confirmation of the GTS Plan.  The marketing and sale process under the GTS Plan is designed to

18 maximize value in a relatively short period of time by appropriately exposing the Project to

19 institutional investors (the most likely purchasers of the Project).

20          At this time, the alternative to the GTS Plan is a plan filed by CCV (the "CCV Plan").  The

21 Debtor believes that the sale process outlined in the CCV Plan filed on September 3, 2010, was

22 designed to minimize the value obtained in a sale of the Project in order to give CCV ownership at

23 a firesale price.  Further, the Debtor believes that the further amended plan filed by CCV on

24 September 22, 2010, and the current CCV Plan are designed to accomplish the same goals as the

25 amended plan filed by CCV on September 3, 2010.  The Debtor is aware that CCV has made

26 presentations to investors that CCV maximizes returns through foreclosure.  The Debtor believes

27 that the CCV Plan is the equivalent of a foreclosure, except that it eliminates the need for CCV to

28 comply with state foreclosure law requirements, circumvents CCV's pending motion for relief

1  from the automatic stay, and is designed to strip away from the Debtor the pending objection to

2  CCV's disputed claim and the pending litigation against CCV.

3      Moreover, the CCV Plan designates Class 2 (mechanics' lien claims) and Class 3 (general

4  unsecured claims) as unimpaired and, thus, unable to vote and deemed to accept the CCV Plan.

5  This would result in a situation where the only potential actual, affirmative creditor vote in favor of

6  the CCV Plan is CCV (Classes 1 and 4), since the only other impaired class of creditors under the

7  CCV Plan (Class 6) contains the  unsecured claims of affiliates of the Debtor and such affiliates

8  have advised the Debtor that they will vote against the CCV Plan.

9  **VIII.    CRITICAL PLAN PROVISIONS**

10     This section provides a discussion of the sources of funds used to pay creditors under the

11  GTS Plan and the CCV Plan as well as the timing of payments under each of the Plans.  See

12  Section IX. below for a more detailed discussion of the classification and payments of claims under

13  the Plans.

14     **A.    THE GTS PLAN**

15     The following sources of funds may be used to pay creditors in accordance with the terms

16  of this GTS Plan: (A) Project Sale Proceeds; and (B) any cash held in the Debtor's estate ("Estate

17  Held Cash") as of the GTS Plan Effective Date

18     Most likely, CCV (Class 1) can expect payment from the Project Sale Proceeds of its

19  allowed secured claim on the later of the GTS Plan Effective Date of the GTS Plan and the date on

20  which such claim is allowed.

21     Most likely, holders of allowed mechanics' lien claims for work performed, or services,

22  equipment, and/or materials provided with respect to the Project (Class 2) can expect payment in

23  full from Estate Held Cash and/or Project Sale Proceeds on the GTS Plan Effective Date of the

24  GTS Plan.

25     Most likely, holders of allowed general unsecured claims (Class 3) can expect payment in

26  full from Project Sale Proceeds on the GTS Plan Effective Date of the GTS Plan.

27     The holders of equity interests (membership interests) in the Debtor (Class 5) will retain

28  their interests in the Debtor.

38

1    Secured claimants may be entitled to assert claims pursuant to § 506(b) of the Bankruptcy

2    Bankruptcy Code for reasonable fees, costs, or charges and interest in connection with their claims.

3    The Debtor does not believe that such claims will have any material impact on distributions under

4    the GTS Plan.  After payment of all allowed claims and administrative expenses in full in

5    accordance with the GTS Plan, the Debtor projects that it will have ending cash of $5,000,000 -

6    $15,000,000 (this projected range is dependent on the sales price for the Project and does not

7    include any Estate Held Cash).  Further, prior to confirmation of the GTS Plan, the Debtor will

8    have already paid in excess of $750,000 for fees and costs of CCV (in addition, to a projected

9    approximate $12,000,000 in other postpetition payments to CCV).  Additionally, while the Plan is

10    not dependent upon the Debtor prevailing in litigation reducing the amount of the claim of CCV,

11    the Debtor believes that the CCV claim should be disallowed and reduced by an amount not less

12    than $46,000,000 less than the amount of CCV's proof of claim of approximately $162,000,000:

13    **B.    THE CCV PLAN**

14    The following sources of funds may be used to pay creditors in accordance with the terms

15    of this CCV Plan: (A) the Estate Held Cash, (B) the CCV Cash, and (C) any Estate Proceeds.

16    Most likely, CCV (Class 1) can expect satisfaction of its secured claim on the CCV Plan

17    Effective Date by the transfer from the Debtor to CCV of title to the CCV Project Assets.  Under

18    the Order Appointing Valuation Expert in Connection with Motion for Relief from the Automatic

19    Stay [Docket No. 851], the Court appointed John G. Ellis, MAI, CRE, FRICS, of Integra Realty

20    Resources, Inc. (the "Valuation Expert"), as an expert to determine the value of the Project in

21    conjunction with the Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (with

22    supporting declarations) (Movant: Corus Construction Venture, LLC) [Docket No. 560] (the

23    "Relief from Stay Motion").  The Valuation Expert issued his report [Docket No. __] (the "Expert

24    Appraisal") (available at http://www.kccllc.net/Concerto) on November 24, 2010, stating that, in

25    his opinion, the highest and best use of the project is to position the 271 units of the Phase I tower

26

27

28

39

as an apartment complex. Based on that assumption, the Valuation Expert derived a market value of the Project in its "as is" condition as of November 1, 2010 of $173,750,000.[4]

To the extent that the value of the CCV Project Assets transferred to CCV, which includes the Project, net of payments to satisfy Mechanic's Lien Claims (defined below), is less than the amount of CCV's claim, CCV shall have a deficiency claim for the difference (the "CCV Deficiency Claim").[5]  The CCV Plan treats the CCV Deficiency Claim as a Class 4 claim.  Class 1 is impaired and entitled to vote on the CCV Plan.

Most likely, holders of allowed non-insider claims for work performed, or services, equipment, and/or materials provided, with respect to the Project that are secured by validly perfected mechanic's liens on assets of the Debtor (such allowed claims, excluding any Astani Claims, the "Mechanic's Lien Claims") (Class 2) can expect payment in full, including Postpetition Interest, from the CCV Cash on the later of the CCV Plan Effective Date and the date on which such Mechanic's Lien Claims are allowed.  As used herein, "Postpetition Interest" means interest accrued from the Petition Date through the CCV Plan Effective Date as allowed under section 506(b) and applicable nonbankruptcy law.  Class 2 is therefore unimpaired and deemed to accept the CCV Plan.

Most likely, holders of allowed non-insider general unsecured claims (such allowed unsecured claims, excluding any Astani Claims and the CCV Deficiency Claim, the "General Unsecured Claims") (Class 3) can expect payment in full from the CCV Cash on the later of the CCV Plan Effective Date and the date on which such General Unsecured Claims are allowed. Class 3 is therefore unimpaired and deemed to accept the CCV Plan.

---

[4] The Expert Appraisal utilizes several methods of valuation, including a sales comparison and two different income capitalization approaches, to reach a reconciled "as is" value conclusion of Phase I of $145,550,000.  The Valuation Expert's $173,750,000 "as is" valuation of the Project as a whole comprises a reconciled $145,550,000 "as is" value conclusion of Phase I and a $28,200,000 valuation of Phase II. See Expert Appraisal at 108-109, 119. The Debtor will request that the Valuation Expert prepare a letter supplementing the Expert Appraisal, setting forth his "as completed" and "as stabilized" value conclusions for the Project.

[5] To the extent that CCV has a CCV Deficiency Claim, CCV's entire claim will be reduced to account for any post-petition payments that CCV has received pursuant to the Court's Order Granting Debtor's Motion Authorizing use of Cash Collateral (Proceeds of Sales of Residential Loft Units) [Docket No. 70] (the "Cash Collateral Order") or otherwise.

1    Most likely, CCV can expect payment of the CCV Deficiency Claim (Class 4) from any

2  Estate Proceeds.  Payment of the CCV Deficiency Claim from any Estate Proceeds is expressly

3  without prejudice to CCV's rights to pursue payment of the CCV Deficiency Claim against non-

4  Debtor parties, including, without limitation, against the Guarantors.  Class 4 is therefore impaired

5  and CCV is entitled to vote on the CCV Plan.  As noted above and reflected in the treatment of

6  Class 5 and Class 6 (discussed below), the Astani Claims are subordinated to CCV's claims, unless

7  the Court orders otherwise.  The CCV Deficiency Claim, on the one hand, and the Astani

8  Unsecured Claims, on the other hand, are separately classified from other unsecured claims in

9  order to account for the enforceability of subordination provisions in the Guaranties executed by

10  the Guarantors.  Accordingly, unless the Court finds that such subordination provisions are

11  unenforceable or inapplicable, the entirety of distributions on account of all Astani Claims will be

12  transferred to CCV until the entirety of CCV's claims are paid in full.  To the extent that

13  distributions to Astani Secured Claims (defined below) are redirected for payment on the CCV

14  Deficiency Claim, CCV Cash will be the source of the redirected payments.  To the extent that

15  distributions to Astani Unsecured Claims (defined below) are redirected for payment on the CCV

16  Deficiency Claim, Estate Proceeds will be the source of the redirected payments, with the CCV

17  Deficiency Claim receiving pro rata shares of Estate Proceeds allocated to both itself and Astani

18  Unsecured Claims until the CCV Deficiency Claim is paid in full.

19    Most likely, holders of allowed secured Astani Claims (such allowed secured claims, the

20  "Astani Secured Claims") (Class 5) can expect payment in full, plus Postpetition Interest, from

21  CCV Cash on the later of the CCV Plan Effective Date and the date on which such Astani Secured

22  Claims are allowed pursuant to a final order, subject to provision for any enforceable subordination

23  agreement, as described in more detail below.  To the extent that, in such final order, the Court

24  determines that the Astani Secured Claims are subordinated to CCV's claims pursuant to the

25  Guaranties, such payment will be redirected to CCV on account of the CCV Deficiency Claim, if

26  any, in enforcement of the Guaranties.  To the extent that, in such final order, the Court determines

27  that the Astani Secured Claims are not subordinated to CCV's claims pursuant to the Guaranties,

28

41

1  such payment will be made directly to the holders of allowed Astani Secured Claims.  Class 5 is

2  therefore unimpaired and deemed to accept the CCV Plan.

3      Most likely, holders of allowed unsecured Astani Claims (such allowed unsecured claims,

4  the "Astani Unsecured Claims") (Class 6) can expect payment from Estate Proceeds pro rata with

5  the CCV Deficiency Claim on the later of the date on which Estate Proceeds become available and

6  the date on which such Astani Unsecured Claims are allowed pursuant to final order, subject to

7  provision for any enforceable subordination agreement, as described in more detail below.  To the

8  extent that, in such final order, the Court determines that the Astani Unsecured Claims are

9  subordinated to CCV's claims pursuant to the Guaranties, such payment will be redirected to CCV

10  on account of the CCV Deficiency Claim, if any, until the CCV Deficiency Claim is paid in full, in

11  enforcement of the Guaranties.  To the extent that, in such final order, the Court determines that the

12  Astani Unsecured Claims are not subordinated to CCV's claims pursuant to the Guaranties, such

13  payment will be made directly to the holders of allowed Astani Unsecured Claims.  Class 6 is

14  therefore impaired and holders of the Astani Unsecured Claims are entitled to vote on the CCV

15  Plan.

16      The holders of the equity interests (membership interests) in the Debtor (Class 7) will have

17  their equity interests in the Debtor cancelled under the CCV Plan.  Unless the Estate Proceeds are

18  sufficient to pay creditors in full plus interest (any remaining proceeds after payment in full of

19  creditor claims plus interest, the "Residual Proceeds"), which is unlikely, holders of equity interests

20  will not receive anything on account of their interests.  To the extent there are any Residual

21  Proceeds, they will be distributed to holders of equity interests in Class 7.  Class 7 is therefore

22  impaired and entitled to vote on the CCV Plan.

23  IX.    **DESCRIPTION AND TREATMENT OF CLAIMS**

24      A.    **OVERVIEW OF PLAN PAYMENTS**

25      Below is a summary of who gets paid what and when and from what source for each of the

26  Plans.  The identity of members within a particular class is explained beginning on the next page.

27  The column entitled "Amount of Payment" in each of the following tables lists the estimate total

28  amounts to be paid (excluding interest payments).  A plan proponent is usually not required by law

42

1  to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a

2  bankruptcy case not commenced.  The "Payment Due Date" column in each of the following tables

3  states the frequency with which payments will be made and the starting and ending dates.  Look at

4  the starting date to figure out who will be paid before and after you and in what amount.  The

5  "Source of Payment" column describes the expected source of payment.  Further details regarding

6  the source of payment are found in sections X and Xl.

7        1.      PAYMENT SCHEDULES

8              (a)      THE GTS PLAN

9        The timing of payments to many creditors is determined by the "GTS Plan Effective Date."

10  Administrative claims, unless otherwise stated, must be paid by the GTS Plan Effective Date.  The

11  timing of payments to impaired creditors is measured from the GTS Plan Effective Date.  In this

12  case, the GTS Plan Effective Date shall be the first business day thirty (30) days after entry of the

13  Court's order confirming the GTS Plan.  As used herein, the term "Confirmation Date" shall mean

14  the date that the Court order confirming the GTS Plan is entered.

15

16

| Payment Recipient | Amount of Payment (Total amount to be paid)[6] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 1.    Debtor's Bankruptcy Counsel (SulmeyerKupetz, a Professional Corporation) | $250,000 | GTS Plan Effective Date | Estate Held Cash and/or Project Sale Proceeds |
| 2.    Debtor's Special. Corporate and Litigation Counsel (Parker Milliken, Clark, O'Hara & Samuelian, A Professional Corporation) | $200,000 | GTS Plan Effective Date | Estate Held Cash and/or Project Sale Proceeds |

---

[6]      These amounts are estimates.  For example, with regard to professionals, the estimated amount to be paid to professionals on the Effective Date may be substantially greater or less than projected depending on the extent of litigation and/or other opposition presented with respect to the GTS Plan, the CCV Plan, and/or other matters in the case. Further, the amounts may be substantially greater or less depending on the amount of payments received by professionals prior to confirmation of the GTS Plan. With respect to the claim of CCV, for example, the amount allowed and paid may vary dramatically depending upon how the Debtor's complaint and objection to claim with regard to CCV's claim are resolved.

43

| | | | |
|---|---|---|---|
| 3.    Creditors' Committee Counsel (Pachulski, Stang, Ziehl & Jones and Venable) | $100,000 | GTS Plan Effective Date | Estate Held Cash and/or Project Sale Proceeds |
| 4.    Creditors' Committee Financial Advisor (Grant Thornton LLP) | $ 25,000 | GTS Plan Effective Date | Estate Held Cash and/or Project Sale Proceeds |
| 5.    Class One - Corus Construction Venture, LLC (Secured Claim Under Corus Loan) | $162,662,216.26 (this claim is subject to pending dispute) | Later of the GTS Plan Effective Date and the date on which such claim is allowed | Project Sale Proceeds |
| 6.    Class Two - Mechanics' Lien Claims secured by assets of the Debtor | The Debtor estimates that allowed mechanics' lien claims amount to approximately $21,400,000. | GTS Plan Effective Date | Project Sale Proceeds and/or Estate Held Cash |
| 7.    Class Three - General Unsecured Creditors | The Debtor estimates that allowed general unsecured claims collectively amount to approximately $762,000 | GTS Plan Effective Date | Project Sale Proceeds |
| 8.  Class Four – equity interest holders | none | n/a | n/a |

44

(b)    THE CCV PLAN

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[7] | Payment Due Date | Source of Payment |
| --- | --- | --- | --- |
| 1.    Holders of Allowed Administrative Claims | Approx. $1,743,000[8] | CCV Plan Effective Date | Estate Held Cash |
| 2.    Class 1 – CCV's Secured Claim | Value of the CCV Project Assets transferred to CCV, which value remains to be determined by the Court, net of amounts necessary to satisfy Mechanic's Lien Claims [9] | CCV Plan Effective Date | CCV Project Assets |

---

[7] These amounts are estimates based, in part, on information contained in the Second Amended Disclosure Statement and Plan of Reorganization for GTS 900 F, LLC [Docket No. 252] (the "Denied Debtor Plan") and other filings in this case. For example, with regard to professionals, the estimated amount to be paid to professionals may be substantially greater or less than projected depending on the extent of litigation and/or other opposition presented with respect to the CCV Plan and/or other matters in the case. Further, the amounts may be substantially greater or less depending on the amount of payments received by professionals prior to confirmation of the CCV Plan. The total amounts of mechanic's lien claims and general unsecured claims are uncertain at this time and remain to be determined in light of pending claims objections. Nonetheless, according to the Debtor, these estimates are based on, among other things, the Debtor's best efforts to estimate such claims as of the filing of the Denied Debtor Plan. The Debtor has advised that its estimate of claims in the Denied Debtor Plan is based upon review and analysis of the Debtor's books and records and an initial review of proofs of claim and related documents filed in the case. At this time, there is some uncertainty with respect to the total allowable amount of certain claims for reasons such as (1) certain portions of some mechanic's lien claims may be based on change orders that were never agreed to; (2) various claims are asserted by sub-subcontractors and may duplicate or overlap with claims asserted by subcontractors; and (3) while the Debtor believed that its estimates were reasonable and appropriate, further analysis and documents may be needed to fully determine definitive allowable amounts of certain sub-subcontractor, subcontractor, and general unsecured claims. The Proponent intends to file a motion seeking reconciliation of various claims in this case and clarification from the Court on the allowed amounts of such claims.

[8] Amount is based on an estimate of outstanding administrative fees and expenses from a review of court filings and other information, plus a projection of fees and expenses for September – December 2010, which projection is based on the accrual rate of administrative expenses to date.

[9] This $162,662,216.26 amount represents the full amount of CCV's claim before application of post-petition payments made by the Debtor to CCV. To the extent that CCV's claim is not paid off from the remaining value of the CCV Project Assets transferred to CCV (after taking into account the amounts necessary to satisfy Mechanic's Lien Claims), CCV will have the CCV Deficiency Claim, which the CCV Plan treats in Class 4.

