Van C. Durrer II (SBN 226693)
Ramon M. Naguiat (SBN 209271)
Emily C. Ma (SBN 246014)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600
van.durrer@skadden.com
ramon.naguiat@skadden.com
emily.ma@skadden.com

Attorneys for Corus Construction Venture, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.:  2:09-bk-35127-VZ |
| GTS 900 F, LLC, a California limited liability company, aka Concerto, | Chapter 11 |
| Debtor. | **Motion to Confirm Corus Construction Venture LLC's Plan of Reorganization** |
| | Date: February 17, 2011 |
| | Time: 9:30 a.m. |
| Tax ID # 20-2396211 | Judge: Hon. Vincent P. Zurzolo |
| | Location: Courtroom 1368 |
| | 255 E. Temple Street |
| | Los Angeles, CA  90012 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................II

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT – THE CCV PLAN SHOULD BE CONFIRMED ...................................1

    I.      CCV Satisfies the Burden of Proof Under Bankruptcy Code Section 1129............1

    II.     The CCV Plan Satisfies the Requirements of Section 1129(a)...............................2

          A.     The CCV Plan Satisfies the Requirements of Section 1129(a)(1) of the Bankruptcy Code...........................................................................2

               1.     The CCV Plan Complies with Section 1122 of the Bankruptcy Code: Classification of Claims and Interests ..............3

               2.     The CCV Plan Complies with Section 1123 of the Bankruptcy Code: Contents of the Plan...........................................7

                    (a)     11 U.S.C. § 1123(a) ........................................................7

                    (b)     11 U.S.C. § 1123(b) ......................................................16

          B.     The Plan Proponent Has Complied with the Provisions of Title 11 as Required by Section 1129(a)(2) of the Bankruptcy Code .........................20

          C.     The CCV Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3) ................................24

          D.     The CCV Plan is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7) .............................................................27

          E.     The CCV Plan Has Been Accepted by at Least One Impaired Class that is Entitled to Vote – 11 U.S.C. § 1129(a)(10) ...................................30

          F.     The CCV Plan is Not Likely to be Followed by Liquidation or the Need for Further Financial Reorganization – 11 U.S.C. § 1129(a)(11) ....31

    III.    The CCV Plan Satisfies the "Cram Down" Requirements Under Section 1129(b) of the Bankruptcy Code.................................................................32

          A.     The CCV Plan Does Not Discriminate Unfairly With Respect to the Rejecting Classes ....................................................................................32

          B.     The Plan is Fair and Equitable with Respect to the Rejecting Classes and the Classes that Voted to Reject the Plan....................................33

IMMEDIATE EFFECTIVENESS ..................................................................................34

CONCLUSION...............................................................................................................35

---

Motion to Confirm Corus Construction Venture LLC's Plan of Reorganization

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Acequia, Inc. v. Clinton (In re Acequia, Inc.),
  787 F.2d 1352 (9th Cir. 1986) ................................................................................. 31

Ambanc La Mesa Ltd. Partnership,
  115 F.3d 650 (9th Cir. 1997) ................................................................................... 33

Amfac Distrib. Corp. v. Wolff (In re Wolff),
  22 B.R. 510 (B.A.P. 9th Cir. 1982) .......................................................................... 33

Andrew v. Coopersmith (In re Downtown Inv. Club III),
  89 B.R. 59 (B.A.P. 9th Cir. 1988) ............................................................................ 21

Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership,
  526 U.S. 434 (1999) .................................................................................................. 27

Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),
  2 F.3d 899 (9th Cir. 1993) .................................................................................. 10, 34

Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),
  764 F.2d 406 (5th Cir. 1985) ................................................................................... 24

CarrAmerica Realty Corp. v. Nvidia Corp.,
  302 Fed. Appx. 514 (9th Cir. 2008) ......................................................................... 20

Computer Task Group, Inc. v. Brotby (In re Brotby),
  303 B.R. 177 (B.A.P. 9th Cir. 2003) ................................................................... 21, 33

Dewsnup v. Timm,
  502 U.S. 410 (1992) ................................................................................................. 11

Everett v. Perez (In re Perez),
  30 F.3d 1209 (9th Cir. 1994) ................................................................................... 10

Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.),
  118 F.3d 635 (9th Cir. 1997) ................................................................................... 27

In re 11,111, Inc.,
  117 B.R. 471 (Bankr. D. Minn. 1990) ...................................................................... 32

In re 203 N. LaSalle Partnership,
  246 B.R. 325 (Bankr. N.D. Ill. 2000) ......................................................................... 5

In re American Solar King Corp.,
  90 B.R. 808 (Bankr. W.D. Tex. 1988) ........................................................................ 8

In re Applied Theory Corp.,
  493 F.3d 82 (2d Cir. 2007) ...................................................................................... 20

Motion to Confirm Corus Construction Venture LLC's Plan of Reorganization

In re Bannerman Holdings, LLC,
   No. 10-01053, 2010 WL 42600003, at *3 (Bankr. E.D.N.C. Oct. 20, 2010) .............................. 16

In re Best Prods. Co., Inc.,
   168 B.R. 35 (S.D.N.Y. 1994) ....................................................................................................... 5

In re Buttonwood Partners, Ltd.,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) ........................................................................................ 32

In re Credit Indus. Corp.,
   366 F.2d 402 (2d Cir. 1966) ...................................................................................................... 5

In re Crosscreek Apts., Ltd.,
   211 B.R. 641 (Bankr. E.D. Tenn. 1997) ................................................................................... 27

In re Elijah,
   41 B.R. 348 (Bankr. Mo. 1984) ................................................................................................. 9

In re Haights Cross Communications, Inc.,
   No. 10-10062, 2010 WL 2723979, at *12, 19 (Bankr. D. Del. 2010) .................................. 14, 16

In re Lighthouse Lodge, LLC,
   No. 09-52610, 2010 WL 4053984 (Bankr. N.D. Cal. Oct. 14, 2010) ........................................ 30

In re Madison Hotel Assocs.,
   749 F.2d 410 (7th Cir. 1994) .................................................................................................... 24

In re River Village Assocs.,
   161 B.R. 127 (Bankr. E.D. Pa. 1993) ...................................................................................... 31

In re Sierra-Cal,
   210 B.R. 168 (Bankr. E.D. Cal. 1997) ..................................................................................... 21

In re Union Meeting Partners,
   178 B.R. 664 ........................................................................................................................... 11

In re Western Asbestos Co.,
   313 B.R. 456 (Bankr. N.D. Cal. 2004) ..................................................................................... 16

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
   843 F.2d 636 (2d Cir. 1988) .................................................................................................... 24

Koelbl v. Glessing (In re Koelbl),
   751 F.2d 137 (2d Cir. 1984) .................................................................................................... 24

L & J Anaheim Associates v. Kawasaki Leasing International Inc. (In re L & J Anaheim
   Associates),
   995 F.2d 940 (9th Cir. 1993) ................................................................................................ 7, 9

Laskin v. First Nat'l Bank of Keystone (In re Laskin),
   222 B.R. 872 (B.A.P. 9th Cir. 1998) ........................................................................................ 11

Liberty National Enterprises v. Ambanc La Mesa Limited Partnership
   115 F.3d 650 (9th Cir. 1997) .............................................................................................. 2, 32

iii

Manati Sugar Co. v. Mock,
    75 F.2d 284 (2d Cir. 1935) ................................................................................... 24

Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.),
    456 F.3d 668 (6th Cir. 2006) ................................................................................. 10

Official Committee of Unsecured Creditors of West Farm Credit Bank v. Michelson (In re
    Michelson),
    141 B.R. 715 (Bankr. E.D. Cal. 1992) ...................................................................... 2

Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.),
    166 B.R. 892 (B.A.P. 9th Cir. 1994) ........................................................................ 3

Pac. Gas & Electric Co. v. Cal.,
    350 F.3d 932 (9th Cir. 2003) ................................................................................. 15

Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),
    314 F.3d 1070 (9th Cir. 2002) ............................................................................... 24

Principal Mutual Life Insurance Co. v. Baldwin Park Towne Center, Ltd. (In re Baldwin Park
    Towne Ctr., Ltd.),
    171 B.R. 374 (Bankr. C.D. Cal. 1994) ...................................................................... 3

Qmect v. Burlingame Capital Partners II, L.P.,
    373 B.R. 682 (N.D. Cal. 2007) .............................................................................. 12

Ryan v. Loui (In re Corey),
    892 F.2d 829 (9th Cir. 1989). ................................................................................ 24

Solow Bldg. Co. v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (US), Inc.),
    324 F.3d 197 (3d Cir. 2003) .................................................................................... 8

Spieker Props., L.P. v. Southern Pacific Funding Corp. (In re S. Pac. Funding Corp.),
    268 F.3d 712 (9th Cir. 2001) .................................................................................... 6

Steelcase, Inc. v. Johnston (In re Johnston),
    21 F.3d 323 (9th Cir. 1994) ........................................................................ 4, 32, 33

Stoll v. Quintanar,
    252 B.R. 492 (B.A.P. 9th Cir. 2000) ................................................................. 19, 20

Teamsters Local No. 310 v. Ingrum, (In re Tucson Yellow Cab Co.
    789 F.2d 701 (9th Cir. 1986) .................................................................................... 5

Three Flint Hill Ltd. v. Prudential Ins. Co. (In re Three Flint Hill Ltd.),
    213 B.R. 292 (D. Md. 1997) .................................................................................. 27

U.S. v. Energy Res. Co., Inc.,
    495 U.S. 545 (1990) .............................................................................................. 31

U.S. v. Reorganized CF & I Fabricators of Utah, Inc.,
    518 U.S. 213 (1996) .............................................................................................. 27

Universal Coops., Inc. v. FCX Inc. (In re FCX, Inc.),
    853 F.2d 1149 (4th Cir. 1988) ............................................................................... 15

<u>Vermont Investment Limited Partnership,</u>
  142 B.R. 571 (Bankr. D.D.C. 1992) ......................................................................... 12

<u>Walsh v. Alpha Fin. Grp. (In re Rice),</u>
  83 B.R. 8 (B.A.P. 9th Cir. 1987) ............................................................................. 5

**Statutes**

11 U.S.C. § 101(31) ....................................................................................................... 31

11 U.S.C. § 1122(a) ......................................................................................................... 3

11 U.S.C. § 1123(a) ......................................................................................................... 7

11 U.S.C. § 1123(a)(2) ..................................................................................................... 7

11 U.S.C. § 1123(a)(3) ..................................................................................................... 9

11 U.S.C. § 1123(a)(5) ................................................................................................... 13

11 U.S.C. § 1123(a)(5)(B) ............................................................................................. 15

11 U.S.C. § 1123(a)(5)(E) ............................................................................................. 15

11 U.S.C. § 1123(b) ....................................................................................................... 16

11 U.S.C. § 1123(b)(2) ................................................................................................... 16

11 U.S.C. § 1123(b)(3) ................................................................................................... 18

11 U.S.C. § 1123(b)(6) ................................................................................................... 16

11 U.S.C. § 1124(1) ......................................................................................................... 7

11 U.S.C. § 1125(b) ....................................................................................................... 22

11 U.S.C. § 1125(c) ....................................................................................................... 22

11 U.S.C. § 1125(e) ....................................................................................................... 21

11 U.S.C. § 1126 ........................................................................................................... 22

11 U.S.C. § 1126(f) ....................................................................................................... 28

11 U.S.C. § 1129(a)(1) ..................................................................................................... 2

11 U.S.C. § 1129(a)(10) ................................................................................................. 31

