Van C. Durrer II (SBN 226693)
Ramon M. Naguiat (SBN 209271)
Emily C. Ma (SBN 246014)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600
van.durrer@skadden.com
ramon.naguiat@skadden.com
emily.ma@skadden.com

Attorneys for Corus Construction Venture, LLC

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:09-bk-35127-VZ |
| GTS 900 F, LLC, a California limited liability company, aka Concerto, | Chapter 11 |
| Debtor | MODIFIED PLAN OF REORGANIZATION PROPOSED BY CORUS CONSTRUCTION VENTURE, LLC[1] |
| Tax Id # 20-2396211 | DATE: February 17, 2011<br>TIME: 9:30 a.m.<br>PLACE: Courtroom 1368<br>255 East Temple Street<br>Los Angeles, CA 90012 |

---

[1] In light of the settlement discussed below, this plan (a) modifies the existing plan proposed by Corus Construction Venture, LLC, which is incorporated in the First Amended Unitary Disclosure Statement and Competing Plans of Reorganization Proposed by GTS 900 F, LLC and Corus Construction Venture, LLC [Docket No. 917] (the "CCV Plan") and (b) replaces the form of modified plan attached to the pursuant to the Conditional Motion to (I) Approve the Settlement, (II) Authorize Modifications to Corus Construction Venture LLC's Plan of Reorganization, and (III) Confirm the Modified Plan [Docket No. 1050].

# **TABLE OF CONTENTS**

I.       INTRODUCTION ................................................................................. 1

II.      GENERAL DISCLAIMER AND VOTING PROCEDURE ....................................... 7

III.     WHO MAY OBJECT TO CONFIRMATION OF THE PLAN ................................. 9

IV.      WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN ................................. 10

V.       VOTES NECESSARY TO CONFIRM THE PLAN .................................................. 10

VI.      INFORMATION REGARDING VOTING IN THIS CASE ................................... 11

VII.     DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND
         EVENTS PRECIPITATING BANKRUPTCY FILING ........................................... 11

         A.      STRUCTURE OF DEBTOR ................................................. 11

         B.      EVENTS PRECIPITATING THE CHAPTER 11 FILING ........................ 13

                 1.      DEBTOR'S VIEW ................................................. 13

                 2.      CCV'S VIEW ................................................. 20

         C.      DEBTOR'S BUSINESS AND FUTURE OF THE PROJECT ................... 23

                 1.      DEVELOPMENT OF PROJECT ................................... 23

                 2.      FUTURE OF THE PROJECT ................................... 24

                 3.      NO CURRENT ALTERNATIVE TO THE MODIFIED
                         PLAN ................................................. 26

VIII.    CRITICAL PLAN PROVISIONS ................................................. 26

IX.      DESCRIPTION AND TREATMENT OF CLAIMS AND INTERESTS ............... 28

         A.      OVERVIEW OF PLAN PAYMENTS ................................... 28

                 2.      AFFILIATE CLAIMS ................................... 32

         B.      ADMINISTRATIVE EXPENSES ................................... 34

         C.      UNSECURED TAX CLAIMS ................................... 39

         D.      CLASSIFICATION OF CLAIMS AND INTERESTS ................... 40

         E.      CCV'S SECURED CLAIM ................................... 40

         F.      MECHANIC'S LIEN CLAIMS ................................... 44

         G.      GENERAL UNSECURED CLAIMS ................................... 45

i

H.      EQUITY INTERESTS ......................................................... 46

I.      CCV DEFICIENCY CLAIM ............................................... 47

J.      SECURED CLAIMS OF DEBTOR'S AFFILIATES .................................. 48

K.      UNSECURED CLAIMS OF DEBTOR'S AFFILIATES ............................ 49

X.      SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS ............ 50

XI.     FINANCIAL INFORMATION TO ASSIST IN DETERMINING
        WHETHER PROPOSED PAYMENT IS FEASIBLE ................................. 50

XII.    ASSETS AND LIABILITIES OF THE ESTATE ...................................... 50

        A.      ASSETS ................................................................. 50

        B.      LIABILITIES ........................................................ 52

        C.      SUMMARY ............................................................ 53

XIII.   TREATMENT OF NONCONSENTING CLASSES ................................... 54

XIV.    TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING
        CLASS (CHAPTER 7 LIQUIDATION ANALYSIS) ................................ 55

XV.     FUTURE DEBTOR ...................................................................... 55

        A.      MANAGEMENT OF DEBTOR ..................................... 55

        B.      FUTURE FINANCIAL OUTLOOK ................................. 55

XVI.    SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF
        CONTRACTS AND LEASES; OTHER PROVISIONS ........................... 56

XVII.   COMPROMISE OF CONTROVERSY; RELEASES; INDEMNIFICATION ........ 57

XVIII.  BANKRUPTCY PROCEEDINGS ................................................... 60

        A.      COMMENCEMENT OF CASE .................................... 60

        B.      LOFT UNITS SALE AND CASH COLLATERAL MOTIONS ................. 60

        C.      CLAIM OF CCV ..................................................... 62

        D.      DEBTOR'S COMPLAINT AND OBJECTION TO CLAIM OF
                CCV ..................................................................... 62

        E.      COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED
                BY THE COMMITTEE ........................................... 63

        F.      COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED
                BY ASTANI CONSTRUCTION, INC. .......................... 64

        G.      COMPLAINT AGAINST CORUS BANK ...................... 65

H.   CLAIMS ACQUIRED BY AFFILIATES OF CCV .................................... 66

I.    RELIEF FROM STAY MOTION ................................................................ 67

J.    COMPLAINT AGAINST GUARANTORS.................................................. 67

K.   COMPLAINT REGARDING CLAIM AND LIEN OF FIRE
      PROTECTION GROUP FILED BY ASTANI CONSTRUCTION,
      INC.................................................................................................................. 68

L.    TREATMENT OF MECHANIC'S LIEN CLAIMS .................................... 69

M.   PLANS AND DISCLOSURE STATEMENTS............................................ 69

XIX.  TAX CONSEQUENCES OF PLAN ................................................................ 69

      1.    INTRODUCTION .................................................................... 69

      2.    FEDERAL INCOME TAX CONSEQUENCES TO A
            DEBTOR.................................................................................. 71

            (a)   PASS-THROUGH TAX ENTITY .......................... 71

            (b)   REDUCTION OF DEBTOR'S INDEBTEDNESS .............. 71

      3.    TAX CONSEQUENCES TO CREDITORS ......................... 72

            (a)   CLAIMS SATISFIED WITH PAYMENT. ........................... 73

                  (i)    GAIN/LOSS ON EXCHANGE ............................... 73

                  (ii)   TAX BASIS AND HOLDING PERIOD OF
                         ITEMS RECEIVED ...................................... 73

                  (iii)  DETERMINATION OF CHARACTER OF
                         GAIN ............................................................ 73

            (b)   RECEIPT OF INTEREST...................................................... 73

            (c)   OTHER TAX CONSIDERATIONS ..................................... 74

                  (i)    MARKET DISCOUNT............................................... 74

                  (ii)   WITHHOLDING .................................................. 74

      4.    TAX CONSEQUENCES TO EQUITY HOLDERS ....................... 75

XX.   EFFECT OF CONFIRMATION OF PLAN............................................... 75

      A.    GENERAL COMMENTS................................................................ 75

      B.    DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS;
            STATUS OF LIENS; EQUITY SECURITY HOLDERS .......................... 76

      C.    MODIFICATION OF THE MODIFIED PLAN ................................. 76

iii

D.    POST-CONFIRMATION CAUSES OF ACTION ........................................ 76

E.    DISSOLUTION OF COMMITTEE ................................................................ 77

F.    POST-CONFIRMATION OPERATIONS ....................................................... 77

G.    EXECUTION AND DELIVERY OF DOCUMENTS .................................. 77

H.    FINAL DECREE ........................................................................................... 78

XXI.    DECLARATION IN SUPPORT OF MODIFIED PLAN ......................................... 78

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

## I.     **INTRODUCTION**

On September 17, 2009 (the "Petition Date"), GTS 900 F, LLC (the "Debtor" or "GTS"), a California limited liability company, also known as Concerto, filed a bankruptcy petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

Corus Construction Venture, LLC (collectively with its designee, "CCV" or the "Plan Proponent") has proposed a reorganization plan, the CCV Plan, which is incorporated in the First Amended Unitary Disclosure Statement and Competing Plans of Reorganization Proposed by GTS 900 F, LLC and Corus Construction Venture, LLC [Docket No. 917] (the "Unitary Disclosure Statement"). CCV hereby proposes the following plan of reorganization (the "Modified Plan"), which reflects certain non-material modifications to the CCV Plan, including modifications consistent with the settlement discussed below. A redline comparing this Modified Plan to the Unitary Disclosure Statement (which integrates the CCV Plan) is attached hereto as Exhibit A.

On February 8, 2011, CCV and the Debtor, Astani Construction, Inc. ("Astani Construction"), Sonny Astani, Marco Astani, and the Participating Equity Holders,[2] in all capacities, on behalf of themselves, their respective affiliates, and any entities controlled by them (collectively, such parties, their affiliates, and any entities controlled by them, excluding the Debtor and Astani Construction, the "Astani Parties"), entered into the Stipulation Regarding Motion of Corus Construction Venture, LLC for Appointment of Chapter 11 Trustee and Related Matters (the "Settlement"). A copy of the Settlement is attached hereto as Exhibit B.

Consistent with the Settlement, this Modified Plan addresses, effects, and/or reflects the following:

> 1)     On the first business day after the date on which the Court's order confirming this Modified Plan is no longer subject to any stay (the "Effective Date" and, the Debtor as reorganized on and after the Effective Date, the "Reorganized Debtor"), subject to the establishment of the Claims Reserve (defined below), CCV will pay $9,525,000 to the Reorganized

---

[2]     As used in this Modified Plan, the "Participating Equity Holders" means, collectively, the following holders of the equity (membership) interests in the Debtor: (a) Sonny Astani and Jo Cho, as trustees of the Astani/Cho Living Trust (30%); (b) Marco Astani, as trustee of the Marco Astani Living Trust (5%); and (c) Concerto Partners, LLC, a California limited liability company (50%).

Debtor (the "Settlement Funds"), which funds shall be subject to the terms and procedures set forth in the Settlement.

2)   The Modified Plan calls for the settlement, discharge, and release of (a) all Estate Actions (defined below), including, but not limited to, the Debtor Adversary Proceeding (defined below) and the Astani Construction Adversary Proceeding (defined below), but excluding the FDIC District Court Proceeding (defined below); (b) any and all claims that the Astani Parties, the Debtor, and/or Astani Construction may have against CCV and/or Corus Bank, N.A. ("Corus Bank"); (c) any and all claims that CCV and/or Corus Bank may have against the Astani Parties and Astani Construction; and (d) any and all claims that any of the Astani Parties and Astani Construction may have against the Debtor's estate, including without limitation, the claims classified in Classes 5 and 6 of the CCV Plan, and any and all claims that the Debtor's estate may have against the Astani Parties and Astani Construction.  Class 7 interests are preserved.

3)   On the Effective Date, the FDIC District Court Proceeding and all rights, claims, and interests asserted therein will be transferred to the Reorganized Debtor.

4)   On the Effective Date, the Guarantor Defendants' (defined below) liability under any guaranties executed in connection with the Loan Agreement will be released, including, without limitation, release of the State Court Guaranty Proceeding (defined below) and the Illinois Guaranty Proceeding (defined below).

5)   On the Effective Date, a supplemental reserve (the "Claims Reserve") in the amount of $125,000 will be deducted from the Settlement Funds and deposited with Kurtzman Carson Consultants LLC (the "Claims Reserve Administrator"), at no cost to the Astani Parties or Astani Construction.  The Claims Reserve Administrator fees shall be paid by CCV.  The Claims Reserve shall be administered outside of this Modified Plan and in accordance with the terms of the Settlement.  Any party that does not have an allowed claim in the Debtor's bankruptcy case or is otherwise not entitled to participate therein may assert a claim against the Claims Reserve by presenting a claim form (a "Claim Form") to Sonny Astani or the representative(s) he designates in writing for purposes of this process (collectively, Sonny Astani and the designated representative(s), the "Astani Reviewer").  The Claim Form shall (a) indicate the amount of the asserted claim, (b) contain a release of the Debtor, CCV, the Astani Parties, Astani Enterprises, Inc. ("Astani Enterprises"), Astani Construction, and their respective affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, and representatives from any and all liabilities that are or may be asserted by the applicable claimant, (c) be executed, (d) contain a representation that the person signing the Claim Form is authorized to submit and to execute the Claim Form on behalf of the applicable claimant, and to bind such applicable claimant to the terms of the Claim Form, including, without limitation, the releases provided therein, and (e) include a signature block for the Astani Reviewer to indicate his or her approval of the asserted claim.  The Astani Reviewer shall review all Claim Forms and, if the Astani Reviewer approves the asserted claim, shall sign the Claim Form to indicate such approval (such signed and approved claims, the "Approved Claims").  Only Approved Claims that the Claims Reserve

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

Administrator has actually received from the Astani Reviewer on or before the date that is 180 days after the Effective Date (such 180th day, the "Claims Determination Date") shall be entitled to distributions from the Claims Reserve. If the total amount of Approved Claims actually received by the Claims Reserve Administrator as of the Claims Determination Date is equal to or less than $125,000, the Approved Claims shall be paid in full from the Claims Reserve, with any remaining balance after payment of such Approved Claims to be transferred to the Reorganized Debtor. If the total amount of Approved Claims actually received by the Claims Reserve Administrator as of the Claims Determination Date exceeds $125,000, holders of Approved Claims will receive their pro rata shares of funds in the Claim Reserve. The Claims Reserve Administrator shall make distributions in accordance with the Settlement within ten (10) business days after the Claims Determination Date and shall be entitled to rely on the Approved Claims actually received from the Astani Reviewer in making such distributions.

6)    The plan-administrator role is eliminated. In addition, there will be no reserve for administrative claims. Instead, allowed administrative claims will be paid from CCV Cash (defined below) and/or Reorganized Debtor Cash (defined below) consistent with the Settlement described in more detail below.

7)    Astani Enterprises and the Reorganized Debtor shall be responsible for payment of all fees and expenses of the Debtor's professionals, including, without limitation, Moran & Company ("Moran")[3] (the "Estate Professional Claims"), except as otherwise provided in the Settlement.

8)    CCV will pay all allowed administrative expense claims excluding the Estate Professional Claims incurred through and including January 25, 2011, which claims will be paid by Astani Enterprises or the Reorganized Debtor. CCV will, however, pay allowed Estate Professional Claims, in an amount not to exceed $125,000 in the aggregate, that are incurred on and after January 26, 2011, through the Effective Date.

9)    The Debtor and CCV shall reasonably cooperate with each other and use their best efforts to cause the extension through at least April 30, 2011 of the existing OCIP insurance policy which currently covers the Concerto project through March 31, 2011. The Debtor shall use its best efforts to cause CCV to be added as an additional insured on the existing OCIP insurance policy. In the event that the OCIP insurance policy is extended prior to the Effective Date, the Debtor may use cash collateral to pay the associated premium. In the event that the OCIP insurance policy is extended on or after the Effective Date, CCV shall be responsible for the associated premium as well as any deductible or self-insured retention that is a condition of coverage under such policy.

---

[3] For the avoidance of doubt, Astani Enterprises shall be responsible for payment of any fees and expenses that may be owed to Moran, regardless of when such fees and expenses were incurred, and CCV shall not be responsible for paying any amounts to Moran under this Modified Plan or otherwise.

3

10)    Subject to the occurrence of the Effective Date, the Debtor, Astani Construction, and the Astani Parties shall reasonably cooperate with CCV regarding the transition of the CCV Project Assets (defined below), including, without limitation, the Project (defined below) and the materials listed in Schedule 1 (such materials, the "Project Materials") to the Assignment attached as Exhibit C hereto (the "Assignment"), to the new post-Effective Date owner of the Concerto Project, 900 Figueroa Street Marketing, LLC (collectively with its designee(s), "900 FSM"). Such cooperation shall include, without limitation, taking such actions and executing such documents as are necessary or appropriate to effect the transfer of the CCV Project Assets to 900 FSM in accordance with this Modified Plan. Under the Settlement, CCV expressly reserves its rights to enforce the obligations of the Debtor, Astani Construction, and the Astani Parties under the Settlement, including, without limitation, under section 1142 of the Bankruptcy Code, and to seek redress against such parties for any failure to satisfy such obligations. The Settlement further provides that nothing therein is intended to or shall be deemed to waive, and the Debtor, Astani Construction, and the Astani Parties expressly reserve, their rights to enforce the obligations of CCV under the Settlement, including, without limitation, under section 1142 of the Bankruptcy Code, and to seek redress against such party for any failure to satisfy such obligations.

11)    Following the Effective Date, within thirty (30) days' notice by an Astani Party, Astani Enterprises, the Reorganized Debtor, or Astani Construction of any bond posted in connection with the Project (including a copy of such bond), CCV shall cause a replacement bond to be issued on behalf of 900 FSM and shall reasonably cooperate with such Astani Party, Astani Enterprises, the Reorganized Debtor, or Astani Construction in the release of such pre-existing bond.

12)    Subject to the terms set forth in an indemnification agreement (the "Indemnity Agreement"), substantially in the form attached hereto as Exhibit D, CCV and 900 FSM will indemnify Astani Enterprises, Astani Construction, Inc., Sonny H. Astani, Jo Cho, The Astani/Cho Living Trust Dated as of April 29, 1999, Marco K. Astani, The Marco Astani Family Trust Dated as of March 16, 2006, Concerto Partners, LLC, and HPG Management, Inc. (each, individually an "Indemnified Party," and collectively the "Indemnified Parties") and hold the Indemnified Parties harmless from and against any and all claims, losses, liabilities, penalties, costs (including attorneys' fees), liens, assessments, and judgments pertaining to the Concerto project to the extent arising from and after the Effective Date arising out of or as a result of any act or omission of CCV or 900 FSM, or their independent contractors, agents, and assigns from and after the Effective Date (including, without limitation, any failure to fulfill CCV's obligations under the Modified Plan and CCV's or 900 FSM's acts relating to the Concerto website and Concerto name), but expressly excluding any such claims, losses, liabilities, penalties, costs (including attorneys' fees), liens, assessments, and judgments pertaining to the Concerto project to the extent arising out of or as a result of any act or omission of any Indemnified Party, or any officer, director, partner, manager, member, shareholder, trustee, affiliate, subsidiary, parent, agent, or employee of the Debtor or any Indemnified Party.

13)    The Debtor, Astani Construction, and the Astani Parties shall execute an agreement and acknowledgment, substantially in the form attached hereto as

4

Exhibit E the ("<u>Acknowledgment</u>"), in which they each agree, acknowledge, and represent as follows: (a) not later than the Effective Date, HPG Management, Inc. (the "<u>Loft Manager</u>") will deliver a notice to Concerto Lofts Condominium Association (the "<u>Loft HOA</u>") terminating the Professional Management Agreement dated December 1, 2009 (the "<u>Loft Management Agreement</u>") between the Loft Manager and the Loft HOA, with such termination to be effective not later than 30 days following delivery of such notice; (b) other than the Loft Management Agreement, any and all rights and agreements, including, without limitation, management rights and agreements, relating to any homeowners' association for the Project (collectively, all such rights and agreements, the "<u>HOA Rights</u>") are held and/or are in the name of the Debtor or Astani Construction and no HOA Rights are held and/or are in the name of any person or entity that is not a signatory to the Acknowledgment; (c) any and all HOA Rights, other than the Loft Management Agreement, shall be transferred to 900 FSM under the Assignment; (d) there are no contractual arrangements relating to or affecting the Project to which the Debtor or any affiliate of the Debtor is a party that will continue in effect after the Effective Date other than such rights as will be transferred and assigned to 900 FSM as provided under this Modified Plan; (e) neither the Debtor nor any affiliate of the Debtor will retain any interest in the Project after the Effective Date; (f) there shall be a letter (the "<u>Loft HOA Letter</u>") from the Debtor and the Loft Manager to the Loft HOA introducing 900 FSM as the new owner of the Project; (g) except as expressly identified in the Acknowledgment, any and all construction materials relating to the Project are located at 900 South Figueroa Street, 901 South Flower Street, and 700 West 9th Street in the City of Los Angeles, County of Los Angeles, State of California; (h) any and all construction materials, wherever located, relating to the Project shall be transferred to 900 FSM under the Assignment.

14)    The Reorganized Debtor and CCV will reasonably cooperate with each other on the issuance of a public statement following the Effective Date regarding the Settlement, which must be reasonably acceptable to CCV and the Astani Parties.  For a period of two years following entry of an order confirming the Modified Plan, none of the Astani Parties, the Debtor, Astani Construction, Astani Enterprises or CCV shall be authorized to issue any public statements regarding the Settlement or the subject matter of the disputes resolved by the Settlement, except as otherwise agreed by the foregoing parties in advance in writing.  In addition, the foregoing parties shall be prohibited from issuing any materials or statements containing disparaging remarks regarding the Concerto project, any parties to the Settlement, or any affiliates (excluding the FDIC and excluding any individuals who were employees, agents, and/or representatives of Corus Bank or of any parent or affiliate of Corus Bank) of such parties.  CCV and its affiliates shall not use the names or likeness of Astani Construction or the Astani Parties in any marketing materials. Nothing in the Modified Plan, however, precludes the filing or submission of ordinary and necessary applications with any governmental official or regulator.

15)    None of the Astani Parties, Astani Construction, the Reorganized Debtor, or Astani Enterprises shall serve any discovery on CCV or CCV's affiliates, officers, directors, employees, agents, or equity holders (excluding the FDIC and excluding any individuals who were employees, agents, and/or representatives of Corus Bank or of any parent or affiliate of Corus Bank) in connection with the FDIC District Court Proceeding.