45

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[7] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 3.    Class 2 – Mechanic's Lien Claims | Collectively, up to approximately $19,600,000 plus Postpetition Interest | Later of the CCV Plan Effective Date and the date on which such claims are allowed | CCV Cash |
| 4.    Class 3 — General Unsecured Creditors | Collectively, approximately $540,000, not including the CCV Deficiency Claim and the Astani Unsecured Claims | Later of the CCV Plan Effective Date and the date on which such claims are allowed | CCV Cash |
| 5.    Class 4 – CCV Deficiency Claim | Deficiency after application of the value of the CCV Project Assets transferred to CCV (and subtracting from this amount the amounts necessary to satisfy Mechanic's Lien Claims) and crediting of post-petition payments to CCV's claim | If the Court determines that the Astani Secured Claims are subordinated to CCV's claims, payment from CCV Cash of amounts originally allocated to Astani Secured Claims on the later of the CCV Plan Effective Date and the date on which such Astani Secured Claims are allowed. The balance of the CCV Deficiency Claim will be paid when Estate Proceeds become available | CCV Cash, if the Court determines that the Astani Secured Claims are subordinated to CCV's claims, and Estate Proceeds |

46

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[7] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 6.    Class 5 – Astani Secured Claims | Payment in full of approximately $2,564,000 claim (subject to allowance), plus Postpetition Interest, from CCV Cash on the later of the CCV Plan Effective Date of the CCV Plan and the date on which such Astani Secured Claims are allowed; If the Court determines that the Astani Secured Claims are subordinated to CCV's claims, such payment will be redirected to CCV on account of the CCV Deficiency Claim | Later of the CCV Plan Effective Date of the CCV Plan and the date on which such Astani Secured Claims are allowed | CCV Cash |

47

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[7] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 7.    Class 6 – Astani Unsecured Claims | These claims are estimated to be approximately $7 million (subject to allowance). Payment, if at all, will be from Estate Proceeds pro rata with the CCV Deficiency Claim on the later of the date on which Estate Proceeds become available and the date on which such Astani Unsecured Claims are allowed;  If the Court determines that the Astani Unsecured Claims are subordinated to CCV's claims, such payment will be redirected to CCV on account of the CCV Deficiency Claim; The amount of available Estate Proceeds are subject to further litigation of the Estate Actions and are difficult to predict with  any certainty;  It is not anticipated that Class 6 claims will receive full recovery on their claims | Later of the date on which Estate Proceeds become available and the date on which such Astani Unsecured Claims are allowed | Estate Proceeds |
| 8.    Class 7 — Equity Interest Holders | Nothing, unless Residual Proceeds are available | When Residual Proceeds are available | Residual Proceeds |

48

2.    AFFILIATE CLAIMS

(a)    GTS PLAN

| Claimants and Interest Holders who are Affiliates of the Debtor | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Concerto Partners, LLC 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | equity interest holder | Holds 50% membership interest No claim |
| Astani/Cho Living Trust Attn: Sonny Astani and Jo Cho, as Trustees 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | equity interest holder | Holds 30% membership interest in the Debtor No claim |
| Concerto Manager, Inc. Attn: Sonny Astani, President 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | claimant | No claim |
| Astani Enterprises, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 . | claimant | No claim |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills,CA 90212 | claimant, and general contractor for the. Project | Pre-petition claims: $2,550,000 (for services secured by mechanics' lien) and approximately $121,000 (for advances made on behalf of the Debtor and treated by the claimant as unsecured • loans) (also approximately another $20,000,000 included in proof of claim of with respect to liabilities to subcontractors — this portion of the claim duplicates the claim of subcontractors) |

As reflected above, certain insiders of the Debtor hold claims against the Debtor.  The only material claim of such nature is held by Astani Construction, Inc., the general contractor for the Project.  This claim consists of: a claim of $2,550,000 for services pursuant to its contract; a claim of approximately $121,000 for funds advanced on behalf of the Debtor to subcontractors, professionals, and to meet other expenses of the Debtor, which were treated by Astani Construction, Inc. as unsecured loans to the Debtor; and a claim of approximately $20,000,000, which includes and duplicates amounts owed by the Debtor to subcontractors, most of whom have perfected lien

49

rights against the Debtor as well as their contractual rights to payment against Astani Construction, Inc.  To the extent that Project Sale Proceeds and Estate Held Cash are insufficient to pay all allowed claims against the Debtor and all administrative expenses of the Debtor's estate in full without subordination of the claim of Astani Construction, Inc., to all other allowed claims and administrative expenses and such subordination would allow for full payment of allowed claims and administrative expenses, the claim of Astani Construction, Inc. shall be subordinated under the GTS Plan to the payment of all other allowed claims and administrative expenses.  The Debtor has not commingled assets with other entities and is not aware of other insider claims (the bar date was January 29, 2010).

(b)    <u>CCV PLAN</u>

| Claimants and Interest Holders Who Are Affiliates of the Debtor[10] | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Concerto Partners, LLC<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Equity interest holder | Holds 50% membership interest<br><br>No claim |
| Astani/Cho Living Trust<br>Attn: Sonny Astani and Jo Cho, as Trustees<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Equity interest holder | Holds 30% membership interest<br><br>No claim |
| Marco Astani Family Trust<br>Attn: Marco Astani as Trustee<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Equity interest holder | Holds 5% membership interest<br><br>No claim |
| Concerto Manager, Inc.<br>Attn: Sonny Astani, President<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Claimant | Unknown |

---

[10] This information is based, in part, on the Denied Debtor Plan and other filings in this case, and may not include other claimants and interest holders that are affiliates of the Debtor.

626760.11-Los Angeles Server 2A - MSW

| Claimants and Interest Holders Who Are Affiliates of the Debtor[10] | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Astani Enterprises, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant | Unknown |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | Pre-petition claims: $2,550,000 (for services secured by mechanic's lien) and approximately $121,000 (for advances made on behalf of the Debtor and treated by the claimant as unsecured loans) (also approximately another $20,000,000 included in proof of claim of with respect to liabilities to subcontractors — this portion of the claim duplicates the claim of subcontractors) |
| HPG Management, Inc. P.O. Box 2399 Beverly Hills, CA 90213 | Claimant | Administrative Expense Claim: $5,000 per month for postpetition services involving maintaining Debtor's books and records and related services. |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | $3,246.78 as purchaser of Claim No. 94-1 from Rolf Jensen & Associates, Inc. (asserted unsecured claim) |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | $13,602.33 as purchaser of Claim No. 96-1 from Sunstate Equipment, Inc. (asserted mechanic's lien claim) |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | $11,120 as purchaser of a scheduled, unsecured claim from Sense, Inc. |

51

| Claimants and Interest Holders Who Are Affiliates of the Debtor[10] | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | Approximately $121,000 for funds advanced on behalf of the Debtor to subcontractors and professionals, and to meet other expenses of the Debtor, which were treated by Astani Construction as unsecured loans to the Debtor |
| Marco Astani 9595 Wilshire Blvd, Ste. 1010 Beverly Hills, CA 90212 | Claimant | $1,018,500 for amounts scheduled by the Debtor as unsecured prepetition loans |
| Sonny Astani 9595 Wilshire Blvd, Ste. 1010 Beverly Hills, CA 90212 | Claimant | $5,997,182.49 for amounts scheduled by the Debtor as unsecured prepetition loans |

As reflected above, certain insiders of the Debtor hold claims against the Debtor. Among the material insider claims are the claims of Astani Construction, the general contractor for the Project, and Sonny Astani and Marco Astani, principals of the Debtor. As discussed above, these claims are subordinated to that of CCV. CCV understands that the Astani Claims include (i) a claim of $2,550,000 for services pursuant to its contract; (ii) a claim of approximately $121,000 for funds advanced on behalf of the Debtor to subcontractors and professionals, and to meet other expenses of the Debtor, which were treated by Astani Construction as unsecured loans to the Debtor; (iii) claims of approximately $7,000,000 for prepetition amounts purportedly loaned to the Debtor by its principals on an unsecured basis – it is CCV's understanding that these claims do not relate to any money advanced to the Debtor, but represent primarily developer fees, which are typically deferred in these types of deals and are more akin to equity (the Debtor does not believe this understanding is accurate); and (iv) a claim of approximately $20,000,000, which includes and duplicates amounts owed by the Debtor to subcontractors, most of whom have perfected lien rights against the Debtor as well as contractual rights to payment from Astani Construction. Further, Astani Construction has also purchased the claims of Rolf Jensen & Associates, Inc. (the "Rolf Claim"), Sunstate Equipment, Inc. (the "Sunstate Claim"), and Sense, Inc. (the "Sense Claim").

1  Notices of claim transfer were filed for the Rolf Claim (Docket No. 558) and the Sunstate Claim

2  (Docket No. 559) on July 19, 2010, and for the Sense Claim (Proof of Claim No. 110) on July 21,

3  2010.  Per the Denied Debtor Plan, the Debtor has not commingled assets with other entities and is

4  not aware of other insider claims (the bar date was January 29, 2010).

5          Below is a detailed description and treatment of administrative expenses, claims, and

6  interests in each of the Plans.

7          **B.    ADMINISTRATIVE EXPENSES**

8          These include the "actual, necessary costs and expenses of preserving the estate" as

9  determined by the Court after notice to creditors of a request for payment and after a hearing

10  thereon.  The amounts set forth below are estimates of amounts required to be paid on the effective

11  date of each Plan and actual amounts required to be paid may be substantially greater or less

12  depending on the extent of opposition and/or other litigation with respect to the GTS Plan, the

13  CCV Plan, and/or the extent of litigation regarding other matters in this case and the extent of

14  services required in connection with the case.  Further, the amounts estimated may differ

15  substantially from the amounts required to be paid on the effective date depending upon the

16  amount of cash collateral and/or other sources used to pay such claims prior to confirmation of the

17  applicable Plan.  Also included within this category of administrative expenses are any allowable

18  claims asserted pursuant to 11 U.S.C. § 503(b)(9) for the value of goods delivered within 20 days

19  before the commencement of this chapter 11 case.  The Debtor and CCV are not aware of any such

20  claims.

21          The Bankruptcy Code requires that allowed administrative expenses be paid on the

22  effective date unless the party holding the administrative expense agrees otherwise.  The claimants

23  have not agreed otherwise.  Below are estimates of administrative expenses under each of the Plans.

24          1.    THE GTS PLAN

25      (a)    Administrative Expense #1.

26              Claimant: SulmeyerKupetz, a professional corporation

27              (Debtor's bankruptcy counsel).

28              $250,000, subject to court approval

53

1       (b)     Administrative Expense # 2.

2              Claimant: Parker, Milliken, Clark, O'Hara Samuelian, A

3              Professional Corporation (Debtor's special litigation

4              counsel)

5              $200,000, subject to Court approval

6       (c)     Administrative Expense # 3.

7              Claimant: Pachulski, Stang, Ziehl & Jones and Venable

8              (Creditors' Committee Counsel).

9              $100,000, subject to Court approval

10      (d)     Administrative Expense # 4.

11             Claimant: Grant Thornton LLP

12             (Creditors' Committee Financial Advisor)

13             $25,000, subject to Court approval

14             ESTIMATED TOTAL: $575,000

15      2.     THE CCV PLAN

16      Any requests for payment of an Administrative Claim must be filed with the Court and

17 served on the Plan Administrator (defined below) no later than forty five (45) days after the CCV

18 Plan Effective Date (the "Administrative Claims Bar Date").  Holders of Administrative Claims

19 that do not file and serve such a request by the Administrative Claims Bar Date shall be forever

20 barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its

21 estate, and such Administrative Claims shall be deemed discharged as of the CCV Plan Effective

22 Date.  The Plan Administrator must file any objections to Administrative Claims no later than sixty

23 (60) days after the Administrative Claims Bar Date (the "Administrative Claims Objection

24 Deadline").  The Plan Administrator may resolve Administrative Claims without further order of

25 the Court.  The Plan Administrator shall hold $2,900,000 of the Estate Held Cash in reserve for

26 payment of allowed Administrative Claims (the "Administrative Claims Reserve"), including

27 compensation for the Plan Administrator, $1,750,000 for Administrative Claims through the CCV

28

626760.11-Los Angeles Server 2A - MSW

1  Plan Effective Date and $1,000,000 for fees and expenses of the Plan Administrator's advisors, as

2  discussed below.

3          The amounts set forth below are estimates based upon various filings in the Debtor's

4  bankruptcy case.  The actual amounts of Administrative Claims may differ significantly from the

5  estimates below because such amounts are subject to Court approval and may have been paid in the

6  ordinary course.  In addition, depending on how this case proceeds, including the extent of

7  litigation on this CCV Plan and other matters, the actual amounts may be significantly higher.

8  Notwithstanding anything to the contrary in the CCV Plan, CCV reserves the right to review and

9  object to the allowance of any asserted Administrative Claims.

10

| **Estimated Administrative Claim** | **Notes** |
|---|---|
| (a)  Administrative Expense #1. <br><br> Claimant: SulmeyerKupetz, a professional corporation (Debtor's bankruptcy counsel). <br><br> Approximately $386,000, subject to Court approval | Based on total of $1,374,464.94 in post-petition fees and expenses billed as of August 31, 2010, minus: <br><br> (i) $214,245.64 in prepetition retainers remaining as of the Petition Date; <br><br> (ii) $400,000.00 in post-petition retainers; and <br><br> (iii) and $374,252.27 in disbursements paid by the Debtor from cash collateral. <br><br> The Denied Debtor Plan estimated $250,000.00. |

55

| **Estimated Administrative Claim** | **Notes** |
|---|---|
| (b) Administrative Expense #2.<br><br>Claimant: Parker Milliken Clark O'Hara & Samuelian, a professional corporation (Debtor's special litigation counsel).<br><br>Approximately $225,000, subject to Court approval | Based on total of $635,479.51 in post-petition fees and expenses billed as of July 31, 2010, minus:<br><br>(i) $40,252.11 in prepetition retainers remaining as of the Petition Date;<br><br>(ii) $213,449.17 in post-petition retainers; and<br><br>(iii) and $156,424.52 in disbursements paid by the Debtor from cash collateral.<br><br>See Docket. No. 722. The Denied Debtor Plan estimated $200,000.00. |
| (c) Administrative Expense #3.<br><br>Claimant: Pachulski Stang Ziehl & Jones LLP (Creditors' Committee counsel).<br><br>Approximately $127,000 , subject to Court approval | Based on $200,652.47 amount provided to CCV by the Committee's counsel regarding actual fees incurred but not yet approved by the Court, minus $73,895.27 in disbursements paid by the Debtor from cash collateral. This amount includes an estimate of $125,000.00 for fees and expenses for January - March 2010 provided by Committee's counsel.<br><br>The Denied Debtor Plan estimated $100,000.00. |
| (d) Administrative Expense #4.<br><br>Claimant: Venable LLP (Creditors' Committee's counsel).<br><br>Approximately $178,000, subject to Court approval | Based on total of $227,346.75 post-petition fees and expenses billed as of August 31, 2010, minus $49,591.00 in disbursements paid by the Debtor from cash collateral. See Docket. No. 717.<br><br>The Debtor did not provide an estimate of these fees in the Denied Debtor Plan. |

56

| Estimated Administrative Claim | Notes |
|---|---|
| (e) Administrative Expense #5.<br><br>Claimant: Grant Thornton LLP (Creditors' Committee's financial advisor).<br><br>$25,000, subject to Court approval | Amount is based on Debtor's original estimate of $25,000.00 from the Denied Debtor Plan. See Docket No. 252. |
| (f) Administrative Expense #6.<br><br>Claimant: HP Management, Inc. (postpetition services relating to maintaining Debtor's books and records).<br><br>Approximately $60,000, subject to Court approval | Amount is based on Debtor's original estimate of $35,000.00 from the Denied Debtor Plan, plus an additional $5,000/month for July - December 2010 ($25,000.00). See Docket No. 252. |
| Total Estimated Administrative Claims: $1,743,000.00 | Amount is based on $993,000.00 in administrative fees and expenses currently outstanding (from a review of court filings and other information), plus a projection of $800,000.00 for fees and expenses for September – December 2010, which projection is based on the accrual rate of administrative expenses to date, minus $50,000.00 in additional cash collateral agreed upon as available through September 30, 2010 for the future payment of fees and expenses. |

## C.    UNSECURED TAX CLAIMS

These include certain types of property, sales, and income taxes.  The Debtor is not aware of any such prepetition claims against the Debtor and does not believe that any such claims exist.

The Bankruptcy Code requires that the holders of such claims receive regular installment payments in cash over a period ending not later than five years after the date of the order for relief, unless agreed otherwise.  Any such claimant has not agreed otherwise.  The total cash payments must have a present value equal to the amount of the allowed claim.  The treatment of any such claims under each of the Plans must be in a manner not less favorable than the most favored non-

57

626760.11-Los Angeles Server 2A - MSW

1  priority unsecured claim provided in each of the Plans (other than any cash payments to an

2  administratively convenient class).  To the extent that any allowed pre-petition tax claim exists,

3  such claim(s) shall receive the same treatment that is provided under each of the Plans for the

4  holders of allowed claims in Class 3 in each of the Plans.

5      **D.      CLASSIFICATION OF CLAIMS AND INTERESTS**

6          The following is a table summarizing the classification of claimants and equity interest

7  holders under each of the Plans.

| CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLANS | | |
|---|---|---|
| | **GTS Plan** | **CCV Plan** |
| Secured Claim of CCV | Class 1 | Class 1 |
| Mechanics Lien Claims | Class 2 | Class 2 |
| General Unsecured Claims | Class 3 | Class 3 |
| Deficiency Claim of CCV | Class 3 | Class 4 |
| Secured Claims of Debtor Affiliates | Class 2 | Class 5 |
| Unsecured Claims of Debtor Affiliates | Class 3 | Class 6 |
| Equity Interests | Class 4 | Class 7 |

**E.      CCV'S SECURED CLAIM**[11]

1.      THE GTS PLAN

The allowed secured claim arising under the Corus Bank Loan Agreement now held by

CCV is classified in Class 1 of the GTS Plan.  Class 1 is impaired.

---

[11] The GTS Plan and the CCV Plan have classified the following claims in the same numerical class: CCV's secured claim (Class 1), mechanic's lien claims (Class 2) and general unsecured claims (Class 3).  The Plans differ in their classification of CCV's deficiency claim (Class 3 under GTS Plan and Class 4 under CCV Plan), secured claims of Debtor's affiliates (Class 2 under GTS Plan and Class 5 under CCV Plan), unsecured claims of Debtor's affiliates (Class 3 under GTS Plan and Class 6 under CCV Plan) and equity interest holders (Class 4 under GTS Plan and Class 7 under CCV Plan).

626760.11-Los Angeles Server 2A - MSW

1    The total amount of CCV's allowed claim is subject to dispute.  CCV filed a proof of claim

2  against the Debtor on October 29, 2009, in the face amount of $162,662,216.26.  CCV filed an

3  amended proof of claim on January 26, 2010, which did not change the amount of the claim

4  asserted..  The Debtor has filed a complaint and objection to the claim asserting that the claim

5  should be reduced by a sum to be determined, but believed by the Debtor as of March 2010, to be

6  at least $46,000,000.  The Committee and Astani Construction, Inc., also filed complaints with

7  respect to CCV's claim.  The objection to claim and complaints are discussed in Section XVII.

8    The allowed secured claim in this class is to be paid in full from Project Sale Proceeds on

9  the later of the GTS Plan Effective Date (or as soon thereafter as, is administratively practicable) of

10  the GTS Plan and the date on which such claim is allowed.  Payment in full of the allowed claim of

11  CCV pursuant to the GTS Plan shall be deemed to constitute full satisfaction of all obligations

12  under and/or connected with the Loan Agreement.

13    Until such time as the claim of CCV is allowed by an order of the Court, the claim shall be

14  paid under the Plan to the extent of the amount of the proof of claim of CCV that is not subject to a

15  timely filed objection (i.e., pursuant to the Debtor's objection to the CCV proof of claim and the

16  declaration attached hereto as Exhibit A-1, until such objection is resolved by order of the Court,

17  the allowed claim of CCV shall be paid in an amount not greater than $116,000,000 under the GTS

18  Plan, and Project Sale Proceeds sufficient to pay the balance of CCV's asserted claim; as set forth

19  in the amended proof of claim filed by CCV, shall be held by the Debtor in trust pending allowance

20  or disallowance by the Court of the balance of CCV's asserted claim).

21    2.    THE CCV PLAN

22    The secured claim arising under the Corus Bank Loan Agreement now held by CCV

23  is classified in Class 1 of the CCV Plan.  Class 1 is impaired.  CCV filed a proof of claim against

24  the Debtor on October 29, 2009, in the face amount of $162,662,216.26.  CCV filed an amended

25  proof of claim on January 26, 2010, which did not change the amount of the claim asserted.  The

26  Debtor has filed a complaint and objection to the claim asserting that the claim should be reduced

27  by a sum to be determined, but believed by the Debtor as of March 2010, to be at least $46,000,000.

28  The Committee and Astani Construction also filed complaints with respect to CCV's claim.  The

59

1   objection to claim and complaints are discussed in Section XVII.  Although the total amount of

2   CCV's allowed claim is subject to dispute, CCV's claim shall be allowed in full under this CCV

3   Plan, without prejudice to the Debtor Adversary Proceeding (defined below) or the FDIC District

4   Court Proceeding (defined below).

5          As stated above, title to the CCV Project Assets shall be transferred from the Debtor to

6   CCV free and clear of any and all liens, claims, interests, and encumbrances that are dealt with in

7   the CCV Plan.  CCV is authorized, and the Debtor is authorized and directed, to execute all

8   documents necessary or appropriate to fully transfer all of the Debtor's right, title, and interest in

9   and to the CCV Project Assets from the Debtor to CCV, including, but not limited to, all affidavits,

10  documents, instruments of conveyance, and other agreements as CCV determines are necessary or

11  appropriate.

12         The extent to which transfer of the CCV Project Assets to CCV satisfies CCV's claim

13  depends on the Court's determination of the value of the CCV Project Assets transferred to CCV.