11 U.S.C. § 1129(a)(11) ........................................................................................... 24, 32

11 U.S.C. § 1129(a)(2) ................................................................................................... 21

11 U.S.C. § 1129(a)(7) ............................................................................................. 27, 28

11 U.S.C. § 1129(b) ....................................................................................................... 33

Motion to Confirm Corus Construction Venture LLC's Plan of Reorganization

11 U.S.C. § 1129(b)(2) ................................................................................................ 27, 34

11 U.S.C. § 1129(b)(2)(B) ........................................................................................... 34

11 U.S.C. § 1129(b)(2)(C) ........................................................................................... 34

11 U.S.C. § 552(b)(1) .................................................................................................. 11

11 U.S.C. § 1127(b) ..................................................................................................... 21

Motion to Confirm Corus Construction Venture LLC's Plan of Reorganization

1   Corus Construction Venture, LLC ("CCV"), the successor-in-interest to Corus Bank, N.A.

2   ("Corus Bank") and the largest secured creditor of GTS 900 F, LLC ("GTS" or the "Debtor"),

3   hereby submits this motion (the "Motion") to confirm CCV's plan of reorganization (the "CCV

4   Plan") and for certain related relief.[1]  In support of the Motion, CCV submits the supporting

5   declarations of Seth Hewitt of ST Residential, LLC (the "Hewitt Declaration"), John Barkidjija, a

6   former executive of ST Residential, LLC (the "Barkidjija Declaration"), James Pike of Cushman &

7   Wakefield (the "Pike Declaration"), and Peter S. Kravitz, the proposed Plan Administrator under

8   the CCV Plan (the "Kravitz Declaration").  In further support of the Motion, CCV respectfully

9   represents as follows:

## PRELIMINARY STATEMENT

10

11   1.      This single asset real estate case has been pending for over 16 months.  CCV has

12   stepped forward with a resolution that will satisfy all non-insider creditors as well as preserve for

13   the benefit of insiders their alleged lender liability claims.  Although the Debtor and its insiders

14   have been unable to complete the Project or satisfy creditor claims, they object to the CCV Plan

15   for the sole purpose of further delaying these proceedings.[2]  These Objections should be overruled

16   and the CCV Plan confirmed.

## ARGUMENT – THE CCV PLAN SHOULD BE CONFIRMED

17

18   2.      The CCV Plan satisfies the requirements of sections 1129(a)(1) through (16) of title

19   11 of the United States Code (the "Bankruptcy Code"), with the exception of section 1129(a)(8).

20   Nevertheless, the CCV Plan meets the "cramdown" requirements of section 1129(b) of the

21   Bankruptcy Code.  Accordingly, the Court should confirm the CCV Plan.  The below arguments

22   address only contested requirements of section 1129 of the Bankruptcy Code.

23   **I.      CCV Satisfies the Burden of Proof Under Bankruptcy Code Section 1129**

24   3.      To confirm the CCV Plan, CCV must demonstrate that the CCV Plan satisfies the

25   _____

26   [1]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the CCV Plan.

27   [2]      The only preliminary objections to the CCV Plan were filed by insiders – one (the "Debtor Preliminary Objection") from the Debtor and the other (the "Astani Construction Preliminary Objection" and, together with the Debtor Preliminary Objection, the "Objections")

28   from Astani Construction, Inc. ("Astani Construction").

1  applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.

2  As set forth by the Ninth Circuit in <u>Liberty National Enterprises v. Ambanc La Mesa Limited</u>

3  <u>Partnership (In re Ambanc La Mesa Limited Partnership)</u>, "[t]he bankruptcy court must confirm a

4  Chapter 11 [plan proponent's] plan of reorganization if the [plan proponent] proves by a

5  preponderance of the evidence" that the plan satisfies section 1129 of the Bankruptcy Code.  115

6  F.3d 650, 653 (9th Cir. 1997).  Based upon (a) the First Amended Unitary Disclosure Statement

7  and Competing Plans of Reorganization Proposed by GTS 900 F, LLC and Corus Construction

8  Venture, LLC [Docket No. 917] (the "<u>Unitary Disclosure Statement</u>") and all exhibits thereto,

9  (b) the Declaration of Michael J. Paque (Kurtzman Carson Consultants LLC) With Respect to the

10  Tabulation of Votes on the Competing Plans of Reorganization Proposed by GTS 900 F, LLC and

11  Corus Construction Venture, LLC Pursuant to Local Rule 3018-1 [Docket No. 1033] (the "<u>Paque</u>

12  <u>Declaration</u>"), (c) the Voting Report attached to the Paque Declaration as <u>Exhibit 1</u>, (d) the Hewitt

13  Declaration, (e) the Barkidjija Declaration, (f) the Pike Declaration, (g) the Kravitz Declaration, (h)

14  any other declarations, testimony, and evidence introduced at the Confirmation Hearing, and

15  (i) the record in this case.  CCV has proven by a preponderance of the evidence that section 1129

16  of the Bankruptcy Code has been satisfied in respect of the CCV Plan.

17  **II.**     **The CCV Plan Satisfies the Requirements of Section 1129(a)**[3]

18       **A.**     **The CCV Plan Satisfies the Requirements of Section 1129(a)(1) of the Bankruptcy Code**

19

20       4.     Section 1129(a)(1) of the Bankruptcy Code requires that "[t]he plan compl[y] with

21  the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).  Section 1129(a)(1) has been

22  interpreted by the courts as requiring that a plan comply with sections 1122 (governing

23  classification of claims) and 1123 (governing the contents of a plan).  <u>See</u> <u>Official Comm. of</u>

24  <u>Unsecured Creditors of W. Farm Credit Bank v. Michelson (In re Michelson)</u>, 141 B.R. 715, 721

25  (Bankr. E.D. Cal. 1992); S. Rep. No. 95-989, at 126 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787

26  (stating that "[p]aragraph (1) [of 1129(a)] requires that the plan comply with the applicable

27  ───────────────
        [3]     The CCV Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code, but the

28  CCV Plan does satisfy the provisions of section 1129(b) as outlined below.

1  provisions of chapter 11, such as §§ 1122 and 1123, governing classification of [a] plan"); H.R.

2  REP. NO. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 (same).  As discussed below,

3  the CCV Plan complies fully with the requirements of both sections 1122 and 1123, as well as

4  other provisions of the Bankruptcy Code.

5            1.    **The CCV Plan Complies with Section 1122 of the Bankruptcy Code:**
6                 **Classification of Claims and Interests**

7       5.    Section 1122 of the Bankruptcy Code governs the classification of claims or

8  interests under a plan and provides, in pertinent part, as follows:

9           [A] plan may place a claim or interest in a particular class only if such
            claim or interest is substantially similar to the other claims or interests of
10          such class.

11  11 U.S.C. § 1122(a).  Under this section, the relevant inquiries are (a) whether all claims and

12  interests in a class have substantially similar rights with respect to the Debtor's assets, and

13  (b) whether there are sufficient business or legal justifications to justify separate classes of similar

14  claims or interests.  See Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-

15  Storage, Inc.), 166 B.R. 892, 897 (B.A.P. 9th Cir. 1994) ("Separate classifications for unsecured

16  creditors are only justified 'where the legal character of their claims is such as to accord them a

17  status different from the other unsecured creditors.'") (citation and internal quotation marks

18  omitted); Principal Mut. Life Ins. Co. v. Baldwin Park Towne Ctr., Ltd. (In re Baldwin Park Towne

19  Ctr., Ltd.), 171 B.R. 374, 376 (Bankr. C.D. Cal. 1994) (holding that substantially similar claims

20  may be separately classified if there is some business or economic justification for doing so).

21       6.    Article IX of the CCV Plan provides for the classification of claims and interests in

22  seven individual classes, each based upon the legal nature and/or priority of such claims and

23  interests, despite the Debtor's assertions to the contrary.  Administrative Claims are not classified

24  and are separately treated in Article IX.B.2 of the CCV Plan.  Each of the claims or interests in

25  each particular class is substantially similar to the other claims or interests in such class.  The

26  classes of claims and interests are as follows:

| Class | Claim or Interest Type |
|---|---|
| 1 | CCV Secured Claim |
| 2 | Mechanic's Lien Claims |

| 3 | General Unsecured Creditors |
| 4 | CCV Deficiency Claim |
| 5 | Astani Secured Claims |
| 6 | Astani Unsecured Claims |
| 7 | Equity Interest Holders |

7.      There is broad discretion to classify claims in the Ninth Circuit.  See Steelcase, Inc. v. Johnston (In re Johnston), 21 F.3d 323, 327-28 (9th Cir. 1994) (holding that separate classification was permissible and that bankruptcy courts have broad discretion to classify claims). Moreover, a plan proponent is allowed considerable discretion to classify claims and interests according to the facts and circumstances of the case so long as the classification scheme does not violate basic priority rights or manipulate voting.  See Tucson Self-Storage, Inc., 166 B.R. at 897.

8.      Here, the classification scheme under the CCV Plan is proper given the facts and circumstances of the case.  In the Debtor Preliminary Objection, the Debtor argues that the CCV Plan improperly classifies claims and "improperly discriminates" in favor of CCV.  Debtor Prelim. Obj. ¶ 1; 10.  In the Astani Construction Preliminary Objection, Astani Construction objects to the separate classification of (a) Class 5 Astani Secured Claims from the Class 2 Mechanic's Lien Claims and (b) Class 6 Astani Unsecured Claims from the Class 3 General Unsecured Creditors. See Astani Constr. Prelim. Obj. ¶ 4.  Such separate classification accounts for the identical subordination provisions in the (a) Repayment Guaranty, (b) Completion Guaranty, and (c) Carve-Out Guaranty (collectively, the "Guaranties"),[4] each executed to secure the Debtor's obligations under that certain Construction Loan Agreement, dated July 27, 2007 (the "Loan Agreement") between the Debtor and Corus Bank.  Section 3.8 of each of the Guaranties provides as follows:

> Such Guarantor[5] hereby subordinates, and shall cause any entity which such Guarantor directly or indirectly controls (an "Affiliate") to subordinate, any claims or liens of such Guarantor or Affiliate against [GTS] of any kind (including any right of such Guarantor to a return of any capital contributed to [GTS]) to all of the Obligations and to any other claims or liens of [Corus Bank] against [GTS] or its property . . . .

---

[4]      The Guaranties are attached as Exhibits A-C to the Hewitt Declaration.

[5]      The term "Guarantor" is defined in each of the Guaranties as, collectively, Sonny H. Astani, individually, Marco H. Astani, individually, Sony H. Astani and Jo Cho, as Trustees of the Astani/Cho Living Trust Dated as of April 29, 1999, and March H. Astani, as Trustee of the Marco Astani Family Trust Dated as of March 15, 2006.

1  Repayment Guaranty § 3.8; Completion Guaranty § 3.8; Carve-Out Guaranty § 3.8 (emphasis

2  added).   The Debtor has previously acknowledged in this case that Sonny Astani and Marco

3  Astani control Astani Construction.  See Sonny Astani Deposition Transcript [Docket No. 641], Ex.

4  A at 39:1-11 (Sonny Astani testifying that he and Marco Astani are decision makers for Astani

5  Construction and there is no formal process for Sonny Astani's decision-making).  In other words,

6  by the Guaranties, the principals of Astani Construction voluntarily subordinated any claims and

7  liens of any entity they control to the claims and liens of Corus Bank.