5

1    In connection with the Settlement, (a) the Debtor has withdrawn with prejudice its Motion

2    to Approve Updated Budget to Complete Construction, Eliminate Adequate Protection Payments,

3    and Permit Payment of Expenses Consistent with Prior Approved Budget [Docket No. 947], (b) the

4    Debtor and Astani Construction have each withdrawn with prejudice their respective objections to

5    the CCV Plan, (c) the votes of the Astani Parties holding claims and/or interests in Classes 6 and/or

6    7 under the CCV Plan have been revised to be in acceptance of the CCV Plan, as modified by this

7    Modified Plan, and (d) each of the Astani Parties holding claims and/or interests in Classes 5, 6,

8    and/or 7 under the CCV Plan expressly consents to confirmation of this Modified Plan.

9    Voting on the CCV Plan was solicited in accordance with the Court's order approving the

10   Unitary Disclosure Statement [Docket No. 932] (the "Disclosure Statement Order").  The voting

11   results with respect to the CCV Plan are sufficient to support confirmation of the CCV Plan.  See

12   Declaration of Michael J. Paque with Respect to the Tabulation of Votes on the Competing Plans

13   of Reorganization Proposed by GTS 900 F, LLC and Corus Construction Venture, LLC Pursuant to

14   Local Rule 3018-1 [Docket No. 1033] (the "Voting Declaration").  Under the Settlement, Astani

15   Construction and the Astani Parties holding claims and/or interests classified in Classes 6 and 7

16   under the CCV Plan have cast ballots voting to accept this Modified Plan.  Moreover, the Debtor,

17   Astani Construction, and the Astani Parties have consented to confirmation of the Modified Plan.

18   The Plan Proponent has not resolicited any vote from FG 98 Investment Co., LP. ("FG 98"),

19   an equity holder of the Debtor.  FG 98's equity interest, however, is classified in Class 7, which has

20   accepted the CCV Plan.  As discussed below, the Modified Plan may be confirmed without FG

21   98's acceptance under section 1129(a)(7)(A)(ii) because FG 98 will retain its interest in the Debtor

22   under the Modified Plan which is at least as much as it would receive in a chapter 7 liquidation

23   scenario.  Given that this Modified Plan reflects only non-material modifications to the CCV Plan

24   in that the parties primarily affected by such modifications have either consented to or will receive

25   better treatment under the Modified Plan, the Plan Proponent believes that this Modified Plan may

26   be confirmed by the Court without need for approval of any disclosure statement for, or solicitation

27   of votes on, this Modified Plan.  Accordingly, this Modified Plan excludes certain elements and

28

1  discussions that are contained in the Unitary Disclosure Statement and focuses on the terms of the

2  Modified Plan itself.

3       The Court has not confirmed the CCV Plan or this Modified Plan, which means that the

4  terms of the CCV Plan and the Modified Plan are not now binding on anyone.

5       Pursuant to the Order Granting Application and Setting Hearing on Shortened Notice

6  [Docket No. 1059] (the "Order Shortening Notice Regarding Modified Plan"), a hearing to

7  consider confirmation of the CCV Plan, as modified by this Modified Plan, will be held on

8  February 17, 2011, at 9:30 a.m., in Courtroom 1368, 255 East Temple Street, Los Angeles,

9  California.  The deadlines to file an objection to the Modified Plan and file a reply to any such

10  objection are set forth below.  As explained above, the Plan Proponent has proposed this Modified

11  Plan to treat the claims of the Debtor's creditors and the interests of equity holders, and to address

12  the disposition of the Debtor's assets consistent with the Settlement.  This Modified Plan is

13  permitted by section 1127 of the Bankruptcy Code because the Modified Plan contains only non-

14  material modifications of the CCV Plan.

15       Any interested party desiring further information regarding the Modified Plan should

16  contact bankruptcy counsel for CCV, Skadden, Arps, Slate, Meagher & Flom LLP, Attention: Van

17  C. Durrer II, Esq., 300 South Grand Avenue, Suite 3400, Los Angeles, CA  90071; Telephone:

18  (213) 687-5000; Facsimile: (213) 687-5600, E-mail: van.durrer@skadden.com.

19  **II.      GENERAL DISCLAIMER AND VOTING PROCEDURE**

20       PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS,

21  CAREFULLY.  IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE

22  MODIFIED PLAN.  IT EXPLAINS WHO WAS ENTITLED TO VOTE ON THE CCV PLAN.

23  NO FURTHER VOTING ON THIS MODIFIED PLAN IS ANTICIPATED AS THE PLAN

24  PROPONENT INTENDS TO RELY ON THE VOTING THAT HAS ALREADY OCCURRED

25  WITH RESPECT TO THE CCV PLAN.  IT ALSO TELLS ALL CREDITORS AND EQUITY

26  HOLDERS (MEMBERS OF THE DEBTOR) WHAT TREATMENT THEY CAN EXPECT TO

27  RECEIVE UNDER THE MODIFIED PLAN, SHOULD THE MODIFIED PLAN BE

28  CONFIRMED BY THE COURT.

1    THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS

2    DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XXI BELOW.  ALL

3    REPRESENTATIONS MADE BY A PARTY OR INDIVIDUAL ARE TRUE TO THE BEST

4    KNOWLEDGE OF THE PARTY OR INDIVIDUAL MAKING THE APPLICABLE

5    REPRESENTATION.

6    NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE INCONSISTENT

7    WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT TO THE EXTENT,

8    IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

9    As noted above, under the Settlement, Astani Construction and the Astani Parties holding

10    claims and/or interests classified in Classes 6 and/or 7 under the CCV Plan have revised their

11    ballots to vote to accept this Modified Plan.  Thus, 85% of the holders of Class 7 interests has

12    accepted the CCV Plan.  Although FG 98 did not vote to accept the CCV Plan, FG 98 will receive

13    better treatment for its claim under this Modified Plan than it would in a chapter 7 liquidation

14    scenario.  Moreover, the Debtor, Astani Construction, and the Astani Parties, including the Astani

15    Parties that hold claims and/or interests in Classes 5, 6, and 7 under the CCV Plan, have consented

16    to confirmation of the Modified Plan.  Accordingly, the Plan Proponent does not believe that

17    further voting on this Modified Plan is required under the circumstances.  The Plan Proponent will

18    rely on the votes cast with respect to the CCV Plan, including the votes cast in accordance with the

19    Settlement, in seeking confirmation of this Modified Plan.

20    Consistent with the Disclosure Statement Order, on December 8, 2010, the voting agent,

21    Kurtzman Carson Consultants LLC (the "Voting Agent"), completed service of the Unitary

22    Disclosure Statement, Competing Plans, and Solicitation Materials (as such terms are defined in

23    the Disclosure Statement Order).  See  Declaration of Service re Solicitation Packages Served

24    December 8, 2010 [Docket No. 939].  The voting deadline was 5:00 p.m. on January 10, 2011.

25    The voting results on the CCV Plan are set forth in the Voting Declaration, which was filed with

26    the Court on January 14, 2010 and is available at http://www.kccllc.net/Concerto.  After

27    accounting for the votes and/or consents by Astani Construction and the Astani Parties in

28    acceptance of the CCV Plan, as modified by this Modified Plan, all classes of claims and interests

8

1    either have accepted, or are deemed to accept pursuant to section 1126(f) of the Bankruptcy Code,

2    the CCV Plan. <u>See</u> Voting Decl. Ex. A.

3            As indicated above, the Plan Proponent intends to seek confirmation of the Modified Plan

4    on February 17, 2011, at 9:30 a.m., in Courtroom 1368, 255 East Temple Street, Los Angeles,

5    California.  On January 31, 2011, the Plan Proponent filed Corus Construction Venture, LLC's

6    Conditional Motion to (I) Approve the Settlement, (II) Authorize Modifications to Corus

7    Construction Venture LLC's Plan of Reorganization, and (III) Confirm the Modified Plan [Docket

8    No. 1050] (the "<u>Modified Plan Motion</u>").  Notice of the Modified Plan Motion was served on all

9    creditors and equity holders, and the Office of the United States Trustee (the "<u>UST</u>").  Pursuant to

10   the Order Shortening Notice Regarding Modified Plan, the deadline to file an opposition to the

11   Modified Plan Motion was February 10, 2011, at 12:00 p.m. (Pacific), and the deadline to reply to

12   any such objections was February 15, 2011, at 12:00 p.m. (Pacific).  Failure to oppose the

13   confirmation of the Modified Plan may be deemed consent to the confirmation of the Modified

14   Plan.

15   **III.    WHO MAY OBJECT TO CONFIRMATION OF THE PLAN**

16           Any party in interest may object to confirmation of the Modified Plan.  As noted above, the

17   Plan Proponent does not intend to re-solicit votes on the Modified Plan, which consists of non-

18   material modifications to the CCV Plan.  Voting has already occurred on the CCV Plan and all

19   classes of claims and interests have accepted, or are deemed to accept, the CCV Plan.  Moreover,

20   under the Settlement, the Astani Parties holding claims and/or interests in impaired classes that

21   previously rejected the CCV Plan have recast their votes to accept the CCV Plan, as modified by

22   this Modified Plan, and  have consented to confirmation of this Modified Plan.  The sole non-

23   accepting equity holder, FG 98 (whose equity interest is classified in Class 7, which has accepted

24   the CCV Plan), will retain its equity interest in the Debtor under the Modified Plan, which is more

25   than it would receive in a chapter 7 liquidation scenario.  The Modified Plan may therefore be

26   confirmed notwithstanding FG 98's rejection.

27

28

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

1    **IV.    WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN**

2          As discussed above, there will be no further voting on this Modified Plan.  The Plan

3    Proponent will rely on the votes cast with respect to the CCV Plan and the consents provided under

4    the Settlement in seeking confirmation of this Modified Plan.  The voting results on the CCV Plan

5    are set forth in the Voting Declaration, which is available at http://www.kccllc.net/Concerto.  As

6    noted above, the Astani Parties holding claims and/or interests in Classes 6 and 7 under the CCV

7    Plan have recast their votes to be in acceptance of the CCV Plan, as modified by this Modified Plan,

8    and have otherwise consented to confirmation of this Modified Plan.  Thus, all classes of claims

9    and interests under the CCV Plan either have accepted or are deemed to accept the CCV Plan.  A

10   discussion of who may vote on a plan and related issues, including an explanation of claims,

11   interests, and "impairment," is set forth in section IV of the Unitary Disclosure Statement.

12         Please refer to Section VI below for information regarding impaired and unimpaired classes

13   in this case.

14         Section IX sets forth which claims are in which class.  Secured claims are placed in

15   separate classes from unsecured claims.  Fed. R. Bankr. P. 3018(d) provides: "A creditor whose

16   claim has been allowed in part as a secured claim and in part as an unsecured claim shall be

17   entitled to accept or reject a plan in both capacities."

18   **V.    VOTES NECESSARY TO CONFIRM THE PLAN**

19         The Court may confirm a particular plan if at least one noninsider impaired class of claims

20   has accepted and certain statutory requirements are met as to both nonconsenting members within a

21   consenting class and as to dissenting classes.  A class of claims has accepted a particular plan when

22   more than one-half in number and at least two-thirds in amount of the allowed claims actually

23   voting, vote in favor of the plan.  A class of interests has accepted a particular plan when at least

24   two-thirds in amount of the allowed interests of such class actually voting have accepted it.  It is

25   important to remember that even if the requisite number of votes to confirm a plan are obtained, the

26   plan will not bind the parties unless and until the Court makes an independent determination that

27   confirmation is appropriate.  That is the subject of the upcoming hearing at which the Plan

28   Proponent will seek confirmation of the Modified Plan.

## VI.    INFORMATION REGARDING VOTING IN THIS CASE

As indicated above, the Plan Proponent will not re-solicit votes on the Modified Plan, but will rely on the votes already cast with respect to the CCV Plan and those cast pursuant to the Settlement. All classes of claims and interests under the CCV Plan either have accepted or are deemed to accept the CCV Plan. In addition, under the Settlement, the Astani Parties holding claims and/or interests in impaired classes that previously rejected the CCV Plan have recast their votes to accept the CCV Plan, as modified by this Modified Plan, and have otherwise consented to confirmation of this Modified Plan.

The bar date (deadline) for filing a proof of claim in this case was January 29, 2010.

The bar date for hearings on objections to claims was June 30, 2010. All objections brought by the Debtor to claims have been resolved.

In light of the Settlement, the Plan Proponent believes that Class 1 (CCV's secured claim) and Class 4 (CCV's unsecured deficiency claim) are the only remaining impaired classes. As the Plan Proponent, CCV supports this Modified Plan (and it voted its Class 1 and Class 4 claims to accept the CCV Plan). The Plan Proponent believes that Class 2 (non-insider mechanic's lien claims) and Class 3 (non-insider general unsecured claims) are unimpaired. Given that the Astani Parties holding 85% of the equity interests in Class 7 have recast their votes to be in acceptance of the CCV Plan subject to the Settlement, Class 7 has accepted the CCV Plan. Moreover, under the Settlement, holders of equity interests in the Debtor will retain their interests and, thus, Class 7 is now unimpaired under this Modified Plan.

## VII.    DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS PRECIPITATING BANKRUPTCY FILING

### A.    STRUCTURE OF DEBTOR

The Debtor is a California limited liability company. The Debtor believes that the members (interest holders) of the Debtor consist of parties experienced in real estate development and management and outside investors. The holders of equity in the Debtor are as follows: (1) Sonny Astani and Jo Cho, as trustees of the Astani/Cho Living Trust (30%); (2) Marco Astani, as trustee

11

1  of the Marco Astani Living Trust (5%); (3) FG 98 (15%); and (4) Concerto Partners, LLC, a

2  California limited liability company (50%). Sonny Astani is the manager of Concerto Partners,

3  LLC, and is a controlling equity holder in or affiliate of entities holding the majority of

4  membership interests in the Debtor. Marco Astani is the brother of Sonny Astani. Concerto

5  Manager, Inc., is the manager of GTS. Sonny Astani is the President of Concerto Manager, Inc.

6  According to the Debtor, Astani Enterprises is the driving force behind GTS. The Debtor

7  believes that, through its subsidiaries and affiliates, Astani Enterprises is downtown Los Angeles'

8  largest residential real estate developer, as well as the owner and operator of more than 5,000

9  apartment units throughout Southern California and the current developer of 1,700 units of

10  apartments, condominiums and mixed-use projects in downtown Los Angeles, Hollywood, Encino,

11  and elsewhere, collectively valued at more than $500,000,000. Sonny Astani is the Chairman and

12  President of Astani Enterprises. According to the Debtor, he has more than 30 years of real estate

13  experience in the Southern California and Baja Mexico areas, and has been involved in the

14  acquisition, development, construction and management of more than $1,000,000,000 of multi-

15  family buildings and condominiums, including 5,000 new residential units in the City of Los

16  Angeles.

17  Astani Construction, a California corporation and affiliate of Astani Enterprises, is the

18  general contractor of the Concerto project. The Debtor contends that Astani Construction, through

19  its principals (Marco Astani and Sonny Astani), has a successful track record of 30 years of

20  building, developing, and renovating more than $1,000,000,000 worth of apartment buildings,

21  condominiums, custom homes, tenant improvements, and commercial enterprises throughout the

22  United States. Marco Astani is the President of Astani Construction.

23  As used herein, the "Astani Claims" means, collectively, (i) with respect to Administrative

24  Claims (defined below), any and all Administrative Claims of any of the Astani Parties or Astani

25  Construction that relate in any way to payments made by or on behalf of the Astani Parties or

26  Astani Construction to any estate professionals, and (ii) with respect to non-Administrative Claims,

27  any and all claims of any of the Astani Parties and Astani Construction, including, without

28  limitation, any claims transferred or sold to any of the Astani Parties or Astani Construction.

12

1    Under the Settlement, any and all claims that any of the Astani Parties and Astani

2    Construction may have against the Debtor's estate, other than the Astani Secured Claims (which

3    shall be paid from the Settlement Funds in accordance with the terms of this Modified Plan), shall

4    be settled, discharged, and released on the Effective Date.

5    According to the Debtor, it conducted all of its business activity in the County of Los

6    Angeles since its formation effective on January 27, 2005.

7    **B.    EVENTS PRECIPITATING THE CHAPTER 11 FILING**

8    The Debtor and CCV have differing views of the events precipitating the Debtor's chapter

9    11 filing.  The following subsections represent the Debtor's and CCV's respective views of the

10    events leading to this bankruptcy cases.

11    1.    DEBTOR'S VIEW

12    What follows is a brief summary of the dates and circumstances that led Debtor to file

13    bankruptcy.  The Debtor's allegations and contentions set forth in this sub-section constitute the

14    Debtor's views regarding events precipitating the filing of this chapter 11 case, are the subject of

15    pending litigation, and may be contested by Corus Bank, the FDIC, and/or CCV.

16    The Debtor believes this case is the result of the conduct of a financially-troubled lender,

17    Corus Bank, whose construction loan was oversecured by the Debtor's mixed use residential/retail

18    project in the heart of downtown Los Angeles.  As discussed below, Corus Bank was ultimately

19    seized and shut down by the Federal government.  Construction of phase I of the approximately

20    1,000,000 square foot development known as "Concerto" was approaching completion at the time

21    of the commencement of the Debtor's chapter 11 case.  However, the final completion of phase I of

22    the Debtor's Concerto development was substantially delayed and undermined by Corus Bank's

23    misconduct and delays and failure to fund the balance of its loan commitment in accordance with

24    the terms of the construction loan.  Delays in the administration of the construction loan impeded

25    the timeliness of the sale of units at the project and further loan advances needed to complete the

26    project.  Further, delays caused by Corus Bank cost the Debtor time, money, sales opportunities,

27    and market momentum.  Nonetheless, prior to the commencement of this reorganization case, the

28    Debtor was able to conduct a sales event on August 29, 2009, which resulted in buyers entering

13

1    into contracts to purchase all 77 units in the seven-story loft structure that constitutes part of the

2    Debtor's first phase of the Concerto development.

3        As of July 27, 2007, the Debtor and Corus Bank entered into a Construction Loan

4    Agreement (which, together with all documents executed by the Debtor pursuant to such agreement,

5    shall be referred to as the "Loan Agreement"), in which Corus Bank agreed to lend to GTS up to

6    $190,000,000 to allow the Debtor to construct, at 900 S. Figueroa Street and 901 S. Flower Street

7    in Los Angeles: (1) a tower that would contain 271 residential units as well as retail space and

8    storage space ("Tower I"); (2) a loft building that would contain 77 residential units as well as

9    retail space and storage space (the "Loft"); and (3) a seven-story partly underground parking

10    structure (the "Parking Garage").  The construction of Tower I, the Loft, and the Parking Garage

11    are collectively referred to as "Phase I" of the Concerto project.

12        GTS and Corus Bank, through the Loan Agreement, anticipated that the Debtor would

13    subsequently construct a second tower ("Tower II"), which was not being financed through the

14    Loan Agreement, but which would be constructed on land on which Corus Bank would initially

15    possess a security interest pursuant to the Loan Agreement.  The construction of Tower II is

16    referred to as "Phase II" of the Concerto project.  As used herein, "Project" refers, collectively, to

17    Tower I, the Loft, Tower II, the Parking Garage and the land underlying each.  The Loan

18    Agreement was structured so that, in order for GTS to borrow the full amount available under the

19    Loan Agreement ($190,000,000), GTS would need to repay from the sale of residential units in the

20    Loft ("Residential Loft Units") up to $23,200,000 of the outstanding loan amounts.  This would

21    enable the Debtor to complete Phase I, including the remainder of Tower I.

22        Accordingly, the Debtor invested significant time and money structuring the Concerto

23    development in a manner that would facilitate sales of the Residential Loft Units such that the

24    Debtor could repay to Corus Bank a portion of the loan and receive the additional funding from

25    Corus Bank necessary to complete the Project.  Towards that end, GTS re-phased the Project

26    numerous times and created a single condominium association for both Tower I and Tower II, per

27    the Loan Agreement, which had the effect of reducing maintenance expenses and monthly

28    assessments that purchasers of the residential units would need to pay, and making the units more

1    affordable and economically feasible for prospective purchasers.  However, as more fully described

2    below, Corus Bank's delays, improper demands, and administration of the Loan Agreement,

3    delayed the Debtor in placing the Residential Loft Units on the market and otherwise injured the

4    Debtor.

5            The Debtor experienced problems with Corus Bank's construction loan beginning in or

6    about the Fall of 2008 and thereafter, at or about the time that Corus Bank's financial problems

7    became readily apparent.  At that time, various governmental agencies informed Corus Bank that it

8    needed to raise capital or risk being seized by regulators, which regulators began to be physically

9    present in Corus Bank's offices at that time.

10           As of February 18, 2009, Corus Bank's financial condition had deteriorated to such a point

11   that it was forced to enter into a Stipulation and Consent Order with the Comptroller of the

12   Currency of the United States Department of Treasury.  The Consent Order required Corus Bank to

13   achieve and maintain minimal levels of capital pursuant to a capital plan, and prohibited Corus

14   Bank from declaring a dividend unless it was in compliance with the capital plan.  Corus Bank's

15   reputation in the financial and business community diminished such that companies would not

16   issue bonds to GTS because of concern about Corus Bank's ability to finance the Project;

17   subcontractors on the Project were significantly concerned about GTS's ability to access its

18   construction loan to pay them for the work they performed.