14  As mentioned above, in conjunction with the Relief from Stay Motion, the Court appointed

15  Valuation Expert determined that, in his opinion, the market value of the Project in its "as is"

16  condition as of November 1, 2010 is $173,750,000.[12]  The Court has stated that it will consider the

17  value determined in the Valuation Expert's appraisal report for purposes of both the Relief from

18  Stay Motion and confirmation of the Plans.  The Valuation Expert's appraisal report is available for

19  download at http://www.kccllc.net/Concerto.  To the extent that the value of the CCV Project

20  Assets transferred to CCV is less than CCV's claim, CCV will have the CCV Deficiency Claim in

21  the amount of any difference.  The CCV Deficiency Claim will be classified as part of Class 4 and

22  receive the treatment described below.  CCV will receive the CCV Project Assets, its collateral, in

23  satisfaction of its secured claim.  Class 1 is therefore impaired and entitled to vote to accept or

24  reject the CCV Plan.

25         As discussed in more detail in Section XVII below, the Debtor filed on December 29, 2009

26  a Complaint and Objection to Claim against CCV, thereby commencing the action captioned *GTS*

27

28         [12] See infra note 4.

1      900 *F, LLC v. Corus Construction Venture, LLC, Adv. No. 2:09-ap-03557V* (the "Debtor

2 Adversary Proceeding").  The complaint, as amended on February 3, 2010, asserts that the claim

3 filed by CCV should be reduced because of the alleged misconduct of Corus Bank in the

4 administration of the construction loan.  The Debtor thus claims that CCV's Proof of Claim should

5 be disallowed to the extent of damages purportedly caused by and defenses purportedly resulting

6 from Corus Bank's alleged breaches of its contractual obligations and alleged breaches of the

7 implied covenant of good faith and fair dealing arising from the Loan Agreement and related

8 documents.

9      The Debtor's complaint asserts claims for (1) declaratory relief as to the amount of the

10 CCV claim, (2) offset and recoupment of damages against the loan amount, and (3) equitable

11 subordination of the CCV claim and lien to the claims of creditors holding allowed secured and

12 unsecured claims against the Debtor.  The Debtor's complaint alleges that, as a result of Corus

13 Bank's actions and inactions, the Debtor has been damaged in an amount to be determined, but

14 believed to be in excess of $46,000,000.  The Debtor's objection to claim asserts that CCV's claim

15 should be reduced to the extent of the damages purportedly caused by the conduct of CCV's

16 predecessor and assignor, Corus Bank.  CCV disputes the allegations in the Debtor's complaint.

17      On September 4, 2009, prior to the commencement of this chapter 11 reorganization case

18 and prior to Corus Bank's seizure by the Federal government, the Debtor filed the Prepetition

19 Action for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3)

20 declaratory relief, and (4) injunctive relief.  The Prepetition Action was originally filed in the

21 Superior Court of the State of California, County of Los Angeles, as *GTS 900 F, LLC v. Corus*

22 *Bank, N.A. et al., Case No: BC421309.*  Following the commencement of this chapter 11 case, the

23 Debtor removed the Prepetition Action to the Bankruptcy Court.  The removed action was pending

24 as *GTS 900 F, LLC v. Corus Bank, N.A., Adv. No. 2:09-ap-02188-VZ* (the "Removed Action").

25      In the Removed Action, the Court entered an order approving a stipulation between the

26 Debtor and the FDIC (as receiver for Corus Bank) entitled Order Granting Stipulation (1)

27 Substituting the Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A.; (2)

28 Extending Deadline to Answer or Otherwise Respond to Complaint; and (3) Staying Adversary

1    Proceeding [Docket No. 20 in the Removed Action], which stayed the Removed Action to allow

2    the Debtor to pursue a claim in the FDIC's receivership proceedings for Corus Bank.  The Court

3    also entered an order approving a stipulation between the FDIC and the Debtor permitting the

4    FDIC to file a motion in the District Court to withdraw the reference of this proceeding to the

5    Bankruptcy Court [Docket No. 28 in the Removed Action].

6    In a letter dated June 8, 2010, the FDIC informed the Debtor that its claim filed in the

7    FDIC's receivership proceedings for Corus Bank had been denied.

8    On August 26, 2010, in a separate proceeding before the United States District Court for the

9    Central District of California (the "District Court") titled *GTS 900 F, LLC v. FDIC et al., Civ. No.*

10    *2:10-cv-02763-SJO* (the "FDIC District Court Proceeding"), the Debtor filed a motion (the

11    "Consolidation Motion") seeking to (i) withdraw the reference of the Debtor Adversary Proceeding

12    from the Bankruptcy Court; (ii) determine that the Debtor is entitled to a jury trial in its damages

13    claims against CCV; (iii) consolidate the Debtor Adversary Proceeding with the FDIC District

14    Court Proceeding for discovery and trial purposes; and (iv) grant a jury trial in the FDIC District

15    Court Proceeding [Docket No. 17 in the FDIC District Court Proceeding].  On September 3, 2010,

16    in the FDIC District Court Proceeding, the District Court ordered the Consolidation Motion be

17    stricken as procedurally improper [Docket No. 25 in the FDIC District Court Proceeding].

18    On September 9, 2010, the Debtor filed the Consolidation Motion in the District Court

19    titled *GTS 900 F, LLC v. Corus Construction Venture LLC , Civ. No. 2:10-cv-06693-SJO* (the

20    "CCV District Court Proceeding").  In the CCV District Court Proceeding, the Debtor seeks the

21    same relief described above in the discussion of the Consolidation Motion filed in the FDIC

22    District Court Proceeding.  A hearing on the Consolidation Motion in the CCV District Court

23    Proceeding has been scheduled for October 18, 2010.

24    On December 29, 2009, the Committee filed a complaint in this case commencing the

25    action captioned *Official Committee of Unsecured Creditors v. Corus Construction Ventures LLC*,

26    *Adv. No. 2:09-ap-03555-VZ* (the "Committee Adversary Proceeding").  The Committee's

27    complaint was for (i) declaratory relief regarding validity, priority, and extent of liens; and (ii) for

28    equitable subordination.  In the adversary proceeding, the Committee seeks a determination from

62

1  the Court that the lien rights of mechanic's lien claimants, to the extent that such lien rights are

2  valid and properly perfected, are prior and senior to the lien rights of CCV, and requests an order of

3  the Court ruling that CCV's rights under the Loan Agreement are equitably subordinated to claims

4  of all other creditors of the Debtor for purposes of distribution and/or that any lien securing those

5  rights be transferred to the Debtor's estate.

6       The Committee's complaint asserts that the mechanic's lien claimants are senior in priority

7  to the claim of CCV, based on the fact that substantial work was performed on the construction site

8  prior to the recordation of the Corus Bank lien on July 5, 2007, thus giving priority to all

9  subsequent mechanic's lien claimants, whose lien rights relate back to the commencement of the

10 work of improvement.  The Committee's equitable subordination claim, among other things, arises

11 from alleged delays in funding the construction loan and mismanagement of the construction ban

12 that has injured the rights of the mechanic's lien creditors.

13      By an order entered April 6, 2010 [Docket No. 32 in Committee Adversary Proceeding]

14 (the "Dismissal Order"), the Court dismissed the Committee Adversary Proceeding.  The

15 Committee filed a notice of appeal of the Dismissal Order [Docket No. 33 in Committee Adversary

16 Proceeding] on April 8, 2010.  Pursuant to a stipulation with CCV filed on August 4, 2010 [Docket

17 No. 669] (the "Committee Stipulation"), the Committee agreed to dismiss its appeal of the

18 Dismissal Order when the order approving the Committee Stipulation became final and non-

19 appealable.  On August 13, 2010, the Court entered an order approving the Committee Stipulation

20 [Docket No. 685] and the Committee is currently pursuing dismissal of the appeal.

21      **F.    MECHANIC'S LIEN CLAIMS**

22          1.    THE GTS PLAN

23      All allowed claims for work performed, or services, equipment, and/or materials provided

24 with respect to the Project secured by validly perfected mechanics' liens on assets of the Debtor are

25 classified in Class 2 of the GTS Plan.  Class 2 is impaired.  The liens securing such allowed claims

26 are of equal priority.  The Debtor believes that the total amount of such claims is approximately

27 $21,400,000 (including the $2,550,000 claim of Astani Construction, Inc.).  See Exhibit A-5 hereto.

28

626760.11-Los Angeles Server 2A - MSW

1    The bar date for filing claims was January 29, 2010.  The bar date for hearings on

2  objections to claims is June 30, 2010.  The Debtor objected to certain claims in this class based

3  upon review and analysis of the Debtor's books and records and review of proofs of claim and

4  related documents filed in the case.  All objections to claims in this class have been resolved.  See

5  Exhibit A-5 hereto.

6    Allowed claims in this class are to be paid in full from Estate Held Cash and/or Project Sale

7  Proceeds on the GTS Plan Effective Date (or as soon thereafter as is administratively practicable).

8    2.    THE CCV PLAN

9    All Mechanic's Lien Claims, which are allowed claims for work performed, or services,

10  equipment, and/or materials provided, with respect to the Project that secured by validly perfected

11  mechanic's liens on assets of the Debtor are classified in Class 2 of the CCV Plan.  Class 2 is

12  unimpaired.  As noted above, Mechanic's Lien Claims exclude any Astani Claims.  Per the Denied

13  Debtor Plan, the Debtor estimated the total amount of Mechanic's Lien Claims at approximately

14  $22,400,000.

15    The bar date for filing claims was January 29, 2010.  The bar date for hearings on

16  objections to claims was June 30, 2010.  Using information contained in the Denied Debtor Plan,

17  court filings in this case and other available information, counsel for CCV has prepared a list of

18  claimants with mechanic's lien claims against the Project.  This list is attached hereto as Exhibit B-

19  1.  Exhibit B-1 does not include certain claimants who voted as mechanic's lien claimants on the

20  Denied Debtor Plan, but do not appear to have any basis for asserting mechanic's liens against the

21  Project and do not appear to have had their mechanic's lien claims temporarily allowed by the

22  Court for voting purposes.  The "Payable Amount" for each claimant listed in Exhibit B-1 is

23  subject to Court allowance.  CCV estimates that there may be approximately $19,600,000 in

24  Mechanic's Lien Claims.

25    Based on a review of various filings in the bankruptcy cases,.  This estimate excludes the

26  asserted mechanic's lien claim of approximately $2.555 million filed by Astani Construction and

27  the mechanic's lien claim of approximately $13,000 filed by Sunstate Equipment, Inc., which was

28  purchased by Astani Construction.  Both of these claims are classified as Astani Claims in Class 5.

64

1  The final allowed amounts of all mechanic's lien claims are undetermined at this time.  As noted

2  above, the Proponent intends to file a motion seeking reconciliation of various claims in this case

3  and clarification from the Court on the allowed amounts of such claims.

4        Allowed claims in this class will be paid in full under the CCV Plan, including Postpetition

5  Interest, from the CCV Cash on the later of the CCV Plan Effective Date and the date such claims

6  are allowed.  The mechanic's liens held by members of this class, to the extent otherwise valid and

7  perfected, will be extinguished when the applicable allowed claim is paid in full.  Class 2 is

8  therefore unimpaired and deemed to accept the CCV Plan pursuant to section 1129(f) of the

9  Bankruptcy Code.  In addition, any and all claims and causes of action that holders of claims in

10  Class 2 may have against CCV will be extinguished when the applicable allowed claim is paid in

11  full.

12        **G.**    **GENERAL UNSECURED CLAIMS**

13        1.    <u>THE GTS PLAN</u>

14        All allowed general unsecured claims against the Debtor are classified in Class 3 of the

15  GTS Plan.  The bar date for filing claims was January 29, 2010.  Class 3 is impaired.  Exhibit A-6

16  hereto contains a list of general unsecured claims in the Debtor's chapter 11 case.  The Debtor

17  objected to certain general unsecured claims and all objections have been resolved.  As set forth in

18  Exhibit A-6 hereto, allowed general unsecured claims amount to approximately $762,000.  <u>See also</u>

19  Exhibit A-7 hereto for a list, compiled based on the Debtor's books and records, of prepetition

20  payables (including general unsecured claims and mechanics' lien claims —this list includes

21  members of classes 2 and 3).

22        Allowed claims in class 3 are to be paid in full from Project Sale Proceeds on the GTS Plan

23  Effective Date (or as soon thereafter as is administratively practicable).

24        2.    <u>THE CCV PLAN</u>

25        All General Unsecured Claims, which exclude the CCV Deficiency Claim and any Astani

26  Claims are classified in Class 3 of the CCV Plan.  Class 3 is unimpaired.  The bar date for filing

27  claims was January 29, 2010.  The bar date for hearings on objections to claims was June 30, 2010.

28  Using information contained in the Denied Debtor Plan, court filings in this case and other

1   available information, counsel for CCV has prepared a list of claimants that CCV believes should

2   be classified as General Unsecured Claims.  This list of claims is attached as Exhibit B-2 hereto.

3   Of those claims, approximately $88,000 involve claims for deposits by purchasers of Loft units and

4   those claims should be withdrawn or otherwise eliminated since the loft unit sales closings have

5   moved forward.  The Debtor estimates that allowed general unsecured claims will likely amount to

6   approximately $762,000 (the amount ultimately may be less or more, depending on whether claims

7   filed as unsecured claim are determined to have mechanic's lien rights or are otherwise disallowed

8   as general unsecured claims).  CCV believes that the Debtor may have included in its estimate

9   claims not appropriately considered General Unsecured Claims.  Exhibit A-7 hereto is a list,

10  compiled based on the Debtor's books and records, of prepetition payables (including general

11  unsecured claims and mechanic's lien claims — this list includes claims in Classes 2 and 3).

12  The Debtor has objected to a number of general unsecured claims.  To the extent those

13  objections are not resolved by the Effective Date, the Plan Administrator (defined below) will

14  succeed to the Debtor's rights with respect to the unresolved objections.  As noted above, the

15  Proponent intends to file a motion seeking reconciliation of various claims in this case and

16  clarification from the Court on the allowed amounts of such claims.

17  Allowed claims in this class will be paid in full from the CCV Cash.  Class 3 is therefore

18  unimpaired and deemed to accept the CCV Plan pursuant to section 1126(f) of the Bankruptcy

19  Code.

20  **H.    <u>EQUITY INTERESTS</u>**

21  1.    <u>THE GTS PLAN</u>

22  The equity interests (membership interests) in the Debtor are classified in Class 4 of the

23  GTS Plan.  Under the Plan, equity interest-holders simply retain their interests.  The GTS Plan

24  leaves unaltered the legal, equitable, and contractual rights to which the equity interests in the

25  Debtor entitle the holders thereof.  Accordingly, the Debtor believes that this class is unimpaired.

26  In accordance with applicable state law, the holders of equity interests shall not receive any

27  distribution or other payment from the Debtor on account of their equity interests until after all

28  allowed claims against the Debtor have been paid in full pursuant to the GTS Plan.

626760.11-Los Angeles Server 2A - MSW

2.      THE CCV PLAN

The equity interests (membership interests) in the Debtor are classified in Class 7 of the CCV Plan. Holders of equity interests will have their equity interests in the Debtor cancelled. To the extent there are any Residual Proceeds, they will be distributed to holders of equity interests. Class 7 is therefore impaired and entitled to vote on the CCV Plan.

**I.     CCV DEFICIENCY CLAIM**

1.      THE GTS PLAN

The CCV Deficiency Claim is classified in Class 3 of the GTS Plan discussed above.

2.      THE CCV PLAN

The CCV Deficiency Claim is classified in Class 4 of the CCV Plan. Class 4 is impaired. The CCV Deficiency Claim is being classified separately from other unsecured claims in order to provide and allow for enforcement of any subordination agreements in favor of such CCV Deficiency Claim. As noted above, the Court appointed Valuation Expert determined that, in his opinion, the market value of the Project in its "as is" condition as of November 1, 2010 is $173,750,000.[13] The Court has stated that it will consider the value determined in the Valuation Expert's appraisal report for purposes of both the Relief from Stay Motion and confirmation of the Plans. The Valuation Expert's appraisal report is available for download at http://www.kccllc.net/Concerto.

To the extent that the value of the CCV Project Assets transferred to CCV, which includes the Project, net of amounts necessary to satisfy Mechanic's Lien Claims, is less than the amount of CCV's claim, CCV shall have the CCV Deficiency Claim in the amount for any difference. In addition, to the extent that CCV has a CCV Deficiency Claim, CCV's entire claim will be reduced by the amount of any post-petition payments received by CCV.

For illustration purposes, suppose that the Project has a value of $150 million and that there is $5 million of Estate Held Cash on the CCV Plan Effective Date, for a total of $155 million.[14]

---

[13] See infra note 4.

[14] The values in this example are purely for illustration purposes and CCV in no way adopts these values as accurate.

1    Administrative Claims, which CCV has estimated at approximately $1.743 million, would be then

2    subtracted from this sum to arrive at a total of $153,257,000, which represents the value of the

3    CCV Project Assets transferred to CCV as of the CCV Plan Effective Date.  The amount of

4    Mechanic's Lien Claims, which CCV has estimated at approximately $19.6 million, would be

5    subtracted from the CCV Project Assets value to arrive at the value of CCV's collateral as of the

6    CCV Plan Effective Date, $133,657,000.  This number would then be subtracted from CCV's

7    claim amount of $162,662,216.26 as would all post-petition payments received by CCV

8    ($10,532,000 to date) to arrive at the total for the CCV Deficiency Claim.  Thus, the CCV

9    Deficiency Claim would be $162,662,216.26 - $133,657,000 - $10,532,000 = $18,473,216.26.

10       The CCV Deficiency will not be paid in full unless there are sufficient Estate Proceeds to

11    effect such payment in full in accordance with the terms of this Plan.  Class 4 is therefore impaired

12    and CCV is entitled to vote on the CCV Plan.  Obviously, CCV as the Proponent, supports

13    confirmation of, and will vote to accept, the CCV Plan.

14       As noted above and reflected in the treatment of Class 5 and Class 6, the Astani Claims are

15    subordinated to CCV's claims.  The CCV Deficiency Claim, on the one hand, and the Astani

16    Claims, on the other hand, are separately classified from other unsecured creditors in order to

17    account for the enforceability of subordination provisions in the Guaranties executed by the

18    Guarantors.  Accordingly, unless the Court finds that such subordination provisions are

19    unenforceable or inapplicable, the entirety of distributions on account of the Astani Claims will be

20    transferred to CCV until the entirety of CCV's claims are paid in full.  To the extent that

21    distributions to Astani Secured Claims are redirected for payment on the CCV Deficiency Claim,

22    CCV Cash will be the source of the redirected payments.  To the extent that distributions to Astani

23    Unsecured Claims are redirected for payment on the CCV Deficiency Claim, Estate Proceeds will

24    be the source of the redirected payments, with the CCV Deficiency Claim receiving pro rata shares

25    of Estate Proceeds allocated to both itself and Astani Unsecured Claims until the CCV Deficiency

26    Claim is paid in full.

27

28

J.    **SECURED CLAIMS OF DEBTOR'S AFFILIATES**

1.    GTS PLAN

Secured claims of affiliates of the Debtor are classified in Class 2 of the GTS Plan discussed above.

2.    CCV PLAN

All allowed secured Astani Claims are classified in Class 5 of the CCV Plan. Class 5 is unimpaired. For the avoidance of doubt, any and all allowed secured Astani Claims are classified in Class 5, regardless of whether such Astani Claim might fall within the parameters of some other class of claims under the CCV Plan. As discussed above, the Astani Secured Claims are subordinated to CCV's claims pursuant to the Guaranties. Holders of allowed Astani Secured Claims can expect payment in full, plus Postpetition Interest, from CCV Cash on the later of the CCV Plan Effective Date of the CCV Plan and the date on which such Astani Secured Claims are allowed pursuant to a final order, subject to provision for any enforceable subordination agreement, as described in more detail below. To the extent that, in such final order, the Court determines that the Astani Secured Claims are subordinated to CCV's claims pursuant to the Guaranties, such payment will be redirected to CCV on account of the CCV Deficiency Claim, if any, in enforcement of the Guaranties. To the extent that, in such final order, the Court determines that the Astani Secured Claims are not subordinated to CCV's claims pursuant to the Guaranties, such payment will be made directly to the holders of allowed Astani Secured Claims. Class 5 is therefore unimpaired and deemed to accept the CCV Plan pursuant to section 1129(f) of the Bankruptcy Code.