8       9.      Nevertheless, Astani Construction argues that the CCV Plan improperly

9  subordinates Astani Construction's claim "where there has been no action or final proceeding to

10  subordinate [Astani Construction's] Claim; the subordination has been raised only as an

11  affirmative defense by CCV.  . . .  Neither is [Astani Construction] a party to the litigation brought

12  by CCV in Chicago against [Astani Construction's] principals."  Astani Constr. Prelim. Obj. ¶

13  4(b)-(c).  This argument fails for three reasons.  First, it is entirely appropriate and, in fact,

14  mandatory for the CCV Plan to take into account the subordination provisions reflected in the

15  Guaranties.  As one court has noted, "[a] bankruptcy court, in order to effectuate its duty to do

16  equity, must enforce lawful subordination agreements according to their terms and prevent junior

17  creditors from receiving funds where they have explicitly agreed not to accept them."  In re Best

18  Prods. Co., Inc., 168 B.R. 35, 70 (S.D.N.Y. 1994) (quoting In re Credit Indus. Corp.,

19  366 F.2d 402, 408-10 (2d Cir. 1966)) (emphasis added); see also In re 203 N. LaSalle P'ship, 246

20  B.R. 325, 330 (Bankr. N.D. Ill. 2000) ("[P]ursuant to § 510(c), it is certain that a subordination

21  provision that violates no principle of bankruptcy law – such as the present one – must be enforced

22  as it would be under nonbankruptcy law.").

23       10.      Second, this Court is a court of equity, and equity treats as done what ought to be

24  done (a "maxim" of equity).  Walsh v. Alpha Fin. Grp. (In re Rice), 83 B.R. 8, 12 (B.A.P. 9th Cir.

25  1987) ("The old equity notion[] – . . . equity considers done what ought to be done – still ha[s]

26  vitality.") (quoting Teamsters Local No. 310 v. Ingrum (In re Tucson Yellow Cab Co., Inc.),

27  789 F.2d 701, 704 (9th Cir. 1986)).  The fact that the Guarantors have refused to comply with their

28  obligations is not dispositive as to whether a court of equity should treat such obligations as

1   performed and accordingly enforce the subordination provisions of the Guaranties against Astani

2   Construction under section 510(a) of the Bankruptcy Code.  Notably, neither the Debtor nor

3   Astani Construction denies that Astani Construction's principals have the power to subordinate its

4   claims.  See Debtor Prelim. Obj. ¶ 8; Astani Construction Prelim. Obj. ¶ 4; Marco Astani

5   Deposition Transcript [Docket No. 639] at 87:17-88:12 (Marco Astani testifying that he is a

6   guarantor and has taken no steps to subordinate Astani Construction's claims).

7        11.    Finally, the Ninth Circuit has also held that courts may enforce subordination

8   agreements in the context of plan confirmation.  Spieker Props., L.P. v. S. Pac. Funding Corp. (In

9   re S. Pac. Funding Corp.), 268 F.3d 712, 715-17 (9th Cir. 2001) (affirming bankruptcy court

10  decision that relied on section 510(a) to confirm plan of reorganization that incorporated

11  subordination provisions of prepetition indenture agreement).  Similarly, the court in Best

12  Products explicitly noted that the bankruptcy court is not required to conduct a separate

13  proceeding to determine the enforceability of subordination agreements; rather, it may adjudicate

14  the agreement in the context of plan confirmation.  168 B.R. at 68-69.  Accordingly, contrary to

15  the assertions of Astani Construction, it is entirely appropriate that the CCV Plan subordinate

16  Astani Construction's claims consistent with the subordination provisions of the Guaranties

17  without commencing a separate litigation.

18       12.    Moreover, the objectors are not prejudiced because the CCV Plan provides for the

19  contingency that the Court decide that Class 5 and Class 6 claims are not subordinated.  The CCV

20  Plan provides that, to the extent that the Court determines that the Class 5 Astani Secured Claims

21  and Class 6 Astani Unsecured Claims are not subordinated to CCV's claims pursuant to the

22  Guaranties, payment will be made directly to the holders of such allowed claims.  See CCV Plan

23  Art. IX.J.2; IX.K.2.  Thus, Class 5 and Class 6 are not prejudiced by their separate classification.

24  It is undisputed that no other claimant in Class 2 or Class 3 has similar subordination issues.  The

25  separate classification is therefore mandated by the voluntary subordination of the Astani Claims

26  and does not arise from any improper or prohibited purpose.

27       13.    Additionally, classification of claims under the CCV Plan does not manipulate

28  voting.  Even if the Class 5 Astani Secured Claims were treated as Class 2 Mechanic's Lien

Claims and Class 6 Astani Unsecured Claims were treated as Class 3 General Unsecured Claims, this does not affect the acceptance of the CCV Plan, as Class 2 and Class 3 are unimpaired and deemed to accept the CCV Plan. In fact, under that scenario, the CCV Plan would have one fewer class voting to reject. Accordingly, for the foregoing reasons, the classification of claims and interests in the CCV Plan complies with section 1122(a) of the Bankruptcy Code.

> **2.    The CCV Plan Complies with Section 1123 of the Bankruptcy Code: Contents of the Plan**

>> **(a)    11 U.S.C. § 1123(a)**

14.    Section 1123(a) sets forth the mandatory requirements with which every chapter 11 plan must comply. See 11 U.S.C. § 1123(a) . As demonstrated below, the CCV Plan fully complies with those requirements.

>> **(ii)    The CCV Plan Specifies Unimpaired Classes – 11 U.S.C. § 1123(a)(2)**

15.    Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." See id. § 1123(a)(2) . Article IX of the CCV Plan specifies the Classes of Claims and Interests that are unimpaired under the CCV Plan: Class 2 Mechanic's Lien Claims, Class 3 General Unsecured Claims, and Class 5 Astani Secured Claims.

16.    In the Debtor Preliminary Objection, the Debtor argues that CCV has improperly identified certain classes claims as unimpaired. See Debtor Prelim. Obj. ¶ 1. Likewise, in the Astani Construction Preliminary Objection, Astani Construction argues that CCV has improperly identified the Class 5 Astani Secured Claims as unimpaired. See Astani Constr. Prelim. Obj. ¶ 1. These objections have no merit. Section 1124(1) of the Bankruptcy Code provides that "a class of claims or interests is impaired under a plan unless . . . the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1) . The Ninth Circuit has held that, when determining impairment under section 1124, "[t]he narrow question that thus arises is whether . . . 'legal, equitable, [or] contractual rights' were changed by the Plan . . . ." See L & J Anaheim Assocs. v. Kawasaki Leasing Int'l Inc. (In re L & J Anaheim Assocs.), 995 F.2d 940, 943 (9th Cir. 1993) (emphasis

added).  Although the Ninth Circuit interpreted section 1124(1)'s "impairment" concept broadly, to include even positive alterations of creditor rights, the Court repeatedly referred to changes made "by the plan."  Id.

17.    Further, in connection with section 1124(1) of the Bankruptcy Court, courts have held that impairment does not result where a claimant's rights are altered by statute (including the Bankruptcy Code) with such changes merely reflected in a plan of reorganization.  Specifically, it has been noted that "[i]mpairment results from what the plan does, not what the statute does."  Solow Bldg. Co. v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (US), Inc.), 324 F.3d 197, 204 (3d Cir. 2003) (noting that section 502(b)(6) cap on landlord claims was required statutory alteration of rights, not plan alteration, and, therefore, claim was not "impaired").  Using the same principle, another court refused to find a creditor's claim impaired where a plan, pursuant to section 510(b) of the Bankruptcy Code, subordinated a claim for damages resulting from rescission of a securities transaction.  See In re Am. Solar King Corp., 90 B.R. 808, 819-20 (Bankr. W.D. Tex. 1988). Because the subordination was required by statute (and not the plan), there was no impairment of the creditor's claim.

18.    Based on the foregoing, impairment only results from plan alteration of a claimant's rights.  As such, there is no impairment of Astani Construction's claims because the CCV Plan did not subordinate such claims; rather, the pre-petition Guaranties did.  Further, because section 510(a) of the Bankruptcy Code requires enforcement of subordination agreements, subordination of Astani Construction's claims is in fact mandated by statute, therefore qualifying as a statutory alteration similar to that which occurred in PPI and American Solar.  To the extent that the Court determines that the Astani Secured Claims are not subordinated, such claims will be paid in full with Postpetition Interest and therefore receive the same treatment as holders of Class 2 Mechanic's Lien Claims.  See CCV Plan Art. IX.F.2; IX.J.2.  Accordingly, Astani Construction's claim was not impaired by the CCV Plan.

19.    Similarly, the CCV Plan does not alter the legal, equitable, or contractual rights of holders of Class 2 Mechanic's Lien Claims and Class 3 General Unsecured Claims.  Holders of Class 2 Mechanic's Lien Claims will be paid in full under the CCV Plan, including Postpetition

8

1   Interest.  See id. Art. IX.F.2.  Holders of Class 3 General Unsecured Claims will also be paid in

2   full from the CCV Cash.  See id. Art. IX.G.2.  Thus, Article IX of the CCV Plan has properly

3   identified those classes that are unimpaired.

4                    **(iii)    The CCV Plan Adequately Specifies the Treatment
                              of Impaired Classes – 11 U.S.C. § 1123(a)(3)**

5

6           20.     Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims

7   or interests that is impaired under the plan."  See 11 U.S.C. § 1123(a)(3).  Article IX of the CCV

8   Plan specifies the treatment of those claims and interests that are impaired under the CCV Plan:

9   Class 1 CCV Secured Claim, Class 4 CCV Deficiency Claim, Class 6 Astani Unsecured Claims,

10  and Class 7 Equity Interests.

11          21.     In the Debtor Preliminary Objection, the Debtor asserts that CCV has improperly

12  identified the Class 1 CCV Secured Claim and the Class 4 CCV Deficiency Claim as impaired.[6]

13  Debtor Prelim. Obj. ¶ 1.  As noted above, the relevant inquiry as to impairment is whether "legal,

14  equitable, [or] contractual rights were changed by the Plan . . . ."  See L & J Anaheim Assocs., 995

15  F.2d at 943.  With respect to the Class 1 CCV Secured Claim, the CCV Plan does not provide for

16  payment in full of CCV's claim in accordance with the applicable loan documents; rather, the

17  CCV Plan provides that title to the CCV Project Assets will be transferred from the Debtor to

18  CCV free and clear of any and all liens, claims, interests, and encumbrances that are dealt with in

19  the CCV Plan, with the Deficiency Claim to be paid separately as discussed below.  See CCV Plan

20  Art. IX.E.2.  Accordingly, CCV's contractual rights with respect to its Class 1 CCV Secured

21  Claim are changed under the CCV Plan and Class 1 is impaired.  See In re Elijah, 41 B.R. 348,

22  351 (Bankr. Mo. 1984) (holding that secured creditor receiving collateral as payment in full was

23  still impairment under section 1124 of Bankruptcy Code).

24          22.     Likewise, to the extent CCV has a deficiency claim, CCV's contractual rights are

25  changed under the CCV Plan by virtue of its treatment of the Class 4 CCV Deficiency Claim.  The

26  CCV Deficiency Claim will not be paid in full unless there are sufficient Estate Proceeds to effect

27  _____

28      [6]      CCV believes that the Debtor and Astani Construction do not object to the
identification of Class 6 Astani Unsecured Claims or Class 7 Equity Interests as impaired.

9

1   such payment in full in accordance with the terms of the CCV Plan.  See CCV Plan Art. IX.I.2.

2   Accordingly, because CCV's contractual rights under the Loan Agreement have been changed by

3   the CCV Plan, CCV's claims in both Class 1 and Class 4 are impaired under the CCV Plan.  See

4   Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship), 2 F.3d 899, 905

5   n.17 (9th Cir. 1993) ("A class is impaired if the plan does not provide it with full payment in cash

6   of its claims on the date the plan becomes effective.") (emphasis in original).