19           Despite the Debtor's requests, and delays Corus Bank had already caused, Corus Bank was

20   unwilling or unable to provide assurances, even in light of its highly publicized failure to fully fund

21   a loan commitment made to the Terranea Resort development in Rancho Palos Verdes, California,

22   that it would be able to satisfy its loan commitment to the Debtor in connection with the

23   completion of the Project.  Corus Bank was seized and closed on September 11, 2009, by the

24   Comptroller of the Currency, which appointed the FDIC as receiver.

25           Despite the obstacles and delays caused by Corus Bank, and coupled with its diminished

26   reputation, GTS moved forward with completion of the Concerto Project.  The Debtor planned,

27   publicized, and executed a significant "sales event" for the first completed units in the Project, the

28   Residential Loft Units.  The sales event, which occurred on August 29, 2009, was "successful" to

1   the extent that all 77 available Residential Loft Units were conditionally sold in a single day, with

2   back-up offers for each unit.  Prior to the commencement of the Debtor's chapter 11 case, the

3   Debtor entered contracts for the sale of each of the 77 Residential Loft Units.  The purchasers made

4   deposits into escrow in the amount of 3% of the purchase prices.  Approximately $1,000,000 was

5   held in escrow.  The total sale price for the 77 units was $30,753,726, and the projected net

6   proceeds from sales amounted to $28,765,592.

7           The prices for the Residential Loft Units were set in a modified auction procedure through

8   the Debtor's consultation with real estate marketing and sale experts.  Corus Bank had participated

9   in and encouraged the marketing of these sales by approving the $1,000,000 marketing budget

10  funded under the Loan Agreement.  Despite the national economic downturn and depressed real

11  estate market for new homes and despite the numerous obstacles facing the Debtor resulting from

12  Corus Bank's misconduct, the Debtor was able to optimize under the circumstances the prices

13  obtained for the Residential Loft Units through its heavily publicized auction procedure and careful

14  analysis of sales demand, new loan terms, and buyer preferences.

15          To be permitted to offer for sale the Residential Loft Units, the Debtor needed to obtain

16  various governmental permits and approvals, including, but not limited to, approval by the

17  California Department of Real Estate ("DRE") in the form of a Conditional or Final Public Report.

18  In September of 2008, GTS provided for review and approval to Corus Bank the Condominium

19  Documents, as defined by the Loan Agreement (the "Condominium Documents"), including the

20  declaration of covenants, conditions, and restrictions.  However, rather than review and approve

21  the Condominium Documents, Corus Bank delayed.

22          In addition, Corus Bank made unreasonable and improper demands that GTS modify the

23  Condominium Documents.  For example, Corus Bank unilaterally demanded that GTS create

24  separate condominium associations for Tower I and Tower II, contrary to the terms of the Loan

25  Agreement, thereby increasing the amount of monthly assessments that purchasers would need to

26  pay and making the Residential Loft Units less attractive to prospective purchasers.  The Debtor

27  believes that Corus Bank demanded the creation of a separate condominium association for Tower

28  II because, rather than focusing on the success of the Project, Corus Bank already was anticipating

1  foreclosing on the land upon which the Project was being built, i.e., the land containing Tower I

2  and the Loft.

3          It was not until after February 10, 2009, that Corus Bank finally approved, in a form

4  substantially similar to that which had been submitted approximately four months earlier, the

5  Condominium Documents GTS had submitted in September of 2008.  As a result of Corus Bank's

6  delays and improper demands, the Debtor was unable in the time frame originally anticipated to

7  secure the government approvals, including the final approval from the DRE that it needed to

8  proceed with offering the Residential Loft Units for sale.  As a further consequence of Corus

9  Bank's delays and improper demands, (i) GTS was unable to open its sales center for these units in

10 January 2009 as scheduled, or to meet its anticipated escrow closings of May 2009, despite having

11 written commitments from several purchasers to purchase such units, (ii) GTS lost the ability to

12 bring the Residential Loft Units to market, as planned, before Evo, a neighboring 311-unit

13 condominium project located at 1155 S. Grand Avenue that also was being financed by Corus

14 Bank and was competing for the same or similar prospective purchasers, and (iii) GTS incurred

15 considerable expenses, including payments to Corus Bank's attorneys to review the documents,

16 and including increased costs in attempting to procure the various bonds needed to obtain final

17 governmental approval.

18         Corus Bank's representatives repeatedly advised the Debtor that Corus Bank would

19 approve the Residential Loft Unit sales prices and consent to the release of its lien on units to be

20 sold if the Debtor obtained a "White Report" from the California Department of Real Estate, which

21 was needed to close escrow for the sale of the units.  This was made very difficult and delayed by

22 Corus Bank's unreasonable refusal to approve the Condominium Documents and publicly known

23 financial troubles which prevented the Debtor from being able to obtain bonds required to obtain

24 the White Report.  Ultimately, after posting cash collateral, the Debtor was able to obtain the White

25 Report; yet Corus Bank failed to fulfill its commitment to approve the sales prices, was seized by

26 the Federal government, and placed under the control of the FDIC.

27         As it entered a period of financial freefall in or about the Fall of 2008, Corus Bank began to

28 engage in a pattern and practice of: (a) delaying approvals on documentation submitted to it by the

17

Debtor, (b) delaying the payment of construction loan funds, (c) making unreasonable demands of the Debtor unwarranted by and in violation of the Loan Agreement as preconditions to its own compliance with the Loan Agreement, and (d) engaging in further delay tactics which made it difficult for the Debtor to successfully and timely complete the Concerto development.

In pending litigation, discussed more fully below, the Debtor asserts that Corus Bank breached its contractual obligations and breached its implied duty of good faith and fair dealing arising from the Loan Agreement in the following respects, among others:

(a)    Corus Bank failed to timely provide funding to the Debtor;

(b)    Corus Bank unreasonably failed and refused to timely approve the Condominium Documents (as defined by the Loan Agreement) submitted to it for approval;

(c)    Corus Bank jeopardized the success of the entire Concerto development by refusing to consent to the Condominium Documents unless the Debtor would first agree to relinquish its contractual right, upon making a $25,000,000 payment to Corus Bank, to obtain a release of the Tower II land from the deed of trust executed in favor of Corus Bank;

(d)    Despite the delays that it had caused and the fact that the market would no longer allow for the sale of the Residential Loft Units at prices originally contemplated in the Loan Agreement, and even though its security interest was not impaired, Corus Bank unreasonably refused to approve the sale of the Residential Loft Units at market prices calculated to optimize sales and sales proceeds;

(e)    Despite the delays it had caused and despite the Debtor's inability to obtain bonds because of the deterioration of Corus Bank's financial rating and reputation, Corus Bank unreasonably refused to advance funds to the Debtor from budgeted-for items to allow the Debtor to procure the bonds necessary to obtain a White Report from the California Department of Real Estate;

(f)    Corus Bank offered the mezzanine lender of Evo, a neighboring 311-unit condominium project located at 1155 S. Grand Avenue that also was being financed by Corus Bank, a right of first refusal to purchase Evo's existing promissory note, empowering it to offer the Evo units at a reduced price at a competitive advantage.

The Debtor contends that, as a result of Corus Bank's breaches of its contractual obligations and its implied duty of good faith and fair dealing arising from the Loan Agreement, (a) the completion of the Project, including the loft portion of the Project, was delayed; (b) the Debtor was unable to timely offer the Residential Loft Units for sale and, when they were offered for sale, was forced to sell them for lower prices than they would have sold for absent Corus Bank's misconduct; (c) the Debtor was unable to timely close escrows on the Residential Loft Units; (d) the Debtor was unable to complete Tower I or to market or sell the Tower I units; (e) the Project was not completed; (f) the Debtor was unable to pay down the Corus Bank loan as projected; and (g) the Debtor was forced into bankruptcy in order to protect itself from further losses, and to protect and safeguard the interests of its buyers.

The Debtor also contends that, as a result of Corus Bank's breaches of its contractual obligations and breaches of its implied duty of good faith and fair dealing arising from the Loan Agreement, the Debtor has incurred considerable additional fees and expenses, including but not limited to (a) increased costs in attempting to procure the various bonds needed to obtain final governmental approval with respect to the Residential Loft Units; (b) increased construction and insurance costs; (c) increased interest under the Loan Agreement; (d) additional payments to Corus Bank's attorneys to review the documents; (e) increased assessors taxes and homeowners association fees; and (f) increased fees and costs in connection with this bankruptcy case.

Also as a result of Corus Bank's breaches of its contractual obligations and breaches of its implied duty of good faith and fair dealing arising from the Loan Agreement, the Debtor asserts that it has been damaged in an amount to be determined, but believed to exceed $46,000,000. Attached to the Unitary Disclosure Statement as Exhibit A-1 is a declaration of a damage expert engaged in a continuing review and analysis of damages Corus Bank caused the Debtor to suffer. The expert, Thomas E. Kabat, MAI, CRE, Managing Director, Real Estate, of LECG, LLC, a global expert services and consulting firm, sets forth a preliminary conclusion regarding economic damages in the declaration attached to the Unitary Disclosure Statement as Exhibit A-1. The qualifications of the expert are set forth in the declaration. The expert states that "[a]s a result of my preliminary evaluation, and based on my present assumptions [set forth in the declaration], I

1  have concluded that the present value of damages suffered by GTS as of the currently assumed

2  damage date of November 1, 2008 (without regard to pre-judgment interest) is in excess of forty-

3  six million dollars . . . ."

4         On September 4, 2009, prior to Corus Bank's seizure by the Federal government, the

5  Debtor filed a lawsuit against Corus Bank for (1) breach of contract, (2) breach of the covenant of

6  good faith and fair dealing, (3) declaratory relief, and (4) injunctive relief.  The action was

7  originally filed in the Superior Court of the State of California, County of Los Angeles, *as GTS 900*

8  *F, LLC v. Corus Bank, N.A.,* Case No. BC421309.  On September 11, 2009, the FDIC was

9  appointed as receiver of Corus Bank by Order of the Office of the Comptroller of the Currency.

10  On September 17, 2009, the Debtor filed a petition under chapter 11 of the Bankruptcy Code,

11  initiating the above-captioned chapter 11 bankruptcy case.

12         In October 2009, CCV acquired the loan assets of Corus Bank from the FDIC.  On October

13  29, 2009, CCV filed a proof of claim in this case in the sum of $162,662,216.26.  CCV filed an

14  amended proof of claim on January 10, 2010, which did not change the amount of the asserted

15  claim.  The proof of claim is based on the claim of Corus Bank under the Loan Agreement and the

16  acquisition of that claim by CCV from the FDIC.  The Debtor, the Committee, and Astani

17  Construction, each filed complaints with respect to the claim of CCV and the Debtor has filed an

18  objection, in accordance with Bankruptcy Rule 3007(b), as part of its complaint.  Each of the

19  complaints with respect to the CCV claim is discussed in Section XVIII below.

20              2.    <u>CCV'S VIEW</u>

21         What follows is a brief summary of the dates and circumstances that led Debtor to file

22  bankruptcy.  CCV's allegations and contentions set forth in this sub-section constitute CCV's

23  views regarding events precipitating the filing of this chapter 11 case and may be contested by the

24  Debtor.

25         As of July 27, 2007, the Debtor and Corus Bank entered into a Construction Loan

26  Agreement, in which Corus Bank agreed to lend to the Debtor up to $190,000,000 (the "<u>Loan</u>") to

27  allow the Debtor to construct, at 900 S. Figueroa Street and 901 S. Flower Street in Los Angeles:

28  (1) Tower 1; (2) the Loft; and (3) the Parking Garage.  In addition, Tower II was originally

1  contemplated.  As a precondition to obtaining the Loan, the Debtor issued a promissory note (the

2  "Note") to correspond to the total future loan disbursements from Corus Bank, not to exceed $190

3  million.  Pursuant to the terms of the Note and a Construction Deed of Trust, Assignment of Leases

4  and Rents, Security Agreement and Fixture Filing dated July 2, 2007 (the "Deed of Trust" and,

5  collectively with the Loan Agreement, the Note, and related agreements, the "Agreements"), the

6  Debtor granted Corus Bank a perfected first priority security interest in most of the Debtor's assets,

7  including the Project.

8         Also on July 2, 2007, Sonny Astani, Marco Astani, individually and as trustee of the Marco

9  Astani Family Trust dated as of March 15, 2006, and Sonny H. Astani and Jo Cho, as Trustees of

10 the Astani/Cho Living Trust dated as of April 29, 1999 (collectively, the "Guarantors"), executed

11 three guaranties related to the Debtor's obligations under the Loan Agreement: (i) Repayment

12 Guaranty (the "Repayment Guaranty"), (ii) Completion Guaranty (the "Completion Guaranty") and

13 (iii) Carve-Out Guaranty ( the "Carve-Out Guaranty" and, with the Repayment Guaranty and the

14 Completion Guaranty, the "Guaranties").  Pursuant to the Guaranties, the Guarantors each agreed

15 to subordinate the claims and liens of any entity they control to the claims and liens of Corus Bank.

16 The Debtor has previously acknowledged in this Bankruptcy Case that Sonny Astani and Marco

17 Astani control Astani Construction, meaning any claims of Astani Construction against the Debtor

18 are subordinated to those of CCV.  As noted below, CCV is pursuing litigation against the

19 Guarantors in connection with the Guaranties, which litigation shall be settled, discharged, and

20 released upon the Effective Date, consistent with the Settlement.

21        The Debtor and Corus Bank, through the Agreements, anticipated that the Debtor would

22 subsequently construct a second tower, Tower II, which was not being financed through the Loan

23 Agreement, but which would be constructed on land on which Corus Bank would initially possess

24 a security interest pursuant to the Agreements.

25        The sub-prime mortgage collapse in early 2007 began to have adverse effects on main

26 stream real estate lending and markets in 2007 and 2008.  By 2009, the depressed commercial real

27 estate market made it nearly impossible for units in the Project to be sold at the release prices

28 required in the Agreements.  Despite the economic climate and depressed market, the Debtor

1   planned a sales event for the first completed units in the Project.  Notwithstanding Corus Bank's

2   repeated efforts to obtain information regarding the sales event, the Debtor proceeded with the

3   sales event on August 29, 2009 without Corus Bank's consent.

4       On September 4, 2009, prior to Corus Bank's seizure by the Federal government, the

5   Debtor filed a lawsuit against Corus Bank for (1) breach of contract, (2) breach of the covenant of

6   good faith and fair dealing, (3) declaratory relief, and (4) injunctive relief.  The action was

7   originally filed in the Superior Court of the State of California, County of Los Angeles, as *GTS 900*

8   *F, LLC v. Corus Bank, N.A.,* Case No. BC421309 (the "Prepetition Action").  On September 11,

9   2009, the FDIC was appointed as receiver of Corus Bank by Order of the Office of the Comptroller

10  of the Currency.  As a result, the FDIC succeed to all of the rights, titles, powers, and privileges of

11  Corus Bank under the Loan Agreement.  At all times leading up to the appointment of the FDIC as

12  receiver and thereafter, Corus Bank continued to satisfy its obligations to fund loans in the ordinary

13  course of business.  The Debtor disputes this assertion.

14      On September 17, 2009, the Debtor filed a petition under chapter 11 of the Bankruptcy

15  Code, initiating the above-captioned bankruptcy case.  It is CCV's belief that the Debtor initiated

16  the case so that it could dictate the terms of the development of the Project.  On September 21,

17  2009, the Debtor filed a notice of removal of the Prepetition Action with the Bankruptcy Court.

18      On October 16, 2009, CCV, an entity unaffiliated with Corus Bank, purchased certain loan

19  assets of Corus Bank, include Corus Bank's rights under the Loan Agreement, from the FDIC in its

20  capacity as receiver for Corus Bank.  On October 29, 2009, CCV filed a proof of claim in this case

21  in the sum of $162,662,216.26.  CCV filed an amended proof of claim (as amended, the "Proof of

22  Claim") on January 10, 2010, which did not change the amount of the asserted claim.  The Proof of

23  Claim is based on the claim of Corus Bank under the Loan Agreement and the acquisition of that

24  claim by CCV from the FDIC.  The Debtor, the Committee, and Astani Construction have each

25  filed complaints with respect to the claim of CCV and the Debtor has filed an objection, in

26  accordance with Bankruptcy Rule 3007(b), as part of its complaint.  Each of the complaints with

27  respect to the CCV claim as well as the Prepetition Action is discussed in Section XVIII below.

28

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

1        What follows is a brief description of the Debtor's business and the future of the Project.

2   Further details relating to the Debtor's financial condition and post-confirmation operation of the

3   Debtor are found in sections X, XI, XII, XV, and XVI.

4        **C.    DEBTOR'S BUSINESS AND FUTURE OF THE PROJECT**

5          1.    DEVELOPMENT OF PROJECT

6        The Debtor is the owner and developer of an approximately 1,000,000 square foot

7   residential real estate development known as "Concerto" located in downtown Los Angeles.  The

8   Concerto project is built on a full city block situated at the north end of an evolving entertainment

9   district anchored by the Staples Center and LA Live, a sports and entertainment complex,

10  sometimes described as Times Square West.  Concerto is part of a wave of development that has

11  gained momentum since 2003, when Los Angeles expanded adaptive reuse policies similar to those

12  of New York.  Construction on the Concerto project started in 2007 and was timed to come on line

13  with a full range of residential units and retail space at the same time as L.A. Live and the new

14  Ralph's Supermarket serving downtown residents.

15       The Project consists of Phase I, including Tower I (containing 271 residential units and

16  retail and storage space), the Loft (containing 77 residential units and retail and storage space), and

17  the Parking Garage (a seven-story partly underground parking structure), and a Phase II, consisting

18  of Tower II (a second 30-story tower) contemplated for the future.  The infrastructure of Tower II

19  (including subterranean parking, elevator shafts, DWP vaults, excavation, shoring and some

20  foundation) has been completed, but further construction has not been commenced.  The Debtor's

21  phase II assets also serve as collateral for the Corus Bank loan.

22       In 2004, GTS purchased the 100,000 square foot parcel on which the Concerto project is

23  located, consisting of a full city block.  The development team envisioned an environmentally

24  conscious all glass residential structure with a range of moderately priced to higher priced

25  condominium units, together with shared amenities, ample parking and retail and restaurant space

26  as part of the "new downtown L.A." In all, the Debtor invested more than $63,000,000 as equity

27  funds into the Concerto project (with more than $54,500,000 in cash and approximately $8,500,000

28

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

1  consisting of deferred developer's and general contactor's fees), starting one of the first high rise

2  residential construction projects in downtown Los Angeles in more than 15 years.

3        2.        <u>FUTURE OF THE PROJECT</u>

4        On the Effective Date, the CCV Project Assets (defined below) shall be transferred to 900

5  FSM.  In connection therewith, the Debtor shall execute and deliver to 900 FSM a Grant Deed,

6  substantially in the form attached hereto as <u>Exhibit F</u> (the "<u>Grant Deed</u>"), and the Debtor, Astani

7  Construction, Astani Enterprises, Sonny Astani, and Marco Astani shall execute and deliver to 900

8  FSM the Assignment, substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Assignment</u>").

9  The order confirming this Modified Plan will require that the transfer pursuant to the Grant Deed

10 be free and clear of any and all liens, claims, interests, and encumbrances other than those liens,

11 claims, interests, and encumbrances specifically identified in <u>Exhibit G</u> hereto (such liens, claims,

12 interests, and encumbrances identified in <u>Exhibit G</u>, the "<u>Permitted Encumbrances</u>").  In addition,

13 consistent with the Settlement and the Acknowledgment, the Debtor and the Loft Manager shall

14 deliver the Loft HOA Letter to the Loft HOA.

15       As used herein, "<u>CCV Project Assets</u>" includes the Project and, more specifically, refers

16 collectively to (A) the cash held in the Debtor's estate as of the Effective Date (the "<u>Estate Held</u>

17 <u>Cash</u>"); (B) that certain parcel of real property located at 900 South Figueroa Street, 901 South

18 Flower Street, and 700 West 9th Street in the City of Los Angeles, County of Los Angeles, State of

19 California, as more particularly described in <u>Exhibit H</u> hereto (the "<u>Land Parcel</u>"), (C) the

20 Improvements; (D) any and all fixtures, furnishings, equipment, machinery, furniture, and other

21 items of tangible personal property located on the Land Parcel or in the Improvements or used in

22 connection with the development, construction, use, occupancy, operation, and maintenance of all

23 or any part of the Land Parcel or the Improvements, including construction equipment, machinery,

24 signs, artwork, furnishings, specialized fixtures, furnishings, and equipment relating to the Debtor's

25 development of the Land Parcel, and all renewals of or replacements or substitutions for any of the

26 foregoing, whether or not the same are or shall be attached to the Land Parcel or Improvements

27 (the "<u>CCV Plan FF&E</u>"); (E) any contracts relating to the Land Parcel, the Improvements, or the

28 CCV Plan FF&E (including all construction related agreements, license agreements, service

24

agreements, maintenance agreements, management agreements, and other agreements relating to the development of the Land Parcel) that CCV designates for assumption and assignment under this Modified Plan; (F) all entitlements, permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land Parcel; (G) all streets, roads, public places, easements, and rights-of-way, existing or proposed, public or private, adjacent to or used in connection with, belonging, or pertaining to the Land Parcel; and (H) the Project Materials, including, without limitation, the Project Materials made available to CCV's representative for inspection on January 27, 2011.

Following the Effective Date, the Debtor, Astani Construction, and the Astani Parties shall reasonably cooperate with CCV and shall take such actions as are necessary or appropriate to effect the provisions and purposes of the Modified Plan.  Without limiting the foregoing, the Debtor, Astani Construction, and the Astani Parties shall execute all documents necessary or appropriate to fully transfer and convey to 900 FSM all of the Debtor's right, title, and interest in and to the CCV Project Assets, including, but not limited to, the Project Materials, and all affidavits, documents, instruments of conveyance, and other agreements as CCV determines are necessary or appropriate. Under the Settlement, CCV expressly reserved its rights to enforce the obligations of the Debtor, Astani Construction, and the Astani Parties under the Settlement, including, without limitation, under section 1142 of the Bankruptcy Code, and to seek redress against such parties for any failure satisfy such obligations.  The Settlement further provides that nothing therein is intended to or shall be deemed to waive, and the Debtor, Astani Construction, and the Astani Parties expressly reserve, their rights to enforce the obligations of CCV under the Settlement, including, without limitation, under section 1142 of the Bankruptcy Code, and to seek redress against such party for any failure to satisfy such obligations.