On December 29, 2010, Astani Construction, Inc. filed the action captioned *Astani Construction, Inc. v. Corus Construction Venture, LLC, Adv. No. 2:09-ap-01361-VZ.* (the "Astani Construction Adversary Proceeding"). An Amended Complaint was filed on January 27, 2010 (as amended, the "Astani Construction Complaint"). The Astani Construction Complaint alleges claims for relief based on (1) Determination of the Extent, Validity and Priority of the lien asserted by Corus Construction Venture, LLC, (2) Equitable subordination, (3) Enforcement of Stop Notice Claim, (4) Declaratory Relief re Priority of Stop Notice Claim, and (5) Injunctive Relief.

1    Among other things, Astani Construction asserts that its claims arise from its status as a

2    mechanic's lien holder with a claim of approximately $22,550,000 (including the mechanic's lien

3    claims of all of the subcontractors).  Similar to the complaint filed by the Committee, Astani

4    Construction alleges that the mechanic's lien claims are prior to and senior to the secured claim of

5    CCV based on the purported fact that the work of improvement on the Project was commenced

6    prior to the recordation of Corus Bank's deed of trust on July 5, 2007.

7    Further, Astani Construction alleges that its rights under a recorded stop notice makes its

8    entire $25 million claim senior to the undisbursed construction loan funds including pre-allocated

9    interest payments to be paid and that have already been paid to CCV and to Corus Bank.  Finally,

10    Astani Construction incorporates the Debtor's damage claim and alleges that it too has been

11    damaged by Corus Bank's purported conduct and, as a result, CCV's Proof of Claim should be

12    equitably subordinated to the entire claim of Astani Construction and its subcontractors.

13    CCV disputes the allegations in the Astani Construction Complaint and has asserted various

14    defenses to the claims asserted in the Astani Construction Complaint, including that Astani

15    Construction voluntarily subordinated its claim to that of CCV pursuant to the Guaranties and that

16    pursuant to Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12

17    U.S.C. § 1821(d)(2)(G)(i)(II), Astani Construction is barred from seeking relief from CCV because

18    CCV, as purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper defendant

19    because it did not expressly assume receivership liabilities of Corus Bank.  Under the CCV Plan,

20    the Astani Construction Adversary Proceeding is transferred to the Plan Administrator and shall be

21    deemed an Estate Action (defined below), unless otherwise ordered by the Court.  In the event that

22    the Court determines that the Astani Construction Adversary Proceeding is not an Estate Action, no

23    estate property may be used to fund the pursuit of the Astani Construction Adversary Proceeding.

24    **K.    UNSECURED CLAIMS OF DEBTOR'S AFFILIATES**

25    1.    GTS PLAN

26    Unsecured claims of affiliates of the Debtor are classified in Class 3 of the GTS Plan

27    discussed above.

28

70

2.    CCV PLAN

All allowed unsecured Astani Claims are classified in Class 6 of the CCV Plan.  Class 6 is impaired.  For the avoidance of doubt, any and all allowed unsecured Astani Claims are classified in Class 6, regardless of whether such Astani Claim might fall within the parameters of some other class of claims under the CCV Plan.  As discussed above, like the Astani Secured Claims, the Astani Unsecured Claims are subordinated to CCV's claims pursuant to the Guaranties.  Holders of Astani Unsecured Claims will receive payment from Estate Proceeds pro rata with the CCV Deficiency Claim on the later of the date on which Estate Proceeds become available and the date on which such Astani Unsecured Claims are allowed pursuant to final order, subject to provision for any enforceable subordination agreement, as described in more detail below.  To the extent that, in such final order, the Court determines that the Astani Unsecured Claims are subordinated to CCV's claims pursuant to the Guaranties, such payment will be redirected to CCV on account of the CCV Deficiency Claim, if any, until the CCV Deficiency Claim is paid in full, in enforcement of the Guaranties.  To the extent that, in such final order, the Court determines that the Astani Unsecured Claims are not subordinated to CCV's claims pursuant to the Guaranties, such payment will be made directly to the holders of allowed Astani Unsecured Claims.  Class 6 is therefore impaired and holders of the Astani Unsecured Claims are entitled to vote on the CCV Plan.

As discussed above, Astani Construction has raised, and CCV disputes, various claims in the Astani Construction Adversary Proceeding, which is an Estate Action (defined below) that will be transferred to the Plan Administrator.

X.    **SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS**

Each of the Plans cannot be confirmed unless the Court finds that the particular Plan is "feasible," which means that the respective Plan Proponent has timely submitted evidence establishing that there will be sufficient funds available to satisfy all expenses, including the scheduled creditor payments discussed above.  As detailed above, creditors holding allowed claims and holders of allowed administrative expenses under the GTS Plan will receive payment from Project Sale Proceeds and estate Held Cash.  In the event that minimal or no Estate Held Cash remains as of the GTS Plan Effective Date, the Debtor believes, as supported by the analyses of

71

Moran (see Exhibit A-4) and CBRE  (available for download at http://www.kccllc.net/Concerto),
that Project Sale Proceeds alone will be sufficient to pay all allowed claims and administrative
expenses in full.

As detailed above, creditors under the CCV Plan will receive payment from the Estate Held
Cash, the CCV Cash, and any Estate Proceeds.

**XI.     FINANCIAL INFORMATION TO ASSIST IN DETERMINING WHETHER
PROPOSED PAYMENT IS FEASIBLE**

In the case of the Debtor, historical financial information regarding the Debtor's operating
results prior to the commencement of this chapter 11 case is not pertinent and does not exist since
the Debtor's business primarily involves the development of the Concerto project and the sale of
condominium units at the Project.  The closing of sales of units in the Loft building began
following the Debtor obtaining Court authority, to close such sales in this chapter 11 case.

The Debtor believes that its retention of Moran, the implementation of the Sale Process, and
the valuation analyses of Moran (Exhibit A-4 hereto) and CBRE (available for download at
http://www.kccllc.net/Concerto) shall adequately support the feasibility of the GTS Plan.  The Sale
Process commenced as of September 14, 2010, and is underway, and Moran has advised that it is
reasonable and appropriate to anticipate that a sale of the Project will be consummated at a price
sufficient to pay all allowed claims and administrative expenses in full in accordance with the GTS
Plan.  Further, the Debtor and Moran believe that the Sale Process outlined above will both
maximize the value of the Debtor Project Assets within a reasonable period of time for the benefit
of the estate, creditors, and interest holders and meaningfully and appropriately expose the Project.
Assets to the market (institutional investors, in particular), which exposure will establish the actual
market, and not just an appraised, value of the Debtor Project Assets.

As discussed above, attached hereto as Exhibit A-4 is a valuation analysis prepared by
Moran reflecting a projected sales price for the Project in the range of approximately $190,000,000
- $200,000,000.  Available for download at http://www.kccllc.net/Concerto, is a summary appraisal
report prepared by CBRE concluding that the prospective market value for the Project, as of
December 1, 2010, subject to the assumptions set forth therein, is $191,200,000.

72

1    In the case of the CCV Plan, historical financial information regarding the Debtor's

2    operating results prior to the commencement of this chapter 11 case is not pertinent as payments

3    under the CCV Plan will be funded by the Estate Held Cash, the CCV Cash, and any Estate

4    Proceeds.

5    According to the monthly operating report [Docket No. 889] filed by the Debtor, as of

6    October 31, 2010, the Debtor had a cash balance of approximately $4,737,864.53.  Assuming that

7    the CCV Plan Effective Date of the CCV Plan occurs within the next few months, CCV asserts that

8    the Estate Held Cash on the CCV Plan Effective Date will likely be sufficient to cover the

9    payments due to holders of allowed Administrative Claims that remain outstanding at that time.  In

10    addition, as reflected in the certification of the Chief Accounting Officer of ST Residential, LLC

11    (which is the managing member of CCV), attached hereto as Exhibit B-3, CCV asserts that it has

12    the financial wherewithal to fulfill its payment obligations under the CCV Plan.

13    **XII.    ASSETS AND LIABILITIES OF THE ESTATE**

14        **A.    ASSETS**

15    As discussed above, the Debtor's assets consist of the Concerto development and revenues

16    generated from the Project.  The development is a two-phase, mixed-use (residential and retail)

17    development.  The site is located at the southeast corner of Figueroa Street and 9th Street.  The

18    Project (Phase I) consists of Tower I (containing 271 residential units and retail and storage space),

19    the Loft (containing 77 residential units and retail and storage space), and the Parking Garage (a

20    seven-story partly underground parking structure).  A phase II of the Concerto development

21    consisting of Tower II (a second 30-story tower) is contemplated for the future, and its

22    infrastructure (including subterranean parking, elevator shafts, DWP vaults, excavation, shoring

23    and some foundation) has been completed, but further construction has not been commenced.

24    The Debtor and CCV have differing opinions as to the value of the Project.

25        1.    DEBTOR'S VALUATION OF THE PROJECT

26    Attached hereto as Exhibit A-4 is a valuation analyses prepared by Moran and available for

27    download at http://www.kccllc.net/Concerto is a "Summary Appraisal Report" (the "CBRE

28    Appraisal Report") prepared by CBRE.  The resume of Moran's California office is attached hereto

73

1   as Exhibit A-3.  The qualifications of the CBRE experts who prepared the CBRE Appraisal Report,

2   Messrs. Zoraster and Moniz, are set forth in detail in Addendum B appearing at the end of the

3   CBRE Appraisal Report.  As discussed above, Moran's valuation analysis (see Exhibit A-4 hereto)

4   concludes with a range of value for the net sales price for the Project of approximately

5   $190,000,000 - $200,000,000.  The CBRE Appraisal Report (available for download at

6   http://www.kccllc.net/Concerto) concludes that the prospective market value of the Project (with

7   Tower I as an apartment tower), as of December 1, 2010, will be $191,200,000.  The CBRE

8   Appraisal Report references CBRE's prior appraisal report (available for download at

9   http://www.kccllc.net/Concerto) on the Project and CBRE's prior liquidation analysis for the

10  Project.  CBRE's prior appraisal report was attached as Exhibit 9 (available for download at

11  http://www.kccllc.net/Concerto) and CBRE's prior liquidation analysis was attached as Exhibit 15

12  to the Debtor's Second Amended Disclosure Statement and Plan [Docket No. 252 in the Debtor's

13  chapter 11 case].

14          2.      CCV'S VALUATION OF THE PROJECT

15          Available for download at http://www.kccllc.net/Concerto is a "Summary Appraisal

16  Report" prepared by valuation experts working with CCV (the "April CCV Appraisal Report")

17  setting forth the "as-is" value of the Project, as $122,000,000 as of April 6, 2010 and a value of

18  $146,000,000 for the Project upon completion, assuming the individual units of the Project are sold

19  exclusively as condominiums.  The experts who prepared the April CCV Appraisal Report are with

20  the firm of Cushman & Wakefield, Inc.  The experts are James H. Pike and Michele Kauffman.

21  The qualifications of Mr. Pike and Ms. Kauffman are set forth in detail in Addendum A appearing

22  at the end of the April CCV Appraisal Report.  The Debtor has recently advised CCV that it

23  intends to file a plan of liquidation involving the sale of the Project in bulk, for possible use as an

24  apartment complex.  See Joint Status Report (defined below) at 6.  This change in strategy from the

25  Debtor's previous stated intention of selling individual units in the Project as condominiums could

26  result in a change in the value of the Project.

27          In connection with the Relief from Stay Motion, CCV's valuation experts prepared an

28  updated "Summary Appraisal Report" (the "October CCV Appraisal Report") setting forth the "as

74

is" value of the Project, as $150,000,000 as of September 30, 2010 and a value of $163,000,000 for

the Project upon completion, assuming the Project is the condominium units are rented as

apartments.  The October CCV Appraisal Report is also available for download at

http://www.kccllc.net/Concerto.

**B.    LIABILITIES**

The bar date for filing proofs of claim was January 29, 2010.  The deadline for hearings on

objections to claims is June 30, 2010.  As set forth above, CCV has filed a proof of claim in the

sum of $162,662,216.26.  The Debtor has objected to this claim and asserts that the claim should

be reduced by a sum of at least $46,000,000.  According to the Debtor, other allowable claims

(mechanics' lien and general unsecured claims) against the Debtor (not including the CCV claim)

amount to approximately $22,162,000.  Of that sum, approximately $21,400,000 (including a

$2,550,000 claim of Astani Construction, Inc.) are allowed mechanics' lien claims and

approximately $762,000 are allowed general unsecured claims.  The Debtor filed a number of

objections to claims in this case.  All objections filed by the Debtor have been resolved, except for

the pending objection to the claim of CCV.  Attached hereto as Exhibit A-7 is a list of the Debtor's

accounts payable, according to the Debtor's books and records, as of the commencement of the

Debtor's chapter 11 case.  Attached hereto as Exhibit A-5 is a list prepared by the Debtor of

mechanics' lien claims for work performed, or services, equipment, and/or materials provided with

respect to the Project.  Attached hereto as Exhibit A-6 is a list prepared by the Debtor of general

unsecured claims.

As discussed above, attached hereto as Exhibit B-1 is a list prepared by CCV of mechanic's

lien claims, for work performed, or services, equipment, and/or materials provided with respect to

the Project.  Also attached hereto as Exhibit B-2 is a list prepared by CCV of asserted general

unsecured claims to date.  Exhibit B-2 was compiled by counsel for CCV based on information

contained in the Denied Debtor Plan, court filings in this case and other available information.  The

"Payable Amounts" for claimants in Exhibit B-1 and Exhibit B-2 are subject to final Court

allowance.

1   Under the CCV Plan, to the extent those objections are not resolved by the CCV Plan

2   Effective Date, the Plan Administrator (defined below) will succeed to the Debtor's rights with

3   respect to the unresolved objections, and CCV will have the right to join such objections on or

4   before the CCV Plan Effective Date.  In addition, CCV intends to file a motion seeking

5   reconciliation of various claims in this case and clarification from the Court on the allowed

6   amounts of such claims.

7       **C.    SUMMARY**

8   The Debtor's asserts that its assets (Phase I and Phase II of the Concerto development) have

9   an estimated value ranging from $191,000,000 - $200,000,000.  The Debtor also asserts that total

10  liabilities (assuming that CCV's claim is not disallowed in part and reduced, including the

11  $2,550,000 claim of Astani Construction, Inc., and including $575,000 of estimated administrative

12  expenses not paid from Estate Held Cash) are in the estimated approximate amount of

13  $184,737,000.

14  CCV believes that the Debtor's assets have an estimated "as-is" value of $154,737,864.53

15  ($150,000,000 for the Project and approximately $4,737,864.53[15] of cash on hand) and that total

16  liabilities are estimated to be $187,865,241.

17  **XIII.   TREATMENT OF NONCONSENTING CLASSES**

18  As stated above, even if all classes do not consent to the proposed treatment of their claims

19  under a particular Plan, that Plan may nonetheless be confirmed if the dissenting classes are treated

20  in a manner prescribed by the Bankruptcy Code.  The process by which dissenting classes are

21  forced to abide by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy

22  Code allows dissenting classes to be crammed down if a Plan does not "discriminate unfairly" and

23  is "fair and equitable."  The Bankruptcy Code does not define discrimination, but it does provide a

24  minimum definition of "fair and equitable." The term can mean that secured claimants retain their

25  liens and receive cash payments whose present value equals the value of their security interest.  For

26  example, if a creditor lends the Debtor $100,000 and obtains a security interest in property that is

27  ─────────────

28  [15] This estimate is based on the cash balance as of October 31, 2010, as set forth in the
monthly operating report [Docket No. 889] filed by the Debtor.

626760.11-Los Angeles Server 2A - MSW

1   worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash

2   payments whose present value equals $80,000 and not $100,000.  The term means that unsecured

3   claimants whose claims are not fully satisfied at least know that no claim or interest that is junior to

4   theirs will receive anything under the Plan, except where the Debtor is an individual, has elected to

5   retain property included in the Estate under 11 U.S.C. § 1115 and has satisfied 11 U.S.C. §

6   1129(b)(2)(B)(ii).  "Fair and equitable" means that each holder of an interest must receive the value

7   of such interest or else no junior interest is entitled to receive anything.

8       Therefore, if a class of general unsecured claims votes against a Plan, that Plan cannot be

9   confirmed where a class of interest holders (e.g. shareholders or partners) will receive or retain any

10  property under the Plan on account of such interests, unless the Plan provides that the class of

11  general unsecured claims shall be paid in full with interest.  These are complex statutory provisions

12  and the preceding paragraphs do not purport to state or explain all of them.

13
    **XIV.    TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS**
14  **    (CHAPTER 7 LIQUIDATION ANALYSIS)**

15      The GTS Plan and the CCV Plan must provide that a nonconsenting impaired claimant or

16  interest holder of a' consenting class receive at least as much as would be available had the Debtor

17  filed a Chapter 7 petition instead.

18      In a Chapter 7 case the general rule is that the Debtor's assets are sold by a trustee.

19  Unsecured creditors generally share in the proceeds of sale only after secured creditors and

20  administrative claimants are paid.  Certain unsecured creditors get paid before other unsecured

21  creditors do.  Unsecured creditors with the same priority share in proportion to the amount of their

22  allowed claim in relationship to the total amount of allowed claims.

23      Generally, a creditor would recover from the assets of the bankruptcy estate less under

24  Chapter 7 than under Chapter 11 for various reasons..  First, the liquidation value of an asset is

25  frequently less than its fair market value when a liquidation sale would take place on an expedited

26  or short-term basis and/or under what prospective purchasers are likely to perceive as a distressed

27  sale or "fire sale" situation.  In this case, the Debtor believes that the sale of the Debtor Project

28  Assets pursuant to the sale process outlined in the GTS Plan is the best means under the

77

1   circumstances for maximizing the value of the Project and the recoveries available for creditors and

2   equity interest holders of the Debtor, and will provide creditors with a greater return than they

3   would receive in a chapter 7 liquidation.  CCV believes that the Estate Held Cash, the CCV Cash,

4   and any Estate Proceeds will provide creditors under the CCV Plan with a far greater return that

5   they would receive in a chapter 7 liquidation.  There is no certainty regarding whether a chapter 7

6   trustee appointed to liquidate the Debtor's assets would have familiarity or expertise with regard to

7   conducting such a liquidation.  Further, the Debtor and CCV fear that the general impression of

8   prospective buyers in the context of the conversion of the Debtor's chapter 11 case to a chapter 7

9   liquidation would be that the liquidation is taking place in a distressed "fire sale" environment and

10  potential buyers would likely expect a substantial discount from otherwise potentially obtainable

11  values.

12         Second, in a chapter 7 case a trustee is appointed and is entitled to compensation from the

13  bankruptcy estate in an amount no more than 25% of the first $5,000 of all moneys disbursed, 10%

14  on any amounts over $5,000 and up to $50,000, 5% on all amounts over $50,000 and up to

15  $1,000,000, .and such reasonable compensation no more than 3% of moneys over $1,000,000.  In

16  this case, the trustee's fee would amount to millions of dollars.  For purposes of the liquidation

17  analysis chart set forth below, the Debtor and CCV have estimated the chapter 7 trustee's fee to be

18  $5,000,000.  Moreover, the chapter 7 trustee would employ professionals adding another layer of

19  administrative expense on the estate.  This additional layer of expense could also amount to

20  millions of dollars.  For purposes of the liquidation analysis chart set forth below, the Debtor and

21  CCV have estimated the sum, of this additional layer (chapter 7 professional fees) of administrative

22  expense to be $1,000,000.

23         **A.      DEBTOR'S LIQUIDATION ANALYSIS FOR GTS PLAN**

24         For purposes of the liquidation analysis chart set forth below, the Debtor has assumed that

25  the secured claim of CCV is not materially reduced and is allowed in the amount of $162,000,000.

26         In this case, the Debtor believes that creditors will be paid in full under the Debtor's chapter

27  11 Plan and has serious concerns that payments would be jeopardized and diminished in a chapter

28  7 scenario.  The Debtor believes that total payment will be substantially greater and payments

1   made more quickly and with greater certainty pursuant to the Debtor's chapter 11 plan than in the

2   situation where an unknown chapter 7 trustee would come in to take over control of the Debtor's

3   assets.