7       23.     Further, the Debtor argues that the CCV Plan improperly treats CCV's disputed

8   claim as allowed and provides CCV with value greater than its potential allowed claim.  Debtor

9   Prelim. Obj. ¶ 1.  Indeed, while the CCV Plan allows CCV's claim in full under the CCV Plan,

10  this is without prejudice to (a) the Debtor's objection to CCV's claim in the Debtor Adversary

11  Proceeding or (b) the FDIC District Court Proceeding.  See CCV Plan Art. IX.E.2.  These

12  proceedings are considered Estate Actions that are transferred to the Plan Administrator under the

13  CCV Plan.  See id. Art. XV.C.  Accordingly, the estate's rights against CCV with respect to

14  CCV's claim are preserved in full.

15      24.     Moreover, the only value CCV is receiving on account of its claim is that of the

16  CCV Project Assets, the value of which should inure to the benefit of CCV.  The Debtor argues

17  that the CCV Plan "fails to provide for the necessary payment to interest holders," who "would

18  receive a distribution in a liquidation."  Debtor Prelim. Obj. ¶ 4.  The argument rests on faulty

19  reasoning because the Debtor fails to recognize that, before equity may participate in any recovery,

20  both secured and unsecured creditors must be paid in full, including postpetition interest.  See, e.g.,

21  Everett v. Perez (In re Perez), 30 F.3d 1209, 1216 n.8 (9th Cir. 1994) (denying confirmation of a

22  plan because, among other things, equity retained value while creditors were denied postpetition

23  interest); Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning

24  Corp.), 456 F.3d 668, 678 (6th Cir. 2006) (holding absolute priority rule requires solvent debtor to

25  provide postpetition interest to unsecured and undersecured creditors before making distributions

26  to equity).  As the liquidation analysis below illustrates, there is no residual value left for equity

27  since creditor claims will not be entirely satisfied.

28      25.     The Debtor presumes, incorrectly, that the $184,750,000.00 "at completion" value

1   reached by the Court-appointed valuation expert, John G. Ellis, MAI, CRE, FRICS, of Integra

2   Realty Resources, Inc. (the "Valuation Expert"), implies an "equity cushion" from which equity

3   might hope to recover.  Even if (a) the Valuation Expert's appraisal of the Project were correct and

4   (b) the Debtor were able to complete the Project as originally contemplated with remaining funds

5   held by the estate, any appreciation in the Project, nevertheless, must initially be allocated to

6   creditors before any value can be retained by equity.  In light of CCV's perfected security interest

7   in any and all proceeds received from the sale or disposition of the Debtor's assets,[7] such

8   appreciation would first be applied to CCV's secured claim pursuant to sections 506 and 552(b)(1)

9   of the Bankruptcy Code, which provides that CCV shall have a security interest in the "proceeds,

10  products, offspring, or profits" of its collateral.  11 U.S.C. § 552(b)(1); see also In re Union

11  Meeting Partners, 178 B.R. 664, 675 (secured claim may "grow[] post-petition due to operation of

12  § 552(b), or even due to the happenstance of appreciation"); Dewsnup v. Timm, 502 U.S. 410, 417

13  (1992) ("Any increase over the judicially determined valuation during bankruptcy rightly accrues

14  to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other

15  unsecured creditors. . . .").  Thus, if the value of the Project has appreciated during the pendency

16  of this case (whether by use of CCV's cash collateral or because of improving market conditions),

17  and such value exceeds the sum of the secured claims, CCV has an oversecured claim, entitling it

18  to postpetition interest, ahead of all junior creditor classes, plus equity.  See Laskin v. First Nat'l

19  Bank of Keystone (In re Laskin), 222 B.R. 872, 876 (B.A.P. 9th Cir. 1998) ("whether the lien is

20  wholly unsecured or merely undersecured, . . . any increase in value of the real property should

21  accrue to the benefit of the creditor, not the debtor or other unsecured creditors"), citing Dewsnup,

22  502 U.S. at 417.

23        26.     The Debtor suggests that the Court should reduce CCV's secured claim by the

24  approximate $12 million in postpetition adequate protection payments.  This position is erroneous

25  for two reasons.  First, such a reduction is unwarranted because CCV has undeniably suffered a

26  diminution in its collateral in the approximate amount of $2.8 million in interest that will have

27  ───────────────
    [7]      CCV's security interest is described in its deed of trust attached as Exhibit B to

28  Proof of Claim No. 16, filed on October 29, 2009.

accrued on senior claims as of the date of the Confirmation Hearing, therefore eroding CCV's position in the collateral.  Second, in view of the current valuations of the Project the Debtor endorses, CCV is oversecured and would therefore be entitled to postpetition interest such that the remaining $9.2 million in postpetition payments received from the proceeds of its collateral must first be credited against postpetition interest before being deducted against the principal of the Class 1 CCV Secured Claim.  See Qmect v. Burlingame Capital Partners II, L.P., 373 B.R. 682, 688 (N.D. Cal. 2007) (holding where all postpetition assets of debtor represent proceeds of secured creditor's collateral, any increase in value of collateral inures to benefit of secured creditor).  In In re Vermont Investment Limited Partnership, 142 B.R. 571 (Bankr. D.D.C. 1992), the bankruptcy court explained the rationale behind crediting section 552(b)(2) proceeds first against a secured creditor's postpetition interest and then against principal:

> The position urged by the debtor would result in the application of the bank's bargained for collateral to create an "equity cushion" from which the debtor might hope to reorganize.  Aside from the obvious inequity of such a result, it would create a dramatic incentive for any secured creditor to bring a single asset reorganization case to a halt at the earliest possible moment, and would create a similar incentive on the part of the debtors to delay the case as long as possible in order to reduce the amount of the creditor's secured claim.

Id. at 574.  Here, the Debtor seeks to achieves the exact result the Vermont Investment Court sought to prevent—unduly delaying the case in hopes of eroding a secured creditor's claim over time.

27.    For the reasons set forth above, the CCV Plan has properly identified the impaired classes under the CCV Plan and specified the treatment of such classes.  Thus, the CCV Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

### (iv)    The CCV Plan Provides Adequate Means for Implementation – 11 U.S.C. § 1123(a)(5)

28.    Section 1123(a)(5) of the Bankruptcy Code requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, sales of the debtor's property, satisfaction or modification of any lien, and issuance of securities of the debtor in exchange for

claims or interests.  11 U.S.C. § 1123(a)(5).  Article XV of the CCV Plan provides for the future of the Debtor, and Article XVI of the CCV Plan provides for the transfer of the CCV Project Assets to CCV.  More specifically, Article XV.A of the CCV Plan provides for the continued management of the Debtor by Concerto Manager, Inc.

29.    Article XV.C of the CCV Plan provides for the appointment of Peter S. Kravitz as the Plan Administrator.  Among other things, the Plan Administrator shall have the Estate Actions transferred to him, and shall investigate such Estate Actions and may, in the exercise of his reasonable judgment, prosecute and/or settle the Estate Actions, and distribute the Estate Proceeds in accordance with the terms of the CCV Plan.  With respect to the Plan Administrator's compensation, the Plan Administrator will hold $2,900,000 of the Estate Held Cash in reserve for payment of the allowed Administrative Claims (the "Administrative Claims Reserve"), including $150,000 for the compensation of the Plan Administrator, $1,750,000 for allowed Administrative Claims (including, without limitation, the allowed Administrative Claims of professionals and of vendors that provided goods and services necessary to preserving the Debtor's estate) through the CCV Plan Effective Date, and $1,000,000 for fees and expenses of the Plan Administrator's advisors.  To the extent that the Administrative Claims Reserve is insufficient to pay all allowed Administrative Claims, CCV will provide additional CCV Cash sufficient to cover any such deficiency.

30.    Finally, to implement Article XVI of the CCV Plan, the CCV Project Assets shall be transferred and conveyed pursuant to a grant deed, substantially in the form attached as Exhibit A to the proposed order confirming the CCV Plan attached hereto as Exhibit 1 (the "Confirmation Order"), and a general assignment, substantially in the form attached as Exhibit B to the proposed Confirmation Order, from the Debtor to CCV free and clear of any and all liens, claims, interests, and encumbrances that are dealt with by the CCV Plan.  CCV hereby requests that CCV and the Plan Administrator be authorized, and the Debtor be authorized and directed, to take any and all actions as are necessary or appropriate to effect the provisions and purposes of the CCV Plan. Consistent with Article XVI.2 of the CCV Plan, CCV requests that the Debtor be directed to execute all documents necessary or appropriate to fully transfer all of the Debtor's right, title, and

1   interest in and to the CCV Project Assets to CCV.  As an additional measure, CCV respectfully

2   requests that the Court appoint CCV as the attorney-in-fact of the Debtor and the Debtor's estate,

3   pursuant to the power of attorney substantially in the form attached to the proposed Confirmation

4   Order as Exhibit D, for the purposes of (a) executing and delivering to (or for the benefit of) CCV

5   such affidavits, documents, instruments of conveyance, or other agreements as CCV determines

6   are necessary or appropriate to fully transfer and convey all of the Debtor's right, title, and interest

7   in and to the CCV Project Assets to CCV, and (b) otherwise effecting the terms of the CCV Plan

8   and any Confirmation Order.  Finally, CCV requests that, pursuant to section 1146(a) of the

9   Bankruptcy Code, the making or delivery of any instrument of transfer under, or in connection

10  with, the CCV Plan not be taxed under any law imposing a stamp tax or similar tax.  Without

11  limiting the foregoing, CCV also respectfully requests that any transfers from the Debtor to any

12  person pursuant to the CCV Plan not be subject to any document recording tax, stamp tax,

13  conveyance fee, intangibles tax, sales or use tax, mortgage tax, real estate transfer tax, mortgage

14  recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or

15  governmental assessment.  To implement the foregoing, CCV requests that all filing or recording

16  officers (or any other person with authority over any of the foregoing), wherever located and by

17  whomever appointed, be directed to comply with the requirements of section 1146(a) of the

18  Bankruptcy Code, forego the collection of any such tax or governmental assessment, and accept

19  for filing and recordation any of the foregoing instruments or other documents without the

20  payment of any such tax or governmental assessment.

21      31.     In the Debtor Preliminary Objection, the Debtor argues that the CCV Plan cannot

22  be implemented because the CCV Plan cannot allow CCV's claim under a plan of reorganization.

23  See Debtor Prelim. Obj. ¶ 1.  To the contrary, a plan of reorganization may provide for the

24  settlement of claim disputes between the debtor and creditors as reflected in the relative

25  distributions and recoveries or other benefits provided to holders of claims or interests under the

26  plan.  See In re Haights Cross Commc'ns, Inc., No. 10-10062, 2010 WL 2723979, at *12, 19

27  (Bankr. D. Del. 2010). Here, the CCV Plan allows for full payment of all non-insider claims, while

28  simultaneously providing a mechanism for preserving the estate's claims against CCV.