Under this Modified Plan, creditors will be paid solely from (i) the cash to be contributed by CCV (the "CCV Cash") for payment of allowed claims in accordance with the Settlement and the Modified Plan, including the CCV Deposit Amount (defined below) and the Estate Held Cash transferred to CCV in under this Modified Plan, and/or (ii) the Settlement Funds and any proceeds of the FDIC District Court Proceeding to be transferred to the Reorganized Debtor under this

1  Modified Plan (collectively, the Settlement Funds and any such proceeds, the "Reorganized Debtor

2  Cash").  Creditors will not be paid from or have any interest in future revenues from the Project

3  under the Modified Plan.

4          On January 6, 2011, pursuant to the Disclosure Statement Order, CCV deposited

5  $1,074,929.54 (the "CCV Deposit Amount") into a segregated account (the "CCV Deposit

6  Account") held by the Voting Agent.  The CCV Deposit Amount is based on CCV's reasonable

7  estimate of the total amount to be paid in CCV Cash in satisfaction of allowed claims as of the

8  Effective Date.  See Declaration of Seth Hewitt (ST Residential, LLC) in Support of Plan of

9  Reorganization Proposed by Corus Construction Venture, LLC [Docket No. 917].  If the Court

10  confirms the Modified Plan, upon the Effective Date, the Voting Agent shall disburse the funds

11  held in the CCV Deposit Account in accordance with the terms of the Modified Plan, with any

12  excess amount immediately remitted to CCV.

13                  3.       NO CURRENT ALTERNATIVE TO THE MODIFIED PLAN

14          The Court denied confirmation of the Debtor's prior plan (the "Debtor Denied Plan") which

15  provided for the sale of individual units at the Project as condominiums.  The Debtor is not

16  pursuing its subsequently proposed plan (the "GTS Plan"), which is integrated in the Unitary

17  Disclosure Statement.  The Debtor has consented to confirmation of this Modified Plan, which is

18  currently the only plan pending.

19  **VIII.   CRITICAL PLAN PROVISIONS**

20          This section provides a discussion of the sources of funds used to pay creditors under the

21  Modified Plan as well as the timing of such payments.  See Section IX. below for a more detailed

22  discussion of the classification and payments of claims under the Modified Plan.

23          The following sources of funds may be used to pay creditors in accordance with the terms

24  of this Modified Plan: (A) the CCV Cash and (B) the Reorganized Debtor Cash.

25          CCV (Class 1) can expect satisfaction of its secured claim on the Effective Date by the

26  transfer from the Debtor to 900 FSM of title to the CCV Project Assets in accordance with the

27  terms of this Modified Plan.  Under the Order Appointing Valuation Expert in Connection with

28  Motion for Relief from the Automatic Stay [Docket No. 851], the Court appointed John G. Ellis,

26

1  MAI, CRE, FRICS, of Integra Realty Resources, Inc. (the "Valuation Expert"), as an expert to

2  determine the value of the Project in conjunction with the Motion for Relief from the Automatic

3  Stay Under 11 U.S.C. § 362 (with supporting declarations) (Movant: Corus Construction Venture,

4  LLC) [Docket No. 560] (the "Relief from Stay Motion").  The Valuation Expert issued his report

5  [Docket No. 915] (the "Expert Appraisal") (available at http://www.kccllc.net/Concerto) on

6  November 24, 2010, stating that, in his opinion, the highest and best use of the project is to position

7  the 271 units of the Phase I tower as an apartment complex.  Based on that assumption, the

8  Valuation Expert derived a market value of the Project in its "as is" condition as of November 1,

9  2010 of $173,750,000.[4]

10      To the extent that the value of the CCV Project Assets transferred to 900 FSM, which

11  includes the Project, net of payments to satisfy Mechanic's Lien Claims (defined below), is less

12  than the amount of CCV's claim, CCV shall have a deficiency claim for the difference (the "CCV

13  Deficiency Claim").[5]  The Modified Plan treats the CCV Deficiency Claim as a Class 4 claim.

14  Class 1 is impaired.

15      Holders of allowed non-insider claims for work performed, or services, equipment, and/or

16  materials provided, with respect to the Project that are secured by validly perfected mechanic's

17  liens on assets of the Debtor (such allowed claims, excluding any Astani Claims, the "Mechanic's

18  Lien Claims") (Class 2) can expect payment in full, including Postpetition Interest, from the CCV

19  Cash on the later of the Effective Date and the date on which such Mechanic's Lien Claims are

20  allowed.  As used herein, "Postpetition Interest" means interest accrued from the Petition Date

21

22

---

23  [4] The Expert Appraisal utilizes several methods of valuation, including a sales comparison
24  and two different income capitalization approaches, to reach a reconciled "as is" value conclusion
    of Phase I of $145,550,000.  The Valuation Expert's $173,750,000 "as is" valuation of the Project
25  as a whole comprises a reconciled $145,550,000 "as is" value conclusion of Phase I and a
    $28,200,000 valuation of Phase II.  See Expert Appraisal at 108-109, 119.

26  [5] To the extent that CCV has a CCV Deficiency Claim, CCV's entire claim will be reduced
27  to account for any post-petition payments that CCV has received pursuant to the Court's Order
    Granting Debtor's Motion Authorizing use of Cash Collateral (Proceeds of Sales of Residential
28  Loft Units) [Docket No. 70] (the "Cash Collateral Order") or otherwise.

1   through the Effective Date as allowed under section 506(b) and applicable nonbankruptcy law.

2   Class 2 is therefore unimpaired.

3       Holders of allowed non-insider general unsecured claims (such allowed unsecured claims,

4   excluding any Astani Claims and the CCV Deficiency Claim, the "General Unsecured Claims")

5   (Class 3) can expect payment in full from the CCV Cash on the later of the Effective Date and the

6   date on which such General Unsecured Claims are allowed.  Class 3 is therefore unimpaired.

7       The CCV Deficiency Claim (Class 4) will not be paid in full under this Modified Plan.

8   Class 4 is therefore impaired.

9       Under the CCV Plan, Class 5, which included allowed secured Astani Claims (such allowed

10   secured claims, the "Astani Secured Claims"), was unimpaired.  In connection with the Settlement,

11   the Reorganized Debtor shall pay the holders of the Astani Secured Claims $2,550,000 from the

12   Settlement Funds and all Astani Secured Claims shall be deemed discharged, released, and

13   satisfied.

14       Under the CCV Plan, Class 6, which included allowed unsecured Astani Claims (such

15   allowed unsecured claims, the "Astani Unsecured Claims"), was impaired.  Under the Settlement,

16   the Astani Unsecured Claims are settled, discharged, and released upon the Effective Date, and this

17   Modified Plan need not provide for any treatment of such claims.

18       Under the CCV Plan, Class 7, which included equity interests (membership interests) in the

19   Debtor, was impaired.  Pursuant to the Settlement, the Astani Parties holding 85% of the equity

20   interests in Class 7 have recast their votes, subject to the Settlement, to be in acceptance of the

21   CCV Plan.  Class 7 has therefore accepted the CCV Plan, as modified by this Modified Plan.

22   Moreover, under the Settlement, holders of equity interests in the Debtor will retain their interests

23   and, thus, Class 7 is now unimpaired under this Modified Plan.

24   **IX.**     **DESCRIPTION AND TREATMENT OF CLAIMS AND INTERESTS**

25       **A.**      **OVERVIEW OF PLAN PAYMENTS**

26       Below is a summary of who gets paid what and when and from what source under the

27   Modified Plan.  The identity of members within a particular class is explained below.  The column

28   entitled "Amount of Payment" in each of the following tables lists the estimate total amounts to be

28

paid (excluding interest payments).  <u>A plan proponent is usually not required by law to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy case not commenced</u>.  The "Payment Due Date" column in the following tables states the frequency with which payments will be made and the starting and ending dates.  Look at the starting date to figure out who will be paid before and after you and in what amount.  The "Source of Payment" column describes the expected source of payment.  Further details regarding the sources of payment are found in sections X and XI.  As discussed below, under the Settlement, holders of equity interests in the Debtor will retain their interests, which are classified in Class 7.  Under this Modified Plan, Class 7 is now unimpaired.

1.    <u>PAYMENT SCHEDULE</u>

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[6] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 1.    Holders of Allowed Administrative Claims | To be determined (as of Nov. 30, 2010, approx. $1,743,000[7]) | Effective Date | CCV Cash or Settlement Funds (in accordance with the Settlement) |

---

[6] These amounts are estimates based, in part, on information contained in the Second Amended Disclosure Statement and Plan of Reorganization for GTS 900 F, LLC [Docket No. 252] (the "<u>Denied Debtor Plan</u>") and other filings in this case.  For example, with regard to professionals, the estimated amount to be paid to professionals may be substantially greater or less than projected depending on the extent of litigation and/or other opposition presented with respect to the CCV Plan and/or other matters in the case.  Further, the amounts may be substantially greater or less depending on the amount of payments received by professionals prior to confirmation of the CCV Plan.  The total amounts of mechanic's lien claims and general unsecured claims are uncertain at this time and remain to be determined in light of pending claims objections.  Nonetheless, according to the Debtor, these estimates are based on, among other things, the Debtor's best efforts to estimate such claims as of the filing of the Denied Debtor Plan.  The Debtor has advised that its estimate of claims in the Denied Debtor Plan is based upon review and analysis of the Debtor's books and records and an initial review of proofs of claim and related documents filed in the case.  At this time, there is some uncertainty with respect to the total allowable amount of certain claims for reasons such as (1) certain portions of some mechanic's lien claims may be based on change orders that were never agreed to; (2) various claims are asserted by sub-subcontractors and may duplicate or overlap with claims asserted by subcontractors; and (3) while the Debtor believed that its estimates were reasonable and appropriate, further analysis and documents may be needed to fully determine definitive allowable amounts of certain sub-subcontractor, subcontractor, and general unsecured claims.  The Plan Proponent may file a motion seeking reconciliation of various claims in this case and clarification from the Court on the allowed amounts of such claims.

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[6] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 2.    Class 1 – CCV's Secured Claim | Value of the CCV Project Assets transferred to 900 FSM, which value remains to be determined by the Court, net of amounts necessary to satisfy Mechanic's Lien Claims[8] | Effective Date | CCV Project Assets |
| 3.    Class 2 – Mechanic's Lien Claims | Collectively, up to approximately $19,600,000 plus Postpetition Interest | Later of the Effective Date and the date on which such claims are allowed | CCV Cash |
| 4.    Class 3 – General Unsecured Creditors | Collectively, approximately $540,000, not including the CCV Deficiency Claim and the Astani Unsecured Claims (which are separately classified) | Later of the Effective Date and the date on which such claims are allowed | CCV Cash |

_____
*(cont'd from previous page)*

[7] Amount is based on an estimate of outstanding administrative fees and expenses from a review of court filings and other information, plus a projection of fees and expenses for September – December 2010, which projection was based on the accrual rate of administrative expenses as of November 30, 2010.

[8] To the extent that CCV's claim is not paid off from the remaining value of the CCV Project Assets transferred to 900 FSM (after taking into account the amounts necessary to satisfy Mechanic's Lien Claims), CCV will have the CCV Deficiency Claim, which the CCV Plan treats in Class 4.

30

| Payment Recipient(s) | Amount of Payment (Total amount to be paid)[6] | Payment Due Date | Source of Payment |
|---|---|---|---|
| 5.    Class 4 – CCV Deficiency Claim | Deficiency after application of the value of the CCV Project Assets transferred to 900 FSM (and subtracting from this amount the amounts necessary to satisfy Mechanic's Lien Claims) and crediting of post-petition payments to CCV's claim | N/A | N/A |
| 6.    Class 5 – Astani Secured Claims | In connection with the Settlement, holders of these claims shall be paid $2,550,000 by the Reorganized Debtor from the Settlement Funds, and all Astani Secured Claims shall be deemed discharged, released, and satisfied. | N/A | Settlement Funds |
| 7.    Class 6 – Astani Unsecured Claims | Under the Settlement, these claims shall be settled, discharged, and released upon the Effective Date, and shall not be paid. | N/A | N/A |
| 8.    Class 7 — Equity Interest Holders | Upon the Effective Date, the Settlement Funds, and the FDIC District Court Proceeding and all rights, claims, and interests asserted therein, shall be transferred to the Reorganized Debtor. | N/A | Settlement Funds |

31

2.    <u>AFFILIATE CLAIMS</u>

| Claimants and Interest Holders Who Are Affiliates of the Debtor[9] | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| Concerto Partners, LLC<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Equity interest holder | Holds 50% membership interest<br><br>No claim |
| Astani/Cho Living Trust<br>Attn: Sonny Astani and Jo Cho, as Trustees<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Equity interest holder | Holds 30% membership interest<br><br>No claim |
| Marco Astani Family Trust<br>Attn: Marco Astani as Trustee<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Equity interest holder | Holds 5% membership interest<br><br>No claim |
| Concerto Manager, Inc.<br>Attn: Sonny Astani, President<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Claimant | Unknown |
| Astani Enterprises, Inc.<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Claimant | Unknown |
| Astani Construction, Inc.<br>9595 Wilshire Blvd., Ste. 1010<br>Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | Pre-petition claims: $2,550,000 (for services secured by mechanic's lien) and approximately $121,000 (for advances made on behalf of the Debtor and treated by the claimant as unsecured loans) (also approximately another $20,000,000 included in proof of claim of with respect to liabilities to subcontractors — this portion of the claim duplicates the claim of subcontractors) |

---

[9] This information is based, in part, on the Denied Debtor Plan and other filings in this case, and may not include other claimants and interest holders that are affiliates of the Debtor.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

| **Claimants and Interest Holders Who Are Affiliates of the Debtor[9]** | | |
|---|---|---|
| **Name & Address of Claimant or Interest Holder** | **Relationship to Debtor** | **Amount of Claim or Interest** |
| HPG Management, Inc. P.O. Box 2399 Beverly Hills, CA 90213 | Claimant | Administrative Expense Claim: $5,000 per month for postpetition services involving maintaining Debtor's books and records and related services. |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | $3,246.78 as purchaser of Claim No. 94-1 from Rolf Jensen & Associates, Inc. (asserted unsecured claim) |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | $13,602.33 as purchaser of Claim No. 96-1 from Sunstate Equipment, Inc. (asserted mechanic's lien claim) |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | $11,120 as purchaser of a scheduled, unsecured claim from Sense, Inc. |
| Astani Construction, Inc. 9595 Wilshire Blvd., Ste. 1010 Beverly Hills, CA 90212 | Claimant, and general contractor for the Project | Approximately $121,000 for funds advanced on behalf of the Debtor to subcontractors and professionals, and to meet other expenses of the Debtor, which were treated by Astani Construction as unsecured loans to the Debtor |
| Marco Astani 9595 Wilshire Blvd, Ste. 1010 Beverly Hills, CA 90212 | Claimant | $1,018,500 for amounts scheduled by the Debtor as unsecured prepetition loans |
| Sonny Astani 9595 Wilshire Blvd, Ste. 1010 Beverly Hills, CA 90212 | Claimant | $5,997,182.49 for amounts scheduled by the Debtor as unsecured prepetition loans |

As reflected above, certain insiders of the Debtor assert claims against the Debtor. Among the material insider claims are the claims of Astani Construction, the general contractor for the Project, and Sonny Astani and Marco Astani, principals of the Debtor. The Astani Claims include (i) a claim of $2,550,000 for services pursuant to Astani Construction's contract; (ii) a claim of

33

1  approximately $121,000 for funds advanced on behalf of the Debtor to subcontractors and

2  professionals, and to meet other expenses of the Debtor, which were treated by Astani Construction

3  as unsecured loans to the Debtor; (iii) claims of approximately $7,000,000 for prepetition amounts

4  purportedly loaned to the Debtor by its principals on an unsecured basis – it is CCV's

5  understanding that these claims do not relate to any money advanced to the Debtor, but represent

6  primarily developer fees, which are typically deferred in these types of deals and are more akin to

7  equity (the Debtor does not believe this understanding is accurate); and (iv) a claim of

8  approximately $20,000,000, which includes and duplicates amounts owed by the Debtor to

9  subcontractors, most of whom have perfected lien rights against the Debtor as well as contractual

10  rights to payment from Astani Construction.  Further, Astani Construction has also purchased the

11  claims of Rolf Jensen & Associates, Inc. (the "Rolf Claim"), Sunstate Equipment, Inc. (the

12  "Sunstate Claim"), and Sense, Inc. (the "Sense Claim").  Notices of claim transfer were filed for

13  the Rolf Claim (Docket No. 558) and the Sunstate Claim (Docket No. 559) on July 19, 2010, and

14  for the Sense Claim (Proof of Claim No. 110) on July 21, 2010.  Per the Denied Debtor Plan, the

15  Debtor has not commingled assets with other entities and is not aware of other insider claims (the

16  bar date was January 29, 2010).  Under the Settlement, all Astani Claims other than the Astani

17  Secured Claims (which shall be paid from the Settlement Funds in accordance with the terms of

18  this Modified Plan) shall be settled, discharged, and released upon the Effective Date.

19  Below is a detailed description and treatment of administrative expenses, claims, and

20  interests under the Modified Plan.

21  **B.    ADMINISTRATIVE EXPENSES**

22  These include the "actual, necessary costs and expenses of preserving the estate" as

23  determined by the Court after notice to creditors of a request for payment and after a hearing

24  thereon.  The amounts set forth below are estimates of amounts required to be paid on the Effective

25  Date and actual amounts required to be paid may be substantially greater or less depending on the

26  extent of opposition and/or other litigation with respect to the Modified Plan and/or the extent of

27  litigation regarding other matters in this case and the extent of services required in connection with

28  the case.  Further, the amounts estimated may differ substantially from the amounts required to be

1  paid on the Effective Date depending upon the amount of cash collateral and/or other sources used

2  to pay such claims prior to confirmation of the Modified Plan.  Also included within this category

3  of administrative expenses are any allowable claims asserted pursuant to 11 U.S.C. § 503(b)(9) for

4  the value of goods delivered within 20 days before the commencement of this chapter 11 case.  The

5  Debtor and CCV are not aware of any such claims.

6        The Bankruptcy Code requires that claims for allowed administrative expenses (the

7  "Administrative Claims") be paid on the Effective date unless the party holding the administrative

8  expense agrees otherwise.  The claimants have not agreed otherwise.  Under this Modified Plan,

9  allowed Administrative Claims will be paid in full by the responsible party under terms of the

10 Settlement on the later of the Effective Date of the Effective Date or the dates on which such

11 Administrative Claims are allowed.  Below are estimates of Administrative Claims under the

12 Modified Plan.

13        Any requests for payment of an Administrative Claim must be filed with the Court and

14 served on (i) counsel for the Reorganized Debtor (SulmeyerKupetz, a professional corporation,

15 Attention David S. Kupetz, 333 South Hope Street, 35th Floor, Los Angeles, CA 90071; Telephone:

16 (213) 626-2311; Facsimile: (213) 629-4520; Email: dkupetz@sulmeyerlaw.com), (ii) counsel for

17 CCV (Skadden, Arps, Slate, Meagher & Flom LLP, Attention: Van C. Durrer II, Esq., 300 South

18 Grand Avenue, Suite 3400, Los Angeles, CA  90071; Telephone: (213) 687-5000; Facsimile: (213)

19 687-5600, E-mail: van.durrer@skadden.com), and (iii) Astani Enterprises, Inc. (c/o Sonny Astani,

20 9595 Wilshire Boulevard, Penthouse 1010, Beverly Hills, CA 90212) no later than thirty (30) days

21 after the Effective Date (the "Administrative Claims Bar Date").  Holders of Administrative Claims

22 that do not file and serve such a request by the Administrative Claims Bar Date shall be forever

23 barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its

24 estate, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Any

25 objections to an Administrative Claim must be filed by the party responsible for payment of such

26 Administrative Claim under this Modified Plan (such responsible party, the "Responsible Party")

27 no later than thirty (30) after the Administrative Claims Bar Date or any such earlier date that may

28

1  be set by the Court.  The Responsible Party may resolve any Administrative Claims that it would

2  be required to pay under the Modified Plan without further order of the Court.

3        Pursuant to the Settlement, Astani Enterprises and the Reorganized Debtor are responsible

4  for payment of all Estate Professionals Claims.  CCV is responsible for payment of all other

5  allowed Administrative Claims excluding such Estate Professional Claims for which Astani

6  Enterprises and the Reorganized Debtor are responsible, but CCV is also contributing up to

7  $125,000 for allowed Estate Professional Claims incurred on and after January 26, 2011, through

8  the Effective Date.[10]

9        The amounts set forth below are estimates based upon various filings in the Debtor's

10  bankruptcy case.  The actual amounts of Administrative Claims may differ significantly from the

11  estimates below because such amounts are subject to Court approval and may have been paid in the

12  ordinary course.  In addition, depending on how this case proceeds, including the extent of

13  litigation on this Modified Plan and other matters, the actual amounts may be significantly higher.

14  Notwithstanding anything to the contrary in the Modified Plan, the Responsible Parties shall retain

15  their rights to review and object to the allowance of any asserted Administrative Claims that they

16  are responsible for paying under the Settlement.