4        The value of the Debtor's assets set forth in the liquidation analysis chart below considers

5   the value conclusions reached by Moran (Exhibit A-4 hereto) and CBRE (available for download at

6   http://www.kccllc.net/Concerto) in their respective valuation analyses of the Project.  As discussed

7   above, Moran concludes with a range of value from approximately $190,000,000 - $200,000,000

8   and CBRE concludes with a prospective market value of $191,200,000, as of December 1, 2010.

9   See the Moran valuation analysis attached hereto as Exhibit A-4 and the CBRE Appraisal Report,

10   available for download at http://www.kccllc.net/Concerto.  For purposes of the liquidation analyses

11   appearing below the Debtor uses the figure of $195,000,000 as the chapter 11 value of the Project.

12   CBRE has also done a prospective liquidation value analysis of the Project (assuming Tower I as

13   an apartment tower), as of December 1, 2010, and concluded that the prospective liquidation value

14   of the Project, as of December 1, 2010, is $166,000,000.  This is the figure used in the below

15   liquidation analysis for the Debtor's projected value of the Project in a chapter 7 liquidation.  The

16   CBRE Appraisal Report (available for download at http://www.kccllc.net/Concerto) references

17   CBRE's prior appraisal report and liquidation report for the Project which were attached as

18   Exhibits 9 and 15, respectively, to the Debtor's Second Amended.  Disclosure Statement and Plan

19   [Docket No. 252 in the Debtor's chapter 11 case].  See the CBRE Appraisal Report, available for

20   download at http://www.kccllc.net/Concerto.  It is not assumed that any material Estate Hold Cash

21   will remain as of the GTS Plan Effective Date.  The claim amounts set forth in the liquidation

22   analysis chart below are discussed above and are the same in chapter 7 and chapter 11 with respect

23   to approximate total allowed mechanics' lien claims ($21,400,000), potential allowed CCV secured

24   claim ($162,000,000), and approximate total allowed general unsecured claims ($762,000).  As

25   discussed above, an additional $6,000,000 in administrative expenses ($1,000,000 for professional

26   fees and $5,000,000 for the chapter 7 trustee fee) are projected in the event of a chapter 7

27   liquidation.  Under the Debtor's chapter 11 plan all creditors are paid in full.  In a chapter 7

28

liquidation, the Debtor projects that creditors holding general unsecured claims will receive nothing.  This liquidation analysis is reflected as follows:

| | | Chapter 7 (Debtor's Valuation of Project) | GTS Plan |
|---|---|---|---|
| 1 | Value of assets | $166,000,000 | $195,000,000 |
| 2 | Administrative expenses | $(1,575,000) | $(575,000) |
| 3 | Mechanic's lien claims | $(21,400,000) | $(21,400,000) |
| 4 | CCV secured claim | $(162,000,000) | $(162,000,000) |
| 5 | Priority unsecured claims | none | none |
| 6 | Chapter 7 trustee fee | $(5,000,000) | n/a |
| 7 | General Unsecured Claims | $(762,000) | $(762,000) |
| | Amount of deficiency (claims left unpaid) for payment of creditors in chapter 7 liquidation (general unsecured creditors receive nothing in chapter 7 liquidation) | $(24,737,000) | All Creditors Paid in Full |
| | Percentage of payment of allowed general unsecured claims under GTS plan | | 100% |
| | Percentage of payment of allowed mechanics' lien claims under GTS Plan | | 100% |

**B.    CCV'S LIQUIDATION ANALYSIS FOR CCV PLAN**

CCV believes that total payment will be substantially greater and payments made more quickly and with greater certainty pursuant to the CCV Plan than in the situation where an unknown chapter 7 trustee would come in to take over control of the Debtor's assets.

The October CCV Appraisal Report, available for download at http://www.kccllc.net/Concerto, sets forth the "as-is" value of the Project as of October 31, 2010 as $150,000,000.  James H. Pike and Michele Kauffman of the firm of Cushman & Wakefield, Inc. are the experts who prepared the October CCV Appraisal Report.  The qualifications of Mr. Pike

626760.11-Los Angeles Server 2A - MSW

1  and Ms. Kauffman are set forth in detail in Addendum A appearing at the end of the October CCV

2  Appraisal Report.

3          The value of the Debtor's assets set forth in the liquidation analysis chart below includes

4  (i) for the chapter 7 liquidation asset value, the value conclusion for the Project in the October

5  CCV Appraisal Report ($150,000,000) plus estimated cash on hand of approximately

6  $4,737,864.53[16] and (ii) for the value of the Debtor's assets in a chapter 11 reorganization under

7  the CCV Plan, the value conclusion in the October CCV Appraisal Report ($150,000,000) plus

8  projected cash on hand as of the CCV Plan Effective Date in the approximate sum of

9  4,737,864.53[17] plus the CCV Cash in the approximate total amount of $23,120,000 to be paid to

10 holders of allowed Class 2 claims (approximately $22,580,000, inclusive of postpetition interest),

11 and allowed Class 3 Claims (approximately $540,000).  The claim amounts set forth in the

12 liquidation analysis chart below are discussed above and are the same in chapter 7 and chapter 11

13 with respect to estimated total mechanic's lien claims ($22,580,000, inclusive of postpetition

14 interest), potential allowed CCV secured claim ($162,662,216), and estimated allowed general

15 unsecured claims ($540,000).  As discussed above, an additional $6,000,000 in administrative

16 expenses ($1,000,000 for professional fees and $5,000,000 for the chapter 7 trustee fee) are

17 projected in the event of a chapter 7 liquidation.  Under the CCV Plan, all creditors other than CCV

18 and the Astani Parties (unless the Court determines that their claims are not subordinated to CCV's

19 claims under the Guaranties) will be paid the full amounts of their allowed claims.  In a chapter 7

20 liquidation scenario, CCV projects that there would be a deficiency of approximately

21 $38,787,351.47 of claims that would go unpaid and that creditors holding general unsecured claims

22 would receive nothing.  This liquidation analysis is reflected as follows:[18]

23

24  _____

25      [16] This estimate is based on the cash balance as of October 31, 2010, as set forth in the
monthly operating report [Docket No. 889] filed by the Debtor.

26      [17] This estimate is based on the cash balance as of October 31, 2010, as set forth in the
27  monthly operating report [Docket No. 889] filed by the Debtor.

28      [18] The information set forth in this chart is for comparison purposes only and is without
prejudice to CCV's rights to contest the validity and/or amounts of any claims included therein.

|  | Chapter 7 (October CCV Appraisal Report Valuation of Project) | Chapter 11 |
|---|---|---|
| 1. Value of assets | $154,737,864.53[19] | $177,857,864.53[20] |
| 2. Administrative expenses[21] | $(2,743,000) | $(1,743,000) |
| 3. Mechanic's lien claims | $(22,580,000)[22] | $(22,580,000) |
| 4. CCV secured claim | $(162,662,216)[23] | $(162,662,216) |
| 5. Priority unsecured claims | none | none |
| 6. Chapter 7 trustee fee | $(5,000,000) | n/a |
| 7. General Unsecured Claims | $(540,000)[24] | $(540,000) |

[19] This amount was calculated by adding the value conclusion for the Project in the October CCV Appraisal Report ($150,000,000) to the estimated cash on hand of approximately $4,737,864.53.

[20] This total is comprised of the value conclusion for the Project in the October CCV Appraisal Report ($150,000,000), estimated cash on hand of approximately $4,737,864.53, and the CCV Cash to be paid to holders of allowed Class 2 claims, including postpetition interest, and allowed Class 3 claims in the estimated total amount of $23,120,000.

[21] Generally, in chapter 7, administrative claimants are paid after claimants holding valid liens on collateral. Administrative claimants are typically paid from unencumbered assets unless there is a surcharge of collateral under section 506(c) of the Bankruptcy Code, which CCV does not believe to be likely in this case.

[22] This amount excludes Astani Secured Claims, which are classified in Class 5, but includes postpetition interest.

[23] This amount is before application of post-petition adequate protection payments made by the Debtor to CCV, however, because neither of the scenarios above consider adequate protection payments, the conclusions of this liquidation analysis are unaffected.

[24] This amount is an estimate of the allowed amount of general unsecured claims based, in part, on information contained in the Denied Debtor Plan and other filings in this case and excludes Astani Unsecured Claims, which are classified in Class 6. (See Denied Debtor Plan at 63.)

| | | |
|---|---|---|
| Amount of deficiency (claims left unpaid) for payment of creditors in chapter 7 liquidation (general unsecured creditors receive nothing in chapter 7 liquidation) | $(38,787,351.47) | $(9,667,351.47) |
| Percentage of payment of non-subordinated allowed general unsecured claims under CCV Plan | | 100% |
| Percentage of payment of non-subordinated allowed mechanic's lien claims under CCV Plan | | 100% |

As reflected above, general unsecured creditors would receive nothing in a chapter 7 liquidation. In contrast, General Unsecured Claims in Class 3 under the CCV Plan will be paid in full from the CCV Cash under the CCV Plan.

## XV.    FUTURE DEBTOR

### A.    MANAGEMENT OF DEBTOR

The Debtor will continued to be managed by Concerto Manager, Inc. (the "Manager"), the current manager of the Debtor. Sonny Astani is the President of Concerto Manager, Inc., and is a controlling equity holder in or an affiliate of persons or entities holding the majority of the equity interests in the Debtor.

As set forth above, the Debtor asserts that Astani Enterprises, Inc. is the driving force behind GTS. The Debtor believes that through its subsidiaries and affiliates, Astani Enterprises, Inc. is downtown Los Angeles' largest residential real estate developer, as well as the owner and operator of more than 5,000 apartment units throughout Southern California and the current developer of 1,700 units of apartments, condominiums and mixed-use projects in, among other areas, downtown Los Angeles, Hollywood, Encino, and elsewhere, collectively valued at more than $500,000,000. Sonny Astani is the Chairman and President of Astani Enterprises, Inc.

1 According to the Debtor, Sonny Astani has more than 30 years of real estate experience in the

2 Southern California and Baja Mexico areas, and has been involved in the acquisition, development,

3 construction and management of more than $1,000,000,000 of multi-family buildings and

4 condominiums, including 5,000 new units in the City of Los Angeles.

5      Astani Construction, Inc., a California corporation and affiliate of Astani Enterprises, Inc.,

6 is the general contractor of the Concerto project.  The Debtor contends that Astani Construction,

7 Inc., through its principals, has a successful track record of 30 years of building, developing and

8 renovating more than $1,000,000,000 worth of apartment buildings, condominiums, custom homes,

9 tenant improvements, and commercial enterprises throughout the United States.

10      **B.**    **DISBURSING AGENT (GTS PLAN ONLY)**

11      Under the GTS Plan, the Manager of the Debtor, Concerto Manager, Inc., shall serve as

12 disbursing agent under the GTS Plan and is responsible for collecting money intended for

13 distribution to claimants and transmitting it to them.

14      **C.**    **PLAN ADMINISTRATOR (CCV PLAN ONLY)**

15      Under the CCV Plan, Peter S. Kravitz shall serve as the plan administrator (the "Plan

16 Administrator").  Mr. Kravitz's qualifications are listed on Exhibit B-4.  The Plan Administrator is

17 an independent third-party who was recommended by counsel to the Committee.  CCV and its

18 counsel have had no prior relationship with the Plan Administrator.  The Plan Administrator will be

19 paid 3% of Estate Proceeds remaining after payment of fees and expenses of the Plan

20 Administrator and his advisors ("Distributable Estate Proceeds").  In addition, the Plan

21 Administrator will be entitled to guaranteed monthly minimum fees (the "Monthly Minimums") for

22 up to 18 months as follows:  $15,000 per month for the first six months after the CCV Plan

23 Effective Date, $7,500 per month for the next six months thereafter and $2,500 for the next six

24 months thereafter.  The Plan Administrator will credit the Monthly Minimums against the 3% of

25 Distributable Estate Proceeds payable to himself, but no portion of the Monthly Minimums will be

26 refundable in the event that they exceed the 3% of Distributable Estate Proceeds payable to the

27 Plan Administrator.  Fees and expenses for the Plan Administrator's advisors will be paid, up to

28 $1,000,000, from the Administrative Claims Reserve. Compensation of the Plan Administrator will

1  be paid from the Administrative Claims Reserve and Estate Proceeds.  The Plan Administrator's

2  address and telephone number are: 9952 S. Santa Monica, Beverly Hills, CA 90212; (909) 964-

3  0643.

4      On the CCV Plan Effective Date, the Estate Actions shall be transferred to the Plan

5  Administrator.  The Plan Administrator shall (1) investigate Estate Actions and may, in the

6  exercise of his reasonable business judgment, prosecute and/or settle the Estate Actions, and (2)

7  distribute the Estate Proceeds in accordance with the terms of this CCV Plan.  As noted above, the

8  Astani Construction Adversary Proceeding shall be deemed an Estate Action, unless otherwise

9  ordered by the Court, and shall be transferred to the Plan Administrator.  In the event that the Court

10  determines that the Astani Construction Adversary Proceeding is not an Estate Action, no estate

11  property may be used to fund the pursuit of the Astani Construction Adversary Proceeding.  On the

12  CCV Plan Effective Date, the Debtor and the Astani Parties shall turn over any and all information

13  and documents in their possession relating to any Estate Actions to the Plan Administrator.

14      CCV believes that all payments made by the Debtor within ninety (90) days before the

15  Petition Date were made in the ordinary course of business.  Accordingly, the Plan Administrator

16  shall not investigate or pursue any avoidance actions arising from payments made during the ninety

17  days before the Petition Date.

18      As noted above, the Plan Administrator has until the Administrative Claims Objection

19  Deadline to file objections to asserted Administrative Claims.  The Plan Administrator shall hold

20  $1,750,000 in the Administrative Claims Reserve for payment of allowed Administrative Claims,

21  and shall remit all other cash of the Debtor to CCV as soon as practicable, but in no case later than

22  the twentieth (20th) day after the Administrative Claims Bar Date.  If an Administrative Claim is

23  allowed in an amount lower than the claimed amount, the Plan Administrator shall remit the

24  difference from the Administrative Claims Reserve to CCV within five (5) days following the

25  Court's entry of an order, or the Plan Administrator's entry into an agreement, allowing such

26  Administrative Claim.

27      The Plan Administrator shall make distributions of Estate Proceeds in accordance with the

28  terms of this CCV Plan at such times as the Plan Administrator deems appropriate in light of the

1  amount of Estate Proceeds available at any given time and costs of making a distribution at such

2  time.  Upon reasonable request by any party with an interest in the Estate Proceeds, the Plan

3  Administrator shall provide an accounting of the Estate Proceeds.  Nothing in this CCV Plan shall

4  prohibit any party with an interest in the Estate Proceeds from requesting that the Plan

5  Administrator make a distribution of Estate Proceeds or, if the Plan Administrator refuses to do so,

6  filing with the Court a motion to compel a distribution.

7          **D.**      **FUTURE FINANCIAL OUTLOOK**

8          The future financial outlook of the Debtor and the Project is not pertinent to either the GTS

9  Plan or the CCV Plan. Under the GTS Plan, creditors will be paid from Project Sale Proceeds and

10  Estate Held Cash.  Claims against the Debtor will be discharged as of the GTS Plan Effective Date

11  and creditors will hold no ongoing interest in the Project or the Debtor Project Assets.  Under the

12  CCV Plan, creditors will be paid solely from the Estate Held Cash and the CCV Cash.  Claims

13  against the Debtor will be discharged as of the CCV Plan Effective Date, and creditors will hold no

14  interests in the Project or the CCV Project Assets.

15  **XVI.    SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND
       LEASES; OTHER PROVISIONS**

16

17          1.      THE GTS PLAN

18          Pursuant to section 363(f) of the Bankruptcy Code, the Debtor Project Assets shall be sold

19  under the GTS Plan free and clear of any and all liens, claims, interests, and encumbrances for a

20  purchase price sufficient to pay all allowed claims and administrative expenses in full.  The Debtor

21  believes that the Sale Process outlined above will both maximize the value of the Debtor Project

22  Assets within a reasonable period of time for the benefit of the estate, creditors and interest holders

23  and meaningfully and appropriately expose the Debtor Project Assets to the market, which

24  exposure will establish the actual market, and not just an appraised, value of the Debtor Project

25  Assets.  The Debtor contends that the sale of the Debtor Project Assets shall close no later than

26  twenty five (25) days following the Confirmation Date.

27          The Debtor is authorized under the GTS Plan to execute all documents necessary to transfer

28  title to the Debtor Project Assets to the purchaser(s) of the Debtor Project Assets, including, but not

86

limited to all affidavits, documents, instruments of conveyance or other agreements as are determined necessary to fully transfer and convey all of Debtor's right, title and interest in and to the Debtor Project Assets.  The sale of the Debtor Project Assets is to be authorized at the Confirmation Hearing or at a hearing on a motion brought by the Debtor pursuant to section 363 of the Bankruptcy Code that takes place prior to the hearing on confirmation of the GTS Plan.  Prior to the GTS Plan Effective Date, the purchaser(s) of the Debtor Project Assets must identify any executory contract or lease for assumption and assignment.  If the purchaser(s) identifies any executory contract or lease for assumption and assignment, the Debtor shall promptly file a motion for approval of such assumption and assignment.  Notwithstanding the foregoing, purchase of the Debtor Project Assets shall not be conditioned upon such assumption and assignment.

As of the GTS Plan Effective Date of the GTS Plan, all remaining executory contracts and unexpired leases of the Debtor that are not identified by the purchaser(s) of the Debtor Project Assets for assumption and assignment shall be deemed rejected.

As the owner and developer of a construction project, the Debtor entered very few contracts directly.  The general contractor for the Project, Astani Construction, Inc., entered into contracts with subcontractors and the subcontractors entered contracts with sub-subcontractors, vendors and suppliers, All or virtually all such parties have mechanics' lien rights with respect to the Project.  The Debtor does not believe that the assumption and rejection of executory contracts to which the Debtor is a party has a material impact on the GTS Plan.  Very few such contracts exist.

The Court must make certain findings of fact before approving the GTS Plan.  The Proponent will request that the Court make the appropriate findings at the confirmation hearing, based, upon evidence submitted in support of the confirmation motion.

2.     THE CCV PLAN

Under the CCV Plan, the CCV Project Assets shall be transferred to CCV free and clear of any and all liens, claims, interests, and encumbrances that are dealt with by the CCV Plan.  CCV is authorized, and the Debtor is authorized and directed, to execute all documents necessary or appropriate to fully transfer all of the Debtor's right, title, and interest in and to the CCV Project

626760.11-Los Angeles Server 2A - MSW

1  Assets from the Debtor to CCV, including, but not limited to, all affidavits, documents, instruments

2  of conveyance, and other agreements as CCV determines are necessary or appropriate.

3       As of the CCV Plan Effective Date of the CCV Plan, all remaining executory contracts and

4  unexpired leases of the Debtor that CCV has not designated for assumption by the Debtor and

5  assignment to CCV shall be deemed rejected.

6       The Court must make certain findings of fact before approving the CCV Plan.  The

7  Proponent will request that the Court make the appropriate findings at the Confirmation Hearing,

8  based upon evidence submitted in support of the Confirmation Motion.

9  **XVII.  BANKRUPTCY PROCEEDINGS**

10       **A.  COMMENCEMENT OF CASE**

11       The Debtor commenced its reorganization case by filing a voluntary chapter 11 petition on

12  September 17, 2009..  Following the commencement of the Debtor's chapter 11 case, the Court

13  approved the Debtor's employment of SulmeyerKupetz, a professional corporation, as bankruptcy

14  counsel and Parker, Milliken, Clark, O'Hara & Samuelian, A Professional Corporation, as special

15  corporate and litigation counsel.  On October 16, 2009, pursuant to the "Notice of Appointment

16  and Appointment of Committee of Creditors Holding Unsecured Claims", the United States

17  Trustee appointed a creditors committee in this case.  The Committee's retention of Venable LLP

18  as counsel and the Committee's retention of Grant Thornton LLP as financial advisor have been

19  approved by the Court.