32.     Further, the Debtor also argues in the Debtor Preliminary Objection that the transfer of the CCV Project Assets to CCV free and clear of liens is in violation of applicable law and renders the CCV Plan unconfirmable.  Debtor Prelim. Obj. ¶ 9.  In a related argument, Astani Construction argues in the Astani Construction Preliminary Objection that the CCV Plan "presumes the elimination of [Astani Construction's] right to compel marshalling under California Civil [C]ode Sections 2899 and 3433 in permitting CCV to foreclose in a way that will harm [Astani Construction's] interests."  Astani Prelim. Obj. ¶ 6.  Both the Debtor and Astani Construction fail to recognize, however, that federal bankruptcy law controlling the implementation of a plan of reorganization preempts any applicable state law that might otherwise apply.[8]

33.     Section 1123(a)(5) of the Bankruptcy Code states, in relevant part, as follows:

> "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall provide adequate means for the plan's implementation, such as … transfer of all or any part of the property of the estate to one or more entities … [or] satisfaction or modification of any lien.

11 U.S.C. § 1123(a)(5)(B), (E).

34.     The methods of plan implementation set forth in section 1123(a)(5) of the Bankruptcy Code are "self-executing."  <u>See</u> 7 Collier on Bankruptcy ¶ 1123.01[5] (16th ed. 2009).  In other words, a plan of reorganization may propose actions to implement the plan notwithstanding contrary nonbankruptcy law or agreements.  The Ninth Circuit has recognized that these methods of plan implementation preempt all nonbankruptcy law dealing with financial matters.  <u>Pac. Gas & Electric Co. v. Cal.</u>, 350 F.3d 932, 948 (9th Cir. 2003) (holding that "'notwithstanding' clause of §1123(a) expressly preempts otherwise applicable nonbankruptcy law" dealing with financial conditions).  Further, the Fourth Circuit has noted that section 1123(a)(5) is an "empowering" statute meant to enhance the ability of the debtor in possession to deal with property of the estate by providing for preemption of conflicting state laws.  <u>Universal</u>

---

[8]     Although CCV believes that Astani Construction's claim is preempted by federal bankruptcy law, CCV nevertheless does not concede that Astani Construction has any rights under state law or otherwise to compel marshaling and reserves it rights to object to any claims that Astani Construction may bring to compel marshaling.

1  Coops., Inc. v. FCX Inc. (In re FCX, Inc.), 853 F.2d 1149, 1155 (4th Cir. 1988).

2      35.     In order to implement the CCV Plan, there is a planned transfer of the CCV Project

3  Assets to CCV in satisfaction of its claim.  Courts have held that, under section 1123(a)(5)(B), a

4  plan may transfer estate assets (without a sale) notwithstanding contrary nonbankruptcy law or

5  agreements. See In re Western Asbestos Co., 313 B.R. 456, 462 (Bankr. N.D. Cal. 2004)

6  (permitting transfer of estate insurance rights to trust notwithstanding conflicting state law and

7  private contractual arrangements); In re Bannerman Holdings, LLC, No. 10-01053, 2010 WL

8  4260003, at *3 (Bankr. E.D.N.C. Oct. 20, 2010) (noting that transfer of estate's condominium

9  units in satisfaction of secured creditor's claim is specifically contemplated under section

10  1123(a)(5)(B) of the Bankruptcy Code and constitutes "indubitable equivalence" of the debt);

11  FCX, 853 F.2d at 1159 (noting that section 1123(a)(5) provides authority "to order . . . setoff

12  against collateral to satisfy a secured creditor's claim even absent the authorization of that creditor

13  necessary under nonbankruptcy law.").

14      36.     Clearly, section 1123(a)(5) of the Bankruptcy Code preempts otherwise applicable

15  nonbankruptcy law dealing with a debtor's financial condition, which would include any laws

16  dealing with liens on the CCV Project Assets.  Such preemption is justified because the CCV Plan

17  ultimately settles the claims of parties holdings liens on such assets by paying them in full, except

18  for Class 5 Astani Secured Claims who are subordinated under the Guaranties.  See In re Haights

19  Cross Commc'ns, Inc., No. 10-10062, 2010 WL 2723979, at *12, 19 (Bankr. D. Del. Feb. 24,

20  2010 (confirming prepackaged chapter 11 plan and noting that plan was a settlement of claim

21  disputes between debtor and creditors as reflected in relative distributions and recoveries or other

22  benefits provided to holders of claims or interests under such plan).

23              **(b)      11 U.S.C. § 1123(b)**

24      37.     Section 1123(b) sets forth the permissive provisions that may be incorporated into a

25  chapter 11 plan, including any "provision not inconsistent with the applicable provisions of [the

26  Bankruptcy Code]."  See 11 U.S.C. § 1123(b)(6) .

27              **(i)      Treatment of Executory Contracts and Unexpired
                          Leases – 11 U.S.C. § 1123(b)(2)**

28

38.     Section 1123(b)(2) of the Bankruptcy Code allows a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. Id. § 1123(b)(2).  Article XVI of the CCV Plan provides that as of the CCV Plan Effective Date of the CCV Plan, all remaining executory contracts and unexpired leases of the Debtor that CCV has not designated for assumption by the Debtor and assignment to CCV shall be deemed rejected.[9]  CCV Plan Art. XVI.  Nevertheless, CCV hereby requests that the Court approve the assumption by the Debtor and the assignment to CCV, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, those executory contracts and unexpired leases listed on the schedule attached hereto as Exhibit 2 (the "Assigned Agreements"), subject to the terms provided for in this subsection.

39.     To the extent provided under the Bankruptcy Code or other applicable law, the Assigned Agreements will remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any Assigned Agreements or that terminates or modifies any Assigned Agreements or allows the counterparty to any Assigned Agreements to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment will constitute an unenforceable anti-assignment provision and is void and of no force or effect.

40.     Any monetary defaults under an Assigned Agreement will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount set forth in Exhibit 2 hereto from CCV Cash on the CCV Plan Effective Date or on such other terms as the parties to such Assigned Agreement may otherwise agree.  Any counterparty to an Assigned Agreement that

---

[9]     The Debtor did not argue that section 1123(b)(2) is not satisfied by the CCV Plan. Nevertheless, CCV addresses section 1123(b)(2) here in connection with effectuating the provisions under the CCV Plan.

has failed to timely object to the assumption and assignment of such Assigned Agreement will be

deemed to have consented to such assumption and assignment.  If there is a dispute regarding

(a) the amount of any cure payment, (b) the ability of CCV to provide "adequate assurance of

future performance" (within the meaning of section 365 of the Bankruptcy Code) under the

Assigned Agreement, or (c) any other matter pertaining to assumption or assignment, the

applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made

following the entry of a final order by the Court resolving the dispute and approving the

assumption and assignment.  If an objection to assumption and assignment and/or the proposed

cure amount is sustained by the Bankruptcy Court, CCV, in its sole discretion, may decide that the

applicable Assigned Agreement be rejected effective as of the CCV Plan Effective Date in lieu of

being assumed and assigned to CCV.

41.    Any claims arising out of the rejection of an executory contract or unexpired lease

pursuant to any Confirmation Order (the "Rejection Claims") must be filed with the Court no later

than thirty (30) days after the CCV Plan Effective Date (the "Rejection Claims Bar Date").

Holders of Rejection Claims that do not file a claim by the Rejection Claims Bar Date will be

forever barred, estopped, and enjoined from asserting such Rejection Claims against the Debtor or

its estate, and such Rejection Claim will be deemed discharged as of the CCV Plan Effective Date.

The Plan Administrator will file any objections to Rejection Claims no later than sixty (60) days

after the Rejection Claims Bar Date (the "Rejection Claims Objection Deadline").  The Plan

Administrator will have the authority to resolve Rejection Claims without further order of the

Court.

### (ii)    Settlement or Retention of Claims or Interests –11 U.S.C. § 1123(b)(3)

42.    Section 1123(b)(3) of the Bankruptcy Code provides that a plan may provide for

the settlement or retention of any claim or interest belonging to the debtor.  See 11 U.S.C.

§ 1123(b)(3).  The CCV Plan provides that Estate Actions[10] shall be transferred to the Plan

---

[10]    The term "Estate Actions" is defined in the CCV Plan as any and all claims and causes belonging to the estate.

Administrator.  See CCV Plan Art. XV.C.  The Plan Administrator shall investigate Estate Actions and may, in the exercise of his reasonable business judgment, prosecute and/or settle the Estate Actions.  See id.

43.    Under the CCV Plan, the Astani Construction Adversary Proceeding shall be deemed an Estate Action, unless otherwise ordered by the Court, and shall be transferred to the Plan Administrator.  See id.  The Debtor and Astani Construction have each objected to this provision of the CCV Plan, arguing that it "strips" Astani Construction of its rights and claims against other non-debtor parties.  See Debtor Prelim. Obj. ¶ 1; Astani Constr. Prelim. Obj. ¶¶ 5-7.

44.    The claims asserted by Astani Construction in its complaint in the Astani Construction Adversary Proceeding (Adv. P. No. 2:09-ap-03561-VZ Docket No. 5) (the "Astani Construction Complaint"), however, are either resolved by the CCV Plan or belong to the Debtor's estate.  The allegations in the Astani Construction Complaint fall into two main categories.  The first concerns Astani Construction's belief that it has priority over CCV's claims.  Astani Construction asserts that its claims arise from its status as a mechanic's lien holder with a claim of approximately $22,250,000 (including the mechanic's lien claims of all of the subcontractors).  Astani Construction also alleges that its mechanic's lien claims are prior and senior to the secured claim of CCV based on the purported fact that the work of improvement on the Project was commenced prior to the recordation of Corus Bank's deed of trust on July 5, 2007.  Further, Astani Construction alleges that its rights under a recorded stop notice makes its entire $25 million claim senior to the undisbursed construction loan funds including pre-allocated interest payments to be paid and that have already been paid to CCV and to Corus Bank.  All of these claims are issues of priority that are resolved under the CCV Plan, as Astani Construction's claims are contractually subordinated to CCV's claims under section 3.8 of the Guaranties as described above.  In addition, several of the asserted mechanic's lien claims underlying the Astani Secured Claims will be satisfied in full under the CCV Plan.

45.    Finally, Astani Construction also incorporates the Debtor's damage claim asserted in the Debtor Adversary Proceeding and alleges that it too has been damaged by Corus Bank's purported conduct and, as a result, CCV's claim should be equitably subordinated to the entire

19

1    claim of Astani Construction and its subcontractors.  Astani Construction, however, does not have

2    standing to pursue a claim of equitable subordination against CCV: "To have standing[,] a party

3    must assert its own legal rights and interests and cannot rest its claim to relief on the legal rights or

4    interests of third parties."  Stoll v. Quintanar, 252 B.R. 492, 495 (B.A.P. 9th Cir. 2000); In re

5    Applied Theory Corp., 493 F.3d 82, 86 (2d Cir. 2007) (holding that creditors' committee lacked

6    standing to bring equitable subordination claim because "[t]he Committee has demonstrated no

7    interest of its own in subordination separate and apart from the interests of the estate as a whole,

8    and has failed to demonstrate why it should be permitted to step into shoes of the trustee").  Here,

9    CCV has no relationship with Astani Construction; rather, CCV's relationship is with the Debtor.

10    Accordingly, any equitable subordination claims belong to the Debtor and are not founded on any

11    individualized allegation of injury to Astani Construction.  As a general rule, "[o]nly a trustee may

12    pursue a cause of action belonging to the bankruptcy estate."  Stoll, 252 B.R. at 495.  A "trustee's

13    standing to sue on behalf of the estate is exclusive; a debtor's creditors cannot prosecute such

14    claims belonging to the estate unless the trustee first abandons such claims."  CarrAmerica Realty

15    Corp. v. Nvidia Corp., 302 Fed. Appx. 514, 516 (9th Cir. 2008), cert. denied, 130 S. Ct. 57 (2009);

16    Stoll, 252 B.R. at 495 ( "[A] creditor does not have standing to assert an action against a third

17    party if the creditor has only suffered a general injury, common to all creditors and derivative of

18    injury to the debtor.").  Accordingly, Astani Construction's claim for equitable subordination

19    belongs to the Debtor, not Astani Construction, and such claim will be transferred to the Plan

20    Administrator, who will address those claims consistent with his duties.

21       46.      Nevertheless, the CCV Plan provides for the possibility that the Court does not find

22    the Astani Construction Adversary Proceeding to be an Estate Action.  In such an event, the CCV

23    Plan properly requires that no estate funds may be used to fund the pursuit of the Astani

24    Construction Adversary Proceeding.  See CCV Plan Art. XV.C.  Accordingly, CCV is not

25    improperly stripping any rights from Astani Construction and the CCV Plan satisfies section

26    1129(b)(3) of the Bankruptcy Code.