17

18

19

20

21

22

23

24

25

26

27      [10] As noted above, CCV shall not be responsible for paying any amounts to Moran under

28  this Modified Plan or otherwise.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

| **Estimated Administrative Claim** | | **Notes** |
|---|---|---|
| (a) | Administrative Expense #1.<br><br>Claimant: SulmeyerKupetz, a professional corporation (Debtor's bankruptcy counsel).<br><br>Approximately $386,000, subject to Court approval | Based on total of $1,374,464.94 in post-petition fees and expenses billed as of August 31, 2010, minus:<br><br>(i) $214,245.64 in prepetition retainers remaining as of the Petition Date;<br><br>(ii) $400,000.00 in post-petition retainers; and<br><br>(iii) and $374,252.27 in disbursements paid by the Debtor from cash collateral.<br><br>The Denied Debtor Plan estimated $250,000.00. |
| (b) | Administrative Expense #2.<br><br>Claimant: Parker Milliken Clark O'Hara & Samuelian, a professional corporation (Debtor's special litigation counsel).<br><br>Approximately $225,000, subject to Court approval | Based on total of $635,479.51 in post-petition fees and expenses billed as of July 31, 2010, minus:<br><br>(i) $40,252.11 in prepetition retainers remaining as of the Petition Date;<br><br>(ii) $213,449.17 in post-petition retainers; and<br><br>(iii) and $156,424.52 in disbursements paid by the Debtor from cash collateral.<br><br>See Docket. No. 722.  The Denied Debtor Plan estimated $200,000.00. |

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

| Estimated Administrative Claim | Notes |
|---|---|
| (c)  Administrative Expense #3.<br><br>Claimant: Pachulski Stang Ziehl & Jones LLP (Committee's counsel).<br><br>Approximately $127,000 , subject to Court approval | Based on $200,652.47 amount provided to CCV by the Committee's counsel regarding actual fees incurred but not yet approved by the Court, minus $73,895.27 in disbursements paid by the Debtor from cash collateral.  This amount includes an estimate of $125,000.00 for fees and expenses for January - March 2010 provided by Committee's counsel. |
| | The Denied Debtor Plan estimated $100,000.00. |
| (d)  Administrative Expense #4.<br><br>Claimant: Venable LLP (Committee's counsel).<br><br>Approximately $178,000, subject to Court approval | Based on total of $227,346.75 post-petition fees and expenses billed as of August 31, 2010, minus $49,591.00 in disbursements paid by the Debtor from cash collateral. See Docket. No. 717. |
| | The Debtor did not provide an estimate of these fees in the Denied Debtor Plan. |
| (e)  Administrative Expense #5.<br><br>Claimant: Grant Thornton LLP (Committee's financial advisor).<br><br>$25,000, subject to Court approval | Amount is based on Debtor's original estimate of $25,000.00 from the Denied Debtor Plan. See Docket No. 252. |
| (f)  Administrative Expense #6.<br><br>Claimant: HP Management, Inc. (postpetition services relating to maintaining Debtor's books and records).<br><br>Approximately $60,000, subject to Court approval | Amount is based on Debtor's original estimate of $35,000.00 from the Denied Debtor Plan, plus an additional $5,000/month for July - December 2010 ($25,000.00).  See Docket No. 252. |

| Estimated Administrative Claim | Notes |
|---|---|
| Total Estimated Administrative Claims: $1,743,000.00 | Amount is based on $993,000.00 in administrative fees and expenses currently outstanding (from a review of court filings and other information), plus a projection of $800,000.00 for fees and expenses for September – December 2010, which projection was based on the accrual rate of administrative expenses as of November 30, 2010, minus $50,000.00 in additional cash collateral agreed upon as available through September 30, 2010 for the future payment of fees and expenses. |

## C.    UNSECURED TAX CLAIMS

These include certain types of property, sales, and income taxes. The Plan Proponent is not aware of any such prepetition claims against the Debtor and does not believe that any such claims exist based on the Debtor's indications.

The Bankruptcy Code requires that the holders of such claims receive regular installment payments in cash over a period ending not later than five years after the date of the order for relief, unless agreed otherwise. Any such claimant has not agreed otherwise. The total cash payments must have a present value equal to the amount of the allowed claim. The treatment of any such claims under the Modified Plan must be in a manner not less favorable than the most favored non-priority unsecured claim provided in the Modified Plan (other than any cash payments to an administratively convenient class). To the extent that any allowed pre-petition tax claim exists, such claim(s) shall receive the same treatment that is provided under the Modified Plan for the holders of allowed claims in Class 3 in the Modified Plan.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

### D.    CLASSIFICATION OF CLAIMS AND INTERESTS

The following is a table summarizing the classification of claimants and equity interest holders under the Modified Plan.

| CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE MODIFIED PLAN | |
|---|---|
| Secured Claim of CCV | Class 1 |
| Mechanics Lien Claims | Class 2 |
| General Unsecured Claims | Class 3 |
| Deficiency Claim of CCV | Class 4 |
| Secured Claims of Debtor Affiliates | Class 5 |
| Unsecured Claims of Debtor Affiliates | Class 6 |
| Equity Interests | Class 7 |

### E.    CCV'S SECURED CLAIM

The secured claim arising under the Corus Bank Loan Agreement now held by CCV is classified in Class 1 of the Modified Plan.  Class 1 is impaired.  CCV, as the Plan Proponent, supports confirmation of the Modified Plan.

CCV filed a proof of claim against the Debtor on October 29, 2009, in the face amount of $162,662,216.26.  CCV filed an amended proof of claim on January 26, 2010, which did not change the amount of the claim asserted.  The Debtor has filed a complaint and objection to the claim asserting that the claim should be reduced by a sum to be determined, but believed by the Debtor as of March 2010, to be at least $46,000,000.  The Committee and Astani Construction also filed complaints with respect to CCV's claim.  The objection to claim and complaints are discussed in Section XVIII.  CCV's claim shall be allowed in full under this Modified Plan.

As stated above, title to the CCV Project Assets shall be transferred to 900 FSM free and clear of any and all liens, claims, interests, and encumbrances other than the Permitted Encumbrances.  In connection therewith, the Debtor shall execute and deliver to 900 FSM the Grant Deed, and the Debtor, Astani Construction, Astani Enterprises, Sonny Astani, and Marco Astani shall execute and deliver to 900 FSM the Assignment.  In addition, consistent with the Settlement and the Acknowledgment, the Debtor and the Loft Manager shall deliver the Loft HOA Letter to the Loft HOA.  Following the Effective Date, the Debtor, Astani Construction, and the Astani Parties shall reasonably cooperate with CCV and shall take such actions as are necessary or

1  appropriate to effect the provisions and purposes of the Modified Plan.  Under the Settlement, CCV

2  expressly reserved its rights to enforce the obligations of the Debtor, Astani Construction, and the

3  Astani Parties under the Settlement, including, without limitation, under section 1142 of the

4  Bankruptcy Code, and to seek redress against such parties for any failure satisfy such obligations.

5  The Settlement further provides that nothing therein is intended to or shall be deemed to waive, and

6  the Debtor, Astani Construction, and the Astani Parties expressly reserve, their rights to enforce the

7  obligations of CCV under the Settlement, including, without limitation, under section 1142 of the

8  Bankruptcy Code, and to seek redress against such party for any failure to satisfy such obligations.

9          The extent to which transfer of the CCV Project Assets to 900 FSM satisfies CCV's claim

10  depends on the Court's determination of the value of the CCV Project Assets transferred to 900

11  FSM.  As mentioned above, in conjunction with the Relief from Stay Motion, the Court appointed

12  Valuation Expert determined that, in his opinion, the market value of the Project in its "as is"

13  condition as of November 1, 2010 is $173,750,000.[11]  The Court has stated that it will consider the

14  value determined in the Valuation Expert's appraisal report for purposes of both the Relief from

15  Stay Motion and confirmation of the GTS Plan and the CCV Plan.  The Valuation Expert's

16  appraisal report is available for download at http://www.kccllc.net/Concerto.  To the extent that the

17  value of the CCV Project Assets transferred to 900 FSM is less than CCV's claim, CCV will have

18  the CCV Deficiency Claim in the amount of any difference.  The CCV Deficiency Claim will be

19  classified as part of Class 4 and receive the treatment described below.  CCV will receive the CCV

20  Project Assets, its collateral, in satisfaction of its secured claim.  Class 1 is therefore impaired.

21          As discussed in more detail in Section XVIII below, on December 29, 2009, the Debtor

22  filed a Complaint and Objection to Claim against CCV, thereby commencing the action captioned

23  *GTS 900 F, LLC v. Corus Construction Venture, LLC, Adv. No. 2:09-ap-03557V* (the "Debtor

24  Adversary Proceeding").  The complaint, as amended on February 3, 2010, asserts that the claim

25  filed by CCV should be reduced because of the alleged misconduct of Corus Bank in the

26  administration of the construction loan.  The Debtor thus claims that CCV's Proof of Claim should

27  _____

28          [11] See infra note 4.

41

1    be disallowed to the extent of damages purportedly caused by and defenses purportedly resulting

2    from Corus Bank's alleged breaches of its contractual obligations and alleged breaches of the

3    implied covenant of good faith and fair dealing arising from the Loan Agreement and related

4    documents.

5         The Debtor's complaint asserts claims for (1) declaratory relief as to the amount of the

6    CCV claim, (2) offset and recoupment of damages against the loan amount, and (3) equitable

7    subordination of the CCV claim and lien to the claims of creditors holding allowed secured and

8    unsecured claims against the Debtor.  The Debtor's complaint alleges that, as a result of Corus

9    Bank's actions and inactions, the Debtor has been damaged in an amount to be determined, but

10    believed to be in excess of $46,000,000.  The Debtor's objection to claim asserts that CCV's claim

11    should be reduced to the extent of the damages purportedly caused by the conduct of CCV's

12    predecessor and assignor, Corus Bank.  CCV disputes the allegations in the Debtor's complaint.

13    Pursuant to the Settlement, the Debtor Adversary Proceeding shall be settled, discharged, and

14    released on the Effective Date.

15         On September 4, 2009, prior to the commencement of this chapter 11 reorganization case

16    and prior to Corus Bank's seizure by the Federal government, the Debtor filed the Prepetition

17    Action for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3)

18    declaratory relief, and (4) injunctive relief.  The Prepetition Action was originally filed in the

19    Superior Court of the State of California, County of Los Angeles, as *GTS 900 F, LLC v. Corus*

20    *Bank, N.A. et al., Case No: BC421309.*  Following the commencement of this chapter 11 case, the

21    Debtor removed the Prepetition Action to the Bankruptcy Court.  The removed action was pending

22    as *GTS 900 F, LLC v. Corus Bank, N.A., Adv. No. 2:09-ap-02188-VZ* (the "Removed Action").

23         In the Removed Action, the Court entered an order approving a stipulation between the

24    Debtor and the FDIC (as receiver for Corus Bank) entitled Order Granting Stipulation (1)

25    Substituting the Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A.; (2)

26    Extending Deadline to Answer or Otherwise Respond to Complaint; and (3) Staying Adversary

27    Proceeding [Docket No. 20 in the Removed Action], which stayed the Removed Action to allow

28    the Debtor to pursue a claim in the FDIC's receivership proceedings for Corus Bank.  The Court

Case 2:09-bk-35127-VZ    Doc 1084    Filed 02/16/11    Entered 02/16/11 16:09:54    Desc
Main Document    Page 48 of 84

1   also entered an order approving a stipulation between the FDIC and the Debtor permitting the

2   FDIC to file a motion in the District Court to withdraw the reference of this proceeding to the

3   Bankruptcy Court [Docket No. 28 in the Removed Action].  In a letter dated June 8, 2010, the

4   FDIC informed the Debtor that its claim filed in the FDIC's receivership proceedings for Corus

5   Bank had been denied.

6         On August 26, 2010, in a separate proceeding before the United States District Court for the

7   Central District of California (the "District Court") titled *GTS 900 F, LLC v. FDIC et al., Civ. No.*

8   *2:10-cv-02763-SJO* (the "FDIC District Court Proceeding"), the Debtor filed a motion (the

9   "Consolidation Motion") seeking to (i) withdraw the reference of the Debtor Adversary Proceeding

10  from the Bankruptcy Court; (ii) determine that the Debtor is entitled to a jury trial in its damages

11  claims against CCV; (iii) consolidate the Debtor Adversary Proceeding with the FDIC District

12  Court Proceeding for discovery and trial purposes; and (iv) grant a jury trial in the FDIC District

13  Court Proceeding [Docket No. 17 in the FDIC District Court Proceeding].  On September 3, 2010,

14  in the FDIC District Court Proceeding, the District Court ordered the Consolidation Motion be

15  stricken as procedurally improper [Docket No. 25 in the FDIC District Court Proceeding].

16  Pursuant to the Settlement, the FDIC District Court Proceeding and all rights, claims, and interests

17  asserted therein shall be transferred to the Reorganized Debtor on the Effective Date.

18        On September 9, 2010, the Debtor filed the Consolidation Motion in the District Court

19  titled *GTS 900 F, LLC v. Corus Construction Venture LLC , Civ. No. 2:10-cv-06693-SJO* (the

20  "CCV District Court Proceeding").  In the CCV District Court Proceeding, the Debtor sought the

21  same relief described above in the discussion of the Consolidation Motion filed in the FDIC

22  District Court Proceeding.  The District Court denied the Consolidation Motion and remanded the

23  proceeding to the Bankruptcy Court.  Pursuant to the Settlement, the CCV District Court

24  Proceeding shall be settled, discharged, and released on the Effective Date.

25        On December 29, 2009, the Committee filed a complaint in this case commencing the

26  action captioned *Official Committee of Unsecured Creditors v. Corus Construction Ventures LLC*,

27  *Adv. No. 2:09-ap-03555-VZ* (the "Committee Adversary Proceeding").  The Committee's

28  complaint was for (i) declaratory relief regarding validity, priority, and extent of liens; and (ii) for

43

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

1  equitable subordination.  In the adversary proceeding, the Committee seeks a determination from

2  the Court that the lien rights of mechanic's lien claimants, to the extent that such lien rights are

3  valid and properly perfected, are prior and senior to the lien rights of CCV, and requests an order of

4  the Court ruling that CCV's rights under the Loan Agreement are equitably subordinated to claims

5  of all other creditors of the Debtor for purposes of distribution and/or that any lien securing those

6  rights be transferred to the Debtor's estate.

7         The Committee's complaint asserts that the mechanic's lien claimants are senior in priority

8  to the claim of CCV, based on the fact that substantial work was performed on the construction site

9  prior to the recordation of the Corus Bank lien on July 5, 2007, thus giving priority to all

10  subsequent mechanic's lien claimants, whose lien rights relate back to the commencement of the

11  work of improvement.  The Committee's equitable subordination claim, among other things, arises

12  from alleged delays in funding the construction loan and mismanagement of the construction ban

13  that has injured the rights of the mechanic's lien creditors.

14         By an order entered April 6, 2010 [Docket No. 32 in Committee Adversary Proceeding]

15  (the "Dismissal Order"), the Court dismissed the Committee Adversary Proceeding.  The

16  Committee filed a notice of appeal of the Dismissal Order [Docket No. 33 in Committee Adversary

17  Proceeding] on April 8, 2010.  Pursuant to a stipulation with CCV filed on August 4, 2010 [Docket

18  No. 669] (the "Committee Stipulation"), the Committee agreed to dismiss its appeal of the

19  Dismissal Order when the order approving the Committee Stipulation became final and non-

20  appealable.  On August 13, 2010, the Court entered an order approving the Committee Stipulation

21  [Docket No. 685] and the appeal has been dismissed.

22      **F.**   **MECHANIC'S LIEN CLAIMS**

23         All Mechanic's Lien Claims, which are allowed claims for work performed, or services,

24  equipment, and/or materials provided, with respect to the Project that are secured by validly

25  perfected mechanic's liens on assets of the Debtor are classified in Class 2 of the Modified Plan.

26  Class 2 is unimpaired.  As noted above, Mechanic's Lien Claims exclude any Astani Claims.  Per

27  the Denied Debtor Plan, the Debtor estimated the total amount of Mechanic's Lien Claims at

28  approximately $22,400,000.

44

1  The bar date for filing claims was January 29, 2010.  The bar date for hearings on

2  objections to claims was June 30, 2010.  Using information contained in the Denied Debtor Plan,

3  court filings in this case, and other available information, counsel for CCV prepared a list of

4  claimants with mechanic's lien claims against the Project.  This list is attached to the Unitary

5  Disclosure Statement as Exhibit B-1.  Exhibit B-1 does not include certain claimants who voted as

6  mechanic's lien claimants on the Denied Debtor Plan, but do not appear to have any basis for

7  asserting mechanic's liens against the Project and do not appear to have had their mechanic's lien

8  claims temporarily allowed by the Court for voting purposes.  The "Payable Amount" for each

9  claimant listed in Exhibit B-1 is subject to Court allowance.  CCV estimates that there may be

10  approximately $19,600,000 in Mechanic's Lien Claims.

11  This estimate excludes the asserted mechanic's lien claim of approximately $2.555 million

12  filed by Astani Construction and the mechanic's lien claim of approximately $13,000 filed by

13  Sunstate Equipment, Inc., which claim was purchased by Astani Construction.  Both of these

14  claims are classified as Astani Claims in Class 5.  The final allowed amounts of all mechanic's lien

15  claims are undetermined at this time.  As noted above, the Plan Proponent may file a motion

16  seeking reconciliation of various claims in this case and clarification from the Court on the allowed

17  amounts of such claims.

18  Allowed claims in this class will be paid in full under the Modified Plan, including

19  Postpetition Interest, from the CCV Cash on the later of the Effective Date and the date such claims

20  are allowed.  The mechanic's liens held by members of this class, to the extent otherwise valid and

21  perfected, will be extinguished when the applicable allowed claim is paid in full.  Class 2 is

22  therefore unimpaired and deemed to accept the CCV Plan pursuant to section 1129(f) of the

23  Bankruptcy Code.  In addition, any and all claims and causes of action that holders of claims in

24  Class 2 may have against CCV will be extinguished when the applicable allowed claim is paid in

25  full.

26  **G.    GENERAL UNSECURED CLAIMS**

27  All General Unsecured Claims, which exclude the CCV Deficiency Claim and any Astani

28  Claims, are classified in Class 3 of the Modified Plan.  Class 3 is unimpaired.  The bar date for

1  filing claims was January 29, 2010.  The bar date for hearings on objections to claims was June 30,

2  2010.  Using information contained in the Denied Debtor Plan, court filings in this case and other

3  available information, counsel for CCV prepared a list of claimants that CCV believes should be

4  classified as General Unsecured Claims.  This list of claims is attached as Exhibit B-2 to the

5  Unitary Disclosure Statement.  Of those claims, approximately $88,000 involve claims for deposits

6  by purchasers of Loft units and those claims should be withdrawn or otherwise eliminated since the

7  loft unit sales closings have moved forward.  The Debtor estimates that allowed general unsecured

8  claims will likely amount to approximately $762,000 (the amount ultimately may be less or more,

9  depending on whether claims filed as unsecured claim are determined to have mechanic's lien

10  rights or are otherwise disallowed as general unsecured claims).  CCV believes that the Debtor may

11  have included in its estimate claims not appropriately considered General Unsecured Claims.

12  Exhibit A-7 to the Unitary Disclosure Statement is a list, compiled based on the Debtor's books

13  and records, of prepetition payables (including general unsecured claims and mechanic's lien

14  claims — this list includes claims in Classes 2 and 3).

15        The Debtor has objected to a number of general unsecured claims.  To the extent those

16  objections are not resolved by the Effective Date, the Plan Proponent will succeed to the Debtor's

17  rights with respect to the unresolved objections.  As noted above, the Plan Proponent may file a

18  motion seeking reconciliation of various claims in this case and clarification from the Court on the

19  allowed amounts of such claims.

20        Allowed claims in this class will be paid in full from the CCV Cash.  Class 3 is therefore

21  unimpaired.

22        **H.    <u>EQUITY INTERESTS</u>**

23        The equity interests (membership interests) in the Debtor classified in Class 7 of the

24  Modified Plan.  Pursuant to the Settlement, the net Settlement Funds remaining after satisfaction of

25  the Estate Professional Claims, and the FDIC District Court Proceeding and all rights, claims, and

26  interests asserted therein, shall be transferred to the Reorganized Debtor, and holders of equity

27  interests in the Debtor will retain such  interests.  Under this Modified Plan, Class 7 is now

28  unimpaired.

46

## I.    CCV DEFICIENCY CLAIM

The CCV Deficiency Claim is classified in Class 4 of the Modified Plan.  Class 4 is impaired.  The CCV Deficiency Claim is being classified separately from other unsecured claims in order to provide and allow for enforcement of any subordination agreements in favor of such CCV Deficiency Claim.  As noted above, the Court appointed Valuation Expert determined that, in his opinion, the market value of the Project in its "as is" condition as of November 1, 2010 is $173,750,000.[12]  The Court has stated that it will consider the value determined in the Valuation Expert's appraisal report for purposes of both the Relief from Stay Motion and confirmation of the GTS Plan and the CCV Plan.  The Valuation Expert's appraisal report is available for download at http://www.kccllc.net/Concerto.

To the extent that the value of the CCV Project Assets transferred to 900 FSM, which includes the Project, net of amounts necessary to satisfy Mechanic's Lien Claims, is less than the amount of CCV's claim, CCV shall have the CCV Deficiency Claim in the amount for any difference.  In addition, to the extent that CCV has a CCV Deficiency Claim, CCV's entire claim will be reduced by the amount of any post-petition payments received by CCV.

For illustration purposes, suppose that the Project has a value of $150 million and that there is $5 million of Estate Held Cash on the Effective Date, for a total of $155 million.[13]  Administrative Claims, which CCV has estimated at approximately $1.743 million, would be then subtracted from this sum to arrive at a total of $153,257,000, which represents the value of the CCV Project Assets transferred to 900 FSM as of the Effective Date.  The amount of Mechanic's Lien Claims, which CCV has estimated at approximately $19.6 million, would be subtracted from the CCV Project Assets value to arrive at the value of CCV's collateral as of the Effective Date, $133,657,000.  This number would then be subtracted from CCV's claim amount of $162,662,216.26 as would all post-petition payments received by CCV ($10,532,000 as of

---

[12] See infra note 4.