20       **B.  LOFT UNITS SALE AND CASH COLLATERAL MOTIONS**

21       On October 1, 2009, the Debtor filed two related motions.  One motion (the "Sale Motion")

22  requested that the Court authorize the Debtor to complete the 77 pending sales (and to complete

23  sales substitute back-purchasers, if necessary, in the event that any pending buyers fail to perform)

24  of all units in the Debtor's low-rise loft structure by authorizing the Debtor's assumption (subject

25  to the Court approving these sales free and clear of interests) of sales contracts and approving the

26  sales free and clear of interests, with all liens to attach to the sale, proceeds with the same validity,

27  priority, and perfection as existed with respect to the residential units to be sold.  Pursuant to the

28  second motion (the "Cash Collateral Motion"), the Debtor requested that the Court authorize the

use of cash collateral (the net proceeds of the sale of the Residential Loft Units) in order to complete construction of phase I of the Concerto project, with the secured lender and any other lien holders to receive replacement liens on postpetition improvements to the collateral and the proceeds therefrom.

The FDIC (as receiver for Corus Bank) filed objections to both the Sale Motion 'and the Cash Collateral Motion.  However, the FDIC's participation with respect to these motions was short lived.  On October 7, 2009, Starwood Capital Group ("Starwood") issued a press release stating that Starwood, TPG Capital, Perry Capital and WLR and LeFrak had reached a definitive agreement with the FDIC to acquire an equity interest in a limited liability company that will hold construction loans and real estate owned assets formerly owned by Corus Bank.  On October 16, 2009 their sale contract was finalized and signed.  The Debtor's construction loan was one of the significant assets acquired by a newly formed joint entity consisting of the FDIC and the Starwood-lead investment consortium.  A true and correct copy of the Press Release is attached hereto as Exhibit A-8.  Among other things, the Press Release stated that the transaction equated to approximately 60% of unpaid principal balance and a significantly greater discount to total construction costs, that the FDIC will hold a 60% equity interest in the newly formed CCV, and will provide financing with a 0% coupon for 50% of the purchase price to CCV.  The Debtor is informed that Starwood will also receive a $50,000,000 annual management fee to oversee the day-to-day management of CCV.  The Debtor believes that the $162,000,000 loan was placed into CCV at a discount value of $85,000,000 or $0.50 per dollar.

Prior to the hearing on the Sale Motion and the Cash Collateral Motion, the Debtor commenced discussions with CCV and ultimately agreed on orders to be entered by the Court with respect to the Sale Motion and the Cash Collateral Motion.  At a hearing on October 29, 2009, the Court announced that it was granting approval of the Sale Motion and the Cash Collateral Motion and on October 30, 2009, orders were entered granting the motions.  As of September 20, 2010, the Debtor has paid CCV $10,532,000 in post-petition payments.  On or about January 18, 2010, CCV, the Debtor, and the Committee agreed on a modified budget.  On January 19, 2010, the Debtor filed a notice with the Court, stating that agreement had been reached on a modified budget and

1  attaching a copy of the modified budget.  This budget was later modified by the Court's Order

2  Regarding Motion by Debtor for Order Modifying Adequate Protection Payments to Corus

3  Construction Ventures LLC [Docket No. 378] and Order Approving Stipulation Re Modified

4  Budget in Connection with Order Granting Debtor's Motion Authorizing Use of Cash Collateral

5  and Related Relief [Docket No. 718].

6        The order approving the Cash Collateral Motion set a deadline of 60 days from the date of

7  submission of documentation by CCV to the Debtor and the Committee (December 29, 2009) for

8  parties to object to the claim of CCV and/or assert claims against CCV.

9        **C.**     **CLAIM OF CCV**

10        On October 29, 2009, CCV filed a Proof of Claim in this, chapter 11 case in the amount of

11  $162,662,216.26, which has been assigned claim number 16 in the claims register in this case.

12  Thereafter, on January 29, 2010, CCV filed an amended proof of claim.  The amendment did not

13  change the amount of the claim asserted by CCV.  The Proof of Claim is based upon a Promissory

14  Note dated as of July 2, 2007 given by the Debtor to Corus Bank, which is CCV's predecessor in

15  interest, and the Deed of Trust given by the Debtor to Corus Bank.  Both the Promissory Note and

16  the Deed of Trust reference the underlying Construction Loan Agreement between the Debtor and

17  Corus Bank.

18        **D.**     **DEBTOR'S COMPLAINT AND OBJECTION TO CLAIM OF CCV**

19        In response to CCV's Proof of Claim, the Debtor filed on December 29, 2009 a Complaint

20  and Objection to Claim against CCV thereby commencing the Debtor Adversary Proceeding.  The

21  complaint, as amended on February 3, 2010 (the "Debtor Complaint"), alleges that the claim filed

22  by CCV should be reduced because of the purported misconduct of Corus Bank in the

23  administration of the construction loan.  The Debtor thus alleges that CCV's Proof of Claim should

24  be disallowed to the extent of damages purportedly caused by and defenses purportedly resulting

25  from Corus Bank's alleged breaches of its contractual obligations and alleged breaches of the

26  implied covenant of good faith and fair dealing arising from the Loan Agreement and related

27  documents.

28

626760.11-Los Angeles Server 2A - MSW

1    The Debtor Complaint asserts claims for (1) declaratory relief as to the amount of the CCV

2    claim, (2) offset and recoupment of damages against the loan amount, and (3) equitable

3    subordination of the CCV claim and lien to the claims of creditors holding allowed secured and

4    unsecured claims against the Debtor.  The Debtor Complaint alleges that, as a result of Corus

5    Bank's actions and inactions, the Debtor has been damaged in an amount to be determined, but

6    believed to be in excess of $46,000,000.  The Objection to Claim asserts that CCV's claims should

7    be reduced to the extent of the damages caused by the purported conduct of CCV's predecessor and

8    assignor, Corus Bank.  CCV disputes the allegations in the Debtor Complaint and has asserted

9    various defenses to the claims asserted in the Debtor Complaint, including that, pursuant to

10    FIRREA, 12 U.S.C. § 1821(d)(2)(G)(i)(II), the Debtor is barred from seeking relief from CCV

11    because CCV, as purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper

12    defendant because it did not expressly assume receivership liabilities of Corus Bank.

13    As discussed above, the Debtor filed the Consolidation Motion in the FDIC District Court

14    Proceeding seeking, among other things, withdrawal of the District Court's reference of the Debtor

15    Adversary Proceeding to the Bankruptcy Court and consolidation of the Debtor Adversary

16    Proceeding with the FDIC District Court Proceeding.  In the FDIC District Court Proceeding, the

17    District Court ordered that the Consolidation Motion be stricken for procedural reasons.  On

18    September 9, 2010, in the CCV District Court Proceeding, the Debtor filed the Consolidation

19    Motion, which is scheduled to be heard therein on October 18, 2010.

20    **E.    COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED BY
         CREDITORS' COMMITTEE**

21

22    On December 29, 2009, the creditors' committee appointed in this chapter 11 case filed a

23    complaint in this case commencing the Committee Adversary Proceeding.  The Committee's

24    complaint is for (i) declaratory relief regarding validity, priority and extent of liens, and (ii) for

25    equitable subordination.  In the adversary proceeding, the Committee seeks a determination from

26    the Court that the lien rights of mechanics' lien claimants, to the extent that such lien rights are

27    valid and properly perfected, are prior and senior to the lien rights of CCV, and requests an order of

28    the Court ruling that CCV's rights under the Loan Agreement are equitably subordinated to claims

91

1  of all other creditors of the Debtor for purposes of distribution and/or that any lien securing those

2  rights be transferred to the Debtor's estate.

3         The Committee's complaint asserted that the mechanics' lien claimants are senior in

4  priority to the claim of CCV, based on the fact that substantial work was performed on the

5  construction site prior to the recordation of the Corus Bank lien on July 5, 2007, thus giving

6  priority to all subsequent mechanic's lien claimants, whose lien rights relate back to the

7  commencement of the work of improvement.  The Committee's equitable subordination claim,

8  among other things, arises from the unwarranted delays in funding the construction loan and

9  mismanagement of the construction loan that has injured the rights of the mechanic's lien creditors.

10 This matter was settled by CCV stipulating that mechanics' lien claimants holding validly

11 perfected mechanic's liens have lien rights with priority over CCV's lien.  The Court approved this

12 stipulation and the Committee Adversary Proceeding has been dismissed.

13        **F.    COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED BY
             ASTANI CONSTRUCTION, INC.**
14

15        On December 29, 2010, as contemplated by the Cash Collateral Order, Astani Construction,

16 Inc., the Debtor's general contractor for the Concerto Project and a mechanics' lien holder, filed a

17 Complaint against CCV commencing the Astani Construction Adversary Proceeding.  An

18 Amended Complaint was filed on January 27, 2010.   The Amended Complaint alleges claims for

19 relief based on (1) Determination of the Extent, Validity and Priority of the lien asserted by Corus

20 Construction Venture, LLC, (2) Equitable subordination, (3) Enforcement of Stop Notice Claim, (4)

21 Declaratory Relief re Priority of Stop Notice Claim, and (5) Injunctive Relief.

22        Among other things, Astani Construction, Inc.'s claims arise from its status as a mechanics'

23 lien holder with a claim of approximately $22,550,000 (including the mechanic's lien claims of all

24 of the subcontractors).  Similar to the Complaint filed by the Committee, Astani Construction, Inc.

25 alleges that the mechanics' lien claims are prior to and senior to the secured claim of CCV based

26 on the fact that the work of improvement on the Concerto Project was commenced prior to the

27 recordation of Corus Bank's deed of trust on July 5, 2007.

28

1    Further, Astani Construction, Inc. alleges that its rights under a recorded stop notice makes

2    its entire $25 million claim senior to the undisbursed construction loan funds including pre-

3    allocated interest payments to be paid and that have already been paid to CCV and to Corus Bank.

4    Finally, Astani Construction, Inc. incorporates the Debtor's damage claim and alleges that it too

5    has been damaged by Corus Bank's conduct and as a result, CCV's proof of claim should be

6    equitably subordinated to the entire claim of Astani Construction, Inc. and its subcontractors.

7    In the Astani Construction Adversary Proceeding, Astani Construction, Inc. filed a motion

8    for order granting provisional relief: (1) to segregate adequate protection payments pending

9    determination of lien status; (2) to disgorge post-petition interest payments; and (3) to disgorge

10    prepetition interest payments.

11    CCV disputes the allegations in the Astani Construction Complaint and has asserted various

12    defenses to the claims asserted in the Astani Construction Complaint, including that Astani

13    Construction voluntarily subordinated its claim to that of CCV.  Pursuant to the Guaranties and that

14    pursuant to the FIRREA, 12 U.S.C. § 1821(d)(2)(G)(i)(II), Astani Construction is barred from

15    seeking relief from CCV because CCV, as purchaser of assets of Corus Bank from the FDIC as

16    receiver, is not a proper defendant because it did not expressly assume receivership liabilities of

17    Corus Bank. [Docket No. 48 in the Astani Construction Adversary Proceeding.]

18    On July 22, 2010, CCV and Astani Construction filed a joint scheduling conference report

19    pursuant to Fed. R. Civ. P. 26(f) [Docket No. 55 in the Astani Construction Adversary Proceeding],

20    proposing to the Court each party's respective discovery proposal.  The Court subsequently entered

21    a discovery order on August 5, 2010, setting: (i) January 14, 2011, as the deadline by which the

22    parties must complete discovery; and (ii) February 4, 2011, as the deadline by which the parties

23    must exchange their respective expert damages reports and identify a neutral damages expert

24    [Docket No. 55 in the Astani Construction Adversary Proceeding].

25    G.    **COMPLAINT AGAINST CORUS BANK**

26    On September 4, 2009, prior to the commencement of this chapter 11 reorganization case

27    and prior to Corus Bank's seizure by the Federal government, the Debtor filed a lawsuit against

28    Corus Bank for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3)

1  declaratory relief, and (4) injunctive relief.  The action was originally filed in the Superior Court of

2  the State of California, County of Los Angeles, as the Prepetition Action.   Following the

3  commencement of this chapter 11, case, the Debtor removed the lawsuit to the Bankruptcy Court.

4  The removed action is pending as the Removed Action.

5       In this adversary proceeding, the Court entered an order approving a stipulation between the

6  Debtor and the FDIC (as receiver for Corus Bank) entitled Order Granting Stipulation (1)

7  Substituting the Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A.; (2)

8  Extending Deadline to Answer or Otherwise Respond to Complaint; and (3) Staying Adversary

9  Proceeding.  The Court also entered an order approving a stipulation between the FDIC and the

10  Debtor permitting the FDIC to file a motion in the District Court to withdraw the reference of this

11  proceeding to the Bankruptcy Court [Docket No. 28 in the Removed Action].

12       On May 17, 2010, in the District Court proceeding titled *GTS 900 F, LLC v. FDIC et al,*

13  *Civ. No. 2:J0-cv-02763-SJO* (the "District Court Proceeding"), the District Court entered an order

14  withdrawing reference from the Bankruptcy Court [Docket No. 12 in the District Court

15  Proceeding].  On June 8, 2010, the FDIC (as receiver for Corus Bank) issued its notice of

16  disallowance of the claim that the Debtor asserted in the Corus Bank's receivership proceeding.

17  See Notice of Disallowance of Claim dated June 8, 2010, which is attached hereto as Exhibit B-5.

18  The FDIC subsequently filed an answer to the Debtor's complaint on July 8,2010 [Docket No. 16

19  in the District Court Proceeding].  Following an unsuccessful, informal settlement conference, on

20  August 31, 2010, the FDIC and the Debtor filed a joint status report in the District Court

21  Proceeding advising the District Court of the parties' intention to move towards discovery and trial

22  [Docket No. 26 in the District Court Proceeding].  By its answer, the FDIC raised among its

23  numerous affirmative defenses that under FIRREA, "Congress withdrew jurisdiction from all

24  courts to take any action that would restrain or affect the [FDIC], as receiver, in the exercise of its

25  statutory powers and functions." Id. at 12.  Specifically, 11 U.S.C. § 1821(j) prohibits courts from

26  taking action against the FDIC in its receivership capacity, except at the request of the agency's

27  board of directors.

28

94

1    As noted above, the Debtor has filed the Consolidation Motion in the CCV District Court

2  Proceeding, seeking withdrawal of the District Court's reference of the Debtor Adversary

3  Proceeding to the Bankruptcy Court and consolidation of the Debtor Adversary Proceeding with

4  the FDIC District Court Proceeding.  A hearing on the Consolidation Motion in the CCV District

5  Court Proceeding is scheduled for October 18, 2010.

6    **H.    CLAIMS ACQUIRED BY AFFILIATES OF CCV**

7    During the course of this chapter 11 case, certain affiliates of CCV (collectively, the "CCV

8  Entities") have acquired certain Mechanic's Lien Claims and General Unsecured Claims from time

9  to time.  The claims purchased to date by the CCV Entities are noted on Exhibits B-1 and B-2

10  hereto.

11    **I.    RELIEF FROM STAY MOTION**

12    On July 19, 2010, CCV and certain of its affiliates filed the Relief from Stay Motion to

13  exercise their rights with respect to their collateral under applicable agreements and state law.  As

14  discussed above, in conjunction with the Relief from Stay Motion, the Court appointed Valuation

15  Expert determined that, in his opinion, the market value of the Project in its "as is" condition as of

16  November 1, 2010 is $173,750,000.[25]  The Valuation Expert's appraisal report is available for

17  download at http://www.kccllc.net/Concerto.  The final hearing on the Relief from Stay Motion is

18  scheduled for March 7, 2011.

19    **J.    COMPLAINT AGAINST GUARANTORS**

20    On July 20, 2010, CCV filed a complaint (the "Guaranty Complaint") against Sonny H.

21  Astani, individually; Marco K. Astani, individually; Sonny H. Astani and Jo Cho, as trustees of

22  The Astani/Cho Living Trust Dated as of April 29, 1999; and Marco Astani, as trustee of The

23  Marco Astani Family Trust Dated as of March 15, 2006 (collectively, the "Guarantor Defendants"),

24  entitled *Corus Construction Venture, LLC v. Sonny Astani, et al., Case Number 2010L008316* in

25  the Circuit Court of Cook County, Illinois (the "State Court Proceeding").  Under the Guaranty

26  Complaint, CCV seeks recovery from the Guarantor Defendants based on the Repayment Guaranty.

27

28    [25] See infra note 4.

On August 19, 2010, the Guarantor Defendants filed a notice of removal of the State Court Proceeding to the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court"), under Case No. 10-01668 (the "Illinois Proceeding").   On August 26, 2010, the Guarantor Defendants filed their answer to the Guaranty Complaint, in which, among other things, the Guarantor Defendants requested a jury trial [Docket No. 23 in the Illinois Proceeding]. Also on August 26, 2010, the Guarantor Defendants filed a motion to transfer the Illinois Proceeding to the United States Bankruptcy Court for the Central District of California [Docket No. 25 in the Illinois Proceeding] (the "Transfer Motion").   The Illinois Bankruptcy Court will hold a scheduling conference on the Transfer Motion on October 27, 2010 [see Docket No. 40 in the Illinois Proceeding].

### K.    COMPLAINT REGARDING CLAIM AND LIEN OF FIRE PROTECTION GROUP FILED BY ASTANI CONSTRUCTION, INC.

On January 28, 2010, Fire Protection Group, Inc. ("FPG") timely filed a proof of claim in the amount of $550,553.79.  [Claim Register No. 103-1.]  On May 21, 2010, FPG filed an amended proof of claim, asserting against the Debtor a claim for mechanic's liens in the amount of $550,552.79 (as amended, the "FPG Claim").

On May 21, 2010, the Debtor filed a motion to disallow the FPG Claim [Docket No. 286] (the "FPG Claim Motion").  In the FPG Claim Motion, the Debtor asserted that the claim was miscalculated by FPG and should be reduced from $550,552.79 to $489,731.00.  [FPG Claim Motion at 2.]  On June 11, 2010, Astani Construction filed a joinder to the FPG Claim Motion [Docket No. 435] (the "Joinder").  In the Joinder, Astani Construction alleged that FPG's work was deficient and incomplete.  [Joinder at 2-3.]  On June 14, 2010, the Debtor filed a supplement to the FPG Claim Motion [Docket No. 454] (the "FPG Claim Motion Supplement").  CCV asserts that the sole purpose of the FPG Claim Motion Supplement was to add the relief requested by the Plaintiff in the Joinder.

On June 22, 2010, the Court held a hearing on, among other things, the FPG Claim Motion (the "Claims Hearing").  At the Claims Hearing, the Court granted the FPG Claim Motion and denied both the Joinder and the FPG Claim Motion Supplement.

96

1     On July 8, 2010, FPG transferred its claim to CCV Concerto Lien 4, LLC ("CCV Lien 4"),

2   an affiliate of CCV.  A notice of such claim transfer was filed with the Court on July 12, 2010

3   [Docket No. 516].

4     On August 4, 2010, Astani Construction commenced an adversary proceeding by filing a

5   complaint (the "FPG Complaint") against FPG and CCV Lien 4 to object to FPG's claim.  In the

6   FPG Complaint, Astani Construction makes the same allegations, with more detail, that it had

7   made in the Joinder.  On September 7, 2010, CCV Lien 4 filed a motion to dismiss (the "Motion to

8   Dismiss") the FPG Complaint, and FPG filed a joinder thereto.  On September 16, 2010, Astani

9   Construction filed its opposition to the Motion to Dismiss.  A hearing on the Motion to Dismiss

10  was held on September 30, 2010, and CCV Lien 4's motion was denied.

11     **L.     TREATMENT OF MECHANIC'S LIEN CLAIMS UNDER THE CCV PLAN**

12     CCV believes that Mechanic's Lien Claims in Class 2 of the CCV Plan are treated

13  appropriately under the CCV Plan.  Pursuant to the Stipulation Between Official Committee of

14  Unsecured Creditors and Corus Construction Venture, LLC Regarding Objection to Plan

15  Confirmation [Docket No. 669] (the "Priority Stipulation"), which the Court approved by an order

16  [Docket No. 685] entered on August 13, 2010, CCV stipulated that the CCV Secured Claim is

17  junior to certain valid and properly perfected mechanic's liens encumbering the Loft and certain

18  valid and properly perfected mechanic's liens encumbering Tower I.  Notwithstanding that the

19  Priority Stipulation does not extend to all Mechanic's Lien Claims, the CCV Plan provides for

20  payment in full of all Mechanic's Lien Claims, including Postpetition Interest.  CCV expressly

21  reserves its rights to contest the validity and amount of any asserted mechanic's lien claim.