27        **B.**      **The Plan Proponent Has Complied with the Provisions of Title 11 as Required by Section 1129(a)(2) of the Bankruptcy Code**

28

47.      Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply "with the applicable provisions of this title." See 11 U.S.C. § 1129(a)(2).  Whereas section 1129(a)(1) focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.  See Andrew v. Coopersmith (In re Downtown Inv. Club III), 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) ("Bankruptcy Code § 1127(b) requires that a modified plan must comply with Bankruptcy Code § 1129.  Section 1129(a)(2) in turn requires that the proponent of the plan complies with the applicable provisions of Title 11.").  In determining whether a plan proponent has complied with this section, courts focus on whether the plan proponent has adhered to the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.  See, e.g., Computer Task Grp., Inc. v. Brotby (In re Brotby), 303 B.R. 177, 192-93 (B.A.P. 9th Cir. 2003) (focusing analysis under section 1129(a)(2) on adequacy of disclosure of plan); In re Sierra-Cal, 210 B.R. 168, 176 (Bankr. E.D. Cal. 1997) ("The Bankruptcy Code's legislative history explicitly refers to the disclosure requirement of § 1125 as an example of what § 1129(a)(2)) is intended to cover."); see also S. REP. NO. 95-989, 95th Cong., 2d Sess. 126 (1978) (stating that section 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure"); H.R. REP. NO. 95-595, 95th Cong., 1st Sess. 412 (1977).  CCV has complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 regarding the adequacy of disclosure and plan solicitation.

48.      Section 1125(e) of the Bankruptcy Code provides in relevant part as follows:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan . . . .

11 U.S.C. § 1125(e).  On December 6, 2010, the Court approved the Unitary Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the holders of claims entitled to vote on the CCV Plan to make an informed judgment as to whether to accept or reject the CCV Plan.  See Order (1) Approving Unitary Disclosure Statement, (2) Fixing Various

1   Deadlines Relating to Plan Confirmation and (3) Approving Forms of Ballot and Notice [Docket

2   No. 932] (the "<u>Disclosure Statement and Solicitation Procedures Order</u>").  As evidenced by the

3   Declaration of Service re: Solicitation Packages Served December 8, 2010 [Docket No. 939] (the

4   "<u>Solicitation Declaration</u>"), each holder of a claim against or interest in the Debtor was sent the

5   following materials as required by the Disclosure Statement and Solicitation Procedures Order: (a)

6   the Unitary Disclosure Statement (which includes the Debtor Plan and the CCV Plan), (b) a Ballot

7   (if appropriate), (c) the Notice With Respect to Solicitation of Votes Concerning Competing Plans

8   of Reorganization, and (d) the Notice of: (1) Approval of Unitary Disclosure Statement; (2) Plan

9   Confirmation Hearing; and (3) Dates and Deadlines Relating to Plan Confirmation Hearing

10  [Docket No. 936] (collectively, the "<u>Solicitation Packages</u>").  The Solicitation Packages were

11  transmitted in connection with the solicitation of votes to accept or reject the Debtor Plan and the

12  CCV Plan in compliance with section 1125 of the Bankruptcy Code and the Disclosure Statement

13  and Solicitation Procedures Order.  <u>See</u> 11 U.S.C. § 1125(b) and (c).  CCV, its affiliates, and their

14  respective present and former members, officers, directors, partners, employees, representatives,

15  advisors, attorneys, professionals, affiliates, and agents (collectively, all such entities and

16  individuals, the "<u>CCV Entities</u>") did not solicit votes on the CCV Plan prior to the transmission of

17  the Unitary Disclosure Statement.  The CCV Entities therefore solicited acceptances of the CCV

18  Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code,

19  including, without limitation, section 1125(a) and (e) of the Bankruptcy Code, the Bankruptcy

20  Rules, the Disclosure Statement and Solicitation Procedures Order, and any applicable

21  nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with

22  such solicitation.

23          49.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

24  the CCV Plan.  Under section 1126, only holders of allowed claims in impaired classes of claims

25  that will receive or retain property under a plan of reorganization on account of such claims may

26  vote to accept or reject such plan.  <u>Id.</u> § 1126.  As set forth in the Solicitation Declaration, CCV

27  solicited acceptances of the CCV Plan from the holders of all claims in each class of impaired

28  claims that is to receive distributions under the CCV Plan.  The impaired classes entitled to vote

under the CCV Plan are Classes 1, 4, 6, and 7. <u>See</u> CCV Plan Art. IX. The CCV Plan reflects that Classes 2, 3, and 5 are unimpaired and thus are conclusively presumed to have accepted the CCV Plan. <u>See id.</u> In accordance with the Disclosure Statement and Solicitation Procedures Order, CCV did not solicit acceptances from the holders of claims and interests in such classes.

50. Under the Debtor Preliminary Objection, the Debtor argues that CCV is not in compliance with section 1129(a)(2) of the Bankruptcy Code. Debtor Prelim. Obj. ¶ 2. The only allegations the Debtor makes in support of this contention is that CCV's actions have purportedly forced the shutdown of construction at the Project and are a part of CCV's litigation tactic designed to depress the value of the Project in connection with the CCV Plan. <u>Id.</u> This is not a proper objection under section 1129(a)(2) of the Bankruptcy Code. As stated above, section 1129(a)(2) concerns the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. CCV has properly adhered to such requirements and other applicable provisions of the Bankruptcy Code. Moreover, as more fully described below, CCV has taken no improper actions with respect to the Project.

51. Even if the Debtor's contentions supported a proper objection under section 1129(a)(2) of the Bankruptcy Code, it is the Debtor itself who is responsible for the slowdown of construction at the Project. CCV believes that the Debtor's allegations may be based on CCV's denial of certain draw requests. The Order Granting Debtor's Motion Authorizing Use of Cash Collateral (Proceeds of Sales of Residential Loft Units) [Docket No. 70] (the "<u>Cash Collateral Order</u>") expressly contemplates CCV's approval of draw requests and, consistent with good business practice, CCV does not simply rubber stamp draw requests. Moreover, the denied draw requests about which the Debtor complains were not timely submitted. <u>See</u> Hewitt Decl. ¶ 12. Those draw requests were also plagued by ambiguities and other issues warranting CCV's request for further information. <u>See</u> Durrer Decl. in Support of Objection to Budget Motion [Docket No. 963] Ex. A. CCV was therefore well within its rights to deny the deficient draw requests. Any attendant delays stem from deficiencies on the Debtor's end.[11]

---

[11] It should be noted that the denial of such draw requests should have come at no surprise to the Debtor. All of CCV's letters approving prior draw requests came with a reservation

*(cont'd)*

52.    Moreover, under the Cash Collateral Order, "[i]f Debtor objects to a disapproval by Lender of Withdrawal and Debtor and Lender are unable to resolve such dispute, Debtor may seek expedited relief on not less than 2 days['] notice to obtain permission to use such Cash Collateral over Lender's objection, and Lender expressly consents to such expedited treatment." See Cash Collateral Order ¶ 13(b).  The Debtor has been free to seek expedited relief from the Court and its failure to do so makes clear that the Debtor itself is the party responsible for any delays.

53.    Based upon the foregoing, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

**C.    The CCV Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law –11 U.S.C. § 1129(a)(3)**

54.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3) .  The Ninth Circuit has held that, although the Bankruptcy Code does not define "good faith," "[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002) (citing Ryan v. Loui (In re Corey), 892 F.2d 829, 835 (9th Cir. 1989)).  "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." Sylmar Plaza, 314 F.3d at 1074 (quoting In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1994)).  A plan may also be found to have been proposed in good faith where there is a showing that "the plan was proposed with 'honesty and good intentions' and with a 'basis for expecting that a reorganization can be effected.'" Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988) (citing Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (quoting Manati Sugar Co. v. Mock, 75 F.2d 284, 285 (2d Cir. 1935)).  Moreover, "[w]here the plan is proposed with the legitimate and honest purpose to

_____
*(cont'd from previous page)*
of rights respecting deficient supporting materials or the like.  See Hewitt Decl. ¶ 13.  Given that the Debtor did not cure such deficiencies, CCV's eventual denial of draw requests was consistent with such reservation of rights.

1    reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3)

2    is satisfied." Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),

3    764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the

4    totality of the circumstances surrounding the establishment of a chapter 11 plan. Sylmar Plaza,

5    314 F.3d at 1074.

6    55.    Throughout this chapter 11 case, CCV has done nothing but protect its own

7    interests by exercising its rights under the Bankruptcy Code. Nonetheless, CCV participated in

8    two court-ordered mediations and no party has suggested that CCV did not participate in such

9    mediations in good faith. In addition to the two failed mediations, CCV has continued to engage

10    in settlement negotiations with the Debtor's principals throughout the chapter 11 case.

11    56.    In the absence of a consensual resolution, CCV explored other ways to resolve this

12    chapter 11 case. Ultimately, CCV determined to propose its own plan of reorganization, the CCV

13    Plan. CCV sought and obtained the termination of the Debtor's exclusivity under section 1121 of

14    the Bankruptcy Code for such purpose, and now seeks confirmation of its plan. It cannot be said

15    that this is bad faith where the underlying plan pays all non-insider creditors in full, preserves the

16    lender liability allegations of the Debtor's principals, and has more than a reasonable hope of

17    success.

18    57.    In the Debtor Preliminary Objection, however, the Debtor argues that the sale

19    process in a prior plan filed by CCV, like the CCV Plan currently proposed, was "designed to

20    minimize the value obtained in a sale in order to give CCV ownership at a fire sale price." Debtor

21    Prelim. Obj. ¶ 3. On the contrary, CCV obviously wants to maximize the value of its collateral

22    and its return on the defaulted loan. See Hewitt Decl. ¶ 17. Like the Debtor, CCV obtained an

23    appraisal of the Project, and was guided in its decision-making by that appraisal. See id. CCV did

24    not direct its appraiser to reach any particular conclusions, but asked it to rely on its assessment of

25    the property, the market, and relevant market forces. See id. Moreover, the Debtor has not

26    provided any explanation as to why the marketplace would view CCV's expert's appraisal as more

27    credible than its own so as to actually achieve a "minimization" of value. Finally, the Debtor has

28    not furnished any evidence supporting its speculation as to CCV's current motivations. The

1    Debtor's allegations amount merely to conjecture and nothing more.

2        58.    The Debtor also argues in the Debtor Preliminary Objection that the CCV Plan

3    (a) is equivalent to foreclosure eliminating the need to comply with state foreclosure law

4    requirements and (b) circumvents CCV's pending Relief from Stay Motion.  See Debtor Prelim.