[13] The values in this example are purely for illustration purposes and CCV in no way adopts these values as accurate.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

1  November 30, 2010) to arrive at the total for the CCV Deficiency Claim.  Thus, the CCV

2  Deficiency Claim would be $162,662,216.26 - $133,657,000 - $10,532,000 = $18,473,216.26.  The

3  holders of the CCV Deficiency Claim may look solely to CCV for payment and shall not be paid

4  by the Reorganized Debtor or from the Settlement Funds.

5      The CCV Deficiency will not be paid in full.  Class 4 is therefore impaired.  As the Plan

6  Proponent, CCV clearly supports confirmation of the Modified Plan.

7      **J.**      <u>**SECURED CLAIMS OF DEBTOR'S AFFILIATES**</u>

8      All allowed Astani Secured Claims are classified in Class 5 of the Modified Plan.  Class 5

9  is unimpaired.  For the avoidance of doubt, any and all allowed secured Astani Claims are

10  classified in Class 5, regardless of whether such Astani Claim might fall within the parameters of

11  some other class of claims under the Modified Plan.  As a result of the Settlement, there is no

12  objection that the Astani Secured Claims are subordinated to CCV's claims pursuant to the

13  Guaranties.  In connection with the Settlement, holders of Astani Secured Claims in Class 5 shall

14  be paid $2,550,000 by the Reorganized Debtor from the Settlement Funds and all Astani Secured

15  Claims shall be deemed discharged, released, and satisfied.

16      On December 29, 2010, Astani Construction filed the action captioned *Astani Construction,*

17  *Inc. v. Corus Construction Venture, LLC, Adv. No. 2:09-ap-01361-VZ.* (the "<u>Astani Construction</u>

18  <u>Adversary Proceeding</u>").  An Amended Complaint was filed on January 27, 2010 (as amended, the

19  "<u>Astani Construction Complaint</u>").  The Astani Construction Complaint alleges claims for relief

20  based on (1) Determination of the Extent, Validity and Priority of the lien asserted by Corus

21  Construction Venture, LLC, (2) Equitable subordination, (3) Enforcement of Stop Notice Claim, (4)

22  Declaratory Relief re Priority of Stop Notice Claim, and (5) Injunctive Relief.

23      Among other things, Astani Construction asserts that its claims arise from its status as a

24  mechanic's lien holder with a claim of approximately $22,550,000 (including the mechanic's lien

25  claims of all of the subcontractors).  Similar to the complaint filed by the Committee, Astani

26  Construction alleges that the mechanic's lien claims are prior to and senior to the secured claim of

27  CCV based on the purported fact that the work of improvement on the Project was commenced

28  prior to the recordation of Corus Bank's deed of trust on July 5, 2007.

48

1    Further, Astani Construction alleges that its rights under a recorded stop notice makes its

2 entire $25 million claim senior to the undisbursed construction loan funds including pre-allocated

3 interest payments to be paid and that have already been paid to CCV and to Corus Bank.  Finally,

4 Astani Construction incorporates the Debtor's damage claim and alleges that it too has been

5 damaged by Corus Bank's purported conduct and, as a result, CCV's Proof of Claim should be

6 equitably subordinated to the entire claim of Astani Construction and its subcontractors.

7    CCV disputes the allegations in the Astani Construction Complaint and has asserted various

8 defenses to the claims asserted in the Astani Construction Complaint, including that Astani

9 Construction voluntarily subordinated its claim to that of CCV pursuant to the Guaranties and that

10 pursuant to Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12

11 U.S.C. § 1821(d)(2)(G)(i)(II), Astani Construction is barred from seeking relief from CCV because

12 CCV, as purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper defendant

13 because it did not expressly assume receivership liabilities of Corus Bank.  Pursuant to the

14 Settlement, the Astani Construction Adversary Proceeding shall be settled, discharged, and

15 released on the Effective Date.

16    **K.    UNSECURED CLAIMS OF DEBTOR'S AFFILIATES**

17    All allowed unsecured Astani Claims are classified in Class 6 of the Modified Plan.  Class 6

18 is impaired.  For the avoidance of doubt, any and all allowed unsecured Astani Claims are

19 classified in Class 6, regardless of whether such Astani Claim might fall within the parameters of

20 some other class of claims under the Modified Plan.  As discussed above, Astani Construction has

21 raised, and CCV disputes, various claims in the Astani Construction Adversary Proceeding.  Under

22 the Settlement, the Astani Construction Adversary Proceeding and any and all claims that any of

23 the Astani Parties or Astani Construction may have against the Debtor's estate, other than the

24 Astani Secured Claims (which shall be paid from the Settlement Funds in accordance with the

25 terms of this Modified Plan), shall be settled, discharged, and released on the Effective Date,

26 except that such Astani Unsecured Claims may look to the Settlement Funds for payment.

27

28

**X.      SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS**

The Modified Plan cannot be confirmed unless the Court finds that it is "feasible," which means that the Plan Proponent has timely submitted evidence establishing that there will be sufficient funds available to satisfy all expenses, including the scheduled creditor payments discussed above.  As detailed above, creditors under the Modified Plan will receive payment from the CCV Cash or the Reorganized Debtor Cash.

**XI.     FINANCIAL INFORMATION TO ASSIST IN DETERMINING WHETHER PROPOSED PAYMENT IS FEASIBLE**

Historical financial information regarding the Debtor's operating results prior to the commencement of this chapter 11 case is not pertinent as payments under the Modified Plan will be funded by the CCV Cash and the Reorganized Debtor Cash.

According to the monthly operating report [Docket No. 944] filed by the Debtor, the Debtor had a cash balance of approximately $2,642,603 as of December 31, 2010.  Assuming that the Effective Date occurs soon, the Plan Proponent believes that the CCV Cash, which includes the Estate Held Cash as well the $1,074,929.54 CCV Deposit Amount, and the Astani Held Cash (including the cash paid to Astani Enterprises under the Settlement) will be sufficient to cover the payments due to holders of allowed Administrative Claims that remain outstanding at that time.  In addition, as reflected in the certification of the Chief Accounting Officer of ST Residential, LLC (which is the managing member of CCV), attached to the Unitary Disclosure Statement as Exhibit B-3, CCV has the financial wherewithal to fulfill its obligations under the Modified Plan.

**XII.    ASSETS AND LIABILITIES OF THE ESTATE**

**A.      ASSETS**

As discussed above, the Debtor's assets consist of the Concerto development and revenues generated from the Project.  The development is a two-phase, mixed-use (residential and retail) development.  The site is located at the southeast corner of Figueroa Street and 9th Street.  The Project (Phase I) consists of Tower I (containing 271 residential units and retail and storage space), the Loft (containing 77 residential units and retail and storage space), and the Parking Garage (a seven-story partly underground parking structure).  Phase II of the Concerto development

50

1  consisting of Tower II (a second 30-story tower) is contemplated for the future, and its

2  infrastructure (including subterranean parking, elevator shafts, DWP vaults, excavation, shoring,

3  and some foundation) has been completed, but further construction has not been commenced.

4          The Debtor and CCV have differing opinions as to the value of the Project.

5      1.      DEBTOR'S VALUATION OF THE PROJECT

6          Attached to the Unitary Disclosure Statement as Exhibit A-4 is a valuation analyses

7  prepared by Moran and available for download at http://www.kccllc.net/Concerto is a "Summary

8  Appraisal Report" (the "CBRE Appraisal Report") prepared by CBRE.  The resume of Moran's

9  California office is attached to the Unitary Disclosure Statement as Exhibit A-3.  The qualifications

10  of the CBRE experts who prepared the CBRE Appraisal Report, Messrs. Zoraster and Moniz, are

11  set forth in detail in Addendum B appearing at the end of the CBRE Appraisal Report.  As

12  discussed above, Moran's valuation analysis (see Exhibit A-4 to the Unitary Disclosure Statement)

13  concludes with a range of value for the net sales price for the Project of approximately

14  $190,000,000 - $200,000,000.  The CBRE Appraisal Report (available for download at

15  http://www.kccllc.net/Concerto) concluded that the prospective market value of the Project (with

16  Tower I as an apartment tower), as of December 1, 2010, would be $191,200,000.  The CBRE

17  Appraisal Report references CBRE's prior appraisal report (available for download at

18  http://www.kccllc.net/Concerto) on the Project and CBRE's prior liquidation analysis for the

19  Project.  CBRE's prior appraisal report was attached as Exhibit 9 (available for download at

20  http://www.kccllc.net/Concerto) and CBRE's prior liquidation analysis was attached as Exhibit 15

21  to the Debtor's Second Amended Disclosure Statement and Plan [Docket No. 252 in the Debtor's

22  chapter 11 case].

23      2.      CCV'S VALUATION OF THE PROJECT

24          Available for download at http://www.kccllc.net/Concerto is a "Summary Appraisal

25  Report" prepared by valuation experts working with CCV (the "April CCV Appraisal Report")

26  setting forth the "as-is" value of the Project as $122,000,000 as of April 6, 2010, and a value of

27  $146,000,000 for the Project upon completion, assuming the individual units of the Project are sold

28  exclusively as condominiums.  The experts who prepared the April CCV Appraisal Report are with

51

1  the firm of Cushman & Wakefield, Inc.  The experts are James H. Pike and Michele Kauffman.

2  The qualifications of Mr. Pike and Ms. Kauffman are set forth in detail in Addendum A appearing

3  at the end of the April CCV Appraisal Report.  As reflected in the GTS, the Debtor changed its

4  strategy to include a potential sale of the Project in bulk, for possible use as an apartment complex.

5  This change in strategy from the Debtor's previous stated intention of selling individual units in the

6  Project as condominiums affects the value of the Project.

7          In connection with the Relief from Stay Motion, CCV's valuation experts prepared an

8  updated "Summary Appraisal Report" (the "October CCV Appraisal Report") setting forth the "as

9  is" value of the Project as $150,000,000 as of September 30, 2010, and a value of $163,000,000 for

10  the Project upon completion, assuming the condominium units are rented as apartments.  The

11  October CCV Appraisal Report is also available for download at http://www.kccllc.net/Concerto.

12          3.          THE VALUATION EXPERT'S VALUATION OF THE PROJECT

13          On November 24, 2010, the court-appointed Valuation Expert issued his report stating that,

14  in his opinion, the highest and best use of the project is to position the 271 units of the Phase I

15  tower as an apartment complex.  As noted earlier, based on that assumption, the Valuation Expert

16  derived a market value of the Project in its "as is" condition as of November 1, 2010 of

17  $173,750,000.  The Valuation Expert's appraisal report is available for download at

18  http://www.kccllc.net/Concerto.

19      **B.          LIABILITIES**

20          The bar date for filing proofs of claim was January 29, 2010.  The deadline for hearings on

21  objections to claims was June 30, 2010.  As set forth above, CCV has filed a proof of claim in the

22  sum of $162,662,216.26.  The Debtor has objected to this claim and asserts that the claim should

23  be reduced by a sum of at least $46,000,000.  According to the Debtor, other allowable claims

24  (mechanics' lien and general unsecured claims) against the Debtor (not including the CCV claim)

25  amount to approximately $22,162,000.  Of that sum, the Debtor believes approximately

26  $21,400,000 (including a $2,550,000 claim of Astani Construction, Inc.) are allowed mechanics'

27  lien claims and approximately $762,000 are allowed general unsecured claims.  The Debtor filed a

28  number of objections to claims in this case.  Attached to the Unitary Disclosure Statement as

1    Exhibit A-7 is a list of the Debtor's accounts payable, according to the Debtor's books and records,

2    as of the commencement of the Debtor's chapter 11 case.  Attached to the Unitary Disclosure

3    Statement as Exhibit A-5 is a list prepared by the Debtor of mechanics' lien claims for work

4    performed, or services, equipment, and/or materials provided with respect to the Project.  Attached

5    to the Unitary Disclosure Statement as Exhibit A-6 is a list prepared by the Debtor of general

6    unsecured claims.

7         As discussed above, attached to the Unitary Disclosure Statement as Exhibit B-1 is a list

8    prepared by CCV of mechanic's lien claims, for work performed, or services, equipment, and/or

9    materials provided with respect to the Project.  Also attached to the Unitary Disclosure Statement

10   as Exhibit B-2 is a list prepared by CCV of asserted general unsecured claims as of November 30,

11   2010.  Exhibit B-2 was compiled by counsel for CCV based on information contained in the

12   Denied Debtor Plan, court filings in this case and other available information.  The "Payable

13   Amounts" for claimants in Exhibit B-1 and Exhibit B-2 are subject to final Court allowance.

14        Under the Modified Plan, to the extent those objections are not resolved by the Effective

15   Date, the Plan Proponent will succeed to the Debtor's rights with respect to the unresolved

16   objections.  In addition, the Plan Proponent may file a motion seeking reconciliation of various

17   claims in this case and clarification from the Court on the allowed amounts of such claims.

18   **C.**    **<u>SUMMARY</u>**

19        The Debtor asserts that its assets (Phase I and Phase II of the Concerto development) have

20   an estimated value ranging from $191,000,000 - $200,000,000.  The Debtor also asserts that total

21   liabilities (assuming that CCV's claim is not disallowed in part and reduced, including the

22   $2,550,000 claim of Astani Construction, Inc., and including $575,000 of estimated administrative

23   expenses) are in the estimated approximate amount of $184,737,000.

24

25

26

27

28

1    CCV believes that the Debtor's assets have an estimated "as-is" value of approximately

2    $152,642,603 ($150,000,000 for the Project and approximately $2,642,603[14] of cash on hand) and

3    estimates that total liabilities are approximately $187,865,241.

4  **XIII.**   **TREATMENT OF NONCONSENTING CLASSES**

5    As stated above, even if all classes do not consent to the proposed treatment of their claims

6    under a particular plan, that plan may nonetheless be confirmed if the dissenting classes are treated

7    in a manner prescribed by the Bankruptcy Code.  The process by which dissenting classes are

8    forced to abide by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy

9    Code allows dissenting classes to be crammed down if a plan does not "discriminate unfairly" and

10    is "fair and equitable."  The Bankruptcy Code does not define discrimination, but it does provide a

11    minimum definition of "fair and equitable." The term can mean that secured claimants retain their

12    liens and receive cash payments whose present value equals the value of their security interest.  For

13    example, if a creditor lends the Debtor $100,000 and obtains a security interest in property that is

14    worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash

15    payments whose present value equals $80,000 and not $100,000.  The term means that unsecured

16    claimants whose claims are not fully satisfied at least know that no claim or interest that is junior to

17    theirs will receive anything under the plan, except where the Debtor is an individual, has elected to

18    retain property included in the Estate under 11 U.S.C. § 1115, and has satisfied 11 U.S.C. §

19    1129(b)(2)(B)(ii).  "Fair and equitable" means that each holder of an interest must receive the value

20    of such interest or else no junior interest is entitled to receive anything.

21    Therefore, if a class of general unsecured claims votes against a plan, that plan cannot be

22    confirmed where a class of interest holders (e.g., shareholders or partners) will receive or retain any

23    property under the plan on account of such interests, unless the plan provides that the class of

24    general unsecured claims shall be paid in full with interest.  These are complex statutory provisions

25    and the preceding paragraphs do not purport to state or explain all of them.

26

27    [14] This estimate is based on the Debtor's monthly operating report [Docket No. 944], which

28  indicates that the Debtor had a cash balance of $2,642,603 as of December 31, 2010.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

1  Here, as discussed above, all classes of claims and interests either have accepted, or are

2  deemed to accept pursuant to section 1126(f) of the Bankruptcy Code, the CCV Plan.

3

4  **XIV.   TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS (CHAPTER 7 LIQUIDATION ANALYSIS)**

5  The Modified Plan must provide that a nonconsenting impaired claimant or interest holder

6  of a consenting class receive at least as much as would be available had the Debtor filed a Chapter

7  7 petition instead.  As noted above, all classes of claims and interests either have accepted, or are

8  deemed to accept pursuant to section 1126(f) of the Bankruptcy Code, the CCV Plan.  FG 98,

9  which is the sole holder of a claim or interest that has not accepted (and is not deemed to accept)

10 the CCV Plan, will receive more on account of its equity interest under this Modified Plan than it

11 would in a chapter 7 liquidation scenario.  In a chapter 7 liquidation scenario, there would not be

12 any value available for distribution to any equity holders, including FG 98.

13 Moreover, as discussed above, holders of equity interests in the Debtor, including FG 98,

14 will retain their interests, and the Astani Parties holding 85% of the equity interests in Class 7 have

15 recast their votes to be in acceptance of the CCV Plan, subject to the Settlement.  Thus, Class 7 has

16 actually accepted the CCV Plan and is now unimpaired under (and deemed to accept pursuant to

17 section 1126(f) of the Bankruptcy Code) the Modified Plan.

18 Liquidation analyses for the CCV Plan and the GTS Plan are set forth in section XIV of the

19 Unitary Disclosure Statement.

20 **XV.   FUTURE DEBTOR**

21 **A.     MANAGEMENT OF DEBTOR**

22 The Reorganized Debtor will continue to be managed by Concerto Manager, Inc. (the

23 "Manager"), the current manager of the Debtor.  Sonny Astani is the President of Concerto

24 Manager, Inc., and is a controlling equity holder in or an affiliate of persons or entities holding the

25 majority of the equity interests in the Debtor.

26 **B.     FUTURE FINANCIAL OUTLOOK**

27 The future financial outlook of the Debtor and the Project is not pertinent to the Modified

28 Plan. Under the Modified Plan, creditors will be paid solely from the CCV Cash and the

Reorganized Debtor Cash.  Claims against the Debtor will be discharged as of the Effective Date, and creditors will hold no interests in the Project or the CCV Project Assets.

**XVI.    SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND LEASES; OTHER PROVISIONS**

Under the Modified Plan, title to the CCV Project Assets shall be transferred to 900 FSM free and clear of any and all liens, claims, interests, and encumbrances other than the Permitted Encumbrances.  In connection therewith, the Debtor shall execute and deliver to 900 FSM the Grant Deed, and the Debtor, Astani Construction, Astani Enterprises, Sonny Astani, and Marco Astani shall execute and deliver to 900 FSM the Assignment.  As set forth in the Assignment, the assignment of all contracts and agreements is subject to any rights to approve or consent to such assignment by the non-transferor parties to such contracts and agreements to the extent such rights exist.  In addition, consistent with the Settlement and the Acknowledgment, the Debtor and the Loft Manager shall deliver the Loft HOA Letter to the Loft HOA.

Following the Effective Date, the Debtor, Astani Construction, and the Astani Parties shall reasonably cooperate with CCV and shall take such actions as are necessary or appropriate to effect the provisions and purposes of the Modified Plan.  In addition, the Debtor and the Loft Manager shall deliver the Loft HOA Letter to the Loft HOA consistent with the Settlement and the Acknowledgment.  Under the Settlement, CCV expressly reserved its rights to enforce the obligations of the Debtor, Astani Construction, and the Astani Parties under the Settlement, including, without limitation, under section 1142 of the Bankruptcy Code, and to seek redress against such parties for any failure satisfy such obligations.  The Settlement further provides that nothing therein is intended to or shall be deemed to waive, and the Debtor, Astani Construction, and the Astani Parties expressly reserve, their rights to enforce the obligations of CCV under the Settlement, including, without limitation, under section 1142 of the Bankruptcy Code, and to seek redress against such party for any failure to satisfy such obligations.

The Court must make certain findings of fact before approving the Modified Plan.  The Plan Proponent will request that the Court make the appropriate findings at the Confirmation Hearing, based upon evidence submitted in support of confirmation of the CCV Plan, as modified

1   by this Modified Plan.  Among other things, the transfers of the CCV Project Assets to 900 FSM

2   pursuant to this Modified Plan shall be deemed to have been made in good faith, and such transfers

3   shall be entitled to the protections of section 363(m) of the Bankruptcy Code.  See In re Ecoventure

4   Wiggins Pass, Ltd., 419 B.R. 870, 872 (Bankr. M.D. Fla. 2009) (confirming plan providing for

5   transfer of Debtor's condominium complex to secured lender group in accordance with sections

6   363(b)(1), 363(m), 1123(a)(5)(B), and 1123(b)(4)).

7        Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of any

8   instrument of transfer under, or in connection with, the Modified Plan shall not be taxed under any

9   law imposing a stamp tax or similar tax.  Furthermore, and without limiting the foregoing, any

10   transfers from the Debtor to any person pursuant to the Modified Plan shall not be subject to any

11   document recording tax, stamp tax, conveyance fee, intangibles tax, sales or use tax, mortgage tax,

12   real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee,

13   or other similar tax or governmental assessment.  All filing or recording officers (or any other

14   person with authority over any of the foregoing), wherever located and by whomever appointed,

15   shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the

16   collection of any such tax or governmental assessment, and shall accept for filing and recordation

17   any of the foregoing instruments or other documents without the payment of any such tax or

18   governmental assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to

19   these matters.

20        As of the Effective Date, except as otherwise provided herein, all executory contracts and

21   unexpired leases of the Debtor that CCV has designated in the Modified Plan Motion shall be

22   assumed by the Debtor and assigned to CCV.

23   **XVII.   COMPROMISE OF CONTROVERSY; RELEASES; INDEMNIFICATION**

24        Upon the Effective Date, in connection with and as consideration for the compromises

25   reflected in the Settlement and in this Modified Plan, the Debtor, its estate, all mechanic's lien

26   claimants, the Committee, Astani Construction, and the Astani Parties (collectively, the "Releasing

27   Parties") shall be deemed to absolutely, unconditionally, and irrevocably release and forever

28

discharge CCV and Corus Bank (collectively, the "Released Parties")[15] from any and all claims, demands, actions, rights, remedies, causes of action, debts, liens, sums, suits, and/or accountings (collectively, the "Released Claims"). Such releases shall include any Released Claims that are not known or suspected to exist as of the Effective Date. No fact or circumstance, evidence, or transactions which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set in this paragraph. From and after the Effective Date, this Modified Plan may be pleaded by the Released Parties as a full and complete defense to any proceeding instituted with respect to any Released Claims and may be used as a basis for an injunction against any action, suit, or any proceeding instituted, prosecuted, or attempted with respect to any Released Claims in violation of the provisions of this Modified Plan. Immediately following the Effective Date, the applicable Releasing Parties shall cause any and all proceedings, including, without limitation, any and all appeals, relating to the Released Claims to be dismissed.