22     **M.     PLANS AND DISCLOSURE STATEMENTS**

23     The Debtor initially filed a Disclosure Statement and Plan of Reorganization in this case on

24  January 13, 2010.  A hearing on the Disclosure Statement was initially set for February 18, 2010.

25  Prior to that hearing' the Court issued a tentative ruling denying approval of the initial Disclosure

26  Statement.  Thereafter, the Debtor filed a First Amended Disclosure Statement and Plan of

27  Reorganization on March 17, 2010.  A continued Disclosure Statement hearing was set for April 22,

28  2010.  The Court approved the Disclosure Statement as containing adequate information and an

626760.11-Los Angeles Server 2A - MSW

1    initial hearing on confirmation of the Debtor's prior Plan was set for August 6, 2010. At a

2    continued hearing on confirmation of the Debtor's prior plan, held on August 27, 2010, the Court

3    denied confirmation of the Debtor's prior plan.

4         In September, 2010, CCV filed the CCV Plan and the Debtor filed the GTS Plan. The GTS

5    Plan and the CCV Plan are competing plans. The Court can only confirm one chapter 11 plan in

6    this case. As discussed above, the Debtor believes that the Sale Process in connection with the

7    GTS Plan is designed to maximize the value obtained in a sale of the Project within a reasonable

8    period of time and that the CCV Plan is not designed to maximize value, but rather allow CCV to

9    obtain ownership of the Project at a firesale price through the equivalent of a credit bid of a

10   disputed claim. CCV, on the other hand, believes that the CCV Plan offers the fastest means by

11   which the majority of creditors in this bankruptcy case would be paid in full.

12        **N.    NO AVOIDANCE ACTIONS**

13        As set forth above, the Debtor believes that it is solvent (that the value of its assets exceed

14   the amount of its liabilities) and that there is no basis for asserting any potential preference or

15   fraudulent transfer avoidance action against any creditor. Accordingly, the Debtor does not intend

16   to pursue any such action. Moreover, the Debtor contends that, under the GTS Plan, creditors are

17   to be paid in full.

18        Under the CCV Plan, CCV believes that all payments made by the Debtor within ninety (90)

19   days before the Petition Date were made in the ordinary course of business. Accordingly, the Plan

20   Administrator shall not investigate or pursue any avoidance actions arising from payments made

21   during the ninety days before the Petition Date.

22   **XVIII. TAX CONSEQUENCES OF PLANS**

23        **A.    GTS PLAN**

24             1.    INTRODUCTION

25        The implementation of a chapter 11 plan may have federal, state and local tax consequences

26   to the Debtor and the Debtor's creditors and equity holders. No tax opinion has been sought or will

27   be obtained with respect to any tax consequences of the GTS Plan: This Unitary Disclosure

28

98

1  Statement does not constitute and is not intended to constitute either a tax opinion, or tax advice to

2  any person, and the summary contained herein is provided for informational purposes only.

3       The discussion below summarizes only certain of the federal income tax consequences

4  associated with the GTS Plan's implementation.  This discussion does not attempt to comment on

5  all aspects of the federal income tax consequences associated with the GTS Plan, nor does it

6  attempt to consider various facts or limitations applicable to any particular creditor or equity

7  interest-holder which may modify or alter the consequences described herein.  A creditor or equity

8  interest-holder may find that the tax consequences of the GTS Plan to such creditor or equity

9  holder differ materially from the tax consequences discussed below because of such creditor's or

10  equity holder's facts and circumstances.  This discussion does not address state, local or foreign tax

11  consequences or the consequences of any federal tax other than the federal income tax.

12       The following discussion is based upon the provisions of the Internal Revenue Bankruptcy

13  Code of 1986, as amended from time to time (the "Internal Revenue Bankruptcy Code" or ("IRC"),

14  the Treasury Income Tax regulations, as amended from time to time, promulgated thereunder,

15  existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax

16  law, no assurance can be given that legislative, judicial or administrative changes will not be

17  forthcoming that would affect the accuracy, validity or applicability of the discussion below.  Any

18  such changes could be material and could be retroactive with respect to the transactions entered

19  into or completed prior to the enactment or promulgation thereof.  The tax consequences of certain

20  aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to

21  judicial or administrative interpretations that differ from the discussion below.

22       CREDITORS AND EQUITY INTEREST-HOLDERS ARE ADVISED TO CONSULT

23  WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM

24  OF THE TRANSACTIONS CONTEMPLATED BY THE GTS PLAN, INCLUDING FEDERAL,

25  STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.  NOTHING CONTAINED IN THIS

26  DISCLOSURE STATEMENT WAS INTENDED OR WRITTEN TO BE USED, CAN BE USED

27  BY ANY TAXPAYER OR MAY BE RELIED UPON OR USED BY ANY TAXPAYER, FOR

28  THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THE

1   TAXPAYER UNDER THE INTERNAL REVENUE BANKRUPTCY CODE OF 1986, AS

2   AMENDED.  ANY WRITTEN STATEMENT CONTAINED IN THIS DISCLOSURE

3   STATEMENT RELATING TO ANY FEDERAL TAX TRANSACTION OR MATTER MAY

4   NOT BE USED BY ANY PERSON IN ANY MANNER TO SUPPORT THE PROMOTION OR

5   MARKETING OF OR TO RECOMMEND ANY FEDERAL TAX TRANSACTION(S) OR

6   MATTER(S).

7           2.      FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR

8                   (a)     UTILIZATION OF A DEBTOR'S NET OPERATING
                            LOSSES
9

10          Internal Revenue Bankruptcy Code section 382 places potentially severe limitations upon

11  an entity's use of its net operating losses and loss carryovers ("NOLs") and certain other tax

12  attributes if an "ownership change" occurs with respect to such entity's equity interests.  Any pre-

13  effective date shift (deemed or actual) in the ownership of stock of a debtor, directly or by

14  attribution, outside the scope of a chapter 11 plan may trigger an "ownership change" that would

15  adversely affect the availability of a debtor's NOLs.  Because the federal income tax consequences

16  of any such shift would depend on the particular facts and circumstances at such time and the

17  application of complex legislation and regulations, the Debtor expresses no view as to the effect of

18  any transactions outside the scope of the GTS Plan or the survival of any NOLs or other tax

19  attributes.  Parties in interest are cautioned against assuming that NOLs will be available to shelter

20  any income or gain that may be recognized as a result of GTS Plan transactions or the Debtor's

21  operations prior to the GTS Plan Effective Date.

22                  (b)     REDUCTION OF DEBTOR'S INDEBTEDNESS

23          Any amount of potential discharged indebtedness for federal income tax purposes will be

24  referred to herein as a "Debt Discharge Amount."  In general, the Internal Revenue Bankruptcy

25  Code provides that a taxpayer who realizes a discharge of indebtedness must include the Debt

26  Discharge Amount in its gross income in the taxable year of discharge to the extent that the Debt

27  Discharge Amount exceeds any consideration given for such discharge.  No income from the

28

100

1   discharge of indebtedness is realized to the extent that payment of the liability being discharged

2   would have given rise to a deduction.

3   　　　If a taxpayer is in a title 11 case (a case under the Bankruptcy Code) and the discharge of

4   indebtedness occurs pursuant to a plan approved by the court (such as the Plan in this case, if

5   confirmed), such discharge of indebtedness is specifically excluded from gross income.  If the

6   taxpayer is insolvent before a cancellation or deemed cancellation of debt and does not become

7   solvent by reason of the cancellation or deemed cancellation, such cancellation or deemed

8   cancellation of indebtedness is specifically excluded from gross income.  The GTS Plan in this case

9   does not result in the elimination of debt.

10   　　　Accordingly, the Debtor believes that it will not be required to include in gross income any

11   Debt Discharge Amount as a result of the GTS Plan.  The Internal Revenue Bankruptcy Code

12   requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded

13   from gross income.  Tax attributes are reduced in the following order of priority: current year net

14   operating losses and net operating loss carryovers; general business credits; minimum tax credits;

15   capital loss carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers;

16   and foreign tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar

17   excluded from gross income, except that general tax credits, minimum tax credits and foreign tax

18   credits are reduced by 33.3 cents for each dollar excluded from gross income.  The tax attribute

19   reduction rules may eliminate a portion of a debtor's NOLs and other tax attributes.  However,

20   such NOLs and other tax attributes will not be reduced until after, the determination of tax, if any,

21   for the taxable year in which a plan is confirmed and becomes effective.

22   　　　　　　　　(c)　　ALTERNATIVE MINIMUM TAX

23   　　　In general, an alternative minimum tax ("AMT") is imposed on an entity's "alternative

24   minimum taxable income" ("AMTI") at a 20 percent rate to the extent such tax exceeds the

25   corporation's regular federal income tax for the taxable year AMTI generally is equal to regular

26   taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions

27   and other beneficial allowances are modified or eliminated.  In particular, even though an entity

28   otherwise may be able to shelter all of its taxable income for regular income tax purposes by

626760.11-Los Angeles Server 2A - MSW

1 applying available NOLs, an entity (or consolidated group) is entitled to offset no more than 90

2 percent of its AMTI with NOLs (as recomputed for AMT purposes). The confluence of a 20

3 percent AMT tax rate and a 90 percent (of AMTI) cap on the deduction for AMT NOLs creates an

4 effective AMT tax rate of two percent (i.e., 20 percent of the 10 percent of AMTI that is not

5 sheltered with AMT NOLs).

6       Accordingly, even if a debtor's NOLs remain available to fully shelter net income or gain,

7 if any, recognized during the tax year in which a plan is confirmed and becomes effective, a debtor

8 may be liable for AMT even though a debtor is not liable for regular federal income tax.

9       (d)      PASS-THROUGH TAX ENTITY

10       The Debtor is a California limited liability company. A limited liability company ("LLC")

11 is a hybrid business entity having certain characteristics of both a corporation and a partnership,

12 The primary characteristic an LLC shares with a corporation is limited liability, and the primary

13 characteristic it shares with a partnership is the availability of pass-through income taxation. The

14 Debtor has elected to be taxed like a partnership. Section 5 of the Debtor's Second Amended and

15 Restated Operating Agreement, effective as of March 15, 2007, provides that net profits and net

16 losses of the Debtor shall be allocated to the members (equity interest-holders) of the Debtor in

17 proportion to the percentage of their respective equity interests in the Debtor.

18       3.      TAX CONSEQUENCES TO CREDITORS

19       The tax consequences of a chapter 11 plan's implementation to a creditor may depend on

20 many factors, including the type of consideration received by the creditor in exchange for its claim,

21 whether the creditor reports income on the cash or accrual method, whether the creditor receives

22 consideration in more than one tax year of the creditor, and whether all the consideration received

23 by the creditor is deemed to be received by that creditor in an integrated transaction. The tax

24 consequences upon the receipt of Cash, debt instruments or other property allocable to interest are

25 discussed below under "Receipt of Interest." Creditors are advised to seek their own tax counsel to

26 properly assess the tax consequences in their particular situation.

27

28

1                (a)     <u>CLAIMS SATISFIED WITH PAYMENT.</u>

2                (i)     <u>GAIN/LOSS ON EXCHANGE</u>

3           As a general rule, a creditor whose existing claims are satisfied with payments under a

4     chapter 11 plan or with the receipt of equity interests in a reorganized debtor, will recognize gain or

5     loss on the actual or constructive exchange of such creditor's existing creditor claims (other than

6     claims for accrued interest) for the consideration received equal to the difference between (i) the

7     "amount realized" in respect of such claims, and (ii) the creditor's tax basis in such claims.  The

8     "amount realized" will generally be equal to the sum of the cash received plush the fair market

9     value of the other consideration received.  Again, creditors are advised to seek their own tax

10    counsel to properly assess the tax consequences in their particular situation.

11               (ii)     <u>TAX BASIS AND HOLDING PERIOD OF ITEMS
12                          RECEIVED</u>

13          Pursuant to Internal Revenue Bankruptcy Code Section 1223, the aggregate tax basis in the

14    items received or deemed received by a creditor will generally equal the amount realized in respect

15    of such items (other than amounts allocable to any accrued interest).  The holding period for items

16    received in the exchange will generally begin on the day following the exchange.

17               (iii)     <u>DETERMINATION OF CHARACTER OF GAIN</u>

18          Under the general rule governing exchanges under the Internal Revenue Bankruptcy Code,

19    in the case, of a creditor whose existing claims constitute capital assets in such creditor's hands, the

20    gain required to be recognized will generally be classified as a capital gain, except to the extent of

21    interest (including accrued market discount, if any), with any gain recognized thereon generally

22    treated as ordinary income to the extent of accrued market discount.  As a general rule, any capital

23    gain recognized by a creditor will be long-term capital gain with respect to those claims for which

24    the creditor's holding period is more than one year, and short-term capital gain with respect to such

25    claims for which the creditor's holding period is one year or less.  Again, the actual

26    characterization of gain/loss in this particular instance pursuant to the general rules governing

27    exchanges is qualified by, among other things, the qualifications noted above with respect to

28

1   realization of gain/loss and exchanges.  Creditors should be advised to seek their own tax counsel

2   to properly assess the tax consequences in their particular situation.

3                    (b)        RECEIPT OF INTEREST

4           As a general rule, income attributable to accrued but unpaid interest will be treated as

5   ordinary income, regardless of whether the creditor's existing claims are capital assets in its hands.

6   A creditor who, under its accounting method, was not previously required to include in income

7   accrued but unpaid interest attributable to existing claims, and who exchanges its interest claim for

8   cash or other property pursuant to a chapter 11 plan, will generally be treated as receiving ordinary

9   interest income to the extent of any consideration so received allocable to such interest, regardless

10  of whether that creditor realizes an overall gain or loss as a result of the exchange of its existing

11  claims.  A creditor who had previously included in income accrued but unpaid interest attributable

12  to its existing claims will generally recognize a loss to the extent such accrued but unpaid interest

13  is not satisfied in full.  For purposes of the above discussion, "accrued" interest means interest

14  which was accrued while the underlying claim was held by the creditor.  The extent to which

15  consideration distributable under the GTS Plan is allocable to such interest is uncertain.

16                   (c)        OTHER TAX CONSIDERATIONS

17                   (i)        MARKET DISCOUNT

18          If a creditor has a lower tax basis in one of a debtor's obligations than its face amount, as a

19  general rule,, the difference may constitute market discount under Internal Revenue Bankruptcy

20  Code section 1276.  (Certain obligations are excluded from the operation of this rule, such as

21  obligations with .a fixed maturity date not exceeding one year from the date of issue, installment

22  obligations to which Internal Revenue Bankruptcy Code section 453B applies and, in all likelihood,

23  demand instruments).

24          Holders in whose hands a debtor's obligations are market discount bonds may be required

25  to treat as ordinary income any gain recognized upon the exchange of such obligations to the extent

26  of the market discount accrued during the holder's period of ownership, unless the holder has

27  elected to include such market discount in income as it accrued.  Such holders should be advised to

28  seek their own tax counsel to properly assess the tax consequences in their particular situation.

                                        104

(ii)    <u>WITHHOLDING</u>

The reorganized debtor will, as a general rule, withhold any amounts required by law from payments made, or deemed to be made, to creditors.  In addition, creditors may be required to provide general tax information to .a in order to receive distributions pursuant to a chapter 11 plan. The Debtor does not believe that there are claims in this case that involve withholding issues.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH CREDITOR.  FURTHERMORE, THE TAX CONSEQUENCES OF A PLAN MAY BE COMPLEX AND, IN SOME CASES, UNCERTAIN, THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE GTS PLAN.

4.    <u>TAX CONSEQUENCES TO EQUITY HOLDERS</u>

As set forth above, the Debtor is a pass-through tax entity.  Section 5 of the Debtor's Second Amended and Restated Operating Agreement, effective as of March 15, 2007, provides that net profits and net losses of the Debtor shall be allocated to the members (equity interest-holders) of the Debtor in proportion to the percentage of their respective equity interests in the Debtor.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN EQUITY INTEREST.  FURTHERMORE, THE TAX CONSEQUENCES OF A PLAN MAY BE COMPLEX AND, IN SOME CASES, UNCERTAIN.- THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN EQUITY INTEREST OR EQUITY INTEREST RELATED CLAIM OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN EQUITY INTEREST AS A RESULT OF THE GTS PLAN.

**B.    <u>THE CCV PLAN</u>**

1.    <u>INTRODUCTION</u>

The following is a summary of certain Federal income tax consequences of the CCV Plan. This summary is for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), Treasury Regulations promulgated thereunder, and

105

1  administrative and judicial interpretations and practice, all as in effect on the date of this Unitary

2  Disclosure Statement and all of which are subject to change or differing interpretations, with

3  possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a

4  number of areas, substantial uncertainty may exist with respect to some of the tax consequences

5  described herein. No opinion of counsel has been obtained as to any of the tax consequences of the

6  CCV Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect to

7  any statement or conclusion in this summary. No representations are being made regarding the

8  particular tax consequences of the confirmation or implementation of the CCV Plan as to any

9  creditor or equity interest holder and there can be no assurance that the IRS would not assert, or

10  that a court would not sustain, positions different from those discussed herein.

11  This summary assumes creditors and equity interest holders hold their claims or interests as

12  capital assets for Federal income tax purposes (generally property held for investment).  The

13  following discussion does not address foreign, state, or local tax consequences of the CCV Plan,

14  nor does it purport to address the Federal income tax consequences of the CCV Plan to special

15  classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-

16  exempt organizations, governmental entities, partnerships or other pass-through entities, persons

17  whose functional currency is not the U.S. dollar, foreign persons, dealers in securities or foreign

18  currency, employees, and persons who received their claims pursuant to the exercise of an

19  employee stock option or otherwise as compensation). Furthermore, the following discussion does

20  not address Federal taxes other than income taxes.

21  Creditors and equity interest holders are urged to consult with their tax advisor regarding

22  the tax consequences to them of the transactions contemplated by the CCV Plan, including Federal,

23  state, local and foreign tax consequences.

24  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, CREDITORS AND EQUITY

25  INTEREST HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF

26  FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS CCV DISCLOSURE

27  STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED,

28  BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING

106

1  PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE, (B) SUCH

2  DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING

3  OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (C) CREDITORS

4  AND EQUITY INTEREST HOLDERS SHOULD SEEK ADVICE BASED ON THEIR

5  PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

6              2.      FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR

7                  (a)      PASS-THROUGH TAX ENTITY

8          The Debtor is a California limited liability company.  An LLC is a hybrid business entity

9  having certain characteristics of both a corporation and a partnership.  The primary characteristic

10  an LLC shares with a corporation is limited liability, and the primary characteristic it shares with a

11  partnership is the availability of pass-through income taxation provided that an election has not

12  been made to be taxed as a corporation.  In general, for Federal income tax purposes, the partners

13  of a partnership, and not the partnership itself, are subject to taxation under the Tax Code on items

14  of income, gain, loss or deduction of the partnership.  For purposes of the discussion herein it is

15  assumed that the Debtor is treated as a partnership for Federal income tax purposes.  Section 5 of

16  the Debtor's Second Amended and Restated Operating Agreement, effective as of March 15, 2007,

17  provides that net profits and net losses of the Debtor shall be allocated to the members (equity

18  interest holders) of the Debtor in proportion to the percentage of their respective equity interests in

19  the Debtor.

20                  (b)      REDUCTION OF DEBTOR'S INDEBTEDNESS

21          Any amount of potential discharged indebtedness for Federal income tax purposes will be

22  referred to herein as a "Debt Discharge Amount."  In general, the Tax Code provides that a

23  taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its

24  gross income in the taxable year of discharge to the extent that the Debt Discharge Amount

25  exceeds any consideration given for such discharge.  No income from the discharge of

26  indebtedness is realized to the extent that payment of the liability being discharged would have

27  given rise to a deduction.  In the event that any action taken pursuant to the CCV Plan results in the

28  discharge of indebtedness of the Debtor, any resulting cancellation of indebtedness ("COD")

107

1  income to the Debtor from such discharge will pass-through the Debtor and will be allocable solely

2  to the members of the Debtor (the equity interest holders).