5    Obj. ¶ 3.  The reality is that CCV is exercising those rights it has under the Bankruptcy Code

6    following the Debtor's voluntary filing for relief under chapter 11 and the termination of the

7    exclusive period during which only the Debtor may file a plan under section 1121 of the

8    Bankruptcy Code.  This chapter 11 case, which has been pending for 16 months already, is

9    expensive and requires the commitment of substantial resources.  See Hewitt Decl. ¶ 18.  Under

10   the circumstances, the CCV Plan will facilitate resolution of this case.  See id.  Perhaps the Debtor

11   is making such a complaint because avoiding the state forum will deprive the Debtor of yet

12   another opportunity to delay and extract value from CCV.

13       59.    In arguing that CCV is attempting to circumvent its pending Relief from Stay

14   Motion, the Debtor also asserts that, despite asserting that the Project has a value of a

15   $122,000,000, CCV "knew that a reasonable valuation conclusion for the Project would be

16   dramatically higher."  See Debtor Prelim. Obj. ¶ 3.  As an initial matter, again, the Debtor has not

17   furnished any evidence supporting its speculations as to CCV's knowledge at any particular time.

18   Indeed, CCV's appraiser has changed its valuation of the Project.  See Hewitt Decl. ¶ 17.  It is

19   CCV's understanding, however, that its appraiser's valuation of the Project changed at least in part

20   because of the Debtor's changed strategy of leasing, rather than selling, the units.  See id; Pike

21   Decl. ¶ 4.

22       60.    The Debtor also asserts that the CCV Plan strips away the Debtor's pending

23   objection to CCV's disputed claim and pending litigation against CCV.  See Debtor Prelim. Obj.

24   ¶ 3.  In fact, the CCV Plan does exactly the opposite.  The CCV Plan actually preserves the action

25   under the control of a Plan Administrator, a neutral third-party fiduciary who can objectively

26   determine the merits of such actions.  Since all creditors are not paid in full on the Effective Date,

27   allowing the Debtor's principals to maintain control over this asset would otherwise violate the

28   absolute priority rule.  See 11 U.S.C. § 1129(b)(2).  The CCV Plan therefore uses the Plan

1    Administrator as a mechanism to respect the absolute priority rule.

2         61.    Finally, the Debtor also suggests that there was bad faith in CCV's purchasing at

3    100 cents on the dollar the claims of virtually all creditors of the Debtor.  See Debtor Prelim. Obj.

4    ¶ 3.  This chapter 11 case embroiled CCV in disputes not only with the Debtor, but also with

5    mechanic's lien claimants and unsecured creditors.  When CCV was unable to settle with such

6    constituencies as a whole, CCV explored the possibility of resolving such disputes with individual

7    creditors.  See Hewitt Decl. ¶ 19.  Resolution, in a bankruptcy case, is sometimes achieved by

8    purchasing claims of the settling parties.  The Bankruptcy Code does not proscribe such activity.

9    Accordingly, CCV determined to purchase certain of the mechanic's lien and unsecured claims it

10   now indirectly holds at 100 percent of the face amount for the following reasons: (a) paying the

11   full amount would eliminate any controversy that CCV was taking advantage of smaller creditors;

12   (b) in the case of mechanic's liens, there was a material risk that such liens would be senior to

13   CCV's lien in any event; and (c) in the case of unsecured claims, the amount was small enough as

14   to be largely inconsequential in light of the size of the Project.  See id.  Fundamentally, CCV

15   purchased claims to protect recoveries on its own claim and reduce the overall costs of the chapter

16   11 process.[12]

17        D.    **The CCV Plan is in the Best Interests of Creditors and Interest Holders –11**

18             **U.S.C. § 1129(a)(7)**

19        62.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best

20   interests of creditors and stockholders.  See 11 U.S.C. § 1129(a)(7).  The best interests test focuses

21   on individual dissenting creditors rather than classes of claims.  See Bank of Am. Nat'l Trust &

---

22        [12]    Even if CCV were purchasing claims in order to block the Debtor's plan, which it

23   was not, secured creditors are permitted to do so in the Ninth Circuit.  See Figter Ltd. v. Teachers
     Ins. & Annuity Ass'n of Am. (In re Figter Ltd.), 118 F.3d 635, 637-39 (9th Cir. 1997) (finding that

24   secured creditor's purchase of 21 of 34 unsecured claims to block debtor's reorganization plan in
     single asset real estate bankruptcy case was not bad faith).  In Figter, the Ninth Circuit found that,

25   by purchasing unsecured claims, the secured creditor was merely protecting its claim and was
     merely demonstrating "enlightened self interest."  118 F.3d at 639-40.  This is true even where the

26   purchasing creditor is proposing its own competing plan of reorganization.  See Three Flint Hill
     Ltd. v. Prudential Ins. Co. (In re Three Flint Hill Ltd.), 213 B.R. 292, 301 (D. Md. 1997); In re

27   Crosscreek Apts., Ltd., 211 B.R. 641, 646 (Bankr. E.D. Tenn. 1997) (noting that creditor/plan
     proponent's purchase of claims to block debtor's plan was not bad faith, but merely attempt to

28   protect itself from uncertainty).

1  Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999). Under the best interests test, the

2  court must find that each non-accepting creditor will receive or retain value that is not less than the

3  amount such creditor would receive if the debtor were liquidated. See 203 N. LaSalle, 526 U.S. at

4  441-42; U.S. v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 228 (1996). As

5  section 1129(a)(7) of the Bankruptcy Code makes clear, this liquidation analysis applies only to

6  non-accepting impaired claims or equity interests. If a class of claims or equity interests

7  unanimously accepts the plan, the best interests test is automatically deemed satisfied for all

8  members of that class. See 11 U.S.C. § 1129(a)(7) . The test requires that each holder of a claim

9  or interest either accepts the plan or will receive or retain under the plan property having a present

10 value, as of the effective date of the plan, not less than the amount that such holder would receive

11 or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

12      63.    The best interests test is satisfied as to each unimpaired class of claims. Pursuant to

13 section 1126(f) of the Bankruptcy Code, each holder of a claim in Classes 2, 3, and 5 is deemed to

14 have accepted the CCV Plan. See id. § 1126(f). Therefore, the best interests test is satisfied with

15 respect to those classes. Further, as noted above, the best interests test is deemed satisfied for all

16 holders of claims in Classes 1 and 4 that voted to accept the CCV Plan. Because a chapter 7

17 liquidation of the Debtor's estate would result in a distribution that is the same as or lower than the

18 distributions described for each holder of a claim or interest in Classes 6 and 7, the best interests is

19 likewise satisfied as to each holder of a claim or interest in Classes 6 and 7 that voted to reject the

20 CCV Plan.

21      64.    The Valuation Expert issued a report on November 24, 2010 [Docket No. 915] (the

22 "Expert Appraisal"), stating that, in his opinion, the highest and best use of the project is to

23 position the 271 units of the Phase I tower as an apartment complex. Based on that assumption,

24 the Valuation Expert derived a market value of the Project in its "as is" condition as of November

25 1, 2010 of $173,750,000.[13]

26

27      [13]    CCV reserves all rights to contest the assumptions and conclusions of the Expert

28 Appraisal.

65.    The value of the Debtor's assets in a hypothetical liquidation must first be adjusted downward $550,000 to reflect the sale of the Debtor's last "unsold" condominium unit,[14] and adjusted upward for estimated cash on hand of approximately $3,300,000.[15]  Finally, the CCV Cash deposited into a segregated account (the "<u>CCV Deposit Account</u>") held by Kurtzman Carson Consultants LLC (the "<u>Voting Agent</u>") in the amount of $1,074,929.54, which is only available in the event the CCV Plan is confirmed, must be considered.[16]  The claim amounts set forth in the liquidation analysis chart attached hereto as <u>Exhibit 3</u> are discussed in the CCV Plan and are the same in chapter 7 and chapter 11 with respect to (i) estimated total non-insider mechanic's lien claims ($19,631,047.93), accruing simple interest at 10% per annum; (ii) potential allowed CCV secured claim ($162,662,216.26), accruing simple interest at 7.36% per annum; (iii) estimated Astani Secured Claims ($2,589,162.83); (iv) estimated administrative expenses ($1,743,000.00); (v) estimated allowed non-insider general unsecured claims ($560,416.84); and (vi) estimated Astani Unsecured Claims ($7,151,266.69).  In a hypothetical chapter 7 liquidation, the parties can expect an additional $6,000,000 in administrative expenses ($1,000,000 for professional fees and $5,000,000 for the chapter 7 trustee fee) as compared with only an additional $1,150,000 in administrative expenses ($1,000,000 for professional fees and $150,000 for the chapter 11 plan administrator) in the chapter 11 context.  Under the CCV Plan, all creditors other than CCV and the Astani Parties (unless the Court determines that their claims are not subordinated to CCV's claims under the Guaranties, in which case such claims will be paid in accordance with the CCV

---

[14]    The Valuation Expert's appraisal report stated an "as is" value of the Project of $173,750,000, but $550,000 of such value was attributable to an "unsold" condominium unit, which has since been sold, the proceeds of which are now reflected in the Debtor's cash balance.

[15]    This estimate is based on the cash balance as of January 4, 2011, as reported in the *Declaration of Sonny Astani in Support of Debtor and Debtor in Possession's Opposition to Motion of Corus Construction Venture, LLC for Appointment of Chapter 11 Trustee* [Docket No. 889], filed on January 4, 2011 (the "<u>Astani Declaration</u>").

[16]    Based on a review of the Debtor's schedules, the claims register, and the record in this case, on January 6, 2011, CCV deposited $1,074,929.54 into the CCV Deposit Account to satisfy estimated claims payable from CCV Cash upon the CCV Plan Effective Date.  <u>See</u> *Declaration of Seth Hewitt (ST Residential, LLC) in Support of Plan of Reorganization Proposed by Corus Construction Venture, LLC* [Docket No. 917] (the "<u>Hewitt Deposit Declaration</u>").  Such amount consists of (a) $954,392.74 in non-insider mechanics lien claims classified under Class 2 of the CCV Plan, inclusive of post-petition interest, and (b) $120,536.80 in non-insider general unsecured claims classified under Class 3 of the CCV Plan, none of which claims have been acquired by CCV or its affiliates.

Plan) will be paid the full amounts of their allowed claims.  In a chapter 7 liquidation scenario, CCV projects that creditors holding general unsecured claims and equity interest holders would receive nothing.  Under the CCV Plan, even equity security holders have some prospect of payment if their alleged lender liability claims are viable.

66.    As reflected in the liquidation analysis, general unsecured creditors would receive nothing in a chapter 7 liquidation.  In contrast, General Unsecured Claims in Class 3 under the CCV Plan will be paid in full from the CCV Cash under the CCV Plan.  With respect to Classes 6 and 7, a chapter 7 liquidation would leave nothing for Classes 6 and 7 other than the potential recovery on the Debtor's lender liability theories.  Under the CCV Plan, those recoveries are preserved.  See CCV Plan Art. IX.K.2.  Because a chapter 7 liquidation of the Debtor's estate would result in a distribution that is the same as or lower than the distributions described for each holder of a claim or interest in Classes 6 and 7, the best interests test is likewise satisfied as to each holder of a claim or interest in the Rejecting Classes.

**E.    The CCV Plan Has Been Accepted by at Least One Impaired Class that is Entitled to Vote –11 U.S.C. § 1129(a)(10)**

67.    While the CCV Plan was not accepted by Classes 6 and 7, the CCV Plan was accepted by Classes 1 and 4.  Section 1129(a)(10) of the Bankruptcy Code requires that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  See 11 U.S.C. § 1129(a)(10).  Class 1 and Class 4 are impaired, contain claims that are not held by an insider, and have voted to accept the CCV Plan.  See Paque Decl. Ex. 1.