Under the Settlement, on the Effective Date, any and all claims that Corus Bank, CCV and/or the Debtor's estate may have against the Astani Parties and/or Astani Construction shall be deemed settled, discharged, and released, and the Guarantor Defendants shall be released from liability under the Guaranties. In addition, under the Settlement, CCV and 900 FSM will indemnify the Indemnified Parties pursuant to the Indemnity Agreement.

All of the releases provided in this section are an integral part of the compromise of controversy reflected in the Settlement and in this Modified Plan. Nothing in this Modified Plan or the order confirming the Modified Plan (the "Confirmation Order") shall be deemed to relieve any party of its obligation to perform under this Modified Plan, the Confirmation Order, or the Settlement.

As discussed in the Modified Plan Motion, the settlement and compromises reflected in the Settlement is the foundation of this Modified Plan, which is the product of extensive negotiations.

---

[15] For the avoidance of doubt, the Released Parties excludes the FDIC and nothing in this Modified Plan is intended, or should be interpreted, to release any claims that any party may have against the FDIC.

1   Under section 1123(b)(3)(A) of the Bankruptcy Code , a plan may provide for "the settlement or

2   adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C.

3   § 1123(b)(3)(A). In the Ninth Circuit, courts consider the following factor in determining whether

4   a compromise is fair and equitable to a debtor's estate: (i) the probability of success in the

5   litigation; (ii) the difficulty, if any, of collection; (iii) the complexity, and attendant expense

6   inconvenience, and delay, of the litigation and (iv) the paramount interests of creditors and proper

7   deference to their reasonable views. See Arden v. Motel Partners (In re Arden), 176 F.3d 1226,

8   1228 (9th Cir. 1999) (quoting Martin v. Kane (In re A & C Props.), 784 F.2d 1377, 1381 (9th Cir.

9   1986).

10       This bankruptcy case has been pending for approximately seventeen months, and has

11   involved various disputes and contested matters. The Settlement and this Modified Plan represent

12   a global, comprehensive resolution of almost all disputes surrounding the Debtor's bankruptcy

13   cases, including the Estate Actions, any claims that the Astani Parties, the Debtor, and Astani

14   Construction may have against CCV and/or Corus Bank, any claims that the Astani Parties and

15   Astani Construction may have against the Debtor's estate, and the proceedings with respect to the

16   Guaranties. As reflected above, the parties to the Estate Actions and other litigation have differing

17   views as to the validity of the various claims and defenses asserted therein. Absent the Settlement,

18   the Debtor, CCV, and others would unnecessarily expend time, money, and other resources to

19   litigate such matters, and any recoveries inevitably would be delayed. The Settlement and this

20   Modified Plan allow the parties to avoid such burdens, as well as the uncertainty, of such litigation.

21       The terms and conditions of the Settlement were negotiated over several weeks following

22   the mediation that occurred in December 2010 with respect to the Relief from Stay Motion, and the

23   filings of the Budget Motion and the Trustee Motion. Such negotiations were conducted at arm's

24   length and in good faith by the parties and their respective counsel. Moreover, the Settlement and

25   this Modified Plan are supported by almost all of the constituencies and, as reflected above, there is

26   more than sufficient business justification for the parties to agree to the terms and conditions of the

27   Settlement and this Modified Plan. The Settlement and this Modified Plan are fair, reasonable and

28   in the best interests of the Debtor's estate and parties in interest.

XVIII. **BANKRUPTCY PROCEEDINGS**

    A.    **COMMENCEMENT OF CASE**

    The Debtor commenced its reorganization case by filing a voluntary chapter 11 petition on September 17, 2009. Following the commencement of the Debtor's chapter 11 case, the Court approved the Debtor's employment of SulmeyerKupetz, a professional corporation, as bankruptcy counsel and Parker, Milliken, Clark, O'Hara & Samuelian, A Professional Corporation, as special corporate and litigation counsel. On October 16, 2009, pursuant to the "Notice of Appointment and Appointment of Committee of Creditors Holding Unsecured Claims", the UST appointed the Committee. The Committee's retention of Venable LLP as counsel and the Committee's retention of Grant Thornton LLP as financial advisor have been approved by the Court.

    B.    **LOFT UNITS SALE AND CASH COLLATERAL MOTIONS**

    On October 1, 2009, the Debtor filed two related motions. One motion (the "Sale Motion") requested that the Court authorize the Debtor to complete the 77 pending sales (and to complete sales with substitute back-purchasers, if necessary, in the event that any pending buyers fail to perform) of all units in the Debtor's low-rise loft structure by authorizing the Debtor's assumption (subject to the Court approving these sales free and clear of interests) of sales contracts and approving the sales free and clear of interests, with all liens to attach to the sale proceeds with the same validity, priority, and perfection as existed with respect to the residential units to be sold. Pursuant to the second motion (the "Cash Collateral Motion"), the Debtor requested that the Court authorize the use of cash collateral (the net proceeds of the sale of the Residential Loft Units) in order to complete construction of Phase I of the Concerto project, with the secured lender and any other lien holders to receive replacement liens on postpetition improvements to the collateral and the proceeds therefrom.

    The FDIC (as receiver for Corus Bank) filed objections to both the Sale Motion and the Cash Collateral Motion. However, the FDIC's participation with respect to these motions was short-lived. On October 7, 2009, Starwood Capital Group ("Starwood") issued a press release stating that Starwood, TPG Capital, Perry Capital and WLR LeFrak had reached a definitive agreement with the FDIC to acquire an equity interest in a limited liability company that would

1  hold construction loans and real estate owned assets formerly owned by Corus Bank.  On October

2  16, 2009, their sale contract was finalized and signed.  The Debtor's construction loan was one of

3  the significant assets acquired by a newly formed joint entity consisting of the FDIC and the

4  Starwood-led investment consortium.  A true and correct copy of the Press Release is attached to

5  the Unitary Disclosure Statement as Exhibit A-8.  Among other things, the Press Release stated

6  that the transaction equated to approximately 60% of unpaid principal balance and a significantly

7  greater discount to total construction costs, the FDIC would hold a 60% equity interest in the newly

8  formed CCV, and the FDIC would provide financing with a 0% coupon for 50% of the purchase

9  price to CCV.  The Debtor believes that Starwood would also receive a $50,000,000 annual

10 management fee to oversee the day-to-day management of CCV.  The Debtor believes that the

11 $162,000,000 loan was placed into CCV at a discount value of $85,000,000 or $0.50 per dollar.

12      Prior to the hearing on the Sale Motion and the Cash Collateral Motion, the Debtor

13 commenced discussions with CCV and ultimately agreed on orders to be entered by the Court with

14 respect to the Sale Motion and the Cash Collateral Motion.  At a hearing on October 29, 2009, the

15 Court announced that it was granting approval of the Sale Motion and the Cash Collateral Motion

16 and, on October 30, 2009, orders were entered granting the motions.  As of September 20, 2010,

17 the Debtor has paid CCV $10,532,000 in post-petition payments.  On or about January 18, 2010,

18 CCV, the Debtor, and the Committee agreed on a modified budget.  On January 19, 2010, the

19 Debtor filed a notice with the Court, stating that agreement had been reached on a modified budget

20 and attaching a copy of the modified budget.  This budget was later modified by the Court's Order

21 Regarding Motion by Debtor for Order Modifying Adequate Protection Payments to Corus

22 Construction Ventures LLC [Docket No. 378] and Order Approving Stipulation Re Modified

23 Budget in Connection with Order Granting Debtor's Motion Authorizing Use of Cash Collateral

24 and Related Relief [Docket No. 718].

25      The order approving the Cash Collateral Motion set a deadline of 60 days from the date of

26 submission of documentation by CCV to the Debtor and the Committee (December 29, 2009) for

27 parties to object to the claim of CCV and/or assert claims against CCV.

28

1    **C.    CLAIM OF CCV**

2    On October 29, 2009, CCV filed a proof of claim in this chapter 11 case in the amount of

3    $162,662,216.26, which has been assigned claim number 16 in the claims register in this case.

4    Thereafter, on January 29, 2010, CCV filed an amended proof of claim.  The amendment did not

5    change the amount of the claim asserted by CCV.  The proof of claim is based upon a Promissory

6    Note dated as of July 2, 2007 given by the Debtor to Corus Bank, which is CCV's predecessor in

7    interest, and the Deed of Trust given by the Debtor to Corus Bank.  Both the Promissory Note and

8    the Deed of Trust reference the underlying Construction Loan Agreement between the Debtor and

9    Corus Bank.

10    **D.    DEBTOR'S COMPLAINT AND OBJECTION TO CLAIM OF CCV**

11    In response to CCV's Proof of Claim, on December 29, 2009, the Debtor filed a Complaint

12    and Objection to Claim against CCV thereby commencing the Debtor Adversary Proceeding.  The

13    complaint, as amended on February 3, 2010 (the "Debtor Complaint"), alleges that the claim filed

14    by CCV should be reduced because of the purported misconduct of Corus Bank in the

15    administration of the construction loan.  The Debtor thus alleges that CCV's Proof of Claim should

16    be disallowed to the extent of damages purportedly caused by and defenses purportedly resulting

17    from Corus Bank's alleged breaches of its contractual obligations and alleged breaches of the

18    implied covenant of good faith and fair dealing arising from the Loan Agreement and related

19    documents.

20    The Debtor Complaint asserts claims for (1) declaratory relief as to the amount of the CCV

21    claim, (2) offset and recoupment of damages against the loan amount, and (3) equitable

22    subordination of the CCV claim and lien to the claims of creditors holding allowed secured and

23    unsecured claims against the Debtor.  The Debtor Complaint alleges that, as a result of Corus

24    Bank's actions and inactions, the Debtor has been damaged in an amount to be determined, but

25    believed to be in excess of $46,000,000.  The Objection to Claim asserts that CCV's claims should

26    be reduced to the extent of the damages caused by the purported conduct of CCV's predecessor and

27    assignor, Corus Bank.  CCV disputes the allegations in the Debtor Complaint and has asserted

28    various defenses to the claims asserted in the Debtor Complaint, including that, pursuant to

1    FIRREA, 12 U.S.C. § 1821(d)(2)(G)(i)(II), the Debtor is barred from seeking relief from CCV

2    because CCV, as purchaser of assets of Corus Bank from the FDIC as receiver, is not a proper

3    defendant because it did not expressly assume receivership liabilities of Corus Bank.

4        As discussed above, the Debtor filed the Consolidation Motion in the FDIC District Court

5    Proceeding seeking, among other things, withdrawal of the District Court's reference of the Debtor

6    Adversary Proceeding to the Bankruptcy Court and consolidation of the Debtor Adversary

7    Proceeding with the FDIC District Court Proceeding.  In the FDIC District Court Proceeding, the

8    District Court ordered that the Consolidation Motion be stricken for procedural reasons.  On

9    September 9, 2010, in the CCV District Court Proceeding, the Debtor filed the Consolidation

10   Motion, which was denied.

11       As noted above, any and all claims and causes of action belonging to the estate other than

12   the FDIC District Court Proceeding (collectively, such claims and causes of action, the "Estate

13   Actions") shall be settled, discharged, and released on the Effective Date pursuant to the Settlement.

14   **E.    COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED BY THE
15            COMMITTEE**

16       On December 29, 2009, the Committee appointed in this chapter 11 case filed a complaint

17   in this case commencing the Committee Adversary Proceeding.  The Committee's complaint is for

18   (i) declaratory relief regarding validity, priority and extent of liens, and (ii) for equitable

19   subordination.  In the adversary proceeding, the Committee seeks a determination from the Court

20   that the lien rights of mechanics' lien claimants, to the extent that such lien rights are valid and

21   properly perfected, are prior and senior to the lien rights of CCV, and requests an order of the

22   Court ruling that CCV's rights under the Loan Agreement are equitably subordinated to claims of

23   all other creditors of the Debtor for purposes of distribution and/or that any lien securing those

24   rights be transferred to the Debtor's estate.

25       The Committee's complaint asserted that the mechanics' lien claimants are senior in

26   priority to the claim of CCV, based on the fact that substantial work was performed on the

27   construction site prior to the recordation of the Corus Bank lien on July 5, 2007, thus giving

28   priority to all subsequent mechanic's lien claimants, whose lien rights relate back to the

1   commencement of the work of improvement.  The Committee's equitable subordination claim,

2   among other things, arises from the unwarranted delays in funding the construction loan and

3   mismanagement of the construction loan that has injured the rights of the mechanic's lien creditors.

4   This matter was settled by CCV stipulating that mechanics' lien claimants holding validly

5   perfected mechanic's liens have lien rights with priority over CCV's lien.  The Court approved this

6   stipulation and the Committee Adversary Proceeding has been dismissed.

7           **F.      COMPLAINT REGARDING CLAIM AND LIEN OF CCV FILED BY
                      ASTANI CONSTRUCTION, INC.**

8

9           On December 29, 2010, as contemplated by the Cash Collateral Order, Astani Construction,

10  Inc., the Debtor's general contractor for the Concerto Project and a mechanics' lien holder, filed a

11  Complaint against CCV commencing the Astani Construction Adversary Proceeding.  An

12  Amended Complaint was filed on January 27, 2010.   The Amended Complaint alleges claims for

13  relief based on (1) Determination of the Extent, Validity and Priority of the lien asserted by Corus

14  Construction Venture, LLC, (2) Equitable Subordination, (3) Enforcement of Stop Notice Claim, (4)

15  Declaratory Relief re Priority of Stop Notice Claim, and (5) Injunctive Relief.

16          Among other things, Astani Construction, Inc.'s claims arise from its status as a mechanics'

17  lien holder with a claim of approximately $22,550,000 (including the mechanic's lien claims of all

18  of the subcontractors).  Similar to the Complaint filed by the Committee, Astani Construction, Inc.

19  alleges that the mechanics' lien claims are prior to and senior to the secured claim of CCV based

20  on the fact that the work of improvement on the Concerto Project was commenced prior to the

21  recordation of Corus Bank's deed of trust on July 5, 2007.

22          Further, Astani Construction, Inc. alleges that its rights under a recorded stop notice makes

23  its entire $25 million claim senior to the undisbursed construction loan funds including pre-

24  allocated interest payments to be paid and that have already been paid to CCV and to Corus Bank.

25  Finally, Astani Construction, Inc. incorporates the Debtor's damage claim and alleges that it too

26  has been damaged by Corus Bank's conduct and, as a result, CCV's proof of claim should be

27  equitably subordinated to the entire claim of Astani Construction, Inc. and its subcontractors.

28

1    In the Astani Construction Adversary Proceeding, Astani Construction, Inc. filed a motion

2  for order granting provisional relief: (1) to segregate adequate protection payments pending

3  determination of lien status; (2) to disgorge post-petition interest payments; and (3) to disgorge

4  prepetition interest payments.

5    CCV disputes the allegations in the Astani Construction Complaint and has asserted various

6  defenses to the claims asserted in the Astani Construction Complaint, including that Astani

7  Construction voluntarily subordinated its claim to that of CCV.  Pursuant to the Guaranties and

8  pursuant to the FIRREA, 12 U.S.C. § 1821(d)(2)(G)(i)(II), Astani Construction is barred from

9  seeking relief from CCV because CCV, as purchaser of assets of Corus Bank from the FDIC as

10  receiver, is not a proper defendant because it did not expressly assume receivership liabilities of

11  Corus Bank. [Docket No. 48 in the Astani Construction Adversary Proceeding.]

12    As noted above, the Astani Construction Adversary Proceeding and the other Estate

13  Actions shall be settled, discharged, and released on the Effective Date pursuant to the Settlement.

14  **G.    COMPLAINT AGAINST CORUS BANK**

15    On September 4, 2009, prior to the commencement of this chapter 11 reorganization case

16  and prior to Corus Bank's seizure by the Federal government, the Debtor filed a lawsuit against

17  Corus Bank for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3)

18  declaratory relief, and (4) injunctive relief.  The action was originally filed in the Superior Court of

19  the State of California, County of Los Angeles, as the Prepetition Action.   Following the

20  commencement of this chapter 11, case, the Debtor removed the lawsuit to the Bankruptcy Court.

21  The removed action is pending as the Removed Action.

22    In this adversary proceeding, the Court entered an order approving a stipulation between the

23  Debtor and the FDIC (as receiver for Corus Bank) entitled Order Granting Stipulation (1)

24  Substituting the Federal Deposit Insurance Corporation, as Receiver for Corus Bank, N.A.; (2)

25  Extending Deadline to Answer or Otherwise Respond to Complaint; and (3) Staying Adversary

26  Proceeding.  The Court also entered an order approving a stipulation between the FDIC and the

27  Debtor permitting the FDIC to file a motion in the District Court to withdraw the reference of this

28  proceeding to the Bankruptcy Court [Docket No. 28 in the Removed Action].

65

On May 17, 2010, in the FDIC District Court Proceeding, the District Court entered an order withdrawing reference from the Bankruptcy Court [Docket No. 12 in the District Court Proceeding].  On June 8, 2010, the FDIC (as receiver for Corus Bank) issued its notice of disallowance of the claim that the Debtor asserted in the Corus Bank's receivership proceeding.  See Notice of Disallowance of Claim dated June 8, 2010, which is attached to the Unitary Disclosure Statement as Exhibit B-5.  The FDIC subsequently filed an answer to the Debtor's complaint on July 8,2010 [Docket No. 16 in the District Court Proceeding].  Following an unsuccessful, informal settlement conference, on August 31, 2010, the FDIC and the Debtor filed a joint status report in the District Court Proceeding advising the District Court of the parties' intention to move towards discovery and trial [Docket No. 26 in the District Court Proceeding].  By its answer, the FDIC raised among its numerous affirmative defenses that under FIRREA, "Congress withdrew jurisdiction from all courts to take any action that would restrain or affect the [FDIC], as receiver, in the exercise of its statutory powers and functions."  Id. at 12.  Specifically, 11 U.S.C. § 1821(j) prohibits courts from taking action against the FDIC in its receivership capacity, except at the request of the agency's board of directors.

As noted above, the Debtor filed the Consolidation Motion in the CCV District Court Proceeding, seeking withdrawal of the District Court's reference of the Debtor Adversary Proceeding to the Bankruptcy Court and consolidation of the Debtor Adversary Proceeding with the FDIC District Court Proceeding.  The Consolidation Motion was denied.

On the Effective Date, in accordance with the Settlement, the FDIC District Court Proceeding and all rights, claims, and interests asserted therein shall be transferred to the Reorganized Debtor.

**H.      CLAIMS ACQUIRED BY AFFILIATES OF CCV**

During the course of this chapter 11 case, certain affiliates of CCV (collectively, the "CCV Entities") have acquired certain Mechanic's Lien Claims and General Unsecured Claims from time to time.  The claims purchased as of the date of the Unitary Disclosure Statement by the CCV Entities are noted on Exhibits B-1 and B-2 to the Unitary Disclosure Statement.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

## I.   RELIEF FROM STAY MOTION

On July 19, 2010, CCV and certain of its affiliates filed the Relief from Stay Motion to exercise their rights with respect to their collateral under applicable agreements and state law.  As discussed above, in conjunction with the Relief from Stay Motion, the Court appointed Valuation Expert determined that, in his opinion, the market value of the Project in its "as is" condition as of November 1, 2010 was $173,750,000.[16]  The Valuation Expert's appraisal report is available for download at http://www.kccllc.net/Concerto.  The final hearing on the Relief from Stay Motion is scheduled for March 7, 2011.

## J.   COMPLAINT AGAINST GUARANTORS

On July 20, 2010, CCV filed a complaint (the "Guaranty Complaint") against Sonny H. Astani, individually; Marco H. Astani, individually; Sonny H. Astani and Jo Cho, as trustees of The Astani/Cho Living Trust Dated as of April 29, 1999; and Marco Astani, as trustee of The Marco Astani Family Trust Dated as of March 15, 2006 (collectively, the "Guarantor Defendants"), entitled *Corus Construction Venture, LLC v. Sonny Astani, et al., Case Number 2010L008316* in the Circuit Court of Cook County, Illinois (the "State Court Guaranty Proceeding").  Under the Guaranty Complaint, CCV seeks recovery from the Guarantor Defendants based on the Repayment Guaranty.  On August 19, 2010, the Guarantor Defendants filed a notice of removal of the State Court Proceeding to the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court"), under Case No. 10-01668 (the "Illinois Guaranty Proceeding").  On August 26, 2010, the Guarantor Defendants filed their answer to the Guaranty Complaint, in which, among other things, the Guarantor Defendants requested a jury trial [Docket No. 23 in the Illinois Proceeding].  Also on August 26, 2010, the Guarantor Defendants filed a motion to transfer the Illinois Proceeding to the United States Bankruptcy Court for the Central District of California [Docket No. 25 in the Illinois Proceeding].  Based on the docket of the Illinois Guaranty Proceeding, it appears that, on January 25, 2011, the Guarantor Defendants filed a motion to stay proceedings therein for 28 days and that a hearing thereon is scheduled for February 9, 2011.

---

[16] See *infra* note 4.

67

1 Under the Settlement, the Guarantor Defendants shall be released from liability under the

2 Guaranties on the Effective Date.

3    **K.    COMPLAINT REGARDING CLAIM AND LIEN OF FIRE PROTECTION
      GROUP FILED BY ASTANI CONSTRUCTION, INC.**

4

5        On January 28, 2010, Fire Protection Group, Inc. ("FPG") timely filed a proof of claim in

6 the amount of $550,553.79.  [Claim Register No. 103-1.]  On May 21, 2010, FPG filed an amended

7 proof of claim, asserting against the Debtor a claim for mechanic's liens in the amount of

8 $550,552.79 (as amended, the "FPG Claim").