3          Generally, a taxpayer recognizes COD income upon satisfaction of its outstanding

4  indebtedness for less that its adjusted issue price.  The amount of COD income is, in general, the

5  excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any

6  new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other

7  consideration given in exchange for the indebtedness satisfied.

8          However, COD income is not included in gross income to a debtor if the discharge occurs

9  in a Title 11 case or the discharge occurs when the debtor is insolvent.  Although while a debtor is

10  either in bankruptcy or insolvent, section 108 of the Tax Code provides for the exclusion of COD

11  income generally from gross income, such rules apply at the partner, rather than the partnership

12  level.  Consequently, the Debtor will not be entitled to exclude COD income from gross income,

13  but instead is required to pass such COD income through to its members and the extent to which

14  that income might be excluded by a member will be determined by the particular tax attributes of

15  the member.

16          Accordingly, the members of Debtor will be required to prepare and file income tax returns

17  reporting transactions occurring under the CCV Plan.

18                          3.    TAX CONSEQUENCES TO CREDITORS

19          The tax consequences of a chapter 11 plan's implementation to a creditor may depend on

20  many factors, including the type of consideration received by the creditor in exchange for its claim,

21  whether the creditor reports income on the cash or accrual method, whether the creditor receives

22  consideration in more than one tax year of the creditor, and whether all the consideration received

23  by the creditor is deemed to be received by that creditor in an integrated transaction.  The tax

24  consequences upon the receipt of cash, debt instruments or other property allocable to interest are

25  discussed below under "Receipt of Interest." Creditors are urged to consult with their tax advisor to

26  properly assess the tax consequences in their particular situation.

27

28

626760.11-Los Angeles Server 2A - MSW

1           (a)      CLAIMS SATISFIED WITH PAYMENT.

2           (i)      GAIN/LOSS ON EXCHANGE

3       As a general rule, a creditor whose existing claims are satisfied with payments under a

4 chapter 11 plan or with the receipt of equity interests in a reorganized debtor, will recognize gain or

5 loss on the actual or constructive exchange of such creditor's existing creditor claims (other than

6 claims for accrued interest) for the consideration received equal to the difference between (i) the

7 "amount realized" in respect of such claims, and (ii) the creditor's tax basis in such claims.  The

8 "amount realized" will generally be equal to the sum of the cash received plus the fair market value

9 of the other consideration received.

10           (ii)     TAX BASIS AND HOLDING PERIOD OF ITEMS
RECEIVED

11

12       Pursuant to Tax Code section 1223, the aggregate tax basis in the items received or deemed

13 received by a creditor will generally equal the amount realized in respect of such items (other than

14 amounts allocable to any accrued interest).  The holding period for items received in the exchange

15 will generally begin on the day following the exchange.

16           (iii)    DETERMINATION OF CHARACTER OF GAIN

17       The character of any gain or loss as capital gain or loss or as ordinary income or loss will be

18 determined by a number of factors, including the tax status of the creditor, the nature of the claim

19 in the creditor's hands, the amount of accrued interest, whether the claim was purchased at a

20 discount, and whether and to what extent the creditor has previously claimed a bad debt deduction

21 with respect to the claim.  Any such capital gain or loss will be long-term capital gain or loss if the

22 creditor's holding period for the claim on the CCV Plan Effective Date is more than one year.  The

23 deductibility of capital losses is subject to certain limitations.  The Federal income tax

24 consequences of the receipt of cash allocable to accrued interest and market discount are

25 summarized below.

26           (b)      RECEIPT OF INTEREST

27       As a general rule, income attributable to accrued but unpaid interest will be treated as

28 ordinary income, regardless of whether the creditor's existing claims are capital assets in its hands.

626760.11-Los Angeles Server 2A - MSW

1   A creditor who, under its accounting method, was not previously required to include in income

2   accrued but unpaid interest attributable to existing claims, and who exchanges its interest claim for

3   cash or other property pursuant to a chapter 11 plan, will generally be treated as receiving ordinary

4   interest income to the extent of any consideration so received allocable to such interest, regardless

5   of whether that creditor realizes an overall gain or loss as a result of the exchange of its existing

6   claims.  A creditor who had previously included in income accrued but unpaid interest attributable

7   to its existing claims will generally recognize a loss to the extent such accrued but unpaid interest

8   is not satisfied in full.  For purposes of the above discussion, "accrued" interest means interest

9   which was accrued while the underlying claim was held by the creditor.

10                          (c)     OTHER TAX CONSIDERATIONS

11                          (i)     MARKET DISCOUNT

12          In general, if a claim were acquired by a creditor on the secondary market at a discount to

13   its stated principal amount, then such claim may be subject to the "market discount" rules of the

14   Tax Code. (Certain obligations are excluded from the operation of this rule, such as obligations

15   with a fixed maturity date not exceeding one year from the date of issue, installment obligations to

16   which Tax Code section 453B applies and, possibly, demand instruments).

17          Holders in whose hands a debtor's obligations are market discount bonds may be required

18   to treat as ordinary income any gain recognized upon the exchange of such obligations to the extent

19   of the market discount accrued during the holder's period of ownership, unless the holder has

20   elected to include such market discount in income as it accrued.

21                          (ii)    WITHHOLDING

22          The reorganized debtor will, as a general rule, withhold any amounts required by law from

23   payments made, or deemed to be made, to creditors.  In addition, creditors may be required to

24   provide general tax information in order to receive distributions pursuant to a chapter 11 plan.

25          THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

26   CONSEQUENCE TO EACH CREDITOR.  FURTHERMORE, THE TAX CONSEQUENCES OF

27   A PLAN MAY BE COMPLEX AND, IN SOME CASES, UNCERTAIN.  THEREFORE, IT IS

28   IMPORTANT THAT EACH CREDITOR CONSULT WITH HIS, HER OR ITS TAX ADVISOR

1   REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE

2   CCV PLAN.

3                    4.    TAX CONSEQUENCES TO EQUITY HOLDERS

4           For U.S. federal income tax purposes, equity interest holders will be allocated their

5   distributive share of items of income (including any COD income), gain, loss, deduction, and credit

6   from the Debtor.  Such items will affect the basis of the equity interest holders' membership

7   interests in the Debtor.  If the equity interests in the Debtor are cancelled pursuant to the CCV Plan,

8   an equity interest holder will generally recognize gain or loss measured by the difference between

9   the amount realized by the equity interest holder and the equity interest holder's adjusted tax basis

10  in the equity interests in the Debtor cancelled pursuant to the CCV Plan. The amount realized by an

11  equity interest holder will include any reduction in the equity interest holder's allocable share of

12  the Debtor's liabilities in connection with the CCV Plan (as determined under U.S. Treasury

13  Regulations governing the allocation of partnership liabilities among partners).  Even if the equity

14  interests in the Debtor are not cancelled and equity interest holders receive no cash distributions

15  under the CCV Plan, they may be deemed for Federal partnership tax purposes to have received a

16  constructive distribution from the Debtor pursuant to section 752 of the Tax Code, relating to a net

17  decrease in a share of liabilities of the Debtors.  Such constructive distributions may reduce the

18  amount of any loss or substantially increase the amount of any gain recognized by the equity

19  interest-holders.

20          THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

21  CONSEQUENCE TO EACH HOLDER OF AN EQUITY INTEREST.  FURTHERMORE, THE

22  TAX CONSEQUENCES OF A PLAN MAY BE COMPLEX AND, IN SOME CASES,

23  UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN EQUITY

24  INTEREST OR EQUITY INTEREST RELATED CLAIM CONSULT WITH HIS, HER, OR ITS

25  TAX ADVISOR REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN

26  EQUITY INTEREST AS A RESULT OF THE CCV PLAN.

27

28

626760.11-Los Angeles Server 2A - MSW

# XIX.   EFFECT OF CONFIRMATION OF PLAN

## A.      GENERAL COMMENTS

The provisions of a confirmed Plan bind the Debtor, any entity acquiring property under the Plan, and any creditor, and equity interest-holder of the Debtor, even those who do not vote to accept the Plan.

The confirmation of the GTS Plan vests all property of the estate in the Debtor, subject to the Debtor Project Assets being sold pursuant to the GTS Plan or an order of the Court, entered prior to the Confirmation Date, approving a motion by the Debtor to sell the Debtor Project Assets pursuant to section 363 of the Bankruptcy Bankruptcy Code.

If the CCV Plan is confirmed, the CCV Project Assets shall be transferred to CCV free and clear of any and all liens, claims, interests, and encumbrances that are dealt with by the CCV Plan, and the Estate Actions shall be transferred to the Plan Administrator.

The automatic stay is lifted upon confirmation as to property of the estate.  However, the stay continues to prohibit collection or enforcement of pre-petition claims against the Debtor or the Debtor's property until the date the Debtor receives a discharge, if any.  The Debtor seeks a discharge pursuant to the GTS Plan and upon entry of an order of the Court confirming the GTS Plan, the Debtor's pre-confirmation obligations and claims in connection therewith shall be replaced by the Debtor's obligations under the GTS Plan, except if and as otherwise specified in the order of the Court confirming the GTS Plan.  Likewise, the Debtor will be discharged pursuant to the CCV Plan and, upon occurrence of the CCV Plan Effective Date of the CCV Plan, the Debtor's pre-confirmation obligations and claims in connection therewith shall be replaced by the Debtor's obligations under the CCV Plan, except as otherwise specified in the Court's order confirming the CCV Plan.

## B.      DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS; STATUS OF LIENS; EQUITY SECURITY HOLDERS

Unless the Debtor is not entitled to receive a discharge pursuant to 11 U.S.C. 1141(d)(3), the debtor may obtain a discharge only upon specific order of the Court.  Notwithstanding the foregoing, the confirmation of either the GTS Plan or the CCV Plan does not discharge the Debtor

112

1  from any debt of a kind specified in 11 U.S.C. § 523(2)(A) - (B) that is owed to a domestic

2  governmental unit, or owed to a person as the result of an action filed under subchapter III of

3  chapter 37 of title 31 or any similar State Statutes, or tax or custom duties with respect to which the

4  debtor made a fraudulent tax return or willfully attempted in any manner to evade or to defeat tax

5  or custom duties.

6      **C.    MODIFICATION OF THE PLANS**

7      The Debtor may modify the GTS Plan and CCV may modify the CCV Plan pursuant to 11

8  U.S.C. § 1127.

9      **D.    POST-CONFIRMATION CAUSES OF ACTION**

10      To the best knowledge of the Debtor, the estate has the following causes of action: those

11  causes of action set forth in the Debtor's Complaint and Objection to Proof of Claim filed by CCV

12  and those set forth in the pre-petition Complaint filed against Corus Bank (for whom the FDIC has

13  been substituted as the party defendant).

14      Under the GTS Plan, the Debtor shall continue to act as representative of the estate under

15  11 U.S.C. § 1123(b)(3) and shall have the right to assert any or all of the above causes of action

16  and any other causes of action possessed by the Debtor post-confirmation in accordance with

17  applicable law.

18      To the best of CCV's knowledge, the estate has the following causes of action: the Debtor

19  Adversary Proceeding (which is the subject of the CCV District Court Proceeding), the FDIC

20  District Court Proceeding, and the Astani Construction Adversary Proceeding.  As noted above,

21  under the CCV Plan, the Estate Actions shall be transferred to the Plan Administrator on the CCV

22  Plan Effective Date.  Thus, the Plan Administrator will serve as the estate's representative under

23  section 1123(b)(3) of the Bankruptcy Code and shall have the right to assert any or all of the Estate

24  Actions post-confirmation in accordance with applicable law.

25      The Debtor disputes that the Astani Construction Adversary Proceeding is an Estate Action.

26  In the event that the Court determines that the Astani Construction Adversary Proceeding is not an

27  Estate Action, the Astani Construction Adversary Proceeding shall not be transferred to the Plan

28  Administrator on the CCV Plan Effective Date and Astani Construction, Inc. will maintain control

113

1    over the prosecution of the Astani Construction Adversary Proceeding.  As noted above, in such a

2    scenario, no estate property may be used to fund the pursuit of the Astani Construction Adversary

3    Proceeding.

4         **E.**    **DISSOLUTION OF COMMITTEE**

5         Following the effective date of either the GTS Plan or the CCV Plan, the Committee shall

6    be deemed dissolved and disbanded and the duties of the Committee shall terminate.

7

8         **F.**    **POST-EFFECTIVE DATE EMPLOYMENT AND COMPENSATION OF PROFESSIONALS**

9         After the GTS Plan Effective Date of the GTS Plan, the Debtor may employ, without notice,

10    hearing or order of the Court, such attorneys, accountants and other professionals as it may desire

11    to render services on such terms as it deems reasonable.  With respect to services rendered by

12    professional persons employed by the Debtor after the GTS Plan Effective Date the Debtor shall be

13    authorized to pay for such services, related costs and expenses without notice, hearing or order of

14    the Court; provided however, that with respect to fees, costs and expenses of such professional

15    persons for services rendered after the GTS Plan Effective Date in or in connection with the this

16    chapter 11 case, or in connection with the Plan and incident to the case, in the event the Debtor

17    disputes the reasonableness of any such fees, costs or expenses, the Debtor shall pay such

18    professional person only the undisputed amount, if any, and the Debtor or the professional may file

19    an application with the Court to determine the reasonableness of the fees, costs or expenses which

20    are in dispute.

21         After the CCV Plan Effective Date, the Plan Administrator may employ, without notice,

22    hearing or order of the Court, such attorneys, accountants and other professionals as it may desire

23    to render services on such terms as it deems reasonable.  With respect to services rendered by

24    professional persons employed by the Plan Administrator after the CCV Plan Effective Date, the

25    Plan Administrator shall be authorized to pay for such services, related costs, and expenses without

26    notice, hearing, or order of the Court; provided however, that with respect to fees, costs, and

27    expenses of such professional persons for services rendered after the CCV Plan Effective Date in

28    or in connection with this chapter 11 case, or in connection with the CCV Plan and incident to the

114

1  case, in the event the Plan Administrator disputes the reasonableness of any such fees, costs, or

2  expenses, the Plan Administrator shall pay such professional person only the undisputed amount, if

3  any, and the Plan Administrator or the professional may file an application with the Court to

4  determine the reasonableness of the fees, costs, or expenses which are in dispute.

5  ## G.    POST-CONFIRMATION OPERATIONS

6  Under the GTS Plan, following the GTS Plan Effective Date, the Debtor may operate and

7  engage in its business free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, the

8  Court or the Office of the United States Trustee, except if and as specifically set forth in the GTS

9  Plan.

10  Under the CCV Plan, following the CCV Plan Effective Date, the Debtor will have no

11  operations as the CCV Project Assets will have been sold pursuant to this CCV Plan.  The Plan

12  Administrator will liquidate Estate Action and distribute Estate Assets in accordance with the terms

13  of this CCV Plan.

14  ## H.    EXECUTION AND DELIVERY OF DOCUMENTS

15  Following the Confirmation Date of the GTS Plan, the Debtor is authorized to execute and

16  deliver documents and instruments as are necessary or appropriate to promote and implement

17  consummation of the GTS Plan or to carry out the purposes of the GTS Plan.

18  Following the CCV Plan CCV Plan Effective Date of the CCV Plan, CCV and the Plan

19  Administrator are authorized, and the Debtor is authorized and directed, to execute and deliver

20  documents and instruments as are necessary or appropriate to promote and implement

21  consummation of the CCV Plan or to carry out the purposes of the CCV Plan.  To the extent

22  necessary or appropriate to such purposes, parties shall reasonably cooperate with CCV and the

23  Plan Administrator and take such actions as are reasonably requested by CCV or the Plan

24  Administrator.

25  ## I.    FINAL DECREE

26  Once either the CCV Plan or the GTS Plan has been consummated, a final decree may be

27  entered upon motion of the applicable Proponent.  The effect of the final decree is to close the

28

115

1  bankruptcy case.  After such closure, a party seeking any type of relief relating to a consummated

2  Plan provision can seek such relief in a state court of general jurisdiction.

3  **XX.    DECLARATIONS IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN**

4  **A.    GTS PLAN**

5  I, Sonny Astani, declare under penalty of perjury under the laws of the United States of

6  America that the following statements are true and based upon personal knowledge.

7  1.  David Kupetz of SulmeyerKupetz, a professional corporation, the bankruptcy counsel

8  for the Debtor, is the individual who prepared this document on behalf of the Debtor.

9  2.  The sources of all financial data are the Debtor, Astani Construction, Inc. (the Debtor's

10  general contractor), Astani Enterprises, Inc. (as set forth above, the driving force behind the

11  Debtor), Moran & Company, and CB Richard Ellis.  Further, as discussed above and indicated

12  below, Moran & Company and CB Richard Ellis provided information and analyses regarding

13  valuation of the Debtor's Concerto project.

14  3.  I have reviewed the foregoing GTS Plan and Unitary Disclosure Statement.  All facts

15  and representations asserted on behalf of the Debtor in the GTS Plan and the Unitary Disclosure

16  Statement are true to the best of my knowledge.

17  4.  To the best of my knowledge, no fact material to a claimant or equity interest-holder in

18  voting to accept or reject the proposed GTS Plan has been omitted.

19  5.  Thomas Moran Jr. and Mary Ann King of Moran & Company prepared information and

20  analyses regarding the marketing and Sale Process for sale of the Project in its entirety, comparable

21  sales, feasibility of the proposed sale of the Project, and current sales environment for apartment

22  buildings, and valuation of the Project, including Exhibit A-4 hereto.

23  6.  David Zoraster and Mark Moniz of CB Richard Ellis, Inc. prepared the Summary

24  Appraisal Report (available for download at http://www.kccllc.net/Concerto) and supplied certain

25  valuation information and conclusions used in the foregoing Disclosure Statement.

26

27  Dated: November 30, 2010                    _/s/ Sonny Astani_
                                              Sonny Astani
28

116

1 | PRESENTED BY:

2 | SulmeyerKupetz
A Professional Corporation

3 |

4 |

5 | By: _____
David S. Kupetz

6 | Bankruptcy Counsel for GTS 900 F, LLC
Debtor and Debtor in Possession

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

626760.11-Los Angeles Server 2A - MSW

**B.**    <u>CCV PLAN</u>

I, Seth Hewitt, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

1.     Van C. Durrer II, Ramon M. Naguiat, and Matthew T. Lim of Skadden, Arps, Slate, Meagher & Flom LLP, CCV's bankruptcy counsel, are the individuals who prepared this document on behalf of CCV.

2.     The source of Exhibit B-3 is CCV. Except as otherwise indicated, the source of all other financial data is the Debtor, Astani Construction, and Astani Enterprises, and such financial data was taken from exhibits originally filed with the Denied Debtor Plan.

3.     I have reviewed the foregoing CCV Plan and Unitary Disclosure Statement. All facts and representations asserted on behalf of CCV in the CCV Plan and the Unitary Disclosure Statement are true to the best of my knowledge.

4.     To the best of my knowledge, no fact material to a claimant or equity interest holder in voting to accept or reject the proposed CCV Plan has been omitted.

5.     The names of the persons who prepared the financial documents supplied by the Debtor, Astani Construction, and Astani Enterprises are listed in the Denied Debtor Plan.

6.     From the Denied Debtor Plan, it appears that the accounting method used to prepare the financial documents supplied by the Debtor, Astani Construction, and Astani Enterprises is a cash-basis approach.

7.     James H. Pike and Michelle Kauffman of Cushman & Wakefield Western, Inc. prepared CCV's valuation reports (available at http://www.kccllc.net/Concerto) and supplied valuation information and conclusions used in the CCV Plan.

Dated: _____11/30/10_____

_____
Seth Hewitt

626760.11-Los Angeles Server 2A - MSW

1   PRESENTED BY:

2   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3

4   By:_____
              Van C. Durrer II
5   Counsel for Corus Construction Venture, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

119