68.    In the Debtor Preliminary Objection, however, the Debtor argues that no "disinterested creditor" will vote in favor of the CCV Plan and that the only purported classes that are anticipated to vote in favor of the CCV Plan will be those with "disputed claims actually held by CCV (insiders of the plan proponent)".  See Debtor Prelim. Obj. ¶ 6. This contention has no merit as section 1129(a)(10) excludes insiders and not "disinterested creditors."  See 11 U.S.C. § 1129(a)(10).

69.    Furthermore, CCV is not an insider for purposes of section 1129(a)(10) of the

1    Bankruptcy Code.  Section 101(31) of the Bankruptcy Code defines "insider" by referring to

2    various categories of individuals related to a debtor.  See id. § 101(31).  CCV has no relationship

3    to the Debtor; it is merely a plan proponent.  Acting as a plan proponent, alone, is an insufficient

4    basis to render a party an insider.  In re Lighthouse Lodge, LLC, No. 09-52610, 2010 WL

5    4053984, at *10-11 (Bankr. N.D. Cal. Oct. 14, 2010) (holding plan proponent was not insider

6    where there was no evidence of any relationship other than typical debtor-creditor relationship

7    between debtor and plan proponent); In re River Village Assocs., 161 B.R. 127, 142 (Bankr. E.D.

8    Pa. 1993) (finding that plan proponent was not insider where parties were "engaged in a

9    heightened adversarial relationship and clearly at arms length from one another.").  The Debtor's

10   characterization of CCV as an interested creditor is irrelevant.  For the foregoing reasons, CCV is

11   a non-insider impaired creditor that voted to accept the CCV Plan in Classes 1 and 4.  Accordingly,

12   the CCV Plan satisfies the requirement of section 1129(a)(10) of the Bankruptcy Code.

13   **F.    The CCV Plan is Not Likely to be Followed by Liquidation or the Need for
             Further Financial Reorganization –11 U.S.C. § 1129(a)(11)**
14

15        70.    Section 1129(a)(11) requires that, as a condition precedent to confirmation, the

16   court determines that the plan is feasible.  See 11 U.S.C. § 1129(a)(11).  Specifically, the court

17   must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or

18   the need for further financial reorganization, of the debtor or any successor to the debtor under the

19   plan, unless such liquidation or reorganization is proposed in the plan."  Id.

20        71.    The feasibility test in section 1129(a)(11) requires the court to determine whether

21   the plan is workable and has a reasonable likelihood of success.  See U.S. v. Energy Res. Co., Inc.,

22   495 U.S. 545, 549 (1990); Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1364 (9th

23   Cir. 1986) (finding that plan met feasibility requirement under section 1129(a)(11) where the

24   debtor presented evidence demonstrating that the plan had a reasonable probability of success).

25   Nevertheless, "only a relatively low threshold of proof [is] necessary to satisfy the feasibility

26   requirement."  In re Sagewood Manor Assocs. Ltd. P'ship, 223 B.R. 756, 762 (Bankr. D. Nev.

27   1998) (citations omitted).  Specifically, "[t]he key element of feasibility is whether there exists a

28   reasonable probability that the provisions of the plan of reorganization can be performed."  Id.

72.    CCV is able to effectuate this by executing all documents necessary or appropriate to fully transfer all of the Debtor's right, title, and interest in and to the CCV Project Assets from the Debtor to CCV under the terms of section 1142 of the Bankruptcy Code.  Moreover, CCV is ready and able to fund its obligations under the CCV Plan.  See Hewitt Decl. ¶ 21.  The CCV Plan is clearly workable and has a reasonable likelihood of success.  The Plan Administrator is ready, willing and able to effectuate his tasks under the CCV Plan, and he believes that the funding available for that task is sufficient.  See Kravitz Decl. ¶ 3.  CCV has outlined what needs to be done for the CCV Plan to be effectuated and has demonstrated how the provisions thereunder will be performed.  Thus, the CCV Plan is feasible under section 1129(a)(11) of the Bankruptcy Code.

## III.    The CCV Plan Satisfies the "Cram Down" Requirements Under Section 1129(b) of the Bankruptcy Code

73.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and/or equity interests.  Thus, under section 1129(b) of the Bankruptcy Code, the court may "cram down" a plan over the actual or deemed rejection by impaired classes of claims or equity interests so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.

### A.    The CCV Plan Does Not Discriminate Unfairly With Respect to the Rejecting Classes

74.    Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes; it prohibits only discrimination that is unfair.  See In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990).  The weight of judicial authority holds that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment.  See Steelcase, Inc. v. Johnston (In re Johnston), 21 F.3d 323, 328 (9th Cir. 1994) (holding that plan's different treatment and classification did not discriminate unfairly because "there were reasonable, nondiscriminatory reasons" for such treatment); see also In re Buttonwood Partners, Ltd., 111 B.R. 57 (Bankr. S.D.N.Y. 1990).  The Ninth Circuit has stated that

[d]iscrimination between classes must satisfy four criteria to be considered fair under 11 U.S.C. § 1129(b) : (1) the discrimination must be supported

32

by a reasonable basis; (2) the [plan proponent] could not confirm or
consummate the Plan without the discrimination; (3) the discrimination is
proposed in good faith; and (4) the degree of the discrimination is directly
related to the basis or rationale for the discrimination.

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115

F.3d 650, 656 (9th Cir. 1997) (citing Amfac Distrib. Corp. v. Wolff (In re Wolff), 22 B.R. 510,

511-12 (B.A.P. 9th Cir. 1982)).

75.     In the Debtor Preliminary Objection, the Debtor argues that the CCV Plan

discriminates against the Astani claimants.[17]  Debtor Prelim. Obj. ¶ 8.  Class 6 Astani Unsecured

Claims, however, are dissimilar in legal nature from other unsecured classes under the CCV Plan

and therefore may be treated differently.  See Johnston, 21 F.3d at 328.  First, Class 6 Astani

Unsecured Claims are held by Astani Construction, an insider of the Debtor, whereas Class 3

General Unsecured Claims and the Class 4 CCV Deficiency Claim are not held by insiders.

Second, Class 6 Astani Unsecured Claims were voluntarily subordinated pursuant to the

subordination provisions contained in the Guaranties.  See supra II.A.1.  Such voluntary

subordination also serves as a reasonable basis for the disparate treatment of Class 6 vis-à-vis

Classes 3 and 4, because neither Class 3 nor Class 4 is subject to any subordination agreements.

Further, if such subordination provisions are not enforceable, holders of Class 6 Astani Unsecured

Claims receive distributions from the proceeds of the Estate Actions.  Moreover, it should be noted

that in none of its proposed plans did the Debtor's unsecured claim estimates include a claim for

Astani Construction.  Accordingly, the CCV Plan does not discriminate unfairly against Class 6, as

it is treated appropriately according to the differences outlined herein.

**B.    The Plan is Fair and Equitable with Respect to the Rejecting Classes and the
Classes that Voted to Reject the Plan**

76.     Classes 6 and 7 voted to reject the CCV Plan.  The CCV Plan, however, is fair and

equitable with respect to these Rejecting Classes.  In order for a plan to be "fair and equitable"

with respect to unsecured creditors, it must provide for payment in full or no junior claimant or

---

[17]     Similarly, Astani Construction makes a blanket claim that the CCV Plan does not
meet the confirmation standards of section 1129(b).  Astani Constr. Prelim. Obj. ¶ 9.

1  interest holder may receive or retain property under the plan.  11 U.S.C. § 1129(b)(2)(B) .  In other

2  words, "all unsecured creditors be paid in full before equity security holders are allowed to retain

3  any ownership interest in the debtor."  Computer Task Group, Inc. v. Brotby (In re Brotby), 303

4  B.R. 177, 195 (B.A.P. 9th Cir. 2007) (citing Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 654 (9th

5  Cir. 1997); Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship), 2 F.3d

6  899, 906-07 (9th Cir. 1993)).  Here, this requirement is satisfied because holders of interests in

7  Class 7, the only class junior to Class 6, receives nothing under the CCV Plan unless there are

8  Residual Proceeds (in which case Class 6 would have been paid in full).  See CCV Plan Art.

9  VIII.B; IX.H.2.  The CCV Plan is likewise "fair and equitable" with respect to interests because no

10  classes junior to Class 7 exist.  See CCV Plan Art. IX.H.2; 11 U.S.C. § 1129(b)(2)(C) .

11        77.      The Debtor argues that the CCV Plan is not fair and equitable because CCV does

12  not hold an allowed claim, yet the CCV Plan nonetheless "provides for the transfer of

13  consideration to CCV with a value in excess of any allowed claim of CCV."  Debtor Prelim. Obj. ¶

14  8.  As a preliminary matter, this is not a "fair and equitable" objection within the definition of "fair

15  and equitable" under section 1129(b)(2) of the Bankruptcy Code.  See 11 U.S.C. § 1129(b)(2).  As

16  noted above, the CCV Plan must adhere to the absolute priority rule respecting classes that voted

17  to reject the CCV Plan, which it does.  Nevertheless, even if it were an appropriate objection under

18  section 1129(b)(2), the CCV Plan preserves the estate's claims in the Debtor Adversary

19  Proceeding and transfers such objection to the Plan Administrator.  See CCV Plan Art. XV.C.

20  Accordingly, the Debtor's rights have not been prejudiced vis-à-vis the treatment of CCV's claim.

21                                    **IMMEDIATE EFFECTIVENESS**

22        78.      CCV requests that the terms of the Confirmation Order be effective immediately

23  upon entry thereof, notwithstanding any stay that might be imposed by Bankruptcy Rules 3020(e),

24  6004(h), 8001, 8002, or otherwise.  The immediate effectiveness of the Confirmation Order is

25  justified.  This is a single-asset real estate case that has been pending for 16 months – far too long

26  for creditors to be waiting for payment, particularly given that non-insider creditors are proposed

27  to be paid in full under the CCV Plan.  There is accordingly no reason to extend this delay any

28  longer.

1    79.    Moreover, the Debtor's delays to date have put the Project in jeopardy.  Further

2 delay only exacerbates that harm.  For example, the Project remains at risk for losing certain

3 beneficial insurance that is in place as well as certain permits.  In addition, there remains a

4 question as to whether any safety hazards exist at the project.  Delaying the change of control

5 provided under the CCV Plan will provide unreasonable opportunity for mischief.  This is

6 particularly true where, as here, the Debtor has no approved budget for the use of cash collateral.

7 CCV submits that allowing the terms of the Confirmation Order to be effective immediately is

8 appropriate under the circumstances and will facilitate the resolution of this bankruptcy case

9 without further undue delay.  See Hewitt Decl. ¶ 23.

10                **CONCLUSION**

11    The CCV Plan complies with and satisfies the requirements of section 1129 of the

12 Bankruptcy Code.  Accordingly, CCV requests that the Court (a) enter an order, substantially in the

13 form attached hereto as Exhibit 1, confirming the CCV Plan and granting related relief,

14 (b) overrule the Objections, and (c) grant the Debtors such other and further relief as is just and

15 proper.

16 Date: January 31, 2011                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

17

18                        By:    /s/ Ramon M. Naguiat
                               Van C. Durrer II (SBN 226693)
19                             Ramon M. Naguiat (SBN 209271)
                               Emily C. Ma (SBN 246014)
20                             300 South Grand Avenue, Suite 3400
                               Los Angeles, California 90071
21                             Telephone:  213-687-5000
                               Facsimile:  213-687-5600

22                        Attorneys for Corus Construction Venture, LLC

23

24

25

26

27

28