9        On May 21, 2010, the Debtor filed a motion to disallow the FPG Claim [Docket No. 286]

10 (the "FPG Claim Motion").  In the FPG Claim Motion, the Debtor asserted that the claim was

11 miscalculated by FPG and should be reduced from $550,552.79 to $489,731.00.  [FPG Claim

12 Motion at 2.]  On June 11, 2010, Astani Construction filed a joinder to the FPG Claim Motion

13 [Docket No. 435] (the "Joinder").  In the Joinder, Astani Construction alleged that FPG's work was

14 deficient and incomplete.  [Joinder at 2-3.]  On June 14, 2010, the Debtor filed a supplement to the

15 FPG Claim Motion [Docket No. 454] (the "FPG Claim Motion Supplement").  CCV asserts that

16 the sole purpose of the FPG Claim Motion Supplement was to add the relief requested by the

17 Plaintiff in the Joinder.

18        On June 22, 2010, the Court held a hearing on, among other things, the FPG Claim Motion

19 (the "Claims Hearing").  At the Claims Hearing, the Court granted the FPG Claim Motion and

20 denied both the Joinder and the FPG Claim Motion Supplement.

21        On July 8, 2010, FPG transferred its claim to CCV Concerto Lien 4, LLC ("CCV Lien 4"),

22 an affiliate of CCV.  A notice of such claim transfer was filed with the Court on July 12, 2010

23 [Docket No. 516].

24        On August 4, 2010, Astani Construction commenced an adversary proceeding by filing a

25 complaint (the "FPG Complaint") against FPG and CCV Lien 4 to object to FPG's claim.  In the

26 FPG Complaint, Astani Construction makes the same allegations, with more detail, that it had

27 made in the Joinder.  On September 7, 2010, CCV Lien 4 filed a motion to dismiss (the "Motion to

28 Dismiss") the FPG Complaint, and FPG filed a joinder thereto.  On September 16, 2010, Astani

68

1  Construction filed its opposition to the Motion to Dismiss.  A hearing on the Motion to Dismiss

2  was held on September 30, 2010, and CCV Lien 4's motion was denied.  CCV Lien 4 appealed the

3  applicable order.  The parties have settled this matter, subject to Court approval.

4       **L.**     **TREATMENT OF MECHANIC'S LIEN CLAIMS**

5       Pursuant to the Stipulation Between Official Committee of Unsecured Creditors and Corus

6  Construction Venture, LLC Regarding Objection to Plan Confirmation [Docket No. 669] (the

7  "Priority Stipulation"), which the Court approved by an order [Docket No. 685] entered on August

8  13, 2010, CCV stipulated that the CCV Secured Claim is junior to certain valid and properly

9  perfected mechanic's liens encumbering the Loft and certain valid and properly perfected

10  mechanic's liens encumbering Tower I.  Notwithstanding that the Priority Stipulation does not

11  extend to all Mechanic's Lien Claims, the Modified Plan provides for payment in full of all

12  Mechanic's Lien Claims, including Postpetition Interest.  The Plan Proponent expressly reserves its

13  rights to contest the validity and amount of any asserted mechanic's lien claim that is not an

14  allowed claim as of the Effective Date.

15       **M.**     **PLANS AND DISCLOSURE STATEMENTS**

16       The Debtor initially filed a Disclosure Statement and Plan of Reorganization in this case on

17  January 13, 2010.  A hearing on that Disclosure Statement was initially set for February 18, 2010.

18  Prior to that hearing, the Court issued a tentative ruling denying approval of the initial Disclosure

19  Statement.  Thereafter, the Debtor filed a First Amended Disclosure Statement and Plan of

20  Reorganization on March 17, 2010.  A continued Disclosure Statement hearing was set for April 22,

21  2010.  The Court approved the Disclosure Statement as containing adequate information and an

22  initial hearing on confirmation of the Debtor's prior Plan was set for August 6, 2010.  At a

23  continued hearing on confirmation of the Debtor's prior plan, held on August 27, 2010, the Court

24  denied confirmation of the Debtor's prior plan.  In September 2010, CCV filed the CCV Plan and

25  the Debtor filed the GTS Plan.  Under the Settlement, the Debtor has consented to and supports

26  confirmation of the CCV Plan, as modified by this Modified Plan.

27  **XIX.**   **TAX CONSEQUENCES OF PLAN**

28            1.     **INTRODUCTION**

1    The following is a summary of certain Federal income tax consequences of the Modified

2  Plan. This summary is for informational purposes only and is based on the Internal Revenue Code

3  of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, and

4  administrative and judicial interpretations and practice, all as in effect on the date of the Unitary

5  Disclosure Statement and all of which are subject to change or differing interpretations, with

6  possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a

7  number of areas, substantial uncertainty may exist with respect to some of the tax consequences

8  described herein. No opinion of counsel has been obtained as to any of the tax consequences of the

9  Modified Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect

10  to any statement or conclusion in this summary. No representations are being made regarding the

11  particular tax consequences of the confirmation or implementation of the Modified Plan as to any

12  creditor or equity interest holder and there can be no assurance that the IRS would not assert, or

13  that a court would not sustain, positions different from those discussed herein.

14    This summary assumes creditors and equity interest holders hold their claims or interests as

15  capital assets for Federal income tax purposes (generally property held for investment). The

16  following discussion does not address foreign, state, or local tax consequences of the Modified

17  Plan, nor does it purport to address the Federal income tax consequences of the Modified Plan to

18  special classes of taxpayers (e.g., banks and certain other financial institutions, insurance

19  companies, tax-exempt organizations, governmental entities, partnerships or other pass-through

20  entities, persons whose functional currency is not the U.S. dollar, foreign persons, dealers in

21  securities or foreign currency, employees, and persons who received their claims pursuant to the

22  exercise of an employee stock option or otherwise as compensation). Furthermore, the following

23  discussion does not address Federal taxes other than income taxes.

24    Creditors and equity interest holders are urged to consult with their tax advisor regarding

25  the tax consequences to them of the transactions contemplated by the Modified Plan, including

26  Federal, state, local, and foreign tax consequences.

27    TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, CREDITORS AND EQUITY

28  INTEREST HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF

1  FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS MODIFIED PLAN IS

2  NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF

3  CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE

4  IMPOSED ON THEM UNDER THE TAX CODE, (B) SUCH DISCUSSION IS WRITTEN IN

5  CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR

6  MATTERS DISCUSSED HEREIN, AND (C) CREDITORS AND EQUITY INTEREST

7  HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES

8  FROM AN INDEPENDENT TAX ADVISOR.

9         2.      FEDERAL INCOME TAX CONSEQUENCES TO A DEBTOR

10              (a)      PASS-THROUGH TAX ENTITY

11        The Debtor is a California limited liability company.  An LLC is a hybrid business entity

12  having certain characteristics of both a corporation and a partnership.  The primary characteristic

13  an LLC shares with a corporation is limited liability, and the primary characteristic it shares with a

14  partnership is the availability of pass-through income taxation provided that an election has not

15  been made to be taxed as a corporation.  In general, for Federal income tax purposes, the partners

16  of a partnership, and not the partnership itself, are subject to taxation under the Tax Code on items

17  of income, gain, loss or deduction of the partnership.  For purposes of the discussion herein it is

18  assumed that the Debtor is treated as a partnership for Federal income tax purposes.  Section 5 of

19  the Debtor's Second Amended and Restated Operating Agreement, effective as of March 15, 2007,

20  provides that net profits and net losses of the Debtor shall be allocated to the members (equity

21  interest holders) of the Debtor in proportion to the percentage of their respective equity interests in

22  the Debtor.

23              (b)      REDUCTION OF DEBTOR'S INDEBTEDNESS

24        Any amount of potential discharged indebtedness for Federal income tax purposes will be

25  referred to herein as a "Debt Discharge Amount."  In general, the Tax Code provides that a

26  taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its

27  gross income in the taxable year of discharge to the extent that the Debt Discharge Amount

28  exceeds any consideration given for such discharge.  No income from the discharge of

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.  In the event that any action taken pursuant to the Modified Plan results in the discharge of indebtedness of the Debtor, any resulting cancellation of indebtedness ("COD") income to the Debtor from such discharge will pass-through the Debtor and will be allocable solely to the members of the Debtor (the equity interest holders).

Generally, a taxpayer recognizes COD income upon satisfaction of its outstanding indebtedness for less that its adjusted issue price.  The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent.  Although while a debtor is either in bankruptcy or insolvent, section 108 of the Tax Code provides for the exclusion of COD income generally from gross income, such rules apply at the partner, rather than the partnership level.  Consequently, the Debtor will not be entitled to exclude COD income from gross income, but instead is required to pass such COD income through to its members and the extent to which that income might be excluded by a member will be determined by the particular tax attributes of the member.

Accordingly, the members of Debtor will be required to prepare and file income tax returns reporting transactions occurring under the Modified Plan.

3.      TAX CONSEQUENCES TO CREDITORS

The tax consequences of a chapter 11 plan's implementation to a creditor may depend on many factors, including the type of consideration received by the creditor in exchange for its claim, whether the creditor reports income on the cash or accrual method, whether the creditor receives consideration in more than one tax year of the creditor, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction.  The tax consequences upon the receipt of cash, debt instruments or other property allocable to interest are

72

1  discussed below under "Receipt of Interest." Creditors are urged to consult with their tax advisor to

2  properly assess the tax consequences in their particular situation.

3  (a)    CLAIMS SATISFIED WITH PAYMENT.

4  (i)    GAIN/LOSS ON EXCHANGE

5  As a general rule, a creditor whose existing claims are satisfied with payments under a

6  chapter 11 plan or with the receipt of equity interests in a reorganized debtor will recognize gain or

7  loss on the actual or constructive exchange of such creditor's existing creditor claims (other than

8  claims for accrued interest) for the consideration received equal to the difference between (i) the

9  "amount realized" in respect of such claims, and (ii) the creditor's tax basis in such claims.  The

10  "amount realized" will generally be equal to the sum of the cash received plus the fair market value

11  of the other consideration received.

12  (ii)    TAX BASIS AND HOLDING PERIOD OF ITEMS
         RECEIVED

13

14  Pursuant to Tax Code section 1223, the aggregate tax basis in the items received or deemed

15  received by a creditor will generally equal the amount realized in respect of such items (other than

16  amounts allocable to any accrued interest).  The holding period for items received in the exchange

17  will generally begin on the day following the exchange.

18  (iii)    DETERMINATION OF CHARACTER OF GAIN

19  The character of any gain or loss as capital gain or loss or as ordinary income or loss will be

20  determined by a number of factors, including the tax status of the creditor, the nature of the claim

21  in the creditor's hands, the amount of accrued interest, whether the claim was purchased at a

22  discount, and whether and to what extent the creditor has previously claimed a bad debt deduction

23  with respect to the claim.  Any such capital gain or loss will be long-term capital gain or loss if the

24  creditor's holding period for the claim on the Effective Date is more than one year.  The

25  deductibility of capital losses is subject to certain limitations.  The Federal income tax

26  consequences of the receipt of cash allocable to accrued interest and market discount are

27  summarized below.

28  (b)    RECEIPT OF INTEREST

73

1   As a general rule, income attributable to accrued but unpaid interest will be treated as

2   ordinary income, regardless of whether the creditor's existing claims are capital assets in its hands.

3   A creditor who, under its accounting method, was not previously required to include in income

4   accrued but unpaid interest attributable to existing claims, and who exchanges its interest claim for

5   cash or other property pursuant to a chapter 11 plan, will generally be treated as receiving ordinary

6   interest income to the extent of any consideration so received allocable to such interest, regardless

7   of whether that creditor realizes an overall gain or loss as a result of the exchange of its existing

8   claims.  A creditor who had previously included in income accrued but unpaid interest attributable

9   to its existing claims will generally recognize a loss to the extent such accrued but unpaid interest

10  is not satisfied in full.  For purposes of the above discussion, "accrued" interest means interest

11  which was accrued while the underlying claim was held by the creditor.

(c)     OTHER TAX CONSIDERATIONS

(i)     MARKET DISCOUNT

14  In general, if a claim were acquired by a creditor on the secondary market at a discount to

15  its stated principal amount, then such claim may be subject to the "market discount" rules of the

16  Tax Code. (Certain obligations are excluded from the operation of this rule, such as obligations

17  with a fixed maturity date not exceeding one year from the date of issue, installment obligations to

18  which Tax Code section 453B applies and, possibly, demand instruments).

19  Holders in whose hands a debtor's obligations are market discount bonds may be required

20  to treat as ordinary income any gain recognized upon the exchange of such obligations to the extent

21  of the market discount accrued during the holder's period of ownership, unless the holder has

22  elected to include such market discount in income as it accrued.

(ii)    WITHHOLDING

24  The reorganized debtor will, as a general rule, withhold any amounts required by law from

25  payments made, or deemed to be made, to creditors.  In addition, creditors may be required to

26  provide general tax information in order to receive distributions pursuant to a chapter 11 plan.

27  THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

28  CONSEQUENCE TO EACH CREDITOR.  FURTHERMORE, THE TAX CONSEQUENCES OF

74

1  A PLAN MAY BE COMPLEX AND, IN SOME CASES, UNCERTAIN.  THEREFORE, IT IS

2  IMPORTANT THAT EACH CREDITOR CONSULT WITH HIS, HER, OR ITS TAX ADVISOR

3  REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE

4  MODIFIED PLAN.

5         4.        TAX CONSEQUENCES TO EQUITY HOLDERS

6         For U.S. federal income tax purposes, equity interest holders will be allocated their

7  distributive share of items of income (including any COD income), gain, loss, deduction, and credit

8  from the Debtor.  Such items will affect the basis of the equity interest holders' membership

9  interests in the Debtor.  Even if the equity interest holders receive no cash distributions under the

10  Modified Plan, they may be deemed for Federal partnership tax purposes to have received a

11  constructive distribution from the Debtor pursuant to section 752 of the Tax Code, relating to a net

12  decrease in a share of liabilities of the Debtors.  Such constructive distributions may reduce the

13  amount of any loss or substantially increase the amount of any gain recognized by the equity

14  interest-holders.

15         THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX

16  CONSEQUENCE TO EACH HOLDER OF AN EQUITY INTEREST.  FURTHERMORE, THE

17  TAX CONSEQUENCES OF A PLAN MAY BE COMPLEX AND, IN SOME CASES,

18  UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN EQUITY

19  INTEREST OR EQUITY INTEREST RELATED CLAIM CONSULT WITH HIS, HER, OR ITS

20  TAX ADVISOR REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN

21  EQUITY INTEREST AS A RESULT OF THE MODIFIED PLAN.

22  **XX.**     **EFFECT OF CONFIRMATION OF PLAN**

23         **A.**     **GENERAL COMMENTS**

24         The provisions of a confirmed plan bind the Debtor, any entity acquiring property under

25  that plan, and any creditors and equity interest-holders of the Debtor, even those who do not vote to

26  accept the plan.

27

28

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

1   Subject to the terms of this Modified Plan, the CCV Project Assets shall be transferred to

2   900 FSM free and clear of any and all liens, claims, interests, and encumbrances other than the

3   Permitted Encumbrances.

4   The automatic stay is lifted upon confirmation as to property of the estate.  However, the

5   stay continues to prohibit collection or enforcement of pre-petition claims against the Debtor or the

6   Debtor's property until the date the Debtor receives a discharge, if any.  The Debtor will be

7   discharged pursuant to this Modified Plan and, upon occurrence of the Effective Date, the Debtor's

8   pre-confirmation obligations and claims relating to such obligations shall be replaced by the

9   Debtor's obligations under the Modified Plan, except as otherwise specified in the Court's order

10  confirming this Modified Plan.

11
12  **B.      DISCHARGE OF LIABILITY FOR PAYMENT OF DEBTS; STATUS OF
          LIENS; EQUITY SECURITY HOLDERS**

13  Unless the Debtor is not entitled to receive a discharge pursuant to 11 U.S.C. 1141(d)(3),

14  the debtor may obtain a discharge only upon specific order of the Court.  Notwithstanding the

15  foregoing, the confirmation of the Modified Plan does not discharge the Debtor from any debt of a

16  kind specified in 11 U.S.C. § 523(2)(A) - (B) that is owed to a domestic governmental unit, or

17  owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any

18  similar State Statutes, or tax or custom duties with respect to which the debtor made a fraudulent

19  tax return or willfully attempted in any manner to evade or to defeat tax or custom duties.

20  **C.      MODIFICATION OF THE MODIFIED PLAN**

21  The Plan Proponent may modify the Modified Plan pursuant to 11 U.S.C. § 1127.

22  **D.      POST-CONFIRMATION CAUSES OF ACTION**

23  To the best of the Plan Proponent's knowledge, the estate has the following causes of action:

24  the Debtor Adversary Proceeding (which is the subject of the CCV District Court Proceeding), the

25  FDIC District Court Proceeding, and the Astani Construction Adversary Proceeding.  In

26  accordance with the Settlement, the Estate Actions, including, without limitation, the Debtor

27  Adversary Proceeding and the Astani Construction Adversary Proceeding, shall be settled,

28  discharged, and released on the Effective Date.  The FDIC District Court Proceeding (which is not

76

1   an Estate Action) and all rights, claims, and interests asserted therein shall be transferred to the

2   Reorganized Debtor.

3        **E.**     **DISSOLUTION OF COMMITTEE**

4        Following the Effective Date, the Committee shall be deemed dissolved and disbanded and

5   the duties of the Committee shall terminate.

6        **F.**     **POST-CONFIRMATION OPERATIONS**

7        Under the Modified Plan, following the Effective Date, the Debtor will have no operations

8   as the CCV Project Assets will be transferred to 900 FSM hereunder.  The Responsible Parties will

9   address Administrative Claims in accordance with the terms of the Settlement and this Modified

10  Plan.

11       **G.**     **EXECUTION AND DELIVERY OF DOCUMENTS**

12       Following the Effective Date, the Debtor, Astani Construction, and the Astani Parties shall

13  reasonably cooperate with CCV and shall take such actions as are necessary or appropriate to effect

14  the provisions and purposes of the Modified Plan.  Without limiting the foregoing, the Debtor,

15  Astani Construction, and the Astani Parties shall execute all documents necessary or appropriate to

16  fully transfer and convey to 900 FSM all of the Debtor's right, title, and interest in and to the CCV

17  Project Assets, including, but not limited to, the Project Materials, and all affidavits, documents,

18  instruments of conveyance, and other agreements as CCV determines are necessary or appropriate.

19  Under the Settlement, CCV expressly reserved its rights to enforce the obligations of the Debtor,

20  Astani Construction, and the Astani Parties under the Settlement, including, without limitation,

21  under section 1142 of the Bankruptcy Code, and to seek redress against such parties for any failure

22  satisfy such obligations.  The Settlement further provides that nothing therein is intended to or shall

23  be deemed to waive, and the Debtor, Astani Construction, and the Astani Parties expressly reserve,

24  their rights to enforce the obligations of CCV under the Settlement, including, without limitation,

25  under section 1142 of the Bankruptcy Code, and to seek redress against such party for any failure

26  to satisfy such obligations.

27

28

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW

**H.    FINAL DECREE**

Once the Modified Plan has been consummated, a final decree may be entered upon motion of the Debtor or the Plan Proponent, but the Plan Proponent shall not be obligated to file any such motion. The effect of the final decree is to close the bankruptcy case. After such closure, a party seeking any type of relief relating to a consummated plan provision can seek such relief in a state court of general jurisdiction.

**XXI.    DECLARATION IN SUPPORT OF MODIFIED PLAN**

I, Seth Hewitt, the Senior Vice President of Asset Management at ST Residential, LLC (formerly known as CCV Managing Member, LLC), which is the managing member of CCV, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

1.    Van C. Durrer II, Ramon M. Naguiat, and Matthew T. Lim of Skadden, Arps, Slate, Meagher & Flom LLP, CCV's bankruptcy counsel, are the individuals who participated in the preparation of this document on behalf of CCV.

2.    The source of Exhibit B-3 to the Unitary Disclosure Statement is CCV. Except as otherwise indicated, the source of all other financial data is the Debtor, Astani Construction, and Astani Enterprises, and such financial data was taken from exhibits originally filed with the Denied Debtor Plan.

3.    I have reviewed the foregoing Modified Plan. All facts and representations asserted on behalf of CCV in the Modified Plan are true to the best of my knowledge. The facts and representation asserted by the Debtor are based on the Debtor Denied Plan and/or the Unitary Disclosure Statement.

4.    The names of the persons who prepared the financial documents supplied by the Debtor, Astani Construction, and Astani Enterprises are listed in the Denied Debtor Plan.

5.    From the Denied Debtor Plan, it appears that the accounting method used to prepare the financial documents supplied by the Debtor, Astani Construction, and Astani Enterprises is a cash-basis approach.

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC

617524.17-Los Angeles Server 1A - MSW

1        6.    James H. Pike and Michelle Kauffman of Cushman & Wakefield Western, Inc.

2    prepared CCV's valuation reports (available at http://www.kccllc.net/Concerto) and supplied

3    valuation information and conclusions used in the CCV Plan and this Modified Plan.

4    

5    Dated: ____February____ __16__, 2011    _____

6    PRESENTED BY:    Seth Hewitt

7    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

8    

9    By:_____
    Van C. Durrer II

10    Counsel for Corus Construction Venture, LLC

11    

12    

13    

14    

15    

16    

17    

18    

19    

20    

21    

22    

23    

24    

25    

26    

27    

28    

Modified Plan of Reorganization Proposed by Corus Construction Venture, LLC
617524.17-Los Angeles Server 1A - MSW